**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | Case Nos. 12-40783 (CEC) |
| | 12-40782 (CEC) |
| | 12-40784 (CEC) |
| | 12-40785 (CEC) |
| | 12-40786 (CEC) |
| | 12-40787 (CEC) |
| | 12-40788 (CEC) |
| | 12-40789 (CEC) |
| | 12-40790 (CEC) |
| Debtors. | Jointly Administered |

DECISION

APPEARANCES:

Jonathan Henes, Esq.
Michael B. Slade, Esq.
Ryan Bennett, Esq.
Christopher T. Greco, Esq.
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Counsel for the Debtors

Jason Teele, Esq.
Sharon Levine, Esq.
Cassandra M. Porter, Esq.
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, New Jersey 07068
Counsel for the Official Committee of Unsecured Creditors

Andrea B. Schwartz, Esq.
U.S. Department of Justice
33 Whitehall Street, 21st Floor
New York, New York 10004
Counsel for Tracy Hope Davis, United States Trustee for Region 2

CARLA E. CRAIG
Chief United States Bankruptcy Judge

This matter comes before the Court on the motion (the "Motion") of Global Aviation

Holdings, Inc. and its affiliated debtors (collectively, the "Debtors") for the entry of an order

approving a key employee retention plan (the "KERP") pursuant to §§ 363(b) and 503(c)(3) of

Title 11 of the United States Code (the "Bankruptcy Code").[1]  The United States Trustee for

Region 2 (the "UST") and the Official Committee of Unsecured Creditors (the "Committee")

filed objections to the Motion, arguing that the Debtors are improperly seeking to pay bonuses (i)

to insiders without satisfying the requirements set forth in § 503(c)(1) or (ii) to the extent the

KERP recipients are non-insiders, without establishing that the proposed bonus payments are

"justified by the facts and circumstances of the case" as required by § 503(c)(3).  An evidentiary

hearing was held on July 11, 2012.  For the reasons set forth below, the employees eligible to

receive compensation under the KERP are not insiders of the Debtors, and because the Debtors

have established that the KERP is "justified by the facts and circumstances of the case," the

objections of the UST and the Committee are overruled and the Motion is granted in its entirety.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334(b), and the

Eastern District of New York standing order of reference dated August 28, 1996.  This matter is

a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(B) and 157(b)(2)(M).  This

Decision constitutes the Court's findings of fact and conclusions of law to the extent required by

Rule 7053 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

On February 5, 2012 (the "Petition Date"), the Debtors filed petitions for relief under

chapter 11 of the Bankruptcy Code.  The Debtors operate two airlines: North American Airlines,

Inc., ("North American") and World Airways, Inc. ("World").  North American's headquarters is

---

[1] Unless otherwise indicated, statutory citations herein are to provisions of Title 11 of the United States Code.

currently located at JFK International Airport in Jamaica, New York, while World's headquarters

is located in Peachtree City, Georgia.  The Debtors, as part of their reorganization strategy, have

decided to consolidate their operations by relocating North American's operations from JFK

International Airport to Peachtree City, Georgia.  According to the Debtors, their business plan

contemplates the completion of this relocation process by August 31, 2012.

On June 15, 2012, the Debtors filed the Motion[2] seeking Court approval of the KERP

under which the Debtors would pay bonuses to five employees of North American: 1) the

Director of Safety; 2) the Vice President of Operations; 3) the Chief Pilot; 4) the Senior Director

of Maintenance; and 5) the Chief Inspector (collectively, the "KERP Employees").  The

proposed bonus payments under the KERP are structured as a percentage of each KERP

Employee's base salary and in accordance with the Debtors' pre-petition annual bonus plan.  The

proposed payouts are intended to ensure that each of the KERP Employees remains with the

Debtors through the relocation of North American's operations to Peachtree City.  Set forth

below is the amount of the bonus that each KERP Employee will receive upon the approval by

the Federal Aviation Administration (the "FAA") of the transfer of North American's operations

to Georgia:

- Director of Safety:  $18,050
- Vice President, Flight Operations:  $50,696
- Chief Pilot:  $29,355
- Senior Director of Maintenance: $15,750
- Director, Quality Assurance and Projects: $23,180

In the aggregate, the Debtors seek to pay the KERP Employees bonuses totaling

$137,031.

