James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | Case Nos. 12-40783 (CEC) |
| | 12-40782 (CEC) |
| | 12-40784 (CEC) |
| | 12-40785 (CEC) |
| | 12-40786 (CEC) |
| | 12-40787 (CEC) |
| | 12-40788 (CEC) |
| | 12-40789 (CEC) |
| | 12-40790 (CEC) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING FURTHER REVISED DISCLOSURE**
**STATEMENT FOR THE AMENDED JOINT PLAN OF**
**REORGANIZATION OF GLOBAL AVIATION HOLDINGS INC. AND ITS**
**DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that on September 14, 2012, Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), filed with the United States Bankruptcy Court for the Eastern District of New York (the "***Bankruptcy Court***") the *Disclosure Statement for the Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 595].

**PLEASE TAKE FURTHER NOTICE** that on October 9, 2012, the Debtors filed the *Disclosure Statement for the First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 643].

**PLEASE TAKE FURTHER NOTICE** that on October 17, 2012, the Debtors filed a revised version of the *Disclosure Statement for the First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 665].

**PLEASE TAKE FURTHER NOTICE** that on October 17, 2012, the Bankruptcy Court held a hearing (the "***Disclosure Statement Hearing***") and approved the Debtors' *Disclosure Statement First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*.

**PLEASE TAKE FURTHER NOTICE** that after incorporating various comments and clarifications from various parties in interest as discussed, at the Disclosure Statement Hearing, on October 19, 2012, the Debtors are now filing a further revised version of the *Disclosure Statement for the First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc.*

*and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Revised First Amended Disclosure Statement***").  For the convenience of parties in interest, attached hereto as **Exhibit A** and **Exhibit B**, respectively, is a copy of the Revised First Amended Disclosure Statement and a blackline comparison of the Revised First Amended Disclosure Statement filed on October 19, 2012, marked against the version filed on October 17, 2012.

**PLEASE TAKE FURTHER NOTICE** that copies of the Revised First Amended Disclosure Statement filed on October 19, 2012 and any other document filed in the Debtors' chapter 11 cases are available free of charge from the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC, by (a) calling the Debtors' restructuring hotline at (877) 606-7657; (b) visiting the Debtors' restructuring website at http://www.kccllc.net/globalaviation and/or (c) writing to writing to Global Aviation Holdings Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.nyeb.uscourts.gov.

3

Brooklyn, New York                        */s/ Jonathan S. Henes*
Dated:  October 19, 2012            James H.M. Sprayregen
                                              Jonathan S. Henes
                                              Christopher T. Greco
                                              KIRKLAND & ELLIS LLP
                                              KIRKLAND & ELLIS INTERNATIONAL LLP
                                              601 Lexington Avenue
                                              New York, New York  10022
                                              Telephone:     (212) 446-4800
                                              Facsimile:     (212) 446-4900

                                              -and-

                                              Michael B. Slade (admitted *pro hac vice*)
                                              Ryan B. Bennett (admitted *pro hac vice*)
                                              KIRKLAND & ELLIS LLP
                                              KIRKLAND & ELLIS INTERNATIONAL LLP
                                              300 North LaSalle
                                              Chicago, Illinois  60654
                                              Telephone:     (312) 862-2000
                                              Facsimile:     (312) 862-2200

                                              Counsel to the Debtors
                                              and Debtors in Possession

4

## EXHIBIT A

**Revised First Amended Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | Case Nos. 12-40783 (CEC) |
| | 12-40782 (CEC) |
| | 12-40784 (CEC) |
| | 12-40785 (CEC) |
| | 12-40786 (CEC) |
| | 12-40787 (CEC) |
| | 12-40788 (CEC) |
| | 12-40789 (CEC) |
| | 12-40790 (CEC) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF GLOBAL AVIATION HOLDINGS INC. AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

### IMPORTANT DATES

- **Date by which Ballots must be received by the Balloting Agent: November 21, 2012**
- **Date by which objections to the Plan must be filed and served: November 20, 2012**
- **Hearing on Confirmation of the Plan: November 28, 2012**

---

James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

K&E 24187721.1

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.   THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**TABLE OF CONTENTS**

Page

I.    EXECUTIVE SUMMARY ................................................................................................................1

II.   IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ...................................5

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      THE PLAN ..............................................................................................................................7

      A.    What is chapter 11?.............................................................................................................7

      B.    Why are the Debtors sending me this Disclosure Statement?.............................................7

      C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is
            consummated?.....................................................................................................................8

      D.    What happens to my recovery if the Plan is not confirmed, or does not go effective? ....................9

      E.    Are any regulatory approvals required to consummate the Plan?........................................9

      F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
            Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective
            Date" and "Consummation?"................................................................................................9

      G.    What information is there regarding Classes of Claims?.....................................................9

      H.    What information is there regarding Administrative Expense Claims?.............................10

      I.    What are the DIP Claims and how are they satisfied? ......................................................10

      J.    Will the Reorganized Debtors be obligated to continue to pay statutory fees after the
            Effective Date?..................................................................................................................11

      K.    What is the Debtors' current financial condition and what is the Debtors' projected cash
            balance on the Effective Date?..........................................................................................11

      L.    What are the terms of the New Loans? ..............................................................................11

      M.    Are there risks to owning an Interest in Reorganized Global Aviation upon emergence
            from chapter 11? ...............................................................................................................12

      N.    Is there potential litigation related to the Plan?................................................................12

      O.    What rights will Reorganized Global Aviation's new stockholders have?........................12

      P.    When will the Plan Supplement be filed and what will it include?...................................12

      Q.    What is the Employee Equity Plan and how will it affect the distribution I receive under
            the Plan?............................................................................................................................13

      R.    What is the Management Equity Incentive Plan and how will it affect the distribution I
            receive under the Plan? .....................................................................................................13

      S.    What are the Debtors' Intercompany Claims and Intercompany Interests?......................13

      T.    How will the release of the Avoidance Actions impact my recovery under the Plan?....................14

      U.    How will Claims asserted with respect to rejection damages affect my recovery under the
            Plan?..................................................................................................................................14

      V.    Will there be releases granted to parties in interest as part of the Plan? ..........................14

      W.    What is the deadline to vote on the Plan? .........................................................................15

      X.    How do I vote for or against the Plan?...............................................................................15

Y.    Why is the Bankruptcy Court holding a Confirmation Hearing?....................................................16

Z.    When is the Confirmation Hearing set to occur? ..........................................................................16

AA.    What is the purpose of the Confirmation Hearing?.......................................................................17

BB.    What is the effect of the Plan on the Debtors' ongoing business? .................................................17

CC.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors? .........................................................................................................17

DD.    Does Global Aviation recommend voting in favor of the Plan? ....................................................17

**IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW............18**

A.    Global Aviation's Prepetition Organizational and Capital Structure ............................................18

B.    Summary of the Global Aviation's Corporate History...................................................................18

C.    Summary of Global Aviation's Prepetition Capital Structure........................................................19

    (i)    The Senior Secured Notes......................................................................................20
    (ii)    The Second Lien Term Loan ..................................................................................20
    (iii)    The Intercreditor Agreement .................................................................................20
    (iv)    Promissory Notes...................................................................................................20
    (v)    Capital Lease Facility ...........................................................................................21
    (vi)    The Amendment of the Senior Secured Notes Indenture and Second Lien Credit Agreement ...........................................................................................................21

D.    Overview of Global Aviation's Business and Operations..............................................................21

    (i)    Military Passenger and Cargo Services .................................................................21
    (ii)    Commercial Cargo Services ..................................................................................22
    (iii)    Commercial Passenger Services ............................................................................22

**V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES....................................................................................................................................22**

A.    Events Leading to Chapter 11 .....................................................................................................22

    (i)    Decreased Military Need, Reduced Military Rates and Schedule Reliability Penalties...............................................................................................................22
    (ii)    Labor Agreements .................................................................................................23
    (iii)    Underutilization of Commercial Cargo Fleet.........................................................24
    (iv)    Global Aviation's Funded Debt Obligations .........................................................24
    (v)    Decreased Team Entitlement Share Partially Offset by Increased Global Entitlement Share...................................................................................................24
    (vi)    ATA Bankruptcy Estate Litigation .......................................................................25

B.    Global Aviation's Prepetition Restructuring Initiatives ................................................................25

**VI.    EVENTS DURING THE CHAPTER 11 CASES ....................................................................................26**

A.    Overview of Chapter 11..............................................................................................................26

B.    First Day Pleadings and Other Case Matters ...............................................................................26

    (i)    First and Second Day Pleadings ...........................................................................26
    (ii)    Procedural and Administrative Motions ................................................................27
    (iii)    Retention of Chapter 11 Professionals...................................................................28
    (iv)    Appointment of the Creditors' Committee Members and Counsel for Such Committee ...........................................................................................................28

C.    Pending Litigation Proceedings and the Automatic Stay ..............................................................28

|  |  | (i) | WARN Act Adversary Proceedings | 29 |
|  |  | (ii) | Creditors' Committee Lien Litigation | 29 |
|  | D. | The Debtors' Transition into Chapter 11. | | 29 |
|  |  | (i) | Postpetition Financing | 30 |
|  |  | (ii) | Stipulation with the United States | 30 |
|  |  | (iii) | Surety Bond Program | 31 |
|  |  | (iv) | Fleet Rationalization and Restructuring | 31 |
|  | E. | The Exclusivity Motions | | 32 |
|  | F. | 365(d)(4) Extension | | 33 |
|  | G. | NAA Relocation | | 33 |
|  | H. | Senior Management Team | | 33 |
|  | I. | Composition of New Board of Directors | | 36 |
|  | J. | Labor Cost Restructurings | | 37 |
|  |  | (i) | The Union Negotiations and Tentative Agreements | 37 |
|  |  | (ii) | Ratification Votes and Their Consequences | 41 |
|  |  | (iii) | Complete Withdrawal from the IBT Pension Plan | 41 |
|  |  | (iv) | Single Carrier Filing | 42 |
|  | K. | Claims Bar Date | | 42 |
|  | L. | NOL Motion | | 42 |
| VII. | PROJECTED FINANCIAL INFORMATION | | | 43 |
|  | A. | Valuation of the Debtors | | 44 |
| VIII. | RISK FACTORS | | | 44 |
|  | A. | Risks Relating to Bankruptcy | | 45 |
|  |  | (i) | Parties in interest may object to the Plan's classification of claims and interests. | 45 |
|  |  | (ii) | The Debtors may fail to satisfy vote requirements. | 45 |
|  |  | (iii) | The Debtors may not be able to obtain Confirmation of the Plan. | 45 |
|  |  | (iv) | The conditions precedent to the Effective Date of the Plan may not occur. | 45 |
|  |  | (v) | The Debtors may not be able to achieve their projected financial results. | 45 |
|  |  | (vi) | The Debtors' "certificate of public convenience and necessity" may be revoked by the federal government. | 46 |
|  |  | (vii) | Certain tax implications of the Debtors' chapter 11 cases. | 46 |
|  |  | (viii) | The Debtors' emergence from chapter 11 is not assured. | 46 |
|  | B. | Risks Related to the Debtors' and Reorganized Debtors' Business | | 46 |
|  |  | (i) | Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition. | 46 |
|  |  | (ii) | The New Loans contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity. | 46 |
|  |  | (iii) | Transfer restrictions on the New Common Stock contained in the New Certificate of Incorporation of Reorganized Global Aviation may limit the liquidity of the New Common Stock; any prohibited ownership change could limit the availability of the Reorganized Debtors' net operating losses. | 47 |
|  |  | (iv) | If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer. | 47 |

(v) Employee strikes and other labor-related disruptions may adversely affect the Debtors' operations...................................................................................47

(vi) If one of the Debtors' AMC team members reduces its commitments or withdraws from the team, or if carriers on other AMC teams commit additional aircraft to the program, the Debtors' share of AMC flying may decline. ........................47

(vii) Unpredictability and variability in military demand for the Debtors' services could make it difficult to optimize the use and maintenance of their aircraft fleet, which could adversely affect our business, financial condition and results of operations...................................................................................48

(viii) The costs incurred in the Debtors' military missions may be greater than the amounts for which they are reimbursed by the AMC, thereby reducing profitability. ..............................................................................................48

(ix) If the DOD activates the Debtors' aircraft pledged to the CRAF, the activated aircraft would not be available for other commercial use...............................49

(x) The Debtors' business could be adversely affected by an adverse audit by the U.S. government. ..............................................................................................49

(xi) Because a substantial portion of the Debtors' operating expenses is fixed, the Debtors may be unable to quickly change their cost structure to respond to any declines in revenues. ........................................................................................49

(xii) The loss of one or more customers in the commercial cargo business could materially and adversely affect the Debtors' business, financial condition and results of operations..........................................................................................49

(xiii) A significant reduction in demand for air cargo transport, resulting from declining worldwide economic activity could materially and adversely affect the Debtors' business, financial condition and results of operations. .....................50

(xiv) Fuel price volatility could adversely affect the Debtors' business, financial condition and results of operations. ...................................................................50

(xv) Volatility in international currency markets may adversely affect demand for our commercial cargo and passenger services. ........................................................50

(xvi) Governments may restrict or revoke the Debtors' authority to operate flights to or over countries. ............................................................................................50

(xvii) If the Debtors are unable to continue to lease aircraft at acceptable rates and terms in the future, or if the Debtors are unable to acquire compatible engines or spare parts, on terms favorable to the Debtors or at all, their business, financial condition and results of operations could be adversely affected....................50

(xviii) The Debtors are at risk of losses and adverse publicity stemming from any accident involving their aircraft......................................................................51

(xix) The airline industry is subject to extensive government regulation, and new regulations may increase the Debtors' operating costs....................................51

(xx) The Debtors' insurance costs have increased substantially as a result of the September 11 terrorist attacks, and further increases in insurance costs or reductions in coverage could have a material adverse impact on the Debtors' business and operating results............................................................................51

IX.    **RELEASE, INJUNCTIVE AND RELATED PROVISIONS**............................................................**52**

A.    Compromise and Settlement of Claims, Interests and Controversies ..............................................52

B.    Releases by the Debtors .....................................................................................................................52

C.    Releases by Holders of Claims and Interests ....................................................................................53

D.    Limitations on Plan Release and Injunction Provisions with Respect to the Government..............53

E.    Exculpation ........................................................................................................................................53

F.    Discharge of Claims and Termination of Interests............................................................................54

G.    Injunction ...........................................................................................................................................54

H.     Release of Liens ...................................................................................................................... 55

I.      Term of Injunctions or Stays.................................................................................................. 55

J.      Protection Against Discriminatory Treatment ...................................................................... 56

**X.**      **SOLICITATION AND VOTING PROCEDURES** ......................................................................... **56**

**XI.**     **CONFIRMATION OF THE PLAN**.................................................................................................. **56**

A.     Requirements for Confirmation of the Plan .......................................................................... 56

B.     Best Interests of Creditors/Liquidation Analysis ................................................................. 56

C.     Feasibility............................................................................................................................... 56

D.     Acceptance by Impaired Classes............................................................................................ 56

E.     Confirmation Without Acceptance by All Impaired Classes ............................................... 57

       (i)       No Unfair Discrimination ....................................................................................... 57
       (ii)      Fair and Equitable Test ........................................................................................... 57

F.      Valuation of the Debtors ........................................................................................................ 58

**XII.**    **CERTAIN SECURITIES LAW MATTERS** ................................................................................. **58**

A.     Plan Securities....................................................................................................................... 58

B.     Issuance and Resale of Plan Securities under the Plan.......................................................... 58

       (i)       Exemptions from Registration Requirements of the Securities Act and State
                Blue Sky Laws........................................................................................................ 58
       (ii)      Resales of Plan Securities; Definition of Underwriter........................................... 58
       (iii)     Warrants and New Common Stock/Equity Incentive Plan .................................... 59

**XIII.**   **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE**
        **PLAN**.............................................................................................................................................. **59**

A.     Introduction............................................................................................................................ 59

B.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ....................... 60

       (i)       Cancellation of Debt and Reduction of Tax Attributes.......................................... 60
       (ii)      Limitation of NOL Carryforwards and Other Tax Attributes ................................ 61
       (iii)     Alternative Minimum Tax ...................................................................................... 62

C.     Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed
        Claims .................................................................................................................................... 62

       (i)       Consequences to Holders of Senior Secured Claims ............................................. 62

D.     Withholding and Reporting.................................................................................................... 65

**XIV.**   **REGULATION**.............................................................................................................................. **66**

**XV.**    **RECOMMENDATION** .................................................................................................................. **66**

## EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleadings

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Union Settlement Agreements

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.    EXECUTIVE SUMMARY

Global Aviation Holdings Inc. ("*Global Aviation*") and its debtor affiliates (collectively, the "*Debtors*")[1] submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims in connection with the solicitation of acceptance of the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated October 19, 2012 [Docket 672], (as amended, supplemented and modified from time to time, the "*Plan*").[2]  A copy of the Plan is attached hereto as **Exhibit A**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement between and among the Debtors, the DIP Lenders, the Consenting Senior Secured Noteholders and certain of the Debtors' Unions. The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise explained in the Plan itself.  Except for unclassified Claims, all claims against a particular Debtor are placed in Classes for each of the Debtors.

As described in the first day declaration of William A. Garrett, the Debtors' Executive Vice President and Chief Financial Officer, to appropriately restructure, the Debtors needed to (a) rationalize their fleet, (b) reduce their labor costs through voluntary modifications to collective bargaining agreements or court order and (c) develop an appropriate post-emergence balance sheet and secure exit financing to emerge from chapter 11 as a competitive enterprise.  All three of these goals will be achieved either prior to or upon confirmation of the Plan.

*First*, the Debtors have rationalized their fleet by over 50% and, as a result, achieved approximately $16 million in annual go-forward aircraft lease reductions.  Prior to and after the Commencement Date, the Debtors and their advisors undertook extensive analysis of the Debtors' contemplated post-emergence fleet structure.  On the first day of the Debtors' chapter 11 cases, pursuant to section 365 of the Bankruptcy Code, the Debtors filed a motion to reject 16 aircraft leases that they deemed burdensome to their estates.  Over the course of these cases, the Debtors filed 4 additional omnibus motions seeking to reject certain aircraft, engine and equipment leases deemed non-essential to their go-forward operations and post emergence business plan.

The Debtors' fleet, which consisted of 30 aircraft on the Commencement Date, now consists of 14 aircraft, subject to several leases that were either assumed or entered into over the course of the Debtors' chapter 11 cases or will be assumed upon confirmation of the Plan.  After substantial negotiation, many of these leases contain amendments representing significant cost savings to the Debtors.  The fleet rationalization has contributed to the significant reduction of the Debtors' liabilities.

*Second*, the Debtors reached agreements with the authorized negotiating teams for all five unionized labor groups to secure modifications to their Collective Bargaining Agreements that would ensure the reduction of going-forward labor expenses by more than $100 million and labor cost stability for the next five years.  On September 12, 2012, the Court approved the Debtors' motion to enter into modified agreements with three of their five labor groups:  the World Pilots represented by the IBT, the World dispatchers represented by the TWU, and the World Flight Attendants represented by the IBT.  The North American pilots (represented by ALPA) ratified the agreement modifying their Collective Bargaining Agreement on September 24, 2012, which was approved by the Court on September 25, 2012.  The North American Flight Attendants (represented by the IBT) did not ratify the tentative agreement executed by their negotiating team.  The Debtors will continue to negotiate in good faith with the North American flight attendants and hope to resolve the ratification issues consensually.  However, in the interim North American has imposed new labor terms on the North American Flight Attendants consistent with applicable law.

*Third*, and finally, the Debtors are very pleased that after extensive, good faith negotiations, the Debtors were able to submit their Plan for an appropriate post-emergence balance sheet with the support of the DIP Lenders,

---

[1]    The Debtors in these chapter 11 cases are: Global Aviation Holdings Inc.; New ATA Investment Inc.; New ATA Acquisition Inc.; Global Aviation Ventures SPV LLC; World Air Holdings Inc.; North American Airlines, Inc.; World Airways, Inc.; Global Shared Services, Inc.; and World Airways Parts Company, LLC.

[2]    All terms not otherwise defined herein shall have the meaning given to them in the Plan.

1

the Ad Hoc Group of Senior Secured Noteholders which represented over 80% of the Senior Secured Noteholders and a majority of their Unions.  The Plan currently contemplates an approximate $168 million reduction of funded debt.  As a result, a significant amount of the Debtors' major creditor constituencies is supportive of the Plan and the Debtors' expeditious emergence from chapter 11.  Among other things, the Plan contemplates the following:

- Each Holder of such Claims arising under that certain Indenture dated as of August 13, 2009, as amended, modified or supplemented from time to time (the "***Senior Secured Indenture***," and any claims arising thereunder, the "***Senior Secured Claims***"), whose claims total approximately $111.9 million, will receive on account of the secured portion of their claims a Pro Rata distribution of: (a) the remaining New First Lien Loan after satisfaction of the DIP Claims and Roll-Up Claims; (b) New Second Lien debt of $40 million, with a 5-year term and an interest rate of 3% per annum, with an option for cash pay or pay-in-kind; and (c) either (i) 75% of the New Common Stock or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders.

- For the avoidance of doubt, the distribution to Non-U.S. Citizens on account of such Holder's Allowed Senior Secured Claim shall not affect the economic value of such Holder's distribution under the Plan.  Any objection by the Ad Hoc Group of Senior Secured Noteholders regarding the structure of the newly established class of New Common Stock or warrants and its effect on a Holder's percentage voting rights shall be per se reasonable.

- Holders of Second Lien Claims will not receive any distribution on account of such Second Lien Claims.  On the Effective Date, all Second Lien Claims shall be cancelled and discharged.

- Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims.  On the Effective Date, all General Unsecured Claims shall be cancelled and discharged.

- Certain of the Debtors hold significant Intercompany Claims against other Debtors.  No distribution shall be made on account of Intercompany Claims.  On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled, discharged in full or in part or contributed, distributed or otherwise transferred between and among the Debtors in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be entitled to transfer funds and obligations between and among themselves as they determine to be necessary or appropriate to best enable the Debtors and Reorganized Debtors to satisfy their obligations under the Plan.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

- Intercompany Interests shall be reinstated on the Effective Date.

- All equity Interests in Global Aviation will be cancelled or extinguished on the Effective Date.

The Debtors have been in dialogue with the advisors for the Creditors' Committee and the advisors for the Second Lien Lender and it is the Debtors' hope that they will come to a consensual resolution with such parties with respect to the Plan in advance of the Confirmation Hearing.  To the extent that the Debtors cannot reach full consensus, however, the Debtors believe that they already have the requisite creditor support necessary to confirm the Plan and intend to proceed on a path to Confirmation of the Plan in an expeditious manner.

**IN SUM, THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CREDITORS.  AT THIS TIME, THE DEBTORS DO NOT BELIEVE THAT THERE IS A VIABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11**

**CASES OTHER THAN THROUGH CONFIRMATION OF THE PLAN.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3] The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to Claims: (a) any Claim proof of which is timely filed with the Bankruptcy Court (excluding Claims not required to be filed with the Bankruptcy Court); (b) any Claim that is listed in the schedules of assets and liabilities, schedules of executory contract and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code (the "*Schedules*") as not contingent, not unliquidated, and not disputed, and for which no proof of claim has been timely field with the Bankruptcy Court; or (c) any Claim that is Allowed pursuant to the Plan.  A Claim is not an "Allowed Claim" if an objection to the allowance of the Claim has been made within the time period fixed for Claims objections by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or if an objection has been made against the Claim and the Claim is Allowed for voting purposes only by a final order of the Bankruptcy Court.

| | | SUMMARY OF EXPECTED RECOVERIES | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Recovery Under the Plan** |
| 1 | Priority Non-Tax Claims | Holders of Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (a) the Effective Date; (b) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim; or (c) such other date as may be ordered by the Bankruptcy Court. | 100% |
| 2 | Other Secured Claims | Holders of Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (a) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (b) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (c) the Debtors and the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired. | 100% |
| 3 | Senior Secured Claims | Holders of Allowed Senior Secured Claim shall receive on the Effective Date a Pro Rata distribution of: (a) the remaining New First Lien Loan after satisfaction of the DIP Claims and Roll-Up Claims; (b) the New Second Lien Loan; and (c) either (i) 75% of the New Common Stock or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders. | 78%[4] |
| 4 | Second Lien Claims | Holders of Second Lien Claims will not receive any distribution on account of such Second Lien Claims. On the Effective Date, all Second Lien Claims shall be cancelled and discharged. | N/A |
| 5 | General Unsecured Claims | Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims. On the Effective Date, all General Unsecured Claims shall be cancelled and discharged. | N/A |
| 6 | Intercompany Claims | To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled, discharged in full or in part or contributed, distributed or otherwise transferred between and among the Debtors in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. No distribution shall be made on account of Intercompany Claims. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be entitled to transfer funds and obligations between and among themselves as they determine to be necessary or | N/A |

---

[4] The projected recovery for the Holders of Allowed Senior Secured Claims is based on the midpoint of Rothschild's estimate of potential recoveries for Class 3, which could vary based upon the range of equity value of the Reorganized Debtors, as discussed further in **Exhibit E**, attached hereto.

4

| | | appropriate to best enable the Debtors and Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practice. | |
|---|---|---|---|
| 7 | Intercompany Interests | Intercompany Interests shall be Reinstated on the Effective Date. | N/A |
| 8 | Global Aviation Interests | Holders of Interests in Global Aviation Interests shall not receive any distribution on account of such Global Aviation Interests.  On the Effective Date, all Global Aviation Interests shall be cancelled and discharged. | N/A |

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court.  The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement

5

has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933 (as amended, the "***Securities Act***"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  Other securities may be issued pursuant to other applicable exemptions under the federal securities laws.  To the extent exemptions from registration, other than section 1145 of the Bankruptcy Court, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made.  There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtors' ability to comply with the terms of the debtor-in-possession credit facility;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- general economic, business and market conditions;

- interest rate fluctuations;

- exposure to litigation;

- unpredictability and variability in military demand for the Debtors' services;

- Debtors' ability to meet OTP requirements;

- changes in AMC team structure and commitments;

- dependence on key customers in the commercial cargo business;

- dependence upon key personnel;

- ability to change cost structure in a timely manner;

- fuel price volatility;

- AMC rate degradation;

- financial conditions of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- damage to aircraft and cargo resulting from dangerous charters;

- inability to implement business plan; and

- the effects of governmental regulation, including FAA and other foreign regulatory rules, on the Debtors' business.


## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  In general, a holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the plan and (iii) the holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest.  Only the holders of Claims in Class 3 (Senior Secured Claims) shall be entitled to vote on the Plan.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted such plan, and thus the holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the holders of Claims in these Classes are not entitled to vote:

- Class 1 (Priority Non-Tax Claims)

- Class 2 (Other Secured Claims)

- Class 6 (Intercompany Claims)

- Class 7 (Intercompany Interests)

In general, if the holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected such plan, and thus the holders of Claims in such Classes are not entitled to vote on such plan. The holders of Claims and Interests in the following Classes are conclusively presumed to have rejected the Plan and are therefore not entitled to vote:

- Class 4 (Second Lien Claims)

- Class 5 (General Unsecured Claims)

- Class 7 (Global Aviation Interests)

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "*Class*") and their respective voting statuses and anticipated recoveries are set forth below.

The following chart is a summary of the classification and treatment of Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation and meet the conditions to consummate the Plan.

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Senior Secured Claims | Impaired | Entitled to Vote | 78% |
| 4 | Second Lien Claims | Impaired | Deemed to Reject | N/A |
| 5 | General Unsecured Claims | Impaired | Deemed to Reject | N/A |
| 6 | Intercompany Claims | Unimpaired | Deemed to Accept | 100% |
| 7 | Intercompany Interests | Unimpaired | Deemed to Accept | 100% |
| 8 | Global Aviation Interests | Impaired | Deemed to Reject | N/A |

**D.    What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page 56 and the Liquidation Analysis attached as **Exhibit F** to this Disclosure Statement.

**E.    Are any regulatory approvals required to consummate the Plan?**

Yes. Under federal law, the Debtors are required to have a "certificate of public convenience and necessity" in order for them to provide air carrier services. 49 U.S.C § 41102(a). The Debtors' license could be revoked by the federal government if Non-U.S. Citizens were to own or control in excess of 25% of the equity interest in the reorganized Debtors.

To effectuate distributions in accordance with the foregoing federal law restrictions, the Debtors propose to send a notice of form declaration (the "*Citizenship Declaration*") to the Holders of Allowed Class 3 Claims that are eligible to receive New Common Stock (the "*Notice of Citizenship Declaration*"), attached as **Exhibit 12** to the Disclosure Statement Order. The Citizenship Declaration will require such Holders to provide and verify the following information: (i) name of creditor; (ii) amount of allowed claim; and (iii) whether such person or entity is a U.S. Citizen or Non-U.S. Citizen as defined by title 49 of the United States Code. If approved by the Bankruptcy Court, the Notice of Citizenship Declaration and Citizenship Declaration will be sent concurrently with the Ballots sent to Holders of Class 3 Claims. If any Holder of a Class 3 Claim does not return a properly completed Citizenship Declaration prior to the deadline set forth therein, the Holder of such Class 3 Claim will be deemed a Non- U.S. Citizen.

All Citizenship Declarations must be actually received by the Balloting Agent on or before the Citizenship Declaration Record Date. After the Citizenship Declaration Record Date, before any Holder of a Class 3 Claim may transfer such Class 3 Claim, the Holder must either (i) submit to the Debtors a Citizenship Declaration from the proposed transferee certifying that the proposed transferee is a U.S. Citizen or (ii) obtain the Debtors' prior written consent. The Debtors reserve the right to establish various classes of New Common Stock or warrants, subject to the reasonable consent of the Consenting Senior Secured Noteholders, to be used to satisfy the Claims in Class 3 held by Non-U.S. Citizens.

For a more detailed description of the regulatory bodies that oversee the Debtors' operations, *see* "Regulation" beginning on page 66.

**F.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims will only be made on the Effective Date as soon as practicable thereafter. *See* "Confirmation of the Plan," which begins on page 56, for a discussion of the conditions to consummation of the Plan.

**G.    What information is there regarding Classes of Claims?**

The United States Trustee has requested additional disclosure regarding the Classes of Claims under the Plan. At the outset, the Debtors would note that the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained in the Plan, the classifications set forth in Plan are deemed to apply to

9

each Debtor, as applicable.  Global Aviation is the only Debtor that possesses a Class 8 with respect to Interests in Global Aviation.  In addition, certain Debtors may not have creditors in certain other Classes.

Because the Debtors are still in the process of reconciling their Claims, the Debtors do not know with certainty the identity of the claimants and the total aggregate allowed Claims in each Class under the Plan.  With respect to Class 3, which is the only Class entitled to vote under the Plan, the Debtors expect to have allowed Claims of approximately $112 million (which is after removing the Class 3 Claims that were "rolled up" pursuant to the DIP Order).  The claimants in Class 3 will include the members of the Ad Hoc Group of Senior Noteholders, who collectively hold approximately 73% of the Senior Secured Notes, as well as other non-Ad Hoc Group Holders of Senior Secured Notes (the Debtors do not have an accurate count of the number of non-Ad Hoc Group Holders of Senior Secured Notes).

With respect to the other Classes under the Plan, while the Debtors do not yet know the identity and aggregate Claims in each Class, the Debtors can provide a summary of the Claims that were filed in advance of the Bar Date.  As of August 3, 2012, approximately 1,047 Claims have been filed against various Debtors, asserting various levels of priority, including the following: (a) 154 Claims for a total of $6,932,136.31 asserting Administrative Priority status; (b) 711 Claims for a total of $362,065,154.28 asserting General Unsecured Status; (c) 86 Claims for a total of $93,671,959.13 asserting Priority Status; and (d) 96 Claims for a total of $16,567,929.82 asserting Secured status. The Debtors are currently in the process of reconciling such Claims and plan to file various objections over the course of the next few weeks.  The Debtors expect the Allowed Claims in each Class to be significantly lower than the Filed Claims.  As previously noted, the Debtors expect approximately $5 million in Allowed Administrative Expense Claims and Priority Claims, including among other things, certain 503(b)(9) Claims and priority tax Claims.  The Debtors do not have an estimate on the aggregate amount of Allowed General Unsecured Claims.

<strong>H.        What information is there regarding Administrative Expense Claims?</strong>

The Debtors received 154 Claims asserting a total of $6,932,136.31 in Claims with Administrative Priority status, 86 Claims asserting a total of $93,671,959.13 with Priority Status and 96 Claims asserting a total of $16,567,929.82 with Secured status. The Debtors are still in the process of reconciling these claims and expect to reconcile or object to many of these claims.  Specifically with respect to their retained professionals, upon Emergence the Debtors expect to pay approximately $8 million in allowed professional fees and expenses.  In addition, after reconciling their priority claims listed above, the Debtors expect to pay approximately $5 million in allowed Administrative Expense Claims and Priority Claims, including among other Claims, allowed section 503(b)(9) Claims and priority tax Claims.  As noted above, after making payments for such Administrative Expense Claims, cash flow related to ongoing operations and drawing $5 million on the New Revolver, the Debtors expect to have a year end cash balance of approximately $3.9 million, and at least $20 million in availability under the New Revolver.

<strong>I.        What are the DIP Claims and how are they satisfied?</strong>

The DIP Claims are post-petition obligations incurred by the Debtors under the DIP Credit Agreement.  As of the Effective Date, the DIP Claims shall be Allowed Claims in the amount that is drawn down under the DIP Credit Agreement as of the Effective Date, plus any interest and fees accrued pursuant to the DIP Credit Agreement. Additionally, pursuant to the DIP Order, the Roll-Up Claims are Allowed Administrative Claims in the amount equal to the DIP Lenders' commitment under the DIP Credit Agreement.  On the Effective Date, the Holders of Allowed DIP Claims or Allowed Roll-Up Claims will receive, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed DIP Claim or Allowed Roll-Up Claim, a Pro Rata distribution of the New First Lien Loan up to the amount of the Allowed DIP Claim or Allowed Roll-Up Claim.  Additionally, on the Effective Date, the Debtors will have to pay all reasonable and documented fees and expenses (i) provided to be paid by the DIP Order or the DIP Credit Agreement, as applicable, including those of the DIP Agent, the DIP Lenders, the Ad Hoc Group of Senior Secured Noteholders and the Senior Secured Indenture Trustee and (ii) of the Senior Secured Indenture Trustee and the Senior Secured Predecessor Indenture Trustee incurred under the Senior Secured Indenture.   The Debtors, however, expressly reserve all of their rights to objected to the reasonableness of such fees and expenses.

10

**J.      Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date?**

Yes.  On the Effective Date the Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation.  Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable, under 28 U.S.C. § 1930(a)(6), plus accrued interest under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements inside and outside of the ordinary course of business until the entry of a final decree, dismissal or conversion of the cases to chapter 7.  The Reorganized Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal or conversion of the cases to chapter 7.

**K.      What is the Debtors' current financial condition and what is the Debtors' projected cash balance on the Effective Date?**

The Untied States Trustee has requested that the Debtors include additional disclosure regarding the Debtors' current financial condition, including their cash position.  Over the course of the chapter 11 cases the Debtors have performed largely in conformance with their business plan.  The Debtors have been able to achieve certain of their restructuring goals and these goals have had a positive impact on the Debtors' operating performance.  For example, the Debtors have secured labor savings on account of new collective bargaining agreements that went effective in September 2012.  In addition, the Debtors secured aircraft lease savings on account of rejected aircraft leases that were rejected in early 2012.  Finally, the Debtors successfully moved the headquarters of North American Airlines, Inc. from Queens, New York to Peachtree City, Georgia and achieved cost synergies on account of the move.  As a result of these changes and the Debtors successfully executing their business plan, the Debtors' current financial condition is sound.

After relatively slow months in July and August, the Debtors' recent financial performance has improved in September 2012 with preliminary EBITDA results for the month expected to be $4.6 million compared to $0.1 million in August 2012. The main drivers for improved financial performance are a recovery of military block hours to above plan levels and coupled with improved crew utilizations as a result of completing labor negotiations. Month over month AMC revenue increased approximately $4.2 million for medium passenger aircraft and $2.1 million for large passenger while commercial cargo revenue was flat.

The Debtors expect to have approximately $13-$15 million in Cash prior to the Effective Date.  Upon Emergence, the Debtors expect to pay approximately $8 million in fees and expenses on account of retained professionals and approximately $5 million in Administrative Expense Claims and Priority Claims, including among other things, certain 503(b)(9) Claims and priority tax Claims.  After making payments for such Administrative Expense Claims, cash flow related to ongoing operations and drawing $5 million on the New Revolver, the Debtors expect to have a year end cash balance of approximately $3.9 million, and at least $20 million in availability under the New Revolver.  Thus, the Debtors project that they will have sufficient cash on hand to satisfy all allowed administrative claims in full on the Effective Date.  *See* Article VII of this Disclosure Statement for additional information.

**L.      What are the terms of the New Loans?**

The New Loans will consist of a New First Lien Loan, New Second Lien Loan and New Revolver.  The New First Lien Loan shall (a) be in the principal amount of $95 million, (b) have an interest rate of 10% per annum on a cash pay basis, (c) have a maturity of four and a half years from the Effective Date and (d) be secured by substantially all of the Reorganized Debtors' assets.

On the Effective Date, the New First Lien Loan will be distributed Pro Rata to Holders of Allowed DIP Claims or Allowed Roll-Up Claims, except to the extent that such a Holder agrees to a less favorable treatment. After satisfaction of the DIP Claims and Roll-Up Claims, the remaining New First Lien Loan will be distributed, on the Effective Date, Pro Rata, to each holder of an Allowed Senior Secured Claim.

11

The New Second Lien Loan shall (a) be in the principal amount of $40 million, (b) have an interest rate of 3% per annum, with an option for a cash pay or pay-in-kind basis, (c) have a maturity date of five years from the Effective Date and (d) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New Revolver and the New First Lien Loan. On the Effective Date, the New Second Lien Loan will be distributed, Pro Rata, to Holders of Allowed Senior Secured Claims.

The Debtors are still in the process of marketing the New Revolver and, as a result, have yet to finalize many of the specific terms. The Debtors requests to potential lenders require that the New Revolver have an availability of $20 million. Rothschild has been leading the Debtors' search for the New Revolver. The Debtors will include the terms of the New Revolver — which will likely either be provided by a third-party lender or some or all of the Ad Hoc Group of Senior Secured Noteholders — in their Plan Supplement.

The specific terms of the New Loans, which will be contained in the Plan Supplement and approved at the Confirmation Hearing, have yet to be finalized and will continue to be negotiated by the Debtors between now and November 18. The Debtors expect the New Loans will contain certain covenants, which will restrict (subject to certain exceptions) the Reorganized Debtors' ability to: incur additional indebtedness; grant liens; consummate mergers, acquisitions, consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; and enter into transactions with affiliates; consummate sale-leaseback transactions.

### M.    Are there risks to owning an Interest in Reorganized Global Aviation upon emergence from chapter 11?

Yes. *See* "Risk Factors," which begins on page 44.

### N.    Is there potential litigation related to the Plan?

Yes. The Plan is structured as a motion under sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 for approval of the compromise and settlement among the Debtors, the Consenting Senior Secured Noteholders, the IBT, ALPA and TWU, the terms of which are outlined herein and in the Heads of Agreement attached as **Exhibit G** hereto. If the Plan is confirmed, it will constitute approval of the compromise and settlement by the Bankruptcy Court, and the Confirmation Order will contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* "Risk Factors — The Debtors may not be able to obtain Confirmation of the Plan," which begins on page 45.

### O.    What rights will Reorganized Global Aviation's new stockholders have?

Holders of New Common Stock will have rights as set forth in the Plan Supplement, which will include the New Shareholders Agreement.

### P.    When will the Plan Supplement be filed and what will it include?

The Plan Supplement will be Filed no later than ten (10) days before the Confirmation Hearing, or such later date on notice to parties in interest, and will include the following: (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) a list of Executory Contracts and Unexpired Leases to be rejected; (d) a list of Executory Contracts and Unexpired Leases to be assumed and the associated cure costs; (e) the New First Lien Loan Credit Agreement; (f) the New Second Lien Loan Credit Agreement; (g) the New Revolving Credit Agreement; (h) the New Intercreditor Agreement; (i) the New Employment Agreements; (j) certain terms of the Management Equity Incentive Plan; (l) the Employee Equity Plan; (m) the New Shareholders Agreement; (n) the New Warrant

Agreement; (o) the identity of the members of the New Boards; and (p) any additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement.  The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors between now and November 18.

**Q.    What is the Employee Equity Plan and how will it affect the distribution I receive under the Plan?**

The Plan contemplates the implementation of the Employee Equity Plan, which will be included with the Plan Supplement and provide for 25% of the New Common Stock to be distributed to Qualifying Represented Employees and Non-Executive, Non-Represented Employees to be shared in proportion to (a) the concessions agreed and ratified through voluntary modifications, in the case of the Reorganized Debtors' Qualifying Represented Employees, and (b) the amount of the World Pilots Savings Credit with respect to the Reorganized Debtors' Non-Executive, Non-Represented Employees.  In addition, the Employee Equity Plan shall provide for New Warrants to purchase 15% of the fully-diluted New Common Stock for the Qualifying Represented Employees and Non-Executive, Non-Represented Employees.

As provided in the Letter of Agreement with ALPA, non-management pilots on the North American seniority list as of September 25, 2012, shall receive no less than 13.6% of the of the distribution of New Common Stock made pursuant to the Employee Equity Plan and no less than 13.6% of the distribution of New Warrants made pursuant to the Employee Equity Plan, recognizing that the Employee Equity Plan as a whole may be diluted by creditors other than the Management Employee Incentive Plan.  ALPA shall, in its sole discretion and according to its policies, determine how its distribution from the Employee Equity Plan shall be distributed among the non-management  pilots on the North American seniority list as of September 25, 2012.

**R.    What is the Management Equity Incentive Plan and how will it affect the distribution I receive under the Plan?**

The Reorganized Global Aviation Board will adopt and implement the Management Equity Incentive Plan, pursuant to which retentive and performance-based equity awards of 10% of the New Common Stock shall be reserved for issuance to certain of the Debtors' Executives and Employees; provided, however, that any Employee participating in the Employee Equity Incentive Plan shall not be eligible for distributions under the Management Equity Incentive Plan. The Management Equity Incentive Plan will not dilute the Employee Equity Plan.  Certain terms of the Management Equity Incentive Plan shall be included in the Plan Supplement.

**S.    What are the Debtors' Intercompany Claims and Intercompany Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other and with World Risk Solutions, Ltd., a non-debtor affiliate and captive insurance company, resulting in Intercompany Claims and Intercompany Interests.  The Intercompany Claims reflect costs and revenues, all of which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims.  Further, the Intercompany Claims include:

•    Notes arising from five loans, each between $1 million and $10 million that North American. extended to World between August 2009 and October 2011.  North American's Intercompany Claims on account of those notes equal $31 million.

•    Claims arising from shared management agreements and subservice agreements by and between certain Debtors.  Under the shared management agreements, Global Aviation Holdings Inc. and Global Shared Services, Inc. provide management and operational support services to North American Airlines, Inc. and World Airways, Inc. in exchange for management fees.

The Plan's treatment of Intercompany Claims and Intercompany Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going-concern enterprise may be replicated

upon emergence for the benefit of creditor constituents receiving distributions under a plan.  The Debtors' Plan provides as owners of the Reorganized Debtors, holders of New Common Stock are the effective owners of the Intercompany Claims and Intercompany Interests as well.  The Plan reinstates Intercompany Claims and Intercompany Interests to implement the substantive transfer of ownership contemplated by the Plan and to avoid the unnecessary and potentially destructive burdens created by the elimination of the Reorganized Debtors' corporate structure.  The Creditors' Committee has indicated that the preservation of Intercompany Claims and Intercompany Interest may violate the absolute priority rule.  The Debtors believe this is an issue that should be preserved for the confirmation hearing.

**T.      How will the release of the Avoidance Actions impact my recovery under the Plan?**

The Debtors believe there are no credible avoidance actions, and their decision to release any avoidance actions under the Plan is a sound exercise of their business judgment.  Likewise, the Liquidation Analysis attached hereto does not reflect any potential recoveries that might be realized by a chapter 7 trustee's potential pursuit of any Avoidance Actions because the Debtors believe such claims are highly speculative. This includes any potential Avoidance Actions against Released Parties, as these terms are defined in the Plan.

Moreover, to the extent there are potential Avoidance Actions that could be pursued against trade creditors, the Debtors believe that pursuing such Avoidance Actions would not result in a net benefit to the Debtors' estates, but instead could potentially harm the Reorganized Debtors' business relationships with their trade partners. Accordingly, the Debtors have not initiated or pursued any such causes of action because they are not aware, at this time, of any possible Avoidance Actions that could materially increase the Debtors' estate.  Additionally, many potential Avoidance Actions, if not released, would be subject to statutory and other defenses, including that the amounts sought to be avoided were paid in the ordinary course of business or were given in exchange for subsequent new value.  The Debtors do not believe that the release of Avoidance Actions will materially impact recoveries under the Plan.

The Creditors' Committee has not evaluated the Debtors' position that there are no credible Avoidance Actions and therefore does not concur in that assertion.

**U.      How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Because the Plan does not provide a distribution to holders of General Unsecured Claims, Claims arising from the Debtors' rejection of Executory Contracts and Unexpired leases will not impact the recoveries to Holders of any Claims in any Class.

**V.      Will there be releases granted to parties in interest as part of the Plan?**

The Plan proposes to release each of: (a) the DIP Agent and the DIP Lenders; (b) the Senior Secured Indenture Trustee and the Senior Secured Noteholders; (c) the Second Lien Agent and the  Second Lien Lender; (d) the Creditors' Committee;  (e) MatlinPatterson; (f) the IBT; (g) the ALPA; (h) the TWU; and (i) with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

The Office of the United States Trustee and Creditors' Committee raised concerns regarding the scope of the releases in the Plan and the lack of justification for the releases.  The foregoing release is an integral part of the Debtors' overall restructuring efforts.  All of the parties included in the definition of Released Parties have made a substantial contribution to the Debtors' restructuring efforts and, in most cases, have insisted on the release as a condition for their contribution.

- **DIP Agent and DIP Lenders**: The DIP Agent and DIP Lenders provided the Debtors with DIP financing, without which the Debtors would not be presenting the Plan and Disclosure Statement, but likely would be

14

facing liquidation.  Moreover, the DIP Lenders have provided the Debtors with waivers of various milestones and other defaults over the course of these chapter 11 cases, without requiring any waiver fees.

- **Senior Secured Indenture Trustee and Senior Secured Noteholders**: The Senior Secured Indenture Trustee and Senior Secured Noteholders have all made substantial contributions, initially by participating in the DIP financing and also by significantly aiding in the formulation and negotiation of the Union Settlement Agreement, Plan and the Disclosure Statement.

- **Second Lien Agent, Second Lien Lender and Creditors' Committee**: The Debtors have been working with the Second Lien Agent, Second Lien Lender and Creditors' Committee with the aim of reaching a global settlement on the Plan.  Based on the Debtors' hope that a settlement can be accomplished, and the incremental litigation costs and uncertainties avoided thereby, the Debtors have included the Second Lien Agent, Second Lien Lender and Creditors' Committee in the release provisions and will seek to obtain such releases if a settlement is ultimately reached.

- **MatlinPatterson**: MatlinPatterson has made substantial contributions to the Debtors over the course of the chapter 11 cases.  First, MatlinPatterson has helped the Debtors exercise their roles as fiduciaries for all stakeholders by appointing members of the Board of Directors of Global Aviation Holdings Inc. to provide guidance to the Debtors.  Second, MatlinPatterson has voluntarily agreed not to exercise its right to declare a worthless stock deduction so that the Debtors can maximize their tax attributes (i.e., significant Net Operating Losses), *provided*, *however*, *that* MatlinPatterson receive a release from the Debtors and their stakeholders.  Third, MatlinPatterson has provided helpful guidance to the Debtors' management team in formulating the Debtors' revised business plan that is expected to lead to long-term growth for the Reorganized Debtors (and thus, maximize the value of the estates for all stakeholders, especially future equity holders of the Debtors).

- **IBT, ALPA and TWU**: As a condition to the Union Settlement Agreements, IBT, ALPA and TWU all required that they be included in the Debtors' release provisions. Based on the significant cost savings achieved by the Union Settlement Agreements, the Debtors believe that such parties are entitled to the protection of the release provisions provided in the Plan.

All of these parties, along with the Debtors' representatives, have made, or are anticipated to make by confirmation, substantial contributions to the Debtors' restructuring efforts and would not have made such contribution without the foregoing releases.  Based on the foregoing, the Debtors believe that the releases in the Plan are necessary and appropriate and meet the requisite legal standard in the Second Circuit.

For more detail see "Article X: Release, Injunction and Related Provisions" which begins on page 52.

### W.    What is the deadline to vote on the Plan?

5:00 p.m. (prevailing Eastern Time) on November 21, 2012.

### X.    How do I vote for or against the Plan?

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan.  If you are a Holder of one or more Claims in the following Class, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

- **Class 3 (Senior Secured Claims)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, to serve as the voting agent for all Claims and generally oversee the voting process (the "***Balloting Agent***").  The Balloting Agent will process and tabulate ballots for Class 3 Claims.

15

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on November 21, 2012.

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the Balloting Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on **November 21, 2012** at the following address:

**Global Aviation Balloting Center (for Ballots)**
**c/o Kurtzman Carson Consultants LLC**
**599 Lexington Avenue, 39th Floor**
**New York, New York 10022**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a master ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the Balloting Agent at the following telephone number:

**1-877- 606-7657**

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by **5:00 p.m. (prevailing Eastern Time), on November 21, 2012**.

Any ballot that is properly executed by a Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot per each Claim held. By signing and returning a ballot, each Holder of a Claim in Class 3 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claims, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot. For information regarding voting by Nominees, see "Solicitation and Voting Procedures" which begins on page 52.

### Y.    Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to confirmation of the Plan.

### Z.    When is the Confirmation Hearing set to occur?

The Bankruptcy Court has scheduled the Confirmation Hearing for **November 28, 2012 at 11:00 a.m. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 20, 2012 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

16

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.

### AA.    What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### BB.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing pursuant to chapter 11.  As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business.  The Debtors will continue to operate their businesses going forward using cash from operations, which will be utilized to implement the Reorganized Debtors' business plan.

### CC.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

The board of directors of each of the Reorganized Debtors will be selected by a committee consisting of the current Chief Executive Officer of Global Aviation, a representative of the Consenting Senior Secured Noteholders and a representative of the Qualified Represented Employees or Non-Executive, Non-Represented Employees.

### DD.    Does Global Aviation recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all creditors.  Any other alternative does not in any way realize or recognize the value inherent under the Plan.

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

### A.    Global Aviation's Prepetition Organizational and Capital Structure



### B.    Summary of the Global Aviation's Corporate History

Global Aviation's subsidiaries World Airways, Inc. ("*World*") and North American Airlines, Inc. ("*North American*") are each among the largest providers of airlift transport services for the United States military. World has been providing supplemental airlift services to the United States military since the Korean conflict in 1951.   In 1990, North American began flying passenger military missions.  Today, World and North American reflect the gold standard in providing safe and high quality service to the United States military.  Additionally, World and North American have developed reputations for safe and reliable commercial cargo and passenger services, which it provides to a broad customer base that includes major corporations, domestic and international airlines, logistic companies, presidential campaigns, sports teams, entertainers and production companies.  Notably, World provided charter services for the presidential campaigns of President George W. Bush, Secretary of State Hillary Clinton and President Barack Obama.

Global Aviation is the successor to ATA Holdings, Corp., which commenced cases under chapter 11 of the Bankruptcy Code in October 2004.   In January 2006, ATA Holdings, Corp. emerged from chapter 11 as New ATA Holdings, Inc. with an equity investment from MatlinPatterson Global Advisors LLC ("*MatlinPatterson*"), the plan sponsor in the ATA Holdings, Corp. chapter 11 cases and Global Aviation' prepetition majority equityholder.

18

Shortly thereafter, New ATA Holdings, Inc. changed its name to Global Aero Logistics Inc. ("*Global Aero*") and, on August 14, 2007, acquired World Air Holdings, Inc., the parent company of World and North American in an all cash transaction.  On April 2, 2008, ATA Airlines, Inc. ("*ATA*"), a subsidiary of Global Aero and affiliate of World and North American, commenced a case under chapter 11 of the Bankruptcy Code, discontinuing all business operations and conducting an orderly liquidation of its assets.  World and North American were generally unaffected by ATA's chapter 11 cases and continued to operate in the ordinary course of business.  Global Aviation was required to settle a number of parent guarantee obligations as a result of ATA's chapter 11 case.  In 2009, Global Aviation became the primary beneficiary of the ATA bankruptcy estate trust.  Furthermore, Global Aviation is currently the direct or indirect parent company of all of the other Debtors.  In early 2009, Global Aero changed its name to Global Aviation Holdings Inc. (*i.e.* Global Aviation) and later in the same year restructured its funded debt obligations.

### C.        Summary of Global Aviation's Prepetition Capital Structure

As of December 31, 2011, Global Aviation's outstanding long-term funded debt obligations were in the aggregate principal amount of approximately \$245 million.  The \$245 million of long-term debt consists primarily of:  (a) \$146.5 million outstanding under certain 14% senior secured notes due August 2013 (the "*Senior Secured Notes*"); (b) \$98.1 million outstanding under a second lien term loan due September 2014 (the "*Second Lien Term Loan*"); (c) \$170,000 outstanding under promissory notes with certain lessors (the "*Promissory Notes*"); and (d) \$251,000 outstanding under a capital lease facility (the "*Capital Lease Facility*," and together with the Senior Secured Notes, the Second Lien Term Loan and the Promissory Notes, the "*Prepetition Debt Obligations*").  The chart below summarizes the Prepetition Debt Obligations; further details with respect to each of these debt obligations is provided below.  In addition, Global Aviation estimates that its trade creditors had outstanding prepetition Claims of approximately \$109.1 million as of the Commencement Date.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of December 31, 2011 | Maturity Date | Security Status |
|---|---|---|---|---|
| **Senior Secured Notes** | \$175 million | \$146.5 million | August 15, 2013 | Secured |
| **Second Lien Term Loan** | \$72.5 million | \$98.1 million | September 29, 2014 | Secured |
| **Promissory Notes** | \$6.1 million | \$170,000 | February 5, 2012 | Unsecured |
| **Capital Lease Facility** | \$625,000 | \$251,000 | August 31, 2012 | Secured |

As of the Commencement Date, MatlinPatterson owned approximately 92.5% of the outstanding shares of Global Aviations' common stock, and certain affiliates of GSO Capital Solutions ("*GSO*"), the sole holder of the Second Lien Term Loan, owned approximately 2.6%.  The remaining 5% of Global Aviation's common stock is held by members of Global Aviation's senior management team and various investors.  While Global Aviation's equity is privately held, the Senior Secured Notes are publicly-traded.

### (i)        *The Senior Secured Notes*

In August 2009, Global Aviation, World and North American issued approximately $175 million of Senior Secured Notes due in August 2013.  The proceeds from the Senior Secured Notes were used to pay off a portion of obligations outstanding under a then existing credit agreement.  The Senior Secured Notes are governed by an indenture agreement, dated as of August 13, 2009, by and among Global Aviation, World and North American as issuers, the other Debtors as guarantors, the lenders party thereto (the "*Senior Secured Noteholders*") and Wells Fargo Bank, National Association as trustee and collateral agent (as amended, supplemented or modified from time to time, the "*Senior Secured Notes Indenture*").  In February of 2012, Deutsche Bank Trust Company Americas replaced Wells Fargo Bank, National Association as trustee and collateral agent.  The payment obligations under the Senior Secured Notes are secured by a first-priority lien on substantially all of the Debtors' assets.  The Senior Secured Notes provide for semiannual payments of interest in February and August at the rate of 14% per annum.  Additionally, the Senior Secured Notes provide for a semiannual requirement of Global Aviation to offer to prepay to the noteholders $10 million of the principal amount outstanding in June and December 2011.  Global Aviation complied with this requirement and offered to repurchase $10.0 million of Senior Secured Notes at par plus accrued interest in both June and December.  The Senior Secured Noteholders accepted the offer to repurchase in June and December.  Global Aviation's December 2011 repurchase obligation of $13.87 million (which includes an additional $3 million repurchase obligation as discussed below and approximately $870,000 in accrued interest), and its semiannual payment of $10.3 million is due on February 15, 2012, further implicating Global Aviation's need to commence these chapter 11 cases.

### (ii)        *The Second Lien Term Loan*

In September 2009, Global Aviation, World and North American entered into a $72.5 million Second Lien Term Loan, which matures in September 2014.  The proceeds from the Second Lien Term Loan were used to pay all remaining obligations outstanding under a then existing credit agreement.  The Second Lien Term Loan is governed by a credit agreement, dated as of September 29, 2009, by and among Global Aviation, World and North American as borrowers, the other Debtors as guarantors, the lenders party thereto (the "*Second Lien Lenders*") and Wells Fargo Bank, National Association as administrative and collateral Agent (as amended, supplemented or modified from time to time, the "*Second Lien Credit Agreement*").  The payment obligations under the Second Lien Term Loan are secured by a second-priority lien on substantially all of the Debtors' assets.  The Second Lien Credit Agreement provides for semiannual payments of interest in September and March at the rate of 12% per annum, and interest that accrues in kind at a rate of 6% per annum.  Additionally, in connection with the entry into the Second Lien Credit Agreement, Global Aviation issued warrants to the Second Lien Lenders that were immediately converted into 838,000 shares of common stock (approximately 3% of the outstanding common stock) of Global Aviation.

### (iii)        *The Intercreditor Agreement*

The trustee, administrative and collateral agents under the Senior Secured Notes and the Second Lien Credit Agreement are party to an intercreditor agreement dated August 13, 2009 (as amended, supplemented or modified from time to time, the "*Intercreditor Agreement*"), which generally provides for the subordination of the claims, liens and security interests of the Second Lien Lenders to the claims, liens and security interests of the Senior Secured Noteholders.  The Intercreditor Agreement also imposes certain limitations on:  (a) the rights and remedies available to the Second Lien Lenders so long as obligations under the Senior Secured Notes remain outstanding; and (b) the Second Lien Lenders' ability to challenge or contest the validity or priority of liens arising under the Senior Secured Notes Indenture.

### (iv)        *Promissory Notes*

Before ATA filed for chapter 11 protection, Global Aero, the predecessor in interest to Global Aviation, guaranteed a number of ATA's aircraft lease obligations.  As part of the consideration provided to the aircraft lessors in connection with a settlement of these guarantee obligations, Global Aero issued promissory notes.  The Promissory Notes were in the principal amount of $6.1 million to Wilmington Trust Company, as trustee under certain trust agreements with Babcock & Brown Air Funding I Limited.  The Promissory Notes require monthly

20

interest payments at a rate of 8% per annum and matured on February 5, 2012.  As of the Commencement Date, the Debtors had one payment of approximately $170,000 outstanding under the Promissory Notes.

### *(v)        Capital Lease Facility*

On July 22, 2009, Global Aviation leased certain telecommunications equipment from Cisco Systems Capital Corporation under the Capital Lease Facility. Under the terms of Capital Lease Facility, Global Aviation pays a specified amount of rent each month and, at the end of the term, has the right to purchase the equipment.  The Capital Lease Facility term ends on August 31, 2012, and the monthly payments under the Capital Lease Facility are approximately $20,600.  As of December 31, 2011, the Debtors had monthly payments totaling approximately $251,000 outstanding under the Capital Lease Facility.

### *(vi)        The Amendment of the Senior Secured Notes Indenture and Second Lien Credit Agreement*

In March 2011, it became clear that Global Aviation would be unable to meet certain covenant requirements in the Senior Secured Notes Indenture and the Second Lien Credit Agreement.  Specifically, Global Aviation was going to breach the minimum consolidated net cash flow covenant.  As a result, Global Aviation negotiated and entered into an amendment and waiver of the Senior Secured Notes Indenture and Second Lien Credit Agreement, which primarily amended the definition of the minimum consolidated net cash flow covenant and enabled Global Aviation to avoid a default under the applicable agreements (the "*March 2011 Amendments*").

After the March 2011 Amendments, Global Aviation's operating performance did not improve and, as a result, in September 2011, Global Aviation negotiated and entered into a further amendment and waiver of the Senior Secured Notes Indenture and Second Lien Credit Agreement (the "*September 2011 Amendments*").  The September 2011, Amendments waived the minimum consolidated net cash flow covenant for the quarters ending September 30, 2011 and December 31, 2011, and required that Global Aviation reduce its annual aircraft lease expenses by a minimum of $18.0 million in 2012 and 2013.  The September 2011 Amendments further required the consent of the majority of the Senior Secured Noteholders and the Second Lien Lenders to take certain actions during the waiver period, including the settlement or payment of outstanding material litigation.

Additionally, the September 2011 Amendments required Global Aviation to make supplemental offers (a) before September 24, 2011, and (b) no later than December 31, 2011, to repurchase up to $3.0 million principal amount of Senior Secured Notes (an aggregate of $6.0 million for both such supplemental offers) at par plus accrued interest.  Global Aviation complied with the first requirement and repurchased $3.0 million of the Senior Secured Notes on October 31, 2011.  Global Aviation offered to repurchase the additional $3.0 million before December 31, 2011, and the repurchase obligation was required to be funded on February 7, 2012, further implicating the Debtors' need to commence these chapter 11 cases.  Moreover, pursuant to the September 2011 Amendments, a consent fee of $6.0 million is due under the Second Lien Term Loan upon maturity or any earlier acceleration of the obligations under the Second Lien Credit Agreement. The consent fee was added to the principal balance of the Second Lien Term Loan and remains outstanding.

### D.        Overview of Global Aviation's Business and Operations

Global Aviation's subsidiaries World and North American are leading providers of customized, non-scheduled passenger and cargo air transport services.  As of the Commencement Date, World was headquartered in Peachtree City, Georgia, and North American was headquartered at JFK International Airport in Jamaica, New York.  As discussed in more detail in Section VI.G, North American has subsequently relocated its headquarters to Peachtree City, Georgia.  As of the Commencement Date, the combined aircraft fleet of World and North American consisted of 30 wide-body and narrow-body leased aircraft, which supported three primary business lines:

### *(i)        Military Passenger and Cargo Services*

World and North American are both leading providers of United States military passenger and cargo air transportation services.  Both airlines are part of the Civil Reserve Air Fleet ("*CRAF*"), a program that falls under the Department of Defense, in which airlines provide aircraft to the United States government in a national emergency.  In return, the airlines receive entitlements to perform government contracts during peace time.  Airlines

21

participating in CRAF are often separated into teams based on their aircraft characteristics and capabilities. Both World and North American are part of the "Alliance Team," which primarily services long-range international missions. Military revenues are derived from mission awards granted to World and North American pursuant to a contract with the Air Mobility Command (the "*AMC*"). The number of AMC missions allotted to each of World and North American depends on entitlement awarded for each aircraft that is committed by the Alliance Team members. The two contracts between World and North American, respectively, and AMC represents the largest portion of each airline's annual revenue.

### *(ii)* ***Commercial Cargo Services***

World operates commercial cargo air transport service for commercial cargo customers through two contract structures: (a) Aircraft, Crew, Maintenance and Insurance ("*ACMI*") contracts, whereby World only provides the aircraft, crew, maintenance and insurance to a customer for a fee and (b) full service contracts whereby World provides the aircraft, crew, maintenance, insurance, fuel, landing, ground handling and all other necessary operating services to a customer for an increased fee.

### *(iii)* ***Commercial Passenger Services***

Both World and North American operate passenger charter services to customers in specialty markets, such as providing supplemental peak capacity for other air carriers, corporations, political campaigns, professional sports teams, tour operators and concert tours. World and North American provide their passenger charter services through both ACMI and full service contracts.

## V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

### A.    Events Leading to Chapter 11

### *(i)* ***Decreased Military Need, Reduced Military Rates and Schedule Reliability Penalties***

Both World's and North American's military operations have been negatively impacted by the decline in military demand. The withdrawal of military troops from Iraq and Afghanistan reduced the demand for aircraft, causing World's and North American's revenues generated from its military passenger and cargo operations to plummet. Combined, military passenger revenue for 2011 for World and North American decreased by approximately $80.2 million, or 11% as against 2010, and military cargo revenue for 2011 decreased by approximately $41 million, or 29% as compared against 2010.

Additionally, AMC hourly rates paid per mile under the 2011 AMC contract were down 5.2% for wide-body passenger aircraft, 5.5% for narrow-body passenger aircraft and 2.0% for large freighter aircraft as compared against the 2010 AMC contract. The decline in rates was mainly due to a combination of lower costs from other airline carriers and changes in the AMC's allowable costs. This resulted in a lower profit margin.

Source: Company Estimates



Furthermore, the 2011 AMC contract included new and increased requirements for on-time performance. In some instances, World and North American were unable to meet all of the increased requirements, and as a result, was penalized and lost the opportunity to fly certain missions. The lost missions also contributed to decreased revenues in the military sector.

### *(ii)* **Labor Agreements**

As of the Commencement Date, World and North American had a combined total of approximately 2,000 employees, roughly 63% of whom were Union members. Five Union groups with five separate Collective Bargaining Agreements represent the employees at World and North American:

- World's pilots and flight attendants, who account for approximately 39% and 33% of the total workforce at World, respectively, are represented by the International Brotherhood of Teamsters (the "*IBT*") and are each subject to a separate Collective Bargaining Agreement.

- North American's pilots, who account for approximately 26% of the total workforce at North American, are represented by Airline Pilots Association ("*ALPA*") and are subject to their own Collective Bargaining Agreement.

- North American's flight attendants, who account for approximately 41% of the total workforce at North American, are represented by the IBT, but have not yet ratified a Collective Bargaining Agreement; this will be the first Collective Bargaining Agreement between NAA and its IBT-represented flight attendants.

- World's nine dispatchers are represented by The Transport Workers Union of America ("*TWU*"), which is affiliated with the AFL-CIO. These nine employees have their own Collective Bargaining Agreement.

23

The Collective Bargaining Agreements require the maintenance of several different health and welfare plans, as well as certain travel policies, less flexible work rules and fringe benefits for the various unionized employees.

Additionally, World participated in a multiemployer defined benefit pension plan for its flight attendants ("*IBT Pension Plan*"). The IBT Pension Plan was structured to place the financial burdens of all of the retirees under the plan upon several companies in the plans that have active union employees. This multiemployer plan was recently determined to be in "critical" status due to past plan participants leaving the plan, ultimately leaving the plan underfunded. As a result, World's obligations to the IBT Pension Plan increased by a 5% surcharge on its contributions.

World also maintains a target benefit plan for its cockpit crewmembers. Under the target benefit plan, an individual account is established for each plan participant and World contributes a fixed amount every year. The plan provides a "target benefit" payable as a lump sum, installment, or an annuity to begin at the participant's retirement. World's estimated annual contributions for the target benefit plan are approximately $4.8 million.

World's and North American's costly labor agreements had become unsustainable, making it difficult for Global Aviation to remain competitive in the marketplace. The Debtors intended to use the chapter 11 reorganization process to enter into negotiations with its unionized workforce and secure competitive and flexible labor agreements that help position Global Aviation for future success.

### (iii)    *Underutilization of Commercial Cargo Fleet*

In 2010, anticipating increased demand for cargo services, World decided to increase its 747 cargo fleet by two aircraft, with delivery to be complete in early 2011. While commercial cargo revenues in 2011 remained high as compared to 2010, market demand was not as high as anticipated due to unfavorable global economic conditions. As a result, these aircraft were not sold under ACMI contracts to commercial customers until the second quarter of 2011. Furthermore, because of weak customer demand of large wide-body freighter aircraft, World's large fleet of nine MD-11 freighters remained significantly underutilized. The underutilization of the commercial cargo fleet resulted in a higher costs per aircraft, further impairing Global Aviation's liquidity position.

### (iv)    *Global Aviation's Funded Debt Obligations*

As discussed in detail above, Global Aviation has outstanding Prepetition Debt Obligations of approximately $244 million. In 2011, Global Aviation's earnings before interest, taxes, depreciation and amortization ("*EBITDA*") substantially declined from $115.2 million in 2010 to $35.7 million. With EBITDA of $35.7 million, Global Aviation did not have the capacity to service $244 million of debt. Consequently, Global Aviation has engaged in extensive negotiations with its secured lenders, resulting in both the March 2011 and September 2011 Amendments. At the time, the Senior Secured Noteholders were amenable to the Amendments, in part, because of over $60 million in funds that Global Aviation anticipated receiving from a favorable money judgment, which funds were going to be used to repurchase the Senior Secured Notes. The Amendments enabled Global Aviation to ascertain its business outlook in regards to military demand, entitlement, world economic conditions and its aircraft capacity needs. In addition, a requirement of the Amendments was an offer to purchase an additional $3 million of the Senior Secured Notes on two different occasions, which constrained Global Aviation's liquidity situation. However, as Global Aviation has taken steps to prepare for a restructuring, it is unable to fund its upcoming offer and its interest payments due under the Senior Secured Notes and the Second Lien Term Loan, or meet the net consolidated cash flow covenants in March 2012. Additionally, as discussed below, Global Aviation's favorable money judgment was overturned on appeal, leaving Global Aviation with far less capital than it has anticipated, and little ability to further negotiate an out-of-court solution with its Senior Secured Noteholders. As a result, Global Aviation deemed that it was in the best interests of the business to commence these chapter 11 cases and effectuate a comprehensive restructuring.

### (v)    *Decreased Team Entitlement Share Partially Offset by Increased Global Entitlement Share*

Under the AMC contract for 2011, the Alliance Team, for which World and North American are primary flyers, was entitled to 43% of long-range international expenditures, down from 56% in the previous year. Beginning in January 2012, the Alliance Team's entitlement is 32%. As a result, World's and North American's

24

AMC volume, as measured in hours, was lower than in 2010.  However, World's and North American's respective entitlement shares increased from approximately 7% during 2010 to approximately 18% in 2011, allowing each airline to pay less in commissions to its teammates.  The lost revenue generation caused by less entitlement was partially offset by the decrease in commission expense.  Thus, even with increased entitlement share, World and North American were unable to realize the same level of revenues as previous years due to the decrease in the Alliance Team's entitlement share.

### *(vi)    ATA Bankruptcy Estate Litigation*

As discussed above, Global Aviation is the primary beneficiary of the ATA bankruptcy estate.  On June 11, 2008, the ATA bankruptcy estate filed suit in the Federal District Court of Indiana against FedEx for a breach of contract claim.  Pursuant to ATA's chapter 11 plan, 85% of any damages recovered by ATA from FedEx were to be retained by the ATA estate and subsequently distributed to Global Aviation.  In 2011, the United States District Court for the Southern District of Indiana entered against FedEx a $71.3 million judgment, which FedEx appealed to the United States Court of Appeals for the Seventh Circuit. On December 27, 2011, the Seventh Circuit reversed the judgment against FedEx and dismissed ATA's lawsuit.  The Debtors' petition for certiorari was recently denied.  As a result of the foregoing, the trustee of the ATA bankruptcy estate is in the process of dissolving ATA and terminating the bankruptcy trust.

After the district court decision, Global Aviation anticipated using the more than $60 million expected to be realized from the FedEx judgment to partially pay down the Senior Secured Notes.  Indeed, under the Senior Secured Notes Indenture, Global Aviation is obligated, for any ATA distribution above $5.0 million, to offer to repurchase amounts outstanding under the Senior Secured Notes.  While Global Aviation was well aware that a reversal of the FedEx litigation was a possibility, actual reversal (subject to the direct appeal) made Global Aviation's restructuring more difficult.

### B.    Global Aviation's Prepetition Restructuring Initiatives

Until 2011, World's and North American's military operations had long represented a consistent revenue base.  However, military revenues and related block hours declined sharply in 2011 due to lower entitlement, the end of the war in Iraq, the commencement of the withdrawal of troops from Afghanistan and decreased military contract rates.  Additionally, World saw a significant decline in commercial cargo demand due to the weakened global economic state, resulting in continued losses in the commercial sector.  The decreased demand for military and commercial cargo services, in conjunction with an overleveraged capital structure, underutilized capacity and excessive operational costs, contributed to a substantial decline in EBITDA from $115.2 million in 2010 to $35.7 million in 2011.

As a result of these difficulties, Global Aviation began initiatives to restructure its financial and business operations, making several difficult decisions to reduce costs and improve efficiencies.  In particular, these prepetition initiatives included:

- amending Global Aviation's Prepetition Debt Obligations (March 2011; September 2011);
- reducing the workforce;
- engaging in negotiations with World and North American's labor unions in an effort to achieve concessions;
- negotiating and amending Global Aviation's fuel payment plan with the Department of Defense;
- planning to reduce a significant portion of the Prepetition Debt Obligations with litigation proceeds; and
- renegotiating certain above-market aircraft leases.

Global Aviation's efforts to address its financial and operational issues were derailed when the FedEx judgment was reversed.  The inability to access immediate cash meant that Global Aviation would not be able to maintain its current fleet and employee level and fund its near-term Senior Secured Notes offer and interest obligations.  The lack of liquidity, combined with the complex issues facing Global Aviation's businesses, forced Global Aviation to commence these chapter 11 cases to facilitate a comprehensive restructuring.

In the weeks leading up to the Commencement Date, Global Aviation engaged in constructive discussions with its prepetition secured creditors and its equity sponsor.   Importantly, Global Aviation obtained from approximately 68% of its Senior Secured Noteholders the consent to use cash collateral, giving the Debtors access to much needed liquidity through the first several weeks of these chapter 11 cases.   During this time, the Debtors negotiated, and ultimately received approval of, postpetition access to debtor in possession financing.

## VI.   EVENTS DURING THE CHAPTER 11 CASES

On February 5, 2012 (the "***Commencement Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Commencement Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The following is a general summary of the chapter 11 Cases, including, without limitation, a discussion of the Debtors' restructuring and business initiatives since the commencement of the chapter 11 cases.

### A.      Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.   Under chapter 11, a debtor can reorganize its business for the benefit of itself, its Creditors and its interest holders. Chapter 11 also promotes equality of treatment for similarly situated Creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

### B.      First Day Pleadings and Other Case Matters

#### *(i)*      ***First and Second Day Pleadings***

To facilitate the chapter 11 cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Commencement Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings resulted in the following orders[5]:

- Cash Collateral.  On February 6, 2012, the Bankruptcy Court entered an interim order approving the use of cash collateral to fund operations and restructuring costs [Docket No. 32].  This relief was necessary to ensure that the Debtors can continue to operate in the ordinary course during the chapter 11 cases.  The Bankruptcy Court entered a final order granting the relief requested on March 30, 2012 [Docket No. 311].  The Debtors' request for authority to obtain postpetition financing was not considered at the first hearing and is discussed in greater detail below in Article VI.D.*(i)*.

- Customer Programs.  On February 7, 2012, the Bankruptcy Court entered an order authorizing the Debtors to continue to maintain and administer their industry agreements and to pay and otherwise honor their industry agreement obligations in the ordinary course of business consistent with past practice [Docket No. 35].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 195].

---

[5]   Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the respective First Day Pleadings.

- <u>Employee Wages and Benefits.</u>  On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee benefits programs [Docket No. 36]. The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 196].

- <u>503(b)(9), Lien and PACA Claimants.</u> On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition claims of vendors that would otherwise be entitled to administrative claims under section 503(b)(9) of the Bankruptcy Code, (b) pay certain prepetition claims of certain essential mechanics and service providers and (c) timely and fully pay all claims arising, or of the type, under the Perishable Agricultural Commodities Act [Docket No. 33].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 194].

- <u>Foreign Creditors.</u> On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to pay, in their sole discretion, any prepetition claims owing to Foreign Creditors [Docket No. 34].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 202].

- <u>Fuel Vendors.</u> On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) apply prepetition payments to prepetition and postpetition obligations under fuel supply contracts, (b) pay prepetition amounts owed to fuel supply parties and (c) honor, perform, and exercise their rights and obligations under fuel supply arrangements [Docket No. 37].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 197].

- <u>Cash Management.</u>  On February 6, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, and existing business forms [Docket No. 31].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 193].

- <u>Taxes.</u>  On March 8, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to pay certain prepetition taxes and fees in the ordinary course of business [Docket No. 199].  Such payments only affect the timing of payment for the vast majority of the amounts at issue.

- <u>Insurance.</u>  On March 8, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to (a) continue their prepetition insurance Policies and honor obligations thereunder and (b) revise, extend, supplement, or change their insurance coverage by, among other things, entering into new insurance policies through renewal of the current Insurance Policies or purchase of new postpetition policies [Docket No. 198].

### *(ii)* ***Procedural and Administrative Motions***

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions including orders:

- authorizing the joint administration of the chapter 11 cases;

- approving notice, case management, and administrative procedures to govern the chapter 11 cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

27

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors;

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business;

- determining the amount and nature of the adequate assurance payment for future utility service; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the chapter 11 cases.

### *(iii)* **Retention of Chapter 11 Professionals**

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the chapter 11 cases. These professionals include: (a) K&E, as counsel to the Debtors; (b) Rothschild, Inc. ("*Rothschild*"), as investment banker to the Debtors; (c) Kurtzman Carson Consultants LLC, as the Notice and Claims Agent for the Debtors; (d) Ernst & Young LLP, as Tax Advisor for the Debtors; (e) Ford & Harrison LLP, as Special Labor Counsel for the Debtors; and (f) Pachulski Stang Ziehl & Jones LLP, as Conflicts Counsel for the Debtors.

### *(iv)* **Appointment of the Creditors' Committee Members and Counsel for Such Committee**

On February 13, 2012, the United States Trustee for Region 2 (the "*U.S. Trustee*") appointed the following individuals to the Creditors' Committee: (a) Specialized Freight Forwarders BV; (b) International Brotherhood of Teamsters, Airline Division; (c) Local 210's Pension Fund; (d) Airline Pilots Association, International; (e) Goodrich Corporation; (f) HEMW, LLC; and (g) World Fuel Services, Inc. [Docket No. 65]. On April 16, 2012, the Bankruptcy Court entered an order [Docket No. 349] authorizing the retention of Lowenstein Sandler PC as counsel to the Creditors' Committee. On May 9, 2012, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Imperial Capital, LLC as its financial advisor [Docket No. 372].

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases. The Debtors have kept the Creditors' Committee informed of, and have conferred with the Creditors' Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Creditors' Committee to the extent its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Creditors' Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

### C.    Pending Litigation Proceedings and the Automatic Stay

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these chapter 11 cases. With certain limited exceptions, the automatic stay remains in effect until the Effective Date of the Plan.

During these chapter 11 cases, the Debtors have entered into certain stipulations (subsequently approved by the Bankruptcy Court) with certain parties in interest in order to facilitate the resolution of prepetition disputes without materially affecting the Debtors and their assets, including stipulations with certain individual defendants modifying the automatic stay to allow them to proceed with certain counterclaims in prepetition state court litigation in order to resolve a state court proceeding and potentially increase the assets of the Debtors' estates [Docket No. 508].

In addition, the Debtors' liability with respect to litigation stayed by the commencement of these chapter 11 cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these chapter 11 cases.

### (i)    *WARN Act Adversary Proceedings*

On February 6, 2012, Plaintiff Sarah Hill, on behalf of herself and all others similarly situated (the "*First WARN Claimants*"), filed an adversary class action complaint in the Bankruptcy Court for the Eastern District of New York (the "*First WARN Adversary Proceeding*"); the complaint was originally filed on February 3, 2012 in the Northern District of Georgia.  The First WARN Adversary Proceeding asserted that the Debtors violated the Worker Adjustment and Retraining Notification Act (the "*WARN Act*") on or about January 3, 2012 by allegedly terminating the First WARN Claimants as part of mass layoffs, without giving the necessary 60 days notice required by the WARN Act.  The First WARN Claimants sought, amongst other things, administrative expense treatment of their claim and a judgment against the Debtors for unpaid wages, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits.  On May 15, 2012, the Debtors filed their Motion to Dismiss First WARN Claimants' complaint.  Pursuant to numerous discussions between the First WARN Claimants and Debtors, the First WARN Claimants agreed to withdraw their First WARN Adversary Proceeding and the Debtors stipulated to the First WARN Claimants' class certification and ability to file a class proof of claim through the claims adjudication process, not the adversary proceeding process.  The Debtors filed an objection to the First WARN Claimants' class proof of claim on October 9, 2012 [Docket No. 639].

On July 30, 2012, Plaintiffs Daniel Schroeder and Charles Martin, Jr., on behalf of themselves and all others similarly situated (the "*Second WARN Claimants*"), filed an adversary class action complaint in the Bankruptcy Court for the Eastern District of New York (the "*Second WARN Adversary Proceeding*").  The Second WARN Adversary Proceeding asserts that the Debtors violated the WARN Act on or  about March 31, 2012 through June 8, 2012 by allegedly terminating the Second WARN Claimants—all of whom are pilots based in Missouri— as part of mass layoffs, without giving the necessary 60 days notice required by the WARN Act.  The Second WARN Claimants seek, amongst other things, a judgment against the Debtors for unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension contributions, other ERISA benefits and administrative expense treatment of their claim.  The Debtors filed their answer the Second WARN Claimants' complaint on September 21, 2012 stating their belief that the allegations set forth therein are baseless and that the Debtors are without liability [Docket No. 9].

### (ii)    *Creditors' Committee Lien Litigation*

On October 16, 2012, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtors' Estates* (the "*Motion to Prosecute*") [Docket No. 662] . The Motion to Prosecute seeks standing to prosecute an adversary proceeding challenging the Senior Secured Noteholders' and Second Lien Lenders' interests in the Debtors' property acquired after the Commencement Date. On October, 16, 2012, the *Creditors' Committee also filed the Official Committee of Unsecured Creditors' Motion (A) For an Expedited Hearing and (B) to Shorten the Notice Period with Respect to the Motion of the Official Committee of Unsecured Creditors for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtors' Estates* (the "*Motion to Shorten*") [Docket No. 662], seeking to have the Motion to Prosecute heard as soon as practicable.

The Bankruptcy Court heard the Motion to Shorten on October 17, 2012, at the Disclosure Statement Hearing.  Based on discussions at the Disclosure Statement Hearing, the Bankruptcy Court determined that the Motion to Prosecute would be heard on October 24, 2012.  The Bankruptcy Court set the deadline for the Debtors' response to the Motion to Prosecute on October 22, 2012, and the deadline for the Creditors' Committee's reply on October 23, 2012.  The Debtors plan to contest the Creditors' Committee' standing.

### D.    The Debtors' Transition into Chapter 11.

Upon entering chapter 11, the Debtors focused their efforts on minimizing any disruptions to the Debtors' business operations.  This required the Debtors to address a series of threshold issues, including (a) securing

postpetition financing; (b) reaching a consensual arrangement with the United States (as defined herein), which provided the Debtors with much needed liquidity; (c) approving the Debtors' surety bond program; and (d) significantly rationalizing their aircraft fleet and negotiating new commercial agreements, all without affecting the customer experience. After achieving these goals, the Debtors could turn their attention to relocating North American's headquarters, negotiating labor savings from the Unions and maximizing the value of the enterprise for the benefit of all stakeholders.

### *(i)        Postpetition Financing*

The Debtors commenced these chapter 11 cases with limited liquidity. Consequently, at the outset of these cases the Debtors negotiated to secure the continued use of cash collateral on a consensual basis with the Debtors' prepetition secured lenders. As stated previously, the Debtors obtained interim approval to use cash collateral to operate their businesses at the first day hearing. However, the use of cash collateral alone was not sufficient to allow the Debtors to operate their business throughout the chapter 11 cases. Indeed, it became evident soon after the commencement of these chapter 11 cases that the Debtors would need the new money financing to prosecute these chapter 11 cases. Unlike most chapter 11 cases where postpeititon financing is negotiated and obtained before commencing chapter 11 cases; here, the Debtors entirely commenced the postpetition financing process after commencing their chapter 11 cases.

The interim use of cash collateral, therefore, acted as a bridge to securing post-petition financing which, once secured, would enable the Debtors to operate their businesses and prosecute these chapter 11 cases going-forward. Leading up to and immediately following the Commencement Date, the Debtors worked closely with their financial advisor, Rothschild, to identify potential sources of postpetition financing. On February 24, 2012, the Debtors submitted a motion seeking authority to obtain up to $45 million (no less than $15 million on an interim basis) in secured postpetition financing (the "*DIP Facility*") under an agreement (as amended, supplemented, and modified from time to time, the "*DIP Agreement*") between the Debtors and IN-FP2 LLC and its affiliated entities, certain funds and accounts managed by Guggenheim Investment Management, LLC, and its affiliates, certain funds and accounts managed by Beach Point Capital Management LP, Chatham Credit Management III, LLC and funds managed by Stonehill Capital Management LLC (together with certain of their affiliates, the "*DIP Lenders*").

On March 1, 2012, the Bankruptcy Court entered an interim order [Docket No. 158] (the "*Interim DIP Order*") approving the DIP Facility. On March 30, 2012, the Bankruptcy Court entered a final order [Docket No. 311] (the "*Final DIP Order*") approving the DIP Facility on a final basis. The Final DIP Order provided the Debtors with the authority to use the proceeds from the DIP Facility to permit the orderly continuation and operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.

### *(ii)        Stipulation with the United States*

Upon commencement of the chapter 11 cases, and as a result of outstanding fuel obligations owed by the Debtors to the United States of America (the "*United States*"), the Department of Defense (the "*DOD*") placed a hold on the approximately $38.5 million in prepetition receivables due and owing to the Debtors on account of prepetition missions that the Debtors flew for the United States Military. This hold constrained the Debtors' liquidity and, absent the release of the funds, the Debtors would have violated their interim cash collateral budget covenant.

Over the course of the first weeks of these chapter 11 cases, the Debtors negotiated and entered into a stipulation with the United States (the "*U.S. Stipulation*"), which was approved by the Court, whereby the United States released approximately $18.5 million to the Debtors, in exchange for certain protections to ensure that the United States preserves all of its rights, including the DOD withholding approximately $20 million in prepetition receivables [Docket No. 201] (the "*Holdback Reserve*"). In addition, the U.S. Stipulation provided for an ongoing plan for the Debtors to continue to pay down their outstanding obligations in exchange for further release of prepetition receivables from the United States.

To date, the Debtors and the United States have been following the plan laid out in the U.S. Stipulation, reducing both receivables owed to the Debtors as well as their outstanding obligations owed to the United States.

On July 9, 2012, the Bankruptcy Court approved the first amendment to the Stipulation (the "*First U.S. Stipulation Amendment*") whereby the DOD agreed to release approximately \$1 million from the Holdback Reserve in exchange for certain protections to ensure that the DOD preserves all of its rights. On July 18, 2012, Global Aviation submitted to the Bankruptcy Court the second amendment to the Stipulation (the "*Second U.S. Stipulation Amendment*"), whereby the DOD agreed to release approximately \$1.2 million from the Holdback Reserve in exchange for certain protections to ensure that the DOD preserves all of its rights.

On August 8, 2012, Debtors submitted to the Bankruptcy Court the third amendment to the Stipulation (the "*Third U.S. Stipulation Amendment*"), whereby the DOD agreed to setoff approximately \$3 million from the Holdback Reserve against Global Aviation's July 30, 2012 \$3 million of outstanding fuel obligation payments. The Prepetition DLA-Energy Agreement currently requires all outstanding fuel obligation payments be completed by September 2012.

On October 16, 2012, the Debtors submitted a fourth amendment to the Stipulation (the "*Fourth U.S. Stipulation Amendment*") which provides for the full setoff of the Reserve against all outstanding fuel obligation payments and returns the Debtors to normal credit terms (*i.e.*, paid in arrears at the beginning of each month for actual fuel use during the prior month) [Docket No. 661].

### *(iii)    Surety Bond Program*

In the ordinary course of business, the Debtors engage in certain activities that require them to provide financial assurance of payment to third parties. A common and reasonable means to do so is through the issuance of surety bonds. Specifically, the Debtors, in the ordinary course of business, regularly issue surety bonds for the benefit of the U.S. Customs Service because such bonds are required by law for an air carrier engaged in international commerce.

Additionally, the Debtors post bonds in order to (a) secure landing rights at certain airports, (b) guaranty lease payments on rental areas at certain airports and (c) guaranty certain other taxes and fees related to the Debtors' operations. Failure to provide, maintain or timely replace these surety bonds could jeopardize the Debtors' ability to conduct their business operations.

Prior to the Commencement Date, the Debtors maintained a surety bond program (the "*Prepetition Surety Bond Program*") with Travelers Casualty & Surety Company ("*Traveler*") under which Travelers issued certain surety bonds in the ordinary course of business for the benefit of the Debtors. As of the Commencement Date, Travelers had issued surety bonds in an amount of approximately \$1,040,686 that were secured by approximately \$1,076,995 in letters of credit posted by the Debtors (the "*Existing Collateral*").

On April 17, 2012, the Debtors filed a motion to enter into a postpetition surety bond program with Travelers [Docket No. 351] (the "*Postpetition Surety Bond Program*"). The Postpetition Surety Bond Program provided the continuation of the Debtors' outstanding surety bonds as well as the ability to issue additional surety bonds upon the posting of additional collateral and approval by the Bankruptcy Court. In addition, the Debtors were required to execute a new indemnity agreement. The Postpetition Surety Bond Program was approved by the Bankruptcy Court on May 9, 2012 [Docket No. 375].

### *(iv)    Fleet Rationalization and Restructuring*

#### (a)    Fleet Rationalization

Subject to Bankruptcy Court approval, the Bankruptcy Code permits an airline debtor to reject leases of aircraft equipment and abandon or sell owned aircraft equipment. As of the Commencement Date, World and North American were, combined, parties to 30 aircraft leases. In addition, as of the Commencement Date, the market values of many of the Debtors' aircraft had declined substantially since the aircraft were originally leased or financed. Consequently, the Debtors were paying above market costs for many of their aircraft.

Prior to and after the Commencement Date, the Debtors and their advisors undertook extensive analysis of the Debtors' contemplated post-emergence fleet structure. On the first day of the Debtors' chapter 11 cases,

31

pursuant to section 365 of the Bankruptcy Code, the Debtors filed a motion to reject 16 aircraft leases that were burdensome to the estates [Docket No. 19] (the "*First Omnibus Rejection Motion*"). Subsequent to First Omnibus Rejection Motion, the Debtors filed 4 additional omnibus motions seeking to reject certain aircraft, engine and equipment leases deemed non-essential to their go-forward operations and post emergence business plan. [Docket Nos. 133, 352, 371 & 391].

(b)      Section 1110

In general, upon the filing of a chapter 11 bankruptcy petition, the automatic stay under section 362 of the Bankruptcy Code enjoins the enforcement of rights and remedies by a debtor's creditors. Section 1110 of the Bankruptcy Code operates as an exception to the automatic stay for certain types of leased or financed aircraft and aircraft equipment. Under this section, certain secured parties, lessors and conditional sales vendors may take possession of certain qualifying aircraft, aircraft engines or other aircraft-related equipment that are leased or subject to a security interest or conditional sale contract pursuant to their agreement with the debtor. Section 1110 of the Bankruptcy Code provides that, unless a debtor agrees to perform under the agreement and cure all defaults other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code within 60 calendar days after filing for bankruptcy, secured parties and lessors can take possession of such equipment.

Section 1110 of the Bankruptcy Code effectively shortens the automatic stay period to 60 days with respect to section 1110-eligible aircraft, engines and related equipment, subject to the following two conditions: (i) the debtor may elect, with court approval, to perform all of the obligations under the applicable financing and cure any defaults thereunder as required by the Bankruptcy Code (which does not preclude later rejecting any related lease or abandoning any owned aircraft) (an "*1110(a) Election Notice*") or (ii) the debtor may extend the 60-day period by agreement of the relevant financing party with court approval (an "*1110(b) Stipulation*"). In the absence of either such arrangement, the financing party or lessor may take possession of the property and enforce any of its contractual rights or remedies to sell, lease or otherwise retain or dispose of such equipment.

In the chapter 11 cases, the 60-day period under section 1110 of the Bankruptcy Code expired on April 5, 2012 (the "*Section 1110 Expiration Date*"). In light of the Section 1110 Expiration Date, the Debtors worked diligently and quickly to analyze their fleet needs and undertake the steps necessary to preserve their operating infrastructure. In particular, the Debtors successfully sought entry of a consensual order establishing procedures under section 1110 of the Bankruptcy Code to enter into 1110(b) Stipulations and provide 1110(a) Election Notices. [Docket No. 245].

Subsequent to entry of the procedures order, the Debtors engaged in discussions with all of their aircraft lessors, and ultimately entered into and filed a number of 1110(b) Stipulations, preserving their ability to use their leased aircraft and engines subsequent to expiration of the 60-day period under section 1110. [Docket Nos. 357-60, 413, 416, 433, 435, 461, 462]. The Debtors have also elected to continue performance under a number of their prepetition leases and have filed corresponding 1110(a) Election Notices [Docket Nos 287, 325, 326].

**E.      The Exclusivity Motions**

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a plan of reorganization (the "*Exclusive Periods*"). If the debtor files such a plan within that initial 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods, within certain limitations, "for cause." On September 20 2012, the Debtors filed their second motion to extend the Exclusive Periods [Docket No. 583].

On May 11, 2012, the Debtors filed their first motion to extend the Exclusive Periods [Docket No. 379] (the "*First Exclusivity Motion*") seeking to extend the exclusive filing period and the exclusive solicitation period through and including October 2, 2012, and December 3, 2012, respectively [Docket No. 379]. The Bankruptcy Court approved the First Exclusivity Motion on June 1, 2012 [Docket No. 401]. Having secured an extension of their Exclusive Periods, the Debtors were able to focus on achieving certain labor cost savings.

On September 10, 2012, the Debtors filed their second motion to extend the Exclusive Periods [Docket No. 379] (the "*Second Exclusivity Motion*") seeking to extend the exclusive filing period and the exclusive solicitation period through and including December 31, 2012, and March 1, 2013, respectively [Docket No. 583]. The Bankruptcy Court approved the Second Exclusivity Motion on September 25, 2012 [Docket No. 624], allowing the Debtors to focus their efforts to achieve consensual approval on the Plan and Disclosure Statement.

### F.  365(d)(4) Extension

By order dated June 1, 2012, the Bankruptcy Court extended the time to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including September 2, 2012. [Docket No. 402]. The Debtors currently have extensions of the time to assume or reject under section 365(d)(4) of the Bankruptcy Code in connection with one unexpired lease of nonresidential real property, and the Debtors have assumed or rejected, as appropriate for their businesses, the remaining unexpired leases of nonresidential real property. [Docket Nos. 546 and 548].

### G.  NAA Relocation

The Debtors, as part of their reorganization strategy, decided to relocate North American's operations from JFK International Airport to Peachtree City, Georgia (the "*North American Relocation*"). To relocate operational control from Jamaica, New York, to Peachtree City, Georgia, North American was required to demonstrate to and receive approval from the FAA that its key operating systems and programs supporting its operations, maintenance and safety departments were functioning as consistently at the new location as they were at the original location.

The personnel who oversaw and managed the movement of these required systems and programs, and who ultimately certify the systems and programs, are required to be employed by North American Airlines pursuant to section 119 of the United States Federal Aviation Regulations (the "*FAA Regulations*"). In particular, section 119.65 of the FAA Regulations provides that a "certificate holder must have qualified personnel serving full-time in the following or equivalent positions: (1) Director of Safety, (2) Director of Operations, (3) Chief Pilot, (4) Director of Maintenance and (5) Chief Inspector" (the "*Section 119 Employees*"). 14 C.F.R. § 119.65. Additionally, section 119.67 of the FAA Regulations specifically provides for the extensive training and experience necessary for each applicable employee to be qualified as a Section 119 Employee. *See* 14 C.F.R. § 119.67.

On June 15, 2012, the Debtors filed a motion for the entry of an order approving a key employee retention plan (the "*KERP*") pursuant to §§ 363(b) and 503(c)(3) of the Bankruptcy Code. The KERP pays bonuses to North American's Section 119 Employees. On July 24, 2012, the Bankruptcy court entered an order approving the Debtors' KERP [Docket No. 512].

On August 9, 2012, the Debtors filed a motion to reject the lease for their operations at JFK International Airport [Docket No. 526]. The Bankruptcy Court approved the motion on August 24, 2012 [Docket No. 548].

### H.  Senior Management Team

The senior management team of Global Aviation Holdings Inc. has remained in place during the course of the chapter 11 cases. On the Effective Date, the members of the senior management team will enter into New Employment Agreements with the Reorganized Company and it is anticipated that the senior management team will continue to work for Global Aviation in their current capacities. Biographical information for the members of the senior management team is set forth below:

- **Robert R. Binns** -- *Chairman & Chief Executive Officer*: Robert R. Binns was appointed Chairman of Global Aviation Holdings Inc., in June 2010. He was named Chief Executive Officer of Global Aero Logistics Inc. (now Global Aviation) in April 2008. He had served as Chief Marketing Officer of Global Aero Logistics since September 2007 and had previously served as Chief Marketing Officer of World Air Holdings from August 2005 to September 2007. He joined World Airways in April 2004 as Senior Vice President of Marketing and Planning. Prior to joining World, Mr. Binns was President and Chief Executive Officer of TransMeridian Airlines from April 2002 to April 2004 and previously had been its Chief Financial Officer from December 2001 to April 2002. Mr. Binns was Vice President and

Controller for the technical division of Pegasus Aviation from April 2000 through December 2001, and also spent several years with TWA in a variety of positions, including General Auditor. Prior to that he worked as an auditor for the accounting firm of KPMG in London. Mr. Binns began his career with a political lobbying firm in London that specialized in transportation issues. He holds an MBA in Finance from the University of Kansas and a Master's degree in Political Behavior from Essex University in England. He has served since 2007 on the Carter Center Board of Councilors, which serves to advance understanding of and support for The Carter Center and its activities. Members attend quarterly meetings with President Carter and act as informed advocates of The Carter Center.

- **Charles P. McDonald** -- *President*: Charles P. McDonald was appointed President of Global Aero Logistics Inc. in April 2008 after serving as Executive Vice President and Chief Airline Officer since February 2008. He previously served as Senior Vice President and Chief Operating Officer of World Airways from April 2005 to September 2007. His responsibilities include Flight Operations, Aircraft Maintenance and Engineering, In-Flight Services, Customer Service, Safety and Human Resources. He first joined World in May 2004 as Senior Vice President of Operations. Mr. McDonald has more than 20 years of aviation experience, including Chief Operating Officer of TransMeridian Airlines from 1999 through 2004. Prior to this position, Mr. McDonald held senior-level positions with British Aerospace Regional Aircraft from 1995 to 1999 and the AMR Corporation, including Director of Aircraft Maintenance for Flagship Airlines from 1988 through 1995.

- **William A. Garrett** -- *Chief Financial Officer*: William A. Garrett joined Global Aero Logistics Inc. in November 2007 as Executive Vice President and Chief Financial Officer. During 2007, Mr. Garrett was previously employed by MatlinPatterson Global Advisors LLC, providing senior advisory and restructuring management services to its international aviation investments. MatlinPatterson is currently Global Aviation's majority shareholder. Prior to joining MatlinPatterson, from 2000 through 2006, Mr. Garrett served as Chief Operating Officer and previously as the Chief Financial Officer of Gemini Air Cargo, an international cargo airline operating wide-body, freighter aircraft. He served as the Chief Financial Officer of Vanguard Airlines, Inc. a domestic passenger airline, from 1996 through 1999. Prior to entering the airline industry, Mr. Garrett spent nine years in public accounting providing accounting, auditing, merger, acquisitions and transactional services, most recently with Ernst & Young LLP and initially with PriceWaterhouse Coopers LLP. While in public accounting, Mr. Garrett had a concentration in transportation and high-growth companies in the public and private sectors. Mr. Garrett holds a B.S. in Business Administration and Accounting from Washington and Lee University.

- **Brian Bauer** -- *Chief Commercial Officer*: Brian Bauer has served as Global's Executive Vice President and Chief Commercial Officer since June 2010. His responsibilities include business and market development; market research and planning; strategic direction for passenger and cargo sales; and corporate planning. Mr. Bauer has more than 21 years of aviation experience. Prior to joining Global Aviation, Bauer served as President of Evergreen International Airlines from 2006 to June 2010. Prior to this position, Mr. Bauer served in a variety of management and executive positions at Evergreen Aviation Ground Logistics Enterprises, including President, Executive Vice President and Vice President of Operations.

- **Brian S. Gillman** -- *General Counsel & Corporate Secretary*: Brian joined Global Aviation Holdings Inc. as Senior Vice President, General Counsel & Corporate Secretary in February 2011. Prior to joining Global, he served as Executive Vice President and General Counsel for Mesa Air Group, Inc. since 2001. Prior to Mesa Air Group, he served as Vice President, General Counsel and Corporate Secretary for Vanguard Airlines, Inc. from 1996 to 2001. Prior to joining Vanguard Airlines, he was an Associate Attorney in the Corporate Department of Stinson, Mag & Fizzell, one of Kansas City's largest full service law firms at the time. Brian has more than 15 years of aviation experience with publicly traded companies. He has extensive experience in complex commercial litigation management, contract

negotiations including complex aircraft and engine leasing involving a wide range of structures and financing sources, public and private debt and equity financing, and significant international joint venture experience. Brian obtained his Juris Doctor degree from The University of Iowa College of Law and holds a B.B.A. in Accounting from The University of Iowa.

Before the Commencement Date, and in the ordinary course of their business, the Debtors maintained an incentive and retention program for certain members of their senior management team. The program applied to five senior managers and consisted of annual bonuses based on achieving certain goals and achieving certain performance targets, payable upon finalization of the annual financial results. This opportunity to earn an annual bonus was set forth in each of the senior managers' employment agreements. The program was administered by the Debtors' compensation committee (the "*Compensation Committee*") of the board of directors of Global Aviation Holdings Inc. (the "*Board*") and the Compensation Committee retained discretion to take into account the facts and circumstances surrounding the Debtors' business and the value added by senior management in awarding annual bonuses. Thus, the Compensation Committee could — and in the past, did — revise performance targets on a retroactive basis to ensure that the senior management team was properly compensated and incentivized. This is necessary as much of the Debtors' governmental business is dependent on the military's needs and, consequently, the senior management team must react quickly to the military's increase or decrease of troop levels and needs. The senior management bonuses, combined with annual salaries, were intended to pay senior managers a market level of compensation.

As discussed above, in 2011, the Debtors' business was adversely impacted by the end of the Iraq war and by the announcement that troops would be withdrawn from Afghanistan. This subsequently reduced the number of missions the military required. Additionally, due to the global recession, the Debtors suffered a significant decrease in demand for commercial cargo services, resulting in a substantial decline in commercial revenues. The decrease in military and cargo service demand, coupled with unionized high labor and fixed costs, excess aircraft (due to military cutbacks) and an overleveraged balance sheet, had a dramatic and negative impact on the Debtors' business, which required senior management to focus on stabilizing the Debtors' business and preserving value.

Based on this, the Compensation Committee determined that, despite missing performance targets, which were impossible to meet due to the military cutbacks, year-end bonuses were warranted due to management's strong efforts in stabilizing the business. However, the Compensation Committee's past practice was to pay bonuses for prior years in early April of the current year, after the previous year's financial results were finalized. As the Debtors commenced these chapter 11 cases on February 5, 2012, the Compensation Committee decided against breaking with past practice and did not authorize the payment of annual bonuses.

In addition, acknowledging the sacrifices that the Debtors would ask of their unionized workforce to bring the Debtors' labor costs more in line with their competitors, the senior management team voluntarily took a 10% base salary pay cut before the Commencement Date. The senior management team has managed the Debtors' estates throughout the course of the chapter 11 cases at these reduced base salary levels and without a bonus.

During the chapter 11 cases, the Compensation Committee considered proposing a key employee incentive plan ("*KEIP*") and filing a motion to approve same. Specifically, the Compensation Committee developed an incentive bonus plan for senior management in conjunction with Towers Watson ("*Towers*"), the Debtors' compensation consultants, Kirkland & Ellis LLP, the Debtors' legal counsel, and Rothschild, Inc., the Debtors' financial advisors. The KEIP was designed to incentivize management to drive value through the Debtors' retaining security clearance with the military, increasing revenue and increasing EBITDA. The Compensation Committee reviewed and pressure tested the proposed KEIP to ensure that it would reach the goal of increasing the Debtors' value.

During the course of evaluating the KEIP, the Debtors reached out to the DIP Lenders and First Lien Noteholders to solicit their opinion on the proper structure and timing of the KEIP. The Debtors' also provided the KEIP to the Creditors' Committee who indicated that they would not support such a plan at that time. After extensive review and deliberation, and with the support of the DIP Lenders and First Lien Noteholders, the Board, at the recommendation of the Compensation Committee, again determined that the best course of action was to postpone paying bonuses to the senior management team. Specifically, the Board did not want to disrupt the progress being made in its chapter 11 cases.

Over the course of the chapter 11 cases, the Compensation Committee continued to evaluate, in conjunction with the DIP Lenders and First Lien Noteholders, ways to properly incentivize the senior management team leading up the filing of the Disclosure Statement.   After consulting with the DIP Lenders and First Lien Noteholders, the Compensation Committee determined that that the best course of action was for the senior management team to enter into New Employee Agreements, the terms of which are being negotiated with the First Lien Noteholders, and for the Debtors' to implement a Management Equity Incentive Plan.

The Management Equity Incentive Plan provides for 10% of the fully-diluted New Common Stock (which shall not dilute the Employee Equity Pool provided for in the Employee Equity Plan), to be reserved for issuance  to certain of the Debtors' Executives and Employees, as determined by the Reorganized Global Aviation Board. Certain terms of the Management Equity Incentive Plan shall be included in the Plan Supplement.  The Debtors believe that the 10% of New Common Stock reserved under the Management Equity Incentive Plan is in line with industry and market norms.[6]   In addition, on the Effective Date, the senior management team will enter into New Employment Agreements with the Reorganized Debtors, the terms of which will govern salary, bonuses and other compensation.

### I.        Composition of New Board of Directors

The New Global Aviation Board shall be chosen through a process led by the Board Selection Committee. The Board Selection Committee may, at its election, retain a qualified search firm, paid for by the Debtors, to identify director candidates.  The Board Selection Committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the Debtors' Chief Executive Officer).  If the Board Selection Committee is unable to reach consensus on a slate of directors, the directors shall be named by Holders of the New Common Stock in proportion of their ownership, with two directors named by the Qualified Represented Employees or Non-Executive, Non-Management Employees based on a majority vote of such Employees within the Employee Equity Pool.  All directors selected shall be qualified and shall not be employees or members of the IBT or any other labor organization.

In addition, the New Global Aviation Board shall also include one non-voting board member identified by IBT and one non-voting board member identified by ALPA.  The non-voting board member or members shall be qualified and shall not be Employees or members of any labor organization.  One year after the appointment of the New Global Aviation Board, the New Global Aviation Board will consider in good faith whether to add the non-voting board members to the New Global Aviation Board as board members, provided that doing so (if the New Global Aviation Board decides to do so) will neither increase the size of the New Global Aviation Board nor affect the Employee Equity Pool's ability to select two directors, and provided that if the New Global Aviation Board adds one of the non-voting board members it must appoint the other.

---

[6]    *See*, *e.g.*, *In re Great Atlantic & Pacific Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Feb. 27, 2012) (reservation of 7.5% of the new common stock); *In re Neff Corp.*, Case No. 10-12610 (Bankr. S.D.N.Y. Sept. 21, 2010) (reservation of 10% of the new common stock on a fully diluted basis); *In re Sbarro, Inc.*,Case No. 11-11527  (Bankr. S.D.N.Y. Nov. 17, 2011) (reservation of 10% of the new common stock); *In re RHI Entm't, Inc.*, Case No. 10-16536 (Bankr. S.D.N.Y. Mar. 29, 2010) (reservation of 15% of the new common stock); In re Chemtura Corp., Case No. 09-11233 (Bankr. S.D.N.Y. Nov. 3, 2010) (reservation of 11% of the new common stock on a fully diluted basis); *In re MGM Studios, Inc*., Case No. 10-15774 (Bankr. S.D.N.Y. Dec. 6, 2010) (reservation of 15% of the new common stock on a fully diluted basis); *In re Readers' Digest Ass'n, Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Jan. 19, 2009) (reservation of 7.5% of the new common stock); *In re Apex Silver Mines Ltd.*, Case No. 09-10182 (Bankr. S.D.N.Y. Mar. 4, 2009) (reservation of 10% of the new common stock on a fully diluted basis); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Nov. 5, 2009) (reservation of 10% of the new common stock); *In re Solutia Inc.*, Case No. 03-17949 (S.D.N.Y. Nov. 29, 2007) (reservation of 12% of the new common stock); *In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill.Jan. 20, 2006) (reservation of 7.86% of the new common stock); *In re US Airways, Inc.*, Case No. 04-13819 (Bankr. E.D. Va. Sept. 16, 2005) (reservation of 12.5% of the new common stock on a fully diluted basis).

ALPA believes the foregoing description regarding the possible addition of the non-voting members as voting members is inconsistent with the ALPA LOA therefore the proposed plan may not be consistent with the ALPA LOA.

### J.    Labor Cost Restructurings

#### *(i)    The Union Negotiations and Tentative Agreements*

Unsustainable labor costs were a primary factor in the Debtors' bankruptcy filing. Indeed, without appropriate labor cost savings, the Debtors would not be able to emerge from chapter 11.  As a result, shortly after the Commencement Date, World and North American (along with their legal and financial advisors) began negotiating with their respective union groups in an attempt to obtain the concessions and modifications necessary for a successful reorganization.

World delivered initial proposals to the IBT-represented World pilots and flight attendants on February 20, 2012 and to the TWU on March 7, 2012.  North American delivered initial proposals to its ALPA-represented pilots on March 1, 2012 and to its IBT-represented flight attendants on March 6, 2012.  World and North American gave each Union a term sheet showing the proposed modifications to each Collective Bargaining Agreement and the savings associated with each change.  All told, the initial proposals to the unions sought approximately $28 million in annual savings and a five-year concessionary period.

Negotiations began in earnest after World and North American made initial proposals.  The negotiations were lengthy, difficult and, at times, extremely contentious.  While discussions of this length, complexity and tone are not unusual in a collective bargaining milieu, these negotiations were made more difficult by two positions (as discussed below) taken by the unions, which increased the complexities of the deal dynamics.  Ultimately, the Debtors were placed in a position where they were faced with a binary choice—agree to a deal with their unions or pursue a litigated path that included a real risk of liquidation.

***First***, World and North American were asking their employees to consensually provide material concessions—concessions without which the company would not be viable at all—and to agree to a five-year concessionary term.  In exchange for settling the parties' disputes and agreeing to the necessary concessions in a 5-year Collective Bargaining Agreement amendment—the type of long-term agreement critical to providing the stability required for emergence (but unavailable even if the Debtors emerged victorious in a trial under section 1113 of the Bankruptcy Code)—the employees demanded significant roles in the company throughout the concessionary period.  No consensual long-term deal would have been possible without including this concept.

***Second***, the World pilots—the source of more than 60% of the needed concessions—made a clear that if World filed a motion to reject their Collective Bargaining Agreement pursuant to section 1113 of the Bankruptcy Code, they would attempt to strike—immediately.  The World pilots took at least two strike votes, both of which resulted in overwhelming votes in favor of striking.  The IBT also filed a letter with the National Mediation Board and a federal court lawsuit in an effort to solidify what they believed was a right to strike.  Although the Debtors did not believe the World pilots had a right to strike, and the Debtors would certainly have sought injunctive relief to bar a strike (and prepared the papers to do so), the reality under which all of these negotiations took place was that any significant work stoppage, slowdown, or other labor action would have devastated the Debtors and likely would have led to liquidation.  Accordingly, while the Debtors were fully prepared to initiate section 1113 litigation if necessary, the consequences of a section 1113 filing were particularly risky.  A settlement was a highly-preferred option given the "bet the company" risks, including the possibility of liquidating regardless of the outcome of section 1113 litigation.

With that background, the negotiations between the IBT (including its legal and financial advisors) and the Debtors (including their legal and financial advisors) continued.  The IBT initially refused to provide anywhere near the concessions necessary for the Debtors to be viable—indeed, they refused to provide any concessions at all—unless they would ultimately receive slightly below 50% of the common equity of the Company.  The Debtors pushed hard against this demand, but it became clear that no deal with labor would be possible unless it ultimately included labor as a significant minority shareholder of the Company.  Thus, the Debtors believed that they had two choices:  they could reach a settlement with their unions that included a post-emergence equity grant, or they could

37

initiate section 1113 litigation, which could never (even if successful) result in the long-term agreement necessary to emerge from chapter 11 protection, but appeared likely to lead to liquidation anyway because of the labor action the World pilots promised would result from a section 1113 filing.

Through the Debtors' negotiations, IBT reduced its demand to 25% of the common equity of the Company, conditioned on agreed-upon debt limitations, and informed the Debtors that if the deal could be achieved, the IBT would deliver approximately 90% of the concessions sought by the Debtors. In light of their other options, the Debtors concluded that pursuing such a deal was in the best interests of the company and its creditors—the company needed the concessions to be viable and to emerge from bankruptcy; a section 1113 filing risked liquidation; and the IBT was unlikely to agree to any less. At the same time, the Debtors believed that they needed the consensus of their senior secured creditors to approve the deal. Accordingly, the Debtors presented the framework of the IBT/Debtors deal to the financial advisors and legal advisors for the DIP lenders and First Lien Noteholders.

The DIP Lenders and First Lien Noteholders were initially hostile to the deal struck between the Debtors and the IBT, particularly the post-emergence equity grant. Ultimately, however, they were convinced—like the Debtors—that the company had no better options. The framework presented by the Debtors and the IBT was indeed value-maximizing for the company; without a settlement with the unions there would likely be no reorganization.

The DIP Lenders and Senior Secured Noteholders then began to participate in the negotiations. Through these negotiations, the maximum debt level for the post-reorganized company was increased to, and the DIP Lenders agreed as part of the settlement that they would accept repayment of the DIP loan in a note rather than cash. While agreeing to raise the debt limits contemplated in the IBT/Debtors framework presented, the IBT demanded and the DIP lenders and First Lien Noteholders agreed to provide additional out-of-the money warrants to the IBT. These terms, along with a number of other terms, were memorialized in the "Heads of Agreement" that was filed with the Court and a separate letter of agreement (the "***IBT LOA***"), which ultimately forms the basis for the Debtors' Plan.[7]

World and North American ultimately reached Union Settlement Agreements with each of the five union negotiating teams, described in more detail below, to modify each of the five Collective Bargaining Agreements between World or North American, on the one hand, and the applicable union on the other, attached to this Disclosure Statement as **Exhibit G**. Ultimately, World and North American entered into tentative agreements on five-year Collective Bargaining Agreements containing a package of modifications that would save the Debtors more than $100 million — up to 90% of the value of the concessions requested in each of the Debtors' proposals. The concessions agreed to include those described in the summary below:

The negotiating team for the World pilots (IBT) agreed to provide $15.9 million in annual savings through a combination of, among other things, the following:

    a)     a salary reduction;

    b)     a reduction in the monthly guarantee to 62 hours;

    c)     reducing the costs for the target benefit retirement plan by reducing the multiplier and raising the eligibility age;

---

[7] The Heads of Agreement ("***HOA***") also resolves a number of other issues between the IBT and the Debtors. For example, the IBT has filed a petition with the NMB seeking to declare World and North American a "single transportation system" for purposes of labor law. While the Debtors firmly believe that World and North American are not a "single transportation system," they realized that if they emerge from bankruptcy, and the NMB later declares them a "single transportation system," it could (absent protection) undermine any agreement reached between the IBT and the Debtors. Part of the HOA protects the Debtors from the possibility of a "single carrier" finding, however remote. Other disputes addressed and resolved in HOA include the IBT's agreement to support any plan of reorganization that is consistent with the heads of agreement.

     d)       reducing World's costs with respect to the pilots' health care and dental plans;

     e)       reducing vacation and sick accruals;

     f)       agreeing to various cost-saving changes to burdensome scheduling rules;

     g)       reducing per diem rates; and

     h)       minimizing the circumstances in which World must pay for pilots to stay overnight at downtown hotels while on layover.

The negotiating team for the North American pilots (ALPA) agreed to provide $3.7 million in annual savings through a combination of the following:

     a)       a salary reduction;

     b)       reductions in trip hour credits;

     c)       reductions in North American's 401(k) match;

     d)       reductions in vacation accrual, vacation pay, and premium pay;

     e)       agreeing to various cost-saving changes to scheduling rules; and

     f)       reducing per diem rates.

The negotiating team for the World flight attendants (IBT) agreed to provide $3.87 million in annual savings through a combination of, among other things:

     a)       a salary reduction and elimination of a longevity bonus;

     b)       a reduction in the monthly guarantee to 62 hours;

     c)       complete and permanent cessation of any need by the Debtors to contribute to the IBT-affiliated defined benefit pension plan ;

     d)       reductions in vacation and sick accruals;

     e)       various cost-saving changes to burdensome scheduling rules;

     f)       reductions in per diem rates; and

     g)       reducing the circumstances in which World had to pay for flight attendants to stay overnight at downtown hotels.

The negotiating team for the North American flight attendants (IBT) agreed to provide $1.6 million in annual savings through a combination of the following:

     a)       reductions in paid time off, personal days, and vacation days;

     b)       reductions in overtime pay and the "trip rig";

     c)       lowering flight attendants' monthly guarantees;

d)        freezing flight attendants' longevity for two years; and

h)        eliminating the company-sponsored 401(k) match.

The World dispatchers (TWU) agreed to provide $127,800 in annual savings from a combination of:

a)        a salary reduction; and

b)        a schedule change (from 4 days on, 4 days off to 4 days on, 3 days off).

As summarized above and as provided in the Union Settlement Agreements, the Unions are agreed to material reductions in employment terms and conditions they had fairly negotiated. The Unions also agreed to new, five-year contracts that ensure both substantial savings and long-term labor peace. Accordingly, the Debtors agreed that they will propose a plan of reorganization that includes the Unions as an important part of the post-emergence company.

The Unions' proposed roles in the post-emergence company are described in the HOA, IBT LOA, a separate Letter of Agreement between North American and ALPA (the "*ALPA LOA*") and a Letter of Agreement with the TWU (the "*TWU LOA*"), which are and were interrelated with the tentative agreements. The Plan is consistent with these documents. If the Plan proposed is not confirmed, the Collective Bargaining Agreements will "snap back" to the terms as they exist prior to being assumed, the Unions will have administrative claims for the savings provided to the Debtors in the interim, and the parties will need to return to the bargaining table and, potentially, to the Bankruptcy Court.

In that context, the core terms of the ALPA LOA and the IBT HOA are as described below:

*First*, within 30 days after emerging from bankruptcy, the reorganized company will create a pool of equity for employees. That "Employee Equity Pool" will be 25% of the New Common Stock of the Reorganized Debtors, and will not be diluted by any management equity incentive plan. The Employee Equity Pool may, with the consent of the IBT, the Debtors, and the Senior Secured Noteholders, be diluted by recoveries of other creditors.

*Second*, the Employee Equity Pool will select a representative to serve on the Board Selection Committee to help select the directors of Reorganized Global Aviation, consistent with the ultimate equity ownership of the company. If the Board Selection Committee is unable to reach consensus on a slate of directors, the directors will be selected by Holders of the New Common Stock in proportion of their ownership, with two of the nine board members selected by the Employee Equity Pool.

*Third*, the debt encumbering the Debtors after these chapter 11 cases will be capped at:

•        $95 million of first lien debt, paying 10% interest with a 4.5 year term;

•        $40 million of second lien debt, paying 3% interest, with a 5 year term;

•        50% sweep of excess cash flow, with a leverage grid; and

•        a revolver with an availability of approximately $20 million.

The HOA contains the protection, for IBT, of a "most favored nations" type clause (the "*MFN*") with respect to the IBT HOA and ALPA LOA. When IBT received a copy of the ALPA LOA, IBT alleged that it contained provisions more favorable for ALPA than the HOA was for IBT. While the Company disagreed with the IBT's position, and with the IBT's interpretation of the MFN, the IBT and the Company negotiated a resolution of the IBT's MFN-related concerns in a separate Letter of Agreement on September 6, 2012, the terms of which is also incorporated into the Plan of Reorganization.

The HOA and ALPA LOA were filed with the Bankruptcy Court at Docket No. 537, Exhibits F and G, and each contain a number of additional terms that are provided for in the Plan.

The IBT HOA, IBT LOA, ALPA LOA and TWU LOA provisions are consistent with the Debtors' business plan and are the backbone of the Debtors' emergence from bankruptcy.  On August 22, 2012, the Debtors' filed a motion for authority to enter into amendments to the Collective Bargaining Agreements with the IBT, ALPA, and TWU [Docket No. 537] (the "***CBA Approval Motion***").

### *(ii)* ***Ratification Votes and Their Consequences***

Each of the five union groups were soliciting votes on ratifications of the revised Collective Bargaining Agreements while the Debtors' CBA Approval Motion was pending.  On September 11, 2012, the Debtors received notice that the North American flight attendants did not ratify the Collective Bargaining Agreement modifications to which their negotiating team had agreed.  On September 12, 2012, the Debtors received notice that the North American pilots also did not ratify the Collective Bargaining Agreement modifications to which their negotiating team had agreed.

The Bankruptcy Court approved the CBA Approval Motion on September 12, 2012 [Docket No. 591 as it relates to the World pilots, the World flight attendants (subject to ratification), and the World dispatchers.  World and North American began to benefit from the savings achieved in the Agreements immediately upon Court approval and ratification.  However, the Agreements are ultimately contingent on confirmation of the Plan or another plan of reorganization consistent with the parties' global deal.  If confirmation of the Plan or another plan or reorganization consistent with the parties' global deal is not achieved, the Agreements will be void and the parties will need to return to the negotiating table.

The North American Flight Attendants have not yet entered into any Collective Bargaining Agreement with North American.  Accordingly, effective September 13, 2012, North American imposed terms and conditions of employment on the North American flight attendants that will save the Debtors approximately $1.8 million annually, as is within North American's rights under applicable labor law.  North American intends to continue negotiating with the North American flight attendants in good faith and desires to achieve a long-term Collective Bargaining Agreement consistent with the Debtors' need for cost savings.  If an agreement is reached and ratified prior to the Debtors' emergence from bankruptcy, it will be brought to the Bankruptcy Court for approval.

North American made a revised proposal to ALPA that would either lead to a new, ratified agreement or serve as the proposal for the Bankruptcy Court's consideration in the section 1113 process.   North American's revised ALPA proposal was designed to move the parties towards a voluntary agreement that could be ratified or, in the alternative, start the process provided by section 1113 of the Bankruptcy Code.  The company's efforts were successful.  On September 19, 2012, North American and ALPA's authorized representatives ultimately reached a revised tentative agreement, which was ratified by the North American pilots on September 24, 2012.  That same day, North American filed an emergency motion to enter into amendments to the Collective Bargaining Agreement with ALPA, which was approved by the Bankruptcy Court on September 25, 2012.  [Docket Nos. 613 and 623].  The now-ratified ALPA agreement was the final piece of the puzzle for the labor agreements that the Debtors need to emerge from chapter 11.  As with the previously approved World Collective Bargaining Agreements, North American began to benefit from the savings achieved in the Agreements immediately upon court approval and ratification.

### *(iii)* ***Complete Withdrawal from the IBT Pension Plan***

As described above, as of the Commencement Date, World was a participant in the IBT Pension Plan.  The IBT Pension Plan was underfunded and World was already paying a surcharge on applicable rates.  Given a number of other factors, including the substantial reductions in force affecting World flight attendants and the resulting impact on the IBT Pension Plan, the Debtors believed that World could not continue as a participant in the IBT Pension Plan upon emergence from bankruptcy.  World thus insisted as a condition of agreement, and ultimately obtained, the agreement of the World flight attendants that, as part of the Collective Bargaining Agreement modifications, World's obligations to contribute to the IBT Pension Plan would immediately, completely, and

permanently cease, resulting in World's complete withdrawal from the IBT Pension Plan.  World flight attendants will participate in a 401(k) plan going forward, as described in the modified Collective Bargaining Agreements.

World's complete withdrawal from the IBT Pension Plan will result in the imposition of withdrawal liability which, under applicable bankruptcy law, will be treated as a prepetition General Unsecured Claim against the Debtors' estates.

### *(iv)*     ***Single Carrier Filing***

After the Commencement Date and during the Debtors' chapter 11 cases, the IBT filed a petition with the National Mediation Board (the "***NMB***"), seeking a determination that World and North American constitute a "single carrier" or a "single transportation system" under applicable labor law.  World and North American strongly dispute the IBT's characterization of their operations and have objected to the IBT's request.  The NMB has not made any findings with respect to the IBT's request.

As part of the HOA, and as incorporated into the Plan, the Debtors and the IBT have agreed that in the event the NMB finds that World and North American are a single carrier (or single transportation system), there shall be no changes to the terms of the revised Collective Bargaining Agreements (as modified and approved by the Bankruptcy Court after voluntary agreement or order following a section 1113 trial) before the amendable date of the revised Collective Bargaining Agreements.  In addition, should it be determined that an integrated seniority list is required as a result of a single carrier determination, there shall be an equipment fence of the current seniority lists (furloughed and active pilots) for duration of agreement except for expansion positions, which would be then governed by seniority and airline/type lock for two years.

For the avoidance of doubt, World and North American deny that they constitute a "single carrier" or "single transportation system" for labor law purposes and intend to vigorously dispute the IBT's claim to the contrary.

### K.     Claims Bar Date

On March 21, 2012, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.  The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case.  Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim.

On June 15, 2012, the Bankruptcy Court entered an order approving (a) July 30, 2012, as the deadline for filing Claims in the Debtors' chapter 11 cases; (b) August 3, 2012, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Debtors' chapter 11 cases; (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the bar dates [Docket No. 434] (the "***Bar Date Order***").

As of August 3, 2012, the Debtors have received approximately 1,047 Claims asserting various levels of priority.  The Debtors are currently in the process of reconciling such Claims and plan to file various objections over the course of the next few weeks.

### L.     NOL Motion

As of the Commencement Date, the Debtors' NOLs and certain other tax attributes were estimated to be approximately $310 million. Under the Internal Revenue Code, and subject to certain limitations, net operating losses ("***NOLs***") that accumulate prior to emergence from bankruptcy may be used to offset post-emergence taxable income.  Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the chapter 11 cases. Consequently, on the Petition Date, the Debtors filed the Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief [Docket No. 12] (the "***NOL Motion***"), pursuant to which the Debtors sought, on an interim and final basis, to restrict (i) trading of their equity securities by shareholders who own, or would own, at least 1.2 million shares, including options to acquire shares of Global Aviation's common stock during the pendency

of the chapter 11 cases and (ii) the ability of shareholders that own or have owned 50% or more -- as measured under the applicable tax rules -- of Global Aviation's common stock to claim a federal tax deduction for worthlessness for a taxable period ending before emergence.  The Bankruptcy Court entered an interim order granting the NOL Motion February 7, 2012 [Docket No. 40] and a final order on March 30, 2012 [Docket No. 313].

The Debtors believe that MatlinPatterson is the only shareholder that may be affected by the worthless stock component of the NOL Motion.

**VII.     PROJECTED FINANCIAL INFORMATION**

The Debtors have attached their projected financial information as **Exhibit D-F** to this Disclosure Statement.  The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  Management developed a business plan and prepared financial projections (the "*Projections*") for the period from September 2012 through December 2016 (the "*Projection Period*").

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were prepared in October 2012.  Management is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

**THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

**MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND**

**OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE XIII OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

**THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

### A.        Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors. Such analysis (the "*Valuation Analysis*") is set forth in **Exhibit E** attached hereto.

### VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risks Relating to Bankruptcy

#### *(i)    Parties in interest may object to the Plan's classification of claims and interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### *(ii)    The Debtors may fail to satisfy vote requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

#### *(iii)    The Debtors may not be able to obtain Confirmation of the Plan.*

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed.  A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid.  If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims.  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

#### *(iv)    The conditions precedent to the Effective Date of the Plan may not occur.*

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

#### *(v)    The Debtors may not be able to achieve their projected financial results.*

The financial projections set forth on **Exhibit D** to this Disclosure Statement represent Global Aviation's management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular. The Debtors' actual financial results may differ significantly from the projections.  If the Debtors do not achieve their projected financial results, the trading prices of the New

45

Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

*(vi)*      ***The Debtors' "certificate of public convenience and necessity" may be revoked by the federal government.***

The Debtors are required to have a "certificate of public convenience and necessity" to provide air carrier services. 49 U.S.C § 41102(a).  The federal government prohibits Non-U.S. Citizens from owning or controlling in excess of 25% of the equity interests in the reorganized Debtors.  If the Holders of Allowed Class 3 Claims that are eligible to receive New Common Stock are unable to provide a Citizenship Declaration satisfactory to the federal government, the Debtors' license could be revoked.

*(vii)*      ***Certain tax implications of the Debtors' chapter 11 cases.***

Holders of Allowed Claims should carefully review Article XII herein, "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Reorganized Debtors.

*(viii)*      ***The Debtors' emergence from chapter 11 is not assured.***

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining confirmation of the Plan.

**B.      Risks Related to the Debtors' and Reorganized Debtors' Business**

*(i)      Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.*

According to the terms and conditions of the Plan, upon confirmation, the Reorganized Debtors will have outstanding indebtedness of approximately $135 million under the New Loans

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance.  These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the New Loans could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt.  The Reorganized Debtors may incur significant additional debt in the future.  If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

*(ii)      The New Loans contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity.*

The New Loans will contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations.  These covenants restrict (subject to certain exceptions), the Reorganized Debtors' ability to: incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with affiliates;

46

consummate sale-leaseback transactions; change their fiscal year; enter into hedging arrangements (except as otherwise expressly permitted); In addition, the Reorganized Debtors will be required to maintain a minimum interest coverage ratio and a maximum leverage ratio.

The breach of any covenants or obligations in the New Loans, not otherwise waived or amended, could result in a default under the New Loans and could trigger acceleration of those obligations. Any default under the New Loans could adversely affect the Reorganized Debtors' growth, financial condition, results of operations and ability to make payments on debt.

*(iii)* **Transfer restrictions on the New Common Stock contained in the New Certificate of Incorporation of Reorganized Global Aviation may limit the liquidity of the New Common Stock; any prohibited ownership change could limit the availability of the Reorganized Debtors' net operating losses.**

The New Certificate of Incorporation of Reorganized Global Aviation will contain restrictions on the transfer of New Common Stock, substantially in the form contained in the Plan Supplement, to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) of Reorganized Global Aviation. The specific terms of these restrictions have not yet been determined. These restrictions are expected to apply for a period of two years after emergence or perhaps longer if extended by a vote of the Board of Directors.

*(iv)* **If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer.**

The Debtors' businesses depend upon the continued efforts, abilities and expertise of the Debtors' executive officers. The Debtors believe that the unique combination of skills and experience possessed by the Debtors' executive officers would be difficult to replace, and their loss could have a material adverse effect on the Reorganized Debtors, including impairing the Reorganized Debtors' ability to execute the Reorganized Debtors' business strategy.

*(v)* **Employee strikes and other labor-related disruptions may adversely affect the Debtors' operations.**

The Debtors' business is labor intensive, utilizing large numbers of pilots, flight attendants and other personnel. Approximately 63% of their workforce is unionized. Strikes or labor disputes with the Debtors' unionized employees may adversely affect the Debtors' ability to conduct business. Relations between air carriers and labor unions in the United States are governed by the Railway Labor Act, which provides that a collective bargaining agreement between an airline and a labor union does not expire, but instead becomes amendable as of a stated date. The Railway Labor Act generally prohibits strikes or other types of self-help actions both before and after a collective bargaining agreement becomes amendable, unless and until the collective bargaining processes required by the Railway Labor Act have been exhausted. The Debtors' collective bargaining agreement with the World pilots further specifies that the World pilots are prohibited from striking World's military-related flying at any time, even after the Railway Labor Act's collective bargaining processes are exhausted.

If the Debtors are unable to reach agreement with any of their unionized work groups on future negotiations regarding the terms of their collective bargaining agreements or if additional segments of the Debtors' workforce become unionized, they may be subject to work interruptions or stoppages, subject to the requirements of the Railway Labor Act.

*(vi)* **If one of the Debtors' AMC team members reduces its commitments or withdraws from the team, or if carriers on other AMC teams commit additional aircraft to the program, the Debtors' share of AMC flying may decline.**

Each year, the AMC grants a certain portion of its business to different air carriers based on a point system. The number of points that an air carrier can accrue is determined by the number and type of aircraft pledged to the CRAF as well as the number of military flights operated by the team members over a past twelve-month period. The

47

Debtors' operating subsidiaries along with the other air carriers in their team currently participate in the CRAF program and generate entitlement points for AMC business.  Points from team members that do not fly AMC missions are used to increase the flights awarded to other team members that do fly AMC missions, such as World and North American, in return for a commission on the revenue derived from those points.

Continued participation by World and North American on the Alliance team is subject to significant risks. The formation of competing teaming arrangements, an increase by carriers from other teams in their commitment of aircraft to the CRAF program and the withdrawal of, or failure to renew a future teaming agreement with, any of the Alliance team's current partners could materially and adversely affect the amount of the Debtors' AMC business. There has been and continues to be significant consolidation in the air carrier industry. As a result of consolidation, we expect some air carriers may choose to join other teams.  As a result of these changes, the Alliance team's total share of entitlement points under the AMC international program has decreased for government fiscal years 2011 and 2012.  In addition, if any Alliance team member were to cease or restructure its operations or dispose of aircraft previously pledged to the CRAF program, the number of aircraft pledged to the CRAF program by the Alliance team could be reduced. Any of these developments could reduce the number of points allocated to the Alliance team and the Alliance team's allocation of AMC business to the Debtors would likely decrease.  In addition, reductions in the Debtors' team's flights in a given period will reduce the Debtors' points in future periods.  If the military substantially reduces the amount of business it awards the Alliance team or if the Alliance team reduces the military missions it awards to the Debtors, the Debtors may not be able to replace the lost business and our business, financial condition and results of operations could be materially and adversely affected.

> ### (vii) *Unpredictability and variability in military demand for the Debtors' services could make it difficult to optimize the use and maintenance of their aircraft fleet, which could adversely affect our business, financial condition and results of operations.*

Predicting the precise timing of the military's demand for the Debtors' services can be difficult, particularly in light of the confidential nature of troop deployment schedules.  The Debtors' inability to precisely forecast demand for their aircraft can hinder our ability to optimize the use of and maintenance schedule for the Debtors' fleet.  In circumstances where the Debtors have planned for significant demand from the military that does not materialize, the Debtors may be unsuccessful in reallocating their aircraft for use by commercial cargo or passenger services customers. The failure to reallocate the Debtors' aircraft to commercial use and the resulting reduction in their utilization could have an adverse effect on the Debtors' business, financial condition and results of operations. Similarly, in circumstances where the Debtors have committed aircraft to commercial contracts, they may not have aircraft for military missions.

> ### (viii) *The costs incurred in the Debtors' military missions may be greater than the amounts for which they are reimbursed by the AMC, thereby reducing profitability.*

Under their contract with the DOD, the Debtors are paid on a cost-plus basis in which they receive a fixed rate per mission based on the route and aircraft type.  The fixed rate is calculated using the average costs of all participating air carriers, weighted by flights flown in the AMC international program.  The AMC sets the fixed rate for each AMC fiscal year using cost data for a 12-month period that ended 15 months prior to the start of such fiscal year as adjusted following consultation with the air carrier, multiplied by a weighted composite price index to account for cost increases in the industry.  As a result, the actual operating costs of the Debtors' military business may exceed the fixed rate, although those higher actual operating costs will provide the basis for the fixed rate used for missions flown in future contract periods. Should the Debtors incur unexpected costs for reasons outside their control, such as the additional costs incurred to fly around the volcanic ash recently affecting flights over Europe, the Debtors are entitled to seek reimbursement from the DOD. Reimbursement is granted based on a reasonableness test.  No assurance can be given, however, that any particular future increased costs would be adequately reimbursed, if at all. Insofar as the actual operating costs of the Debtors military business exceed the fixed rate paid by the AMC and such shortfall is not reimbursed, the Debtors' profitability would be reduced.

*(ix)* ***If the DOD activates the Debtors' aircraft pledged to the CRAF, the activated aircraft would not be available for other commercial use.***

All of the Debtors' aircraft are pledged to the CRAF and are therefore available for activation and use by the U.S. government in times of need. If the DOD activates the Debtors' aircraft under the CRAF, such aircraft could not be used to serve commercial customers while they are used by the U.S. government pursuant to an activation. The Debtors cannot predict whether revenues from the DOD during the activation of their aircraft under the CRAF would be less than or more than would otherwise be generated by commercial customers. While the Debtors' agreements with their commercial customers generally allow cancellation without penalty in the event of CRAF activation, activation could disrupt operations, customer relationships and the Debtors' competitive position as compared to charter operators with aircraft not pledged to the CRAF.

*(x)* ***The Debtors' business could be adversely affected by an adverse audit by the U.S. government.***

DOD contracts are routinely subject to audit by government agencies. Such an audit involves a review of our performance under the Debtors' contracts, cost structure and compliance with applicable laws and regulations. It may also involve a review of the adequacy of, and the Debtors' compliance with, the Debtors' internal control systems and policies, including management, purchasing, property, estimating, compensation, accounting and information systems. If an audit or investigation uncovers improper or illegal activities, the Debtors may be subject to civil or criminal penalties and administrative sanctions, including termination of their government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the Government. In addition, the Debtors could suffer serious reputational harm if allegations of impropriety were made against them.

*(xi)* ***Because a substantial portion of the Debtors' operating expenses is fixed, the Debtors may be unable to quickly change their cost structure to respond to any declines in revenues.***

To maintain the Debtors' level of operations, a substantial portion of their costs, such as aircraft lease payments, crew, maintenance and facility costs, is fixed. Operating revenues from the Debtors' business are directly affected by their ability to maintain high utilization of their aircraft at favorable rates. The utilization of the Debtors' aircraft and their ability to obtain favorable rates are affected by many factors, including military requirements, global demand for passenger and cargo air transport services, global economic conditions, fuel costs and the deployment by the Debtors' current and potential customers of their own aircraft, among others, which may cause the Debtors' revenues to vary significantly over time. The Debtors are particularly vulnerable to reductions in demand due to their relatively high fixed-cost structure, which is difficult to adjust to match shifting volume levels. Accordingly, if the Debtors' revenues for a particular period fall below expectations, they may be unable to proportionately reduce their operating expenses for that period.

*(xii)* ***The loss of one or more customers in the commercial cargo business could materially and adversely affect the Debtors' business, financial condition and results of operations.***

The Debtors depend on a limited number of significant customers for their commercial cargo business, most of which is conducted pursuant to contracts that are set to expire in the next two years. There is a risk that the Debtors' customers may not renew their ACMI contracts on favorable terms or at all. Entering into ACMI contracts with new customers may require a long sales cycle. Because the Debtors generally lease their aircraft pursuant to non-cancelable operating leases, the Debtors could be forced to maintain aircraft in their fleet while the aircraft produce little or no revenue. In addition, certain of the Debtors' principal competitors have ordered Boeing 747-8 freighters and Boeing 777 freighters, which could increase competition for long-haul large payload ACMI customers. As a result, if the Debtors' ACMI contracts are not renewed or can only be renewed on less favorable terms, and if the Debtors are not able to obtain other business in a timely manner or at all, their business, financial condition and results of operations could be materially and adversely affected.

*(xiii)* *A significant reduction in demand for air cargo transport, resulting from declining worldwide economic activity could materially and adversely affect the Debtors' business, financial condition and results of operations.*

The Debtors' success is highly dependent upon the level of business activity and overall global economic conditions. The recent economic downturn has decreased and may continue to decrease the volume of world trade and materially and adversely affect demand for the services offered by the Debtors' ACMI customers, such as a significant reduction in the production of time-sensitive inventories, perishables and packages that have historically been transported via air freight. The Debtors cannot predict the effect or duration of any economic slowdown or the timing or strength of a subsequent economic recovery. The Debtors are particularly vulnerable to reductions in demand due to their relatively high fixed-cost structure, which is difficult to adjust to match shifting volume levels.

*(xiv)* *Fuel price volatility could adversely affect the Debtors' business, financial condition and results of operations.*

The price of aircraft fuel is unpredictable and has been increasingly volatile over the past few years. While the Debtors' military and ACMI contracts require our customers to pay for or reimburse the Debtors for aviation fuel, if fuel costs increase significantly, the Debtors' customers may reduce the volume and frequency of cargo shipments or find less costly alternatives for cargo delivery, such as land and sea carriers. If the Debtors' customers reduce their use of air freight, the Debtors' business, financial condition and results of operations could be materially and adversely affected.

In addition, as a result of the timing of reimbursement under contracts providing for the Debtors' customers to reimburse the Debtors for fuel costs, the Debtors' working capital position may be adversely affected by significant increases in fuel costs, which could affect our liquidity.

*(xv)* *Volatility in international currency markets may adversely affect demand for our commercial cargo and passenger services.*

Although the Debtors price their services and receive payments in U.S. dollars, many of the Debtors' customers' revenues are denominated in other currencies. Any significant devaluation in such currencies relative to the U.S. dollar could have a material adverse effect on such customers' ability to pay the Debtors or on their level of demand for the Debtors' services, which could have a material adverse effect on the Debtors' business, financial condition and results of operations. If there is a significant decline in the value of the U.S. dollar against other currencies, the demand for some of the products the Debtors transport could decline.

*(xvi)* *Governments may restrict or revoke the Debtors' authority to operate flights to or over countries.*

The Debtors have authority to operate flights anywhere in the world that U.S. carriers are permitted to operate. However, either the U.S. or foreign governments could limit or restrict the Debtors' authority to operate flights to or over specified countries due to security concerns, armed conflict, international disputes, or for other reasons. For example, certain foreign governments currently restrict the number of charter flights that can be operated to these countries. In light of such restrictions, the Debtors may not be able to serve customers seeking charter services to or that would require flying over such countries, and our business, financial condition and results of operations could be adversely affected.

*(xvii)* *If the Debtors are unable to continue to lease aircraft at acceptable rates and terms in the future, or if the Debtors are unable to acquire compatible engines or spare parts, on terms favorable to the Debtors or at all, their business, financial condition and results of operations could be adversely affected.*

All of the Debtors' aircraft are leased. The Debtors' operating leases typically run from three to ten years from the date of delivery. The Debtors may face more competition for, or a limited supply of, leased aircraft, making it difficult for the Debtors to negotiate competitive terms upon expiration of our current operating leases or to lease additional capacity required for their targeted level of operations. If the Debtors are forced to pay higher

lease rates in the future to maintain their fleet, the Debtors' profitability would be adversely affected.  Also, if available aircraft, whether by purchase or lease, are not compatible with the rest of the Debtors' fleet in terms of takeoff weight, avionics, engine type or other factors, the Debtors would incur potentially significant costs of fleet induction and modification, and reduced efficiency of their operations.  Any increase in demand could also impair the Debtors' ability to obtain additional engines and spare parts on favorable terms or at all at the time needed for their operations or for the implementation of their growth plan.

### (xviii)    The Debtors are at risk of losses and adverse publicity stemming from any accident involving their aircraft.

An accident or incident involving one of the Debtors' aircraft could involve repair or replacement of a damaged aircraft and its consequential temporary or permanent loss from service, and significant potential claims of injured passengers and others. The Debtors are required by the DOT and their lenders and lessors to carry hull, liability and war risk insurance.  Although the Debtors believe they currently maintain liability insurance in amounts and of the type generally consistent with industry practice, the amount of such coverage may not be adequate and they may be forced to bear substantial losses from an accident. Substantial claims resulting from an accident in excess of their related insurance coverage would harm their business and financial results. Moreover, any aircraft accident or incident, even if fully insured, could cause a public perception that the Debtors are less safe or reliable than other airlines, which would harm their business.

### (xix)    The airline industry is subject to extensive government regulation, and new regulations may increase the Debtors' operating costs.

Airlines are subject to extensive regulatory and legal compliance requirements that result in significant costs. For instance, the FAA from time to time issues directives and other regulations relating to the maintenance and operation of aircraft that necessitate significant expenditures. The Debtors expect to continue incurring expenses to comply with FAA regulations, which may be significant.

The federal government has on several occasions proposed a significant increase in per ticket taxes.  Due to the weak revenue environment, the existing tax has negatively impacted the Debtors' revenues because the Debtors have generally not been able to increase their fares to pass these fees on to their customers.  Similarly, the proposed increase in ticket taxes, if implemented, could negatively impact the Debtors' revenues.

Furthermore, the Debtors and other U.S. carriers are subject to domestic and foreign laws regarding privacy of passenger and employee data. Compliance with these regulatory regimes is expected to result in additional operating costs and could impact the Debtors' operations and any future expansion.

### (xx)    The Debtors' insurance costs have increased substantially as a result of the September 11 terrorist attacks, and further increases in insurance costs or reductions in coverage could have a material adverse impact on the Debtors' business and operating results

As a result of the terrorist attacks on September 11, 2001, aviation insurers significantly reduced the maximum amount of insurance coverage available to commercial air carriers for liability to persons (other than employees or passengers) for claims resulting from acts of terrorism, war or similar events. At the same time, aviation insurers significantly increased the premiums for such coverage and for aviation insurance in general. Since September 24, 2001, the U.S. government has been providing U.S. airlines with war-risk insurance to cover certain losses, including those resulting from terrorism, to passengers, third parties (ground damage) and the aircraft hull. The coverage currently extends through August 31, 2009.  The withdrawal of government support of airline war-risk insurance would require the Debtors to obtain war-risk insurance coverage commercially, if available. Such commercial insurance could have substantially less desirable coverage than that currently provided by the U.S. government, may not be adequate to protect the Debtors' risk of loss from future acts of terrorism, may result in a material increase to their operating expenses or may not be obtainable at all, resulting in an interruption to their operations.

**IX.    RELEASE, INJUNCTIVE AND RELATED PROVISIONS**

**A.    Compromise and Settlement of Claims, Interests and Controversies**

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.   In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

**B.    Releases by the Debtors**

**PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OR A FORMER OFFICER OR DIRECTOR OF THE DEBTORS THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.  FOR THE AVOIDANCE OF DOUBT, AND EXCEPT TO THE EXTENT LISTED IN THE RETAINED CAUSES OF ACTION FILED AS PART OF THE PLAN SUPPLEMENT, ALL AVOIDANCE ACTIONS ARE RELEASED PURSUANT TO THIS PLAN.  THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.**

C.      Releases by Holders of Claims and Interests

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, PLAN SUPPLEMENT OR CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM OR AN INTEREST AND EACH OF THE RELEASED PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE DEBTORS' CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

D.      Limitations on Plan Release and Injunction Provisions with Respect to the Government

NOTHING IN THE PLAN OR THE CONFIRMATION ORDER SHALL DISCHARGE, RELEASE, OR PRECLUDE:  (A) ANY LIABILITY TO A GOVERNMENTAL UNIT THAT IS NOT A CLAIM; (B) ANY CLAIM OF A GOVERNMENTAL UNIT ARISING ON OR AFTER THE CONFIRMATION DATE; (C) ANY LIABILITY TO A GOVERNMENTAL UNIT ON THE PART OF ANY PERSON OR ENTITY OTHER THAN THE DEBTORS OR REORGANIZED DEBTORS; (D) ANY VALID RIGHT OF SETOFF OR RECOUPMENT BY A GOVERNMENTAL UNIT; OR (E) ANY CRIMINAL LIABILITY.   NOTHING IN THE PLAN OR CONFIRMATION ORDER SHALL ENJOIN OR OTHERWISE BAR ANY GOVERNMENTAL UNIT FROM ASSERTING OR ENFORCING, OUTSIDE THE BANKRUPTCY COURT, ANY LIABILITY DESCRIBED IN THE PRECEDING SENTENCE.  THE DISCHARGE AND INJUNCTION PROVISIONS CONTAINED IN THE PLAN AND CONFIRMATION ORDER ARE NOT INTENDED AND SHALL NOT BE CONSTRUED TO BAR ANY GOVERNMENTAL UNIT FROM, AFTER THE CONFIRMATION DATE, PURSUING ANY POLICE OR REGULATORY ACTION.  NOTHING IN THE PLAN OR CONFIRMATION ORDER LIMITS OR EXPANDS THE DISCHARGE AND INJUNCTION TO WHICH THE DEBTORS OR REORGANIZED DEBTORS ARE ENTITLED UNDER THE BANKRUPTCY CODE.

E.      Exculpation

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN AND IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY

**UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.  NOTHING PROVIDED HEREIN SHALL APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.**

### F.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided herein, in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### G.    Injunction

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, PLAN SUPPLEMENT OR CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE X OF THE PLAN, EACH HOLDER OF A CLAIM OR AN INTEREST SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE X OF THE PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL**

**ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE X.B. OR C. OF THE PLAN, DISCHARGED PURSUANT TO X.F., OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO X.E. OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:    (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.**

**THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES.  ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.**

**ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

### H.        Release of Liens

Except as otherwise provided herein, in the Plan, in the New Loans or in any other contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, (a) all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, (b) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

### I.        Term of Injunctions or Stays

Unless otherwise provided herein, in the Plan or in the Confirmation Order, all injunctions or stays in effect in the chapter 11 cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

###### J.       Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the chapter 11 cases (or during the chapter 11 cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the chapter 11 cases.

### X.       SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Class 3.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

### XI.      CONFIRMATION OF THE PLAN

#### A.       Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

#### B.       Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors have attached as **Exhibit G** a liquidation analysis prepared by the Debtors' management with the assistance of Rothschild, the Debtors' financial advisor.

#### C.       Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit D**.  The Debtors will supplement this Disclosure Statement with such information in advance of the hearing to approve this Disclosure Statement.

#### D.       Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not

"impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that *actually* voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### *(i)    No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### *(ii)    Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

---

8    A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

57

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post confirmation going concern value of the Debtors.  Such analysis (the "*Valuation Analysis*") will be set forth in Exhibit E attached hereto.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The Plan provides for Reorganized Global Aviation to distribute New Common Stock (the "*Plan Securities*") to Holders of Allowed Claims in Class 3.

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.  The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

### B.    Issuance and Resale of Plan Securities under the Plan

#### (i)    *Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws*

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Law) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law.

#### (ii)    *Resales of Plan Securities; Definition of Underwriter*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities

Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and applicable state Blue Sky Laws. In addition, there will be the Registration Rights Agreement providing for registration rights for the New Common Stock, which agreement shall be in form and substance reasonably acceptable to the Senior Agent, dated as of the Effective Date, and in substantially the form set forth in the Plan Supplement.

### *(iii)*      ***Warrants and New Common Stock/Equity Incentive Plan***

The Plan contemplates the implementation of the Employee Equity Plan, which will be included with the Plan Supplement and provide for (a) 25% of the New Common Stock and (b) warrants to purchase 15% of the fully-diluted New Common Stock, to be reserved for issuance to the Debtors' Qualifying Represented Employees and Non-Executive, Non-Represented Employees to be shared in proportion to (i) the concessions agreed and ratified through voluntary modifications, in the case of the Reorganized Debtors' Qualifying Represented Employees, and (ii) the amount of the World Pilots Savings Credit with respect to the Reorganized Debtors' Non-Executive, Non-Represented Employees, the form of which is included in the Plan Supplement.

Such warrants and New Common Stock (and New Common Stock underlying the warrants) will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act.

### XIII.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S.

Internal Revenue Service (the "*IRS*") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New First Lien Loan, the New Second Lien Loan or New Common Stock, as part of a hedge, straddle, conversion or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

         *(i)*     *Cancellation of Debt and Reduction of Tax Attributes*

         In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("*COD Income*") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

         A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its

60

depreciable assets pursuant to Section 108(b)(5) of the IRC.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain claims will receive shares of New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock.  This value cannot be known with certainty until after the Effective Date.  The Debtors expect that, subject to the limitations discussed herein, they will be required to make material reductions in their NOLs, NOL carryforwards and other tax attributes.

### *(ii)        Limitation of NOL Carryforwards and Other Tax Attributes*

Even after reducing the amount of their tax attributes, the Debtors anticipate that the Reorganized Debtors will have significant NOLs and other tax attributes at emergence.  The amount of such tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  (a) the amount of tax losses incurred by the Debtors in 2011 and 2012; (b) the fair market value of the New Common Stock and the issue price of the New First Lien Loan and the Second Lien Loan; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan.  Following consummation of the Plan, the Debtors anticipate that their NOLs may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

#### (a)        General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently approximately 3%).  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Global Aviation Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

#### (b)        Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an

annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "*382(l)(6) Exception*"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors believe that it will be beneficial for them to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtors do utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtors' Pre-Change Losses would effectively be eliminated. In order to prevent such a subsequent ownership change, the New Certificate of Incorporation of Reorganized Global Aviation is expected to contain restrictions on trading of New Common Stock that are intended to prevent such a change. The specific terms of these restrictions have not yet been determined. These restrictions are expected to apply for a period of two years after emergence or perhaps longer if extended by a vote of the Board of Directors.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another owenership change will occur within two years after emergence. In either case, the Debtors expect that their use of the Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### *(iii)    Alternative Minimum Tax*

In general, an alternative minimum tax ("*AMT*") is imposed on a corporation's alternative minimum taxable income ("*AMTI*") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

### *(i)    Consequences to Holders of Senior Secured Claims*

Pursuant to the Plan, each Holder of an allowed Senior Secured Claim shall receive such holder's *pro rata* share of: (a) the remaining New First Lien Loan after satisfaction of the DIP Claims and Roll-Up Claims; (b) the

New Second Lien Loan; and (c) either (i) 75% of the New Common Stock or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders.

Whether a Holder of an allowed Senior Secured Claim recognizes gain or loss as a result of the exchange of its claim for the New First Lien Loan, New Second Lien Loan or the New Common Stock or all three depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed Senior Secured Claim surrendered and the New First Lien Loan and New Second Lien Loan (with respect to receipt of the New First Lien Loan and New Second Lien Loan) are treated as a "security" for the reorganization provisions of the IRC.

(a)        Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  The Senior Secured Indenture had an initial term of approximately four years.  The Debtors expect to take the position that the debt underlying the Senior Secured Claims are not "Securities."

(b)        Treatment of a Holder of an Allowed Senior Secured Claim if the Exchange of its Claim
           is not Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Secured Claim is not treated as a "security" for U.S. federal income tax purposes, a Holder of such a claim should be treated as exchanging its allowed Senior Secured Claim for the New First Lien Loan, New Second Lien Loan and the New Common Stock in a fully taxable exchange.  A Holder of an allowed Senior Secured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price (as determined under the applicable Treasury regulations) of the New First Lien Loan and the New Second Lien Loan and the fair market value of the New Common Stock, in each case that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Senior Secured Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below. A Holder's tax basis in the New First Lien Loan and Second Lien Loan received on the Effective Date should equal its issue price and a Holder's tax basis in the New Common Stock should equal its fair market value.  A Holder's holding period for the New First Lien Loan, New Second Lien Loan and New Common Stock received on the Effective Date should begin on the day following the Effective Date.

(c)        Treatment of a Holder of an Allowed Senior Secured Claim if the Exchange of
           its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Secured Claim, the New First Lien Loan and the New Second Lien Loan are each treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed Senior Secured Claim for the New First Lien Loan, New Second Lien Loan and New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC.  In such case, a Holder should not recognize loss with respect to the exchange and should not recognize gain except to the extent that the share of the New First Lien Loan, New Second Lien Loan and New Common Stock received are allocable to accrued but untaxed interest (see discussion below, "Accrued Interest")..   Such Holder's tax basis in its New First

Lien Loan, New Second Lien Loan and New Common Stock should be equal to the tax basis of the obligation constituting the allowed Senior Secured Claim surrendered therefor (allocated between the New First Lien Loan, New Second Lien Loan and New Common Stock based on their relative fair market value), and a Holder's holding period for its New First Lien Loan, New Second Lien and New Common Stock should include the holding period for the obligation constituting the surrendered allowed Senior Secured Claim; provided that the tax basis of any New First Lien Loan, New Second Lien Loan and New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New First Lien Loan, New Second Lien Loan and New Common Stock should not include the holding period of the debt instrument constituting the surrendered allowed Senior Secured Claim.

**The tax consequences of the Plan and to the Holders of allowed Senior Secured Claims are highly uncertain. Holders of allowed Senior Secured Claims should consult their tax advisors regarding whether such Claims, the New First Lien Loan and the New Second Lien Loan could be treated as "securities" for U.S. federal income tax purposes.**

(d)     Accrued Interest

To the extent that any amount received by a Holder of a surrendered allowed claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered allowed claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered allowed claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed claims shall be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

(e)     Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other

64

disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**D.        Withholding and Reporting**

The Debtors will withhold all amounts required by law to be withheld from payments of interest.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a holder of a claim.  Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.  Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**[Remainder of page intentionally left blank.]**

## XIV.    Regulation

The Debtors are subject to various federal, international and local laws and regulations governing, among other things, aviation security, environmental matters, baggage liability, consumer protection and labor relations. While the Airline Deregulation Act of 1978, as amended, eliminated domestic economic regulation of passenger and freight air transportation in many regards, the industry, nevertheless, remains regulated in a number of areas. The DOT has jurisdiction over international route authorities and various consumer protection matters, such as advertising, denied boarding compensation, baggage liability and access for persons with disabilities. The Debtors are subject to regulations of the DOT and the FAA because they holds certificates of public convenience and necessity, air carrier operating certificates and other authority granted by those agencies. The FAA regulates flight operations, including air space control and aircraft standards, maintenance, ground facilities, transportation of hazardous materials and other technical matters. The DOJ has jurisdiction over airline competition matters, including mergers and acquisitions, under federal antitrust laws. The TSA regulates airline and airport security. Other federal agencies have jurisdiction over postal operations, use of radio facilities by aircraft and certain other aspects of the Debtors operations.

The Debtors are also subject to federal labor regulation through the RLA. The RLA governs the labor relations of employers and employees engaged in the airline industry.  Comprehensive provisions are set forth in the RLA establishing the right of airline employees to organize and bargain collectively along craft or class lines and imposing a duty upon air carriers and their employees to exert every reasonable effort to make and maintain collective bargaining agreements.

The RLA contains detailed procedures that must be exhausted before a lawful work stoppage may occur. Pursuant to the RLA, the Debtors have has collective bargaining agreements with two domestic unions representing two separate employee groups -- pilots and flight attendants.

The Debtors are also subject to FAA jurisdiction pertaining to aircraft maintenance and operations, including equipment, dispatch, communications, training, flight personnel and other matters affecting air safety. To ensure compliance with its regulations, the FAA requires all United States airlines to obtain operating, airworthiness and other certificates, which are subject to suspension or revocation for cause.

Under FAA regulations, the Debtors have established, and the FAA has approved, maintenance programs for all aircraft operated by the Debtors. These programs provide for the ongoing maintenance of the Debtors' aircraft, ranging from frequent routine inspections to major overhauls. The Debtors' aircraft require various levels of maintenance or "checks" and periodically undergo complete overhauls. Maintenance programs are monitored closely by the FAA, with FAA representatives routinely present at the Debtors' maintenance facilities. The FAA issues airworthiness directives, which mandate changes to an air carrier's maintenance program. These airworthiness directives (which include requirements for structural modifications to certain aircraft) are issued to ensure that the nation's transport aircraft fleet remains airworthy. The Debtors are currently, and expects to remain, in compliance with all applicable requirements under all airworthiness directives and the FAA-approved maintenance programs.

Further, a combination of FAA and Occupational Safety and Health Administration regulations on both the federal and state levels apply to all of the Debtors' ground-based operations in the United States.

The Debtors are also subject to regulation under various environmental laws and regulations, including the Clean Air Act, the Clean Water Act and Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, many state and local governments have adopted environmental laws and regulations to which the Debtors' operations are subject. Environmental laws and regulations are administered by numerous federal and state agencies.

## XV.    Recommendation

In the opinion of Global Aviation and each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other

scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  **October 19, 2012**

                      Respectfully submitted,

                      GLOBAL AVIATION HOLDINGS INC.
                      (on behalf of itself and each of the Debtors)

                      By: */s/ William T. Garrett*
                         Name: William T. Garrett
                         Title: Executive Vice President and Chief Financial Officer

Prepared by:

*/s/ Jonathan S. Henes*

James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Plan of Reorganization**

[Filed as Docket No. 672]

**Exhibit B**

**Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleading**

[Filed as Docket No. 3]

**<u>Exhibit C</u>**

**Disclosure Statement Order**

## Exhibit D

**Financial Projections**

**FINANCIAL PROJECTIONS**

### GENERAL ASSUMPTIONS

In connection with the Debtors' Business Plan, management has prepared financial projections through 2016 for the purpose of illustrating to lessors, employees and creditors the financial impact of the Debtor's Plan of Reorganization. Factors that may affect these projections include, without limitation:

- Military/AMC (Air Mobility Command) Risk Factors:

    - Decreased AMC demand, reduction in paid rates for flying

    - Reduced participation in the AMC international program, which is derived from one-year contracts that the DOD (Department of Defense) is not obligated to renew

    - If one of Global's team members reduces its commitments or withdraws from the team, or if carriers on other teams commit additional aircraft to this program, Global's share of AMC flying may decline

    - Costs incurred on Global's military missions may be greater than the amounts for which Global is reimbursed by the AMC, which would reduce profitability

    - Global's AMC contracts contain various operational performance requirements.  These include on-time performance, availability or aircraft and crews to meet committed missions, and successful completion of inspections. Failure to meet these requirements could result in a penalty and in the worst case the AMC could termination the contract.

    - Global's business could be adversely affected by an adverse audit by the U.S. government

    - As a U.S. government contractor, Global is subject to a number of procurement and other laws and regulations that affect how Global conducts business and subjects it to certain costs

    - Government regulations impose requirements and restrictions on Global's operations that may increase operating costs

- Commercial Risk Factors:

    - The economic environment in general and the air cargo market in particular

    - Limited number of significant customers for Global's commercial cargo business, and the loss of one or more of these customers could materially and adversely affect its projections

    - The DOD activates Global's aircraft pledged to the CRAF and the activated aircraft would not be available for other commercial use

- General Risk Factors:

    - If Global is unable to continue to lease aircraft at acceptable rates and terms in the future, or if it is unable to acquire compatible engines or spare parts, on terms favorable to it or at all, Global's business, financial condition and results of operations could be adversely affected

    - Fuel price volatility could adversely affect Global's business, financial condition and results of operations, although a substantial portion of its fuel costs are reimbursed by customers

- Volatility in international currency markets may adversely affect demand for Global's commercial cargo and passenger services

- Significant changes in operating expenses may adversely impact profitability

- Some of Global's aircraft are periodically deployed in potentially dangerous situations, which may result in damage to aircraft or cargo or harm to Global's employees

- Governments may restrict or revoke Global's authority to operate flights to or over certain countries

- Global's insurance coverage may become more expensive and difficult to obtain and may not be adequate to insure against all risks

- Union disputes, employee strikes and other labor-related disruptions may materially and adversely affect Global's business, financial condition and results of operations

- Global may be liable for a share of any underfunding of the multiemployer defined pension plan in which some employees participate

- Global's maintenance costs may increase more than budgeted as its fleet ages

- Global's reputation, business, financial condition and results of operations could be materially and adversely affected in the event of an accident or other incident involving any of its aircraft or the same types of aircraft it operates

- Due to Global's limited fleet size, if any of its aircraft become unavailable, Global may suffer greater damage to its service, reputation and profitability than airlines with larger fleets

- If Global develop problems with any of its third-party service providers, Global's operations could be materially and adversely affected, resulting in a decline in revenue, increase in expenses or negative public perception about Global's services

- Global could be adversely affected by a failure or disruption of its computer, communications or other technology systems

- Global's ability to use its substantial net operating losses for federal income tax purposes could be substantially limited.

- Initiatives to address global climate change may adversely affect Global's business and increase its costs

- Global may not be able to retain or attract senior management and other key employees

- Global may experience difficulty finding, training and retaining employees

- Global's business is affected by factors beyond its control, including air traffic congestion at airports, adverse weather conditions, natural disasters, volcanoes, earthquakes and increased security measures

- Chapter 11 Risk Factors

  - The uncertainties associated with the emergence from chapter 11 of the U.S. Bankruptcy Code and related considerations of approval of a plan of reorganization

The financial projections present, to the best of management's knowledge and belief, the expected financial positions, and results of operations for the Debtors. The financial projections and underlying assumptions were prepared by management and reflect management's judgment of expected future operating conditions affecting the Debtors and management's expected course of actions. There may be differences between the projected and actual results because events and circumstances may not occur as expected. Those differences may be material and adverse.

The projections are based on a number of estimates and assumptions that, although considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and management in addition to assumptions with respect to future business decisions which are subject to change. Accordingly, there can be no assurance that the projected results will be realized, and actual results may vary from those projected. If actual results are lower than those shown, or if the assumptions used in formulating the projections are not realized, cash flows could be materially and adversely affected.

**FLEET PLAN**

The Business Plan is based on a current total fleet of 14 aircraft growing to 23 aircraft through 2016. The expected year-end allocation of these aircraft among the Debtors is as follows:

| World | 2011A | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|---|
| MD11P | 7 | 3 | 2 | 2 | 2 | 2 |
| MD11F | 9 | 4 | 4 | 4 | 4 | 4 |
| B747F | 4 | 2 | 3 | 4 | 5 | 6 |
| Total Passenger | 7 | 3 | 2 | 2 | 2 | 2 |
| Total Freighter | 13 | 6 | 7 | 8 | 9 | 10 |
| **World Aircraft** | **20** | **9** | **9** | **10** | **11** | **12** |

| North American | 2011A* | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|---|
| B757P/Combi | 4 | 0 | 1 | 1 | 1 | 1 |
| B767P | 5 | 5 | 5 | 5 | 5 | 5 |
| B767F | 0 | 0 | 2 | 3 | 4 | 5 |
| Total Passenger | 9 | 5 | 6 | 6 | 6 | 6 |
| Total Freighter | 0 | 0 | 2 | 3 | 4 | 5 |
| **North American Aircraft** | **9** | **5** | **8** | **9** | **10** | **11** |
| **Total Aircraft** | **29** | **14** | **17** | **19** | **21** | **23** |

*North American had one additional B757P airplane it subleased to another carrier.

3

The following table summarizes revenue-generating block hours9:

|  | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| B757P | 431 | 2,338 | 2,848 | 2,848 | 3,111 |
| B767P | 11,161 | 8,701 | 8,191 | 7,811 | 7,717 |
| MD11P | 7,799 | 5,959 | 5,963 | 5,992 | 5,990 |
| **Military Passenger** | **19,391** | **16,998** | **17,001** | **16,650** | **16,818** |
|  |  |  |  |  |  |
| MD11F | 3,054 | 2,912 | 3,742 | 2,793 | 2,793 |
| B747F | 3,661 | 3,416 | 5,161 | 5,033 | 5,033 |
| **Military Cargo** | **6,715** | **6,328** | **8,903** | **7,826** | **7,826** |
|  |  |  |  |  |  |
| B767F | - | 4,590 | 8,840 | 12,490 | 15,580 |
| MD11F | 10,985 | 11,073 | 10,740 | 11,182 | 11,476 |
| B747F | 5,539 | 4,826 | 8,131 | 11,426 | 16,516 |
| **Commercial Cargo** | **16,524** | **20,489** | **27,711** | **35,098** | **43,572** |
|  |  |  |  |  |  |
| B757P | 133 | - | - | - | - |
| B767P | 2,043 | 5,029 | 4,855 | 5,087 | 5,002 |
| MD11P | 157 | 325 | 325 | 325 | 325 |
| **Commercial Passenger** | **2,333** | **5,354** | **5,180** | **5,412** | **5,327** |
|  |  |  |  |  |  |
| **Total Block Hours** | **44,963** | **49,168** | **58,795** | **64,986** | **73,542** |

### REVENUE

Military Passenger and Cargo Revenue

AMC revenue is associated with military passenger and cargo flying. The AMC grants mission awards based on entitlement of participating carriers and certain teaming arrangements. AMC revenues are driven by the rate per mile and total miles flown. Contracts for both passenger and cargo missions under the AMC international program are typically one year in duration. While the volume of flying is not fixed and determinable, rates are fixed based on the average costs of all participating air carriers, weighted by flights flown in the AMC international program, plus a fixed operating margin that the AMC sets annually. The AMC also reimburses participating carriers for fuel costs thus limiting carriers' exposure to the volatility of fuel costs.

Forecast AMC demand is based on projected troop counts, troop movements, and expected entitlement. The approximate 31% Alliance Team entitlement, in which Global participates, is applied to aggregate AMC demand to estimate Alliance Team block hours.  These block hours are then allocated to World and North American based on the projected need for medium and large capacity aircraft based on historical data. . Revenue per block hour is forecast by category. World operates within the large passenger and cargo categories, while North American operates in the medium passenger category. Rates are based on the fiscal year 2013 rate, with forecast rate increases of approximately 1% to 2% annually.

Commercial Passenger and Cargo Revenue

---

[1]    Excludes Ferry Block Hours

4

Commercial revenues are principally driven by overall macroeconomic trends that affect cargo and passenger demand, capacity available in the markets in which the Company competes in addition to general pricing dynamics. World operates both commercial cargo and passenger services while North American operates only passenger services. North American is forecast to enter the commercial cargo market during the fiscal year 2013.

Global provides services through two contract structures: ACMI contracts and full service contracts. ACMI contracts are aircraft operational arrangements whereby the Company provides the aircraft, crew, maintenance and insurance to a customer for a fee that is generally based on the expected block hours multiplied by a block hour rate. An ACMI contract typically includes a minimum block hour commitment per month over the term of the contract. In contrast, a full service contract is an aircraft operational arrangement whereby a carrier provides the aircraft, crew, maintenance, insurance, fuel, landing, ground handling and other necessary operating services to a customer for a single fee that is either based on a fixed fee or a fee based on block hours multiplied by a block hour rate. Full service contracts generally involve higher rates than ACMI contracts because of the full array of services provided, the largest of which is fuel. Due to this price differential per block hour, the mix of full service and ACMI block hours flown in any period can affect the Company's period-over-period commercial revenue results. An increase in relative full service block hours flown will generate higher commercial revenue, all else equal. A decrease in relative full service block hours flown will have the converse effect.

Since ACMI customers are responsible for fuel costs, commercial ACMI revenues are not directly affected by fuel price changes. However, a significant increase in fuel prices could have an adverse effect on demand for the use of the Company's aircraft. Global's commercial full service revenues are fuel price sensitive (although operating income is much less so), as it generally increases or decreases full service block hour rates to reflect expected fuel costs. The Company's full service contracts generally have a block hour rate adjustment provision to mitigate losses created by differences between the fuel price stated in the contract and the actual fuel price incurred.

The Company forecasts ACMI revenue based on recent market experience and management's expectations for future market conditions. ACMI rates and terms are forecast to improve for new customer contracts and for contract renewals. An economic recovery in world cargo markets is projected, which will drive demand and the need for available ACMI capacity in both B747-400F and newly introduced B767-300F flying. The Company projects its full service cargo revenue based on historical activity in addition to current contracts. Full service cargo missions are regularly preceded by one-way AMC cargo flights.

ACMI passenger flying is typically used to "fill" unused block hours on aircraft dedicated to full-time customers; as an example, entering into contracts for university charters during the college football bowl season. Demand is projected based on historical experience and current contracts.

Finally, the Company recently commenced full service passenger flying for a new one-year government contract with a fixed volume of flying and a fixed base rate component.  This contract is expected to continue throughout the forecast period.

Other Revenue

Other revenue primarily consists of revenue generated from the rebill to customers of operating costs incurred which are the customer's responsibility under ACMI or full service contracts.  Other revenue also includes revenue earned by subcontracting the operation of a scheduled flight to another air carrier due to capacity constraints, unanticipated maintenance events and/or scheduling conflicts.

**OPERATING EXPENSES**

Flight

Flight expenses include crewmember wages and benefits, crew positioning costs, aircraft traffic and servicing expenses, and passenger-related expenses.

In September 2012, Global finalized amendments or implemented new labor agreements as follows:

- The World pilots are represented by the International Brotherhood of Teamsters ("*IBT*") and have an existing collective bargaining agreement;

- The World flight attendants are also represented by the IBT under a separate collective bargaining agreement;

- The North American pilots are represented by the Air Line Pilots Association  ("*ALPA*") and have their own existing collective bargaining agreement;

- The North American flight attendants are represented by the IBT but have not yet finalized a collective bargaining agreement; and

- The dispatchers for World and North American represented by the Transport Workers Union ("*TWU*") and have their own existing collective bargaining agreement.

The Company expects the restructure of the above agreements in total to decrease flight expenses in excess of $100 million over the five-year projection period. Collective bargaining agreement savings are the result of lower pay rates, modified provisions for benefits and workrules leading to more efficient and flexible crew scheduling. In 2012, the Company reduced its headcount to coincide with the reduced fleet size. Collective bargaining agreement savings mainly associated with benefits and workrules will begin to be realized during the implementation period in 2012 and the majority of the savings realized during the fiscal year 2013. Cockpit crewmember compensation and benefits are forecast based on the number of heads required to operate each aircraft by business line. Flight attendant compensation and benefits is based on the number of heads required for each passenger flight by business line and aircraft type as forecast in block hours.

Crew positioning expenses are primarily the cost of air and ground transportation and hotels incurred to position crewmembers in locations around the world from which they can operate their assigned flights and then return to their home bases. Global currently has bases near John F. Kennedy (JFK) International airport in New York and Washington-Dulles International Airport. Crew positioning is based on a historical average rate per total forecast departures. The historical average rate was adjusted by 10% in connection with the Company's cost saving initiatives offset by estimated diseconomies of scale resulting from a smaller fleet, and includes a 2% rate increase in future periods.

Ground and aircraft handling include aircraft and traffic servicing expenses, ground services and overfly and navigation fees. Ground services include the costs incurred at airports to land and service aircraft and to handle passenger check-in, security, cargo and baggage. Overfly and navigation fees are incurred when the Company's aircraft fly through certain foreign air space and are paid to the relevant foreign authorities. All aircraft and traffic servicing employee costs and benefits for line and management functions such as ground operations are also included. ACMI contracts typically do not incur aircraft and traffic servicing expenses. Aircraft and traffic servicing was forecast generally based on a rate per total departure. The forecast rate was the historical average and adjusted down by 5% in connection with the Company's cost saving initiatives that include contract renegotiations and companywide pay decreases of 5% for manager levels and above. Future periods included a 2% rate increase. Overfly and navigation fees are forecast based on the number of non-ACMI departures.

Passenger-related expenses mainly include catering, passenger liability insurance, inflight entertainment and interrupted trip expenses. Catering is forecast based on an historical average rate per total passenger departures. The historical average rate was adjusted by 5% in connection with the renegotiation of catering contracts, and includes a 2% rate increase in future periods. All other passenger-related expenses were forecast based on the number of forecast passenger departures.

Maintenance

Maintenance expense includes the cost of repairing the Company's aircraft, which includes the repair or replacement of parts as appropriate, certain scheduled airframe maintenance events, company and contract labor for maintenance activities, line maintenance and other non-capitalized direct costs related to airframe and engine maintenance, including short-term spare engine leases, loan and exchange fees for spare parts, and shipping costs. It

also includes the component usage costs incurred under hourly or per landing maintenance agreements. These agreements require payments of monthly fees to the vendor based on a specified rate per engine flight hour, in exchange for the vendor's providing agreed-upon inventory levels and the performance of overhauls and maintenance as required.

Event, time-driven and maintenance reserves are forecast based on the number of forecast block hours times an average historical rate. Certain historical rates were reduced by 10% in connection with the Company's cost saving initiatives. These initiatives include identifying new maintenance providers and renegotiating the rate in current contracts. Future periods include a 2% rate increase. Maintenance personnel compensation and benefits is forecast based on current headcount times an average historical rate. In 2012, the Company reduced its headcount to coincide with the reduced fleet size and implemented a 5% wage reduction for managers and above.

Fuel

Aircraft fuel expense includes all fuel costs under military and full service commercial contracts. In addition, in certain circumstances, the Company purchases fuel for its ACMI commercial customers. The Company subsequently rebills the amounts to the customers. Aircraft fuel expense is a variable cost; however, the Company's fuel price volatility exposure is limited to its full service commercial contracts. At times, Global has experienced temporary favorable and unfavorable fluctuations in working capital due to the timing of significant fuel price changes and reimbursement for these costs. Fuel prices for 2012 and 2013 were forecast based on the latest AMC peg rate and published fuel curves and assumed to increase 2% per year thereafter. Volume is forecast non-ACMI block hours, and burn rates by aircraft type.

Aircraft Rent

Aircraft rentals include aircraft and engine rent expense under various operating leases for aircraft and spare engines. Global recently restructured its leases in connection with its chapter 11 bankruptcy filing. These amounts are fixed for the duration of the underlying lease. Aircraft rentals can also include certain supplemental rents paid to fund future maintenance events, commonly referred to as maintenance reserves. This expense category also includes hull insurance which is forecast based on the number of aircraft in the fleet. Spare engine rent is generally forecast by the total number of block hours times an average rate per engine type.

Depreciation and Amortization

Depreciation reflects the periodic expensing of the recorded cost of capitalized engine overhauls and related life limited parts, referred to as LLPs, and certain scheduled airframe and landing gear maintenance events, aircraft improvements, and rotable parts for all fleet types, together with property and equipment. Depreciation is forecast for existing depreciable assets, in addition to forecast maintenance events. Amortization reflects the periodic expensing of the recorded value of definite-lived intangible assets. Amortization is forecast based on the historical amortization.

Selling, General and Administrative Costs

Selling, general and administrative expenses (SG&A) predominately include salaries, wages and benefits for administrative personnel, facility rents and utilities, professional and legal fees, information technology expenditures as well as AMC commissions. Compensation and benefits were forecast based on the number of heads subsequent to a significant headcount reduction in February 2012 in connection with the Company's fleet rationalization. In that same month, the Company implemented a 5% pay cut for manager level and above, in addition to a 10% decrease for executives. As a result, SG&A wages are forecast to be down 57% for the fiscal year 2013 as compared to the fiscal year 2011. Non-wage general and administrative expenses are forecast at a 34% decrease for 2013 compared to 2011 as the company rationalizes its cost base for a smaller operating footprint. Future periods include an increase of 1% to 2%. Commissions are paid to Alliance team members as compensation for military missions the Company operates that were awarded to the Alliance team based on its AMC entitlement points. These commissions are negotiated as a percentage of the revenue earned from those military missions, and are paid monthly. Commissions are forecast based on a percent of AMC revenue.

Interest, Reorganization Items and Other Expenses

Interest expense represents interest on its outstanding debt obligations as well as the amortization of projected capitalizable debt issuance costs.  Forecast interest expense includes the Company's post-bankruptcy capital structure at forecast market interest rates. Reorganization items include the write-off of flight equipment and capitalized maintenance events associated with rejected aircraft leases, workforce reduction and retraining costs, legal and professional fees associated with the Company's chapter 11 filing and the Company's restructured debt all offset by trade payables, accrued interest and debt forecasted to be compromised.

## BALANCE SHEET ASSUMPTIONS

Accounts Receivable

Accounts receivable are due primarily from the U.S. Government, tour operators, international passenger and cargo air carriers, and international freight forwarders. Accounts receivable are charged off against the allowance for doubtful accounts when it is probable that the receivable will not be recovered. Accounts Receivable, net, are forecast on a days' receivable basis with the allowance for doubtful accounts unchanged.

Inventories

Inventories consist primarily of expendable and recoverable/repairable aircraft spare parts and other supplies. Inventories are charged to expense when consumed. The Company records an allowance for obsolescence against its inventories by amortizing the book value of the aircraft parts inventories, net of any estimated residual value, over the related fleet's estimated useful service life, or the average of the related fleet's lease term, whichever is shorter. Inventories, net, are forecast at a historical rate, net of obsolescence times the number of aircraft.

Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets consist mainly of deposits under leases, or other agreements that will be returned within the next 12 months, and the prepayment for goods or services to be realized within the next 12 months. Also included are deposits received in advance of certain charter flights, which are held in an escrow account until the charter service is provided. Other receivables included in prepaid expenses and other current assets include insurance claims and other miscellaneous receivables including receivables from lessors. Prepaid expenses and other current assets are forecast based on a percentage of certain operating expenses based on history.

Property and Equipment

The Company records additions to property and equipment at cost. Property and equipment is depreciated to residual values, if any, over their estimated useful service lives using the straight-line method. The vast majority of the Company's capital expenditures include capitalized engine overhauls and related life limited parts, referred to as LLPs, and certain scheduled airframe and landing gear maintenance events, aircraft improvements, and rotable parts for all fleet types, together with property and equipment. Forecast capital expenditures predominately include capitalizable maintenance events pursuant to event or time-driven intervals based on the Company's current Federal Aviation Administration (FAA) approved maintenance programs.

**Capital Expenditures**

| (in mm's) | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| Engine overhauls | $16.7 | $26.2 | $41.1 | $30.4 | $44.3 |
| 4C checks | 4.3 | 6.3 | 4.4 | 8.7 | 2.4 |
| Other maintenance event | 8.1 | 9.8 | 5.6 | 8.2 | 7.0 |
| Non-maintenance [2] | (0.0) | 4.2 | 4.3 | 2.6 | 2.8 |
| **Total capital expenditures** | **$29.2** | **$46.5** | **$55.4** | **$49.8** | **$56.5** |

8

Airframe and Engine Maintenance and Lease Requirements

The cost of major engine overhauls for fleet types and the cost of certain overhauls related to heavy airframe, engine, life-limited parts (LLP), landing gear and auxiliary power units (APU) for all fleet types is capitalized when performed and amortized over estimated useful lives based upon usage, or to earlier fleet or aircraft calendar limits, for both owned and leased aircraft. Under the majority of its aircraft and engine leases, the Company is required to make periodic maintenance reserve payments to lessors for certain future maintenance work such as airframe, engine, LLP, landing gear and APU overhauls. At inception and at each balance sheet date the Company assesses whether its maintenance reserve payments required by its leases are substantively and contractually related to the maintenance of the leased asset. Payments that are determined to be substantively and contractually related to the maintenance of the leased asset are accounted for as maintenance deposits and are reflected as Maintenance Reserve Deposits in the Company's balance sheet. In addition, under its aircraft and engine leases, the Company is required to return the airframes, engines, LLP, landing gear, and APUs to the lessors in a specified maintenance condition at the end of the lease (return condition). If the return condition is not met, the leases generally require the Company to provide financial compensation to the lessor. Under certain leases, the maintenance reserve deposits may not be refundable to the Company. Consequently, the Company periodically reviews the balances of the maintenance reserve deposits and writes off any amounts that are no longer probable of recovery. In determining whether it is probable that maintenance deposits will be used to offset the liability for future maintenance costs, the Company considers the condition of the aircraft, including but not limited to, the airframe and engines and the projected future usage of the aircraft based on the Company's business and fleet plans.

Maintenance reserve deposits are forecast based on the requirements in our aircraft leases. Short-term and long-term fluctuations occur depending on the forecast timing of maintenance events and the subsequent reimbursement. Maintenance reserve deposits estimated to be refunded in the next 12-month period are classified as short-term. Maintenance reserve deposits to be refunded over the forecast period are as follows:

| | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| Maintenance reserve reimbursement | $17.0 | $29.3 | $27.8 | $24.3 | $33.0 |

Intangible Assets

Intangible assets include the present value of future cash flows on our military contract as well as the value of our operating certificates. Military contract intangibles are forecast to include amortization at the historical rate. The Company's operating certificates are forecast to be unchanged.

Restricted Cash

Restricted cash primarily consists of deposits held to secure outstanding stand-by letters of credit issued by a financial institution on behalf of the Company predominately in favor of insurance companies as part of the Company's risk management program. Restricted cash is forecast to remain unchanged.

Deposits and Other Assets

Deposits and other assets primarily consist of long-term security deposits required under aircraft, engine, or building lease agreements, and unamortized deferred loan costs. Deposits and other assets are forecast to fluctuate with the estimated changes in the Company's fleet.

Income Taxes

---

[2]    2012F includes asset sales

The Company accounts for income taxes under the asset and liability method. Under this method, the Company recognizes deferred income taxes based upon the tax effects of temporary differences between the financial statement and tax basis of assets and liabilities, as measured through the application of current enacted tax rates. When necessary, deferred income tax assets are reduced by a valuation allowance to an amount that is determined to be more likely than not recoverable. The Company must make significant estimates and assumptions about future taxable income and future tax consequences when determining the amount of the valuation allowance.

The Company's income tax provisions are based on calculations, estimates, and assumptions that are subject to potential examination by the Internal Revenue Service (IRS) and other taxing authorities.

Forecast taxes assume the utilization of the maximum net operating losses on an annual basis as well as certain preferred tax positions management believes it will elect. Deferred taxes are forecast to remain unchanged. The Company has forecast its cashflow based on an assumption that there are limitations associated with net operating loss uses associated with section 382(l)(6) of the tax code.

Liabilities and Stockholders' Equity

Accounts payable, accrued flight expenses, and accrued expenses and other are forecast as a percentage of historical operating expense. Air traffic liability represents the Company's unearned revenue and is forecast based on a historical percentage of future revenue. Accrued compensation and benefits is forecast as a percent of historical compensation and benefit expenses for all employees. Other liabilities predominately include the World post-retirement benefit plan obligation, deferred rents and FIN48 "more-likely-than-not" tax estimates. Other liabilities are forecast to remain unchanged. The forecast assumes $307.0 million in pre-petition bankruptcy liabilities have been extinguished, including certain accounts payable, outstanding debt (net of discount), and accrued interest.  In addition, the forecast assumes the recovery of normalized credit terms provide to the Company by its vendors. Forecast additional paid-in capital is adjusted for non-cash stock option expense at the historical rate.

## STATEMENT OF CASH FLOWS

Operating Activities

Net income (loss) is adjusted for forecast non-cash items including depreciation and amortization, amortization of loan costs and non-cash stock-based compensation expense. Forecast working capital changes predominately represent the changes in the working capital accounts on the balance sheet. The largest changes forecast are accounts payable and accrued expenses and other current liabilities in 2013 as the Company returns to normal credit terms, begins paying cash taxes and increases its fleet and related block hours operated; other assets in 2014, and other current assets in 2015 as the Company grows its fleet and funds maintenance reserve requirements as required under its aircraft leases. To a lesser extent this is offset by the refund of maintenance reserves for heavy maintenance events.

Investing Activities

Investing activities consist primarily of capitalized maintenance events and the purchase of rotable parts. Capitalized maintenance events are forecast based on the requirements of both the underlying aircraft leases and time driven edicts by the FAA.

Financing Activities

Financing activities consist primarily of proceeds and paydowns on its restructured debt obligations and its revolving line of credit.

**Consolidated Income Statement** [3][4][5]

|  | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| Military Passenger | 347.8 | 302.7 | 311.2 | 311.8 | 320.3 |
| Military Cargo | 135.8 | 132.0 | 193.1 | 178.6 | 182.2 |
| Commercial Cargo | 94.7 | 132.7 | 169.1 | 211.8 | 258.4 |
| Commercial Passenger | 32.1 | 83.6 | 83.6 | 87.6 | 88.6 |
| Other | 11.3 | 1.8 | - | - | - |
| **Total Revenues** | **621.8** | **652.9** | **757.1** | **789.8** | **849.5** |
|  |  |  |  |  |  |
| Flight Costs | 187.0 | 146.0 | 158.8 | 166.9 | 178.6 |
| *Pilot Compensation* | 65.6 | 45.9 | 51.0 | 58.9 | 67.0 |
| *Flight Attendant Compensation* | 22.9 | 12.9 | 13.4 | 13.7 | 14.1 |
| *Positioning* | 45.6 | 34.2 | 37.0 | 37.2 | 38.8 |
| *Overfly / Navigation Fees* | 13.0 | 14.2 | 15.8 | 15.0 | 15.0 |
| *Passenger Expense* | 3.1 | 3.0 | 3.1 | 3.2 | 3.2 |
| *Ground Services* | 24.0 | 23.4 | 25.8 | 26.0 | 27.3 |
| *Catering* | 12.8 | 12.4 | 12.7 | 12.9 | 13.2 |
| Maintenance | 72.1 | 78.8 | 95.7 | 107.0 | 122.1 |
| Fuel | 203.5 | 218.5 | 250.5 | 245.6 | 250.6 |
| **Total Variable Costs** | **462.7** | **443.3** | **505.0** | **519.5** | **551.2** |
|  |  |  |  |  |  |
| Aircraft & Engine Rent | 61.9 | 59.2 | 71.4 | 79.9 | 90.5 |
| Depreciation & Amortization | 66.1 | 57.0 | 61.4 | 63.6 | 68.0 |
| SG&A | 80.0 | 73.6 | 80.8 | 84.1 | 87.4 |
| **Total Fixed Costs** | **207.9** | **189.8** | **213.6** | **227.6** | **245.9** |
|  |  |  |  |  |  |
| **Total Operating Expenses** | **670.6** | **633.1** | **718.7** | **747.1** | **797.1** |
|  |  |  |  |  |  |
| **Operating Income (Loss)** | **(48.9)** | **19.7** | **38.4** | **42.7** | **52.4** |
|  |  |  |  |  |  |
| Interest, net | 44.4 | 11.9 | 10.3 | 10.1 | 10.1 |
| Reorganization Items | (73.6) | - | - | - | - |
| Other | 0.5 | - | - | - | - |
| **Other Expense (Income)** | **(28.7)** | **11.9** | **10.3** | **10.1** | **10.1** |
|  |  |  |  |  |  |
| **Pretax Income (Loss)** | **(20.2)** | **7.8** | **28.1** | **32.6** | **42.3** |
|  |  |  |  |  |  |
| Taxes | (15.5) | 10.6 | 11.1 | 14.2 | 17.3 |
| **Net Income (Loss)** | **(4.7)** | **(2.8)** | **17.0** | **18.4** | **25.0** |
|  |  |  |  |  |  |
| **EBITDA** | **17.2** | **76.8** | **99.8** | **106.3** | **120.4** |
| Maintenance Event Capex | (29.2) | (42.3) | (51.1) | (47.2) | (53.7) |
| **Adjusted EBITDA** | **(12.0)** | **34.5** | **48.7** | **59.1** | **66.7** |

---

[3]    Prior to fresh start accounting

[4]    Actuals as of August 2012

[5]    Reorganization items include the write-off of flight equipment and capitalized maintenance events associated with rejected aircraft leases, workforce reduction and retraining costs, legal and professional fees associated with the Company's chapter 11 filing and the Company's restructured debt all offset by trade payables, accrued interest and debt forecasted to be compromised

**Consolidated Balance Sheet** [6][7][8]

| | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents | 3.9 | 16.3 | 43.6 | 74.3 | 106.2 |
| Accounts Receivable, Net | 18.0 | 19.9 | 18.4 | 19.3 | 20.9 |
| Inventories, Net | 8.6 | 8.6 | 7.8 | 8.7 | 9.5 |
| Maintenance Reserve Deposits | 13.6 | 12.2 | 8.7 | 17.4 | 22.6 |
| Deferred Tax Assets | 22.5 | 22.5 | 22.5 | 22.5 | 22.5 |
| Prepaid Items and Other Current Assets | 27.9 | 38.7 | 40.0 | 41.8 | 41.8 |
| **Total Current Assets** | **94.6** | **118.2** | **141.1** | **183.9** | **223.4** |
| **Total Property and Equipment, Net** | **101.3** | **116.0** | **135.2** | **146.6** | **160.3** |
| Military Contract Intangibles | 117.0 | 91.8 | 66.6 | 41.4 | 16.1 |
| Other Intangible Assets | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Restricted Cash | 8.1 | 8.1 | 8.1 | 8.1 | 8.1 |
| Maintenance Reserve Deposits | 41.7 | 41.1 | 49.8 | 52.0 | 55.3 |
| Deposits and Other Assets | 16.5 | 20.3 | 22.6 | 25.0 | 27.3 |
| **Total Other Assets** | **187.3** | **165.3** | **151.1** | **130.4** | **110.8** |
| **Total Assets** | **383.2** | **399.4** | **427.4** | **460.9** | **494.5** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| **Liabilities** | | | | | |
| Short Term Debt | 5.0 | 5.0 | - | - | - |
| Accounts Payable | 29.1 | 35.3 | 41.4 | 44.1 | 48.0 |
| Air Traffic Liability | 4.9 | 6.4 | 7.6 | 9.1 | 9.1 |
| Accrued Compensation and Benefits | 21.4 | 19.5 | 20.2 | 22.4 | 24.4 |
| Accrued Flight Expenses | 10.8 | 11.4 | 12.2 | 11.5 | 11.3 |
| Accrued Expenses and Other | 27.8 | 36.3 | 38.9 | 43.1 | 41.0 |
| **Total Current Liabilities** | **99.0** | **114.0** | **120.3** | **130.2** | **133.7** |
| Long Term Debt | 135.6 | 135.6 | 135.6 | 135.6 | 135.6 |
| Deferred Tax Liabilities | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Other Liabilities | 37.4 | 37.4 | 37.4 | 37.4 | 37.4 |
| **Total Other Liabilities** | **188.1** | **188.1** | **188.1** | **188.1** | **188.1** |
| **Total Liabilities** | **287.1** | **302.0** | **308.4** | **318.3** | **321.8** |
| **Equity** | | | | | |
| **Total Shareholders' Equity** | **96.1** | **97.4** | **119.1** | **142.6** | **172.7** |
| **Total Liabilities and Shareholders' Equity** | **383.2** | **399.4** | **427.4** | **460.9** | **494.5** |

---

6    Prior to fresh start accounting
7    Actuals as of August 2012
8    Prior to any excess cash flow sweep

**Consolidated Cash Flow Statement** [9] [10] [11]

| | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| Net Income (Loss) | (6.2) | (2.8) | 17.0 | 18.4 | 25.0 |
| Depreciation and Amortization | 66.4 | 57.0 | 61.4 | 63.6 | 68.0 |
| Amortization of Loan Costs | 17.3 | 0.6 | 0.2 | 0.2 | - |
| Amortization of Debt Discount | 12.7 | - | - | - | - |
| Asset Impairments and Retirements | 90.9 | - | - | - | - |
| Gain on Extinguishment of Debt | (187.6) | - | - | - | - |
| Stock Compensation Expense | 3.2 | 4.1 | 4.7 | 5.1 | 5.2 |
| Non-Cash Interest Expense | 10.8 | - | - | - | - |
| Loss (Gain) on Disposal of Assets | 0.6 | - | - | - | - |
| Deferred Income Taxes | (15.5) | - | - | - | - |
| Change in Operating Assets & Liabilities | | | | | |
| Restricted Cash | (0.3) | - | - | - | - |
| Accounts Receivable, Net | 24.6 | (1.9) | 1.5 | (0.9) | (1.6) |
| Inventories, Net | 2.0 | 0.0 | 0.8 | (0.9) | (0.8) |
| Other Current Assets | (5.5) | (9.3) | 2.2 | (10.4) | (5.2) |
| Accounts Payable | (23.5) | 6.2 | 6.1 | 2.8 | 3.8 |
| Air Traffic Liabilities and Accrued Flight | (7.0) | 2.0 | 2.0 | 0.8 | (0.3) |
| Accrued Compensation | (3.5) | (1.8) | 0.7 | 2.2 | 2.0 |
| Accrued Expense and Other Current Liabilities | (44.2) | 8.5 | 2.5 | 4.2 | (2.1) |
| Other Liabilities | (0.6) | - | - | - | - |
| Other Assets | 8.9 | (3.8) | (11.2) | (4.6) | (5.7) |
| **Net Cash (Used In) Provided By Operating Activities** | **(56.5)** | **58.9** | **87.8** | **80.4** | **88.4** |
| | | | | | |
| **Investing Activities** | | | | | |
| Capital Expenditures -- Flight Equipment | (29.2) | (45.0) | (52.6) | (48.8) | (55.4) |
| Capital Expenditures -- Facilities, Ground & Other | (0.1) | (1.5) | (2.8) | (1.0) | (1.0) |
| Sale of Assets, Investments, and Other | 0.1 | - | - | - | - |
| **Net Cash Used In Investing** | **(29.2)** | **(46.5)** | **(55.4)** | **(49.8)** | **(56.5)** |
| | | | | | |
| **Financing Activities** | | | | | |
| Proceeds from Long-term Debt, Net | 44.6 | - | - | - | - |
| Revolver Draw (Repayment), Net | 5.0 | - | (5.0) | - | - |
| Debt Issuance Costs | (0.8) | - | - | - | - |
| **Net Cash (Used In) Provided By Financing Activities** | **48.8** | **-** | **(5.0)** | **-** | **-** |
| | | | | | |
| **Change in Cash and Cash Equivalents** | **(36.9)** | **12.4** | **27.4** | **30.6** | **31.9** |
| | | | | | |
| Cash and Equivalents, beginning of period | 40.7 | 3.9 | 16.3 | 43.6 | 74.3 |
| **Cash and Equivalents, end of period** | **3.9** | **16.3** | **43.6** | **74.3** | **106.2** |

---

[9]   Prior to fresh start accounting

[10]  Actuals as of August 2012

[19]  Prior to any excess cash flow sweep

**Exhibit E**

**Valuation Analysis**

## VALUATION ANALYSIS

### ESTIMATED REORGANIZATION VALUATION OF DEBTORS

The Debtors have been advised by Rothschild Inc. ("**Rothschild**"), their investment banker, with respect to the reorganization value of reorganized Global, World and North American on a going concern basis.

Solely for purposes of the Plan, the estimated range of a reorganization value of the Reorganized Debtors was assumed to be approximately $170 million to $220 million (with a point estimate of approximately $195 million) as of an assumed Effective Date of December 1, 2012. Rothschild's estimate of a range of reorganization values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ASSUMED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 1, 2012, REFLECTS WORK PERFORMED BY ROTHSCHILD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO ROTHSCHILD AS OF OCTOBER 3, 2012. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT ROTHSCHILD'S CONCLUSIONS, ROTHSCHILD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE**.

Based upon the assumed combined range of the reorganization value of the Reorganized Debtors of between $170 million and $220 million, assumed net debt of $135 million, Rothschild has employed an imputed estimate of the range of equity value for the Reorganized Debtors between approximately $35 million and $85 million, with a midpoint estimate of $60 million.

**THE ASSUMED RANGE OF TOTAL ENTERPRISE VALUE IS BASED ON A COMPROMISE AND SETTLEMENT OF ISSUES BETWEEN AND AMONG THE DEBTORS, THEIR LABOR UNIONS AND THE CONSENTING SECURED NOTEHOLDERS RELATING TO THE DEBTORS' ENTRY INTO NEW FIVE-YEAR COLLECTIVE BARGAINING AGREEMENTS.    THE TERMS OF THE SETTLEMENT ARE OUTLINED IN THE HEADS OF AGREEMENT ATTACHED AS EXHIBIT G TO THE DISCLOSURE STATEMENT.    THE TERMS OF THE SETTLEMENT AND THE HEADS OF AGREEMENT ARE NON-SEVERABLE WITHOUT THE CONSENT OF THE PARTIES.    WITHOUT BANKRUPTCY COURT APPROVAL OF THE SETTLEMENT, THE ASSUMED RANGE OF TOTAL ENTERPRISE VALUE COULD BE MATERIALLY LOWER.**

In providing the foregoing estimate of the reorganization value of the Reorganized Debtors, Rothschild based their estimate on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of reorganized the Debtors' Business Plan, the achievement of the forecasts reflected in the Business Plan, access to adequate exit financing, the leadership of the management team, market conditions as of October 1, 2012 continuing through the assumed Effective Date of December 1, 2012, no change to the economy, air cargo industry or AMC demand or rates, sustainability of constructive relationship with the Debtors' unionized crafts, no material adverse change and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Business Plan financial projections prepared by the management of the Debtors and included as **EXHIBIT D** to this Disclosure Statement, Rothschild assumed that such projections have been reasonably prepared in good faith and on a basis reflecting the best, currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Rothschild's estimate of a range of reorganization values assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecast by the management of the Debtors are materially better than the recent historical results of operations of the Debtors. As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the projections, such performance may have a material impact on the projections and on the estimated range of values derived there from. The business plan and the valuation are subject to certain risks including global economic growth and its effect on

the air cargo market, the demand and reimbursement rates associated with AMC flying, sustainability of constructive relationship with the Debtors' unionized crafts, operational challenges, tax risks and other risks as discussed in the general assumptions describing the business plan.

**IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, ROTHSCHILD (I) REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS; (II) REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTED FINANCIAL INFORMATION, WHICH WAS PREPARED AND PROVIDED TO ROTHSCHILD BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND ITS PROSPECTS; (III) MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS DEBTORS' OPERATIONS AND FUTURE PROSPECTS ; (IV) REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT ROTHSCHILD DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS; (V) CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND (VI) CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE. ALTHOUGH ROTHSCHILD CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE DEBTORS' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION.**

**IN ADDITION, ROTHSCHILD DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN THE BUSINESS PLAN IN CONNECTION WITH ROTHSCHILD'S ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY ROTHSCHILD REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.**

**THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, ROTHSCHILD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A**

**LONG- TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.**

Valuation Methodology

Rothschild performed a variety of analyses and considered a variety of factors in preparing the valuations of the Reorganized Debtors. Rothschild prepared individual valuation analyses of both World and North American utilizing the same methodologies below and allocating corporate costs and cashflows across the two airlines. While several generally accepted valuation techniques for estimating the Debtors' enterprise values were used, Rothschild primarily relied on two methodologies: comparable public company analysis and discounted cash flow analysis. Rothschild applied equal weighting to these two methodologies. Rothschild also considered precedent transactions; however, it was determined that there were not enough transactions involving companies comparable to Global within a reasonable time period to make this valuation approach relevant to an estimate of the Debtor's enterprise value. In addition, there are challenges in the application of precedent transactions analysis due to the absence of a useful and reliable last twelve months ("*LTM*") performance. As such, precedent transactions were not relied upon. Rothschild's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analysis as a whole, could create a misleading or incomplete conclusion as to the Debtors' enterprise values. In preparing its valuation estimate, Rothschild performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Rothschild's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

Comparable Public Company Analysis:

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation; however, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the Comparable Public Company Analysis, the following publicly traded companies deemed generally comparable to the Debtors in some or all of the factors described above, were selected:

Passenger Comparables: Southwest Airlines, US airways, Delta Airlines, Hawaiian Holdings, United Continental, JetBlue Airways Corporation, Spirit Airlines, Allegiant Travel Company, LAN Airlines, Republic Airways Holdings, Inc. and Alaska Air Group.

Cargo Comparables: Atlas Air Worldwide Holdings Inc. and Air Transport Services Group, Inc.

The selection of appropriate comparable companies is difficult because there are no public, "pure- play" competitors to the Debtors.  Rothschild focused on Cargo Comparables while also considering the Passenger Comparables.

Rothschild has utilized the median consensus of analyst estimates for 2013 earnings before interest, taxes, depreciation and amortization ("*EBITDA*") and utilized LTM rental expense added to consensus EBITDA as proxy for forecast earnings before interest, taxes, depreciation, amortization and rent ("*EBITDAR*"). Rothschild also

3

reviewed individual analyst reports for EBITDA and EBITDAR forecasts. These metrics were reduced for maintenance capex (where available) to create an adjusted EBITDA. Rothschild analyzed the current trading values (including capitalized leases calculated at 7.0x rent expense for EBITDAR) for the comparable companies as a multiple of forecasted EBITDAR and EBITDA for the year ending 2013.

Rothschild employed an adjusted EBITDAR multiple range of 4.0x - 5.0x for 2013 results (including an estimate for capitalized aircraft rent). These multiples were then applied to the Debtors' forecast financial adjusted EBITDAR to determine the range of enterprise values. The value of capitalized leases, calculated as 7.0x rent expense, is deducted to determine the Debtors' enterprise values. Rothschild also used an adjusted EBITDA range of 3.5x – 4.5x applied to Global's 2013 forecast EBITDA to determine the Debtors' enterprise value.

Discounted Cash Flow Approach:

The discounted cash flow ("*DCF*") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Rothschild's discounted cash flow valuation is based on the Business Plan's projections. Rothschild discounted the projected cash flows using World and North American's estimated weighted average cost of capital ("*WACC*") assuming that rent expense is either an operating or a financial cost. For the DCF analysis, Rothschild employed an 11.8% to 12.8% WACC. Rothschild calculated the terminal value of using the perpetual free cash flow growth formula.

Under the perpetual free cash flow growth method, terminal value is calculated assuming a constant growth rate that continues indefinitely. Rothschild applied a range of growth rates of 0% to 1%; however, the Debtors' cash flows cannot be predicted to grow at any stable rate for perpetuity due to the highly cyclical nature of the industry.

The DCF approach relies on the Debtors' ability to project future cash flows with some degree of accuracy. Because the Debtors' projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projected Financial Information may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Rothschild cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' projections. Rothschild separated valued the Debtors' projected net operating losses and included this amount in the DCF valuation.

**THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY ROTHSCHILD REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED HOLDINGS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST- REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH ROTHSCHILD'S VALUATION ANALYSIS.**

**<u>Exhibit F</u>**

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### INTRODUCTION

Separate liquidation analyses have been prepared for World, North American, Global Shared Services, Inc. and Global Aviation. These analyses have been consolidated into a single liquidation analysis (the "*Liquidation Analysis*"), which reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by the Debtors, are subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtors' control, and which could be subject to material change.

**THERE CAN BE NO ASSURANCE THAT THE RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.**

The Liquidation Analysis assumes that the Bankruptcy Cases were converted to cases under Chapter 7 and liquidated through an orderly liquidation process and assumes the July 31, 2012 balance sheet is a reasonable proxy for the analysis. Both the estimated proceeds arising from the liquidation of the Debtors' assets and the estimated claims associated with the Debtors are set forth in the analysis with a low and high estimated amount, where applicable. The Debtors are still in the process of reviewing and analyzing unsecured claims. Thus, the amounts used in the Liquidation Analysis are subject to material change, and the actual amount of Allowed Claims could vary materially from the estimates utilized in the Liquidation Analysis.

### ASSUMPTIONS

Balance Sheet Assets

The following are assumptions with respect to specific categories of the balance sheet assets.

*Cash*: This category reflects the Debtors' cash balance as of July 31, 2012.

*Accounts Receivable, net*: This category reflects the Debtors' trade receivables balance as of July 31, 2012. This amount was offset by an approximate $13.5 million fuel obligation to the AMC, and then estimated at 85%-100% recovery based on a net orderly liquidation value percentage (NOLV).

*Intercompany Receivable (Payable)*: Intercompany accounts on an individual Debtor basis consolidate to $0. Recovery on these claims is assumed to be pari passu with other Unsecured Claims against the Debtors, and thus is estimated at a 0% recovery rate.

*Inventories, net*: This category reflects the Debtors' inventory balance as of July 31, 2012. Inventories consist primarily of expendable and recoverable/repairable aircraft spare parts and other supplies. The Debtors utilized a NOLV Percentage of 10% - 15%.

*Deferred tax assets*: The Company has not assumed any recovery on tax assets.

*Prepaid and other current assets*: Prepaid assets include insurance, fuel, VISA, rent, VAT, non-trade AR, Valley escrow, miscellaneous operating deposits, short-term deferred rent, professional fee retainers and other. The Company has utilized various recovery rates on these categories between 0%-100% which results in a total recovery of $7.6 million - $10.8 million.

*Flight equipment, net and facilities and ground equipment, net (combined, "PP&E")*:  This category reflects the Debtors' PP&E balance as of July 31, 2012. Recovery is estimated at 10%-25% for flight equipment, and between 5%-10% for facilities and ground equipment. Capitalized maintenance events have an estimated recovery of $0.

*Military intangibles*: Upon the acquisition of World Air Holdings, the Company recorded the estimated value of its contract with the AMC. The value of this account as of July 31, 2012 is net of accumulated amortization.  As this intangible asset is non-transferable, the NOLV of this balance sheet line item is estimated at 0%.

*Restricted cash*: This category includes cash collateral associated with outstanding letters of credit and is assumed to have a 0% NOLV.

*Maintenance reserve deposits*: This category includes deposits held by lessors for certain future maintenance work such as airframe, engine, landing gear and APU overhauls. The Debtors' estimate these deposits would be retained by the lessor in the event of a Chapter 7 filing and thus are estimated at a 0% NOLV.

*Deposits and other assets*: This category predominately includes unamortized debt issuance costs and aircraft lessor operating deposits. Unamortized debt issuance costs have no cash value. Similar to maintenance reserve deposits, the Debtors' anticipate all operating deposits would be retained by the lessor in the event of a conversion to a chapter 7 filing.

*Other intangibles*: This category includes the Debtors' fair market value for estimated NOLV and is related to the operating certificates from the FAA. This category is assumed to a have some recovery associated with the transfer of the certificate to another air carrier.

Carve-out and Liquidation Expenses

*Carve-out*: The estimate of claims includes a carve-out of $1.9 million for outstanding chapter 11 professional fees not paid prior to the conversion of the case to chapter 7 liquidation.

*Liquidation Expenses*: Liquidation expenses include estimated trustee fees and expenses to wind-down in the event of chapter 7 liquidation.

**Chapter 7 Trustee Fees**:  The Liquidation Analysis assumes that a chapter 7 trustee would receive three percent of the value distributed to creditors as payment for administering the chapter 7 cases. These fees are assumed to be paid prior to any distribution to creditors.

**Wind down Expenses**: The estimated wind down expenses include amounts for certain payroll and other employee payroll and benefits, real estate carrying costs and other expenses incurred during the asset disposition period. These expenses are assumed to be $250,000 per month for a total of 12 months, and to be paid prior to any distribution to creditors.

Claims

Secured Claims

*Debtor In Possession ("DIP") and Roll-up Claims*:  The Liquidation Analysis includes payment of $30.9 million outstanding under the DIP Credit Agreement as of July 31, 2012. $5.0 million was subsequently borrowed under this loan which has not been incorporated but would be offset by the cash proceeds received on account of the $5.0 million additional draw.

The Liquidation Analysis assumes $45.0 million in Senior Secured Noteholders roll-up claims as of conversion to Chapter 7 consistent with the outstanding amount as of the time of this analysis.

*Non-Roll-Up Claims*: The Debtors have estimated $111.4 million as a non-roll up claim for the benefit of the Senior Secured Noteholders.

*Second Lien Claims*: The Debtors have estimated the Second Lien Lender claim to be $98.1 million.

Administrative Claims

*Administrative Claims*: The Debtors have estimated their administrative claims to be $5.0 - $10.0 million, and include chapter 7 post-petition accounts payable, accrued payroll and benefits and 503(b)(9) claims arising from the inventory that the Debtors received in the 20 days preceding the filing.

General Unsecured Claims

*General Unsecured Claims*: The Debtors are continuing to analyze all claims and therefore the amounts utilized for the purposes of the Liquidation Analysis are subject to material change. The estimated amount of general unsecured claims include, but are not limited to, trade creditors, amounts owed to lessors and other creditors.

**DISCLAIMERS AND VARIANCES**

The process of estimating recoveries in the event of conversion to a chapter 7 filing is uncertain due to economic, business, litigation and other contingencies, among other reasons. The underlying estimates and projections utilized by the Debtors to develop the attached Liquidation Analysis have been prepared by the Debtors and have not been examined by independent accountants.

The Debtors make no representations of the accuracy of these estimates and projections or a chapter 7 trustee's ability to meet the estimates and projections as the assumptions underlying the estimates and projections are subject to significant uncertainties. Unanticipated results, positive or negative, may occur. The Liquidation Analysis is, by its nature, uncertain. Nonetheless, the Liquidation Analysis represents the Debtors' current and best estimate of the financial implications from a conversion of the Bankruptcy Cases to cases under chapter 7 and the associated liquidation of assets under the circumstances described above.

**Global Aviation Holdings Inc. - Liquidation Analysis**
**As of July 31, 2012**
**($ in millions)**

| | Book Value | Recovery (%) Low | Recovery (%) High | Recovery Value ($) Low | Recovery Value ($) High |
|---|---|---|---|---|---|
| Cash | $20.6 | 100% | 100% | $20.6 | $20.6 |
| Accounts receivable, net [1] | 17.8 | 85% | 100% | 15.2 | 17.8 |
| Intercompany Receivables (payable) | - | 0% | 0% | - | - |
| Inventories, net | 10.8 | 10% | 15% | 1.1 | 1.6 |
| Deferred tax assets | 14.3 | 0% | 0% | - | - |
| Prepaid and other current assets [2] | 38.4 | 20% | 28% | 7.6 | 10.8 |
| Flight equipment, net | 22.8 | 10% | 25% | 2.3 | 5.7 |
| Facilities and ground equipment, net | 11.1 | 5% | 10% | 0.6 | 1.1 |
| Military intangibles | 127.1 | 0% | 0% | - | - |
| Restricted cash (Long Term) | 8.0 | 0% | 0% | - | - |
| Maintenance reserve deposits (Long term) | 49.7 | 0% | 0% | - | - |
| Deposits and other assets | 33.0 | 0% | 0% | - | - |
| Other intangibles | 2.0 | 50% | 100% | 1.0 | 2.0 |
| **Total liquidation value before fees and expenses** | | | | **$48.3** | **$59.7** |
| Carve-out [3] | | | | 1.9 | 1.9 |
| Liquidation expenses | | | | | |
| Trustee fees [4] | | | | 1.4 | 1.8 |
| Wind-down expenses [5] | | | | 3.0 | 3.0 |
| **Remaining distributable value** | | | | **$41.9** | **$53.0** |
| DIP claims [6] | | | | 30.9 | 30.9 |
| Roll-up claims | | | | 45.0 | 45.0 |
| **Total DIP and roll-up claims** | | | | **$75.9** | **$75.9** |
| *% Recovery on DIP and Roll-up Claims* | | | | *55%* | *70%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Non-Roll-up claims | | | | 111.4 | 111.4 |
| *% Recovery on Non-roll-up Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Second Lien Claims | | | | 98.1 | 98.1 |
| *% Recovery on Second Lien Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Administrative Claims | | | | 5.0 | 10.0 |
| *% Recovery on Admin Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Unsecured Claims [7] | | | | 200.0 | 200.0 |
| *% Recovery on Unsecured Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |

**Notes:**

(1) Net of $13.5 million of the AMC fuel obligation

(2) Includes prepaid insurance, prepaid fuel, prepaid VISA, prepaid rent, prepaid foreign VAT, non-trade AR, AMC escrow account, and miscellaneous operating deposits

(3) All reasonable and documented unpaid fees, costs, disbursements and expenses of the Debtors' Professionals and Committee's Professionals that in an aggregate amount not to exceed $1.9 million (per the DIP agreement)

(4) 3% of proceeds received in a liquidation, assumed to be paid prior to any distributions of claims

(5) $3.0 million assumed to be paid prior to any distributions of claims

(6) As of the 7/31/2012 (the date of this detailed balance sheet supporting this analysis), $30.9 million was outstanding on the DIP, subsquently, there was a $5.0 draw which is excluded from this analysis

(7) Preliminary estimate of Unsecured Claims, work still ongoing

**Exhibit G**

**Union Settlement Agreements**

**This document, all drafts, and all discussions about it are protected under our FRE Rule 408 agreement for settlement discussions.**

Heads of Agreement

The parties, Global Aviation Holdings Inc. and its affiliated debtors (collectively, "Global" or the "Debtors") and the International Brotherhood of Teamsters (the "IBT") have jointly agreed (in this "Heads of Agreement") to pursue the terms below to secure both: (1) modified, five-year collective bargaining agreements for each of the Debtors' unionized work groups, including the IBT-represented World Pilots (the "World Pilots") and IBT represented World Flight Attendants (the "World Flight Attendants") and an initial five-year collective bargaining agreement for the North American Flight Attendants (the "North American Flight Attendants"), with effective dates no earlier than September 12, 2012; and (2) part of a framework for a plan of reorganization (a "Plan") under which such modified collective bargaining agreements would be assumed.

Achievement of Cost Savings

- The World Pilots will agree to CBA modifications that extend the amendable date of the existing CBA through a date five years after ratification of the modifications and achieve 90% of Global's request for $18.8 million of annual cost savings from the existing CBA (approximately $16.9 million). The World Pilots shall be credited with $1 million of annual savings, toward the approximately $16.9 million, from Global's non-represented employees or other costs (the "Credit"), and thus the World Pilots will achieve approximately $15.9 million in annual savings. Global and the World Pilots must mutually agree that the CBA modifications will actually produce at least $15.9 million in annual savings.
- The World Flight Attendants, North American Pilots, and Transport Workers Union shall each voluntarily reach agreement with Global prior to any filing pursuant to 11 U.S.C. § 1113 ("Section 1113"), and the North American Flight Attendants shall reach agreement with Global voluntarily to the imposition of terms, to achieve at least 90% of the savings that would be achieved by Global's proposals,[1] respectively, as a condition for participating in the Settlement Amount as set forth below.

---

[1] That is, 90% of $4.1 million in annual savings for ALPA, 90% of $4.3 million in annual savings for the World Flight Attendants, 90% of $1.8 million in annual savings for the North American Flight Attendants, and 90% of $142,000 in annual savings for the dispatchers represented by the Transport Workers Union (the "TWU").

1

- o Rules governing participation in the Settlement Amount shall be determined by the relevant union in its discretion, provided that pilots currently in management are entitled to participate in the Settlement Amount pursuant to the rules governing participation when and to the extent he or she is working and compensated under the relevant CBA.
- The IBT shall (on behalf of its members) accrue and shall be entitled to a stipulated, approved, and allowed administrative claim in the amount of the savings provided to Global by IBT members under the amended CBAs and the initial North American Flight Attendant CBA from the effective date of the CBA modifications through the confirmation of a Plan. Any such administrative claim shall be waived, extinguished, and forever discharged upon confirmation of a Plan in Global's chapter 11 cases. Should a Plan fail to become effective by December 15, 2012, IBT members will snap-back to CBA terms and conditions as of the Petition Date, provided that the December 15, 2012 deadline shall be extended either by agreement of both IBT and Global for any length of time to which both parties agree, or for a maximum of 60 days if necessary to accommodate scheduling issues identified by the Bankruptcy Court, DIP Lenders or First Lien Noteholders.

Settlement Amount

- All Qualifying Represented Employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which would be issued by reorganized Global after the effective date of confirmation of a Plan (the "Effective Date"):
  - o An equity pool which, in the aggregate, will consist of 25% of the distribution of common equity in reorganized Global (the "Employee Pool"), which shall be the same class of equity issued to the First Lien Noteholders and which shall be issued by reorganized Global within 30 days following the Effective Date, the mechanics of which will be described in the Plan and confirmation order. The Employee Pool shall not be diluted by any grant of equity to management. Global, the First Lien Noteholders, and the IBT must consent unanimously to any equity recovery for other creditors in the chapter 11 cases, provided that if Global, the First Lien Noteholders, and the IBT consent to equity recovery by other creditors, there will be pro rata dilution of the equity recoveries of the First Lien Noteholders and the Employee Pool. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities

2

filings, and shall be entitled to meaningful minority shareholder protections.

- o Freely tradable warrants to purchase 15% of the fully diluted equity of the reorganized Global, attaching at the point at which the First Lien Noteholders have recovered $202.1M of value. The warrants shall expire ten years after the Effective Date. The strike price shall be adjusted upward due to any dilution of the First Lien Noteholders' equity recovery by the MEIP or recoveries by any other creditors. The warrants will be structured such that reorganized Global will have no obligations to make public securities filings. All reasonable fees and costs related to and associated with the establishment and maintenance of such structure shall be paid by Global.

- Directors for reorganized Global shall be chosen through a process led by a committee of the CEO, a First Lien Noteholder representative and a representative of the Employee Pool. The committee may, at its election, retain a qualified search firm, paid for by Global, to identify director candidates. The committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the CEO). If the committee is unable to reach consensus on a slate of directors, directors shall be named by shareholders in the proportion of their ownership, with two named by the Employee Pool based on a majority vote of prospective shareholders within the Employee Pool. All directors selected shall be qualified and shall not be members of the IBT or any other labor organization.

- The Employee Pool shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of the Credit.[2] The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

---

[2] For illustrative purposes, assuming all represented groups meet their respective 90% thresholds, the distribution of the Employee Pool created by reorganized Global after the Effective Date would be approximately as follows: World Pilots, 15.5%; World Flight Attendants, 3.5%; North American Pilots, 3.4%; North American Flight Attendants, 1.5%; TWU Dispatchers, 0.1%; and non-executive, non-represented employees, 0.9%.

- Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds set forth above prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude. If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in an initial collective bargaining agreement, for the North American Flight Attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% remaining in the Employee Pool, to be reallocated in proportion to the ratified concessions.
- The distribution of the Employee Pool shall be issued by reorganized Global after the Effective Date, provided that it is issued within 30 days of the Effective Date. The Employee Pool shall not be diluted by any management equity incentive plan to be proposed and implemented as part of a plan of reorganization (the "MEIP").
- Global agrees that if a material transaction involving some or all of Global's assets or capital structure occurs within the first 30 days after the Effective Date, the equity shall be issued into the Employee Pool and shall immediately vest before the closing of any such material transaction.
- If reorganized Global does not create and distribute the Employee Pool by 5pm Eastern Time on the 30th day after the Effective Date, then all of the concessions granted by the represented employee groups will be null and void, and there will be an immediate, full snap-back to CBA terms and conditions as of the Petition Date. This deadline can be extended with the consent of the IBT.

Management Enhancements
- A committee consisting of Global's Chief Executive Officer, Global's Head of Human Resources, Jeffrey Erickson, and Greg Unterseher has been established and tasked with hiring a new permanent Chief Operations Officer for World, replacing acting Chief Operating Officer Charles McDonald, who is returning to his permanent position at Global Aviation

4

Holdings. The Company will appoint an interim COO during the search. The Company shall have final authority to select the permanent COO, taking into account the feedback and recommendations of the committee.

- Captain Yeager will resign as VP of Operations and Director of Operations prior to pilot ratification. The new Director of Operations may or may not be a member of the Teamsters.

Capital Structure

- At consummation, funded debt shall include:
  - First lien:
    - $95M
    - 10%
    - 4.5 year term
  - Second lien:
    - $40M
    - 3%, PIK option
    - 5 year term
  - Excess cash flow:
    - 50% sweep with leverage grid
  - Revolver:
    - in an amount sufficient to provide approximately $20M of availability upon exit from chapter 11
- Global agrees that, for the period of the modified CBAs, or, if later, during the period in which the concessionary terms of the modified CBAs remain in effect, any proceeds realized from the sale or refinancing of a major operating subsidiary (revenues greater than $15 million) or sale of assets greater than $10 million shall be applied to repay funded debt (with the exception of the Revolver).

Timeline

- August 21: Approval of this agreement by First Lien Noteholders and DIP Lenders
- August 21: Finalize North American FAs, finish language for World FAs, prepare materials for Pilot and FA roadshow
- August 21: Roadshow begins
- August 22: Filing of Motion to Approve CBA amendments
- August 22: Distribution of ratification ballots
- September 12: Ratification date
- September 12: Hearing in Bankruptcy Court for approval of modified CBAs

5

- September 12: Target effective date of modified CBAs[3]
- These target dates are deadlines that can be extended by agreement of both Global and IBT, except that the IBT reserves sole discretion in interpreting its constitutional requirements, including those pertaining to contract ratification.

Conditions
- The following are explicit and nonseverable conditions of this Heads of Agreement:
  - o Global Board approval
  - o World Pilots ExCo approval and agreement to include a letter supporting the Agreement and the modified collective bargaining agreement in the package sent to World Pilots for ratification
  - o Ratification by the World Pilots and the World Flight Attendants of the modified collective bargaining agreements consistent with the concessions described above
  - o Approval of the Bankruptcy Court of the modified collective bargaining agreements consistent with the concessions described above
  - o Approval of First Lien Noteholders and DIP lenders
- Global agrees to pay on the Effective Date, as an administrative expense and through the Plan, reasonable fees and expenses of counsel and advisors to the IBT, including Levy Ratner, P.C., MAEVA Group, LLC, Dan Akins, Farrell Fritz and Cheiron. This obligation is subject to the IBT providing appropriate documentation and invoices for all fees and expenses. With regard to MAEVA Group, LLC, Global, the IBT and the First Lien Noteholders and DIP Lenders agree that the fees and expenses of MAEVA will be paid pursuant to the terms of MAEVA's engagement letter as amended per the agreement of the parties on August 17, 2012 (which cannot be modified and which the parties agree are reasonable).

- So long as Global's proposed Plan is consistent in all material respects with this Agreement, the IBT agrees that it will support (not object to) the confirmation of Global's proposed Plan, argue in support of confirmation

---

[3] All work performed prior to the ratification of the modified CBAs will be compensated under the terms and conditions provided in the CBAs prior to their modification; all work performed after ratification will be compensated under the CBAs as modified.

6

and file a written pleading (if requested by Global) articulating its support for confirmation of the Plan.

- In the event the National Mediation Board ("NMB") finds that World and North American Airlines, Inc. ("NAA") are a single carrier (or single transportation system):
  - o There shall be no changes to the terms of the revised CBAs before the amendable date of the revised CBAs.
  - o Should it be determined that an integrated seniority list is required as a result of a single carrier determination, there shall be an Equipment fence of the current seniority lists (furloughed and active pilots) for duration of agreement except for expansion positions, which would be then governed by seniority and airline/type lock for two years.
- This agreement and the modified World Pilot CBA is contingent on:
  - o Global securing savings from the North American Pilots (ALPA), World Flight Attendants (IBT), and the North American Flight Attendants (IBT), through either voluntary modifications or by imposition as a result of a hearing pursuant to Section 1113 (with respect to the World and North American Pilots and the World Flight Attendants), or voluntarily or by imposition (with respect to the North American Flight Attendants) which, in the Company's good faith discretion, are approximately equivalent (in terms of relative savings achieved) to the savings provided by the World Pilots, when measured relative to the savings that would have been generated by proposals made by Global to each IBT group and ALPA on the one hand, and the proposal made by Global to the World Pilots on the other hand. More specifically, Global must achieve total savings that is (in Global's good faith discretion) approximately equivalent to 90% of $4.1 million in annual savings for ALPA, 90% of $4.3 million in annual savings for the World Flight Attendants, and 90% of $1.8 million in annual savings for the North American Flight Attendants. This contingency may be waived by the agreement of Global and the World Pilots ExCo.

Parties' Protections

- No party shall use this Agreement in Court at any time and for any reason except for a proceeding to enforce this Agreement.
- Should the framework provided in this Agreement not be achieved, regardless of the reason, the IBT understands that Global may have to pursue relief in the Bankruptcy Court under the provisions of Section 1113, and the IBT understands that Global will ask the Bankruptcy Court for authority to reject the current CBA and impose the terms of a proposal that either has been or would be made.  In any proceedings related to a request for modifications pursuant to Section 1113, none of the Parties shall attempt to introduce this Agreement, nor shall any Party refer to this agreement in any way whatsoever.  This provision precludes any use of this Agreement by the Parties in Section 1113 litigation at all, including but not limited to any arguments:  (a) by the IBT that Global does not "need" the terms of its proposal, or that the proposal that has been or would be made is not "reasonable," on the basis that Global agreed to pursue the framework provided in this Agreement; or (b) by Global that the IBT must accept at least the savings provided above because it had agreed to do so as part of this Agreement. In any case, neither the IBT nor Global are precluded from advancing any arguments in defense of their respective positions that do not refer to this Agreement or the negotiations about this Agreement.
- IBT review of the parallel agreement with ALPA that does not contain terms more favorable or materially different than any terms described herein.
- IBT agrees not to attempt to introduce, use, or refer in any way to this Agreement in any proceeding regarding whether Global and/or its affiliates are a "single carrier" under applicable labor law.

Global

By: ROBERT BINNS
8/20/2012

The IBT

By:

8

# LETTER OF AGREEMENT

between

# NORTH AMERICAN AIRLINES

and the air line pilots in the service of

# NORTH AMERICAN AIRLINES

as represented by the

# AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

## RE:  BANKRUPTCY RESTRUCTURING AGREEMENTS

This Letter of Agreement ("LOA") is made and entered into by and between North American Airlines, Inc. ("NAA") and the air line pilots in the service of NAA, as represented for purposes of collective bargaining by the Air Line Pilots Association, International ("ALPA").  ALPA and NAA are hereafter referred to as the "Parties."

WHEREAS, NAA and certain of its affiliates, including its parent Global Aviation Holdings, Inc. ("Global"), filed Chapter 11 petitions on February 5, 2012 which are pending in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court") in *In re Global Aviation Holdings, Inc.*, Case No. 12-40783-cec, *et al.* ("Bankruptcy Case"); and

WHEREAS, NAA has sought modification of the collective bargaining agreement ("CBA") in effect between NAA and ALPA, and commenced negotiations with ALPA in advance of filing a motion pursuant to Section 1113 of the Bankruptcy Code; and

WHEREAS, as a result of negotiations, the Parties have agreed to modifications of the CBA ("Modifications") and other terms in furtherance of NAA's effort to restructure its business and reorganize under Chapter 11 of the Bankruptcy Code; and

WHEREAS, the parties wish to work cooperatively to enhance Company efforts to restructure successfully;

NOW THEREFORE, the Parties agree as follows:

1

A.    Modifications to the CBA and its Assumption by the Debtor

1.    The Parties agree that the terms of the CBA dated April 2008 have been amended in accordance with the document attached as Exhibit A, Collective Bargaining Agreement between North American Airlines, Inc. and the Air Line Pilots Association, International.

2.    The effective date of the CBA Modifications ("CBA Effective Date") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA Modifications, and the date on which the LOA and the CBA are ratified by ALPA, provided that the CBA Effective Date will not be later than September 25, 2012 and ALPA agrees to complete its membership ratification by September 24, 2012.

3.    The Parties agree that Modifications to the CBA are expected to produce savings at an annual rate of approximately $3.7 million.

4.    NAA shall assume the CBA, as modified, pursuant to 11 U.S.C. § 365, as part of NAA's plan of reorganization (the "POR") on the effective date of the POR (the "POR Effective Date"). Assuming that the modified CBA is ratified and approved by the Bankruptcy Court, and that no snap-back such as that provided by paragraph F(4)(b) below has occurred, NAA agrees that neither it nor any affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113(c) or 1113(e), seeking rejection or modification of, or relief or interim relief from, the CBAs, during the course of the Bankruptcy Case, and NAA and its affiliates specifically waive the right to file or support such a motion, except that NAA reserves the right to file or support such a motion if it can demonstrate that there has been a material adverse change in NAA and/or its affiliates' business such that additional concessions are essential to NAA's continuation in business.

5.    Any grievances by ALPA or by any NAA pilots that were pending, and any System Board awards in favor of ALPA or any NAA pilots that were unresolved or unsatisfied as of the commencement of the Bankruptcy Case, shall be unaffected by the Bankruptcy Case. Any such pending grievances shall be processed in the ordinary course. Any awards or settled grievances shall be paid in the ordinary course pursuant to the CBA.

B.    <u>Joint Efforts to Seek Additional Savings and Promote Cooperation</u>

1.    During negotiations the Parties discussed opportunities to identify and capture additional savings and work cooperatively to promote successful reorganization of the business. This is to confirm that no later than ninety-(90) days after the CBA Effective Date, and upon request by ALPA, the parties will meet and confer to:

a.    discuss and implement, if agreed, additional operational savings that can be obtained and opportunities to increase Company revenue;

b.    review and seek to resolve outstanding grievances through mediation, facilitation, or the use of other efficient dispute resolution processes; and

c.    identify and seek to clarify contract language, if any, that currently results in misunderstandings and disagreements between the parties.

In addition, during the first twelve months following the CBA Effective Date, the Company shall provide ALPA, subject to ALPA's execution of appropriate confidentiality agreements, with periodic financial briefings and financial and operational data regarding the Company's recovery.

C.    <u>Settlement Amount</u>

1.    All qualified represented employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which will be issued by reorganized Global within 30 days after the POR Effective Date:

(a)    An equity pool which, in the aggregate, will consist of 25% of the common equity in reorganized Global (the "Employee Pool"), which shall be issued by reorganized Global within 30 days following the POR Effective Date. The Employee Pool is not subject to dilution by the management equity incentive plan (the "MEIP"), but is subject to potential dilution by recoveries of other creditors. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities filings, and shall be entitled to meaningful minority shareholder protections.

3

(b)     In addition to the Employee Pool, freely tradable warrants ("Warrants") to purchase 15% of the equity of the reorganized Global, attaching at the point at which the First Lien lenders have recovered $202.1M of value. The strike price shall be adjusted upward due to any dilution of the First Lien lenders' equity recovery by the MEIP and by the recovery, if any, of other creditors. The Warrants will be structured such that reorganized Global will have no obligations to make public securities filings.

2.      The Employee Pool and Warrants shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the POR Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of $1 million. The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

3.      Non-management pilots on the NAA seniority list as of the CBA Effective Date shall receive no less than 13.6% of the Employee Pool and no less than 13.6% of the Warrants, recognizing that the Employee Pool as a whole may be diluted by creditors other than the MEIP. ALPA shall, in its sole discretion and according to its policies, determine how its portion of the Employee Pool and Warrants shall be distributed among the non-management pilots on the NAA seniority list as of the CBA Effective Date.

4.      Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds determined by Global (such threshold for ALPA being $3.7 million) prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude. If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in a first collective bargaining agreement, for the North American flight attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to

4

voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% remaining in the Employee Pool, to be reallocated in proportion to the ratified concessions (and with ALPA receiving at least 6.8% of any Unclaimed Equity).

D.    Profit Sharing

1.    Pilots employed by NAA will participate in any profit sharing plan implemented after the CBA Effective Date that NAA administrative employees participate in, with target payouts to pilots of 5% of salary upon achievement of Company performance metrics set by the reorganized Global board for all NAA employees (administrative and pilots).

E.    Board of Directors

1.    The initial directors for reorganized Global shall be chosen through a process led by a committee of the CEO, a First Lien Noteholder representative and a representative of the Employee Pool. The committee may, at its election, retain a qualified search firm, paid for by Global, to identify director candidates. The committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the CEO). If the committee is unable to reach consensus on a slate of directors, directors shall be named by shareholders in the proportion of their ownership, with two named by the Employee Pool based on a majority vote of prospective shareholders. All directors selected shall be qualified and shall not be employees or members of any labor organization or, other than the CEO, an employee of the company.

2.    In addition to the voting directors for reorganized Global identified above, the Board of Directors of reorganized Global shall, for the term of the Modifications, and so long as the NAA pilots are represented by ALPA, also include one non-voting board member selected by ALPA. The non-voting board member selected by ALPA shall be qualified and shall not be an employee or a member of ALPA or any other labor organization. After 12 months following the POR Effective Date, the Board of Directors of

5

reorganized Global shall consider in good faith whether to add the non-voting director selected by ALPA as a full voting member of the Board.

F.    Plan of Reorganization

1.    Neither NAA, Global nor any of their affiliates shall propose or support any Plan of Reorganization ("POR") in the Bankruptcy Case that is materially inconsistent in any respect with this LOA.

2.    The POR will include customary release and exculpation clauses that will be at least as comprehensive for ALPA and each of its current or former members, officers, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives (the "ALPA Exculpated Parties"), as it is for NAA and its officers, directors, and advisors. NAA will propose in its POR that the ALPA Exculpated Parties be released and exculpated from any and all claims related to the NAA's bankruptcy cases; the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the modified CBA, the disclosure statement concerning the POR or the POR itself, or any other agreement or document created, modified, amended, terminated or entered into in connection with either the POR or any agreement between NAA or ALPA.

3.    So long as Global's proposed Plan is consistent in all material respects with this Agreement, ALPA agrees that it will support (and will not object to) the confirmation of Global's proposed Plan, by arguing in support of confirmation and by filing a written pleading articulating its support for confirmation.

4.    Deadline for POR --

   a.    The deadline ("Deadline") for the effective date of a POR incorporating the terms of this LOA shall be December 15, 2012, unless extended as set forth herein. The Deadline may be extended only by either (1) agreement of the Parties or (2) by NAA or Global, for a maximum of sixty (60) days, if necessary to accommodate scheduling issues.

   b.    Should a POR incorporating the terms of this LOA not become effective by the Deadline, (1) ALPA shall accrue and shall be entitled to a stipulated, approved and allowed administrative claim pursuant to

6

Section 503(b) of the Bankruptcy Code (the "Administrative Claim") in the amount of savings provided by the Modifications from the CBA Effective Date until the date of the snapback under subparagraph (2); and (2) the Modifications shall become immediately null and void, replaced by the terms of the CBA in effect prior to the CBA Effective Date. The Administrative Claim shall be waived, extinguished, and forever discharged upon confirmation of a POR in Global's chapter 11 cases.

G.  Efforts to Obtain Approval

1.  ALPA shall take all reasonable steps to obtain the ratification of this LOA and the CBA by the NAA pilots, including providing a written communication in support of ratification to the NAA pilots.

2.  NAA shall take all reasonable steps to obtain ratification of this LOA by Global's Board of Directors. NAA shall also take all reasonable steps to obtain support of this LOA by the secured lenders and the Committee of Unsecured Creditors and other parties in interest in the Bankruptcy Case.

3.  NAA shall take all reasonable and prompt steps to obtain approval of the CBA Modifications by the Bankruptcy Court. NAA will provide ALPA's counsel with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by NAA for filing with the Bankruptcy Court relating to court approval of the CBA Modifications. The terms of this LOA will be incorporated into the POR and submitted for Bankruptcy Court approval as part of the plan confirmation process.

H.  Conditions

1.  Before the CBA Modifications may be implemented, each of the following must have occurred: (1) execution of the LOA and CBA by an executive officer of NAA and by an executive officer of Global; (2) ratification of the LOA and CBA by the NAA pilots pursuant to ALPA's ratification procedures and signed by ALPA's president; and (3) approval of the CBA Modifications by the Bankruptcy Court.

2.  Should the CBA Modifications not be approved by order of the Bankruptcy Court within ninety (90) days of the satisfaction of the conditions in H.1.(1) and (2), above, they shall become null and void, and

7

replaced by the terms of the CBA that were in effect prior to the CBA Effective Date.

3.      Should the Bankruptcy Court's order approving the CBA or POR be reversed on appeal in whole or in part, (1) the CBA Modifications shall become null and void, and replaced by the terms of the CBA that were in effect prior to the CBA Effective Date, and (2) ALPA shall accrue and be entitled to an administrative claim in the amount of savings provided by the CBA Modifications during the period that they were in effect.

I.      Prohibited Use of this LOA

Neither of the Parties shall use this LOA in any legal proceeding at any time or for any reason except in a proceeding to enforce its terms or to defend against a claim brought against one or both of the Parties in connection with the LOA and CBA.

IN WITNESS WHEREOF, the Parties hereto and Global have signed this LOA this _____24ᵀᴴ_____ day of ___SEPTEMBER___, 2012.

FOR NORTH AMERICAN AIRLINES, INC.

_____
Executive Officer

FOR THE AIR LINE PILOTS IN THE SERVICE OF NORTH AMERICAN AIRLINES, INC.

_____
Captain Robert Lewis, Chairman
NAA Master Executive Council

FOR GLOBAL AVIATION HOLDINGS INC.

_____

_____
Captain Lee Moak, President

8

**LETTER OF AGREEMENT**
between
**WORLD AIRWAYS, INC.**
and its dispatchers
as represented by the
**TRANSPORT WORKERS UNION OF AMERICA AFL-CIO**

This Letter of Agreement ("LOA") is made and entered into by and between World Airways, Inc. ("WOA") and the dispatchers in the service of WOA, as represented for purposes of collective bargaining by the Transport Workers Union of America AFL-CIO ("TWU"). TWU and WOA are hereafter referred to as the "Parties."

WHEREAS, WOA and certain of its affiliates, including its parent Global Aviation Holdings, Inc. ("Global"), filed Chapter 11 petitions on February 5, 2012 which are pending in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court") in *In re Global Aviation Holdings, Inc.*, Case No. 12-40783-cec, *et al.* ("Bankruptcy Case"); and

WHEREAS, WOA sought modification of the collective bargaining agreement ("CBA") in effect between WOA and TWU, and commenced negotiations with TWU in advance of filing a motion pursuant to Section 1113 of the Bankruptcy Code; and

WHEREAS, as a result of negotiations, the Parties have agreed to modifications of the CBA ("Modifications") and other terms in furtherance of WOA's effort to restructure its business and reorganize under Chapter 11 of the Bankruptcy Code.

NOW THEREFORE, the Parties agree as follows:

A.    Modifications to the CBA and its Assumption by the Debtor

    1.    The Parties agree that the terms of the CBA have been amended as provided in the amended CBA filed with the Bankruptcy Court.

    2.    The effective date of the CBA (the "CBA Effective Date") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA and the date on which the CBA is ratified by TWU, and in any case shall be no later than September 12, 2012.

    3.    WOA shall assume the CBA, as modified, pursuant to 11 U.S.C. § 365, as part of WOA's plan of reorganization (the "Plan") on the effective date of the Plan (the "Effective Date").

1

B.    Settlement Amount

1.    As part of the Plan to be presented to the Bankruptcy Court at a later date, all qualified, represented employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which would be issued by reorganized Global within 30 days after the effective date of confirmation of a Plan (the "Effective Date"):

(a)    An equity pool which, in the aggregate, will consist of 25% of the common equity in reorganized Global (the "Employee Pool"), which shall be issued by reorganized Global within 30 days following the Effective Date. The Employee Pool is not subject to dilution by the MEIP, but is subject to potential dilution by recoveries of other creditors. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities filings, and shall be entitled to meaningful minority shareholder protections.

(b)    Freely tradable warrants to purchase 15% of the fully diluted equity of the reorganized Global, attaching at the point at which the First Lien lenders have recovered $202.1M of value. The strike price shall be adjusted upward due to any dilution of the First Lien lenders' equity recovery by the MEIP. The warrants will be structured such that reorganized Global will have no obligations to make public securities filings.

2.    The Employee Pool and warrants shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of $1 million.[1] The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

---

[1] If no other creditors recover in a way that dilutes the Employee Pool, the distribution of the Employee Pool created by reorganized Global after the Effective Date would be approximately as follows: World Pilots, 15.5%; World Flight Attendants, 3.5%; North American Pilots, 3.4%; North American Flight Attendants, 1.5%; TWU Dispatchers, 0.1%; and non-executive, non-represented employees, 0.9%.

2

3.      Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds set forth above prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude. If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in a first collective bargaining agreement, for the North American flight attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% reallocated in proportion to the ratified concessions.

C.   Conditions

1.      Before this LOA becomes effective, each of the following must have occurred: (1) execution of the LOA and CBA by an executive officer of WOA and by an executive officer of Global; (2) ratification of the CBA by the TWU pursuant to TWU's ratification procedures and execution of the CBA by the TWU; and (3) confirmation of a Plan by the Bankruptcy Court that is consistent with this LOA.

C.   Prohibited Use of this LOA

So long as this LOA and CBA remain in effect, and are not deemed null and void, neither of the Parties shall use it in any legal proceeding at any time or for any reason except in a proceeding to enforce its terms or to defend against a claim brought against one or both of the Parties in connection with the LOA and CBA.

IN WITNESS WHEREOF, the Parties hereto have signed this LOA this __30th__ day of __August__, 2012.

*Signature Page to Follow*

3

**WORLD AIRWAYS, INC.**

By: _James Casbarro_

Name: _JAMES CASBARRO_

Title: _ACTING C.O.O._

**TRANSPORT WORKERS UNION OF AMERICA, AFL-CIO**

By: _Giarrocco_

Name: _Alex Giarrocco_

Title: _PRESIDENT_
_TWU LOCAL 540_

**GLOBAL AVIATION HOLDINGS INC.**

By: _Robert Binns_

Name: _ROBERT B. WAS_

Title: _CEO_

*Signature Page to WOA-TWU LOA*

4

## LETTER OF AGREEMENT

WHEREAS, World Airways, Inc. ("*World*"), North American Airlines ("*North American*"), and the International Brotherhood of Teamsters (the "*IBT*") (and collectively with World and North American, the "*Parties*") entered into both modified collective bargaining agreements (the "*CBAs*") and a certain Heads of Agreement dated August 20, 2012 (the "*HOA*"); and

WHEREAS, World and North American's motion to approve the CBAs (the "*Motion*") has been filed and is scheduled for a hearing before the United States Bankruptcy Court for the Eastern District of New York (the "*Bankruptcy Court*") on September 12, 2012; and

WHEREAS, the HOA states that one of IBT's "Protections" is "IBT review of the parallel agreement with ALPA that does not contain terms more favorable or materially different than any terms described" in the HOA; and

WHEREAS, IBT has reviewed the "parallel agreement with ALPA" (the "*ALPA LOA*") and has raised concerns about whether that agreement contains terms that are "favorable or materially different than" terms of the HOA; and

WHEREAS the Parties have agreed in this Letter of Agreement to resolve all the IBT's concerns in that regard in full and without reservation,

The Parties agree as follows:

1.      Relationship Between CBAs and the HOA

(a)      The effective date of the modified CBAs (the "*CBA Effective Date*") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA Modifications ("CBA Modifications"), and the date on which the HOA and CBAs are ratified by IBT, provided that the CBA Effective Date will not be later than September 12, 2012 unless agreed upon by the IBT on the one hand, and the relevant airline (World or North American) on the other.

(b)      The CBAs and the HOA are interrelated.  World and North American will begin to benefit from the savings accruing as a result of the CBA Modifications immediately upon the CBA Effective Date.  However, the CBA Modifications are contingent on confirmation of a plan of reorganization ("*POR*") consistent with the HOA as ratified.  Any POR proposed or supported by World and/or North American will be consistent in all material respects with the HOA as ratified.  The HOA will not be presented for approval by the Bankruptcy Court but, if a POR consistent in all material respects with the HOA as ratified is not confirmed on or prior to the deadline described in the HOA, the CBA Modifications will be null and void and replaced with the terms of the CBAs in effect prior to the CBA Effective Date (i.e., the "snap-back") and IBT will be entitled to an administrative claim for savings delivered during the period that the CBA Modifications were in effect.

2.    Plan and Assumption of Modified Collective Bargaining Agreements

(a)    World and North American, as applicable, shall assume the CBAs, as modified, pursuant to 11 U.S.C. § 365, as part of the POR on the effective date of the POR (the "*POR Effective Date*").  Assuming that the modified CBAs are ratified and approved by the Bankruptcy Court, and that no snap-back has occurred, each of World and North American agree that neither it nor any affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113(c) or 1113(e), seeking rejection or modification of, or relief or interim relief from, either or both of the CBAs, during the course of the Bankruptcy Case, and World and North American and their affiliates specifically waive the right to file or support such a motion, except that World and North American (and their affiliates) reserve the right to file or support such a motion if it can demonstrate that there has been a material adverse change in World, North American, and/or its affiliates' business such that additional concessions are essential to the company's continuation in business.

(b)    Any grievances by IBT or by any World pilots, World flight attendants, and/or North American flight attendants that were pending, and any System Board awards in favor of IBT or any World pilots, World flight attendants, and/or North American flight attendants that were unresolved or unsatisfied as of the commencement of the Bankruptcy Case, shall be unaffected by the Bankruptcy Case.  Any awards or settled grievances shall be paid in the ordinary course pursuant to the CBAs.

3.    Information Sharing.

(a)    During the first twelve months following the effective date of the CBAs, World and North American shall provide IBT, subject to IBT's execution of appropriate confidentiality agreements, with periodic financial briefings and financial and operational data regarding World's and North American's recovery.

4.    Plan of Reorganization

(a)    The POR will include customary release and exculpation clauses that will be at least as comprehensive for IBT and each of its current or former members, officers, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives (the "IBT Exculpated Parties"), as it is for World and North American and their officers, directors, and advisors.  IBT will propose in its POR that the IBT Exculpated Parties be released and exculpated from any and all claims related to World's and North American's bankruptcy cases; the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the modified CBAs, the disclosure statement concerning the POR or the POR itself, or any other agreement or document created, modified, amended, terminated or entered into in connection with either the POR or any agreement between World, North American, or the IBT.

(b)    The Employee Pool (as defined in the HOA) will, at the conclusion of the process described in the HOA, select two of the nine voting directors on the board.  The

2

board will also include one non-voting member as provided in the ALPA LOA, and an additional non-voting member identified by the IBT. The non-voting members selected by ALPA and IBT shall be qualified and shall not be employees or members of ALPA, IBT, or any other labor organization. In addition, the board will after a 12 month period following confirmation of a POR determine in good faith whether to add the non-voting board members to the board, provided that if such members are added to the board as voting members, they will only replace directors not selected by the Employee Pool or the unions. Addition of such members will not increase the size of the board. The board will not add an ALPA non-voting board member to the board without adding the IBT non-voting board member to the board and vice versa.

5.     Profit Sharing

(a)     World pilots and flight attendants are currently participants in the profit sharing bonus plan described in Appendix C to the pilots' CBA and Article 25, Section C of the flight attendants' CBA (collectively, the "*WOA Profit Sharing Plan*"). Alternatively, pilots and flight attendants employed by World may participate in any profit sharing plan implemented after the CBA Effective Date that World's administrative employees participate in, with target payouts to pilots and flight attendants of 5% of salary upon achievement of World performance metrics set by the reorganized Global board for all World employees (administrative, pilots, and flight attendants) (the "*Potential Alternative Profit Sharing Plan*"). World agrees that for each year in which the modified CBAs are in place, World pilots and World flight attendants will receive the greater of the payout, if any, that they would have received under the WOA Profit Sharing Plan on the one hand, or the Potential Alternative Profit Sharing Plan on the other hand.

(b)     The flight attendants at North American Airlines, Inc. ("*NAA*") will participate in the same profit sharing plan as the pilots at NAA, under the same terms as the pilots at NAA.

World                                          The IBT

_____              _____

By:                                          By:   DiRecToR

                                                   DAViD BouRue

North American

_____

By:

**EXHIBIT B**

**Blackline of Revised First Amended Disclosure Statement**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | Case Nos. 12-40783 (CEC) |
| | 12-40782 (CEC) |
| | 12-40784 (CEC) |
| | 12-40785 (CEC) |
| | 12-40786 (CEC) |
| | 12-40787 (CEC) |
| | 12-40788 (CEC) |
| | 12-40789 (CEC) |
| | 12-40790 (CEC) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR THE FIRST AMENDED JOINT PLAN
## OF REORGANIZATION OF GLOBAL AVIATION HOLDINGS INC. AND ITS
## DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

**IMPORTANT DATES**

- Date by which Ballots must be received by the ~~Notice, Claims and Solicitation~~**Balloting** **Agent: November 21, 2012**
- **Date by which objections to the Plan must be filed and served: November 20, 2012**

---

James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

K&E ~~24156616.5~~**24187721.1**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**TABLE OF CONTENTS**

Page

I.      EXECUTIVE SUMMARY..................................................................................................................1

II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT....................................5

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ..................................................................................................................................7

        A.      What is chapter 11? ............................................................................................................7

        B.      Why are the Debtors sending me this Disclosure Statement?.............................................7

        C.      Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is
                consummated? ....................................................................................................................8

        D.      What happens to my recovery if the Plan is not confirmed, or does not go effective?.....................9

        E.      Are any regulatory approvals required to consummate the Plan?........................................9

        F.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan
                goes effective, and what do you mean when you refer to "Confirmation," "Effective Date"
                and "Consummation?"..........................................................................................................9

        G.      What information is there regarding Classes of Claims?.....................................................9

        H.      What information is there regarding Administrative Expense Claims?..............................10

        I.      What **are the DIP Claims and how are they satisfied?....................................................10**

        **J.      Will the Reorganized Debtors be obligated to continue to pay statutory fees after the
                Effective Date? ...............................................................................................................11**

        **K.      What** is the Debtors' current financial condition and what is the Debtors' projected cash
                balance on the Effective Date? ...........................................................................~~10~~**11**

        ~~J~~**L**.      What are the terms of the New Loans?................................................................................11

        ~~K~~**M**.      Are there risks to owning an Interest in Reorganized Global Aviation upon emergence
                from chapter 11?..............................................................................................................~~11~~**12**

        ~~L~~**N**.      Is there potential litigation related to the Plan?................................................................~~11~~**12**

        ~~M~~**O**.      What rights will Reorganized Global Aviation's new stockholders have?........................12

        ~~N~~**P**.      When will the Plan Supplement be filed and what will it include? ..................................12

        ~~O~~**Q**.      What is the Employee Equity Plan and how will it affect the distribution I receive under the
                Plan? ...............................................................................................................................~~12~~**13**

        ~~P~~**R**.      What is the Management Equity Incentive Plan and how will it affect the distribution I
                receive under the Plan?....................................................................................................~~12~~**13**

        ~~Q~~**S**.      What are the Debtors' Intercompany Claims and Intercompany Interests?.....................~~12~~**13**

        ~~R~~**T**.      How will the release of the Avoidance Actions impact my recovery under the Plan? ...............~~13~~**14**

        ~~S~~**U**.      How will Claims asserted with respect to rejection damages affect my recovery under the
                Plan? ...............................................................................................................................~~13~~**14**

        ~~T~~**V**.      Will there be releases granted to parties in interest as part of the Plan?.........................~~13~~**14**

        ~~U~~**W**.      What is the deadline to vote on the Plan? .......................................................................15

        ~~V~~**X**.      How do I vote for or against the Plan? ...........................................................................15

W**Y**. Why is the Bankruptcy Court holding a Confirmation Hearing?.................................................. 16

X**Z**. When is the Confirmation Hearing set to occur?.......................................................... 16

Y**AA**. What is the purpose of the Confirmation Hearing? .................................................... 16**17**

Z**BB**. What is the effect of the Plan on the Debtors' ongoing business?............................................ 16**17**

AA**CC**. Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?.................................................................................... 16**17**

BB**DD**. Does Global Aviation recommend voting in favor of the Plan?.................................................. 16**17**

IV. **THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW ....... 1718**

    A. Global Aviation's Prepetition Organizational and Capital Structure......................................... 17**18**

    B. Summary of the Global Aviation's Corporate History ................................................................ 17**18**

    C. Summary of Global Aviation's Prepetition Capital Structure ..................................................... 18**19**

        (i) The Senior Secured Notes .............................................................................................. 19**20**
        (ii) The Second Lien Term Loan.......................................................................................... 19**20**
        (iii) The Intercreditor Agreement ......................................................................................... 19**20**
        (iv) Promissory Notes ........................................................................................................... 19**20**
        (v) Capital Lease Facility..................................................................................................... 20**21**
        (vi) The Amendment of the Senior Secured Notes Indenture and Second Lien Credit Agreement ................................................................................................................. 20**21**

    D. Overview of Global Aviation's Business and Operations ........................................................... 20**21**

        (i) Military Passenger and Cargo Services.......................................................................... 20**21**
        (ii) Commercial Cargo Services............................................................................................ 21**22**
        (iii) Commercial Passenger Services...................................................................................... 21**22**

V. **EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES ....................................................................................................................................... 2122**

    A. Events Leading to Chapter 11..................................................................................................... 21**22**

        (i) Decreased Military Need, Reduced Military Rates and Schedule Reliability Penalties ................................................................................................................... 21**22**
        (ii) Labor Agreements .......................................................................................................... 22**23**
        (iii) Underutilization of Commercial Cargo Fleet ................................................................ 23**24**
        (iv) Global Aviation's Funded Debt Obligations .................................................................. 23**24**
        (v) Decreased Team Entitlement Share Partially Offset by Increased Global Entitlement Share ................................................................................................... 23**24**
        (vi) ATA Bankruptcy Estate Litigation................................................................................ 24**25**

    B. Global Aviation's Prepetition Restructuring Initiatives.............................................................. 24**25**

VI. **EVENTS DURING THE CHAPTER 11 CASES................................................................................. 2526**

    A. Overview of Chapter 11.............................................................................................................. 25**26**

    B. First Day Pleadings and Other Case Matters ............................................................................. 25**26**

        (i) First and Second Day Pleadings..................................................................................... 25**26**
        (ii) Procedural and Administrative Motions......................................................................... 26**27**
        (iii) Retention of Chapter 11 Professionals .......................................................................... 27**28**
        (iv) Appointment of the Creditors' Committee Members and Counsel for Such Committee ................................................................................................................ 27**28**

    C. Pending Litigation Proceedings and the Automatic Stay............................................................ 27**28**

|  |  | (i) | WARN Act Adversary Proceedings | 2829 |
|  |  | **(ii)** | **Creditors' Committee Lien Litigation** | **29** |
|  | D. | The Debtors' Transition into Chapter 11. |  | 2829 |
|  |  | (i) | Postpetition Financing | 2830 |
|  |  | (ii) | Stipulation with the United States | 2930 |
|  |  | (iii) | Surety Bond Program | 3031 |
|  |  | (iv) | Fleet Rationalization and Restructuring | 3031 |
|  | E. | The Exclusivity Motions |  | 3132 |
|  | F. | 365(d)(4) Extension |  | 3133 |
|  | G. | NAA Relocation |  | 3233 |
|  | H. | Senior Management Team |  | 3233 |
|  | I. | Composition of New Board of Directors |  | 3536 |
|  | J. | Labor Cost Restructurings |  | 3537 |
|  |  | (i) | The Union Negotiations and Tentative Agreements | 3537 |
|  |  | (ii) | Ratification Votes and Their Consequences | 3941 |
|  |  | (iii) | Complete Withdrawal from the IBT Pension Plan | 4041 |
|  |  | (iv) | Single Carrier Filing | 4042 |
|  | K. | Claims Bar Date |  | 4142 |
|  | L. | NOL Motion |  | 4142 |
| **VII.** | **PROJECTED FINANCIAL INFORMATION** |  |  | **4143** |
|  | A. | Valuation of the Debtors |  | 4344 |
| **VIII.** | **RISK FACTORS** |  |  | **4344** |
|  | A. | Risks Relating to Bankruptcy |  | 4345 |
|  |  | (i) | Parties in interest may object to the Plan's classification of claims and interests. | 4345 |
|  |  | (ii) | The Debtors may fail to satisfy vote requirements. | 4345 |
|  |  | (iii) | The Debtors may not be able to obtain Confirmation of the Plan. | 4445 |
|  |  | (iv) | The conditions precedent to the Effective Date of the Plan may not occur. | 4445 |
|  |  | (v) | The Debtors may not be able to achieve their projected financial results. | 4445 |
|  |  | (vi) | The Debtors' "certificate of public convenience and necessity" may be revoked by the federal government. | 4446 |
|  |  | (vii) | Certain tax implications of the Debtors' chapter 11 cases. | 4546 |
|  |  | (viii) | The Debtors' emergence from chapter 11 is not assured. | 4546 |
|  | B. | Risks Related to the Debtors' and Reorganized Debtors' Business |  | 4546 |
|  |  | (i) | Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition. | 4546 |
|  |  | (ii) | The New Loans contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity. | 4546 |
|  |  | (iii) | Transfer restrictions on the New Common Stock contained in the New Certificate of Incorporation of Reorganized Global Aviation may limit the liquidity of the New Common Stock; any prohibited ownership change could limit the availability of the Reorganized Debtors' net operating losses. | 4647 |
|  |  | (iv) | If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer. | 4647 |

(v)     Employee strikes and other labor-related disruptions may adversely affect the Debtors' operations. .................................................................................................................. 46<u>47</u>

(vi)    If one of the Debtors' AMC team members reduces its commitments or withdraws from the team, or if carriers on other AMC teams commit additional aircraft to the program, the Debtors' share of AMC flying may decline. .......................................... 46<u>47</u>

(vii)   Unpredictability and variability in military demand for the Debtors' services could make it difficult to optimize the use and maintenance of their aircraft fleet, which could adversely affect our business, financial condition and results of operations. .............................................................................................................. 47<u>48</u>

(viii)  The costs incurred in the Debtors' military missions may be greater than the amounts for which they are reimbursed by the AMC, thereby reducing profitability. ............................................................................................................... 47<u>48</u>

(ix)    If the DOD activates the Debtors' aircraft pledged to the CRAF, the activated aircraft would not be available for other commercial use. ........................................... 47<u>49</u>

(x)     The Debtors' business could be adversely affected by an adverse audit by the U.S. government. ............................................................................................................... 48<u>49</u>

(xi)    Because a substantial portion of the Debtors' operating expenses is fixed, the Debtors may be unable to quickly change their cost structure to respond to any declines in revenues. ............................................................................................... 48<u>49</u>

(xii)   The loss of one or more customers in the commercial cargo business could materially and adversely affect the Debtors' business, financial condition and results of operations. ............................................................................................... 48<u>49</u>

(xiii)  A significant reduction in demand for air cargo transport, resulting from declining worldwide economic activity could materially and adversely affect the Debtors' business, financial condition and results of operations. .............................................. 48<u>50</u>

(xiv)   Fuel price volatility could adversely affect the Debtors' business, financial condition and results of operations. ..................................................................... 49<u>50</u>

(xv)    Volatility in international currency markets may adversely affect demand for our commercial cargo and passenger services. ................................................................ 49<u>50</u>

(xvi)   Governments may restrict or revoke the Debtors' authority to operate flights to or over countries. ...................................................................................................... 49<u>50</u>

(xvii)  If the Debtors are unable to continue to lease aircraft at acceptable rates and terms in the future, or if the Debtors are unable to acquire compatible engines or spare parts, on terms favorable to the Debtors or at all, their business, financial condition and results of operations could be adversely affected. ................................ 49<u>50</u>

(xviii) The Debtors are at risk of losses and adverse publicity stemming from any accident involving their aircraft. .......................................................................... 49<u>51</u>

(xix)   The airline industry is subject to extensive government regulation, and new regulations may increase the Debtors' operating costs. ............................................. 50<u>51</u>

(xx)    The Debtors' insurance costs have increased substantially as a result of the September 11 terrorist attacks, and further increases in insurance costs or reductions in coverage could have a material adverse impact on the Debtors' business and operating results ....................................................................................... 50<u>51</u>

IX.     **RELEASE, INJUNCTIVE AND RELATED PROVISIONS** ............................................................... 50<u>52</u>

A.      Compromise and Settlement of Claims, Interests and Controversies ........................................ 50<u>52</u>

B.      Releases by the Debtors .......................................................................................................... 51<u>52</u>

C.      Releases by Holders of Claims and Interests .......................................................................... 51<u>53</u>

D.      Limitations on Plan Release and Injunction Provisions with Respect to the Government ......... 52<u>53</u>

E.      Exculpation ........................................................................................................................... 52<u>53</u>

F.      Discharge of Claims and Termination of Interests .................................................................. 53<u>54</u>

G.      Injunction .............................................................................................................................. 53<u>54</u>

H. Release of Liens................................................................................................................... 54**55**

I. Term of Injunctions or Stays ............................................................................................. 54**55**

J. Protection Against Discriminatory Treatment .............................................................. 54**56**

**X. SOLICITATION AND VOTING PROCEDURES**.............................................................. 55**56**

**XI. CONFIRMATION OF THE PLAN** ..................................................................................... 55**56**

A. Requirements for Confirmation of the Plan.................................................................... 55**56**

B. Best Interests of Creditors/Liquidation Analysis ......................................................... 55**56**

C. Feasibility ........................................................................................................................ 55**56**

D. Acceptance by Impaired Classes ..................................................................................... 55**56**

E. Confirmation Without Acceptance by All Impaired Classes....................................... 56**57**

(i) No Unfair Discrimination.................................................................................. 56**57**
(ii) Fair and Equitable Test...................................................................................... 56**57**

F. Valuation of the Debtors................................................................................................... 56**58**

**XII. CERTAIN SECURITIES LAW MATTERS** ........................................................................ 57**58**

A. Plan Securities .................................................................................................................. 57**58**

B. Issuance and Resale of Plan Securities under the Plan ................................................. 57**58**

(i) Exemptions from Registration Requirements of the Securities Act and State Blue
Sky Laws ............................................................................................................ 57**58**
(ii) Resales of Plan Securities; Definition of Underwriter.................................... 57**58**
(iii) Warrants and New Common Stock/Equity Incentive Plan............................ 58**59**

**XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN**............................................................................................................................................. 58**59**

A. Introduction ....................................................................................................................... 58**59**

B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ............... 59**60**

(i) Cancellation of Debt and Reduction of Tax Attributes .................................. 59**60**
(ii) Limitation of NOL Carryforwards and Other Tax Attributes........................ 60**61**
(iii) Alternative Minimum Tax ................................................................................. 61**62**

C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims
........................................................................................................................................... 61**62**

(i) Consequences to Holders of Senior Secured Claims...................................... 61**62**

D. Withholding and Reporting .............................................................................................. 63**65**

**XIV. REGULATION** ..................................................................................................................... 65**66**

**XV. RECOMMENDATION** ......................................................................................................... 65**66**

**EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleadings

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Financial Projections

EXHIBIT E    Valuation Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Union Settlement Agreements

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

---

I.      **EXECUTIVE SUMMARY**

        Global Aviation Holdings Inc. ("***Global Aviation***") and its debtor affiliates (collectively, the "***Debtors***")[1] submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to certain Holders of Claims in connection with the solicitation of acceptance of the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated October ~~17, 2012,~~**19, 2012 [Docket 672],** (as amended, supplemented and modified from time to time, the "***Plan***").[2]  A copy of the Plan is attached hereto as **Exhibit A**.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement between and among the Debtors, the DIP Lenders, the Consenting Senior Secured Noteholders and certain of the Debtors' Unions. The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise explained in the Plan itself.  Except for unclassified Claims, all claims against a particular Debtor are placed in Classes for each of the Debtors.

        As described in the first day declaration of William A. Garrett, the Debtors' Executive Vice President and Chief Financial Officer, to appropriately restructure, the Debtors needed to (a) rationalize their fleet, (b) reduce their labor costs through voluntary modifications to collective bargaining agreements or court order and (c) develop an appropriate post-emergence balance sheet and secure exit financing to emerge from chapter 11 as a competitive enterprise.  All three of these goals will be achieved either prior to or upon confirmation of the Plan.

        ***First***, the Debtors have rationalized their fleet by over 50% and, as a result, achieved approximately $16 million in annual go-forward aircraft lease reductions.  Prior to and after the Commencement Date, the Debtors and their advisors undertook extensive analysis of the Debtors' contemplated post-emergence fleet structure.  On the first day of the Debtors' chapter 11 cases, pursuant to section 365 of the Bankruptcy Code, the Debtors filed a motion to reject 16 aircraft leases that they deemed burdensome to their estates.  Over the course of these cases, the Debtors filed 4 additional omnibus motions seeking to reject certain aircraft, engine and equipment leases deemed non-essential to their go-forward operations and post emergence business plan.

        The Debtors' fleet, which consisted of 30 aircraft on the Commencement Date, now consists of 14 aircraft, subject to several leases that were either assumed or entered into over the course of the Debtors' chapter 11 cases or will be assumed upon confirmation of the Plan.  After substantial negotiation, many of these leases contain amendments representing significant cost savings to the Debtors.  The fleet rationalization has contributed to the significant reduction of the Debtors' liabilities.

        ***Second***, the Debtors reached agreements with the authorized negotiating teams for all five unionized labor groups to secure modifications to their Collective Bargaining Agreements that would ensure the reduction of going-forward labor expenses by more than $100 million and labor cost stability for the next five years. On September 12, 2012, the Court approved the Debtors' motion to enter into modified agreements with three of their five labor groups:  the World Pilots represented by the IBT, the World dispatchers represented by the TWU, and the World Flight Attendants represented by the IBT.  The North American pilots (represented by ALPA) ratified the agreement modifying their Collective Bargaining Agreement on September 24, 2012, which was approved by the Court on September 25, 2012.  The North American Flight Attendants (represented by the IBT) did not ratify the tentative agreement executed by their negotiating team.  The Debtors will continue to negotiate in good faith with the North American flight attendants and hope to resolve the ratification issues consensually.  However, in the interim North American has imposed new labor terms on the North American Flight Attendants consistent with applicable law.

        ***Third***, and finally, the Debtors are very pleased that after extensive, good faith negotiations, the Debtors were able to submit their Plan for an appropriate post-emergence balance sheet with the support of the DIP Lenders, the Ad

---

[1]     The Debtors in these chapter 11 cases are: Global Aviation Holdings Inc.; New ATA Investment Inc.; New ATA Acquisition Inc.; Global Aviation Ventures SPV LLC; World Air Holdings Inc.; North American Airlines, Inc.; World Airways, Inc.; Global Shared Services, Inc.; and World Airways Parts Company, LLC.

[2]     All terms not otherwise defined herein shall have the meaning given to them in the Plan.

Hoc Group of Senior Secured Noteholders which represented over 80% of the Senior Secured Noteholders and a majority of their Unions.  The Plan currently contemplates an approximate $168 million reduction of funded debt.  As a result, a significant amount of the Debtors' major creditor constituencies is supportive of the Plan and the Debtors' expeditious emergence from chapter 11.  Among other things, the Plan contemplates the following:

- Each Holder of such Claims arising under that certain Indenture dated as of August 13, 2009, as amended, modified or supplemented from time to time (the "***Senior Secured Indenture***," and any claims arising thereunder, the "***Senior Secured Claims***"), whose claims total approximately $111.9 million, will receive on account of the secured portion of their claims a Pro Rata distribution of:  (a) the remaining New First Lien Loan after satisfaction of the DIP Claims **and Roll-Up Claims**; (b)  New Second Lien debt of $40 million, with a 5-year term and an interest rate of 3% per annum, with an option for cash pay or pay-in-kind; and (c) either (i) ~~100~~**75**% of the New Common Stock or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders.

- For the avoidance of doubt, the distribution to Non-U.S. Citizens on account of such Holder's Allowed Senior Secured Claim shall not affect the economic value of such Holder's distribution under the Plan. Any objection by the Ad Hoc Group of Senior Secured Noteholders regarding the structure of the newly established class of New Common Stock or warrants and its effect on a Holder's percentage voting rights shall be per se reasonable.

- Holders of Second Lien Claims will not receive any distribution on account of such Second Lien Claims. On the Effective Date, all Second Lien Claims shall be cancelled and discharged.

- Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims.  On the Effective Date, all General Unsecured Claims shall be cancelled and discharged.

- Certain of the Debtors hold significant Intercompany Claims against other Debtors.  No distribution shall be made on account of Intercompany Claims.  On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled, discharged in full or in part or contributed, distributed or otherwise transferred between and among the Debtors in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be entitled to transfer funds and obligations between and among themselves as they determine to be necessary or appropriate to best enable the Debtors and Reorganized Debtors to satisfy their obligations under the Plan.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

- Intercompany Interests shall be reinstated on the Effective Date.

- All equity Interests in Global Aviation will be cancelled or extinguished on the Effective Date.

~~On September 27, 2012, GSO, the Debtors' Second Lien Lender, filed a preliminary objection to the Disclosure Statement.  The Debtors intend to continue to negotiate with their Second Lien Lender and their other major stakeholders in the time leading up to the approval of this Disclosure Statement and in advance of any hearing to consider confirmation of the Plan.  To that end, the~~**The** Debtors have been in dialogue with the advisors for the Creditors' Committee ~~as well as~~**and** the advisors for ~~GSO. It~~**the Second Lien Lender and it** is the Debtors' hope that they will come to a consensual resolution with ~~the Creditors' Committee and their Second Lien Lender~~**such parties with respect to the Plan** in advance of the Confirmation Hearing.  To the extent that the Debtors cannot reach full consensus, however, the Debtors believe that they already have the requisite creditor support necessary to confirm the Plan and intend to proceed on a path to Confirmation of the Plan in an expeditious manner.

**IN SUM, THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES**

**AND PROVIDES THE BEST RECOVERY TO CREDITORS.  AT THIS TIME, THE DEBTORS DO NOT BELIEVE THAT THERE IS A VIABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES OTHER THAN THROUGH CONFIRMATION OF THE PLAN.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to Claims: (a) any Claim proof of which is timely filed with the Bankruptcy Court (excluding Claims not required to be filed with the Bankruptcy Court); (b) any Claim that is listed in the schedules of assets and liabilities, schedules of executory contract and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code (the "*Schedules*") as not contingent, not unliquidated, and not disputed, and for which no proof of claim has been timely field with the Bankruptcy Court; or (c) any Claim that is Allowed pursuant to the Plan.  A Claim is not an "Allowed Claim" if an objection to the allowance of the Claim has been made within the time period fixed for Claims objections by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or if an objection has been made against the Claim and the Claim is Allowed for voting purposes only by a final order of the Bankruptcy Court.

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Priority Non-Tax Claims | Holders of Allowed Priority Non-Tax Claim shall be paid in full in Cash on or as reasonably practicable after (a) the Effective Date; (b) the date on which such Priority Non-Tax Claim against the Debtors becomes an Allowed Priority Non-Tax Claim; or (c) such other date as may be ordered by the Bankruptcy Court. | 100% |
| 2 | Other Secured Claims | Holders of Allowed Other Secured Claim shall receive one of the following treatments, in the sole discretion of the applicable Debtor: (a) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claims in full in Cash, including the payment of any interest required to be paid under section 506(b) of the Bankruptcy Code; (b) the Debtors or the Reorganized Debtors shall deliver the collateral securing any such Allowed Other Secured Claim; or (c) the Debtors and the Reorganized Debtors shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Claim shall be rendered Unimpaired. | 100% |
| 3 | Senior Secured Claims | Holders of Allowed Senior Secured Claim shall receive on the Effective Date a Pro Rata distribution of: (a) the remaining New First Lien Loan after satisfaction of the DIP Claims **and Roll-Up Claims**; (b) the New Second Lien Loan; and (c) either (i) ~~100~~**75**% of the New Common Stock or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders. | 78%[4] |
| 4~~A~~ | Second Lien Claims | Holders of Second Lien Claims will not receive any distribution on account of such Second Lien Claims. On the Effective Date, all Second Lien Claims shall be cancelled and discharged. | N/A |
| 4~~B~~**5** | General Unsecured Claims | Holders of General Unsecured Claims will not receive any distribution on account of such General Unsecured Claims. On the Effective Date, all General Unsecured Claims shall be cancelled and discharged. | N/A |
| ~~5~~**6** | Intercompany Claims | To preserve the Debtors' corporate structure, on the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be reinstated in full or in part or cancelled, discharged in full or in part or contributed, distributed or otherwise transferred between and among the Debtors in full or in part, in each case, to the extent determined appropriate by the Reorganized Debtors. No distribution shall be made on account of Intercompany Claims. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be entitled to transfer funds and obligations between and among themselves as they determine to be necessary or appropriate to best enable the Debtors and Reorganized Debtors to | N/A |

---

[4] The projected recovery for the Holders of Allowed Senior Secured Claims is based on the midpoint of Rothschild's estimate of potential recoveries for Class 3, which could vary based upon the range of equity value of the Reorganized Debtors, as discussed further in **Exhibit E**, attached hereto.

4

| | | satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practice. | |
|---|---|---|---|
| ~~6~~7 | Intercompany Interests | Intercompany Interests shall be Reinstated on the Effective Date. | N/A |
| ~~7~~**8** | Global Aviation Interests | Holders of Interests in Global Aviation Interests shall not receive any distribution on account of such Global Aviation Interests.  On the Effective Date, all Global Aviation Interests shall be cancelled and discharged. | N/A |

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court.  The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.  The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933 (as amended, the "*Securities Act*"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.  Other securities may be issued pursuant to other applicable exemptions under the federal securities laws.  To the extent exemptions from registration, other than section 1145 of the Bankruptcy Court, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws.  The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;

- projected dividends;

- financing plans;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs;

- results of litigation;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- off-balance sheet arrangements;

- growth opportunities for existing services;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance.  Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made.  There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

6

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtors' ability to comply with the terms of the debtor-in-possession credit facility;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- general economic, business and market conditions;

- interest rate fluctuations;

- exposure to litigation;

- unpredictability and variability in military demand for the Debtors' services;

- Debtors' ability to meet OTP requirements;

- changes in AMC team structure and commitments;

- dependence on key customers in the commercial cargo business;

- dependence upon key personnel;

- ability to change cost structure in a timely manner;

- fuel price volatility;

- AMC rate degradation;

- financial conditions of the Debtors' customers;

- adverse tax changes;

- limited access to capital resources;

- changes in laws and regulations;

- damage to aircraft and cargo resulting from dangerous charters;

- inability to implement business plan; and

- the effects of governmental regulation, including FAA and other foreign regulatory rules, on the Debtors' business.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**C.      Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold. In general, a holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the plan and (iii) the holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest.  Only the holders of Claims in Class 3 (Senior Secured Claims) shall be entitled to vote on the Plan.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted such plan, and thus the holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Plan, the holders of Claims in these Classes are not entitled to vote:

- Class 1 (Priority Non-Tax Claims)

- Class 2 (Other Secured Claims)

- Class ~~5~~**6** (Intercompany Claims)

- Class ~~6~~**7** (Intercompany Interests)

In general, if the holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected such plan, and thus the holders of Claims in such Classes are not entitled to vote on such plan. The holders of Claims and Interests in the following Classes are conclusively presumed to have rejected the Plan and are therefore not entitled to vote:

- Class 4~~A~~ (Second Lien Claims)

- Class ~~4B~~**5** (General Unsecured Claims)

- Class 7 (Global Aviation Interests)

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "***Class***") and their respective voting statuses and anticipated recoveries are set forth below.

The following chart is a summary of the classification and treatment of Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation and meet the conditions to consummate the Plan.

8

| Class | ~~Sub-Class~~ | Claim | Status | Voting Rights | Estimated Recovery |
|-------|-----------|-------|--------|---------------|---------------------|
| 1 | | Priority Non-Tax Claims | Unimpaired | Deemed to Accept | |
| 2 | | Other Secured Claims | Unimpaired | Deemed to Accept | |
| 3 | | Senior Secured Claims | Impaired | Enti | |

9

| Class | Sub-Class | Claim | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|---|
| 4 | | ~~Unsecured~~**Second Lien** Claims | Impaired | Entitled to Vote | Deemed to Reject |
| | ~~4A~~ | ~~Second Lien Claims~~ | ~~Impaired~~ | | ~~Deemed to Reject~~ |
| **5** | ~~4B~~ | General Unsecured Claims | Impaired | | Deemed to |

| Class | ~~Sub-Class~~ | Claim | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|---|
| | | | | Reject | |
| ~~5~~6 | | Intercompany Claims | Unimpaired | Deemed to Accept | |
| ~~6~~7 | | Intercompany Interests | Unimpaired | Deemed to Accept | |
| ~~7~~8 | | Global Aviation Interests | Impaired | D | |

11

| Class | ~~Sub-Class~~ | Claim | Status | **Voting Rights** *deemed to Reject* | **Estimated Recovery** |
|---|---|---|---|---|---|

**D.        What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page ~~55~~**56** and the Liquidation Analysis attached as **Exhibit F** to this Disclosure Statement.

**E.        Are any regulatory approvals required to consummate the Plan?**

Yes.  Under federal law, the Debtors are required to have a "certificate of public convenience and necessity" in order for them to provide air carrier services. 49 U.S.C § 41102(a). The Debtors' license could be revoked by the federal government if Non-U.S. Citizens were to own or control in excess of 25% of the equity interest in the reorganized Debtors.

To effectuate distributions in accordance with the foregoing federal law restrictions, the Debtors propose to send a notice of form declaration (the "*Citizenship Declaration*") to the Holders of Allowed Class 3 Claims that are eligible to receive New Common Stock (the "*Notice of Citizenship Declaration*"), attached as **Exhibit 12** to the Disclosure Statement Order.  The Citizenship Declaration will require such Holders to provide and verify the following information: (i) name of creditor; (ii) amount of allowed claim; and (iii) whether such person or entity is a U.S. Citizen or Non-U.S. Citizen as defined by title 49 of the United States Code.  If approved by the Bankruptcy Court, the Notice of Citizenship Declaration and Citizenship Declaration will be sent concurrently with the Ballots sent to Holders of Class 3 Claims.  If any Holder of a Class 3 Claim does not return a properly completed Citizenship

12

Declaration prior to the deadline set forth therein, the Holder of such Class 3 Claim will be deemed a Non- U.S. Citizen.

All Citizenship Declarations must be actually received by the Balloting Agent on or before the Citizenship Declaration Record Date. After the Citizenship Declaration Record Date, before any Holder of a Class 3 Claim may transfer such Class 3 Claim, the Holder must either (i) submit to the Debtors a Citizenship Declaration from the proposed transferee certifying that the proposed transferee is a U.S. Citizen or (ii) obtain the Debtors' prior written consent. The Debtors reserve the right to establish various classes of New Common Stock or warrants, subject to the reasonable consent of the Consenting Senior Secured Noteholders, to be used to satisfy the Claims in Class 3 held by Non-U.S. Citizens.

For a more detailed description of the regulatory bodies that oversee the Debtors' operations, *see* "Regulation" beginning on page 65.**66.**

F.      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims will only be made on the Effective Date as soon as practicable thereafter. *See* "Confirmation of the Plan," which begins on page 55,**56,** for a discussion of the conditions to consummation of the Plan.

G.      **What information is there regarding Classes of Claims?**

The United States Trustee has requested additional disclosure regarding the Classes of Claims under the Plan. At the outset, the Debtors would note that the Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, unless otherwise explained in the Plan, the classifications set forth in Plan are deemed to apply to each Debtor, as applicable. Global Aviation is the only Debtor that possesses a Class 7**8** with respect to Interests in Global Aviation. In addition, certain Debtors may not have creditors in certain other Classes.

Because the Debtors are still in the process of reconciling their Claims, the Debtors do not know with certainty the identity of the claimants and the total aggregate allowed Claims in each Class under the Plan. With respect to Class 3, which is the only Class entitled to vote under the Plan, the Debtors expect to have allowed Claims of approximately $112 million (which is after removing the Class 3 Claims that were "rolled up" pursuant to the DIP Order). The claimants in Class 3 will include the members of the Ad Hoc Group of Senior Noteholders, who collectively hold approximately 73% of the Senior Secured Notes, as well as other non-Ad Hoc Group Holders of Senior Secured Notes (the Debtors do not have an accurate count of the number of non-Ad Hoc Group Holders of Senior Secured Notes).

With respect to the other Classes under the Plan, while the Debtors do not yet know the identity and aggregate Claims in each Class, the Debtors can provide a summary of the Claims that were filed in advance of the Bar Date. As of August 3, 2012, approximately 1,047 Claims have been filed against various Debtors, asserting various levels of priority, including the following: (a) 154 Claims for a total of $6,932,136.31 asserting Administrative Priority status; (b) 711 Claims for a total of $362,065,154.28 asserting General Unsecured Status; (c) 86 Claims for a total of $93,671,959.13 asserting Priority Status; and (d) 96 Claims for a total of $16,567,929.82 asserting Secured status. The Debtors are currently in the process of reconciling such Claims and plan to file various objections over the course of the next few weeks. The Debtors expect the Allowed Claims in each Class to be significantly lower than the Filed Claims. As previously noted, the Debtors expect approximately $5 million in Allowed Administrative Expense Claims and Priority Claims, including among other things, certain 503(b)(9) Claims and priority tax Claims. The Debtors do not have an estimate on the aggregate amount of Allowed General Unsecured Claims.

13

**H.**     **What information is there regarding Administrative Expense Claims?**

The Debtors received 154 Claims asserting a total of $6,932,136.31 in Claims with Administrative Priority status, 86 Claims asserting a total of $93,671,959.13 with Priority Status and 96 Claims asserting a total of $16,567,929.82 with Secured status. The Debtors are still in the process of reconciling these claims and expect to reconcile or object to many of these claims.  Specifically with respect to their retained professionals, upon Emergence the Debtors expect to pay approximately $8 million in allowed professional fees and expenses.  In addition, after reconciling their priority claims listed above, the Debtors expect to pay approximately $5 million in allowed Administrative Expense Claims and Priority Claims, including among other Claims, allowed section 503(b)(9) Claims and priority tax Claims.  As noted above, after making payments for such Administrative Expense Claims, cash flow related to ongoing operations and drawing $5 million on the New Revolver, the Debtors expect to have a year end cash balance of approximately $3.9 million, and at least $20 million in availability under the New Revolver.

**I.**     **What are the DIP Claims and how are they satisfied?**

The DIP Claims are post-petition obligations incurred by the Debtors under the DIP Credit Agreement.  As of the Effective Date, the DIP Claims shall be Allowed Claims in the amount that is drawn down under the DIP Credit Agreement as of the Effective Date, plus any interest and fees accrued pursuant to the DIP Credit Agreement. Additionally, ~~as of~~**pursuant to** the ~~Effective Date~~**DIP Order**, the Roll-Up Claims ~~will be~~**are** Allowed Administrative Claims in the amount equal to the DIP Lenders' commitment under the DIP Credit Agreement.  On the Effective Date, the Holders of Allowed DIP Claims or Allowed Roll-Up Claims will receive, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed DIP Claim or Allowed Roll-Up Claim, a Pro Rata distribution of the New First Lien Loan up to the amount of the Allowed DIP Claim or Allowed Roll-Up Claim. Additionally, on the Effective Date, the Debtors will have to pay all reasonable and documented fees and expenses (i) provided to be paid by the DIP Order or the DIP Credit Agreement, as applicable, including those of the DIP Agent, the DIP Lenders, the Ad Hoc Group of Senior Secured Noteholders and the Senior Secured Indenture Trustee and (ii) of the Senior Secured Indenture Trustee and the Senior Secured Predecessor Indenture Trustee incurred under the Senior Secured Indenture.    The Debtors, however, expressly reserve all of their rights to objected to the reasonableness of such fees and expenses.

**J.**     **Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date?**

Yes.  On the Effective Date the Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation.  Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable, under 28 U.S.C. § 1930(a)(6), plus accrued interest under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements inside and outside of the ordinary course of business until the entry of a final decree, dismissal or conversion of the cases to chapter 7.  The Reorganized Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal or conversion of the cases to chapter 7.

**K.**     **What is the Debtors' current financial condition and what is the Debtors' projected cash balance on the Effective Date?**

The Untied States Trustee has requested that the Debtors include additional disclosure regarding the Debtors' current financial condition, including their cash position.  Over the course of the chapter 11 cases the Debtors have performed largely in conformance with their business plan.  The Debtors have been able to achieve certain of their restructuring goals and these goals have had a positive impact on the Debtors' operating performance.  For example, the Debtors have secured labor savings on account of new collective bargaining agreements that went effective in September 2012.  In addition, the Debtors secured aircraft lease savings on account of rejected aircraft leases that were rejected in early 2012.  Finally, the Debtors successfully moved the headquarters of North American Airlines, Inc. from Queens, New York to Peachtree City, Georgia and achieved cost synergies on account of the move.  As a result of these changes and the Debtors successfully executing their business plan, the Debtors' current financial condition is sound.

After relatively slow months in July and August, the Debtors' recent financial performance has improved in September 2012 with preliminary EBITDA results for the month expected to be $4.6 million compared to $0.1 million in August 2012. The main drivers for improved financial performance are a recovery of military block hours to above plan levels and coupled with improved crew utilizations as a result of completing labor negotiations. Month over month AMC revenue increased approximately $4.2 million for medium passenger aircraft and $2.1 million for large passenger while commercial cargo revenue was flat.

The Debtors expect to have approximately $13-$15 million in Cash prior to the Effective Date. Upon Emergence, the Debtors expect to pay approximately $8 million in fees and expenses on account of retained professionals and approximately $5 million in Administrative Expense Claims and Priority Claims, including among other things, certain 503(b)(9) Claims and priority tax Claims. After making payments for such Administrative Expense Claims, cash flow related to ongoing operations and drawing $5 million on the New Revolver, the Debtors expect to have a year end cash balance of approximately $3.9 million, and at least $20 million in availability under the New Revolver. Thus, the Debtors project that they will have sufficient cash on hand to satisfy all allowed administrative claims in full on the Effective Date. *See* Article VII of this Disclosure Statement for additional information.

### L.      What are the terms of the New Loans?

The New Loans will consist of a New First Lien Loan, New Second Lien Loan and New Revolver. The New First Lien Loan shall (a) be in the principal amount of $95 million, (b) have an interest rate of 10% per annum on a cash pay basis, (c) have a maturity of four and a half years from the Effective Date and (d) be secured by substantially all of the Reorganized Debtors' assets.

On the Effective Date, the New First Lien Loan will be distributed Pro Rata to Holders of Allowed DIP Claims or Allowed Roll-Up Claims, except to the extent that such a Holder agrees to a less favorable treatment. After satisfaction of the DIP Claims and Roll-Up Claims, the remaining New First Lien Loan will be distributed, on the Effective Date, Pro Rata, to each holder of an Allowed Senior Secured Claim.

The New Second Lien Loan shall (a) be in the principal amount of $40 million, (b) have an interest rate of 3% per annum, with an option for a cash pay or pay-in-kind basis, (c) have a maturity date of five years from the Effective Date and (d) be secured by substantially all of the Reorganized Debtors' assets, junior in lien and payment to the New Revolver and the New First Lien Loan. On the Effective Date, the New Second Lien Loan will be distributed, Pro Rata, to Holders of Allowed Senior Secured Claims.

The Debtors are still in the process of marketing the New Revolver and, as a result, have yet to finalize many of the specific terms. The Debtors requests to potential lenders require that the New Revolver have an availability of $20 million. Rothschild has been leading the Debtors' search for the New Revolver. The Debtors will include the terms of the New Revolver — which will likely either be provided by a third-party lender or some or all of the Ad Hoc Group of Senior Secured Noteholders — in their Plan Supplement.

The specific terms of the New Loans, which will be contained in the Plan Supplement and approved at the Confirmation Hearing, have yet to be finalized and will continue to be negotiated by the Debtors between now and November 18. The Debtors expect the New Loans will contain certain covenants, which will restrict (subject to certain exceptions) the Reorganized Debtors' ability to: incur additional indebtedness; grant liens; consummate mergers, acquisitions, consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; and enter into transactions with affiliates; consummate sale-leaseback transactions.

### M.      Are there risks to owning an Interest in Reorganized Global Aviation upon emergence from chapter 11?

Yes. *See* "Risk Factors," which begins on page ~~43.~~ **44.**

**N.    Is there potential litigation related to the Plan?**

Yes.  The Plan is structured as a motion under sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 for approval of the compromise and settlement among the Debtors, the Consenting Senior Secured Noteholders, the IBT, ALPA and TWU, the terms of which are outlined herein and in the Heads of Agreement attached as **Exhibit G** hereto.  If the Plan is confirmed, it will constitute approval of the compromise and settlement by the Bankruptcy Court, and the Confirmation Order will contain findings supporting and conclusions approving the compromise and settlement as fair and equitable and within the bounds of reasonableness.

In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* "Risk Factors — The Debtors may not be able to obtain Confirmation of the Plan," which begins on page 44.**45.**

**O.    What rights will Reorganized Global Aviation's new stockholders have?**

Holders of New Common Stock will have rights as set forth in the Plan Supplement, which will include the New Shareholders Agreement.

**P.    When will the Plan Supplement be filed and what will it include?**

The Plan Supplement will be Filed no later than ten (10) days before the Confirmation Hearing, or such later date on notice to parties in interest, and will include the following:  (a) the New By-Laws; (b) the New Certificates of Incorporation; (c) a list of Executory Contracts and Unexpired Leases to be rejected; (d) a list of Executory Contracts and Unexpired Leases to be assumed and the associated cure costs; (e) the New First Lien Loan Credit Agreement; (f) the New Second Lien Loan Credit Agreement; (g) the New Revolving Credit Agreement; (h) the New Intercreditor Agreement; (i) the New Employment Agreements; (j) certain terms of the Management Equity Incentive Plan; (l) the Employee Equity Plan; (m) the New Shareholders Agreement; (n) the New Warrant Agreement; (o) the identity of the members of the New Boards; and (p) any additional documents Filed before the Effective Date as supplements or amendments to the Plan Supplement.  The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors between now and November 18.

**Q.    What is the Employee Equity Plan and how will it affect the distribution I receive under the Plan?**

The Plan contemplates the implementation of the Employee Equity Plan, which will be included with the Plan Supplement and provide for 25% of the New Common Stock to be distributed to Qualifying Represented Employees and Non-Executive, Non-Represented Employees to be shared in proportion to (a) the concessions agreed and ratified through voluntary modifications, in the case of the Reorganized Debtors' Qualifying Represented Employees, and (b) the amount of the World Pilots Savings Credit with respect to the Reorganized Debtors' Non-Executive, Non-Represented Employees.  In addition, the Employee Equity Plan shall provide for New Warrants to purchase 15% of the fully-diluted New Common Stock for the Qualifying Represented Employees and Non-Executive, Non-Represented Employees.

As provided in the Letter of Agreement with ALPA, non-management pilots on the North American seniority list as of September 25, 2012, shall receive no less than 13.6% of the of the distribution of New Common Stock made pursuant to the Employee Equity Plan and no less than 13.6% of the distribution of New Warrants made pursuant to the Employee Equity Plan, recognizing that the Employee Equity Plan as a whole may be diluted by creditors other than the Management Employee Incentive Plan.  ALPA shall, in its sole discretion and according to its policies, determine how its distribution from the Employee Equity Plan shall be distributed among the non-management  pilots on the North American seniority list as of September 25, 2012.

**R.      What is the Management Equity Incentive Plan and how will it affect the distribution I receive under the Plan?**

The Reorganized Global Aviation Board will adopt and implement the Management Equity Incentive Plan, pursuant to which retentive and performance-based equity awards of 10% of the New Common Stock shall be reserved for issuance to certain of the Debtors' Executives and Employees; provided, however, that any Employee participating in the Employee Equity Incentive Plan shall not be eligible for distributions under the Management Equity Incentive Plan. The Management Equity Incentive Plan will not dilute the Employee Equity Plan. Certain terms of the Management Equity Incentive Plan shall be included in the Plan Supplement.

**S.      What are the Debtors' Intercompany Claims and Intercompany Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other and with World Risk Solutions, Ltd., a non-debtor affiliate and captive insurance company, resulting in Intercompany Claims and Intercompany Interests. The Intercompany Claims reflect costs and revenues, all of which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims. Further, the Intercompany Claims include:

- Notes arising from five loans, each between $1 million and $10 million that North American. extended to World between August 2009 and October 2011. North American's Intercompany Claims on account of those notes equal $31 million.

- Claims arising from shared management agreements and subservice agreements by and between certain Debtors. Under the shared management agreements, Global Aviation Holdings Inc. and Global Shared Services, Inc. provide management and operational support services to North American Airlines, Inc. and World Airways, Inc. in exchange for management fees.

The Plan's treatment of Intercompany Claims and Intercompany Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going-concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan. The Debtors' Plan provides as owners of the Reorganized Debtors, holders of New Common Stock are the effective owners of the Intercompany Claims and Intercompany Interests as well. The Plan reinstates Intercompany Claims and Intercompany Interests to implement the substantive transfer of ownership contemplated by the Plan and to avoid the unnecessary and potentially destructive burdens created by the elimination of the Reorganized Debtors' corporate structure. The Creditors' Committee has indicated that the preservation of Intercompany Claims and Intercompany Interest may violate the absolute priority rule. The Debtors believe this is an issue that should be preserved for the confirmation hearing.

**T.      How will the release of the Avoidance Actions impact my recovery under the Plan?**

The Debtors believe there are no credible avoidance actions, and their decision to release any avoidance actions under the Plan is a sound exercise of their business judgment. Likewise, the Liquidation Analysis attached hereto does not reflect any potential recoveries that might be realized by a chapter 7 trustee's potential pursuit of any Avoidance Actions because the Debtors believe such claims are highly speculative. This includes any potential Avoidance Actions against Released Parties, as these terms are defined in the Plan.

Moreover, to the extent there are potential Avoidance Actions that could be pursued against trade creditors, the Debtors believe that pursuing such Avoidance Actions would not result in a net benefit to the Debtors' estates, but instead could potentially harm the Reorganized Debtors' business relationships with their trade partners. Accordingly, the Debtors have not initiated or pursued any such causes of action because they are not aware, at this time, of any possible Avoidance Actions that could materially increase the Debtors' estate. Additionally, many potential Avoidance Actions, if not released, would be subject to statutory and other defenses, including that the amounts sought to be avoided were paid in the ordinary course of business or were given in exchange for subsequent new value. The Debtors do not believe that the release of Avoidance Actions will materially impact recoveries under the Plan.

The Creditors' Committee has not evaluated the Debtors' position that there are no credible Avoidance Actions and therefore does not concur in that assertion.

**U.        How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

Because the Plan does not provide a distribution to holders of General Unsecured Claims, Claims arising from the Debtors' rejection of Executory Contracts and Unexpired leases will not impact the recoveries to Holders of any Claims in any Class.

**V.        Will there be releases granted to parties in interest as part of the Plan?**

The Plan proposes to release each of: (a) the DIP Agent and the DIP Lenders; (b) the Senior Secured Indenture Trustee and the Senior Secured Noteholders; (c) the Second Lien Agent and the  Second Lien Lender; (d) the Creditors' Committee;  (e) MatlinPatterson; (f) the IBT; (g) the ALPA; (h) the TWU; and (i) with respect to each of the foregoing entities, such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other Professionals.

The Office of the United States Trustee and Creditors' Committee raised concerns regarding the scope of the releases in the Plan and the lack of justification for the releases.  The foregoing release is an integral part of the Debtors' overall restructuring efforts.  All of the parties included in the definition of Released Parties have made a substantial contribution to the Debtors' restructuring efforts and, in most cases, have insisted on the release as a condition for their contribution.

- **DIP Agent and DIP Lenders**: The DIP Agent and DIP Lenders provided the Debtors with DIP financing, without which the Debtors would not be presenting the Plan and Disclosure Statement, but likely would be facing liquidation.  Moreover, the DIP Lenders have provided the Debtors with waivers of various milestones and other defaults over the course of these chapter 11 cases, without requiring any waiver fees.

- **Senior Secured Indenture Trustee and Senior Secured Noteholders**: The Senior Secured Indenture Trustee and Senior Secured Noteholders have all made substantial contributions, initially by participating in the DIP financing and also by significantly aiding in the formulation and negotiation of the Union Settlement Agreement, Plan and the Disclosure Statement.

- **Second Lien Agent, Second Lien Lender and Creditors' Committee**: The Debtors have been working with the Second Lien Agent, Second Lien Lender and Creditors' Committee with the aim of reaching a global settlement on the Plan.  Based on the Debtors' hope that a settlement can be accomplished, and the incremental litigation costs and uncertainties avoided thereby, the Debtors have included the Second Lien Agent, Second Lien Lender and Creditors' Committee in the release provisions and will seek to obtain such releases if a settlement is ultimately reached.

- **MatlinPatterson**:  MatlinPatterson has made substantial contributions to the Debtors over the course of the chapter 11 cases.  First, MatlinPatterson has helped the Debtors exercise their roles as fiduciaries for all stakeholders by appointing members of the Board of Directors of Global Aviation Holdings Inc. to provide guidance to the Debtors.  Second, MatlinPatterson has voluntarily agreed not to exercise its right to declare a worthless stock deduction so that the Debtors can maximize their tax attributes (i.e., significant Net Operating Losses), *provided*, *however*, *that* MatlinPatterson receive a release from the Debtors and their stakeholders.  Third, MatlinPatterson has provided helpful guidance to the Debtors' management team in formulating the Debtors' revised business plan that is expected to lead to long-term growth for the Reorganized Debtors (and thus, maximize the value of the estates for all stakeholders, especially future equity holders of the Debtors).

- **IBT, ALPA and TWU**: As a condition to the Union Settlement Agreements, IBT, ALPA and TWU all required that they be included in the Debtors' release provisions. Based on the significant cost savings achieved by the Union Settlement Agreements, the Debtors believe that such parties are entitled to the protection of the release provisions provided in the Plan.

All of these parties, along with the Debtors' representatives, have made, or are anticipated to make by confirmation, substantial contributions to the Debtors' restructuring efforts and would not have made such contribution without the foregoing releases. Based on the foregoing, the Debtors believe that the releases in the Plan are necessary and appropriate and meet the requisite legal standard in the Second Circuit.

For more detail see "Article X: Release, Injunction and Related Provisions" which begins on page 50.**52.**

### W.    What is the deadline to vote on the Plan?

5:00 p.m. (prevailing Eastern Time) on November 21, 2012.

### X.    How do I vote for or against the Plan?

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of one or more Claims in the following Class, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

- **Class 3 (Senior Secured Claims)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, to serve as the voting agent for all Claims and generally oversee the voting process (the "*Notice, Claims and Solicitation***Balloting** *Agent*"). The Notice, Claims and Solicitation**Balloting** Agent will process and tabulate ballots for Class 3 Claims.

19

The deadline to vote on the Plan is 5:00 p.m. (prevailing Eastern Time), on November 21, 2012.

| **BALLOTS** |
|---|
| Ballots and Master Ballots must be actually received by the ~~Notice, Claims and Solicitation~~**Balloting** Agent by the voting deadline of 5:00 p.m. (prevailing Eastern Time) on **November 21, 2012** at the following address:<br><br>**Global Aviation Balloting Center (for Ballots)**<br>**c/o Kurtzman Carson Consultants LLC**<br>**599 Lexington Avenue, 39th Floor**<br>**New York, New York 10022**<br><br>If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a master ballot before the voting deadline.<br><br>If you have any questions on the procedure for voting on the Plan, please call the ~~Notice, Claims and Solicitation~~**Balloting** Agent at the following telephone number:<br><br>**1-877- 606-7657** |

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by **5:00 p.m. (prevailing Eastern Time), on November 21, 2012**.

Any ballot that is properly executed by a Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one ballot per each Claim held. By signing and returning a ballot, each Holder of a Claim in Class 3 will certify to the Bankruptcy Court and the Debtors that no other ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claims, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot. For information regarding voting by Nominees, see "Solicitation and Voting Procedures" which begins on page ~~50.~~**52.**

**Y.       Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to confirmation of the Plan.

**Z.       When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **November 28, 2012 at 11:00 a.m. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 20, 2012 at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.

### AA.    What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### BB.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing pursuant to chapter 11.  As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business.  The Debtors will continue to operate their businesses going forward using cash from operations, which will be utilized to implement the Reorganized Debtors' business plan.

### CC.    Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?

The board of directors of each of the Reorganized Debtors will be selected by a committee consisting of the current Chief Executive Officer of Global Aviation, a representative of the Consenting Senior Secured Noteholders and a representative of the Qualified Represented Employees or Non-Executive, Non-Represented Employees.

### DD.    Does Global Aviation recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all creditors.  Any other alternative does not in any way realize or recognize the value inherent under the Plan.

### IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE AND BUSINESS OVERVIEW

####     A.        Global Aviation's Prepetition Organizational and Capital Structure



####     B.        Summary of the Global Aviation's Corporate History

Global Aviation's subsidiaries World Airways, Inc. ("***World***") and North American Airlines, Inc. ("***North American***") are each among the largest providers of airlift transport services for the United States military. World has been providing supplemental airlift services to the United States military since the Korean conflict in 1951.   In 1990, North American began flying passenger military missions.   Today, World and North American reflect the gold standard in providing safe and high quality service to the United States military.   Additionally, World and North American have developed reputations for safe and reliable commercial cargo and passenger services, which it provides to a broad customer base that includes major corporations, domestic and international airlines, logistic companies, presidential campaigns, sports teams, entertainers and production companies.   Notably, World provided charter services for the presidential campaigns of President George W. Bush, Secretary of State Hillary Clinton and President Barack Obama.

Global Aviation is the successor to ATA Holdings, Corp., which commenced cases under chapter 11 of the Bankruptcy Code in October 2004.   In January 2006, ATA Holdings, Corp. emerged from chapter 11 as New ATA Holdings, Inc. with an equity investment from MatlinPatterson Global Advisors LLC ("***MatlinPatterson***"), the plan sponsor in the ATA Holdings, Corp. chapter 11 cases and Global Aviation' prepetition majority equityholder.   Shortly thereafter, New ATA Holdings, Inc. changed its name to Global Aero Logistics Inc. ("***Global Aero***") and, on August

14, 2007, acquired World Air Holdings, Inc., the parent company of World and North American in an all cash transaction.  On April 2, 2008, ATA Airlines, Inc. ("*ATA*"), a subsidiary of Global Aero and affiliate of World and North American, commenced a case under chapter 11 of the Bankruptcy Code, discontinuing all business operations and conducting an orderly liquidation of its assets.  World and North American were generally unaffected by ATA's chapter 11 cases and continued to operate in the ordinary course of business.  Global Aviation was required to settle a number of parent guarantee obligations as a result of ATA's chapter 11 case.  In 2009, Global Aviation became the primary beneficiary of the ATA bankruptcy estate trust.  Furthermore, Global Aviation is currently the direct or indirect parent company of all of the other Debtors.  In early 2009, Global Aero changed its name to Global Aviation Holdings Inc. (*i.e.* Global Aviation) and later in the same year restructured its funded debt obligations.

### C.      Summary of Global Aviation's Prepetition Capital Structure

As of December 31, 2011, Global Aviation's outstanding long-term funded debt obligations were in the aggregate principal amount of approximately $245 million.  The $245 million of long-term debt consists primarily of: (a) $146.5 million outstanding under certain 14% senior secured notes due August 2013 (the "*Senior Secured Notes*"); (b) $98.1 million outstanding under a second lien term loan due September 2014 (the "*Second Lien Term Loan*"); (c) $170,000 outstanding under promissory notes with certain lessors (the "*Promissory Notes*"); and (d) $251,000 outstanding under a capital lease facility (the "*Capital Lease Facility*," and together with the Senior Secured Notes, the Second Lien Term Loan and the Promissory Notes, the "*Prepetition Debt Obligations*").  The chart below summarizes the Prepetition Debt Obligations; further details with respect to each of these debt obligations is provided below.   In addition, Global Aviation estimates that its trade creditors had outstanding prepetition Claims of approximately $109.1 million as of the Commencement Date.

| Debt Obligation | Original Amount | Approximate Amount Outstanding as of December 31, 2011 | Maturity Date | Security Status |
|---|---|---|---|---|
| **Senior Secured Notes** | $175 million | $146.5 million | August 15, 2013 | Secured |
| **Second Lien Term Loan** | $72.5 million | $98.1 million | September 29, 2014 | Secured |
| **Promissory Notes** | $6.1 million | $170,000 | February 5, 2012 | Unsecured |
| **Capital Lease Facility** | $625,000 | $251,000 | August 31, 2012 | Secured |

As of the Commencement Date, MatlinPatterson owned approximately 92.5% of the outstanding shares of Global Aviations' common stock, and certain affiliates of GSO Capital Solutions ("*GSO*"), the sole holder of the Second Lien Term Loan, owned approximately 2.6%.  The remaining 5% of Global Aviation's common stock is held by members of Global Aviation's senior management team and various investors.  While Global Aviation's equity is privately held, the Senior Secured Notes are publicly-traded.

23

### (i)        The Senior Secured Notes

In August 2009, Global Aviation, World and North American issued approximately $175 million of Senior Secured Notes due in August 2013.  The proceeds from the Senior Secured Notes were used to pay off a portion of obligations outstanding under a then existing credit agreement.  The Senior Secured Notes are governed by an indenture agreement, dated as of August 13, 2009, by and among Global Aviation, World and North American as issuers, the other Debtors as guarantors, the lenders party thereto (the "*Senior Secured Noteholders*") and Wells Fargo Bank, National Association as trustee and collateral agent (as amended, supplemented or modified from time to time, the "*Senior Secured Notes Indenture*").  In February of 2012, Deutsche Bank Trust Company Americas replaced Wells Fargo Bank, National Association as trustee and collateral agent.  The payment obligations under the Senior Secured Notes are secured by a first-priority lien on substantially all of the Debtors' assets.  The Senior Secured Notes provide for semiannual payments of interest in February and August at the rate of 14% per annum.  Additionally, the Senior Secured Notes provide for a semiannual requirement of Global Aviation to offer to prepay to the noteholders $10 million of the principal amount outstanding in June and December 2011.   Global Aviation complied with this requirement and offered to repurchase $10.0 million of Senior Secured Notes at par plus accrued interest in both June and December.  The Senior Secured Noteholders accepted the offer to repurchase in June and December.  Global Aviation's December 2011 repurchase obligation of $13.87 million (which includes an additional $3 million repurchase obligation as discussed below and approximately $870,000 in accrued interest), and its semiannual payment of $10.3 million is due on February 15, 2012, further implicating Global Aviation's need to commence these chapter 11 cases.

### (ii)        The Second Lien Term Loan

In September 2009, Global Aviation, World and North American entered into a $72.5 million Second Lien Term Loan, which matures in September 2014.  The proceeds from the Second Lien Term Loan were used to pay all remaining obligations outstanding under a then existing credit agreement.  The Second Lien Term Loan is governed by a credit agreement, dated as of September 29, 2009, by and among Global Aviation, World and North American as borrowers, the other Debtors as guarantors, the lenders party thereto (the "*Second Lien Lenders*") and Wells Fargo Bank, National Association as administrative and collateral Agent (as amended, supplemented or modified from time to time, the "*Second Lien Credit Agreement*").  The payment obligations under the Second Lien Term Loan are secured by a second-priority lien on substantially all of the Debtors' assets.  The Second Lien Credit Agreement provides for semiannual payments of interest in September and March at the rate of 12% per annum, and interest that accrues in kind at a rate of 6% per annum.  Additionally, in connection with the entry into the Second Lien Credit Agreement, Global Aviation issued warrants to the Second Lien Lenders that were immediately converted into 838,000 shares of common stock (approximately 3% of the outstanding common stock) of Global Aviation.

### (iii)        The Intercreditor Agreement

The trustee, administrative and collateral agents under the Senior Secured Notes and the Second Lien Credit Agreement are party to an intercreditor agreement dated August 13, 2009 (as amended, supplemented or modified from time to time, the "*Intercreditor Agreement*"), which generally provides for the subordination of the claims, liens and security interests of the Second Lien Lenders to the claims, liens and security interests of the Senior Secured Noteholders.  The Intercreditor Agreement also imposes certain limitations on:  (a) the rights and remedies available to the Second Lien Lenders so long as obligations under the Senior Secured Notes remain outstanding; and (b) the Second Lien Lenders' ability to challenge or contest the validity or priority of liens arising under the Senior Secured Notes Indenture.

### (iv)        Promissory Notes

Before ATA filed for chapter 11 protection, Global Aero, the predecessor in interest to Global Aviation, guaranteed a number of ATA's aircraft lease obligations.  As part of the consideration provided to the aircraft lessors in connection with a settlement of these guarantee obligations, Global Aero issued promissory notes.  The Promissory Notes were in the principal amount of $6.1 million to Wilmington Trust Company, as trustee under certain trust agreements with Babcock & Brown Air Funding I Limited.  The Promissory Notes require monthly interest payments at a rate of 8% per annum and matured on February 5, 2012.  As of the Commencement Date, the Debtors had one payment of approximately $170,000 outstanding under the Promissory Notes.

24

### *(v)* *Capital Lease Facility*

On July 22, 2009, Global Aviation leased certain telecommunications equipment from Cisco Systems Capital Corporation under the Capital Lease Facility. Under the terms of Capital Lease Facility, Global Aviation pays a specified amount of rent each month and, at the end of the term, has the right to purchase the equipment. The Capital Lease Facility term ends on August 31, 2012, and the monthly payments under the Capital Lease Facility are approximately $20,600. As of December 31, 2011, the Debtors had monthly payments totaling approximately $251,000 outstanding under the Capital Lease Facility.

### *(vi)* *The Amendment of the Senior Secured Notes Indenture and Second Lien Credit Agreement*

In March 2011, it became clear that Global Aviation would be unable to meet certain covenant requirements in the Senior Secured Notes Indenture and the Second Lien Credit Agreement. Specifically, Global Aviation was going to breach the minimum consolidated net cash flow covenant. As a result, Global Aviation negotiated and entered into an amendment and waiver of the Senior Secured Notes Indenture and Second Lien Credit Agreement, which primarily amended the definition of the minimum consolidated net cash flow covenant and enabled Global Aviation to avoid a default under the applicable agreements (the "*March 2011 Amendments*").

After the March 2011 Amendments, Global Aviation's operating performance did not improve and, as a result, in September 2011, Global Aviation negotiated and entered into a further amendment and waiver of the Senior Secured Notes Indenture and Second Lien Credit Agreement (the "*September 2011 Amendments*"). The September 2011, Amendments waived the minimum consolidated net cash flow covenant for the quarters ending September 30, 2011 and December 31, 2011, and required that Global Aviation reduce its annual aircraft lease expenses by a minimum of $18.0 million in 2012 and 2013. The September 2011 Amendments further required the consent of the majority of the Senior Secured Noteholders and the Second Lien Lenders to take certain actions during the waiver period, including the settlement or payment of outstanding material litigation.

Additionally, the September 2011 Amendments required Global Aviation to make supplemental offers (a) before September 24, 2011, and (b) no later than December 31, 2011, to repurchase up to $3.0 million principal amount of Senior Secured Notes (an aggregate of $6.0 million for both such supplemental offers) at par plus accrued interest. Global Aviation complied with the first requirement and repurchased $3.0 million of the Senior Secured Notes on October 31, 2011. Global Aviation offered to repurchase the additional $3.0 million before December 31, 2011, and the repurchase obligation was required to be funded on February 7, 2012, further implicating the Debtors' need to commence these chapter 11 cases. Moreover, pursuant to the September 2011 Amendments, a consent fee of $6.0 million is due under the Second Lien Term Loan upon maturity or any earlier acceleration of the obligations under the Second Lien Credit Agreement. The consent fee was added to the principal balance of the Second Lien Term Loan and remains outstanding.

### D.    Overview of Global Aviation's Business and Operations

Global Aviation's subsidiaries World and North American are leading providers of customized, non-scheduled passenger and cargo air transport services. As of the Commencement Date, World was headquartered in Peachtree City, Georgia, and North American was headquartered at JFK International Airport in Jamaica, New York. As discussed in more detail in Section VI.G, North American has subsequently relocated its headquarters to Peachtree City, Georgia. As of the Commencement Date, the combined aircraft fleet of World and North American consisted of 30 wide-body and narrow-body leased aircraft, which supported three primary business lines:

### *(i)* *Military Passenger and Cargo Services*

World and North American are both leading providers of United States military passenger and cargo air transportation services. Both airlines are part of the Civil Reserve Air Fleet ("*CRAF*"), a program that falls under the Department of Defense, in which airlines provide aircraft to the United States government in a national emergency. In return, the airlines receive entitlements to perform government contracts during peace time. Airlines participating in CRAF are often separated into teams based on their aircraft characteristics and capabilities. Both World and North American are part of the "Alliance Team," which primarily services long-range international missions. Military revenues are derived from mission awards granted to World and North American pursuant to a contract with the Air

25

Mobility Command (the "*AMC*").  The number of AMC missions allotted to each of World and North American depends on entitlement awarded for each aircraft that is committed by the Alliance Team members.  The two contracts between World and North American, respectively, and AMC represents the largest portion of each airline's annual revenue.

### *(ii)    Commercial Cargo Services*

World operates commercial cargo air transport service for commercial cargo customers through two contract structures:  (a) Aircraft, Crew, Maintenance and Insurance ("*ACMI*") contracts, whereby World only provides the aircraft, crew, maintenance and insurance to a customer for a fee and (b) full service contracts whereby World provides the aircraft, crew, maintenance, insurance, fuel, landing, ground handling and all other necessary operating services to a customer for an increased fee.

### *(iii)    Commercial Passenger Services*

Both World and North American operate passenger charter services to customers in specialty markets, such as providing supplemental peak capacity for other air carriers, corporations, political campaigns, professional sports teams, tour operators and concert tours.  World and North American provide their passenger charter services through both ACMI and full service contracts.

## V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

### A.    Events Leading to Chapter 11

### *(i)    Decreased Military Need, Reduced Military Rates and Schedule Reliability Penalties*

Both World's and North American's military operations have been negatively impacted by the decline in military demand.  The withdrawal of military troops from Iraq and Afghanistan reduced the demand for aircraft, causing World's and North American's revenues generated from its military passenger and cargo operations to plummet.  Combined, military passenger revenue for 2011 for World and North American decreased by approximately $80.2 million, or 11% as against 2010, and military cargo revenue for 2011 decreased by approximately $41 million, or 29% as compared against 2010.

Additionally, AMC hourly rates paid per mile under the 2011 AMC contract were down 5.2% for wide-body passenger aircraft, 5.5% for narrow-body passenger aircraft and 2.0% for large freighter aircraft as compared against the 2010 AMC contract.  The decline in rates was mainly due to a combination of lower costs from other airline carriers and changes in the AMC's allowable costs.  This resulted in a lower profit margin.

Source: Company Estimates



Furthermore, the 2011 AMC contract included new and increased requirements for on-time performance. In some instances, World and North American were unable to meet all of the increased requirements, and as a result, was penalized and lost the opportunity to fly certain missions. The lost missions also contributed to decreased revenues in the military sector.

### *(ii)    Labor Agreements*

As of the Commencement Date, World and North American had a combined total of approximately 2,000 employees, roughly 63% of whom were Union members. Five Union groups with five separate Collective Bargaining Agreements represent the employees at World and North American:

- World's pilots and flight attendants, who account for approximately 39% and 33% of the total workforce at World, respectively, are represented by the International Brotherhood of Teamsters (the "*IBT*") and are each subject to a separate Collective Bargaining Agreement.

- North American's pilots, who account for approximately 26% of the total workforce at North American, are represented by Airline Pilots Association ("*ALPA*") and are subject to their own Collective Bargaining Agreement.

- North American's flight attendants, who account for approximately 41% of the total workforce at North American, are represented by the IBT, but have not yet ratified a Collective Bargaining Agreement; this will be the first Collective Bargaining Agreement between NAA and its IBT-represented flight attendants.

- World's nine dispatchers are represented by The Transport Workers Union of America ("*TWU*"), which is affiliated with the AFL-CIO. These nine employees have their own Collective Bargaining Agreement.

The Collective Bargaining Agreements require the maintenance of several different health and welfare plans, as well as certain travel policies, less flexible work rules and fringe benefits for the various unionized employees.

27

Additionally, World participated in a multiemployer defined benefit pension plan for its flight attendants ("*IBT Pension Plan*"). The IBT Pension Plan was structured to place the financial burdens of all of the retirees under the plan upon several companies in the plans that have active union employees. This multiemployer plan was recently determined to be in "critical" status due to past plan participants leaving the plan, ultimately leaving the plan underfunded. As a result, World's obligations to the IBT Pension Plan increased by a 5% surcharge on its contributions.

World also maintains a target benefit plan for its cockpit crewmembers. Under the target benefit plan, an individual account is established for each plan participant and World contributes a fixed amount every year. The plan provides a "target benefit" payable as a lump sum, installment, or an annuity to begin at the participant's retirement. World's estimated annual contributions for the target benefit plan are approximately $4.8 million.

World's and North American's costly labor agreements had become unsustainable, making it difficult for Global Aviation to remain competitive in the marketplace. The Debtors intended to use the chapter 11 reorganization process to enter into negotiations with its unionized workforce and secure competitive and flexible labor agreements that help position Global Aviation for future success.

### *(iii)    Underutilization of Commercial Cargo Fleet*

In 2010, anticipating increased demand for cargo services, World decided to increase its 747 cargo fleet by two aircraft, with delivery to be complete in early 2011. While commercial cargo revenues in 2011 remained high as compared to 2010, market demand was not as high as anticipated due to unfavorable global economic conditions. As a result, these aircraft were not sold under ACMI contracts to commercial customers until the second quarter of 2011. Furthermore, because of weak customer demand of large wide-body freighter aircraft, World's large fleet of nine MD-11 freighters remained significantly underutilized. The underutilization of the commercial cargo fleet resulted in a higher costs per aircraft, further impairing Global Aviation's liquidity position.

### *(iv)    Global Aviation's Funded Debt Obligations*

As discussed in detail above, Global Aviation has outstanding Prepetition Debt Obligations of approximately $244 million. In 2011, Global Aviation's earnings before interest, taxes, depreciation and amortization ("*EBITDA*") substantially declined from $115.2 million in 2010 to $35.7 million. With EBITDA of $35.7 million, Global Aviation did not have the capacity to service $244 million of debt. Consequently, Global Aviation has engaged in extensive negotiations with its secured lenders, resulting in both the March 2011 and September 2011 Amendments. At the time, the Senior Secured Noteholders were amenable to the Amendments, in part, because of over $60 million in funds that Global Aviation anticipated receiving from a favorable money judgment, which funds were going to be used to repurchase the Senior Secured Notes. The Amendments enabled Global Aviation to ascertain its business outlook in regards to military demand, entitlement, world economic conditions and its aircraft capacity needs. In addition, a requirement of the Amendments was an offer to purchase an additional $3 million of the Senior Secured Notes on two different occasions, which constrained Global Aviation's liquidity situation. However, as Global Aviation has taken steps to prepare for a restructuring, it is unable to fund its upcoming offer and its interest payments due under the Senior Secured Notes and the Second Lien Term Loan, or meet the net consolidated cash flow covenants in March 2012. Additionally, as discussed below, Global Aviation's favorable money judgment was overturned on appeal, leaving Global Aviation with far less capital than it has anticipated, and little ability to further negotiate an out-of-court solution with its Senior Secured Noteholders. As a result, Global Aviation deemed that it was in the best interests of the business to commence these chapter 11 cases and effectuate a comprehensive restructuring.

### *(v)    Decreased Team Entitlement Share Partially Offset by Increased Global Entitlement Share*

Under the AMC contract for 2011, the Alliance Team, for which World and North American are primary flyers, was entitled to 43% of long-range international expenditures, down from 56% in the previous year. Beginning in January 2012, the Alliance Team's entitlement is 32%. As a result, World's and North American's AMC volume, as measured in hours, was lower than in 2010. However, World's and North American's respective entitlement shares increased from approximately 7% during 2010 to approximately 18% in 2011, allowing each airline to pay less in commissions to its teammates. The lost revenue generation caused by less entitlement was partially offset by the decrease in commission expense. Thus, even with increased entitlement share, World and North American were

unable to realize the same level of revenues as previous years due to the decrease in the Alliance Team's entitlement share.

### *(vi)*       *ATA Bankruptcy Estate Litigation*

As discussed above, Global Aviation is the primary beneficiary of the ATA bankruptcy estate.  On June 11, 2008, the ATA bankruptcy estate filed suit in the Federal District Court of Indiana against FedEx for a breach of contract claim.  Pursuant to ATA's chapter 11 plan, 85% of any damages recovered by ATA from FedEx were to be retained by the ATA estate and subsequently distributed to Global Aviation.  In 2011, the United States District Court for the Southern District of Indiana entered against FedEx a $71.3 million judgment, which FedEx appealed to the United States Court of Appeals for the Seventh Circuit.  On December 27, 2011, the Seventh Circuit reversed the judgment against FedEx and dismissed ATA's lawsuit.  The Debtors' petition for certiorari was recently denied.  As a result of the foregoing, the trustee of the ATA bankruptcy estate is in the process of dissolving ATA and terminating the bankruptcy trust.

After the district court decision, Global Aviation anticipated using the more than $60 million expected to be realized from the FedEx judgment to partially pay down the Senior Secured Notes.  Indeed, under the Senior Secured Notes Indenture, Global Aviation is obligated, for any ATA distribution above $5.0 million, to offer to repurchase amounts outstanding under the Senior Secured Notes.  While Global Aviation was well aware that a reversal of the FedEx litigation was a possibility, actual reversal (subject to the direct appeal) made Global Aviation's restructuring more difficult.

### B.       Global Aviation's Prepetition Restructuring Initiatives

Until 2011, World's and North American's military operations had long represented a consistent revenue base.  However, military revenues and related block hours declined sharply in 2011 due to lower entitlement, the end of the war in Iraq, the commencement of the withdrawal of troops from Afghanistan and decreased military contract rates.  Additionally, World saw a significant decline in commercial cargo demand due to the weakened global economic state, resulting in continued losses in the commercial sector.  The decreased demand for military and commercial cargo services, in conjunction with an overleveraged capital structure, underutilized capacity and excessive operational costs, contributed to a substantial decline in EBITDA from $115.2 million in 2010 to $35.7 million in 2011.

As a result of these difficulties, Global Aviation began initiatives to restructure its financial and business operations, making several difficult decisions to reduce costs and improve efficiencies.  In particular, these prepetition initiatives included:

- amending Global Aviation's Prepetition Debt Obligations (March 2011; September 2011);
- reducing the workforce;
- engaging in negotiations with World and North American's labor unions in an effort to achieve concessions;
- negotiating and amending Global Aviation's fuel payment plan with the Department of Defense;
- planning to reduce a significant portion of the Prepetition Debt Obligations with litigation proceeds; and
- renegotiating certain above-market aircraft leases.

Global Aviation's efforts to address its financial and operational issues were derailed when the FedEx judgment was reversed.  The inability to access immediate cash meant that Global Aviation would not be able to maintain its current fleet and employee level and fund its near-term Senior Secured Notes offer and interest obligations.  The lack of liquidity, combined with the complex issues facing Global Aviation's businesses, forced Global Aviation to commence these chapter 11 cases to facilitate a comprehensive restructuring.

In the weeks leading up to the Commencement Date, Global Aviation engaged in constructive discussions with its prepetition secured creditors and its equity sponsor.  Importantly, Global Aviation obtained from approximately 68% of its Senior Secured Noteholders the consent to use cash collateral, giving the Debtors access to much needed liquidity through the first several weeks of these chapter 11 cases.   During this time, the Debtors negotiated, and ultimately received approval of, postpetition access to debtor in possession financing.

## VI.    EVENTS DURING THE CHAPTER 11 CASES

On February 5, 2012 (the "***Commencement Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Commencement Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The following is a general summary of the chapter 11 Cases, including, without limitation, a discussion of the Debtors' restructuring and business initiatives since the commencement of the chapter 11 cases.

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor can reorganize its business for the benefit of itself, its Creditors and its interest holders. Chapter 11 also promotes equality of treatment for similarly situated Creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

### B.    First Day Pleadings and Other Case Matters

#### *(i)    First and Second Day Pleadings*

To facilitate the chapter 11 cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Commencement Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings resulted in the following orders[5]:

- Cash Collateral.  On February 6, 2012, the Bankruptcy Court entered an interim order approving the use of cash collateral to fund operations and restructuring costs [Docket No. 32].  This relief was necessary to ensure that the Debtors can continue to operate in the ordinary course during the chapter 11 cases.  The Bankruptcy Court entered a final order granting the relief requested on March 30, 2012 [Docket No. 311].  The Debtors' request for authority to obtain postpetition financing was not considered at the first hearing and is discussed in greater detail below in Article VI.D.*(i)*.

- Customer Programs.  On February 7, 2012, the Bankruptcy Court entered an order authorizing the Debtors to continue to maintain and administer their industry agreements and to pay and otherwise honor their industry agreement obligations in the ordinary course of business consistent with past practice [Docket No. 35].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 195].

- Employee Wages and Benefits.  On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses and (b) continue employee benefits programs [Docket No. 36]. The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 196].

- 503(b)(9), Lien and PACA Claimants. On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition claims of vendors that would

---

[5]    Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the respective First Day Pleadings.

30

otherwise be entitled to administrative claims under section 503(b)(9) of the Bankruptcy Code, (b) pay certain prepetition claims of certain essential mechanics and service providers and (c) timely and fully pay all claims arising, or of the type, under the Perishable Agricultural Commodities Act [Docket No. 33].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 194].

- Foreign Creditors. On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to pay, in their sole discretion, any prepetition claims owing to Foreign Creditors [Docket No. 34].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 202].

- Fuel Vendors. On February 7, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) apply prepetition payments to prepetition and postpetition obligations under fuel supply contracts, (b) pay prepetition amounts owed to fuel supply parties and (c) honor, perform, and exercise their rights and obligations under fuel supply arrangements [Docket No. 37].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 197].

- Cash Management.  On February 6, 2012, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, and existing business forms [Docket No. 31].  The Bankruptcy Court entered a final order granting the relief requested on March 8, 2012 [Docket No. 193].

- Taxes.  On March 8, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to pay certain prepetition taxes and fees in the ordinary course of business [Docket No. 199].  Such payments only affect the timing of payment for the vast majority of the amounts at issue.

- Insurance.  On March 8, 2012, the Bankruptcy Court entered a final order authorizing the Debtors to (a) continue their prepetition insurance Policies and honor obligations thereunder and (b) revise, extend, supplement, or change their insurance coverage by, among other things, entering into new insurance policies through renewal of the current Insurance Policies or purchase of new postpetition policies [Docket No. 198].

### *(ii)    Procedural and Administrative Motions*

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions including orders:

- authorizing the joint administration of the chapter 11 cases;

- approving notice, case management, and administrative procedures to govern the chapter 11 cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors;

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business;

- determining the amount and nature of the adequate assurance payment for future utility service; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the chapter 11 cases.

31

### *(iii)*        *Retention of Chapter 11 Professionals*

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the chapter 11 cases.  These professionals include: (a) K&E, as counsel to the Debtors; (b) Rothschild, Inc. ("*Rothschild*"), as investment banker to the Debtors; (c) Kurtzman Carson Consultants LLC, as the Notice and Claims Agent for the Debtors; (d) Ernst & Young LLP, as Tax Advisor for the Debtors; (e) Ford & Harrison LLP, as Special Labor Counsel for the Debtors; and (f) Pachulski Stang Ziehl & Jones LLP, as Conflicts Counsel for the Debtors.

### *(iv)*        *Appointment of the Creditors' Committee Members and Counsel for Such Committee*

On February 13, 2012, the United States Trustee for Region 2 (the "*U.S. Trustee*") appointed the following individuals to the Creditors' Committee:  (a) Specialized Freight Forwarders BV; (b) International Brotherhood of Teamsters, Airline Division; (c) Local 210's Pension Fund; (d) Airline Pilots Association, International; (e) Goodrich Corporation; (f) HEMW, LLC; and (g) World Fuel Services, Inc. [Docket No. 65].  On April 16, 2012, the Bankruptcy Court entered an order [Docket No. 349] authorizing the retention of Lowenstein Sandler PC as counsel to the Creditors' Committee.  On May 9, 2012, the Bankruptcy Court entered an order authorizing the Creditors' Committee to retain Imperial Capital, LLC as its financial advisor [Docket No. 372].

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases. The Debtors have kept the Creditors' Committee informed of, and have conferred with the Creditors' Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Creditors' Committee to the extent its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Creditors' Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

### C.        Pending Litigation Proceedings and the Automatic Stay

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.  Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these chapter 11 cases.  With certain limited exceptions, the automatic stay remains in effect until the Effective Date of the Plan.

During these chapter 11 cases, the Debtors have entered into certain stipulations (subsequently approved by the Bankruptcy Court) with certain parties in interest in order to facilitate the resolution of prepetition disputes without materially affecting the Debtors and their assets, including stipulations with certain individual defendants modifying the automatic stay to allow them to proceed with certain counterclaims in prepetition state court litigation in order to resolve a state court proceeding and potentially increase the assets of the Debtors' estates [Docket No. 508].

In addition, the Debtors' liability with respect to litigation stayed by the commencement of these chapter 11 cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these chapter 11 cases.

### *(i)*        *WARN Act Adversary Proceedings*

On February 6, 2012, Plaintiff Sarah Hill, on behalf of herself and all others similarly situated (the "*First WARN Claimants*"), filed an adversary class action complaint in the Bankruptcy Court for the Eastern District of New York (the "*First WARN Adversary Proceeding*"); the complaint was originally filed on February 3, 2012 in the Northern District of Georgia.  The First WARN Adversary Proceeding asserted that the Debtors violated the Worker

32

Adjustment and Retraining Notification Act (the "*WARN Act*") on or about January 3, 2012 by allegedly terminating the First WARN Claimants as part of mass layoffs, without giving the necessary 60 days notice required by the WARN Act.  The First WARN Claimants sought, amongst other things, administrative expense treatment of their claim and a judgment against the Debtors for unpaid wages, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension and 401(k) contributions and other ERISA benefits.  On May 15, 2012, the Debtors filed their Motion to Dismiss First WARN Claimants' complaint.  Pursuant to numerous discussions between the First WARN Claimants and Debtors, the First WARN Claimants agreed to withdraw their First WARN Adversary Proceeding and the Debtors stipulated to the First WARN Claimants' class certification and ability to file a class proof of claim through the claims adjudication process, not the adversary proceeding process.  The Debtors filed an objection to the First WARN Claimants' class proof of claim on October 9, 2012 [Docket No. 639].

On July 30, 2012, Plaintiffs Daniel Schroeder and Charles Martin, Jr., on behalf of themselves and all others similarly situated (the "*Second WARN Claimants*"), filed an adversary class action complaint in the Bankruptcy Court for the Eastern District of New York (the "*Second WARN Adversary Proceeding*").  The Second WARN Adversary Proceeding asserts that the Debtors violated the WARN Act on or  about March 31, 2012 through June 8, 2012 by allegedly terminating the Second WARN Claimants—all of whom are pilots based in Missouri— as part of mass layoffs, without giving the necessary 60 days notice required by the WARN Act.  The Second WARN Claimants seek, amongst other things, a judgment against the Debtors for unpaid wages, salary, commissions, bonuses, accrued holiday pay, accrued vacation pay, pension contributions, other ERISA benefits and administrative expense treatment of their claim.  The Debtors filed their answer the Second WARN Claimants' complaint on September 21, 2012 stating their belief that the allegations set forth therein are baseless and that the Debtors are without liability [Docket No. 9].

### (ii)     Creditors' Committee Lien Litigation

**On  October  16,  2012,  the  Creditors'  Committee  filed  the  *Motion  of  the  Official  Committee  of Unsecured Creditors for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtors' Estates*  (the "*Motion to Prosecute*") [Docket No. 662] . The Motion to Prosecute seeks standing to prosecute  an  adversary  proceeding  challenging  the  Senior  Secured  Noteholders'  and  Second  Lien  Lenders' interests  in  the  Debtors'  property  acquired  after  the  Commencement  Date.   On  October,  16,  2012,  the Creditors'  Committee  also  filed  the  Official  Committee  of  Unsecured  Creditors'  Motion  (A)  For  an  Expedited Hearing and (B) to Shorten the Notice Period with Respect to the Motion of the Official Committee of Unsecured Creditors for an Order Authorizing the Committee to Prosecute Certain Causes of Action on Behalf of the Debtors' Estates (the "*Motion to Shorten*") [Docket No. 662], seeking to have the Motion to Prosecute heard as soon as practicable.**

**The Bankruptcy Court heard the Motion to Shorten on October 17, 2012, at the Disclosure Statement Hearing.  Based on discussions at the Disclosure Statement Hearing, the Bankruptcy Court determined that the Motion to Prosecute would be heard on October 24, 2012.  The Bankruptcy Court set the deadline for the Debtors'  response  to  the  Motion  to  Prosecute  on  October  22,  2012,  and  the  deadline  for  the  Creditors' Committee's reply on October 23, 2012.  The Debtors plan to contest the Creditors' Committee' standing.**

### D.       The Debtors' Transition into Chapter 11.

Upon entering chapter 11, the Debtors focused their efforts on minimizing any disruptions to the Debtors' business operations.  This required the Debtors to address a series of threshold issues, including (a) securing postpetition financing; (b) reaching a consensual arrangement with the United States (as defined herein), which provided the Debtors with much needed liquidity; (c) approving  the Debtors' surety bond program; and (d) significantly rationalizing their aircraft fleet and negotiating new commercial agreements, all without affecting the customer experience.  After achieving these goals, the Debtors could turn their attention to relocating North American's headquarters, negotiating labor savings from the Unions and maximizing the value of the enterprise for the benefit of all stakeholders.

### (i)       Postpetition Financing

The Debtors commenced these chapter 11 cases with limited liquidity.  Consequently, at the outset of these cases the Debtors negotiated to secure the continued use of cash collateral on a consensual basis with the Debtors'

prepetition secured lenders.  As stated previously, the Debtors obtained interim approval to use cash collateral to operate their businesses at the first day hearing.  However, the use of cash collateral alone was not sufficient to allow the Debtors to operate their business throughout the chapter 11 cases.   Indeed, it became evident soon after the commencement of these chapter 11 cases that the Debtors would need the new money financing to prosecute these chapter 11 cases.  Unlike most chapter 11 cases where postpeititon financing is negotiated and obtained before commencing chapter 11 cases; here, the Debtors entirely commenced the postpetition financing process after commencing their chapter 11 cases.

The interim use of cash collateral, therefore, acted as a bridge to securing post-petition financing which, once secured, would enable the Debtors to operate their businesses and prosecute these chapter 11 cases going-forward. Leading up to and immediately following the Commencement Date, the Debtors worked closely with their financial advisor, Rothschild, to identify potential sources of postpetition financing.  On February 24, 2012, the Debtors submitted a motion seeking authority to obtain up to $45 million (no less than $15 million on an interim basis) in secured postpetition financing (the "*DIP Facility*") under an agreement (as amended, supplemented, and modified from time to time, the "*DIP Agreement*") between the Debtors and IN-FP2 LLC and its affiliated entities, certain funds and accounts managed by Guggenheim Investment Management, LLC, and its affiliates, certain funds and accounts managed by Beach Point Capital Management LP, Chatham Credit Management III, LLC and funds managed by Stonehill Capital Management LLC (together with certain of their affiliates, the "*DIP Lenders*").

On March 1, 2012, the Bankruptcy Court entered an interim order [Docket No. 158] (the "*Interim DIP Order*") approving the DIP Facility.  On March 30, 2012, the Bankruptcy Court entered a final order [Docket No. 311] (the "*Final DIP Order*") approving the DIP Facility on a final basis.  The Final DIP Order provided the Debtors with the authority to use the proceeds from the DIP Facility to permit the orderly continuation and operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs.

### *(ii)    Stipulation with the United States*

Upon commencement of the chapter 11 cases, and as a result of outstanding fuel obligations owed by the Debtors to the United States of America (the "*United States*"), the Department of Defense (the "*DOD*") placed a hold on the approximately $38.5 million in prepetition receivables due and owing to the Debtors on account of prepetition missions that the Debtors flew for the United States Military.  This hold constrained the Debtors' liquidity and, absent the release of the funds, the Debtors would have violated their interim cash collateral budget covenant.

Over the course of the first weeks of these chapter 11 cases, the Debtors negotiated and entered into a stipulation with the United States (the "*U.S. Stipulation*"), which was approved by the Court, whereby the United States released approximately $18.5 million to the Debtors, in exchange for certain protections to ensure that the United States preserves all of its rights, including the DOD withholding approximately $20 million in prepetition receivables  [Docket No. 201] (the "*Holdback Reserve*").  In addition, the U.S. Stipulation provided for an ongoing plan for the Debtors to continue to pay down their outstanding obligations in exchange for further release of prepetition receivables from the United States.

To date, the Debtors and the United States have been following the plan laid out in the U.S. Stipulation, reducing both receivables owed to the Debtors as well as their outstanding obligations owed to the United States.  On July 9, 2012, the Bankruptcy Court approved the first amendment to the Stipulation (the "*First U.S. Stipulation Amendment*") whereby the DOD agreed to release approximately $1 million from the Holdback Reserve in exchange for certain protections to ensure that the DOD preserves all of its rights. On July 18, 2012, Global Aviation submitted to the Bankruptcy Court the second amendment to the Stipulation (the "*Second U.S. Stipulation Amendment*"), whereby the DOD agreed to release approximately $1.2 million from the Holdback Reserve in exchange for certain protections to ensure that the DOD preserves all of its rights.

On August 8, 2012, Debtors submitted to the Bankruptcy Court the third amendment to the Stipulation (the "*Third U.S. Stipulation Amendment*"), whereby the DOD agreed to setoff approximately $3 million from the Holdback Reserve against Global Aviation's July 30, 2012 $3 million of outstanding fuel obligation payments.  The Prepetition DLA-Energy Agreement currently requires all outstanding fuel obligation payments be completed by September 2012.

On October 16, 2012, the Debtors submitted a fourth amendment to the Stipulation (the "*Fourth U.S. Stipulation Amendment*") which provides for the full setoff of the Reserve against all outstanding fuel obligation payments and returns the Debtors to normal credit terms (*i.e.*, paid in arrears at the beginning of each month for actual fuel use during the prior month) [Docket No. 661].

### *(iii)    Surety Bond Program*

In the ordinary course of business, the Debtors engage in certain activities that require them to provide financial assurance of payment to third parties. A common and reasonable means to do so is through the issuance of surety bonds. Specifically, the Debtors, in the ordinary course of business, regularly issue surety bonds for the benefit of the U.S. Customs Service because such bonds are required by law for an air carrier engaged in international commerce.

Additionally, the Debtors post bonds in order to (a) secure landing rights at certain airports, (b) guaranty lease payments on rental areas at certain airports and (c) guaranty certain other taxes and fees related to the Debtors' operations. Failure to provide, maintain or timely replace these surety bonds could jeopardize the Debtors' ability to conduct their business operations.

Prior to the Commencement Date, the Debtors maintained a surety bond program (the "*Prepetition Surety Bond Program*") with Travelers Casualty & Surety Company ("*Traveler*") under which Travelers issued certain surety bonds in the ordinary course of business for the benefit of the Debtors. As of the Commencement Date, Travelers had issued surety bonds in an amount of approximately $1,040,686 that were secured by approximately $1,076,995 in letters of credit posted by the Debtors (the "*Existing Collateral*").

On April 17, 2012, the Debtors filed a motion to enter into a postpetition surety bond program with Travelers [Docket No. 351] (the "*Postpetition Surety Bond Program*"). The Postpetition Surety Bond Program provided the continuation of the Debtors' outstanding surety bonds as well as the ability to issue additional surety bonds upon the posting of additional collateral and approval by the Bankruptcy Court. In addition, the Debtors were required to execute a new indemnity agreement. The Postpetition Surety Bond Program was approved by the Bankruptcy Court on May 9, 2012 [Docket No. 375].

### *(iv)    Fleet Rationalization and Restructuring*

#### (a)    Fleet Rationalization

Subject to Bankruptcy Court approval, the Bankruptcy Code permits an airline debtor to reject leases of aircraft equipment and abandon or sell owned aircraft equipment. As of the Commencement Date, World and North American were, combined, parties to 30 aircraft leases. In addition, as of the Commencement Date, the market values of many of the Debtors' aircraft had declined substantially since the aircraft were originally leased or financed. Consequently, the Debtors were paying above market costs for many of their aircraft.

Prior to and after the Commencement Date, the Debtors and their advisors undertook extensive analysis of the Debtors' contemplated post-emergence fleet structure. On the first day of the Debtors' chapter 11 cases, pursuant to section 365 of the Bankruptcy Code, the Debtors filed a motion to reject 16 aircraft leases that were burdensome to the estates [Docket No. 19] (the "*First Omnibus Rejection Motion*"). Subsequent to First Omnibus Rejection Motion, the Debtors filed 4 additional omnibus motions seeking to reject certain aircraft, engine and equipment leases deemed non-essential to their go-forward operations and post emergence business plan. [Docket Nos. 133, 352, 371 & 391].

#### (b)    Section 1110

In general, upon the filing of a chapter 11 bankruptcy petition, the automatic stay under section 362 of the Bankruptcy Code enjoins the enforcement of rights and remedies by a debtor's creditors. Section 1110 of the Bankruptcy Code operates as an exception to the automatic stay for certain types of leased or financed aircraft and aircraft equipment. Under this section, certain secured parties, lessors and conditional sales vendors may take possession of certain qualifying aircraft, aircraft engines or other aircraft-related equipment that are leased or subject

35

to a security interest or conditional sale contract pursuant to their agreement with the debtor. Section 1110 of the Bankruptcy Code provides that, unless a debtor agrees to perform under the agreement and cure all defaults other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code within 60 calendar days after filing for bankruptcy, secured parties and lessors can take possession of such equipment.

Section 1110 of the Bankruptcy Code effectively shortens the automatic stay period to 60 days with respect to section 1110-eligible aircraft, engines and related equipment, subject to the following two conditions: (i) the debtor may elect, with court approval, to perform all of the obligations under the applicable financing and cure any defaults thereunder as required by the Bankruptcy Code (which does not preclude later rejecting any related lease or abandoning any owned aircraft) (an "*1110(a) Election Notice*") or (ii) the debtor may extend the 60-day period by agreement of the relevant financing party with court approval (an "*1110(b) Stipulation*"). In the absence of either such arrangement, the financing party or lessor may take possession of the property and enforce any of its contractual rights or remedies to sell, lease or otherwise retain or dispose of such equipment.

In the chapter 11 cases, the 60-day period under section 1110 of the Bankruptcy Code expired on April 5, 2012 (the "*Section 1110 Expiration Date*"). In light of the Section 1110 Expiration Date, the Debtors worked diligently and quickly to analyze their fleet needs and undertake the steps necessary to preserve their operating infrastructure. In particular, the Debtors successfully sought entry of a consensual order establishing procedures under section 1110 of the Bankruptcy Code to enter into 1110(b) Stipulations and provide 1110(a) Election Notices. [Docket No. 245].

Subsequent to entry of the procedures order, the Debtors engaged in discussions with all of their aircraft lessors, and ultimately entered into and filed a number of 1110(b) Stipulations, preserving their ability to use their leased aircraft and engines subsequent to expiration of the 60-day period under section 1110. [Docket Nos. 357-60, 413, 416, 433, 435, 461, 462]. The Debtors have also elected to continue performance under a number of their prepetition leases and have filed corresponding 1110(a) Election Notices [Docket Nos 287, 325, 326].

### E.    The Exclusivity Motions

Section 1121(b) of the Bankruptcy Code establishes an initial period of 120 days after the Bankruptcy Court enters an order for relief under chapter 11 of the Bankruptcy Code, during which only the debtor may file a plan of reorganization (the "*Exclusive Periods*"). If the debtor files such a plan within that initial 120-day period, section 1121(c)(3) of the Bankruptcy Code extends the exclusivity period by an additional 60 days to permit the debtor to seek acceptances of such plan. Section 1121(d) of the Bankruptcy Code also permits the Bankruptcy Court to extend these exclusivity periods, within certain limitations, "for cause." On September 20 2012, the Debtors filed their second motion to extend the Exclusive Periods [Docket No. 583].

On May 11, 2012, the Debtors filed their first motion to extend the Exclusive Periods [Docket No. 379] (the "*First Exclusivity Motion*") seeking to extend the exclusive filing period and the exclusive solicitation period through and including October 2, 2012, and December 3, 2012, respectively [Docket No. 379]. The Bankruptcy Court approved the First Exclusivity Motion on June 1, 2012 [Docket No. 401]. Having secured an extension of their Exclusive Periods, the Debtors were able to focus on achieving certain labor cost savings.

On September 10, 2012, the Debtors filed their second motion to extend the Exclusive Periods [Docket No. 379] (the "*Second Exclusivity Motion*") seeking to extend the exclusive filing period and the exclusive solicitation period through and including December 31, 2012, and March  1, 2013, respectively [Docket No. 583]. The Bankruptcy Court approved the Second Exclusivity Motion on September 25, 2012 [Docket No. 624], allowing the Debtors to focus their efforts to achieve consensual approval on the Plan and Disclosure Statement.

### F.    365(d)(4) Extension

By order dated June 1, 2012, the Bankruptcy Court extended the time to assume or reject unexpired leases of nonresidential real property pursuant to section 365(d)(4) of the Bankruptcy Code through and including September 2, 2012. [Docket No. 402]. The Debtors currently have extensions of the time to assume or reject under section 365(d)(4) of the Bankruptcy Code in connection with one unexpired lease of nonresidential real property, and the

Debtors have assumed or rejected, as appropriate for their businesses, the remaining unexpired leases of nonresidential real property. [Docket Nos. 546 and 548].

### G.    NAA Relocation

The Debtors, as part of their reorganization strategy, decided to relocate North American's operations from JFK International Airport to Peachtree City, Georgia (the "*North American Relocation*").  To relocate operational control from Jamaica, New York, to Peachtree City, Georgia, North American was required to demonstrate to and receive approval from the FAA that its key operating systems and programs supporting its operations, maintenance and safety departments were functioning as consistently at the new location as they were at the original location.

The personnel who oversaw and managed the movement of these required systems and programs, and who ultimately certify the systems and programs, are required to be employed by North American Airlines pursuant to section 119 of the United States Federal Aviation Regulations (the "*FAA Regulations*").  In particular, section 119.65 of the FAA Regulations provides that a "certificate holder must have qualified personnel serving full-time in the following or equivalent positions: (1) Director of Safety, (2) Director of Operations, (3) Chief Pilot, (4) Director of Maintenance and (5) Chief Inspector" (the "*Section 119 Employees*").  14 C.F.R. § 119.65.  Additionally, section 119.67 of the FAA Regulations specifically provides for the extensive training and experience necessary for each applicable employee to be qualified as a Section 119 Employee.  *See* 14 C.F.R. § 119.67.

On June 15, 2012, the Debtors filed a motion for the entry of an order approving a key employee retention plan (the "*KERP*") pursuant to §§ 363(b) and 503(c)(3) of the Bankruptcy Code.  The KERP pays bonuses to North American's Section 119 Employees.  On July 24, 2012, the Bankruptcy court entered an order approving the Debtors' KERP [Docket No. 512].

On August 9, 2012, the Debtors filed a motion to reject the lease for their operations at JFK International Airport [Docket No. 526].  The Bankruptcy Court approved the motion on August 24, 2012 [Docket No. 548].

### H.    Senior Management Team

The senior management team of Global Aviation Holdings Inc. has remained in place during the course of the chapter 11 cases.  On the Effective Date, the members of the senior management team will enter into New Employment Agreements with the Reorganized Company and it is anticipated that the senior management team will continue to work for Global Aviation in their current capacities.  Biographical information for the members of the senior management team is set forth below:

- **Robert R. Binns** -- *Chairman & Chief Executive Officer*: Robert R. Binns was appointed Chairman of Global Aviation Holdings Inc., in June 2010. He was named Chief Executive Officer of Global Aero Logistics Inc. (now Global Aviation) in April 2008. He had served as Chief Marketing Officer of Global Aero Logistics since September 2007 and had previously served as Chief Marketing Officer of World Air Holdings from August 2005 to September 2007. He joined World Airways in April 2004 as Senior Vice President of Marketing and Planning. Prior to joining World, Mr. Binns was President and Chief Executive Officer of TransMeridian Airlines from April 2002 to April 2004 and previously had been its Chief Financial Officer from December 2001 to April 2002. Mr. Binns was Vice President and Controller for the technical division of Pegasus Aviation from April 2000 through December 2001, and also spent several years with TWA in a variety of positions, including General Auditor. Prior to that he worked as an auditor for the accounting firm of KPMG in London. Mr. Binns began his career with a political lobbying firm in London that specialized in transportation issues. He holds an MBA in Finance from the University of Kansas and a Master's degree in Political Behavior from Essex University in England. He has served since 2007 on the Carter Center Board of Councilors, which serves to advance understanding of and support for The Carter Center and its activities. Members attend quarterly meetings with President Carter and act as informed advocates of The Carter Center.

- **Charles P. McDonald** -- *President*: Charles P. McDonald was appointed President of Global Aero Logistics Inc. in April 2008 after serving as Executive Vice President and Chief Airline

Officer since February 2008. He previously served as Senior Vice President and Chief Operating Officer of World Airways from April 2005 to September 2007. His responsibilities include Flight Operations, Aircraft Maintenance and Engineering, In-Flight Services, Customer Service, Safety and Human Resources. He first joined World in May 2004 as Senior Vice President of Operations. Mr. McDonald has more than 20 years of aviation experience, including Chief Operating Officer of TransMeridian Airlines from 1999 through 2004. Prior to this position, Mr. McDonald held senior-level positions with British Aerospace Regional Aircraft from 1995 to 1999 and the AMR Corporation, including Director of Aircraft Maintenance for Flagship Airlines from 1988 through 1995.

- **William A. Garrett** -- *Chief Financial Officer*: William A. Garrett joined Global Aero Logistics Inc. in November 2007 as Executive Vice President and Chief Financial Officer. During 2007, Mr. Garrett was previously employed by MatlinPatterson Global Advisors LLC, providing senior advisory and restructuring management services to its international aviation investments. MatlinPatterson is currently Global Aviation's majority shareholder. Prior to joining MatlinPatterson, from 2000 through 2006, Mr. Garrett served as Chief Operating Officer and previously as the Chief Financial Officer of Gemini Air Cargo, an international cargo airline operating wide-body, freighter aircraft. He served as the Chief Financial Officer of Vanguard Airlines, Inc. a domestic passenger airline, from 1996 through 1999. Prior to entering the airline industry, Mr. Garrett spent nine years in public accounting providing accounting, auditing, merger, acquisitions and transactional services, most recently with Ernst & Young LLP and initially with PriceWaterhouse Coopers LLP. While in public accounting, Mr. Garrett had a concentration in transportation and high-growth companies in the public and private sectors. Mr. Garrett holds a B.S. in Business Administration and Accounting from Washington and Lee University.

- **Brian Bauer** -- *Chief Commercial Officer*: Brian Bauer has served as Global's Executive Vice President and Chief Commercial Officer since June 2010. His responsibilities include business and market development; market research and planning; strategic direction for passenger and cargo sales; and corporate planning. Mr. Bauer has more than 21 years of aviation experience. Prior to joining Global Aviation, Bauer served as President of Evergreen International Airlines from 2006 to June 2010. Prior to this position, Mr. Bauer served in a variety of management and executive positions at Evergreen Aviation Ground Logistics Enterprises, including President, Executive Vice President and Vice President of Operations.

- **Brian S. Gillman** -- *General Counsel & Corporate Secretary*: Brian joined Global Aviation Holdings Inc. as Senior Vice President, General Counsel & Corporate Secretary in February 2011. Prior to joining Global, he served as Executive Vice President and General Counsel for Mesa Air Group, Inc. since 2001. Prior to Mesa Air Group, he served as Vice President, General Counsel and Corporate Secretary for Vanguard Airlines, Inc. from 1996 to 2001. Prior to joining Vanguard Airlines, he was an Associate Attorney in the Corporate Department of Stinson, Mag & Fizzell, one of Kansas City's largest full service law firms at the time. Brian has more than 15 years of aviation experience with publicly traded companies. He has extensive experience in complex commercial litigation management, contract negotiations including complex aircraft and engine leasing involving a wide range of structures and financing sources, public and private debt and equity financing, and significant international joint venture experience. Brian obtained his Juris Doctor degree from The University of Iowa College of Law and holds a B.B.A. in Accounting from The University of Iowa.

Before the Commencement Date, and in the ordinary course of their business, the Debtors maintained an incentive and retention program for certain members of their senior management team. The program applied to five senior managers and consisted of annual bonuses based on achieving certain goals and achieving certain performance targets, payable upon finalization of the annual financial results. This opportunity to earn an annual bonus was set forth in each of the senior managers' employment agreements. The program was administered by the Debtors' compensation committee (the "*Compensation Committee*") of the board of directors of Global Aviation Holdings Inc. (the "*Board*") and the Compensation Committee retained discretion to take into account the facts and circumstances

38

surrounding the Debtors' business and the value added by senior management in awarding annual bonuses.  Thus, the Compensation Committee could — and in the past, did — revise performance targets on a retroactive basis to ensure that the senior management team was properly compensated and incentivized.  This is necessary as much of the Debtors' governmental business is dependent on the military's needs and, consequently, the senior management team must react quickly to the military's increase or decrease of troop levels and needs.  The senior management bonuses, combined with annual salaries, were intended to pay senior managers a market level of compensation.

As discussed above, in 2011, the Debtors' business was adversely impacted by the end of the Iraq war and by the announcement that troops would be withdrawn from Afghanistan.  This subsequently reduced the number of missions the military required.  Additionally, due to the global recession, the Debtors suffered a significant decrease in demand for commercial cargo services, resulting in a substantial decline in commercial revenues.  The decrease in military and cargo service demand, coupled with unionized high labor and fixed costs, excess aircraft (due to military cutbacks) and an overleveraged balance sheet, had a dramatic and negative impact on the Debtors' business, which required senior management to focus on stabilizing the Debtors' business and preserving value.

Based on this, the Compensation Committee determined that, despite missing performance targets, which were impossible to meet due to the military cutbacks, year-end bonuses were warranted due to management's strong efforts in stabilizing the business.  However, the Compensation Committee's past practice was to pay bonuses for prior years in early April of the current year, after the previous year's financial results were finalized.  As the Debtors commenced these chapter 11 cases on February 5, 2012, the Compensation Committee decided against breaking with past practice and did not authorize the payment of annual bonuses.

In addition, acknowledging the sacrifices that the Debtors would ask of their unionized workforce to bring the Debtors' labor costs more in line with their competitors, the senior management team voluntarily took a 10% base salary pay cut before the Commencement Date.  The senior management team has managed the Debtors' estates throughout the course of the chapter 11 cases at these reduced base salary levels and without a bonus.

During the chapter 11 cases, the Compensation Committee considered proposing a key employee incentive plan ("*KEIP*") and filing a motion to approve same.  Specifically, the Compensation Committee developed an incentive bonus plan for senior management in conjunction with Towers Watson ("*Towers*"), the Debtors' compensation consultants, Kirkland & Ellis LLP, the Debtors' legal counsel, and Rothschild, Inc., the Debtors' financial advisors.  The KEIP was designed to incentivize management to drive value through the Debtors' retaining security clearance with the military, increasing revenue and increasing EBITDA.  The Compensation Committee reviewed and pressure tested the proposed KEIP to ensure that it would reach the goal of increasing the Debtors' value.

During the course of evaluating the KEIP, the Debtors reached out to the DIP Lenders and First Lien Noteholders to solicit their opinion on the proper structure and timing of the KEIP.  The Debtors' also provided the KEIP to the Creditors' Committee who indicated that they would not support such a plan at that time.  After extensive review and deliberation, and with the support of the DIP Lenders and First Lien Noteholders, the Board, at the recommendation of the Compensation Committee, again determined that the best course of action was to postpone paying bonuses to the senior management team.  Specifically, the Board did not want to disrupt the progress being made in its chapter 11 cases.

Over the course of the chapter 11 cases, the Compensation Committee continued to evaluate, in conjunction with the DIP Lenders and First Lien Noteholders, ways to properly incentivize the senior management team leading up the filing of the Disclosure Statement.   After consulting with the DIP Lenders and First Lien Noteholders, the Compensation Committee determined that that the best course of action was for the senior management team to enter into New Employee Agreements, the terms of which are being negotiated with the First Lien Noteholders, and for the Debtors' to implement a Management Equity Incentive Plan.

The Management Equity Incentive Plan provides for 10% of the fully-diluted New Common Stock (which shall not dilute the Employee Equity Pool provided for in the Employee Equity Plan), to be reserved for issuance  to certain of the Debtors' Executives and Employees, as determined by the Reorganized Global Aviation Board.

Certain terms of the Management Equity Incentive Plan shall be included in the Plan Supplement. The Debtors believe that the 10% of New Common Stock reserved under the Management Equity Incentive Plan is in line with industry and market norms.[6]  In addition, on the Effective Date, the senior management team will enter into New Employment Agreements with the Reorganized Debtors, the terms of which will govern salary, bonuses and other compensation.

### I.    Composition of New Board of Directors

The New Global Aviation Board shall be chosen through a process led by the Board Selection Committee. The Board Selection Committee may, at its election, retain a qualified search firm, paid for by the Debtors, to identify director candidates.  The Board Selection Committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the Debtors' Chief Executive Officer). If the Board Selection Committee is unable to reach consensus on a slate of directors, the directors shall be named by Holders of the New Common Stock in proportion of their ownership, with two directors named by the Qualified Represented Employees or Non-Executive, Non-Management Employees based on a majority vote of such Employees within the Employee Equity Pool.  All directors selected shall be qualified and shall not be employees or members of the IBT or any other labor organization.

In addition, the New Global Aviation Board shall also include one non-voting board member identified by IBT and one non-voting board member identified by ALPA.  The non-voting board member or members shall be qualified and shall not be Employees or members of any labor organization.  One year after the appointment of the New Global Aviation Board, the New Global Aviation Board will consider in good faith whether to add the non-voting board members to the New Global Aviation Board as board members, provided that doing so (if the New Global Aviation Board decides to do so) will neither increase the size of the New Global Aviation Board nor affect the Employee Equity Pool's ability to select two directors, and provided that if the New Global Aviation Board adds one of the non-voting board members it must appoint the other.

ALPA believes the foregoing description regarding the possible addition of the non-voting members as voting members is inconsistent with the ALPA LOA therefore the proposed plan may not be consistent with the ALPA LOA.

### J.    Labor Cost Restructurings

#### *(i)    The Union Negotiations and Tentative Agreements*

Unsustainable labor costs were a primary factor in the Debtors' bankruptcy filing. Indeed, without appropriate labor cost savings, the Debtors would not be able to emerge from chapter 11.  As a result, shortly after the

---

[6]    *See*, *e.g.*, *In re Great Atlantic & Pacific Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Feb. 27, 2012) (reservation of 7.5% of the new common stock); *In re Neff Corp.*, Case No. 10-12610 (Bankr. S.D.N.Y. Sept. 21, 2010) (reservation of 10% of the new common stock on a fully diluted basis); *In re Sbarro, Inc.*,Case No. 11-11527 (Bankr. S.D.N.Y. Nov. 17, 2011) (reservation of 10% of the new common stock); *In re RHI Entm't, Inc.*, Case No. 10-16536 (Bankr. S.D.N.Y. Mar. 29, 2010) (reservation of 15% of the new common stock); In re Chemtura Corp., Case No. 09-11233 (Bankr. S.D.N.Y. Nov. 3, 2010) (reservation of 11% of the new common stock on a fully diluted basis); *In re MGM Studios, Inc.*, Case No. 10-15774 (Bankr. S.D.N.Y. Dec. 6, 2010) (reservation of 15% of the new common stock on a fully diluted basis); *In re Readers' Digest Ass'n, Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Jan. 19, 2009) (reservation of 7.5% of the new common stock); *In re Apex Silver Mines Ltd.*, Case No. 09-10182 (Bankr. S.D.N.Y. Mar. 4, 2009) (reservation of 10% of the new common stock on a fully diluted basis); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Nov. 5, 2009) (reservation of 10% of the new common stock); *In re Solutia Inc.*, Case No. 03-17949 (S.D.N.Y. Nov. 29, 2007) (reservation of 12% of the new common stock); *In re UAL Corp.*, Case No. 02-48191 (Bankr. N.D. Ill.Jan. 20, 2006) (reservation of 7.86% of the new common stock); *In re US Airways, Inc.*, Case No. 04-13819 (Bankr. E.D. Va. Sept. 16, 2005) (reservation of 12.5% of the new common stock on a fully diluted basis).

Commencement Date, World and North American (along with their legal and financial advisors) began negotiating with their respective union groups in an attempt to obtain the concessions and modifications necessary for a successful reorganization.

World delivered initial proposals to the IBT-represented World pilots and flight attendants on February 20, 2012 and to the TWU on March 7, 2012. North American delivered initial proposals to its ALPA-represented pilots on March 1, 2012 and to its IBT-represented flight attendants on March 6, 2012. World and North American gave each Union a term sheet showing the proposed modifications to each Collective Bargaining Agreement and the savings associated with each change. All told, the initial proposals to the unions sought approximately $28 million in annual savings and a five-year concessionary period.

Negotiations began in earnest after World and North American made initial proposals. The negotiations were lengthy, difficult and, at times, extremely contentious. While discussions of this length, complexity and tone are not unusual in a collective bargaining milieu, these negotiations were made more difficult by two positions (as discussed below) taken by the unions, which increased the complexities of the deal dynamics. Ultimately, the Debtors were placed in a position where they were faced with a binary choice—agree to a deal with their unions or pursue a litigated path that included a real risk of liquidation.

***First***, World and North American were asking their employees to consensually provide material concessions—concessions without which the company would not be viable at all—and to agree to a five-year concessionary term. In exchange for settling the parties' disputes and agreeing to the necessary concessions in a 5-year Collective Bargaining Agreement amendment—the type of long-term agreement critical to providing the stability required for emergence (but unavailable even if the Debtors emerged victorious in a trial under section 1113 of the Bankruptcy Code)—the employees demanded significant roles in the company throughout the concessionary period. No consensual long-term deal would have been possible without including this concept.

***Second***, the World pilots—the source of more than 60% of the needed concessions—made a clear that if World filed a motion to reject their Collective Bargaining Agreement pursuant to section 1113 of the Bankruptcy Code, they would attempt to strike—immediately. The World pilots took at least two strike votes, both of which resulted in overwhelming votes in favor of striking. The IBT also filed a letter with the National Mediation Board and a federal court lawsuit in an effort to solidify what they believed was a right to strike. Although the Debtors did not believe the World pilots had a right to strike, and the Debtors would certainly have sought injunctive relief to bar a strike (and prepared the papers to do so), the reality under which all of these negotiations took place was that any significant work stoppage, slowdown, or other labor action would have devastated the Debtors and likely would have led to liquidation. Accordingly, while the Debtors were fully prepared to initiate section 1113 litigation if necessary, the consequences of a section 1113 filing were particularly risky. A settlement was a highly-preferred option given the "bet the company" risks, including the possibility of liquidating regardless of the outcome of section 1113 litigation.

With that background, the negotiations between the IBT (including its legal and financial advisors) and the Debtors (including their legal and financial advisors) continued. The IBT initially refused to provide anywhere near the concessions necessary for the Debtors to be viable—indeed, they refused to provide any concessions at all—unless they would ultimately receive slightly below 50% of the common equity of the Company. The Debtors pushed hard against this demand, but it became clear that no deal with labor would be possible unless it ultimately included labor as a significant minority shareholder of the Company. Thus, the Debtors believed that they had two choices: they could reach a settlement with their unions that included a post-emergence equity grant, or they could initiate section 1113 litigation, which could never (even if successful) result in the long-term agreement necessary to emerge from chapter 11 protection, but appeared likely to lead to liquidation anyway because of the labor action the World pilots promised would result from a section 1113 filing.

Through the Debtors' negotiations, IBT reduced its demand to 25% of the common equity of the Company, conditioned on agreed-upon debt limitations, and informed the Debtors that if the deal could be achieved, the IBT would deliver approximately 90% of the concessions sought by the Debtors. In light of their other options, the Debtors concluded that pursuing such a deal was in the best interests of the company and its creditors—the company needed the concessions to be viable and to emerge from bankruptcy; a section 1113 filing risked liquidation; and the IBT was unlikely to agree to any less. At the same time, the Debtors believed that they needed the consensus of their senior

41

secured creditors to approve the deal.  Accordingly, the Debtors presented the framework of the IBT/Debtors deal to the financial advisors and legal advisors for the DIP lenders and First Lien Noteholders.

The DIP Lenders and First Lien Noteholders were initially hostile to the deal struck between the Debtors and the IBT, particularly the post-emergence equity grant.  Ultimately, however, they were convinced—like the Debtors—that the company had no better options.  The framework presented by the Debtors and the IBT was indeed value-maximizing for the company; without a settlement with the unions there would likely be no reorganization.

The DIP Lenders and Senior Secured Noteholders then began to participate in the negotiations.  Through these negotiations, the maximum debt level for the post-reorganized company was increased to, and the DIP Lenders agreed as part of the settlement that they would accept repayment of the DIP loan in a note rather than cash.  While agreeing to raise the debt limits contemplated in the IBT/Debtors framework presented, the IBT demanded and the DIP lenders and First Lien Noteholders agreed to provide additional out-of-the money warrants to the IBT.  These terms, along with a number of other terms, were memorialized in the "Heads of Agreement" that was filed with the Court and **a** separate letter of agreement (the "***IBT LOA***"), which ultimately forms the basis for the Debtors' Plan.[7]

World and North American ultimately reached Union Settlement Agreements with each of the five union negotiating teams, described in more detail below, to modify each of the five Collective Bargaining Agreements between World or North American, on the one hand, and the applicable union on the other, attached to this Disclosure Statement as **Exhibit G**.   Ultimately, World and North American entered into tentative agreements on five-year Collective Bargaining Agreements containing a package of modifications that would save the Debtors more than $100 million — up to 90% of the value of the concessions requested in each of the Debtors' proposals.   The concessions agreed to include those described in the summary below:

The negotiating team for the World pilots (IBT) agreed to provide $15.9 million in annual savings through a combination of, among other things, the following:

- a)    a salary reduction;

- b)    a reduction in the monthly guarantee to 62 hours;

- c)    reducing the costs for the target benefit retirement plan by reducing the multiplier and raising the eligibility age;

- d)    reducing World's costs with respect to the pilots' health care and dental plans;

- e)    reducing vacation and sick accruals;

- f)    agreeing to various cost-saving changes to burdensome scheduling rules;

- g)    reducing per diem rates; and

- h)    minimizing the circumstances in which World must pay for pilots to stay overnight at downtown hotels while on layover.

---

[7]    The Heads of Agreement ("***HOA***") also resolves a number of other issues between the IBT and the Debtors.  For example, the IBT has filed a petition with the NMB seeking to declare World and North American a "single transportation system" for purposes of labor law.  While the Debtors firmly believe that World and North American are not a "single transportation system," they realized that if they emerge from bankruptcy, and the NMB later declares them a "single transportation system," it could (absent protection) undermine any agreement reached between the IBT and the Debtors.  Part of the HOA protects the Debtors from the possibility of a "single carrier" finding, however remote.  Other disputes addressed and resolved in HOA include the IBT's agreement to support any plan of reorganization that is consistent with the heads of agreement.

The negotiating team for the North American pilots (ALPA) agreed to provide $3.7 million in annual savings through a combination of the following:

a)      a salary reduction;

b)      reductions in trip hour credits;

c)      reductions in North American's 401(k) match;

d)      reductions in vacation accrual, vacation pay, and premium pay;

e)      agreeing to various cost-saving changes to scheduling rules; and

f)      reducing per diem rates.

The negotiating team for the World flight attendants (IBT) agreed to provide $3.87 million in annual savings through a combination of, among other things:

a)      a salary reduction and elimination of a longevity bonus;

b)      a reduction in the monthly guarantee to 62 hours;

c)      complete and permanent cessation of any need by the Debtors to contribute to the IBT-affiliated defined benefit pension plan ;

d)      reductions in vacation and sick accruals;

e)      various cost-saving changes to burdensome scheduling rules;

f)      reductions in per diem rates; and

g)      reducing the circumstances in which World had to pay for flight attendants to stay overnight at downtown hotels.

The negotiating team for the North American flight attendants (IBT) agreed to provide $1.6 million in annual savings through a combination of the following:

a)      reductions in paid time off, personal days, and vacation days;

b)      reductions in overtime pay and the "trip rig";

c)      lowering flight attendants' monthly guarantees;

d)      freezing flight attendants' longevity for two years; and

h)      eliminating the company-sponsored 401(k) match.

The World dispatchers (TWU) agreed to provide $127,800 in annual savings from a combination of:

a)      a salary reduction; and

b)      a schedule change (from 4 days on, 4 days off to 4 days on, 3 days off).

43

As summarized above and as provided in the Union Settlement Agreements, the Unions are agreed to material reductions in employment terms and conditions they had fairly negotiated. The Unions also agreed to new, five-year contracts that ensure both substantial savings and long-term labor peace. Accordingly, the Debtors agreed that they will propose a plan of reorganization that includes the Unions as an important part of the post-emergence company.

The Unions' proposed roles in the post-emergence company are described in the HOA, IBT LOA, a separate Letter of Agreement between North American and ALPA (the "*ALPA LOA*") and a Letter of Agreement with the TWU (the "*TWU LOA*"), which are and were interrelated with the tentative agreements. The Plan is consistent with these documents. If the Plan proposed is not confirmed, the Collective Bargaining Agreements will "snap back" to the terms as they exist prior to being assumed, the Unions will have administrative claims for the savings provided to the Debtors in the interim, and the parties will need to return to the bargaining table and, potentially, to the Bankruptcy Court.

In that context, the core terms of the ALPA LOA and the IBT HOA are as described below:

*First*, within 30 days after emerging from bankruptcy, the reorganized company will create a pool of equity for employees. That "Employee Equity Pool" will be 25% of the ~~common equity~~**New Common Stock** of the Reorganized Debtors, and will not be diluted by any management equity incentive plan. The Employee Equity Pool may, with the consent of the IBT, the Debtors, and the Senior Secured ~~Lenders~~**Noteholders**, be diluted by recoveries of other creditors.

*Second*, the Employee Equity Pool will select a representative to serve on ~~a committee~~**the Board Selection Committee** to help select the directors of Reorganized Global Aviation, consistent with the ultimate equity ownership of the company. **If the Board Selection Committee is unable to reach consensus on a slate of directors, the directors will be selected by Holders of the New Common Stock in proportion of their ownership, with two of the nine board members selected by the Employee Equity Pool.**

*Third*, the debt encumbering the Debtors after these chapter 11 cases will be capped at:

• $95 million of first lien debt, paying 10% interest with a 4.5 year term;

• $40 million of second lien debt, paying 3% interest, with a 5 year term;

• 50% sweep of excess cash flow, with a leverage grid; and

• a revolver with an availability of approximately $20 million.

The HOA contains the protection, for IBT, of a "most favored nations" type clause (the "*MFN*") with respect to the IBT HOA and ALPA LOA. When IBT received a copy of the ALPA LOA, IBT alleged that it contained provisions more favorable for ALPA than the HOA was for IBT. While the Company disagreed with the IBT's position, and with the IBT's interpretation of the MFN, the IBT and the Company negotiated a resolution of the IBT's MFN-related concerns in a separate Letter of Agreement on September 6, 2012, the terms of which is also incorporated into the Plan of Reorganization.

The HOA and ALPA LOA were filed with the Bankruptcy Court at Docket No. 537, Exhibits F and G, and each contain a number of additional terms that are provided for in the Plan.

The IBT HOA, IBT LOA, ALPA LOA and TWU LOA provisions are consistent with the Debtors' business plan and are the backbone of the Debtors' emergence from bankruptcy. On August 22, 2012, the Debtors' filed a motion for authority to enter into amendments to the Collective Bargaining Agreements with the IBT, ALPA, and TWU [Docket No. 537] (the "*CBA Approval Motion*").

### (ii)    Ratification Votes and Their Consequences

Each of the five union groups were soliciting votes on ratifications of the revised Collective Bargaining Agreements while the Debtors' CBA Approval Motion was pending.  On September 11, 2012, the Debtors received notice that the North American flight attendants did not ratify the Collective Bargaining Agreement modifications to which their negotiating team had agreed.  On September 12, 2012, the Debtors received notice that the North American pilots also did not ratify the Collective Bargaining Agreement modifications to which their negotiating team had agreed.

The Bankruptcy Court approved the CBA Approval Motion on September 12, 2012 [Docket No. 591 as it relates to the World pilots, the World flight attendants (subject to ratification), and the World dispatchers.  World and North American began to benefit from the savings achieved in the Agreements immediately upon Court approval and ratification.  However, the Agreements are ultimately contingent on confirmation of the Plan or another plan of reorganization consistent with the parties' global deal.  If confirmation of the Plan or another plan or reorganization consistent with the parties' global deal is not achieved, the Agreements will be void and the parties will need to return to the negotiating table.

The North American Flight Attendants have not yet entered into any Collective Bargaining Agreement with North American.  Accordingly, effective September 13, 2012, North American imposed terms and conditions of employment on the North American flight attendants that will save the Debtors approximately \$1.8 million annually, as is within North American's rights under applicable labor law.  North American intends to continue negotiating with the North American flight attendants in good faith and desires to achieve a long-term Collective Bargaining Agreement consistent with the Debtors' need for cost savings.  If an agreement is reached and ratified prior to the Debtors' emergence from bankruptcy, it will be brought to the Bankruptcy Court for approval.

North American made a revised proposal to ALPA that would either lead to a new, ratified agreement or serve as the proposal for the Bankruptcy Court's consideration in the section 1113 process.  North American's revised ALPA proposal was designed to move the parties towards a voluntary agreement that could be ratified or, in the alternative, start the process provided by section 1113 of the Bankruptcy Code.  The company's efforts were successful.  On September 19, 2012, North American and ALPA's authorized representatives ultimately reached a revised tentative agreement, which was ratified by the North American pilots on September 24, 2012.  That same day, North American filed an emergency motion to enter into amendments to the Collective Bargaining Agreement with ALPA, which was approved by the Bankruptcy Court on September 25, 2012.  [Docket Nos. 613 and 623].  The now-ratified ALPA agreement was the final piece of the puzzle for the labor agreements that the Debtors need to emerge from chapter 11.  As with the previously approved World Collective Bargaining Agreements, North American began to benefit from the savings achieved in the Agreements immediately upon court approval and ratification.

### (iii)    Complete Withdrawal from the IBT Pension Plan

As described above, as of the Commencement Date, World was a participant in the IBT Pension Plan.  The IBT Pension Plan was underfunded and World was already paying a surcharge on applicable rates.  Given a number of other factors, including the substantial reductions in force affecting World flight attendants and the resulting impact on the IBT Pension Plan, the Debtors believed that World could not continue as a participant in the IBT Pension Plan upon emergence from bankruptcy.  World thus insisted as a condition of agreement, and ultimately obtained, the agreement of the World flight attendants that, as part of the Collective Bargaining Agreement modifications, World's obligations to contribute to the IBT Pension Plan would immediately, completely, and permanently cease, resulting in World's complete withdrawal from the IBT Pension Plan.  World flight attendants will participate in a 401(k) plan going forward, as described in the modified Collective Bargaining Agreements.

World's complete withdrawal from the IBT Pension Plan will result in the imposition of withdrawal liability which, under applicable bankruptcy law, will be treated as a prepetition General Unsecured Claim against the Debtors' estates.

### (iv)    Single Carrier Filing

After the Commencement Date and during the Debtors' chapter 11 cases, the IBT filed a petition with the National Mediation Board (the "*NMB*"), seeking a determination that World and North American constitute a "single

45

carrier" or a "single transportation system" under applicable labor law.  World and North American strongly dispute the IBT's characterization of their operations and have objected to the IBT's request.  The NMB has not made any findings with respect to the IBT's request.

As part of the HOA, and as incorporated into the Plan, the Debtors and the IBT have agreed that in the event the NMB finds that World and North American are a single carrier (or single transportation system), there shall be no changes to the terms of the revised Collective Bargaining Agreements (as modified and approved by the Bankruptcy Court after voluntary agreement or order following a section 1113 trial) before the amendable date of the revised Collective Bargaining Agreements.  In addition, should it be determined that an integrated seniority list is required as a result of a single carrier determination, there shall be an equipment fence of the current seniority lists (furloughed and active pilots) for duration of agreement except for expansion positions, which would be then governed by seniority and airline/type lock for two years.

For the avoidance of doubt, World and North American deny that they constitute a "single carrier" or "single transportation system" for labor law purposes and intend to vigorously dispute the IBT's claim to the contrary.

### K.    Claims Bar Date

On March 21, 2012, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code.  The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case.  Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim.

On June 15, 2012, the Bankruptcy Court entered an order approving (a) July 30, 2012, as the deadline for filing Claims in the Debtors' chapter 11 cases; (b) August 3, 2012, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the Debtors' chapter 11 cases; (c) procedures for filing proofs of claim; and (d) the form and manner of notice of the bar dates [Docket No. 434] (the "*Bar Date Order*").

As of August 3, 2012, the Debtors have received approximately 1,047 Claims asserting various levels of priority.  The Debtors are currently in the process of reconciling such Claims and plan to file various objections over the course of the next few weeks.

### L.    NOL Motion

As of the Commencement Date, the Debtors' NOLs and certain other tax attributes were estimated to be approximately $310 million. Under the Internal Revenue Code, and subject to certain limitations, net operating losses ("*NOLs*") that accumulate prior to emergence from bankruptcy may be used to offset post-emergence taxable income. Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the chapter 11 cases.  Consequently, on the Petition Date, the Debtors filed the Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief [Docket No. 12] (the "*NOL Motion*"), pursuant to which the Debtors sought, on an interim and final basis, to restrict (i) trading of their equity securities by shareholders who own, or would own, at least 1.2 million shares, including options to acquire shares of Global Aviation's common stock during the pendency of the chapter 11 cases and (ii) the ability of shareholders that own or have owned 50% or more -- as measured under the applicable tax rules -- of Global Aviation's common stock to claim a federal tax deduction for worthlessness for a taxable period ending before emergence.  The Bankruptcy Court entered an interim order granting the NOL Motion February 7, 2012 [Docket No. 40] and a final order on March 30, 2012 [Docket No. 313].

The Debtors believe that MatlinPatterson is the only shareholder that may be affected by the worthless stock component of the NOL Motion.

## VII.    PROJECTED FINANCIAL INFORMATION

The Debtors have attached their projected financial information as **Exhibit D-F** to this Disclosure Statement. The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy

Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  Management developed a business plan and prepared financial projections (the "*Projections*") for the period from September 2012 through December 2016 (the "*Projection Period*").

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or projections to Holders of Claims or other parties in interest after the Confirmation Date or otherwise make such information public.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were prepared in October 2012.  Management is unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the Projections due to a material change in the Debtors' prospects.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below.

**THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

**MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, ACTS OF TERRORISM OR WAR, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN ARTICLE XIII OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

**THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

### A.      Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors. Such analysis (the "*Valuation Analysis*") is set forth in **Exhibit E** attached hereto.

## VIII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.      Risks Relating to Bankruptcy

#### (i)       *Parties in interest may object to the Plan's classification of claims and interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

48

*(ii)*        *The Debtors may fail to satisfy vote requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

*(iii)*        *The Debtors may not be able to obtain Confirmation of the Plan.*

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code.  To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed.  A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid.  If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims.  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

*(iv)*        *The conditions precedent to the Effective Date of the Plan may not occur.*

As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

*(v)*        *The Debtors may not be able to achieve their projected financial results.*

The financial projections set forth on **Exhibit D** to this Disclosure Statement represent Global Aviation's management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  The Debtors' actual financial results may differ significantly from the projections.  If the Debtors do not achieve their projected financial results, the trading prices of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

*(vi)*        *The Debtors' "certificate of public convenience and necessity" may be revoked by the federal government.*

The Debtors are required to have a "certificate of public convenience and necessity" to provide air carrier services. 49 U.S.C § 41102(a).  The federal government prohibits Non-U.S. Citizens from owning or controlling in excess of 25% of the equity interests in the reorganized Debtors.  If the Holders of Allowed Class 3 Claims that are

eligible to receive New Common Stock are unable to provide a Citizenship Declaration satisfactory to the federal government, the Debtors' license could be revoked.

### *(vii)    Certain tax implications of the Debtors' chapter 11 cases.*

Holders of Allowed Claims should carefully review Article XII herein, "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Reorganized Debtors.

### *(viii)    The Debtors' emergence from chapter 11 is not assured.*

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining confirmation of the Plan.

### B.    Risks Related to the Debtors' and Reorganized Debtors' Business

### *(i)    Indebtedness may adversely affect the Reorganized Debtors' operations and financial condition.*

According to the terms and conditions of the Plan, upon confirmation, the Reorganized Debtors will have outstanding indebtedness of approximately $135 million under the New Loans

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance. These factors depend partly on economic, financial, competitive and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the New Loans could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt. The Reorganized Debtors may incur significant additional debt in the future. If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

### *(ii)    The New Loans contain certain restrictions and limitations that could significantly affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity.*

The New Loans will contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their businesses, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations. These covenants restrict (subject to certain exceptions), the Reorganized Debtors' ability to: incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with affiliates; consummate sale-leaseback transactions; change their fiscal year; enter into hedging arrangements (except as otherwise expressly permitted); In addition, the Reorganized Debtors will be required to maintain a minimum interest coverage ratio and a maximum leverage ratio.

The breach of any covenants or obligations in the New Loans, not otherwise waived or amended, could result in a default under the New Loans and could trigger acceleration of those obligations. Any default under the New Loans could adversely affect the Reorganized Debtors' growth, financial condition, results of operations and ability to make payments on debt.

> *(iii)    Transfer restrictions on the New Common Stock contained in the New Certificate of Incorporation of Reorganized Global Aviation may limit the liquidity of the New Common Stock; any prohibited ownership change could limit the availability of the Reorganized Debtors' net operating losses.*

The New Certificate of Incorporation of Reorganized Global Aviation will contain restrictions on the transfer of New Common Stock, substantially in the form contained in the Plan Supplement, to minimize the likelihood of any potential adverse U.S. federal income tax consequences resulting from an ownership change (as defined in section 382 of the Internal Revenue Code) of Reorganized Global Aviation. The specific terms of these restrictions have not yet been determined. These restrictions are expected to apply for a period of two years after emergence or perhaps longer if extended by a vote of the Board of Directors.

> *(iv)    If the Debtors lose key executive officers, the Debtors' business could be disrupted and the Debtors' financial performance could suffer.*

The Debtors' businesses depend upon the continued efforts, abilities and expertise of the Debtors' executive officers. The Debtors believe that the unique combination of skills and experience possessed by the Debtors' executive officers would be difficult to replace, and their loss could have a material adverse effect on the Reorganized Debtors, including impairing the Reorganized Debtors' ability to execute the Reorganized Debtors' business strategy.

> *(v)    Employee strikes and other labor-related disruptions may adversely affect the Debtors' operations.*

The Debtors' business is labor intensive, utilizing large numbers of pilots, flight attendants and other personnel. Approximately 63% of their workforce is unionized. Strikes or labor disputes with the Debtors' unionized employees may adversely affect the Debtors' ability to conduct business. Relations between air carriers and labor unions in the United States are governed by the Railway Labor Act, which provides that a collective bargaining agreement between an airline and a labor union does not expire, but instead becomes amendable as of a stated date. The Railway Labor Act generally prohibits strikes or other types of self-help actions both before and after a collective bargaining agreement becomes amendable, unless and until the collective bargaining processes required by the Railway Labor Act have been exhausted. The Debtors' collective bargaining agreement with the World pilots further specifies that the World pilots are prohibited from striking World's military-related flying at any time, even after the Railway Labor Act's collective bargaining processes are exhausted.

If the Debtors are unable to reach agreement with any of their unionized work groups on future negotiations regarding the terms of their collective bargaining agreements or if additional segments of the Debtors' workforce become unionized, they may be subject to work interruptions or stoppages, subject to the requirements of the Railway Labor Act.

> *(vi)    If one of the Debtors' AMC team members reduces its commitments or withdraws from the team, or if carriers on other AMC teams commit additional aircraft to the program, the Debtors' share of AMC flying may decline.*

Each year, the AMC grants a certain portion of its business to different air carriers based on a point system. The number of points that an air carrier can accrue is determined by the number and type of aircraft pledged to the CRAF as well as the number of military flights operated by the team members over a past twelve-month period. The Debtors' operating subsidiaries along with the other air carriers in their team currently participate in the CRAF program and generate entitlement points for AMC business. Points from team members that do not fly AMC missions are used to increase the flights awarded to other team members that do fly AMC missions, such as World and North American, in return for a commission on the revenue derived from those points.

Continued participation by World and North American on the Alliance team is subject to significant risks. The formation of competing teaming arrangements, an increase by carriers from other teams in their commitment of aircraft to the CRAF program and the withdrawal of, or failure to renew a future teaming agreement with, any of the Alliance team's current partners could materially and adversely affect the amount of the Debtors' AMC business. There has been and continues to be significant consolidation in the air carrier industry. As a result of consolidation, we

51

expect some air carriers may choose to join other teams.  As a result of these changes, the Alliance team's total share of entitlement points under the AMC international program has decreased for government fiscal years 2011 and 2012.  In addition, if any Alliance team member were to cease or restructure its operations or dispose of aircraft previously pledged to the CRAF program, the number of aircraft pledged to the CRAF program by the Alliance team could be reduced. Any of these developments could reduce the number of points allocated to the Alliance team and the Alliance team's allocation of AMC business to the Debtors would likely decrease.  In addition, reductions in the Debtors' team's flights in a given period will reduce the Debtors' points in future periods.  If the military substantially reduces the amount of business it awards the Alliance team or if the Alliance team reduces the military missions it awards to the Debtors, the Debtors may not be able to replace the lost business and our business, financial condition and results of operations could be materially and adversely affected.

### (vii)     *Unpredictability and variability in military demand for the Debtors' services could make it difficult to optimize the use and maintenance of their aircraft fleet, which could adversely affect our business, financial condition and results of operations.*

Predicting the precise timing of the military's demand for the Debtors' services can be difficult, particularly in light of the confidential nature of troop deployment schedules.  The Debtors' inability to precisely forecast demand for their aircraft can hinder our ability to optimize the use of and maintenance schedule for the Debtors' fleet.  In circumstances where the Debtors have planned for significant demand from the military that does not materialize, the Debtors may be unsuccessful in reallocating their aircraft for use by commercial cargo or passenger services customers. The failure to reallocate the Debtors' aircraft to commercial use and the resulting reduction in their utilization could have an adverse effect on the Debtors' business, financial condition and results of operations.  Similarly, in circumstances where the Debtors have committed aircraft to commercial contracts, they may not have aircraft for military missions.

### (viii)    *The costs incurred in the Debtors' military missions may be greater than the amounts for which they are reimbursed by the AMC, thereby reducing profitability.*

Under their contract with the DOD, the Debtors are paid on a cost-plus basis in which they receive a fixed rate per mission based on the route and aircraft type.  The fixed rate is calculated using the average costs of all participating air carriers, weighted by flights flown in the AMC international program.  The AMC sets the fixed rate for each AMC fiscal year using cost data for a 12-month period that ended 15 months prior to the start of such fiscal year as adjusted following consultation with the air carrier, multiplied by a weighted composite price index to account for cost increases in the industry.  As a result, the actual operating costs of the Debtors' military business may exceed the fixed rate, although those higher actual operating costs will provide the basis for the fixed rate used for missions flown in future contract periods. Should the Debtors incur unexpected costs for reasons outside their control, such as the additional costs incurred to fly around the volcanic ash recently affecting flights over Europe, the Debtors are entitled to seek reimbursement from the DOD.  Reimbursement is granted based on a reasonableness test.  No assurance can be given, however, that any particular future increased costs would be adequately reimbursed, if at all.  Insofar as the actual operating costs of the Debtors military business exceed the fixed rate paid by the AMC and such shortfall is not reimbursed, the Debtors' profitability would be reduced.

### (ix)     *If the DOD activates the Debtors' aircraft pledged to the CRAF, the activated aircraft would not be available for other commercial use.*

All of the Debtors' aircraft are pledged to the CRAF and are therefore available for activation and use by the U.S. government in times of need.  If the DOD activates the Debtors' aircraft under the CRAF, such aircraft could not be used to serve commercial customers while they are used by the U.S. government pursuant to an activation.  The Debtors cannot predict whether revenues from the DOD during the activation of their aircraft under the CRAF would be less than or more than would otherwise be generated by commercial customers.  While the Debtors' agreements with their commercial customers generally allow cancellation without penalty in the event of CRAF activation, activation could disrupt operations, customer relationships and the Debtors' competitive position as compared to charter operators with aircraft not pledged to the CRAF.

*(x)      The Debtors' business could be adversely affected by an adverse audit by the U.S. government.*

DOD contracts are routinely subject to audit by government agencies.  Such an audit involves a review of our performance under the Debtors' contracts, cost structure and compliance with applicable laws and regulations.   It may also involve a review of the adequacy of, and the Debtors' compliance with, the Debtors' internal control systems and policies, including management, purchasing, property, estimating, compensation, accounting and information systems.  If an audit or investigation uncovers improper or illegal activities, the Debtors may be subject to civil or criminal penalties and administrative sanctions, including termination of their government contracts, forfeiture of profits, suspension of payments, fines and suspension or prohibition from doing business with the Government.  In addition, the Debtors could suffer serious reputational harm if allegations of impropriety were made against them.

*(xi)      Because a substantial portion of the Debtors' operating expenses is fixed, the Debtors may be unable to quickly change their cost structure to respond to any declines in revenues.*

To maintain the Debtors' level of operations, a substantial portion of their costs, such as aircraft lease payments, crew, maintenance and facility costs, is fixed.  Operating revenues from the Debtors' business are directly affected by their ability to maintain high utilization of their aircraft at favorable rates.  The utilization of the Debtors' aircraft and their ability to obtain favorable rates are affected by many factors, including military requirements, global demand for passenger and cargo air transport services, global economic conditions, fuel costs and the deployment by the Debtors' current and potential customers of their own aircraft, among others, which may cause the Debtors' revenues to vary significantly over time.  The Debtors are particularly vulnerable to reductions in demand due to their relatively high fixed-cost structure, which is difficult to adjust to match shifting volume levels.  Accordingly, if the Debtors' revenues for a particular period fall below expectations, they may be unable to proportionately reduce their operating expenses for that period.

*(xii)     The loss of one or more customers in the commercial cargo business could materially and adversely affect the Debtors' business, financial condition and results of operations.*

The Debtors depend on a limited number of significant customers for their commercial cargo business, most of which is conducted pursuant to contracts that are set to expire in the next two years.  There is a risk that the Debtors' customers may not renew their ACMI contracts on favorable terms or at all.  Entering into ACMI contracts with new customers may require a long sales cycle.   Because the Debtors generally lease their aircraft pursuant to non-cancelable operating leases, the Debtors could be forced to maintain aircraft in their fleet while the aircraft produce little or no revenue.  In addition, certain of the Debtors' principal competitors have ordered Boeing 747-8 freighters and Boeing 777 freighters, which could increase competition for long-haul large payload ACMI customers.  As a result, if the Debtors' ACMI contracts are not renewed or can only be renewed on less favorable terms, and if the Debtors are not able to obtain other business in a timely manner or at all, their business, financial condition and results of operations could be materially and adversely affected.

*(xiii)    A significant reduction in demand for air cargo transport, resulting from declining worldwide economic activity could materially and adversely affect the Debtors' business, financial condition and results of operations.*

The Debtors' success is highly dependent upon the level of business activity and overall global economic conditions.  The recent economic downturn has decreased and may continue to decrease the volume of world trade and materially and adversely affect demand for the services offered by the Debtors' ACMI customers, such as a significant reduction in the production of time-sensitive inventories, perishables and packages that have historically been transported via air freight.  The Debtors cannot predict the effect or duration of any economic slowdown or the timing or strength of a subsequent economic recovery. The Debtors are particularly vulnerable to reductions in demand due to their relatively high fixed-cost structure, which is difficult to adjust to match shifting volume levels.

*(xiv)     Fuel price volatility could adversely affect the Debtors' business, financial condition and results of operations.*

The price of aircraft fuel is unpredictable and has been increasingly volatile over the past few years.  While the Debtors' military and ACMI contracts require our customers to pay for or reimburse the Debtors for aviation fuel,

53

if fuel costs increase significantly, the Debtors' customers may reduce the volume and frequency of cargo shipments or find less costly alternatives for cargo delivery, such as land and sea carriers.  If the Debtors' customers reduce their use of air freight, the Debtors' business, financial condition and results of operations could be materially and adversely affected.

In addition, as a result of the timing of reimbursement under contracts providing for the Debtors' customers to reimburse the Debtors for fuel costs, the Debtors' working capital position may be adversely affected by significant increases in fuel costs, which could affect our liquidity.

> *(xv)*      *Volatility in international currency markets may adversely affect demand for our commercial cargo and passenger services.*

Although the Debtors price their services and receive payments in U.S. dollars, many of the Debtors' customers' revenues are denominated in other currencies.  Any significant devaluation in such currencies relative to the U.S. dollar could have a material adverse effect on such customers' ability to pay the Debtors or on their level of demand for the Debtors' services, which could have a material adverse effect on the Debtors' business, financial condition and results of operations.  If there is a significant decline in the value of the U.S. dollar against other currencies, the demand for some of the products the Debtors transport could decline.

> *(xvi)*      *Governments may restrict or revoke the Debtors' authority to operate flights to or over countries.*

The Debtors have authority to operate flights anywhere in the world that U.S. carriers are permitted to operate.  However, either the U.S. or foreign governments could limit or restrict the Debtors' authority to operate flights to or over specified countries due to security concerns, armed conflict, international disputes, or for other reasons. For example, certain foreign governments currently restrict the number of charter flights that can be operated to these countries.  In light of such restrictions, the Debtors may not be able to serve customers seeking charter services to or that would require flying over such countries, and our business, financial condition and results of operations could be adversely affected.

> *(xvii)*      *If the Debtors are unable to continue to lease aircraft at acceptable rates and terms in the future, or if the Debtors are unable to acquire compatible engines or spare parts, on terms favorable to the Debtors or at all, their business, financial condition and results of operations could be adversely affected.*

All of the Debtors' aircraft are leased.  The Debtors' operating leases typically run from three to ten years from the date of delivery.  The Debtors may face more competition for, or a limited supply of, leased aircraft, making it difficult for the Debtors to negotiate competitive terms upon expiration of our current operating leases or to lease additional capacity required for their targeted level of operations.  If the Debtors are forced to pay higher lease rates in the future to maintain their fleet, the Debtors' profitability would be adversely affected.  Also, if available aircraft, whether by purchase or lease, are not compatible with the rest of the Debtors' fleet in terms of takeoff weight, avionics, engine type or other factors, the Debtors would incur potentially significant costs of fleet induction and modification, and reduced efficiency of their operations.  Any increase in demand could also impair the Debtors' ability to obtain additional engines and spare parts on favorable terms or at all at the time needed for their operations or for the implementation of their growth plan.

> *(xviii)*      *The Debtors are at risk of losses and adverse publicity stemming from any accident involving their aircraft.*

An accident or incident involving one of the Debtors' aircraft could involve repair or replacement of a damaged aircraft and its consequential temporary or permanent loss from service, and significant potential claims of injured passengers and others. The Debtors are required by the DOT and their lenders and lessors to carry hull, liability and war risk insurance.  Although the Debtors believe they currently maintain liability insurance in amounts and of the type generally consistent with industry practice, the amount of such coverage may not be adequate and they may be forced to bear substantial losses from an accident. Substantial claims resulting from an accident in excess of their related insurance coverage would harm their business and financial results. Moreover, any aircraft accident or

incident, even if fully insured, could cause a public perception that the Debtors are less safe or reliable than other airlines, which would harm their business.

> ### *(xix)      The airline industry is subject to extensive government regulation, and new regulations may increase the Debtors' operating costs.*

Airlines are subject to extensive regulatory and legal compliance requirements that result in significant costs. For instance, the FAA from time to time issues directives and other regulations relating to the maintenance and operation of aircraft that necessitate significant expenditures. The Debtors expect to continue incurring expenses to comply with FAA regulations, which may be significant.

The federal government has on several occasions proposed a significant increase in per ticket taxes.  Due to the weak revenue environment, the existing tax has negatively impacted the Debtors' revenues because the Debtors have generally not been able to increase their fares to pass these fees on to their customers.  Similarly, the proposed increase in ticket taxes, if implemented, could negatively impact the Debtors' revenues.

Furthermore, the Debtors and other U.S. carriers are subject to domestic and foreign laws regarding privacy of passenger and employee data. Compliance with these regulatory regimes is expected to result in additional operating costs and could impact the Debtors' operations and any future expansion.

> ### *(xx)      The Debtors' insurance costs have increased substantially as a result of the September 11 terrorist attacks, and further increases in insurance costs or reductions in coverage could have a material adverse impact on the Debtors' business and operating results*

As a result of the terrorist attacks on September 11, 2001, aviation insurers significantly reduced the maximum amount of insurance coverage available to commercial air carriers for liability to persons (other than employees or passengers) for claims resulting from acts of terrorism, war or similar events. At the same time, aviation insurers significantly increased the premiums for such coverage and for aviation insurance in general.  Since September 24, 2001, the U.S. government has been providing U.S. airlines with war-risk insurance to cover certain losses, including those resulting from terrorism, to passengers, third parties (ground damage) and the aircraft hull. The coverage currently extends through August 31, 2009.  The withdrawal of government support of airline war-risk insurance would require the Debtors to obtain war-risk insurance coverage commercially, if available. Such commercial insurance could have substantially less desirable coverage than that currently provided by the U.S. government, may not be adequate to protect the Debtors' risk of loss from future acts of terrorism, may result in a material increase to their operating expenses or may not be obtainable at all, resulting in an interruption to their operations.

## IX.     RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.      Compromise and Settlement of Claims, Interests and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

55

B.      **Releases by the Debtors**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THEIR ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ESTATES OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE DEBTORS' RESTRUCTURING, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY OR A FORMER OFFICER OR DIRECTOR OF THE DEBTORS THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE. FOR THE AVOIDANCE OF DOUBT, AND EXCEPT TO THE EXTENT LISTED IN THE RETAINED CAUSES OF ACTION FILED AS PART OF THE PLAN SUPPLEMENT, ALL AVOIDANCE ACTIONS ARE RELEASED PURSUANT TO THIS PLAN. THE FOREGOING RELEASE SHALL NOT APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATIONS ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENTS ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.

C.      **Releases by Holders of Claims and Interests**

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, PLAN SUPPLEMENT OR CONFIRMATION ORDER, AS OF THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM OR AN INTEREST AND EACH OF THE RELEASED PARTIES SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER, RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE DEBTORS' CHAPTER 11 CASES, THE PURCHASE, SALE OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING

OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION OR PREPARATION OF THE PLAN, THE DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT OR OTHER OCCURRENCE RELATING TO THE DEBTORS TAKING PLACE ON OR BEFORE THE CONFIRMATION DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY POST-EFFECTIVE DATE OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

**D.      Limitations on Plan Release and Injunction Provisions with Respect to the Government**

NOTHING IN THE PLAN OR THE CONFIRMATION ORDER SHALL DISCHARGE, RELEASE, OR PRECLUDE:  (A) ANY LIABILITY TO A GOVERNMENTAL UNIT THAT IS NOT A CLAIM; (B) ANY CLAIM OF A GOVERNMENTAL UNIT ARISING ON OR AFTER THE CONFIRMATION DATE; (C) ANY LIABILITY TO A GOVERNMENTAL UNIT ON THE PART OF ANY PERSON OR ENTITY OTHER THAN THE DEBTORS OR REORGANIZED DEBTORS; (D) ANY VALID RIGHT OF SETOFF OR RECOUPMENT BY A GOVERNMENTAL UNIT; OR (E) ANY CRIMINAL LIABILITY.  NOTHING IN THE PLAN OR CONFIRMATION ORDER SHALL ENJOIN OR OTHERWISE BAR ANY GOVERNMENTAL UNIT FROM ASSERTING OR ENFORCING, OUTSIDE THE BANKRUPTCY COURT, ANY LIABILITY DESCRIBED IN THE PRECEDING SENTENCE.  THE DISCHARGE AND INJUNCTION PROVISIONS CONTAINED IN THE PLAN AND CONFIRMATION ORDER ARE NOT INTENDED AND SHALL NOT BE CONSTRUED TO BAR ANY GOVERNMENTAL UNIT FROM, AFTER THE CONFIRMATION DATE, PURSUING ANY POLICE OR REGULATORY ACTION. NOTHING IN THE PLAN OR CONFIRMATION ORDER LIMITS OR EXPANDS THE DISCHARGE AND INJUNCTION TO WHICH THE DEBTORS OR REORGANIZED DEBTORS ARE ENTITLED UNDER THE BANKRUPTCY CODE.

**E.      Exculpation**

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED HEREIN AND IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY EXCULPATED CLAIM, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE PARTICIPATED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. NOTHING PROVIDED HEREIN SHALL APPLY TO ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH, OR CONTEMPLATED BY THE PLAN.

**F.      Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided herein, in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall file in complete satisfaction, discharge and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective

Date by the Reorganized Debtors), Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the chapter 11 cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

   **G.      Injunction**

   EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, PLAN SUPPLEMENT OR CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

   FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN ARTICLE X OF THE PLAN, EACH HOLDER OF A CLAIM OR AN INTEREST SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO ARTICLE X OF THE PLAN.

   EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE X.B. OR C. OF THE PLAN, DISCHARGED PURSUANT TO X.F., OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO X.E. OF THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

   THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST

ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### H.      Release of Liens

Except as otherwise provided herein, in the Plan, in the New Loans or in any other contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, (a) all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, (b) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

### I.      Term of Injunctions or Stays

Unless otherwise provided herein, in the Plan or in the Confirmation Order, all injunctions or stays in effect in the chapter 11 cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### J.      Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the chapter 11 cases (or during the chapter 11 cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the chapter 11 cases.

## X.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Class 3. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

**XI.    CONFIRMATION OF THE PLAN**

**A.    Requirements for Confirmation of the Plan**

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

**B.    Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors have attached as **Exhibit G** a liquidation analysis prepared by the Debtors' management with the assistance of Rothschild, the Debtors' financial advisor.

**C.    Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit D**.  The Debtors will supplement this Disclosure Statement with such information in advance of the hearing to approve this Disclosure Statement.

**D.    Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[8]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

---

[8]    A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

60

### E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### *(i)    No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### *(ii)    Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post confirmation going concern value of the Debtors.  Such analysis (the "***Valuation Analysis***") will be set forth in Exhibit E attached hereto.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The Plan provides for Reorganized Global Aviation to distribute New Common Stock (the "***Plan Securities***") to Holders of Allowed Claims in Class 3.

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws.  The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in

the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

### B.    Issuance and Resale of Plan Securities under the Plan

#### *(i)    Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws*

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Law) shall not apply to the offer or sale of stock, options, warrants or other securities by a debtor if: (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer and sale of the Plan Securities will not be registered under the Securities Act or any applicable state Blue Sky Law.

To the extent that the issuance of the Plan Securities are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code.  In addition, the Plan Securities generally may be able to be resold without registration under applicable state Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Law of those states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.  Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state Blue Sky Law in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the Plan Securities are advised to consult with their own legal advisors as to the applicability of section 1145 of the Bankruptcy Code to the Plan Securities and the availability of any exemption from registration under the Securities Act and state Blue Sky Law.

#### *(ii)    Resales of Plan Securities; Definition of Underwriter*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such Claim or Interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Resales of the Plan Securities by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities and, in turn, whether any Person may freely resell Plan Securities. The Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning their ability to freely trade such securities without compliance with the federal and applicable state Blue Sky Laws. In addition, there will be the Registration Rights Agreement providing for registration rights for the New Common Stock, which agreement shall be in form and substance reasonably acceptable to the Senior Agent, dated as of the Effective Date, and in substantially the form set forth in the Plan Supplement.

### (iii)       *Warrants and New Common Stock/Equity Incentive Plan*

The Plan contemplates the implementation of the Employee Equity Plan, which will be included with the Plan Supplement and provide for (a) 25% of the New Common Stock and (b) warrants to purchase 15% of the fully-diluted New Common Stock, to be reserved for issuance to the Debtors' Qualifying Represented Employees and Non-Executive, Non-Represented Employees to be shared in proportion to (i) the concessions agreed and ratified through voluntary modifications, in the case of the Reorganized Debtors' Qualifying Represented Employees, and (ii) the amount of the World Pilots Savings Credit with respect to the Reorganized Debtors' Non-Executive, Non-Represented Employees, the form of which is included in the Plan Supplement.

Such warrants and New Common Stock (and New Common Stock underlying the warrants) will be issued pursuant to Rule 701 promulgated under the Securities Act or pursuant to the exemption provided by section 4(a)(2) of the Securities Act.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "*IRC*"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "*IRS*") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New First Lien Loan, the New Second Lien Loan or New Common Stock, as part of a hedge,

straddle, conversion or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

<u>**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**</u>:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

### *(i)       Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any new consideration (including New Common Stock) given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income.  In general, tax attributes will be reduced in the following order:  (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.  In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain claims will receive shares of New Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend on the fair market value of the New Common Stock.  This value cannot be known with certainty until after the Effective Date. The Debtors expect that, subject to the limitations discussed herein, they will be required to make material reductions in their NOLs, NOL carryforwards and other tax attributes.

### *(ii)      Limitation of NOL Carryforwards and Other Tax Attributes*

Even after reducing the amount of their tax attributes, the Debtors anticipate that the Reorganized Debtors will have significant NOLs and other tax attributes at emergence.  The amount of such tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  (a) the amount of tax

losses incurred by the Debtors in 2011 and 2012; (b) the fair market value of the New Common Stock and the issue price of the New First Lien Loan and the Second Lien Loan; and (c) the amount of COD Income incurred by the Debtors in connection with consummation of the Plan. Following consummation of the Plan, the Debtors anticipate that their NOLs may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a) General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently approximately 3%). The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Global Aviation Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date. As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b) Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

The Debtors believe that it will be beneficial for them to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtors do utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtors' Pre-Change Losses would effectively be eliminated. In order to prevent such a subsequent ownership change, the New Certificate of Incorporation of Reorganized Global Aviation is expected to contain restrictions on trading of New Common Stock that are intended to prevent such a change. The specific terms of these restrictions have not yet been determined. These restrictions are expected to apply for a period of two years after emergence or perhaps longer if extended by a vote of the Board of Directors.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception. Alternatively, the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another owenership change will occur within two years after emergence. In either case, the Debtors expect that their use of the Pre-Change Losses after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### *(iii)      Alternative Minimum Tax*

In general, an alternative minimum tax ("*AMT*") is imposed on a corporation's alternative minimum taxable income ("*AMTI*") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

### *(i)      Consequences to Holders of Senior Secured Claims*

Pursuant to the Plan, each Holder of an allowed Senior Secured Claim shall receive such holder's *pro rata* share of: (a) the remaining New First Lien Loan after satisfaction of the DIP Claims **and Roll-Up Claims**; (b) the New Second Lien Loan; and (c) ~~100~~**either (i) 75**% of the New Common Stock **or (ii) to the extent required by federal regulatory requirements, and with respect to Non-U.S. Citizens only, a newly established class of New Common Stock or warrants, to be determined by the Debtors subject to the reasonable consent of the Ad Hoc Group of Senior Secured Noteholders**.

Whether a Holder of an allowed Senior Secured Claim recognizes gain or loss as a result of the exchange of its claim for the New First Lien Loan, New Second Lien Loan or the New Common Stock or all three depends, in part, on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the allowed Senior Secured Claim surrendered and the New First Lien Loan and New Second Lien Loan (with respect to receipt of the New First Lien Loan and New Second Lien Loan) are treated as a "security" for the reorganization provisions of the IRC.

(a)      Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that

could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued. The Senior Secured Indenture had an initial term of approximately four years. The Debtors expect to take the position that the debt underlying the Senior Secured Claims are not "Securities."

> (b)     Treatment of a Holder of an Allowed Senior Secured Claim if the Exchange of its Claim is not Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Secured Claim is not treated as a "security" for U.S. federal income tax purposes, a Holder of such a claim should be treated as exchanging its allowed Senior Secured Claim for the New First Lien Loan, New Second Lien Loan and the New Common Stock in a fully taxable exchange. A Holder of an allowed Senior Secured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the issue price (as determined under the applicable Treasury regulations) of the New First Lien Loan and the New Second Lien Loan and the fair market value of the New Common Stock, in each case that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Senior Secured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in the New First Lien Loan and Second Lien Loan received on the Effective Date should equal its issue price and a Holder's tax basis in the New Common Stock should equal its fair market value. A Holder's holding period for the New First Lien Loan, New Second Lien Loan and New Common Stock received on the Effective Date should begin on the day following the Effective Date.

> (c)     Treatment of a Holder of an Allowed Senior Secured Claim if the Exchange of its Claim is Treated as a Reorganization

If a debt instrument constituting a surrendered allowed Senior Secured Claim, the New First Lien Loan and the New Second Lien Loan are each treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed Senior Secured Claim for the New First Lien Loan, New Second Lien Loan and New Common Stock should be treated as a recapitalization, and therefore a reorganization, under the IRC. In such case, a Holder should not recognize loss with respect to the exchange and should not recognize gain except to the extent that the share of the New First Lien Loan, New Second Lien Loan and New Common Stock received are allocable to accrued but untaxed interest (see discussion below, "Accrued Interest").. Such Holder's tax basis in its New First Lien Loan, New Second Lien Loan and New Common Stock should be equal to the tax basis of the obligation constituting the allowed Senior Secured Claim surrendered therefor (allocated between the New First Lien Loan, New Second Lien Loan and New Common Stock based on their relative fair market value), and a Holder's holding period for its New First Lien Loan, New Second Lien and New Common Stock should include the holding period for the obligation constituting the surrendered allowed Senior Secured Claim; provided that the tax basis of any New First Lien Loan, New Second Lien Loan and New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such New First Lien Loan, New Second Lien Loan and New Common Stock should not include the holding period of the debt instrument constituting the surrendered allowed Senior Secured Claim.

**The tax consequences of the Plan and to the Holders of allowed Senior Secured Claims are highly uncertain. Holders of allowed Senior Secured Claims should consult their tax advisors regarding whether such Claims, the New First Lien Loan and the New Second Lien Loan could be treated as "securities" for U.S. federal income tax purposes.**

> (d)     Accrued Interest

To the extent that any amount received by a Holder of a surrendered allowed claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross

income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered allowed claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered allowed claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed claims shall be allocated first to the principal amount of such claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

          (e)      Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

**D.       Withholding and Reporting**

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**[Remainder of page intentionally left blank.]**

**XIV.    Regulation**

The Debtors are subject to various federal, international and local laws and regulations governing, among other things, aviation security, environmental matters, baggage liability, consumer protection and labor relations. While the Airline Deregulation Act of 1978, as amended, eliminated domestic economic regulation of passenger and freight air transportation in many regards, the industry, nevertheless, remains regulated in a number of areas. The DOT has jurisdiction over international route authorities and various consumer protection matters, such as advertising, denied boarding compensation, baggage liability and access for persons with disabilities. The Debtors are subject to regulations of the DOT and the FAA because they holds certificates of public convenience and necessity, air carrier operating certificates and other authority granted by those agencies. The FAA regulates flight operations, including air space control and aircraft standards, maintenance, ground facilities, transportation of hazardous materials and other technical matters. The DOJ has jurisdiction over airline competition matters, including mergers and acquisitions, under federal antitrust laws. The TSA regulates airline and airport security. Other federal agencies have jurisdiction over postal operations, use of radio facilities by aircraft and certain other aspects of the Debtors operations.

The Debtors are also subject to federal labor regulation through the RLA. The RLA governs the labor relations of employers and employees engaged in the airline industry.  Comprehensive provisions are set forth in the RLA establishing the right of airline employees to organize and bargain collectively along craft or class lines and imposing a duty upon air carriers and their employees to exert every reasonable effort to make and maintain collective bargaining agreements.

The RLA contains detailed procedures that must be exhausted before a lawful work stoppage may occur. Pursuant to the RLA, the Debtors have has collective bargaining agreements with two domestic unions representing two separate employee groups -- pilots and flight attendants.

The Debtors are also subject to FAA jurisdiction pertaining to aircraft maintenance and operations, including equipment, dispatch, communications, training, flight personnel and other matters affecting air safety. To ensure compliance with its regulations, the FAA requires all United States airlines to obtain operating, airworthiness and other certificates, which are subject to suspension or revocation for cause.

Under FAA regulations, the Debtors have established, and the FAA has approved, maintenance programs for all aircraft operated by the Debtors. These programs provide for the ongoing maintenance of the Debtors' aircraft, ranging from frequent routine inspections to major overhauls. The Debtors' aircraft require various levels of maintenance or "checks" and periodically undergo complete overhauls. Maintenance programs are monitored closely by the FAA, with FAA representatives routinely present at the Debtors' maintenance facilities. The FAA issues airworthiness directives, which mandate changes to an air carrier's maintenance program. These airworthiness directives (which include requirements for structural modifications to certain aircraft) are issued to ensure that the nation's transport aircraft fleet remains airworthy. The Debtors are currently, and expects to remain, in compliance with all applicable requirements under all airworthiness directives and the FAA-approved maintenance programs.

Further, a combination of FAA and Occupational Safety and Health Administration regulations on both the federal and state levels apply to all of the Debtors' ground-based operations in the United States.

The Debtors are also subject to regulation under various environmental laws and regulations, including the Clean Air Act, the Clean Water Act and Comprehensive Environmental Response, Compensation and Liability Act of 1980. In addition, many state and local governments have adopted environmental laws and regulations to which the Debtors' operations are subject. Environmental laws and regulations are administered by numerous federal and state agencies.

**XV.    Recommendation**

In the opinion of Global Aviation and each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  **October ~~17,~~19, 2012**

Respectfully submitted,

GLOBAL AVIATION HOLDINGS INC.
(on behalf of itself and each of the Debtors)

By: */s/ William T. Garrett*                     
    Name: William T. Garrett
    Title: Executive Vice President and Chief Financial
    Officer

Prepared by:

*/s/ Jonathan S. Henes*                     
James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors*
*and Debtors in Possession*

## Exhibit A

### Plan of Reorganization

[Filed as Docket No. ~~594~~**672**]

1

**Exhibit B**

**Declaration of William A. Garrett, Executive Vice President and Chief Financial Officer of Global Aviation Holdings Inc., in Support of First Day Pleading**

**[Filed as Docket No. 3]**

**Exhibit C**

**Disclosure Statement Order**

## Exhibit D

**Financial Projections**

22

**FINANCIAL PROJECTIONS**

**I.      GENERAL ASSUMPTIONS**

In connection with the Debtors' Business Plan, management has prepared financial projections through 2016 for the purpose of illustrating to lessors, employees and creditors the financial impact of the Debtor's Plan of Reorganization. Factors that may affect these projections include, without limitation:

- Military/AMC (Air Mobility Command) Risk Factors:

    – Decreased AMC demand, reduction in paid rates for flying

    – Reduced participation in the AMC international program, which is derived from one-year contracts that the DOD (Department of Defense) is not obligated to renew

    – If one of Global's team members reduces its commitments or withdraws from the team, or if carriers on other teams commit additional aircraft to this program, Global's share of AMC flying may decline

    – Costs incurred on Global's military missions may be greater than the amounts for which Global is reimbursed by the AMC, which would reduce profitability

    – Global's AMC contracts contain various operational performance requirements.  These include on-time performance, availability or aircraft and crews to meet committed missions, and successful completion of inspections. Failure to meet these requirements could result in a penalty and in the worst case the AMC could termination the contract.

    – Global's business could be adversely affected by an adverse audit by the U.S. government

    – As a U.S. government contractor, Global is subject to a number of procurement and other laws and regulations that affect how Global conducts business and subjects it to certain costs

    – Government regulations impose requirements and restrictions on Global's operations that may increase operating costs

- Commercial Risk Factors:

    – The economic environment in general and the air cargo market in particular

    – Limited number of significant customers for Global's commercial cargo business, and the loss of one or more of these customers could materially and adversely affect its projections

    – The DOD activates Global's aircraft pledged to the CRAF and the activated aircraft would not be available for other commercial use

- General Risk Factors:

    – If Global is unable to continue to lease aircraft at acceptable rates and terms in the future, or if it is unable to acquire compatible engines or spare parts, on terms favorable to it or at all, Global's business, financial condition and results of operations could be adversely affected

    – Fuel price volatility could adversely affect Global's business, financial condition and results of operations, although a substantial portion of its fuel costs are reimbursed by customers

**2**

- Volatility in international currency markets may adversely affect demand for Global's commercial cargo and passenger services

- Significant changes in operating expenses may adversely impact profitability

- Some of Global's aircraft are periodically deployed in potentially dangerous situations, which may result in damage to aircraft or cargo or harm to Global's employees

- Governments may restrict or revoke Global's authority to operate flights to or over certain countries

- Global's insurance coverage may become more expensive and difficult to obtain and may not be adequate to insure against all risks

- Union disputes, employee strikes and other labor-related disruptions may materially and adversely affect Global's business, financial condition and results of operations

- Global may be liable for a share of any underfunding of the multiemployer defined pension plan in which some employees participate

- Global's maintenance costs may increase more than budgeted as its fleet ages

- Global's reputation, business, financial condition and results of operations could be materially and adversely affected in the event of an accident or other incident involving any of its aircraft or the same types of aircraft it operates

- Due to Global's limited fleet size, if any of its aircraft become unavailable, Global may suffer greater damage to its service, reputation and profitability than airlines with larger fleets

- If Global develop problems with any of its third-party service providers, Global's operations could be materially and adversely affected, resulting in a decline in revenue, increase in expenses or negative public perception about Global's services

- Global could be adversely affected by a failure or disruption of its computer, communications or other technology systems

- Global's ability to use its substantial net operating losses for federal income tax purposes could be substantially limited.

- Initiatives to address global climate change may adversely affect Global's business and increase its costs

- Global may not be able to retain or attract senior management and other key employees

- Global may experience difficulty finding, training and retaining employees

- Global's business is affected by factors beyond its control, including air traffic congestion at airports, adverse weather conditions, natural disasters, volcanoes, earthquakes and increased security measures

- Chapter 11 Risk Factors

  - The uncertainties associated with the emergence from chapter 11 of the U.S. Bankruptcy Code and related considerations of approval of a plan of reorganization

**3**

The financial projections present, to the best of management's knowledge and belief, the expected financial positions, and results of operations for the Debtors. The financial projections and underlying assumptions were prepared by management and reflect management's judgment of expected future operating conditions affecting the Debtors and management's expected course of actions. There may be differences between the projected and actual results because events and circumstances may not occur as expected. Those differences may be material and adverse.

The projections are based on a number of estimates and assumptions that, although considered reasonable by management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and management in addition to assumptions with respect to future business decisions which are subject to change. Accordingly, there can be no assurance that the projected results will be realized, and actual results may vary from those projected. If actual results are lower than those shown, or if the assumptions used in formulating the projections are not realized, cash flows could be materially and adversely affected.

II.      FLEET PLAN

The Business Plan is based on a current total fleet of 14 aircraft growing to 23 aircraft through 2016. The expected year-end allocation of these aircraft among the Debtors is as follows:

| World | 2011A | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|---|
| MD11P | 7 | 3 | 2 | 2 | 2 | 2 |
| MD11F | 9 | 4 | 4 | 4 | 4 | 4 |
| B747F | 4 | 2 | 3 | 4 | 5 | 6 |
| Total Passenger | 7 | 3 | 2 | 2 | 2 | 2 |
| Total Freighter | 13 | 6 | 7 | 8 | 9 | 10 |
| **World Aircraft** | **20** | **9** | **9** | **10** | **11** | **12** |
| **North American** | **2011A\*** | **2012F** | **2013F** | **2014F** | **2015F** | **2016F** |
| B757P/Combi | 4 | 0 | 1 | 1 | 1 | 1 |
| B767P | 5 | 5 | 5 | 5 | 5 | 5 |
| B767F | 0 | 0 | 2 | 3 | 4 | 5 |
| Total Passenger | 9 | 5 | 6 | 6 | 6 | 6 |
| Total Freighter | 0 | 0 | 2 | 3 | 4 | 5 |
| **North American Aircraft** | **9** | **5** | **8** | **9** | **10** | **11** |
| **Total Aircraft** | **29** | **14** | **17** | **19** | **21** | **23** |

\*North American had one additional B757P airplane it subleased to another carrier.

**3**

The following table summarizes revenue-generating block hours9:

|  | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| B757P | 431 | 2,338 | 2,848 | 2,848 | 3,111 |
| B767P | 11,161 | 8,701 | 8,191 | 7,811 | 7,717 |
| MD11P | 7,799 | 5,959 | 5,963 | 5,992 | 5,990 |
| **Military Passenger** | **19,391** | **16,998** | **17,001** | **16,650** | **16,818** |
|  |  |  |  |  |  |
| MD11F | 3,054 | 2,912 | 3,742 | 2,793 | 2,793 |
| B747F | 3,661 | 3,416 | 5,161 | 5,033 | 5,033 |
| **Military Cargo** | **6,715** | **6,328** | **8,903** | **7,826** | **7,826** |
|  |  |  |  |  |  |
| B767F | - | 4,590 | 8,840 | 12,490 | 15,580 |
| MD11F | 10,985 | 11,073 | 10,740 | 11,182 | 11,476 |
| B747F | 5,539 | 4,826 | 8,131 | 11,426 | 16,516 |
| **Commercial Cargo** | **16,524** | **20,489** | **27,711** | **35,098** | **43,572** |
|  |  |  |  |  |  |
| B757P | 133 | - | - | - | - |
| B767P | 2,043 | 5,029 | 4,855 | 5,087 | 5,002 |
| MD11P | 157 | 325 | 325 | 325 | 325 |
| **Commercial Passenger** | **2,333** | **5,354** | **5,180** | **5,412** | **5,327** |
|  |  |  |  |  |  |
| **Total Block Hours** | **44,963** | **49,168** | **58,795** | **64,986** | **73,542** |

### III.    REVENUE

#### A.    Military Passenger and Cargo Revenue

AMC revenue is associated with military passenger and cargo flying. The AMC grants mission awards based on entitlement of participating carriers and certain teaming arrangements. AMC revenues are driven by the rate per mile and total miles flown. Contracts for both passenger and cargo missions under the AMC international program are typically one year in duration. While the volume of flying is not fixed and determinable, rates are fixed based on the average costs of all participating air carriers, weighted by flights flown in the AMC international program, plus a fixed operating margin that the AMC sets annually. The AMC also reimburses participating carriers for fuel costs thus limiting carriers' exposure to the volatility of fuel costs.

Forecast AMC demand is based on projected troop counts, troop movements, and expected entitlement. The approximate 31% Alliance Team entitlement, in which Global participates, is applied to aggregate AMC demand to estimate Alliance Team block hours.  These block hours are then allocated to World and North American based on the projected need for medium and large capacity aircraft based on historical data. . Revenue per block hour is forecast by category. World operates within the large passenger and cargo categories, while North American operates in the medium passenger category. Rates are based on the fiscal year 2013 rate, with forecast rate increases of approximately 1% to 2% annually.

#### B.    Commercial Passenger and Cargo Revenue

---

[1]    Excludes Ferry Block Hours

**5**

Commercial revenues are principally driven by overall macroeconomic trends that affect cargo and passenger demand, capacity available in the markets in which the Company competes in addition to general pricing dynamics. World operates both commercial cargo and passenger services while North American operates only passenger services. North American is forecast to enter the commercial cargo market during the fiscal year 2013.

Global provides services through two contract structures: ACMI contracts and full service contracts. ACMI contracts are aircraft operational arrangements whereby the Company provides the aircraft, crew, maintenance and insurance to a customer for a fee that is generally based on the expected block hours multiplied by a block hour rate. An ACMI contract typically includes a minimum block hour commitment per month over the term of the contract. In contrast, a full service contract is an aircraft operational arrangement whereby a carrier provides the aircraft, crew, maintenance, insurance, fuel, landing, ground handling and other necessary operating services to a customer for a single fee that is either based on a fixed fee or a fee based on block hours multiplied by a block hour rate. Full service contracts generally involve higher rates than ACMI contracts because of the full array of services provided, the largest of which is fuel. Due to this price differential per block hour, the mix of full service and ACMI block hours flown in any period can affect the Company's period-over-period commercial revenue results. An increase in relative full service block hours flown will generate higher commercial revenue, all else equal. A decrease in relative full service block hours flown will have the converse effect.

Since ACMI customers are responsible for fuel costs, commercial ACMI revenues are not directly affected by fuel price changes. However, a significant increase in fuel prices could have an adverse effect on demand for the use of the Company's aircraft. Global's commercial full service revenues are fuel price sensitive (although operating income is much less so), as it generally increases or decreases full service block hour rates to reflect expected fuel costs. The Company's full service contracts generally have a block hour rate adjustment provision to mitigate losses created by differences between the fuel price stated in the contract and the actual fuel price incurred.

The Company forecasts ACMI revenue based on recent market experience and management's expectations for future market conditions. ACMI rates and terms are forecast to improve for new customer contracts and for contract renewals. An economic recovery in world cargo markets is projected, which will drive demand and the need for available ACMI capacity in both B747-400F and newly introduced B767-300F flying. The Company projects its full service cargo revenue based on historical activity in addition to current contracts. Full service cargo missions are regularly preceded by one-way AMC cargo flights.

ACMI passenger flying is typically used to "fill" unused block hours on aircraft dedicated to full-time customers; as an example, entering into contracts for university charters during the college football bowl season. Demand is projected based on historical experience and current contracts.

Finally, the Company recently commenced full service passenger flying for a new one-year government contract with a fixed volume of flying and a fixed base rate component.  This contract is expected to continue throughout the forecast period.

C.     Other Revenue

Other revenue primarily consists of revenue generated from the rebill to customers of operating costs incurred which are the customer's responsibility under ACMI or full service contracts.  Other revenue also includes revenue earned by subcontracting the operation of a scheduled flight to another air carrier due to capacity constraints, unanticipated maintenance events and/or scheduling conflicts.

IV.     **OPERATING EXPENSES**

A.     Flight

Flight expenses include crewmember wages and benefits, crew positioning costs, aircraft traffic and servicing expenses, and passenger-related expenses.

In September 2012, Global finalized amendments or implemented new labor agreements as follows:

**5**

–  The World pilots are represented by the International Brotherhood of Teamsters ("*IBT*") and have an existing collective bargaining agreement;

–  The World flight attendants are also represented by the IBT under a separate collective bargaining agreement;

–  The North American pilots are represented by the Air Line Pilots Association ("*ALPA*") and have their own existing collective bargaining agreement;

–  The North American flight attendants are represented by the IBT but have not yet finalized a collective bargaining agreement; and

–  The dispatchers for World and North American represented by the Transport Workers Union ("*TWU*") and have their own existing collective bargaining agreement.

The Company expects the restructure of the above agreements in total to decrease flight expenses in excess of $100 million over the five-year projection period. Collective bargaining agreement savings are the result of lower pay rates, modified provisions for benefits and workrules leading to more efficient and flexible crew scheduling. In 2012, the Company reduced its headcount to coincide with the reduced fleet size. Collective bargaining agreement savings mainly associated with benefits and workrules will begin to be realized during the implementation period in 2012 and the majority of the savings realized during the fiscal year 2013. Cockpit crewmember compensation and benefits are forecast based on the number of heads required to operate each aircraft by business line. Flight attendant compensation and benefits is based on the number of heads required for each passenger flight by business line and aircraft type as forecast in block hours.

Crew positioning expenses are primarily the cost of air and ground transportation and hotels incurred to position crewmembers in locations around the world from which they can operate their assigned flights and then return to their home bases. Global currently has bases near John F. Kennedy (JFK) International airport in New York and Washington-Dulles International Airport. Crew positioning is based on a historical average rate per total forecast departures. The historical average rate was adjusted by 10% in connection with the Company's cost saving initiatives offset by estimated diseconomies of scale resulting from a smaller fleet, and includes a 2% rate increase in future periods.

Ground and aircraft handling include aircraft and traffic servicing expenses, ground services and overfly and navigation fees. Ground services include the costs incurred at airports to land and service aircraft and to handle passenger check-in, security, cargo and baggage. Overfly and navigation fees are incurred when the Company's aircraft fly through certain foreign air space and are paid to the relevant foreign authorities. All aircraft and traffic servicing employee costs and benefits for line and management functions such as ground operations are also included. ACMI contracts typically do not incur aircraft and traffic servicing expenses. Aircraft and traffic servicing was forecast generally based on a rate per total departure. The forecast rate was the historical average and adjusted down by 5% in connection with the Company's cost saving initiatives that include contract renegotiations and companywide pay decreases of 5% for manager levels and above. Future periods included a 2% rate increase. Overfly and navigation fees are forecast based on the number of non-ACMI departures.

Passenger-related expenses mainly include catering, passenger liability insurance, inflight entertainment and interrupted trip expenses. Catering is forecast based on an historical average rate per total passenger departures. The historical average rate was adjusted by 5% in connection with the renegotiation of catering contracts, and includes a 2% rate increase in future periods. All other passenger-related expenses were forecast based on the number of forecast passenger departures.

### ~~B.~~ Maintenance

Maintenance expense includes the cost of repairing the Company's aircraft, which includes the repair or replacement of parts as appropriate, certain scheduled airframe maintenance events, company and contract labor for maintenance activities, line maintenance and other non-capitalized direct costs related to airframe and engine maintenance, including short-term spare engine leases, loan and exchange fees for spare parts, and shipping costs. It

also includes the component usage costs incurred under hourly or per landing maintenance agreements. These agreements require payments of monthly fees to the vendor based on a specified rate per engine flight hour, in exchange for the vendor's providing agreed-upon inventory levels and the performance of overhauls and maintenance as required.

Event, time-driven and maintenance reserves are forecast based on the number of forecast block hours times an average historical rate. Certain historical rates were reduced by 10% in connection with the Company's cost saving initiatives. These initiatives include identifying new maintenance providers and renegotiating the rate in current contracts. Future periods include a 2% rate increase. Maintenance personnel compensation and benefits is forecast based on current headcount times an average historical rate. In 2012, the Company reduced its headcount to coincide with the reduced fleet size and implemented a 5% wage reduction for managers and above.

C.      Fuel

Aircraft fuel expense includes all fuel costs under military and full service commercial contracts. In addition, in certain circumstances, the Company purchases fuel for its ACMI commercial customers. The Company subsequently rebills the amounts to the customers. Aircraft fuel expense is a variable cost; however, the Company's fuel price volatility exposure is limited to its full service commercial contracts. At times, Global has experienced temporary favorable and unfavorable fluctuations in working capital due to the timing of significant fuel price changes and reimbursement for these costs. Fuel prices for 2012 and 2013 were forecast based on the latest AMC peg rate and published fuel curves and assumed to increase 2% per year thereafter. Volume is forecast non-ACMI block hours, and burn rates by aircraft type.

D.      Aircraft Rent

Aircraft rentals include aircraft and engine rent expense under various operating leases for aircraft and spare engines. Global recently restructured its leases in connection with its chapter 11 bankruptcy filing.  These amounts are fixed for the duration of the underlying lease. Aircraft rentals can also include certain supplemental rents paid to fund future maintenance events, commonly referred to as maintenance reserves. This expense category also includes hull insurance which is forecast based on the number of aircraft in the fleet. Spare engine rent is generally forecast by the total number of block hours times an average rate per engine type.

E.      Depreciation and Amortization

Depreciation reflects the periodic expensing of the recorded cost of capitalized engine overhauls and related life limited parts, referred to as LLPs, and certain scheduled airframe and landing gear maintenance events, aircraft improvements, and rotable parts for all fleet types, together with property and equipment. Depreciation is forecast for existing depreciable assets, in addition to forecast maintenance events. Amortization reflects the periodic expensing of the recorded value of definite-lived intangible assets. Amortization is forecast based on the historical amortization.

F.      Selling, General and Administrative Costs

Selling, general and administrative expenses (SG&A) predominately include salaries, wages and benefits for administrative personnel, facility rents and utilities, professional and legal fees, information technology expenditures as well as AMC commissions. Compensation and benefits were forecast based on the number of heads subsequent to a significant headcount reduction in February 2012 in connection with the Company's fleet rationalization. In that same month, the Company implemented a 5% pay cut for manager level and above, in addition to a 10% decrease for executives. As a result, SG&A wages are forecast to be down 57% for the fiscal year 2013 as compared to the fiscal year 2011. Non-wage general and administrative expenses are forecast at a 34% decrease for 2013 compared to 2011 as the company rationalizes its cost base for a smaller operating footprint. Future periods include an increase of 1% to 2%. Commissions are paid to Alliance team members as compensation for military missions the Company operates that were awarded to the Alliance team based on its AMC entitlement points. These commissions are negotiated as a percentage of the revenue earned from those military missions, and are paid monthly. Commissions are forecast based on a percent of AMC revenue.

G.      Interest, Reorganization Items and Other Expenses

Interest expense represents interest on its outstanding debt obligations as well as the amortization of projected capitalizable debt issuance costs.  Forecast interest expense includes the Company's post-bankruptcy capital structure at forecast market interest rates. Reorganization items include the write-off of flight equipment and capitalized maintenance events associated with rejected aircraft leases, workforce reduction and retraining costs, legal and professional fees associated with the Company's chapter 11 filing and the Company's restructured debt all offset by trade payables, accrued interest and debt forecasted to be compromised.

### V.      BALANCE SHEET ASSUMPTIONS

#### A.      Accounts Receivable

Accounts receivable are due primarily from the U.S. Government, tour operators, international passenger and cargo air carriers, and international freight forwarders. Accounts receivable are charged off against the allowance for doubtful accounts when it is probable that the receivable will not be recovered. Accounts Receivable, net, are forecast on a days' receivable basis with the allowance for doubtful accounts unchanged.

#### B.      Inventories

Inventories consist primarily of expendable and recoverable/repairable aircraft spare parts and other supplies. Inventories are charged to expense when consumed. The Company records an allowance for obsolescence against its inventories by amortizing the book value of the aircraft parts inventories, net of any estimated residual value, over the related fleet's estimated useful service life, or the average of the related fleet's lease term, whichever is shorter. Inventories, net, are forecast at a historical rate, net of obsolescence times the number of aircraft.

#### C.      Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets consist mainly of deposits under leases, or other agreements that will be returned within the next 12 months, and the prepayment for goods or services to be realized within the next 12 months. Also included are deposits received in advance of certain charter flights, which are held in an escrow account until the charter service is provided. Other receivables included in prepaid expenses and other current assets include insurance claims and other miscellaneous receivables including receivables from lessors. Prepaid expenses and other current assets are forecast based on a percentage of certain operating expenses based on history.

#### D.      Property and Equipment

The Company records additions to property and equipment at cost. Property and equipment is depreciated to residual values, if any, over their estimated useful service lives using the straight-line method. The vast majority of the Company's capital expenditures include capitalized engine overhauls and related life limited parts, referred to as LLPs, and certain scheduled airframe and landing gear maintenance events, aircraft improvements, and rotable parts for all fleet types, together with property and equipment. Forecast capital expenditures predominately include capitalizable maintenance events pursuant to event or time-driven intervals based on the Company's current Federal Aviation Administration (FAA) approved maintenance programs.

**Capital Expenditures**

| (in mm's) | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| Engine overhauls | $16.7 | $26.2 | $41.1 | $30.4 | $44.3 |
| 4C checks | 4.3 | 6.3 | 4.4 | 8.7 | 2.4 |
| Other maintenance event | 8.1 | 9.8 | 5.6 | 8.2 | 7.0 |
| Non-maintenance [2] | (0.0) | 4.2 | 4.3 | 2.6 | 2.8 |
| **Total capital expenditures** | **$29.2** | **$46.5** | **$55.4** | **$49.8** | **$56.5** |

E.       Airframe and Engine Maintenance and Lease Requirements

The cost of major engine overhauls for fleet types and the cost of certain overhauls related to heavy airframe, engine, life-limited parts (LLP), landing gear and auxiliary power units (APU) for all fleet types is capitalized when performed and amortized over estimated useful lives based upon usage, or to earlier fleet or aircraft calendar limits, for both owned and leased aircraft. Under the majority of its aircraft and engine leases, the Company is required to make periodic maintenance reserve payments to lessors for certain future maintenance work such as airframe, engine, LLP, landing gear and APU overhauls. At inception and at each balance sheet date the Company assesses whether its maintenance reserve payments required by its leases are substantively and contractually related to the maintenance of the leased asset. Payments that are determined to be substantively and contractually related to the maintenance of the leased asset are accounted for as maintenance deposits and are reflected as Maintenance Reserve Deposits in the Company's balance sheet. In addition, under its aircraft and engine leases, the Company is required to return the airframes, engines, LLP, landing gear, and APUs to the lessors in a specified maintenance condition at the end of the lease (return condition). If the return condition is not met, the leases generally require the Company to provide financial compensation to the lessor. Under certain leases, the maintenance reserve deposits may not be refundable to the Company. Consequently, the Company periodically reviews the balances of the maintenance reserve deposits and writes off any amounts that are no longer probable of recovery. In determining whether it is probable that maintenance deposits will be used to offset the liability for future maintenance costs, the Company considers the condition of the aircraft, including but not limited to, the airframe and engines and the projected future usage of the aircraft based on the Company's business and fleet plans.

Maintenance reserve deposits are forecast based on the requirements in our aircraft leases. Short-term and long-term fluctuations occur depending on the forecast timing of maintenance events and the subsequent reimbursement. Maintenance reserve deposits estimated to be refunded in the next 12-month period are classified as short-term. Maintenance reserve deposits to be refunded over the forecast period are as follows:

|  | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| **Maintenance reserve reimbursement** | $17.0 | $29.3 | $27.8 | $24.3 | $33.0 |

F.       Intangible Assets

Intangible assets include the present value of future cash flows on our military contract as well as the value of our operating certificates. Military contract intangibles are forecast to include amortization at the historical rate. The Company's operating certificates are forecast to be unchanged.

G.       Restricted Cash

Restricted cash primarily consists of deposits held to secure outstanding stand-by letters of credit issued by a financial institution on behalf of the Company predominately in favor of insurance companies as part of the Company's risk management program. Restricted cash is forecast to remain unchanged.

H.       Deposits and Other Assets

Deposits and other assets primarily consist of long-term security deposits required under aircraft, engine, or building lease agreements, and unamortized deferred loan costs. Deposits and other assets are forecast to fluctuate with the estimated changes in the Company's fleet.

I.       Income Taxes

---

2    2012F includes asset sales

The Company accounts for income taxes under the asset and liability method. Under this method, the Company recognizes deferred income taxes based upon the tax effects of temporary differences between the financial statement and tax basis of assets and liabilities, as measured through the application of current enacted tax rates. When necessary, deferred income tax assets are reduced by a valuation allowance to an amount that is determined to be more likely than not recoverable. The Company must make significant estimates and assumptions about future taxable income and future tax consequences when determining the amount of the valuation allowance.

The Company's income tax provisions are based on calculations, estimates, and assumptions that are subject to potential examination by the Internal Revenue Service (IRS) and other taxing authorities.

Forecast taxes assume the utilization of the maximum net operating losses on an annual basis as well as certain preferred tax positions management believes it will elect. Deferred taxes are forecast to remain unchanged. The Company has forecast its cashflow based on an assumption that there are limitations associated with net operating loss uses associated with section 382(l)(6) of the tax code.

J.      Liabilities and Stockholders' Equity

Accounts payable, accrued flight expenses, and accrued expenses and other are forecast as a percentage of historical operating expense. Air traffic liability represents the Company's unearned revenue and is forecast based on a historical percentage of future revenue. Accrued compensation and benefits is forecast as a percent of historical compensation and benefit expenses for all employees. Other liabilities predominately include the World post-retirement benefit plan obligation, deferred rents and FIN48 "more-likely-than-not" tax estimates. Other liabilities are forecast to remain unchanged. The forecast assumes $307.0 million in pre-petition bankruptcy liabilities have been extinguished, including certain accounts payable, outstanding debt (net of discount), and accrued interest. In addition, the forecast assumes the recovery of normalized credit terms provide to the Company by its vendors. Forecast additional paid-in capital is adjusted for non-cash stock option expense at the historical rate.

VI.      **STATEMENT OF CASH FLOWS**

A.      Operating Activities

Net income (loss) is adjusted for forecast non-cash items including depreciation and amortization, amortization of loan costs and non-cash stock-based compensation expense. Forecast working capital changes predominately represent the changes in the working capital accounts on the balance sheet. The largest changes forecast are accounts payable and accrued expenses and other current liabilities in 2013 as the Company returns to normal credit terms, begins paying cash taxes and increases its fleet and related block hours operated; other assets in 2014, and other current assets in 2015 as the Company grows its fleet and funds maintenance reserve requirements as required under its aircraft leases. To a lesser extent this is offset by the refund of maintenance reserves for heavy maintenance events.

B.      Investing Activities

Investing activities consist primarily of capitalized maintenance events and the purchase of rotable parts. Capitalized maintenance events are forecast based on the requirements of both the underlying aircraft leases and time driven edicts by the FAA.

C.      Financing Activities

Financing activities consist primarily of proceeds and paydowns on its restructured debt obligations and its revolving line of credit.

**Consolidated Income Statement** [3][4][5]

| | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| Military Passenger | 347.8 | 302.7 | 311.2 | 311.8 | 320.3 |
| Military Cargo | 135.8 | 132.0 | 193.1 | 178.6 | 182.2 |
| Commercial Cargo | 94.7 | 132.7 | 169.1 | 211.8 | 258.4 |
| Commercial Passenger | 32.1 | 83.6 | 83.6 | 87.6 | 88.6 |
| Other | 11.3 | 1.8 | - | - | - |
| **Total Revenues** | **621.8** | **652.9** | **757.1** | **789.8** | **849.5** |
| | | | | | |
| Flight Costs | 187.0 | 146.0 | 158.8 | 166.9 | 178.6 |
| *Pilot Compensation* | 65.6 | 45.9 | 51.0 | 58.9 | 67.0 |
| *Flight Attendant Compensation* | 22.9 | 12.9 | 13.4 | 13.7 | 14.1 |
| *Positioning* | 45.6 | 34.2 | 37.0 | 37.2 | 38.8 |
| *Overfly / Navigation Fees* | 13.0 | 14.2 | 15.8 | 15.0 | 15.0 |
| *Passenger Expense* | 3.1 | 3.0 | 3.1 | 3.2 | 3.2 |
| *Ground Services* | 24.0 | 23.4 | 25.8 | 26.0 | 27.3 |
| *Catering* | 12.8 | 12.4 | 12.7 | 12.9 | 13.2 |
| Maintenance | 72.1 | 78.8 | 95.7 | 107.0 | 122.1 |
| Fuel | 203.5 | 218.5 | 250.5 | 245.6 | 250.6 |
| **Total Variable Costs** | **462.7** | **443.3** | **505.0** | **519.5** | **551.2** |
| | | | | | |
| Aircraft & Engine Rent | 61.9 | 59.2 | 71.4 | 79.9 | 90.5 |
| Depreciation & Amortization | 66.1 | 57.0 | 61.4 | 63.6 | 68.0 |
| SG&A | 80.0 | 73.6 | 80.8 | 84.1 | 87.4 |
| **Total Fixed Costs** | **207.9** | **189.8** | **213.6** | **227.6** | **245.9** |
| | | | | | |
| **Total Operating Expenses** | **670.6** | **633.1** | **718.7** | **747.1** | **797.1** |
| | | | | | |
| **Operating Income (Loss)** | **(48.9)** | **19.7** | **38.4** | **42.7** | **52.4** |
| | | | | | |
| Interest, net | 44.4 | 11.9 | 10.3 | 10.1 | 10.1 |
| Reorganization Items | (73.6) | - | - | - | - |
| Other | 0.5 | - | - | - | - |
| **Other Expense (Income)** | **(28.7)** | **11.9** | **10.3** | **10.1** | **10.1** |
| | | | | | |
| **Pretax Income (Loss)** | **(20.2)** | **7.8** | **28.1** | **32.6** | **42.3** |
| | | | | | |
| Taxes | (15.5) | 10.6 | 11.1 | 14.2 | 17.3 |
| **Net Income (Loss)** | **(4.7)** | **(2.8)** | **17.0** | **18.4** | **25.0** |
| | | | | | |
| **EBITDA** | **17.2** | **76.8** | **99.8** | **106.3** | **120.4** |
| Maintenance Event Capex | (29.2) | (42.3) | (51.1) | (47.2) | (53.7) |
| **Adjusted EBITDA** | **(12.0)** | **34.5** | **48.7** | **59.1** | **66.7** |

---

[3]    Prior to fresh start accounting

[4]     Actuals as of August 2012

[5]    Reorganization items include the write-off of flight equipment and capitalized maintenance events associated with rejected aircraft leases, workforce reduction and retraining costs, legal and professional fees associated with the Company's chapter 11 filing and the Company's restructured debt all offset by trade payables, accrued interest and debt forecasted to be compromised

12

**Consolidated Balance Sheet** [6][7][8]

|  | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| **ASSETS** |  |  |  |  |  |
| Cash and Cash Equivalents | 3.9 | 16.3 | 43.6 | 74.3 | 106.2 |
| Accounts Receivable, Net | 18.0 | 19.9 | 18.4 | 19.3 | 20.9 |
| Inventories, Net | 8.6 | 8.6 | 7.8 | 8.7 | 9.5 |
| Maintenance Reserve Deposits | 13.6 | 12.2 | 8.7 | 17.4 | 22.6 |
| Deferred Tax Assets | 22.5 | 22.5 | 22.5 | 22.5 | 22.5 |
| Prepaid Items and Other Current Assets | 27.9 | 38.7 | 40.0 | 41.8 | 41.8 |
| **Total Current Assets** | **94.6** | **118.2** | **141.1** | **183.9** | **223.4** |
| **Total Property and Equipment, Net** | **101.3** | **116.0** | **135.2** | **146.6** | **160.3** |
| Military Contract Intangibles | 117.0 | 91.8 | 66.6 | 41.4 | 16.1 |
| Other Intangible Assets | 4.0 | 4.0 | 4.0 | 4.0 | 4.0 |
| Restricted Cash | 8.1 | 8.1 | 8.1 | 8.1 | 8.1 |
| Maintenance Reserve Deposits | 41.7 | 41.1 | 49.8 | 52.0 | 55.3 |
| Deposits and Other Assets | 16.5 | 20.3 | 22.6 | 25.0 | 27.3 |
| **Total Other Assets** | **187.3** | **165.3** | **151.1** | **130.4** | **110.8** |
| **Total Assets** | **383.2** | **399.4** | **427.4** | **460.9** | **494.5** |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** |  |  |  |  |  |
| **Liabilities** |  |  |  |  |  |
| Short Term Debt | 5.0 | 5.0 | - | - | - |
| Accounts Payable | 29.1 | 35.3 | 41.4 | 44.1 | 48.0 |
| Air Traffic Liability | 4.9 | 6.4 | 7.6 | 9.1 | 9.1 |
| Accrued Compensation and Benefits | 21.4 | 19.5 | 20.2 | 22.4 | 24.4 |
| Accrued Flight Expenses | 10.8 | 11.4 | 12.2 | 11.5 | 11.3 |
| Accrued Expenses and Other | 27.8 | 36.3 | 38.9 | 43.1 | 41.0 |
| **Total Current Liabilities** | **99.0** | **114.0** | **120.3** | **130.2** | **133.7** |
| Long Term Debt | 135.6 | 135.6 | 135.6 | 135.6 | 135.6 |
| Deferred Tax Liabilities | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Other Liabilities | 37.4 | 37.4 | 37.4 | 37.4 | 37.4 |
| **Total Other Liabilities** | **188.1** | **188.1** | **188.1** | **188.1** | **188.1** |
| **Total Liabilities** | **287.1** | **302.0** | **308.4** | **318.3** | **321.8** |
| **Equity** |  |  |  |  |  |
| **Total Shareholders' Equity** | **96.1** | **97.4** | **119.1** | **142.6** | **172.7** |
| **Total Liabilities and Shareholders' Equity** | **383.2** | **399.4** | **427.4** | **460.9** | **494.5** |

---

6    Prior to fresh start accounting
7    Actuals as of August 2012
8    Prior to any excess cash flow sweep

**13**

**Consolidated Cash Flow Statement** [9] [10] [11]

| | 2012F | 2013F | 2014F | 2015F | 2016F |
|---|---|---|---|---|---|
| **Operating Activities** | | | | | |
| Net Income (Loss) | (6.2) | (2.8) | 17.0 | 18.4 | 25.0 |
| Depreciation and Amortization | 66.4 | 57.0 | 61.4 | 63.6 | 68.0 |
| Amortization of Loan Costs | 17.3 | 0.6 | 0.2 | 0.2 | - |
| Amortization of Debt Discount | 12.7 | - | - | - | - |
| Asset Impairments and Retirements | 90.9 | - | - | - | - |
| Gain on Extinguishment of Debt | (187.6) | - | - | - | - |
| Stock Compensation Expense | 3.2 | 4.1 | 4.7 | 5.1 | 5.2 |
| Non-Cash Interest Expense | 10.8 | - | - | - | - |
| Loss (Gain) on Disposal of Assets | 0.6 | - | - | - | - |
| Deferred Income Taxes | (15.5) | - | - | - | - |
| Change in Operating Assets & Liabilities | | | | | |
| Restricted Cash | (0.3) | - | - | - | - |
| Accounts Receivable, Net | 24.6 | (1.9) | 1.5 | (0.9) | (1.6) |
| Inventories, Net | 2.0 | 0.0 | 0.8 | (0.9) | (0.8) |
| Other Current Assets | (5.5) | (9.3) | 2.2 | (10.4) | (5.2) |
| Accounts Payable | (23.5) | 6.2 | 6.1 | 2.8 | 3.8 |
| Air Traffic Liabilities and Accrued Flight | (7.0) | 2.0 | 2.0 | 0.8 | (0.3) |
| Accrued Compensation | (3.5) | (1.8) | 0.7 | 2.2 | 2.0 |
| Accrued Expense and Other Current Liabilities | (44.2) | 8.5 | 2.5 | 4.2 | (2.1) |
| Other Liabilities | (0.6) | - | - | - | - |
| Other Assets | 8.9 | (3.8) | (11.2) | (4.6) | (5.7) |
| **Net Cash (Used In) Provided By Operating Activities** | **(56.5)** | **58.9** | **87.8** | **80.4** | **88.4** |
| | | | | | |
| **Investing Activities** | | | | | |
| Capital Expenditures -- Flight Equipment | (29.2) | (45.0) | (52.6) | (48.8) | (55.4) |
| Capital Expenditures -- Facilities, Ground & Other | (0.1) | (1.5) | (2.8) | (1.0) | (1.0) |
| Sale of Assets, Investments, and Other | 0.1 | - | - | - | - |
| **Net Cash Used In Investing** | **(29.2)** | **(46.5)** | **(55.4)** | **(49.8)** | **(56.5)** |
| | | | | | |
| **Financing Activities** | | | | | |
| Proceeds from Long-term Debt, Net | 44.6 | - | - | - | - |
| Revolver Draw (Repayment), Net | 5.0 | - | (5.0) | - | - |
| Debt Issuance Costs | (0.8) | - | - | - | - |
| **Net Cash (Used In) Provided By Financing Activities** | **48.8** | **-** | **(5.0)** | **-** | **-** |
| | | | | | |
| **Change in Cash and Cash Equivalents** | **(36.9)** | **12.4** | **27.4** | **30.6** | **31.9** |
| | | | | | |
| Cash and Equivalents, beginning of period | 40.7 | 3.9 | 16.3 | 43.6 | 74.3 |
| **Cash and Equivalents, end of period** | **3.9** | **16.3** | **43.6** | **74.3** | **106.2** |

---

[9]  Prior to fresh start accounting

[10]  Actuals as of August 2012

[11]  Prior to any excess cash flow sweep

**13**

**Exhibit E**

**Valuation Analysis**

## VALUATION ANALYSIS

### I.    ESTIMATED REORGANIZATION VALUATION OF DEBTORS

The Debtors have been advised by Rothschild Inc. ("***Rothschild***"), their investment banker, with respect to the reorganization value of reorganized Global, World and North American on a going concern basis.

Solely for purposes of the Plan, the estimated range of a reorganization value of the Reorganized Debtors was assumed to be approximately $170 million to $220 million (with a point estimate of approximately $195 million) as of an assumed Effective Date of December 1, 2012.  Rothschild's estimate of a range of reorganization values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ASSUMED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF DECEMBER 1, 2012, REFLECTS WORK PERFORMED BY ROTHSCHILD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO ROTHSCHILD AS OF OCTOBER 3, 2012. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT ROTHSCHILD'S CONCLUSIONS, ROTHSCHILD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE**.

Based upon the assumed combined range of the reorganization value of the Reorganized Debtors of between $170 million and $220 million, assumed net debt of $135 million, Rothschild has employed an imputed estimate of the range of equity value for the Reorganized Debtors between approximately $35 million and $85 million, with a midpoint estimate of $60 million.

**THE ASSUMED RANGE OF TOTAL ENTERPRISE VALUE IS BASED ON A COMPROMISE AND SETTLEMENT OF ISSUES BETWEEN AND AMONG THE DEBTORS, THEIR LABOR UNIONS AND THE CONSENTING SECURED NOTEHOLDERS RELATING TO THE DEBTORS' ENTRY INTO NEW FIVE-YEAR COLLECTIVE BARGAINING AGREEMENTS.    THE TERMS OF THE SETTLEMENT ARE OUTLINED IN THE HEADS OF AGREEMENT ATTACHED AS EXHIBIT G TO THE DISCLOSURE STATEMENT.   THE TERMS OF THE SETTLEMENT AND THE HEADS OF AGREEMENT ARE NON-SEVERABLE WITHOUT THE CONSENT OF THE PARTIES.   WITHOUT BANKRUPTCY COURT APPROVAL OF THE SETTLEMENT, THE ASSUMED RANGE OF TOTAL ENTERPRISE VALUE COULD BE MATERIALLY LOWER.**

In providing the foregoing estimate of the reorganization value of the Reorganized Debtors, Rothschild based their estimate on a number of assumptions, including a successful reorganization of the Debtors' business and finances in a timely manner, the implementation of reorganized the Debtors' Business Plan, the achievement of the forecasts reflected in the Business Plan, access to adequate exit financing, the leadership of the management team, market conditions as of October 1, 2012 continuing through the assumed Effective Date of December 1, 2012, no change to the economy, air cargo industry or AMC demand or rates, sustainability of constructive relationship with the Debtors' unionized crafts, no material adverse change and the Plan becoming effective in accordance with the estimates and other assumptions discussed herein.

With respect to the Business Plan financial projections prepared by the management of the Debtors and included as **EXHIBIT D** to this Disclosure Statement, Rothschild assumed that such projections have been reasonably prepared in good faith and on a basis reflecting the best, currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Reorganized Debtors. Rothschild's estimate of a range of reorganization values assumes that operating results projected by the Debtors will be achieved by the Reorganized Debtors in all material respects, including revenue growth and improvements in operating margins, earnings and cash flow. Certain of the results forecast by the management of the Debtors are materially better than the recent historical results of operations of the Debtors.  As a result, to the extent that the estimate of enterprise values is dependent upon the Reorganized Debtors performing at the levels set forth in the projections, such analysis must be considered speculative. If the business performs at levels below those set forth in the projections, such performance may have a material impact on the projections and on the estimated range of values derived there from. The business plan and the valuation are subject to certain risks including global economic growth and its effect on the air cargo market, the

demand and reimbursement rates associated with AMC flying, sustainability of constructive relationship with the Debtors' unionized crafts, operational challenges, tax risks and other risks as discussed in the general assumptions describing the business plan.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND EQUITY VALUE OF THE REORGANIZED DEBTORS, ROTHSCHILD (I) REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF THE DEBTORS; (II) REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTORS, INCLUDING THE PROJECTED FINANCIAL INFORMATION, WHICH WAS PREPARED AND PROVIDED TO ROTHSCHILD BY THE DEBTORS' MANAGEMENT AND WHICH RELATE TO THE DEBTORS' BUSINESS AND ITS PROSPECTS; (III) MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTORS TO DISCUSS DEBTORS' OPERATIONS AND FUTURE PROSPECTS ; (IV) REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT ROTHSCHILD DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESS OF THE DEBTORS; (V) CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESS; AND (VI) CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE. ALTHOUGH ROTHSCHILD CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTORS' BUSINESS, OPERATING ASSETS AND LIABILITIES AND THE DEBTORS' BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTORS, AS WELL AS PUBLICLY AVAILABLE INFORMATION.

IN ADDITION, ROTHSCHILD DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN THE BUSINESS PLAN IN CONNECTION WITH ROTHSCHILD'S ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH. ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE. IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY ROTHSCHILD REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTORS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, ROTHSCHILD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER

**TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG- TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.**

(i)——Valuation Methodology

Rothschild performed a variety of analyses and considered a variety of factors in preparing the valuations of the Reorganized Debtors. Rothschild prepared individual valuation analyses of both World and North American utilizing the same methodologies below and allocating corporate costs and cashflows across the two airlines. While several generally accepted valuation techniques for estimating the Debtors' enterprise values were used, Rothschild primarily relied on two methodologies: comparable public company analysis and discounted cash flow analysis. Rothschild applied equal weighting to these two methodologies. Rothschild also considered precedent transactions; however, it was determined that there were not enough transactions involving companies comparable to Global within a reasonable time period to make this valuation approach relevant to an estimate of the Debtor's enterprise value. In addition, there are challenges in the application of precedent transactions analysis due to the absence of a useful and reliable last twelve months ("*LTM*") performance. As such, precedent transactions were not relied upon. Rothschild's valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analysis as a whole, could create a misleading or incomplete conclusion as to the Debtors' enterprise values. In preparing its valuation estimate, Rothschild performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Rothschild's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

(a)——Comparable Public Company Analysis:

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, target market segments, growth prospects, maturity of businesses, market presence, size and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation; however, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value. In performing the Comparable Public Company Analysis, the following publicly traded companies deemed generally comparable to the Debtors in some or all of the factors described above, were selected:

Passenger Comparables: Southwest Airlines, US airways, Delta Airlines, Hawaiian Holdings, United Continental, JetBlue Airways Corporation, Spirit Airlines, Allegiant Travel Company, LAN Airlines, Republic Airways Holdings, Inc. and Alaska Air Group.

Cargo Comparables: Atlas Air Worldwide Holdings Inc. and Air Transport Services Group, Inc.

The selection of appropriate comparable companies is difficult because there are no public, "pure- play" competitors to the Debtors.  Rothschild focused on Cargo Comparables while also considering the Passenger Comparables.

Rothschild has utilized the median consensus of analyst estimates for 2013 earnings before interest, taxes, depreciation and amortization ("*EBITDA*") and utilized LTM rental expense added to consensus EBITDA as proxy for forecast earnings before interest, taxes, depreciation, amortization and rent ("*EBITDAR*"). Rothschild also reviewed individual analyst reports for EBITDA and EBITDAR forecasts. These metrics were reduced for

maintenance capex (where available) to create an adjusted EBITDA. Rothschild analyzed the current trading values (including capitalized leases calculated at 7.0x rent expense for EBITDAR) for the comparable companies as a multiple of forecasted EBITDAR and EBITDA for the year ending 2013.

Rothschild employed an adjusted EBITDAR multiple range of 4.0x - 5.0x for 2013 results (including an estimate for capitalized aircraft rent). These multiples were then applied to the Debtors' forecast financial adjusted EBITDAR to determine the range of enterprise values. The value of capitalized leases, calculated as 7.0x rent expense, is deducted to determine the Debtors' enterprise values. Rothschild also used an adjusted EBITDA range of 3.5x – 4.5x applied to Global's 2013 forecast EBITDA to determine the Debtors' enterprise value.

(b)    Discounted Cash Flow Approach:

The discounted cash flow ("**DCF**") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to the Debtors. The expected future cash flows have two components: the present value of the projected unlevered after- tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the projections). Rothschild's discounted cash flow valuation is based on the Business Plan's projections. Rothschild discounted the projected cash flows using World and North American's estimated weighted average cost of capital ("**WACC**") assuming that rent expense is either an operating or a financial cost. For the DCF analysis, Rothschild employed an 11.8% to 12.8% WACC. Rothschild calculated the terminal value of using the perpetual free cash flow growth formula.

Under the perpetual free cash flow growth method, terminal value is calculated assuming a constant growth rate that continues indefinitely. Rothschild applied a range of growth rates of 0% to 1%; however, the Debtors' cash flows cannot be predicted to grow at any stable rate for perpetuity due to the highly cyclical nature of the industry.

The DCF approach relies on the Debtors' ability to project future cash flows with some degree of accuracy. Because the Debtors' projections reflect significant assumptions made by the Debtors' management concerning anticipated results, the assumptions and judgments used in the Projected Financial Information may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Rothschild cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtors' projections. Rothschild separated valued the Debtors' projected net operating losses and included this amount in the DCF valuation.

**THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY ROTHSCHILD REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF REORGANIZED HOLDINGS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST- REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH ROTHSCHILD'S VALUATION ANALYSIS.**

**Exhibit F**

**Liquidation Analysis**

**LIQUIDATION ANALYSIS**

## I.    INTRODUCTION

Separate liquidation analyses have been prepared for World, North American, Global Shared Services, Inc. and Global Aviation. These analyses have been consolidated into a single liquidation analysis (the "***Liquidation Analysis***"), which reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is based on a number of estimates and assumptions that, although considered reasonable by the Debtors, are subject to significant business, economic and competitive uncertainties and contingencies beyond the Debtors' control, and which could be subject to material change.

**THERE CAN BE NO ASSURANCE THAT THE RECOVERIES FROM THE LIQUIDATION OF ASSETS REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE ESTIMATED IN THE LIQUIDATION ANALYSIS.**

The Liquidation Analysis assumes that the Bankruptcy Cases were converted to cases under Chapter 7 and liquidated through an orderly liquidation process and assumes the July 31, 2012 balance sheet is a reasonable proxy for the analysis. Both the estimated proceeds arising from the liquidation of the Debtors' assets and the estimated claims associated with the Debtors are set forth in the analysis with a low and high estimated amount, where applicable. The Debtors are still in the process of reviewing and analyzing unsecured claims. Thus, the amounts used in the Liquidation Analysis are subject to material change, and the actual amount of Allowed Claims could vary materially from the estimates utilized in the Liquidation Analysis.

## II.    ASSUMPTIONS

### A.    Balance Sheet Assets

The following are assumptions with respect to specific categories of the balance sheet assets.

***Cash***: This category reflects the Debtors' cash balance as of July 31, 2012.

***Accounts Receivable, net***: This category reflects the Debtors' trade receivables balance as of July 31, 2012. This amount was offset by an approximate $13.5 million fuel obligation to the AMC, and then estimated at 85%-100% recovery based on a net orderly liquidation value percentage (NOLV).

***Intercompany Receivable (Payable)***: Intercompany accounts on an individual Debtor basis consolidate to $0. Recovery on these claims is assumed to be pari passu with other Unsecured Claims against the Debtors, and thus is estimated at a 0% recovery rate.

***Inventories, net***: This category reflects the Debtors' inventory balance as of July 31, 2012. Inventories consist primarily of expendable and recoverable/repairable aircraft spare parts and other supplies. The Debtors utilized a NOLV Percentage of 10% - 15%.

***Deferred tax assets***: The Company has not assumed any recovery on tax assets.

***Prepaid and other current assets***: Prepaid assets include insurance, fuel, VISA, rent, VAT, non-trade AR, Valley escrow, miscellaneous operating deposits, short-term deferred rent, professional fee retainers and other. The Company has utilized various recovery rates on these categories between 0%-100% which results in a total recovery of $7.6 million - $10.8 million.

***Flight equipment, net and facilities and ground equipment, net (combined, "PP&E")***:  This category reflects the Debtors' PP&E balance as of July 31, 2012. Recovery is estimated at 10%-25% for flight equipment, and between 5%-10% for facilities and ground equipment. Capitalized maintenance events have an estimated recovery of $0.

***Military intangibles***: Upon the acquisition of World Air Holdings, the Company recorded the estimated value of its contract with the AMC. The value of this account as of July 31, 2012 is net of accumulated amortization.  As this intangible asset is non-transferable, the NOLV of this balance sheet line item is estimated at 0%.

*Restricted cash*: This category includes cash collateral associated with outstanding letters of credit and is assumed to have a 0% NOLV.

*Maintenance reserve deposits*: This category includes deposits held by lessors for certain future maintenance work such as airframe, engine, landing gear and APU overhauls. The Debtors' estimate these deposits would be retained by the lessor in the event of a Chapter 7 filing and thus are estimated at a 0% NOLV.

*Deposits and other assets*: This category predominately includes unamortized debt issuance costs and aircraft lessor operating deposits. Unamortized debt issuance costs have no cash value. Similar to maintenance reserve deposits, the Debtors' anticipate all operating deposits would be retained by the lessor in the event of a conversion to a chapter 7 filing.

*Other intangibles*: This category includes the Debtors' fair market value for estimated NOLV and is related to the operating certificates from the FAA. This category is assumed to a have some recovery associated with the transfer of the certificate to another air carrier.

> B.    Carve-out and Liquidation Expenses

*Carve-out*: The estimate of claims includes a carve-out of $1.9 million for outstanding chapter 11 professional fees not paid prior to the conversion of the case to chapter 7 liquidation.

*Liquidation Expenses*: Liquidation expenses include estimated trustee fees and expenses to wind-down in the event of chapter 7 liquidation.

> *Chapter 7 Trustee Fees*:  The Liquidation Analysis assumes that a chapter 7 trustee would receive three percent of the value distributed to creditors as payment for administering the chapter 7 cases. These fees are assumed to be paid prior to any distribution to creditors.
>
> *Wind down Expenses*: The estimated wind down expenses include amounts for certain payroll and other employee payroll and benefits, real estate carrying costs and other expenses incurred during the asset disposition period. These expenses are assumed to be $250,000 per month for a total of 12 months, and to be paid prior to any distribution to creditors.

> C.    Claims

> (i)    Secured Claims

*Debtor In Possession ("DIP") and Roll-up Claims*:  The Liquidation Analysis includes payment of $30.9 million outstanding under the DIP Credit Agreement as of July 31, 2012. $5.0 million was subsequently borrowed under this loan which has not been incorporated but would be offset by the cash proceeds received on account of the $5.0 million additional draw.

The Liquidation Analysis assumes $45.0 million in Senior Secured ~~Lenders~~**Noteholders** roll-up claims as of conversion to Chapter 7 consistent with the outstanding amount as of the time of this analysis.

*Non-Roll-Up Claims*: The Debtors have estimated $111.4 million as a non-roll up claim for the benefit of the Senior Secured ~~Lenders~~**Noteholders**.

*Second Lien Claims*: The Debtors have estimated the Second Lien Lender claim to be $98.1 million.

> (ii)    Administrative Claims

*Administrative Claims*: The Debtors have estimated their administrative claims to be $5.0 - $10.0 million, and include chapter 7 post-petition accounts payable, accrued payroll and benefits and 503(b)(9) claims arising from the inventory that the Debtors received in the 20 days preceding the filing.

> (iii)    General Unsecured Claims

*General Unsecured Claims*: The Debtors are continuing to analyze all claims and therefore the amounts utilized for the purposes of the Liquidation Analysis are subject to material change. The estimated amount of general unsecured claims include, but are not limited to, trade creditors, amounts owed to lessors and other creditors.

3

### III.    DISCLAIMERS AND VARIANCES

The process of estimating recoveries in the event of conversion to a chapter 7 filing is uncertain due to economic, business, litigation and other contingencies, among other reasons. The underlying estimates and projections utilized by the Debtors to develop the attached Liquidation Analysis have been prepared by the Debtors and have not been examined by independent accountants.

The Debtors make no representations of the accuracy of these estimates and projections or a chapter 7 trustee's ability to meet the estimates and projections as the assumptions underlying the estimates and projections are subject to significant uncertainties. Unanticipated results, positive or negative, may occur. The Liquidation Analysis is, by its nature, uncertain. Nonetheless, the Liquidation Analysis represents the Debtors' current and best estimate of the financial implications from a conversion of the Bankruptcy Cases to cases under chapter 7 and the associated liquidation of assets under the circumstances described above.

**4**

**Global Aviation Holdings Inc. - Liquidation Analysis**
**As of July 31, 2012**
**($ in millions)**

| | Book Value | Recovery (%) Low | Recovery (%) High | Recovery Value ($) Low | Recovery Value ($) High |
|---|---|---|---|---|---|
| Cash | $20.6 | 100% | 100% | $20.6 | $20.6 |
| Accounts receivable, net [1] | 17.8 | 85% | 100% | 15.2 | 17.8 |
| Intercompany Receivables (payable) | - | 0% | 0% | - | - |
| Inventories, net | 10.8 | 10% | 15% | 1.1 | 1.6 |
| Deferred tax assets | 14.3 | 0% | 0% | - | - |
| Prepaid and other current assets [2] | 38.4 | 20% | 28% | 7.6 | 10.8 |
| Flight equipment, net | 22.8 | 10% | 25% | 2.3 | 5.7 |
| Facilities and ground equipment, net | 11.1 | 5% | 10% | 0.6 | 1.1 |
| Military intangibles | 127.1 | 0% | 0% | - | - |
| Restricted cash (Long Term) | 8.0 | 0% | 0% | - | - |
| Maintenance reserve deposits (Long term) | 49.7 | 0% | 0% | - | - |
| Deposits and other assets | 33.0 | 0% | 0% | - | - |
| Other intangibles | 2.0 | 50% | 100% | 1.0 | 2.0 |
| **Total liquidation value before fees and expenses** | | | | **$48.3** | **$59.7** |
| Carve-out [3] | | | | 1.9 | 1.9 |
| Liquidation expenses | | | | | |
| Trustee fees [4] | | | | 1.4 | 1.8 |
| Wind-down expenses [5] | | | | 3.0 | 3.0 |
| **Remaining distributable value** | | | | **$41.9** | **$53.0** |
| DIP claims [6] | | | | 30.9 | 30.9 |
| Roll-up claims | | | | 45.0 | 45.0 |
| **Total DIP and roll-up claims** | | | | **$75.9** | **$75.9** |
| *% Recovery on DIP and Roll-up Claims* | | | | *55%* | *70%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Non-Roll-up claims | | | | 111.4 | 111.4 |
| *% Recovery on Non-roll-up Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Second Lien Claims | | | | 98.1 | 98.1 |
| *% Recovery on Second Lien Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Administrative Claims | | | | 5.0 | 10.0 |
| *% Recovery on Admin Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |
| Unsecured Claims [7] | | | | 200.0 | 200.0 |
| *% Recovery on Unsecured Claims* | | | | *0%* | *0%* |
| **Remaining distributable value** | | | | **-** | **-** |

**Notes:**

(1) Net of $13.5 million of the AMC fuel obligation

(2) Includes prepaid insurance, prepaid fuel, prepaid VISA, prepaid rent, prepaid foreign VAT, non-trade AR, AMC escrow account, and miscellaneous operating deposits

(3) All reasonable and documented unpaid fees, costs, disbursements and expenses of the Debtors' Professionals and Committee's Professionals that in an aggregate amount not to exceed $1.9 million (per the DIP agreement)

(4) 3% of proceeds received in a liquidation, assumed to be paid prior to any distributions of claims

(5) $3.0 million assumed to be paid prior to any distributions of claims

(6) As of the 7/31/2012 (the date of this detailed balance sheet supporting this analysis), $30.9 million was outstanding on the DIP, subsquently, there was a $5.0 draw which is excluded from this analysis

(7) Preliminary estimate of Unsecured Claims, work still ongoing

<u>**Exhibit G**</u>

**Union Settlement Agreements**

**This document, all drafts, and all discussions about it are protected under our FRE Rule 408 agreement for settlement discussions.**

Heads of Agreement

The parties, Global Aviation Holdings Inc. and its affiliated debtors (collectively, "Global" or the "Debtors") and the International Brotherhood of Teamsters (the "IBT") have jointly agreed (in this "Heads of Agreement") to pursue the terms below to secure both: (1) modified, five-year collective bargaining agreements for each of the Debtors' unionized work groups, including the IBT-represented World Pilots (the "World Pilots") and IBT represented World Flight Attendants (the "World Flight Attendants") and an initial five-year collective bargaining agreement for the North American Flight Attendants (the "North American Flight Attendants"), with effective dates no earlier than September 12, 2012; and (2) part of a framework for a plan of reorganization (a "Plan") under which such modified collective bargaining agreements would be assumed.

Achievement of Cost Savings
- The World Pilots will agree to CBA modifications that extend the amendable date of the existing CBA through a date five years after ratification of the modifications and achieve 90% of Global's request for $18.8 million of annual cost savings from the existing CBA (approximately $16.9 million). The World Pilots shall be credited with $1 million of annual savings, toward the approximately $16.9 million, from Global's non-represented employees or other costs (the "Credit"), and thus the World Pilots will achieve approximately $15.9 million in annual savings. Global and the World Pilots must mutually agree that the CBA modifications will actually produce at least $15.9 million in annual savings.
- The World Flight Attendants, North American Pilots, and Transport Workers Union shall each voluntarily reach agreement with Global prior to any filing pursuant to 11 U.S.C. § 1113 ("Section 1113"), and the North American Flight Attendants shall reach agreement with Global voluntarily to the imposition of terms, to achieve at least 90% of the savings that would be achieved by Global's proposals,[1] respectively, as a condition for participating in the Settlement Amount as set forth below.

---

[1] That is, 90% of $4.1 million in annual savings for ALPA, 90% of $4.3 million in annual savings for the World Flight Attendants, 90% of $1.8 million in annual savings for the North American Flight Attendants, and 90% of $142,000 in annual savings for the dispatchers represented by the Transport Workers Union (the "TWU").

1

- o Rules governing participation in the Settlement Amount shall be determined by the relevant union in its discretion, provided that pilots currently in management are entitled to participate in the Settlement Amount pursuant to the rules governing participation when and to the extent he or she is working and compensated under the relevant CBA.
- The IBT shall (on behalf of its members) accrue and shall be entitled to a stipulated, approved, and allowed administrative claim in the amount of the savings provided to Global by IBT members under the amended CBAs and the initial North American Flight Attendant CBA from the effective date of the CBA modifications through the confirmation of a Plan. Any such administrative claim shall be waived, extinguished, and forever discharged upon confirmation of a Plan in Global's chapter 11 cases. Should a Plan fail to become effective by December 15, 2012, IBT members will snap-back to CBA terms and conditions as of the Petition Date, provided that the December 15, 2012 deadline shall be extended either by agreement of both IBT and Global for any length of time to which both parties agree, or for a maximum of 60 days if necessary to accommodate scheduling issues identified by the Bankruptcy Court, DIP Lenders or First Lien Noteholders.

## Settlement Amount

- All Qualifying Represented Employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which would be issued by reorganized Global after the effective date of confirmation of a Plan (the "Effective Date"):
  - o An equity pool which, in the aggregate, will consist of 25% of the distribution of common equity in reorganized Global (the "Employee Pool"), which shall be the same class of equity issued to the First Lien Noteholders and which shall be issued by reorganized Global within 30 days following the Effective Date, the mechanics of which will be described in the Plan and confirmation order. The Employee Pool shall not be diluted by any grant of equity to management. Global, the First Lien Noteholders, and the IBT must consent unanimously to any equity recovery for other creditors in the chapter 11 cases, provided that if Global, the First Lien Noteholders, and the IBT consent to equity recovery by other creditors, there will be pro rata dilution of the equity recoveries of the First Lien Noteholders and the Employee Pool. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities

2

filings, and shall be entitled to meaningful minority shareholder protections.

- o Freely tradable warrants to purchase 15% of the fully diluted equity of the reorganized Global, attaching at the point at which the First Lien Noteholders have recovered $202.1M of value. The warrants shall expire ten years after the Effective Date. The strike price shall be adjusted upward due to any dilution of the First Lien Noteholders' equity recovery by the MEIP or recoveries by any other creditors. The warrants will be structured such that reorganized Global will have no obligations to make public securities filings. All reasonable fees and costs related to and associated with the establishment and maintenance of such structure shall be paid by Global.

- Directors for reorganized Global shall be chosen through a process led by a committee of the CEO, a First Lien Noteholder representative and a representative of the Employee Pool. The committee may, at its election, retain a qualified search firm, paid for by Global, to identify director candidates. The committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the CEO). If the committee is unable to reach consensus on a slate of directors, directors shall be named by shareholders in the proportion of their ownership, with two named by the Employee Pool based on a majority vote of prospective shareholders within the Employee Pool. All directors selected shall be qualified and shall not be members of the IBT or any other labor organization.

- The Employee Pool shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of the Credit.[2] The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

---

[2] For illustrative purposes, assuming all represented groups meet their respective 90% thresholds, the distribution of the Employee Pool created by reorganized Global after the Effective Date would be approximately as follows: World Pilots, 15.5%; World Flight Attendants, 3.5%; North American Pilots, 3.4%; North American Flight Attendants, 1.5%; TWU Dispatchers, 0.1%; and non-executive, non-represented employees, 0.9%.

- Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds set forth above prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude. If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in an initial collective bargaining agreement, for the North American Flight Attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% remaining in the Employee Pool, to be reallocated in proportion to the ratified concessions.
- The distribution of the Employee Pool shall be issued by reorganized Global after the Effective Date, provided that it is issued within 30 days of the Effective Date. The Employee Pool shall not be diluted by any management equity incentive plan to be proposed and implemented as part of a plan of reorganization (the "MEIP").
- Global agrees that if a material transaction involving some or all of Global's assets or capital structure occurs within the first 30 days after the Effective Date, the equity shall be issued into the Employee Pool and shall immediately vest before the closing of any such material transaction.
- If reorganized Global does not create and distribute the Employee Pool by 5pm Eastern Time on the 30th day after the Effective Date, then all of the concessions granted by the represented employee groups will be null and void, and there will be an immediate, full snap-back to CBA terms and conditions as of the Petition Date. This deadline can be extended with the consent of the IBT.

Management Enhancements
- A committee consisting of Global's Chief Executive Officer, Global's Head of Human Resources, Jeffrey Erickson, and Greg Unterseher has been established and tasked with hiring a new permanent Chief Operations Officer for World, replacing acting Chief Operating Officer Charles McDonald, who is returning to his permanent position at Global Aviation

Holdings. The Company will appoint an interim COO during the search. The Company shall have final authority to select the permanent COO, taking into account the feedback and recommendations of the committee.

- Captain Yeager will resign as VP of Operations and Director of Operations prior to pilot ratification. The new Director of Operations may or may not be a member of the Teamsters.

Capital Structure

- At consummation, funded debt shall include:
  - First lien:
    - $95M
    - 10%
    - 4.5 year term
  - Second lien:
    - $40M
    - 3%, PIK option
    - 5 year term
  - Excess cash flow:
    - 50% sweep with leverage grid
  - Revolver:
    - in an amount sufficient to provide approximately $20M of availability upon exit from chapter 11
- Global agrees that, for the period of the modified CBAs, or, if later, during the period in which the concessionary terms of the modified CBAs remain in effect, any proceeds realized from the sale or refinancing of a major operating subsidiary (revenues greater than $15 million) or sale of assets greater than $10 million shall be applied to repay funded debt (with the exception of the Revolver).

Timeline

- August 21: Approval of this agreement by First Lien Noteholders and DIP Lenders
- August 21: Finalize North American FAs, finish language for World FAs, prepare materials for Pilot and FA roadshow
- August 21: Roadshow begins
- August 22: Filing of Motion to Approve CBA amendments
- August 22: Distribution of ratification ballots
- September 12: Ratification date
- September 12: Hearing in Bankruptcy Court for approval of modified CBAs

5

- September 12: Target effective date of modified CBAs[3]
- These target dates are deadlines that can be extended by agreement of both Global and IBT, except that the IBT reserves sole discretion in interpreting its constitutional requirements, including those pertaining to contract ratification.

Conditions

- The following are explicit and nonseverable conditions of this Heads of Agreement:
  - o Global Board approval
  - o World Pilots ExCo approval and agreement to include a letter supporting the Agreement and the modified collective bargaining agreement in the package sent to World Pilots for ratification
  - o Ratification by the World Pilots and the World Flight Attendants of the modified collective bargaining agreements consistent with the concessions described above
  - o Approval of the Bankruptcy Court of the modified collective bargaining agreements consistent with the concessions described above
  - o Approval of First Lien Noteholders and DIP lenders
- Global agrees to pay on the Effective Date, as an administrative expense and through the Plan, reasonable fees and expenses of counsel and advisors to the IBT, including Levy Ratner, P.C., MAEVA Group, LLC, Dan Akins, Farrell Fritz and Cheiron. This obligation is subject to the IBT providing appropriate documentation and invoices for all fees and expenses. With regard to MAEVA Group, LLC, Global, the IBT and the First Lien Noteholders and DIP Lenders agree that the fees and expenses of MAEVA will be paid pursuant to the terms of MAEVA's engagement letter as amended per the agreement of the parties on August 17, 2012 (which cannot be modified and which the parties agree are reasonable).

- So long as Global's proposed Plan is consistent in all material respects with this Agreement, the IBT agrees that it will support (not object to) the confirmation of Global's proposed Plan, argue in support of confirmation

---

[3] All work performed prior to the ratification of the modified CBAs will be compensated under the terms and conditions provided in the CBAs prior to their modification; all work performed after ratification will be compensated under the CBAs as modified.

and file a written pleading (if requested by Global) articulating its support for confirmation of the Plan.

- In the event the National Mediation Board ("NMB") finds that World and North American Airlines, Inc. ("NAA") are a single carrier (or single transportation system):
  - o There shall be no changes to the terms of the revised CBAs before the amendable date of the revised CBAs.
  - o Should it be determined that an integrated seniority list is required as a result of a single carrier determination, there shall be an Equipment fence of the current seniority lists (furloughed and active pilots) for duration of agreement except for expansion positions, which would be then governed by seniority and airline/type lock for two years.
- This agreement and the modified World Pilot CBA is contingent on:
  - o Global securing savings from the North American Pilots (ALPA), World Flight Attendants (IBT), and the North American Flight Attendants (IBT), through either voluntary modifications or by imposition as a result of a hearing pursuant to Section 1113 (with respect to the World and North American Pilots and the World Flight Attendants), or voluntarily or by imposition (with respect to the North American Flight Attendants) which, in the Company's good faith discretion, are approximately equivalent (in terms of relative savings achieved) to the savings provided by the World Pilots, when measured relative to the savings that would have been generated by proposals made by Global to each IBT group and ALPA on the one hand, and the proposal made by Global to the World Pilots on the other hand. More specifically, Global must achieve total savings that is (in Global's good faith discretion) approximately equivalent to 90% of $4.1 million in annual savings for ALPA, 90% of $4.3 million in annual savings for the World Flight Attendants, and 90% of $1.8 million in annual savings for the North American Flight Attendants. This contingency may be waived by the agreement of Global and the World Pilots ExCo.

Parties' Protections
- No party shall use this Agreement in Court at any time and for any reason except for a proceeding to enforce this Agreement.
- Should the framework provided in this Agreement not be achieved, regardless of the reason, the IBT understands that Global may have to pursue relief in the Bankruptcy Court under the provisions of Section 1113, and the IBT understands that Global will ask the Bankruptcy Court for authority to reject the current CBA and impose the terms of a proposal that either has been or would be made.  In any proceedings related to a request for modifications pursuant to Section 1113, none of the Parties shall attempt to introduce this Agreement, nor shall any Party refer to this agreement in any way whatsoever.  This provision precludes any use of this Agreement by the Parties in Section 1113 litigation at all, including but not limited to any arguments:  (a) by the IBT that Global does not "need" the terms of its proposal, or that the proposal that has been or would be made is not "reasonable," on the basis that Global agreed to pursue the framework provided in this Agreement; or (b) by Global that the IBT must accept at least the savings provided above because it had agreed to do so as part of this Agreement. In any case, neither the IBT nor Global are precluded from advancing any arguments in defense of their respective positions that do not refer to this Agreement or the negotiations about this Agreement.
- IBT review of the parallel agreement with ALPA that does not contain terms more favorable or materially different than any terms described herein.
- IBT agrees not to attempt to introduce, use, or refer in any way to this Agreement in any proceeding regarding whether Global and/or its affiliates are a "single carrier" under applicable labor law.

Global

By: ROBERT BINNS
8/20/2012

The IBT

By:

8

## LETTER OF AGREEMENT

between

## NORTH AMERICAN AIRLINES

and the air line pilots in the service of

## NORTH AMERICAN AIRLINES

as represented by the

## AIR LINE PILOTS ASSOCIATION, INTERNATIONAL

### RE:  BANKRUPTCY RESTRUCTURING AGREEMENTS

This Letter of Agreement ("LOA") is made and entered into by and between North American Airlines, Inc. ("NAA") and the air line pilots in the service of NAA, as represented for purposes of collective bargaining by the Air Line Pilots Association, International ("ALPA").  ALPA and NAA are hereafter referred to as the "Parties."

WHEREAS, NAA and certain of its affiliates, including its parent Global Aviation Holdings, Inc. ("Global"), filed Chapter 11 petitions on February 5, 2012 which are pending in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court") in *In re Global Aviation Holdings, Inc.*, Case No. 12-40783-cec, *et al.* ("Bankruptcy Case"); and

WHEREAS, NAA has sought modification of the collective bargaining agreement ("CBA") in effect between NAA and ALPA, and commenced negotiations with ALPA in advance of filing a motion pursuant to Section 1113 of the Bankruptcy Code; and

WHEREAS, as a result of negotiations, the Parties have agreed to modifications of the CBA ("Modifications") and other terms in furtherance of NAA's effort to restructure its business and reorganize under Chapter 11 of the Bankruptcy Code; and

WHEREAS, the parties wish to work cooperatively to enhance Company efforts to restructure successfully;

NOW THEREFORE, the Parties agree as follows:

1

A.   Modifications to the CBA and its Assumption by the Debtor

1.   The Parties agree that the terms of the CBA dated April 2008 have been amended in accordance with the document attached as Exhibit A, Collective Bargaining Agreement between North American Airlines, Inc. and the Air Line Pilots Association, International.

2.   The effective date of the CBA Modifications ("CBA Effective Date") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA Modifications, and the date on which the LOA and the CBA are ratified by ALPA, provided that the CBA Effective Date will not be later than September 25, 2012 and ALPA agrees to complete its membership ratification by September 24, 2012.

3.   The Parties agree that Modifications to the CBA are expected to produce savings at an annual rate of approximately $3.7 million.

4.   NAA shall assume the CBA, as modified, pursuant to 11 U.S.C. § 365, as part of NAA's plan of reorganization (the "POR") on the effective date of the POR (the "POR Effective Date").  Assuming that the modified CBA is ratified and approved by the Bankruptcy Court, and that no snap-back such as that provided by paragraph F(4)(b) below has occurred, NAA agrees that neither it nor any affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113(c) or 1113(e), seeking rejection or modification of, or relief or interim relief from, the CBAs, during the course of the Bankruptcy Case, and NAA and its affiliates specifically waive the right to file or support such a motion, except that NAA reserves the right to file or support such a motion if it can demonstrate that there has been a material adverse change in NAA and/or its affiliates' business such that additional concessions are essential to NAA's continuation in business.

5.   Any grievances by ALPA or by any NAA pilots that were pending, and any System Board awards in favor of ALPA or any NAA pilots that were unresolved or unsatisfied as of the commencement of the Bankruptcy Case, shall be unaffected by the Bankruptcy Case.  Any such pending grievances shall be processed in the ordinary course.  Any awards or settled grievances shall be paid in the ordinary course pursuant to the CBA.

2

B.    <u>Joint Efforts to Seek Additional Savings and Promote Cooperation</u>

1.    During negotiations the Parties discussed opportunities to identify and capture additional savings and work cooperatively to promote successful reorganization of the business. This is to confirm that no later than ninety-(90) days after the CBA Effective Date, and upon request by ALPA, the parties will meet and confer to:

    a.  discuss and implement, if agreed, additional operational savings that can be obtained and opportunities to increase Company revenue;

    b.  review and seek to resolve outstanding grievances through mediation, facilitation, or the use of other efficient dispute resolution processes; and

    c.  identify and seek to clarify contract language, if any, that currently results in misunderstandings and disagreements between the parties.

In addition, during the first twelve months following the CBA Effective Date, the Company shall provide ALPA, subject to ALPA's execution of appropriate confidentiality agreements, with periodic financial briefings and financial and operational data regarding the Company's recovery.

C.    <u>Settlement Amount</u>

1.    All qualified represented employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which will be issued by reorganized Global within 30 days after the POR Effective Date:

    (a)  An equity pool which, in the aggregate, will consist of 25% of the common equity in reorganized Global (the "Employee Pool"), which shall be issued by reorganized Global within 30 days following the POR Effective Date. The Employee Pool is not subject to dilution by the management equity incentive plan (the "MEIP"), but is subject to potential dilution by recoveries of other creditors. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities filings, and shall be entitled to meaningful minority shareholder protections.

3

(b)     In addition to the Employee Pool, freely tradable warrants ("Warrants") to purchase 15% of the equity of the reorganized Global, attaching at the point at which the First Lien lenders have recovered $202.1M of value.  The strike price shall be adjusted upward due to any dilution of the First Lien lenders' equity recovery by the MEIP and by the recovery, if any, of other creditors.  The Warrants will be structured such that reorganized Global will have no obligations to make public securities filings.

2.     The Employee Pool and Warrants shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the POR Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of $1 million.  The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

3.     Non-management pilots on the NAA seniority list as of the CBA Effective Date shall receive no less than 13.6% of the Employee Pool and no less than 13.6% of the Warrants, recognizing that the Employee Pool as a whole may be diluted by creditors other than the MEIP.   ALPA shall, in its sole discretion and according to its policies, determine how its portion of the Employee Pool and Warrants shall be distributed among the non-management pilots on the NAA seniority list as of the CBA Effective Date.

4.     Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds determined by Global (such threshold for ALPA being $3.7 million) prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude.  If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in a first collective bargaining agreement, for the North American flight attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to

4

voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% remaining in the Employee Pool, to be reallocated in proportion to the ratified concessions (and with ALPA receiving at least 6.8% of any Unclaimed Equity).

D.    Profit Sharing

1.    Pilots employed by NAA will participate in any profit sharing plan implemented after the CBA Effective Date that NAA administrative employees participate in, with target payouts to pilots of 5% of salary upon achievement of Company performance metrics set by the reorganized Global board for all NAA employees (administrative and pilots).

E.    Board of Directors

1.    The initial directors for reorganized Global shall be chosen through a process led by a committee of the CEO, a First Lien Noteholder representative and a representative of the Employee Pool. The committee may, at its election, retain a qualified search firm, paid for by Global, to identify director candidates. The committee shall interview candidates together, with the objective of agreeing on a slate of nine directors (which shall include the CEO). If the committee is unable to reach consensus on a slate of directors, directors shall be named by shareholders in the proportion of their ownership, with two named by the Employee Pool based on a majority vote of prospective shareholders. All directors selected shall be qualified and shall not be employees or members of any labor organization or, other than the CEO, an employee of the company.

2.    In addition to the voting directors for reorganized Global identified above, the Board of Directors of reorganized Global shall, for the term of the Modifications, and so long as the NAA pilots are represented by ALPA, also include one non-voting board member selected by ALPA. The non-voting board member selected by ALPA shall be qualified and shall not be an employee or a member of ALPA or any other labor organization. After 12 months following the POR Effective Date, the Board of Directors of

5

reorganized Global shall consider in good faith whether to add the non-voting director selected by ALPA as a full voting member of the Board.

F.    Plan of Reorganization

1.    Neither NAA, Global nor any of their affiliates shall propose or support any Plan of Reorganization ("POR") in the Bankruptcy Case that is materially inconsistent in any respect with this LOA.

2.    The POR will include customary release and exculpation clauses that will be at least as comprehensive for ALPA and each of its current or former members, officers, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives (the "ALPA Exculpated Parties"), as it is for NAA and its officers, directors, and advisors.  NAA will propose in its POR that the ALPA Exculpated Parties be released and exculpated from any and all claims related to the NAA's bankruptcy cases; the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the modified CBA, the disclosure statement concerning the POR or the POR itself, or any other agreement or document created, modified, amended, terminated or entered into in connection with either the POR or any agreement between NAA or ALPA.

3.    So long as Global's proposed Plan is consistent in all material respects with this Agreement, ALPA agrees that it will support (and will not object to) the confirmation of Global's proposed Plan, by arguing in support of confirmation and by filing a written pleading articulating its support for confirmation.

4.    Deadline for POR --

   a.    The deadline ("Deadline") for the effective date of a POR incorporating the terms of this LOA shall be December 15, 2012, unless extended as set forth herein.  The Deadline may be extended only by either (1) agreement of the Parties or (2) by NAA or Global, for a maximum of sixty (60) days, if necessary to accommodate scheduling issues.

   b.    Should a POR incorporating the terms of this LOA not become effective by the Deadline, (1) ALPA shall accrue and shall be entitled to a stipulated, approved and allowed administrative claim pursuant to

6

Section 503(b) of the Bankruptcy Code (the "Administrative Claim") in the amount of savings provided by the Modifications from the CBA Effective Date until the date of the snapback under subparagraph (2); and (2) the Modifications shall become immediately null and void, replaced by the terms of the CBA in effect prior to the CBA Effective Date. The Administrative Claim shall be waived, extinguished, and forever discharged upon confirmation of a POR in Global's chapter 11 cases.

G.  Efforts to Obtain Approval

1.  ALPA shall take all reasonable steps to obtain the ratification of this LOA and the CBA by the NAA pilots, including providing a written communication in support of ratification to the NAA pilots.

2.  NAA shall take all reasonable steps to obtain ratification of this LOA by Global's Board of Directors. NAA shall also take all reasonable steps to obtain support of this LOA by the secured lenders and the Committee of Unsecured Creditors and other parties in interest in the Bankruptcy Case.

3.  NAA shall take all reasonable and prompt steps to obtain approval of the CBA Modifications by the Bankruptcy Court. NAA will provide ALPA's counsel with copies of, and a reasonable opportunity to comment on, all motions, applications, proposed orders, pleadings and supporting papers prepared by NAA for filing with the Bankruptcy Court relating to court approval of the CBA Modifications. The terms of this LOA will be incorporated into the POR and submitted for Bankruptcy Court approval as part of the plan confirmation process.

H.  Conditions

1.  Before the CBA Modifications may be implemented, each of the following must have occurred: (1) execution of the LOA and CBA by an executive officer of NAA and by an executive officer of Global; (2) ratification of the LOA and CBA by the NAA pilots pursuant to ALPA's ratification procedures and signed by ALPA's president; and (3) approval of the CBA Modifications by the Bankruptcy Court.

2.  Should the CBA Modifications not be approved by order of the Bankruptcy Court within ninety (90) days of the satisfaction of the conditions in H.1.(1) and (2), above, they shall become null and void, and

7

replaced by the terms of the CBA that were in effect prior to the CBA Effective Date.

3. Should the Bankruptcy Court's order approving the CBA or POR be reversed on appeal in whole or in part, (1) the CBA Modifications shall become null and void, and replaced by the terms of the CBA that were in effect prior to the CBA Effective Date, and (2) ALPA shall accrue and be entitled to an administrative claim in the amount of savings provided by the CBA Modifications during the period that they were in effect.

I. Prohibited Use of this LOA

Neither of the Parties shall use this LOA in any legal proceeding at any time or for any reason except in a proceeding to enforce its terms or to defend against a claim brought against one or both of the Parties in connection with the LOA and CBA.

IN WITNESS WHEREOF, the Parties hereto and Global have signed this LOA this ___*24TH*___ day of ___*SEPTEMBER*___, 2012.

FOR NORTH AMERICAN AIRLINES, INC.

_____
Executive Officer

FOR THE AIR LINE PILOTS IN THE SERVICE OF NORTH AMERICAN AIRLINES, INC.

_____
Captain Robert Lewis, Chairman
NAA Master Executive Council

FOR GLOBAL AVIATION HOLDINGS INC.

_____

_____
Captain Lee Moak, President

8

**LETTER OF AGREEMENT**
between
**WORLD AIRWAYS, INC.**
and its dispatchers
as represented by the
**TRANSPORT WORKERS UNION OF AMERICA AFL-CIO**

This Letter of Agreement ("LOA") is made and entered into by and between World Airways, Inc. ("WOA") and the dispatchers in the service of WOA, as represented for purposes of collective bargaining by the Transport Workers Union of America AFL-CIO ("TWU"). TWU and WOA are hereafter referred to as the "Parties."

WHEREAS, WOA and certain of its affiliates, including its parent Global Aviation Holdings, Inc. ("Global"), filed Chapter 11 petitions on February 5, 2012 which are pending in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court") in *In re Global Aviation Holdings, Inc.*, Case No. 12-40783-cec, *et al.* ("Bankruptcy Case"); and

WHEREAS, WOA sought modification of the collective bargaining agreement ("CBA") in effect between WOA and TWU, and commenced negotiations with TWU in advance of filing a motion pursuant to Section 1113 of the Bankruptcy Code; and

WHEREAS, as a result of negotiations, the Parties have agreed to modifications of the CBA ("Modifications") and other terms in furtherance of WOA's effort to restructure its business and reorganize under Chapter 11 of the Bankruptcy Code.

NOW THEREFORE, the Parties agree as follows:

A.    Modifications to the CBA and its Assumption by the Debtor

1.    The Parties agree that the terms of the CBA have been amended as provided in the amended CBA filed with the Bankruptcy Court.

2.    The effective date of the CBA (the "CBA Effective Date") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA and the date on which the CBA is ratified by TWU, and in any case shall be no later than September 12, 2012.

3.    WOA shall assume the CBA, as modified, pursuant to 11 U.S.C. § 365, as part of WOA's plan of reorganization (the "Plan") on the effective date of the Plan (the "Effective Date").

1

B.    Settlement Amount

1.    As part of the Plan to be presented to the Bankruptcy Court at a later date, all qualified, represented employees and non-executive employees will share in the following consideration (in aggregate, the "Settlement Amount"), which would be issued by reorganized Global within 30 days after the effective date of confirmation of a Plan (the "Effective Date"):

(a)    An equity pool which, in the aggregate, will consist of 25% of the common equity in reorganized Global (the "Employee Pool"), which shall be issued by reorganized Global within 30 days following the Effective Date. The Employee Pool is not subject to dilution by the MEIP, but is subject to potential dilution by recoveries of other creditors. The Employee Pool shall be structured such that reorganized Global will have no obligations to make public securities filings, and shall be entitled to meaningful minority shareholder protections.

(b)    Freely tradable warrants to purchase 15% of the fully diluted equity of the reorganized Global, attaching at the point at which the First Lien lenders have recovered $202.1M of value. The strike price shall be adjusted upward due to any dilution of the First Lien lenders' equity recovery by the MEIP. The warrants will be structured such that reorganized Global will have no obligations to make public securities filings.

2.    The Employee Pool and warrants shall be available to Global's represented and non-executive, non-represented employees upon issuance by reorganized Global after the Effective Date in proportion to a) the concessions agreed and ratified through voluntary modifications, in the case of Global's represented employees, and b) Global's non-executive, non-represented employees, in the amount of $1 million.[1] The non-executive, non-represented employees eligible to participate in the Employee Pool shall not be eligible for participation in the MEIP.

---

[1] If no other creditors recover in a way that dilutes the Employee Pool, the distribution of the Employee Pool created by reorganized Global after the Effective Date would be approximately as follows: World Pilots, 15.5%; World Flight Attendants, 3.5%; North American Pilots, 3.4%; North American Flight Attendants, 1.5%; TWU Dispatchers, 0.1%; and non-executive, non-represented employees, 0.9%.

2

3. Global reserves the right, if a represented group does not agree to voluntary concessions at or above the thresholds set forth above prior to a Section 1113 filing or, in the case of the North American Flight Attendants, prior to imposition of modifications by Global, to agree to provide that represented group with up to 80% of the portion of the Employee Pool that is reserved for it as part of any agreement to modify that group's collective bargaining agreement, even if it is reached after proceedings pursuant to Section 1113 conclude. If, following the modification of all represented groups' collective bargaining agreements (or of terms and conditions of employment in a first collective bargaining agreement, for the North American flight attendants), a portion of the Employee Pool is not available to a represented group (either because it does not agree to voluntary concessions at or above the thresholds set forth above or because an agreement to those concessions is not ratified; in either case, the "Unclaimed Equity"), it shall be partially reallocated, with 50% of the Unclaimed Equity removed from the Employee Pool and 50% reallocated in proportion to the ratified concessions.

C. Conditions

1. Before this LOA becomes effective, each of the following must have occurred: (1) execution of the LOA and CBA by an executive officer of WOA and by an executive officer of Global; (2) ratification of the CBA by the TWU pursuant to TWU's ratification procedures and execution of the CBA by the TWU; and (3) confirmation of a Plan by the Bankruptcy Court that is consistent with this LOA.

C. Prohibited Use of this LOA

So long as this LOA and CBA remain in effect, and are not deemed null and void, neither of the Parties shall use it in any legal proceeding at any time or for any reason except in a proceeding to enforce its terms or to defend against a claim brought against one or both of the Parties in connection with the LOA and CBA.

IN WITNESS WHEREOF, the Parties hereto have signed this LOA this ___30th___ day of ___August___, 2012.

*Signature Page to Follow*

3

**WORLD AIRWAYS, INC.**

By: _James Casbarro_

Name: _JAMES CASBARRO_

Title: _ACTING C.O.O._

**TRANSPORT WORKERS UNION
OF AMERICA, AFL-CIO**

By: _Giarrocco_

Name: _Alex Giarrocco_

Title: _PRESIDENT
TWU LOCAL 540_

**GLOBAL AVIATION HOLDINGS INC.**

By: _Robert B._

Name: _ROBERT B. Was_

Title: _CEO_

*Signature Page to WOA-TWU LOA*

4

## LETTER OF AGREEMENT

WHEREAS, World Airways, Inc. ("*World*"), North American Airlines ("*North American*"), and the International Brotherhood of Teamsters (the "*IBT*") (and collectively with World and North American, the "*Parties*") entered into both modified collective bargaining agreements (the "*CBAs*") and a certain Heads of Agreement dated August 20, 2012 (the "*HOA*"); and

WHEREAS, World and North American's motion to approve the CBAs (the "*Motion*") has been filed and is scheduled for a hearing before the United States Bankruptcy Court for the Eastern District of New York (the "*Bankruptcy Court*") on September 12, 2012; and

WHEREAS, the HOA states that one of IBT's "Protections" is "IBT review of the parallel agreement with ALPA that does not contain terms more favorable or materially different than any terms described" in the HOA; and

WHEREAS, IBT has reviewed the "parallel agreement with ALPA" (the "*ALPA LOA*") and has raised concerns about whether that agreement contains terms that are "favorable or materially different than" terms of the HOA; and

WHEREAS the Parties have agreed in this Letter of Agreement to resolve all the IBT's concerns in that regard in full and without reservation,

The Parties agree as follows:

1.    <u>Relationship Between CBAs and the HOA</u>

(a)    The effective date of the modified CBAs (the "*CBA Effective Date*") shall be the business day following the later of the date on which the Bankruptcy Court enters an order approving the CBA Modifications ("CBA Modifications"), and the date on which the HOA and CBAs are ratified by IBT, provided that the CBA Effective Date will not be later than September 12, 2012 unless agreed upon by the IBT on the one hand, and the relevant airline (World or North American) on the other.

(b)    The CBAs and the HOA are interrelated. World and North American will begin to benefit from the savings accruing as a result of the CBA Modifications immediately upon the CBA Effective Date. However, the CBA Modifications are contingent on confirmation of a plan of reorganization ("*POR*") consistent with the HOA as ratified. Any POR proposed or supported by World and/or North American will be consistent in all material respects with the HOA as ratified. The HOA will not be presented for approval by the Bankruptcy Court but, if a POR consistent in all material respects with the HOA as ratified is not confirmed on or prior to the deadline described in the HOA, the CBA Modifications will be null and void and replaced with the terms of the CBAs in effect prior to the CBA Effective Date (i.e., the "snap-back") and IBT will be entitled to an administrative claim for savings delivered during the period that the CBA Modifications were in effect.

2.    <u>Plan and Assumption of Modified Collective Bargaining Agreements</u>

(a)    World and North American, as applicable, shall assume the CBAs, as modified, pursuant to 11 U.S.C. § 365, as part of the POR on the effective date of the POR (the "*POR Effective Date*").  Assuming that the modified CBAs are ratified and approved by the Bankruptcy Court, and that no snap-back has occurred, each of World and North American agree that neither it nor any affiliate will file or support any motion pursuant to 11 U.S.C. Sections 1113(c) or 1113(e), seeking rejection or modification of, or relief or interim relief from, either or both of the CBAs, during the course of the Bankruptcy Case, and World and North American and their affiliates specifically waive the right to file or support such a motion, except that World and North American (and their affiliates) reserve the right to file or support such a motion if it can demonstrate that there has been a material adverse change in World, North American, and/or its affiliates' business such that additional concessions are essential to the company's continuation in business.

(b)    Any grievances by IBT or by any World pilots, World flight attendants, and/or North American flight attendants that were pending, and any System Board awards in favor of IBT or any World pilots, World flight attendants, and/or North American flight attendants that were unresolved or unsatisfied as of the commencement of the Bankruptcy Case, shall be unaffected by the Bankruptcy Case.  Any awards or settled grievances shall be paid in the ordinary course pursuant to the CBAs.

3.    <u>Information Sharing</u>.

(a)    During the first twelve months following the effective date of the CBAs, World and North American shall provide IBT, subject to IBT's execution of appropriate confidentiality agreements, with periodic financial briefings and financial and operational data regarding World's and North American's recovery.

4.    <u>Plan of Reorganization</u>

(a)    The POR will include customary release and exculpation clauses that will be at least as comprehensive for IBT and each of its current or former members, officers, committee members, employees, advisors, attorneys, accountants, actuaries, investment bankers, consultants, agents and other representatives (the "IBT Exculpated Parties"), as it is for World and North American and their officers, directors, and advisors.  IBT will propose in its POR that the IBT Exculpated Parties be released and exculpated from any and all claims related to World's and North American's bankruptcy cases; the formulation, preparation, negotiation, dissemination, implementation, administration, confirmation or consummation of the modified CBAs, the disclosure statement concerning the POR or the POR itself, or any other agreement or document created, modified, amended, terminated or entered into in connection with either the POR or any agreement between World, North American, or the IBT.

(b)    The Employee Pool (as defined in the HOA) will, at the conclusion of the process described in the HOA, select two of the nine voting directors on the board.  The

2

board will also include one non-voting member as provided in the ALPA LOA, and an additional non-voting member identified by the IBT. The non-voting members selected by ALPA and IBT shall be qualified and shall not be employees or members of ALPA, IBT, or any other labor organization. In addition, the board will after a 12 month period following confirmation of a POR determine in good faith whether to add the non-voting board members to the board, provided that if such members are added to the board as voting members, they will only replace directors not selected by the Employee Pool or the unions. Addition of such members will not increase the size of the board. The board will not add an ALPA non-voting board member to the board without adding the IBT non-voting board member to the board and vice versa.

5.    Profit Sharing

(a)    World pilots and flight attendants are currently participants in the profit sharing bonus plan described in Appendix C to the pilots' CBA and Article 25, Section C of the flight attendants' CBA (collectively, the "*WOA Profit Sharing Plan*"). Alternatively, pilots and flight attendants employed by World may participate in any profit sharing plan implemented after the CBA Effective Date that World's administrative employees participate in, with target payouts to pilots and flight attendants of 5% of salary upon achievement of World performance metrics set by the reorganized Global board for all World employees (administrative, pilots, and flight attendants) (the "*Potential Alternative Profit Sharing Plan*"). World agrees that for each year in which the modified CBAs are in place, World pilots and World flight attendants will receive the greater of the payout, if any, that they would have received under the WOA Profit Sharing Plan on the one hand, or the Potential Alternative Profit Sharing Plan on the other hand.

(b)    The flight attendants at North American Airlines, Inc. ("*NAA*") will participate in the same profit sharing plan as the pilots at NAA, under the same terms as the pilots at NAA.

World

_____

By:

North American

_____

By:

The IBT

_____

By:    Director

David Bourne

3