---

[2] [Docket No. 436]

In support of the Motion, the Debtors filed the declaration of William A. Garrett, the Executive Vice President and Chief Financial Officer of the Debtors.  In his declaration, Mr. Garrett explains that the relocation of North American is contingent on the FAA making a determination that North American's operations, maintenance, and safety departments are functioning consistently in Peachtree City as they were functioning at JFK International Airport. (Dec. at ¶ 5.)[3]  Mr. Garrett asserts that the retention of the KERP Employees is critical to securing FAA approval because the KERP Employees oversee the operations, maintenance, and safety departments of North American. (Id. at ¶ 6.)  The Debtors point out that the FAA regulations, codified at 14 C.F.R. § 119.65, specifically mandate that a commercial airplane operator "have qualified personal serving full time" in each of the five positions filled by the KERP Employees.  (Id. at ¶5.)  Because the FAA considers the tenure of the employees who fill these positions and the extent and nature of their preexisting relationships with the FAA in determining if the personnel are qualified, the Debtors believe that if even one of the KERP Employees were to leave North American in the coming weeks, FAA approval of the relocation would be delayed beyond August 31, 2012.  (Id. at ¶ 6.)  The Debtors point out that the lease costs alone at the JFK International Airport location amount to $132,000 per month, approximately the total amount of the proposed payments under the KERP.  (Supp. Dec. at ¶ 9.) Any delay, therefore, will result in a loss of cost savings that exceeds the proposed bonuses to be paid to the KERP Employees.

On July 3, 2012, the Committee filed an objection to the Motion.[4]  The Committee's objection is two-fold.  First, the Committee disputes the Debtors' characterization of the KERP

---

[3] "Dec." refers to the Declaration of William A. Garrett, dated June 15, 2012.  "Supp. Dec." refers to the Supplemental Declaration of William A. Garrett, dated July 9, 2012.

[4] [Docket No. 473]

Employees as "non-insiders."  The Committee asserts that the KERP Employees have oversight

authority over areas of North American's corporate policy consistent with the status of insiders.

The Committee contends that these proposed bonuses must therefore be reviewed under §

503(c)(1), which requires evidentiary showings that the Debtors have not made.  Second, the

Committee argues that even if the KERP Employees are determined not to be insiders, the

Debtors have still not met the standard for permissible bonus payments outside the ordinary

course of business set forth in § 503(c)(3).

The UST also filed an objection to the Motion on July 3, 2012.[5]  The UST argues that the

Debtors have failed to provide sufficient evidence to establish that one of the KERP Employees–

the Director of Safety– is not an insider of the Debtors.  The UST further argues that, whether or

not the Director of Safety is an insider of the Debtors, the Debtors have not carried their burden

of proof to demonstrate that the proposed bonuses to the KERP Employees are permissible under

§ 503(c)(3).

On July 9, 2012, in response to the Committee and the UST's objections, the Debtors

filed an omnibus reply[6] arguing that, under applicable case law, the KERP Employees are not

insiders and that the decision to proceed with the KERP is within their business judgment.  With

the omnibus reply, the Debtors also filed a supplemental declaration by Mr. Garrett.

On July 11, 2012, a hearing was held on the Motion, at which Mr. Garrett testified in

further support of the Motion.

## DISCUSSION

The Motion must be evaluated under the standards set forth in § 503(c), as enacted by the

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119

---

[5] [Docket No. 474]

[6] [Docket No. 480]

Stat. 23.  The threshold inquiry is whether all, or any, of the KERP Employees are insiders of the

Debtors such that the proposed bonus payments under the KERP fall within the purview of §

503(c)(1).

A.      Insider Analysis

        If a KERP Employee is an insider of the Debtors, then he or she is precluded from

receiving a retention bonus unless the strict requirements outlined in § 503(c)(1) are met.  That

section prohibits the payment of a retention bonus to an insider unless: (i) the insider has a bona

fide job offer that pays at least the same rate of compensation, (ii) the insider performs "services

. . .[that] are essential to the survival of the business," and (iii) the proposed amount of bonus for

the insider is (x) not greater than an amount equal to 10 times the mean amount of any bonuses

paid to nonmanagement employees during the current calendar year or (y) if no such bonuses

were paid to nonmanagement employees during the current calendar year, not greater than an

amount equal to 25 percent of the amount of any bonuses paid to the insider in the preceding

calendar year.  11 U.S.C. § 503(c)(1).

        Congress has built by design "a set of challenging standards" and "high hurdles" for the

payment of retention bonuses to insiders.  In re Global Home Prods., LLC, 369 B.R. 778, 784-85

(Bankr. D. Del. 2007).  Here, the Debtors concede that none of the KERP Employees has a bona

fide job offer.  (Tr. 147: 9-12.)[7]  Accordingly, a finding that the KERP Employees are insiders

would be fatal to the Motion.  If, on the other hand, the KERP Employees are not insiders, the

proposed bonuses under the KERP must be evaluated under § 503(c)(3), which prohibits

payments to employees outside the ordinary course which are "not justified by the facts and

circumstances of the case."

---

[7] "Tr." refers to the transcript of the hearing held on July 11, 2012.  Citations to the transcript are by page number
and line.

With respect to a debtor that is a corporation, the Bankruptcy Code's definition of an "insider" includes a:

       (i) director of the debtor;

       (ii) officer of the debtor;

       (iii) person in control of the debtor;

       (iv) partnership in which the debtor is a general partner;

       (v) general partner of the debtor; or

       (vi) relative of a general partner, director, officer, or person in control of the debtor.

11 U.S.C. § 101(31)(B).

Neither "officer" or "director" is defined in the Bankruptcy Code. In re Borders Group, Inc., 453 B.R. 459, 468 (Bankr. S.D.N.Y. 2011). However, courts have relied on dictionary definitions of these terms. As the court explained in Borders Group, a director is "an individual who sits on the board of directors" of a debtor. Id. (citing Rupp v. United Security Bank (In re Kunz), 489 F.3d 1072, 1077 (10th Cir. 2007)). An officer "is defined as a 'person elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary, or treasurer.'" Id. (citing BLACK'S LAW DICTIONARY 1193 (9th ed. 2009)).

The fact that some of the KERP Employees have the word "director" in their titles does not make them insiders. The label an employer chooses to attach to a position is not dispositive for purposes of insider analysis because "[c]ompanies often give employees the title 'director' or 'director-level' but do not give them decision-making authority akin to an executive." Id. at 469. See also In re Foothills Texas, Inc., 408 B.R. 573, 579 (Bankr. D. Del 2009) (holding that the "mere title of a person does not end the inquiry."). Likewise, titles such as "vice president" are not determinative. For example, in In re NMI Systems, Inc., 179 B.R. 357, 370 (Bankr. D.D.C. 1995), the court found that a vice president was not an insider because he was conferred the title

"for purposes of marketing" only and as a direct report of another vice president, he was not "in the inner circle making the company's critical financial decisions."

On the other hand, a person can be found to be an insider even if that person does not hold a position enumerated in § 101(31)(B).  The statutory definition "is merely illustrative and the term insider should be flexibly applied on a case by case basis." In re 9281 Shore Road Owners Corp., 187 B.R. 837, 853 (E.D.N.Y. 1995).  An employee's "[i]nsider status can also be determined on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs."  Borders Group, 453 B.R. at 469. To find that a person not listed in §101(31)(B) is an insider, the Borders Group court held, a court must determine that such a person has "at least a controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." 453 B.R. at 469 (internal quotation marks and citation omitted).  See also In re Velo Holdings Inc., No. 12–11384, 2012 WL 2015870, at *5, (Bankr. S.D.N.Y. Jun. 06, 2012) (applying the same test).

The record clearly establishes that the KERP Employees are not insiders as defined in § 101(31)(B).  As an initial matter, none of the KERP Employees is a member of the board of the Debtors or participates in corporate governance.  (Tr. 72:4-15.)  They are not directors as that term is understood in the context of § 101(31)(B).  Like the corporate employees in Borders Group, most of whom had the word "director" attached to their titles, the Directors of Safety, Maintenance and Operations have none of the responsibilities of a corporate director.  None of the KERP Employees attend board meetings, and they generally do not report to the board.  (Tr. 72:4-12.)  Nor do the KERP Employees qualify as "officers" of the Debtors.  The record is clear

that the board did not appoint or elect the KERP Employees to the positions they hold.  (Tr. 38:15-18.)

Nor are the KERP Employees "person[s] in control of the debtor" within the meaning of § 101(31)(B)(iii).  The Debtors' pay scale has twenty-two different grades.  Grade 1 through Grade 5 consist of the Debtors' senior executives.  The pay grades of the KERP Employees fall below these top grades.  (Tr. 71:1-10.)  None of the KERP Employees receive equity of the Debtors as part of their compensation packages.  Only the Director of Operations owns a small number of restricted shares issued by the Debtors.  (Tr. 71:16–72:3.)

The organizational structure of North American places the KERP Employees at least two levels down from senior management.  Four of the five KERP Employees report to the Chief Operating Officer of North American, who in turn reports to the Debtors' senior management team, including the Chief Executive Officer, the President, the Chief Commercial Officer, the Chief Financial Officer and the General Counsel.  (Dec. at ¶ 10.)  Additionally, the Chief Pilot reports to the Vice President, Flight Operations, who then reports to the Chief Operating Officer of North American.  (Id.)  The Director of Safety has the ability to report directly to the board on matters pertaining to safety, as required by FAA regulations.  (Id.; Tr. 39:17-20.)  However, he does not report to the board in the "ordinary course."  (Tr. 148:24-25;149:1-3.)  He generally reports to the Chief Operating Officer of North American.  (Dec. at ¶ 10.)  The Director of Safety is not an insider for purposes of § 101(31)(B) solely because FAA regulations require him to report to the board on safety issues.

None of the KERP Employees have discretionary control over substantial budgetary amounts.  Most of the items in the budgets for which the KERP Employees are responsible fall under the non-discretionary category of salaries for existing employees, which are payments over

which the KERP Employees have no control.  (Tr. 91:1-94:13; 139:15–140:7.)  Although the

Director of Maintenance has some discretion to expend funds for emergency repairs, this

discretion is limited.  (Tr. 94:14-96:1.)  Mr. Garrett testified that, although the Director of

Maintenance would have discretion to approve expenditures for day-to-day maintenance, larger

expenditures would require supervisory approval.  (Tr. 95:14-17.)  ("[I]f he has to replace an

engine he could not make that decision.  He could make a recommendation whether we lease or

buy.  There's a huge financial analysis because of that.")  Importantly, none of the KERP

Employees had any role in the development of the KERP, nor did they have any authority to do

so.  (Tr. 96:6-16.)

     The KERP Employees are tasked with writing and updating manuals required by the

FAA for safety, maintenance and flight operations.  This process consists of interpreting FAA

guidelines for application to North American's operations, and those manuals must be approved

by the FAA, and the Chief Operating Officer of North American.  (Tr. 73:11-18; 88:23-89:7.)

This work with respect to manuals does not constitute setting corporate policy for North

American.  It rather reflects responsibility for the "day-to-day operations" of the airline

consistent with the status of mid-ranking non-insider employees.  Borders Group, 453 B.R at

469.

     The legislative history of § 101(31)(B) makes it clear that Congress was concerned with

situations where "[a]n insider . . . has a sufficiently close relationship with the debtor that his

conduct is made subject to closer scrutiny than those dealing at arms length with the debtor."

9281 Shore Road Owners Corp., 187 B.R. at 853 (quoting H.R.Rep. No. 595, 95th Cong., 1st

Sess. 311–314 (1977)).  In the context of enacting the limitations set forth in § 503(c), Congress

was responding to an "inherently unseemly" public perception that chapter 11 bonus programs

"ha[d] been used to lavishly reward-at the expense of the creditor body-the very executives

whose bad decisions or lack of foresight were responsible for the debtor's financial plight." In re

U.S. Airways, Inc., 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).

Based on the record, it is clear that none of the KERP Employees have authority to make

company-wide or strategic decisions.  None of the KERP Employees "exercise[s] sufficient

authority over the debtor as to unqualifiably dictate corporate policy and the disposition of

corporate assets."  Borders Group, 453 B.R at  469.  Given their intermediate positions in the

corporate chain of command, their distance from the board and senior management, and the

limited extent of their corporate authority, it is apparent that none of the KERP Employees are

insiders under § 101(31)(B).

B.    Analysis under § 503(c)(3)

Given that § 503(c)(1) is inapplicable because the KERP Employees are not insiders, the

KERP must be analyzed under § 503(c)(3), which governs bonus payments to employees that are

outside of the ordinary course.  Such payments are permitted only if they are "justified by the

facts and circumstances of the case." 11 U.S.C. § 503(c)(3).

The appropriate standard for determining whether an outside the ordinary course

compensation proposal is justified by the facts and circumstances of a given case was articulated

in In re Dana Corp., 358 B.R. 567, 576-77 (Bankr. S.D.N.Y. 2006) ("Dana II") as follows:

- whether the plan has a reasonable relationship to the results to be obtained;
- whether the cost is reasonable in light of the debtor's assets, liabilities, and earnings potential;
- whether the scope of the plan is fair and reasonable or discriminates unfairly;
- whether the plan comports with industry standards;
- whether the debtor undertook due diligence in investigating the need for a plan, the employees that should be incentivized, market standards; and

- whether the debtor received independent counsel in performing due diligence in creating and authorizing the incentive compensation.

Applying these factors to the KERP demonstrates that the proposed bonuses are justified by the facts and circumstances of this case.

1.    *Relationship Between the KERP and the Results to be Obtained*

The Debtors have sufficiently demonstrated that a reasonable relationship exists between the KERP and the results the Debtors seek to obtain from it.  The purpose of paying bonuses to the KERP Employees is to ensure that they remain with the Debtors until the FAA has approved the transfer of the operations of North American to Georgia.  This is important because of the role the KERP Employees play in obtaining FAA approval of North American's relocation.  The KERP Employees fill the five positions specifically mandated by FAA regulation § 119.65, and oversee and manage the systems that must be approved by the FAA as a prerequisite to the relocation of North American's operations to Georgia.  (Dec. at ¶ 5.)  As a result, the KERP Employees have been working on the relocation as North American's "key liaisons to the FAA" since shortly after the Petition Date.  (Supp. Dec. at ¶ 9.)  Mr. Garrett testified that "[t]he FAA relies heavily on the relationship with the KERP [Employees] in determining approval of operational relocation."   (Id. at ¶ 9.)

Moreover, Mr. Garrett testified that, given the specific qualifications set forth in FAA regulations for each of the five positions filled by the KERP Employees, hiring replacements would take "longer than a month," requiring the Debtors not only to find qualified applicants but to obtain FAA approval before the replacements may take their positions.  (Tr. 76: 12-17.)  Mr. Garrett further testified that, even after a replacement is hired, the "learning curve in this business is very large," and that it would take the replacement time to become familiar with North American's software programs and protocols.  (Tr. 78: 9-12.)  Mr. Garrett unequivocally

testified that, if North American had to go through the process of hiring a replacement for one of

the KERP Employees, the relocation to Georgia would be delayed beyond August 31, 2012.  (Tr.

76: 23- 77:1.)   Given that the relocation of North American to Georgia is a key component of

the Debtors' restructuring, and that the Debtors have demonstrated that the KERP Employees

play a critical role in obtaining the FAA approval that is a prerequisite to this relocation, there is

clearly a reasonable relationship between offering the KERP Employees a bonus and achieving a

timely transfer of North American's operations to Georgia.

The Committee, however, argues that the bonuses are unnecessary, and therefore,

unreasonable, because, as of the hearing date, the KERP Employees have already accepted

positions with the Debtors in Georgia.  The Committee asserts that the Motion should be denied

because the Debtors have not presented any evidence that any of the KERP Employees intends to

leave North American.

This argument has the effect of reading the requirements of § 503(c)(1) into § 503(c)(3).

Although the KERP proposes to pay retention bonuses, no showing of a bona fide job offer or

any other evidence of an intent to leave is required to pay a bonus to non-insiders under §

503(c)(3).  Moreover, the fact that the KERP Employees have agreed to remain in their positions

does not lead to the conclusion that the proposed bonuses are unnecessary.  The KERP

Employees are at-will employees and their employment may be terminated at any time by either

side for any reason.  The "commitments" that the Committee refers to are in no way legally

binding on the KERP Employees, and as Mr. Garrett testified, were made with the understanding

that the Debtors would seek authorization to pay the bonuses in question.  (Tr. 76: 5-6.)  Mr.

Garrett testified that North American has "been losing employees, important employees to our

competitors," and that since the Petition Date, North American has lost 45% of its work force.

(Tr. 75: 17-18; 22-23).  See Borders Group, 453 B.R. 474-75 ("The necessity for retaining and

incentivizing important employees is especially pressing given the recent and numerically

significant exodus of corporate employees.").  It is reasonable for the Debtors to conclude, as

they have, that there is a risk that at least one of the KERP Employees would, in the event the

KERP was not approved, leave North American.

The Committee would have the Debtors make the gamble that all KERP Employees

would elect to remain even if the bonuses were not paid.  Mr. Garrett, however, testified that

even one of the KERP Employees were to leave North American before the move, the requisite

FAA approval, and hence the relocation, would be delayed beyond the August 31, 2012 target

date.  In that case, the Debtors would continue to incur the costs of operating North American

out of JFK International Airport, which includes a monthly lease payment of $132,251.  Given

that the amount of one month's rent at JFK International Airport is approximately equal to the

amount of the entire proposed bonus package, the Debtors are clearly justified in electing not to

gamble on whether the KERP Employees would remain with North American without receiving

these proposed bonuses.

2.       *Cost of the KERP is Reasonable in Light of the Debtors' Finances*

The KERP is economically reasonable.  In 2011, the Debtors reported revenue in excess

of $1 billion. (Motion at ¶ 36.)  The Debtors' proposed bonuses of $137,031 constitute less than

0.014 percent of their 2011 revenue.

The UST, in its objection, argues that the Debtors have failed to provide sufficient

information regarding the economic reasonableness of the proposed bonuses.  The UST further

points out that the financial documents that have been provided show the Debtors operating at a

loss in excess of $111 million since the Petition Date.  (UST Objection at ¶ 47.)

The Debtors argue that the figure cited by the UST is not an accurate representation of the Debtors' current financial state because, as Mr. Garret testified, approximately $80 million of the $111 million loss represents write offs of maintenance deposits associated with leases that the Debtors have rejected, while another $9 million represents professional fees incurred in this bankruptcy case.  (Tr. 99:6-10.)  Mr. Garret testified that, putting the Debtors' reorganization expenses aside, the Debtors' operating figures since the Petition Date are far better:  North American has operated at a $200,000 profit and World has operated at slightly over a $10 million loss.  (Tr. 101: 9-11.)

Mr. Garrett testified that, in any event, a better indicator of the Debtors' financial condition is EBITDA,[8] which reflects the cash flow generated by the Debtors' operations.  (Tr. 101: 17-21.)  The Debtors' EBITDA is calculated by adding the Debtors' depreciation expenses, totaling approximately $23 million, to the approximate $10 million loss the Debtors have incurred since the Petition Date, which results in a positive cash flow of $13 million since the bankruptcy filing.  (Tr. 101: 21-24.)

Ultimately, however, regardless of the method by which the Debtors' financial condition is assessed, the proposed bonuses are economically reasonable:  the KERP is a small cost to ensure that the Debtors are able to begin achieving the significant costs savings associated with the relocation of North American to Georgia as soon as possible.

3.    *The KERP Does Not Discriminate Unfairly*

The Debtors have shown that the KERP does not discriminate unfairly.  Discrimination is permitted as long as it is fair because different employees may have different values to the debtor's reorganization efforts.  Borders Group, 453 B.R. at 475-476.  No unfair discrimination exists if the pool of bonus recipients is not limited to the most senior executives and is "broad

---

[8] EBITDA is earnings before interest, taxes, depreciation, and amortization.

enough" to include lower-ranking employees vital to the chapter 11 process.  Id. at 475 (quoting

In re EaglePicher Holdings, Inc., No. 05–12601, 2005 WL 4030132, at *4 (Bankr. S.D. Ohio

Aug. 25, 2005)).

        The KERP excludes the senior executives of the Debtors and proposes to pay bonuses to

a specific group of mid-ranking employees: those whose positions are mandated by the FAA.

The Debtors have provided ample evidentiary support that the continued employment of the

KERP Employees is "of paramount importance to the Debtors' reorganization effort." Borders

Group, 453 B.R. at 476.  If the KERP Employees elect not to stay with the Debtors, the

relocation of North American and the resulting cost savings to the Debtors will inevitably be

delayed.  The fact that the Debtors considered but ultimately rejected the payment of bonuses to

a larger group of employees (Tr. 136: 11-12.) further demonstrates that the Debtors have

"carefully selected" the pool of bonus recipients.  Borders Group, 453 B.R. at 476.

4.        *The KERP Comports with Industry Standards*

        No evidence was introduced of industry compensation practices, other than Mr. Garrett's

testimony that the Debtors' compensation packages are at the low end of the industry spectrum.

(Tr. 107:11-13.) ("[O]ur reputation in aviation-- and again this is just Bill Garrett's opinion, we

generally pay low.")

        However, the Velo Holdings court upheld a bonus program as consistent with industry

practices because it was "nearly identical to the bonus plan that the Debtors had in place

prepetition." Velo Holdings, 2012 WL 2015870 at *9.  The Borders Group court also approved a

bonus program that was modeled after a prepetition bonus program.  453 B.R. at 464-65.  Here

too, the proposed bonus payments equal to the amounts that the KERP Employees would have

received under the Debtors' pre-petition bonus program, and thus this Dana II factor is satisfied.

5.     *The Debtors Have Exercised Due Diligence*

The record demonstrates that the Debtors performed sufficient due diligence in investigating the need for a retention bonus plan and in determining the specific employees that should be eligible for a bonus.  This Court held in In re Brooklyn Hosp. Center, 341 B.R. 405, 412 (Bankr. E.D.N.Y. 2006), that due care was exercised where "[t]he board consulted with its counsel and financial advisors, formulated several proposals, reduced the amount to be paid pursuant to [a bonus program], and, after negotiations with the Committee, broadened the scope of employees included and added a mitigation clause to the severance payment provision."  Likewise, in Borders Group, the debtor relied on the expert input of a third-party consultant.  453 B.R. at 477.

Here, the Debtors worked with a compensation consultant, Towers Barrett, in devising the KERP.  (Tr. 158:2-8.)  The Debtors' senior management team originally considered a much wider pool of potential bonus recipients and ultimately narrowed the field to the five KERP Employees who are critical to the timely relocation of North American.  (Tr. 136:11-12.) ("It was a management decision not to go forth with" a wider bonus program).  Accordingly, the Debtors have demonstrated the requisite level of due diligence.

6.     *The Debtors Have Received Sufficient Counsel*

The sixth Dana II factor deals with whether a debtor received independent counsel in performing due diligence and in authorizing a retention bonus.  However, the lack of counsel "is not fatal." Borders Group, 453 B.R. at 477.

The bonus program at issue in Borders Group was not reviewed by independent counsel, but it still passed muster because of the participation of a third party consultant as well as the existence of a pre-petition bonus program upon which the proposed bonus payments were based.

Id.  Likewise, the Debtors here had the benefit of advice from a compensation consultant and the bonus payments to be made to the KERP Employees "are commensurate with," id., what they would have received under a company-wide bonus program that was in existence for at least five years prior to the Petition Date. (Tr. 106:21-24.) ("[The] basis of this program is the bonus plan that's been in place at the airline since I've been working there. So at least five years. It's the incentive program that we utilize to incent all our employees.")

Moreover, the Debtors consulted with its bankruptcy counsel in connection with the bonus program. (Tr. 41:13-16) ("The company worked with its lawyers and its advisors and with the first lien lenders and the DIP lenders to make sure that this was a plan that major constituencies did approve.")  Finally, the relatively modest size of the proposed bonus payouts made the retention of independent legal counsel economically inefficient.  Like the Borders Group court, this Court "is satisfied that Debtors' interests were sufficiently protected" under the sixth Dana II factor.  Borders Group, 453 B.R. at 477.

**CONCLUSION**

For the reasons set forth above, the KERP Employees are not insiders of the Debtors, and the proposed bonuses to the KERP Employees are justified by the facts and circumstances of this case.  Accordingly, the Motion is granted.  A separate order will issue.



**Dated: Brooklyn, New York**
        **July 24, 2012**

_____
        **Carla E. Craig**
**United States Bankruptcy Judge**