**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| GLOBAL AVIATION HOLDINGS INC., *et al.*, | Case Nos. 12-40783 (CEC) |
| | 12-40782 (CEC) |
| | 12-40784 (CEC) |
| | 12-40785 (CEC) |
| | 12-40786 (CEC) |
| | 12-40787 (CEC) |
| | 12-40788 (CEC) |
| | 12-40789 (CEC) |
| | 12-40790 (CEC) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING EXHIBITS TO THE PLAN
SUPPLEMENT FOR THE FIRST AMENDED JOINT PLAN OF
REORGANIZATION OF GLOBAL AVIATION HOLDINGS INC. AND ITS
DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE THAT** Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*"),[1] hereby file the following documents that comprise part of the Plan Supplement in connection with confirmation of the Debtors' proposed Plan:[2]

- **Exhibit A**: New By-Laws;

- **Exhibit B:** New Certificates of Incorporation;

- **Exhibit C:** Executory Contracts and Unexpired Leases to be Rejected;

- **Exhibit D:** Executory Contracts and Unexpired Leases to be Assumed;

---

[1] All capitalized terms used but not otherwise defined herein and in each of the Exhibits hereto shall have the meanings set forth in the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 7, 2012 [Docket No. 717] (as modified from time to time, the "*Plan*").

[2] To the extent a document is identified in the Plan as a document to be included in the Plan Supplement and has not yet been filed with the Court, the Debtors will file such document with the Court as soon as practicable.

- **Exhibit E:**   Material Terms of the New First Lien Loan Credit Agreement;

- **Exhibit F:**   Material Terms of the New Second Lien Loan Credit Agreement;

- **Exhibit G:**   Material Terms of the New Revolving Credit Agreement;

- **Exhibit H:**   Material Terms of the New Intercreditor Agreement;

- **Exhibit I:**   New Employment Agreements;

- **Exhibit J:**   Management Equity Incentive Plan;

- **Exhibit K:**   Employee Equity Plan;

- **Exhibit L:**   New Shareholders Agreement;

- **Exhibit M:**   New Warrant Agreement;

- **Exhibit N:**   New Second Lien Lender Warrant Agreement;

- **Exhibit O:**   Second Lien Lender SAR Agreement; and

- **Exhibit P:**   Identity of the Members of the New Boards.

**PLEASE TAKE FURTHER NOTICE THAT** the forms of the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the Plan Supplement will be approved as well. The Debtors reserve the right to alter, amend, modify or supplement any document in the Plan Supplement as provided by the Plan; provided that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider Confirmation of the Plan (the "*Confirmation Hearing*") will commence at **11:00 a.m. prevailing Eastern Time on November 28, 2012**, before the Honorable Chief Judge Carla E.

Craig of the Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East, Courtroom 3529, Brooklyn, New York 11201.

**PLEASE TAKE FURTHER NOTICE THAT** any objection to the Plan must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Bankruptcy Court; (c) state the name and address of the objecting party and the amount and nature of the Claim of such Entity; (d) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is *actually received* no later than **November 20, 2012 at 5:00 p.m. (prevailing Eastern Time)**, by the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Global Aviation Holdings Inc.<br>101 World Drive<br>Peachtree City, Georgia 30269<br>Attn.:  Brian Gillman, Esq. | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York  10022-4611<br>Attn.:  Christopher T. Greco, Esq. |
| **United States Trustee** | **Counsel to the Committee** |
| United States Trustee for Region 2<br>33 Whitehall Street<br>21st Floor, New York, New York 10004<br>Attn.: Marylou Martin, Esq.<br><br>and<br><br>271 Cadman Plaza East<br>Suite 4529<br>Brooklyn, New York 11201<br>Attn.: Alicia Leonhard, Esq. | Lowenstein Sandler PC<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Attn.: Sharon L. Levine, Esq. |
| **Indenture Trustee for the Senior Secured Notes** | **Counsel the Ad Hoc Committee of First Lien Noteholders** |
| Moses and Singer LLP<br>The Chrysler Building<br>405 Lexington Avenue<br>New York, NY 10174<br>Attn.: Alan Kolod, Esq. | Latham & Watkins LLP<br>885 Third Avenue<br>New York NY 10022<br>Attn.:  Mark A. Broude, Esq. |

| Counsel to the Holders of the Second Lien Term Loan | Counsel to the Agent for the Second Lien Term Loan |
|---|---|
| Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York 10019<br>Attn.: Joshua A. Feltman, Esq. | Thompson Hine LLP<br> 3900 Key Center<br>127 Public Square<br>Cleveland, Ohio 44114<br>Attn.: Curtis L. Tuggle, Esq. |
| **The International Brotherhood of Teamsters** | **Counsel to the Prepetition Equityholders** |
| International Brotherhood of Teamsters<br>2351 Sunset Blvd.<br>Suite 170-709<br>Rocklin, California 95765<br>Attn.:  Gary Unterseher<br><br> and<br><br>110 Wall Street<br>3rd Floor<br>New York, New York 10005<br>Attn:  Cynthia De Figueiredo | MatlinPatterson Global Advisors LLC<br>520 Madison Avenue<br>New York, New York 10022<br>Attn:  Raph Posner, Esq. |
| **Transport Workers Union of America** | **The Air Line Pilots Association** |
| Transport Workers Union of America<br>AFL-CIO Local 540<br>2054 Village Park Drive<br>Peachtree City, Georgia 30269<br>Attn:  Joseph Papian | Air Line Pilots Association<br>1625 Massachusetts Avenue NW<br>Washington, DC 20036<br>Attn.:  Office of the General Counsel |

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Plan or the Plan Supplement, you may contact Kurtzman Carson Consultants LLC, the claims agent retained by the Debtors in these chapter 11 cases (the "*Notice, Claims, and Solicitation Agent*"), by: (a) calling the Debtors' restructuring hotline at (877) 606-7657; (b) visiting the Debtors' restructuring website at: www.kccllc.net/globalaviation; and/or (c) writing to Global Aviation Holdings Claims Processing Center, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.nyeb.uscourts.gov.  Please be advised that the Notice, Claims, and Solicitation Agent is not permitted to provide legal advice.

Brooklyn, New York
Dated:  November 19, 2012

*/s/ Jonathan S. Henes*

James H.M. Sprayregen
Jonathan S. Henes
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

Michael B. Slade (admitted *pro hac vice*)
Ryan B. Bennett (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors
and Debtors in Possession

**<u>Exhibit A</u>**

**New By-Laws**

**BYLAWS**

**OF**

**GLOBAL AVIATION HOLDINGS INC.**[1]

## ARTICLE I.  OFFICES.

**Section 1.01    Offices**. Global Aviation Holdings Inc (the "Corporation") shall maintain its registered office, and a registered agent in charge thereof, in the State of Delaware, and such other offices, either within or without the State of Delaware, at such locations as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.  SEAL.

**Section 2.01    Seal**.

(a) The Corporation shall have a seal, which shall have inscribed thereon its name and year of incorporation and the words, "Corporate Seal Delaware."

(b) The seal shall be kept in safe custody by the Secretary of the Corporation. It shall be affixed by the Chairman of the Board, the President or any Vice President, the Secretary or any Assistant Secretary, or the Treasurer to any corporate instrument or document requiring it, by practice or by law, and when so affixed, it may be attested by the signature of the officer so affixing it.

## ARTICLE III.  MEETINGS OF STOCKHOLDERS.

**Section 3.01    Annual Meetings**.

(a) Annual meetings of stockholders shall be held at such place, either within or without the State of Delaware, and at such time and date as the Board of Directors shall determine by resolution and set forth in the notice of the meeting.

(b) At each annual meeting the stockholders shall, by plurality of the votes cast, elect directors to succeed the existing directors and transact such other business as may properly be brought before them; provided that, no director shall be elected to the Board of Directors to the extent that he or she receives more abstentions and votes against than votes for such person.

(c) The Board of Directors shall have the sole right to determine the proper purpose or purposes of such meeting and if the Board of Directors should determine that the proposed business was not properly brought before the meeting in accordance with the provisions of

---

[1]    The bylaws of the subsidiary Debtor entities will be substantially in the same form provided herein.

Section 3.05(b) and Section 4.03, the Chairman shall so declare to the meeting, and any such proposed business not properly brought before the meeting shall not be transacted.

### Section 3.02    Special Meetings.

(a) Special meetings of the stockholders of the Corporation, for any purpose or purposes, unless otherwise prescribed herein or by statute, may be called by the Chairman of the Board of Directors or the Chief Executive Officer, or by the Secretary at the written request, or by resolution adopted by the affirmative vote, of a majority of the entire Board of Directors. Such request shall state the purpose or purposes of the proposed meeting. Stockholders of the Corporation shall not be entitled to request a special meeting of the stockholders. No business other than that specified in the notice thereof shall be transacted at any special meeting.

(b) Nominations of persons for election to the Board of Directors may be made at a special meeting of stockholders at which directors are to be elected pursuant to the Corporation's notice of meeting (x) by or at the direction of the Board of Directors or if any committee thereof has determined that directors shall be elected at such meeting, or (y) provided that the Board of Directors has determined that directors shall be elected at such meeting, by any stockholder of the Corporation who is a stockholder of record at the time the notice provided for in Section 4.03 is delivered to the Secretary, who is entitled to vote at the meeting and upon such election and who complies with the notice procedures set forth in Section 4.03.

(c) The Board of Directors shall have the sole right to determine the proper purpose or purposes of such meeting and if the Board of Directors should determine that the proposed business was not properly brought before the meeting in accordance with the provisions of Section 3.04(b) and Section 4.03, the Chairman shall so declare to the meeting and any such proposed business not properly brought before the meeting shall not be transacted.

### Section 3.03    Notice of Meetings. Except as otherwise required by applicable law:

(a) Notice of meetings of stockholders shall be in writing, or by a form of electronic transmission, if applicable, and shall state the place (which may be within or without the state of Delaware), date and hour of the meeting and in the case of special meeting, the purpose or purposes for which a meeting is called.

(b) Such notice shall be delivered to each stockholder entitled to vote at such meeting either personally, mailed withpostage prepaid), or by electronic transmission, if electronic receipt thereof has been consented to by the stockholder to whom the notice is given, not less than ten (10) nor more then sixty (60) days before the date of the meeting. If mailed, the notice shall be directed to the stockholder at his or her address as it appears on the records of the Corporation. Personal delivery of any such notice to any officer of a corporation or association or to any member of a partnership shall constitute delivery of such notice to such corporation, association or partnership. If given by electronic transmission the notice shell be directed to an electronic mail address and/or electronic network and/or any other form of electronic transmission at which the stockholder has consented to receive notice.  If given by facsimile telecommunication, the

notice will be directed to a number at which the stockholder has consented to receive notice by facsimile.

(c) If mailed, notice of meetings of stockholders shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the stockholder at his, her or its address as the same appears on the records of the Corporation.  If given by facsimile telecommunication, such notice shall be deemed to be delivered when directed to a number at which the stockholder has consented to receive notice by facsimile.  Subject to the limitations of Section 3.03(e) of this ARTICLE III, if given by electronic transmission, such notice shall be deemed to be delivered:  (i) by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (x) such posting and (y) the giving of such separate notice by United States mail or facsimile transmission; and (iii) if by any other form of electronic transmission, when directed to the stockholder.  An affidavit of the Secretary or an assistant Secretary of the Corporation, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

(d) Waiver of Notice.  Notice of any meeting of stockholders need not be given to any stockholder if waived by such stockholder in writing, whether before or after such meeting is held, or if such stockholder shall sign the minutes or attend the meeting (unless such signature is noted solely as, or attendance at is solely to, object to the meeting on grounds of insufficient notice thereof).

(e) Notice by Electronic Delivery.  Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the General Corporation Law of the State of Delaware, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given.  Any such consent shall be revocable by the stockholder by written notice to the Corporation.  Any such consent shall be deemed revoked if: (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices of meetings or of other business given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the Secretary or an assistant Secretary of the Corporation or to the transfer agent or other person responsible for the giving of notice. However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.  For purposes of these Bylaws, except as otherwise limited by applicable law, the term "electronic transmission" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

### Section 3.04    Stockholder Notices.

(a) At any meeting of the stockholders, only such business shall be conducted, and only such proposals shall be acted upon as (i) shall have been brought before the meeting by or at the

direction of the Board of Directors, or (ii) shall have been brought before the meeting by any stockholder (a "Proposing Stockholder") who complies with the notice procedures set forth in this Section 3.04 and, for election of directors, in Section 4.03, and be a proper matter for stockholder action.

(b) For a proposal to be properly brought before an annual meeting by a Proposing Stockholder, including a proposal for nominations of persons for election to the Board of Directors, the stockholder must have given timely notice thereof in writing to the Secretary and complied with the applicable provisions set forth in this Section 3.04 and Section 4.03 above (for election of directors). To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is advanced more than thirty (30) days prior to or delayed by more than thirty (30) days after the anniversary of the preceding year's annual meeting, notice by the stockholder to be timely must be so delivered not earlier than the close of business on the one hundred twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above.

(c) For a proposal for nominations of persons for election to the Board of Directors to be properly brought before a special meeting by a Proposing Stockholder, the stockholder must have given timely notice thereof in writing to the Secretary and complied with the applicable provisions set forth in this Section 3.04 and Section 4.03 below. To be timely, a stockholder's notice must be delivered to, or mailed and received at, the principal executive offices of the Corporation not later than the close of business on the tenth (10th) day following the day on which public announcement of the date of such meeting is first made. In no event shall the public announcement of an adjournment of an annual meeting commence a new time period for the giving of a stockholder's notice as described above. Stockholders are not permitted to bring any other business before a special meeting.

(d) To bring a proposal before any meeting, a Proposing Stockholder must deliver (in accordance with any applicable time periods prescribed for delivery of notice under this Section) to the Secretary of the Corporation a written questionnaire providing as to the Proposing Stockholder: (i) the name and address of the Proposing Stockholder as they appear on the Corporation's books and of the beneficial owner, if any, on whose behalf the proposal or nomination of persons for election to the Board of Directors, as applicable, is being made, (ii) the class and number of shares of the Corporation which are owned by the Proposing Stockholder (beneficially and of record) and owned by the beneficial owner, if any, on whose behalf the proposal or nomination, as applicable, is being made, as of the date of the Proposing Stockholder's notice, and a representation that the Proposing Stockholder will notify the Corporation in writing of the class and number of such shares owned of record and beneficially as of the record date for the meeting promptly following the later of the record date or the date notice of the record date is first publicly disclosed, (iii) a description of any agreement,

arrangement or understanding with respect to such proposal or nomination, as applicable, between or among the Proposing Stockholder and any of its affiliates or associates, and any others (including their names) acting in concert with any of the foregoing, and a representation that the Proposing Stockholder will notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the later of the record date or the date notice of the record date is first publicly disclosed, (iv) a description of any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions, and borrowed or loaned shares) that has been entered into as of the date of the Proposing Stockholder's notice by, or on behalf of, the Proposing Stockholder or any of its affiliates or associates, the effect or intent of which is to mitigate loss to, manage risk or benefit of share price changes for, or increase or decrease the voting power of the Proposing Stockholder or any of its affiliates or associates with respect to shares of stock of the Corporation, and a representation that the Proposing Stockholder will notify the Corporation in writing of any such agreement, arrangement or understanding in effect as of the record date for the meeting promptly following the later of the record date or the date notice of the record date is first publicly disclosed, (v) a representation that the Proposing Stockholder is a holder of record of shares of the Corporation entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to nominate the person or persons specified in the notice, and (vi) a representation whether the Proposing Stockholder intends to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Corporation's outstanding capital stock required to approve the proposal or nomination, as applicable, and/or otherwise to solicit proxies from stockholders in support of the proposal or nomination, as applicable.

(e) A stockholder's notice to the Secretary for proposals other than for election of directors at an annual meeting shall set forth as to each matter the stockholder proposes to bring before such meeting, a description of the proposal desired to be brought before such meeting and the reasons for conducting such business at such meeting. A stockholder's notice to the Secretary for proposal for election of directors shall set forth the information required pursuant to Section 4.03 below.

(f) The foregoing notice requirements of this Section 3.04 shall be deemed satisfied by a Proposing Stockholder with respect to business other than a nomination for election of a director if the Proposing Stockholder has notified the Corporation of his, her or its intention to present a proposal at an annual meeting in compliance with the applicable rules and regulations promulgated under the Exchange Act and such stockholder's proposal has been included in a proxy statement that has been prepared by the Corporation to solicit proxies for such annual meeting.

**Section 3.05    Adjourned Meetings**. When a meeting is adjourned to another time or place, unless otherwise provided by these Bylaws, notice need not be given of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting at which the requisite amount of shares shall be represented, the stockholders may transact any business which might have been transacted at the original meeting. If an adjournment is for more than thirty (30) days or if after an adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder entitled to vote at the meeting.

5

**Section 3.06    Quorum and Adjournment**. Except as otherwise provided by law, by the Certificate of Incorporation or by these Bylaws, the presence, in person or by proxy, of the holders of a majority of the aggregate voting power of the stock issued and outstanding, entitled to vote thereat, and the voting rights of which are not suspended in accordance with Sections 7.03 and 7.04 below, shall be requisite and shall constitute a quorum for the transaction of business at all meetings of stockholders. If, however, such majority shall not be present or represented at any meeting of stockholders, the stockholders present, although less than a quorum, shall have the power to adjourn the meeting.

**Section 3.07    Majority Vote Required**. When a quorum is present at any meeting of stockholders, the affirmative vote of the majority of the aggregate voting power of the shares present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall constitute the act of the stockholders, unless by express provision of law, the Certificate of Incorporation or these Bylaws a different vote is required, in which case such express provision shall govern and control.

**Section 3.08    Manner of Voting**.  At each meeting of stockholders, each stockholder having the right to vote, and whose voting rights have not been suspended in accordance with Sections 7.03 and 7.04 below, shall be entitled to vote in person or proxy. Proxies need not be filed with the Secretary of the Corporation until the meeting is called to order, but shall be filed before being voted. Each stockholder shall be entitled to vote each share of stock having voting power registered in his name on the books of the Corporation on the record date fixed, as provided in Section 6.04 below, for the determination of stockholders entitled to vote at such meeting. All elections of Directors shall be by written ballot.

**Section 3.09    Proxies**.

(a) At any meeting of stockholders, any stockholder may be represented and vote by proxy or proxies appointed by a written form of proxy subscribed by such stockholder and bearing a date not more than three years prior to said meeting, unless said instrument provides for a longer period. In the event than any form of proxy shall designate two or more persons to act as proxies, a majority of such persons present at the meeting or, if only one shall be present, then that one shall have and may exercise all of the powers conferred by the form of proxy upon all of the persons so designated unless the form of proxy shall otherwise provide.

(b) The Board of Directors may, in advance of any annual or special meeting of the stockholders, prescribe additional regulations concerning the manner of execution and filing of proxies and the validation of the same, which are intended to be voted at any such meeting.

**Section 3.10    Presiding Officer and Secretary**. At each meeting of stockholders, the Chairman of the Board or the Chief Executive Officer shall preside and the Secretary shall act as Secretary of the meeting.

**Section 3.11    Disregard of Nomination or Proposal**.

(a) Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the person presiding over any meeting of the stockholders shall have the power and duty to determine whether a nomination or any other business proposed to be brought before the meeting

6

was made in accordance with the procedures set forth in this Article 3 and Section 4.03 below and, if any proposed nomination or business is not in compliance with such provisions, to declare that such defective proposal or nomination shall be disregarded.

(b) The requirements of Section 3.04 above and Section 4.03 below are included to provide the Corporation notice of a stockholder's intention to bring business before an annual meeting and shall in no event be construed as imposing upon any stockholder the requirement to seek approval from the Corporation as a condition precedent to bringing any such business before an annual meeting.

**Section 3.12    Inspections of Elections**. The Board of Directors by resolution shall appoint one or more inspectors of election (which may include individuals who serve the Corporation in other capacities including, without limitation, as officers, employees, agents or representatives of the Corporation) to act at any meeting of the stockholders and make a written report thereof. Such appointments shall be made in accordance with, and each inspector shall have the duties prescribed by, Section 231 of the Delaware General Corporation Law (the "DGCL"). If any of the inspectors appointed shall fail to attend, or refuse or be unable to serve, substitutes shall be appointed by the chairman of the meeting.

## ARTICLE IV.  DIRECTORS.

**Section 4.01    Powers**. The Board of Directors shall exercise all of the powers of the Corporation except such as are by law, or by the Certificate of Incorporation or by these Bylaws conferred upon or reserved to the stockholders of any class or classes.

**Section 4.02    Number**. From time to time, the number of directors constituting the Board of Directors shall be determined by resolution of the Board of Directors; provided; however the Board of Directors of the Corporation shall not be less than [●] ([●]) nor more than [●] ([●]) members.

### Section 4.03    Nominations.

(a) No person shall be elected to the Board of Directors of this Corporation at an annual meeting of the stockholders, or at a special meeting called for that purpose, unless a written nomination of such person to the Board of Directors (i) by a stockholder of the Corporation who is a stockholder of record at the time of giving of the notice provided for in this Section and at the time of the meeting, shall be received by the Secretary of the Corporation in accordance the applicable timing requirements set forth in Section 3.04 above or (ii) is made by or at the direction of the Board of Directors.

(b) To be eligible to be a nominee for election or reelection as a director of the Corporation, the prospective nominee (whether nominated by or at the direction of the Board of Directors or by a stockholder), or someone acting on such prospective nominee's behalf, must deliver (in accordance with any applicable time periods prescribed for delivery of notice under this Section) to the Secretary of the Corporation a written questionnaire providing as to the nominee(s): (i) the name, age, business address and residence address of each nominee proposed in such notice, (ii) the principal occupation or employment of each such nominee, (iii) the number of shares of capital stock of the Corporation which are owned of record and beneficially

7

by each such nominee (if any), (iv) such other information concerning each such nominee as would be required to be disclosed in a proxy statement soliciting proxies for the election of such nominee as a director in an election contest (even if an election contest is not involved), or that is otherwise required to be disclosed, under the rules of the Securities and Exchange Commission, and (v) the consent of the nominee to being named in the proxy statement as a nominee and to serving as a director if elected. The Corporation may require any proposed nominee to furnish such other information as it may reasonably require to determine the eligibility of such proposed nominee to serve as an independent director of the Corporation or that could be material to a reasonable stockholder's understanding of the independence, or lack thereof, of such nominee.

(c) No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in these Bylaws. Except as otherwise provided by law, the Certificate of Incorporation or these Bylaws, the chairman of the meeting may, if the facts warrant, determine that a nomination was not made in accordance with the procedures prescribed in these Bylaws; and if the chairman should so determine, the chairman shall so declare to the meeting, and the defective nomination shall be disregarded. Notwithstanding the foregoing provisions of this Section, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder, if applicable, with respect to the matters set forth in this Section; provided, however, that any references in these Bylaws to the Exchange Act or the rules promulgated thereunder are not intended to and shall not limit the requirements applicable to nominations to be considered pursuant to Section.

**Section 4.04    Resignations**. Any director may resign at any time by giving written notice or by electronic transmission to the Board of Directors or the Secretary. Such resignation shall take effect at the date of receipt of such notice or any later time specified therein. Acceptance of such resignation shall not be necessary to make it effective.

**Section 4.05    Removal**. At any special meeting of the stockholders duly called as provided herein, any director may, by vote of the holders of stock representing a majority of the voting power of all the shares of stock issued and outstanding and entitled to vote threat, be removed from office with or without cause, and the successor of the director so removed may be elected at such meeting. Any vacancy may be filled as provided in Section 4.06 below.

**Section 4.06    Vacancies.**

(a) In case any vacancy shall occur on the Board of Directors because of death, resignation, retirement, disqualifications, removal, an increase in the authorized number of directors or any other cause, the Board of Directors may, at any meeting, by resolution adopted by the affirmative vote of a majority of the Directors then in office, though less than a quorum, elect a director to fill such vacancy, and any successor director so chosen shall hold office until such director's successor is elected and qualified, or until such director's earlier resignation or removal.

(b) If, as a result of a disaster or emergency (as determined in good faith by the then remaining directors), it becomes impossible to ascertain whether or not vacancies exist on the

Board of Director's and a person is or persons are elected by Directors, in good faith believe themselves to be a majority of the remaining directors, to fill a vacancy or vacancies that said remaining directors in good faith believe exists, then the acts of such person or persons who are so elected as directors shall be valid and binding upon the Corporation whether (i) there was in fact no vacancy or vacancies existing on the Board of Directors, or (ii) the directors who so elected such person or persons did not in fact constitute a majority of the remaining directors.

**Section 4.07    The Chairman of the Board; Presiding Officer and Secretary**.

(a) The Board of Directors shall elect from among its members a Chairman of the Board by the vote of a majority of directors then in office (which may include the director who was or is to be Chairman of the Board). The Chairman of the Board shall be so elected annually at the first meeting of the Board of directors held after each annual meeting of the stockholders and shall hold such position for one (1) year and until a successor shall have been duly elected and shall qualify in his or her stead, or until he or she shall have resigned as Chairman of the Board or as a director and his or her resignation shall have become effective, or until he or she shall have been removed as Chairman of the Board or as a director in the manner provided in these Bylaws. The Chairman of the Board may be removed from such position (but not as a director (removal as a director being governed by Section 4.05 above)), either with or without cause, by the vote of a majority of the directors then in office (excluding the director who is Chairman of the Board). The Chairman of the Board shall have the powers and duties provided in the Certificate of Incorporation and these Bylaws or as delegated to him or her from time to time by the Board of Directors, as well as those customarily and usually associated with the position of Chairman of the Board. The Chairman of the Board, alone or with the President, the Secretary and/or such other directors as the Chairman shall determine, shall sign and send out reports and other messages which are to be sent to stockholders from time to time.

(b) The Chairman of the Board shall have the power and authority to designate (i) any director to preside at any meeting of the Board of Directors in his absence, and (ii) any director or officer of the Corporation to preside at any or all meetings of the stockholders, whether or not the Chairman of the Board is also present. In the event of the Chairman of the Board's disability or unexpected absence the Board of Directors shall designate a director to preside at meetings of the Board of Directors, and the Board of Directors may designate a director or officer of the Corporation to preside at meetings of the stockholders (in the absence of such designation by the Board, the senior officer of the Corporation shall preside at a meeting of the stockholders). At each meeting of the Board of Directors, the Chairman of the Board shall preside (subject to the applicable provisions of paragraph (a) above in the case of absence or disability), and the Secretary shall act as secretary of the meeting (subject to the applicable provisions of Section 5.10 above in the case of absence or disability).

**Section 4.08    Annual Meetings**. The Board of Directors shall meet each year immediately following the annual meeting of stockholders, at the place where such meeting of stockholders has been held, or at such other place as shall be fixed by the person presiding over the meeting of the stockholders at which such directors are elected, for the purpose of organization, election of officers, and consideration of such other business as the Board considers relevant to the management of the Corporation.

**Section 4.09    <u>Regular Meetings</u>**. Regular meetings of the Board of Directors shall be held on such dates and at such times and places, within or without the State of Delaware, as shall from time to time be determined by the Board of Directors. In the absence of any such determination, such meetings shall be held at such times and places, within or without the State of Delaware, as shall be designated by the Chairman of the Board on not less than three (3) calendar days' notice (specifying the time and place of the meeting and the agenda therefore) to each director, given verbally or in writing either personally, by telephone, by facsimile transmission, by mail, by courier service, by telegram, by telex, by electronic mail or by any other electronic transmission.

**Section 4.10    <u>Special Meetings</u>**. Special meetings of the Board of Directors shall be held at the call of the Chairman of the Board at such times and places, within or without the State of Delaware, as he or she shall designate, on not less than two (2) calendar days' notice (specifying the time and place of the meeting and the agenda therefore) to each director, given verbally or in writing either personally, by telephone, by electronic mail, by facsimile transmission, by mail, by courier service, by telegram by telex or by ant other electronic transmission. Special meetings shall be called by the Secretary on like notice at the written request of a majority of the directors.

**Section 4.11    <u>Quorum and Powers of a Majority</u>**. At all meetings of the Board of Directors and of each committee thereof, a majority of the members shall be necessary and sufficient to constitute a quorum for the transaction of business, and the act of a majority of the members present at any meeting at which a quorum is present shall be the act of the Board of Directors or such committee, unless by express provision of law, of the Certificate of Incorporation or these Bylaws, a different vote is required, in which case such express provision shall govern and control. In the absence of a quorum, a majority of the members present at any meeting may, without notice other than announcement at the meeting, adjourn such meeting from time to time until a quorum is present.

**Section 4.12    <u>Waiver of Notice</u>**. Notice of any meeting of the Board of Directors, or any committee thereof, need not be given to any member if waived by him or her in writing, whether before or after such meeting is held, or if he or she shall sign the minutes or attend the meeting (unless such signature is noted solely as, or attendance at is solely to, object to the meeting on grounds of insufficient notice thereof).

**Section 4.13    <u>Manner of Acting</u>**.

(a) Members of the Board of Directors, or any committee thereof, may participate in any meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all persons participating therein can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(b) Any action required or permitted to be taken at any meeting of the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board of Directors or such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board of Directors or such committee.

### Section 4.14    Compensation.

(a) The Board of Directors, by a resolution or resolutions, may fix and change the compensation of directors, from time to time.

(b) Each director who is not also an employee of the Corporation shall be entitled to reimbursement from the Corporation for his or her reasonable expenses incurred in attending meetings of the Board of Directors or any committee thereof.

(c) Nothing contained in these Bylaws shall be construed to preclude any director from serving the Corporation in any other capacity and from receiving compensation from the Corporation for services rendered to it in such other capacity.

### Section 4.15    Committees. The Board of Directors may, by resolution or resolutions adopted by the affirmative vote of a majority of the Board of Directors, designate one or more committees, each committee to consist of two or more directors, which to the extent provided in said resolution or resolutions shall have and may exercise the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation; provided that no such committee shall have the power to (i) elect directors, (ii) alter, amend, or repeal these Bylaws or any resolution of the Board relating to such committee, (iii) appoint any member of such committee, (iv) declare any dividend or make any other distribution to the stockholders of the Corporation, or (v) take any other actions which may lawfully be taken only by the full Board of Directors. Such committee or committees shall have such name or names as may be determined from time to time by resolutions adopted by the Board of Directors.

### Section 4.16    Committee Procedure.

(a) Except as otherwise provided by these Bylaws, each committee shall adopt its own rules governing the time, place and method of holding its meetings and the conduct of its proceedings and shall meet as provided by such rules or by resolution of the Board of Directors. Unless otherwise provided by these Bylaws or any such rules or resolutions, notice of the time and place of each meeting of a committee shall be given to each member of such committee as provided in Section 4.10 below with respect to notices of special meetings of the Board of Directors.

(b) Each committee shall keep regular minutes of its proceedings and report the same to the Board of Directors when required.

(c) Any member of any committee, other than a member thereof serving ex-officio, may be removed from such committee either with or without cause, at any time, by resolution adopted by the affirmative vote of a majority of the Board of Directors at any meeting thereof. Any vacancy in any committee shall be filled by the Board of Directors in the manner prescribed by these Bylaws for the original appointment of the members of such committee.

### ARTICLE V.  OFFICERS.

### Section 5.01    Number.

11

(a) The officers of the Corporation shall include a Chief Executive Officer, a President, one or more Vice Presidents (including one or more Executive Vice Presidents and one or more Senior Vice Presidents if deemed appropriate by the Board of Directors), a Secretary and a Treasurer. The Board of Directors may also elect such other officers, as the Board of Directors may from time to time deem appropriate or necessary. None of the officers of the Corporation need be a director of the Corporation.

(b) Any two or more offices may be held by the same person, but no officer shall execute, acknowledge or verify any instrument in more than one capacity.

(c) If at any time the office of the Chief Executive Officer shall not be filled, the President shall also be the Chief Executive Officer.

(d) The Board of Directors may delegate to the Chief Executive Officer the power to appoint one or more employees of the Corporation as divisional or departmental Vice Presidents and fix the duties of such appointees. However, no such divisional or departmental Vice President shall be considered as an officer of the Corporation, until and unless they are elected by the Board of Directors.

**Section 5.02    Election of Officers**. The officers of the Corporation to be elected by the Board of Directors shall be elected annually at the first meeting of the Board of Directors held after each annual meeting of the stockholders. Each such officer shall hold office for one (1) year and until a successor shall have been duly elected and shall qualify in his or her stead unless the Board of Directors shall have provided by contract or otherwise in any particular case, or until such officer shall have resigned and his or her resignation shall have become effective, or until such officer shall have been removed in the manner hereinafter provided.

**Section 5.03    Removal**. Except as otherwise expressly provided in a contract duly authorized by the Board of Directors, any officer elected by the Board of Directors may be suspended or removed, either with or without cause, at any time by resolution adopted by the affirmative vote of a majority of the Board of Directors at any meeting thereof.

**Section 5.04    Resignations**. Any officer of the Corporation may resign at any time by giving notice in writing or electronic transmission to the Board of Directors or the Chairman of the Board. Such resignation shall take effect at the date of the receipt of such notice or at any later time specified therein and, unless otherwise specified herein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 5.05    Vacancies**. A vacancy in any office because of death, resignation, removal, disqualification or any other cause may be filled for the unexpired portion of the term by election by the Board of Directors at any meeting thereof.

**Section 5.06    Salaries**. The salaries of all officers of the Corporation shall be fixed by the Board of Directors from time to time, or by any applicable committee established by the Board of Directors in accordance with Section 4.15 above, and no officer shall be prevented from receiving such salary by reason of the fact that he is also a director of the Corporation.

**Section 5.07** **Chief Executive Officer**. The Chief Executive Officer shall have, subject to the supervision, direction and control of the Board of Directors, the general powers and duties of supervision, direction and management of the affairs and business of the Corporation usually vested in the Chief Executive Officer of a corporation, including, without limitation, all powers necessary to direct and control the organizational and reporting relationships within the Corporation.

**Section 5.08** **The President**. The President shall, subject to the supervision, direction and control of the Chief Executive Officer and the Board of Directors, manage the day-to-day operations of the Corporation and, in general, shall assist the Chief Executive Officer.

**Section 5.09** **The Vice Presidents**. Each Vice President shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Directors, the Chairman of the Board or the President.

**Section 5.10** **The Secretary and the Assistant Secretary**.

(a) The Secretary shall attend meetings of the Board of Directors and meetings of the stockholders and record all votes and minutes of all such proceedings in a book or equivalent electronic database kept for such purpose and shall perform like duties for the committees of directors as provided for in these Bylaws when required. The Secretary shall give, or cause to be given, notice of all meetings of stockholders and of the Board of Directors (except in case of meetings called by the Chairman of the Board in accordance with Sections 4.09 or 4.10 above). He or she shall have charge of the stock ledger (unless responsibility for maintaining the stock ledger is delegated to a transfer agent by the Board of Directors pursuant to Section 6.06 below) and such other books and papers as the Board of Directors may direct. He or she shall have all such further powers and duties as generally are incident to the position of Secretary or as may from time to time be assigned to him or her by the Board of Directors of the Chairman of the Board.

(b) Each Assistant Secretary shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Directors, the Chairman of the Board or the Secretary. In case of the absence or disability of the Secretary, the Assistant Secretary designated by the Secretary (or, in the absence of such designation, the senior Assistant Secretary) shall perform the duties and exercise the powers of the Secretary.

**Section 5.11** **The Treasurer and the Assistant Treasurer**.

(a) The Treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. He or she may endorse all commercial documents requiring endorsements for or on behalf of the Corporation and may sign all receipts and vouchers for payments made to the Corporation.

(b) The Treasurer shall disburse funds of the Corporation as may from time to time be ordered by the Board of Directors, taking proper vouchers for such disbursements, and render to

13

the Board of Directors, the Chairman of the Board and President, whenever they may require it, an account of all transactions undertaken by him or her as Treasurer and of the financial condition of the Corporation.

(c) Each Assistant Treasurer shall have such powers and perform such duties as may from time to time be assigned to him or her by the Board of Directors, the Chairman of the Board, the President or the Treasurer. In case of the absence or disability of the Treasurer, the Assistant Treasurer designated by the Treasurer (or, in the absence of such designation, the senior Assistant Treasurer) shall perform the duties and exercise the powers of the Treasurer.

## ARTICLE VI.  STOCK.

**Section 6.01    Certificates**. Certificates or shares of the stock of the Corporation shall be issued under the seal of the Corporation, or facsimile thereof, and shall be numbered and shall be entered in the books of the Corporation as they are issued; provided, however, that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares, in which case such shares shall be evidenced by registration in book-entry accounts without certificates for shares of stock in such form as the appropriate officers of the Corporation may from time to time prescribe. Every holder of stock represented by a certificate shall be entitled to have a certificate which shall bear a serial number, shall exhibit the holder's name and the number of shares evidenced thereby and shall be signed by the Chairman of the Board or a Vice Chairman, if any, or the Chief Executive Officer or the President or any Vice President and the Secretary or an Assistant Secretary or the Treasurer or an Assistant Treasurer. Any or all of the signatures on the certificate may be electronic or a facsimile. In case any officer, transfer agent or registrar who has signed or whose electronic or facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person or entity were such officer, transfer agent or registrar at the date of issue.

**Section 6.02    Transfers**. Transfers of stock of the Corporation shall be made on the books of the Corporation only upon surrender to the Corporation of a certificate for the shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer (or, with respect to uncertificated shares, by delivery of duly executed instructions or in any other manner permitted by law), provided such succession, assignment, or transfer is not prohibited by the Certificate of Incorporation, the Bylaws, applicable law or contract. Thereupon, the Corporation shall issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**Section 6.03    Lost, Stolen or Destroyed Certificates**. Any person claiming a certificate of stock to be lost, stolen or destroyed shall make an affidavit or an affirmation of that fact, and may be required to give the Corporation a bond of indemnity in satisfactory form and with one or more satisfactory sureties to indemnify it against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate, whereupon a new certificate (or uncertificated shares) may be issued of the same tenor and for the same number of shares as the one alleged to be lost or destroyed.

**Section 6.04    Record Date**.

(a) In order that the Corporation may determine the stockholders entitled to notice of or to vote at a meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors shall fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action.

(b) If no record date is fixed by the Board of Directors, (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the date on which notice is given, or, if the notice is waived by all stockholders entitled to vote at the meeting, at the close of business on the day next preceding the date on which the meeting was held and, (ii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c) A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided that the Board of Directors may fix a new record date for the adjourned meeting.

**Section 6.05    Registered Stockholders**. The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares as the person entitled to exercise the rights referred to in Section 6.04 above and shall not be bound to recognize any equitable or other claim to or interest in any such shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise expressly provided by the laws of the State of Delaware.

**Section 6.06    Additional Powers of the Board**.

(a) In addition to those powers set forth in Section 4.01 above, the Board of Directors shall have power and authority to make all such rules and regulations as it shall deem expedient concerning the issue, transfer and registration of certificates for shares of stock of the Corporation.

(b) The Board of Directors may appoint and remove transfer agents and registrars of transfers, and may require all stock certificates to bear the signature of any such transfer agent and/or any such registrar of transfers.

(c) The Board of Directors shall have power and authority to create and issue (whether or not in connection with the issue and sale of any stock or other securities or the Corporation) warrants, rights or options entitling the holders thereof to purchase from the Corporation any shares of any class or classes or any other securities of the Corporation for such consideration and to such persons, firms or corporations as the Board of Directors, in its sole discretion, may determine, setting aside from the authorized but unissued stock of the Corporation the requisite number of shares for issuance upon the exercise of such warrants, rights or options. Such

15

warrants, rights or options shall be evidenced by such instrument or instruments as shall be approved by the Board of Directors. The terms upon which, the time or times (which may be limited or unlimited in duration) at or within which, and the price or prices at which any such shares or other securities may be purchased from the Corporation upon the exercise of any such warrant, right or option shall be such as shall be fixed and stated in a resolution or resolutions of the Board of Directors providing for the creation and issue of such warrants, rights or options.

### ARTICLE VII.  LIMITATIONS OF OWNERSHIP BY NON-CITIZENS.

**Section 7.01    Definitions**. For purposes of this Article 7, the following definitions shall apply:

"Act" shall mean Subtitle VII of Title 49 of the United States Code, as amended, or as the same may be from time to time amended, supplemented, and/or superseded.

"Citizen of the United States" shall have the meaning set forth in Section 40102(a)(15) of the Act (or any successor or replacement of the provision thereto) and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time.

"Foreign Stock Record" shall have the meaning set forth in Article Eleventh (C).

"Non-U.S. Citizen" shall mean any person or entity who is not a "Citizen of the "United States" as defined in Section 40102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time, including any agent, trustee or representative of a Non-Citizen.

"Own or Control" or "Owned" or "Controlled" shall mean (i) ownership of record, (ii) beneficial ownership, or (iii) the power to direct, by agreement, agency or in any other manner, the voting of Stock.  Any determination by the Board of Directors as to whether Stock is Owned or Controlled by a Non-U.S. Citizen shall be final.

''Permitted Percentage" shall mean 25% of the voting power of the Stock, or such other amount as permitted by Section 40102 of the Act (or any successor or replacement thereto) to be Owned or Controlled by Non-U.S. Citizens.

"Stock" shall mean the outstanding capital stock of the Corporation entitled to vote; provided, however, that for the purpose of determining the voting power of Stock that shall at anytime constitute the Permitted Percentage, the voting power of Stock outstanding shall not be adjusted downward solely because shares of Stock may not be entitled to vote by reason of any provision of this Article 7.

**Section 7.02    Foreign Ownership and Control**. It is the policy of the Corporation that, consistent with the requirements of the Transportation Code: (i), Non-Citizens shall not Own or Control more than the Permitted Percentage and, if Non-Citizens nonetheless at any time Own or Control more than the Permitted Percentage, the voting rights of the Stock in excess of the Permitted Percentage shall be automatically suspended in accordance with Sections 7.03 and 7.04 below; (ii) at no time shall Non-Citizens constitute more than one-third of the total

number of officers of the Corporation or more than one-third of the Board of Directors; and (iii) at no time shall the President, Chief Executive Officer, or Chairman of the Board of Directors of the Corporation be a Non-Citizen.

**Section 7.03    Foreign Stock Record**. The Corporation or any transfer agent designated by it shall maintain a separate stock record (the "Foreign Stock Record") in which shall be registered Stock known to the Corporation to be Owned or Controlled by Non-Citizens. Without limiting the provisions of Section 7.05 below, each shareholder of the Corporation and any proposed transferee thereof shall certify, if required to do so pursuant to one or more forms which may be established for this purpose from time to time by the Corporation or its transfer agent, whether it is a Citizen of the United States or a Non-U.S. Citizen and the Corporation or its transfer agent shall register in the Corporation's Foreign Stock Record any such shares known to it to be held by a Non-U.S. Citizen. The Foreign Stock Record shall include (i) the name and nationality of each such Non-U.S. Citizen, (ii) the number of shares of Stock Owned or Controlled by such Non-U.S. Citizen and (iii) the date of registration of such shares in the Foreign Stock Record. In no event shall shares in excess of the Permitted Percentage be entered on the Foreign Stock Record. In the event that the Corporation shall determine that Stock registered on the Foreign Stock Record exceeds the Permitted Percentage, sufficient shares shall be removed from the Foreign Stock Record so that the number of shares entered therein does not exceed the Permitted Percentage. Stock shall be removed from the Foreign Stock Record in reverse chronological order based upon the date or registration therein. The Corporation may refuse to register the issuance or transfer of shares on its books if such issuance or transfer would result in shares in excess of the Permitted Percentage being entered on the Foreign Stock Record.

**Section 7.04    Voidance of Certain Transfers**. Any purported transfer of beneficial ownership of any shares of any class or series of Stock of the Corporation (excluding, for the avoidance of doubt, the original issuance of such shares by the Corporation), the effect of which would be to cause one or more Non-U.S. Citizens in the aggregate to beneficially own shares of any class or series of Stock of the Corporation in excess of the Permitted Percentage, shall be void and ineffective, and, to the extent that the Corporation knows of such purported transfer, neither the Corporation nor its transfer agent (if any) shall register such purported transfer on the stock transfer records of the Corporation and neither the Corporation nor its transfer agent (if any) shall recognize the purported transferee thereof as a stockholder of the Corporation for any purpose whatsoever. In no event shall any such registration or recognition make such purported transfer effective unless the Board of Directors shall have expressly and specifically authorized the same.

**Section 7.05    Beneficial Ownership Inquiry**.

(a) The Corporation may by notice in writing (which may be included in the form of proxy or ballot distributed to stockholders in connection with the annual meeting or any special meeting of the stockholders of the Corporation or otherwise) require a person that is a holder of record of Stock or that the Corporation knows to have, or has reasonable cause to believe has, Beneficial Ownership of Stock to certify in such manner as the Corporation shall deem appropriate (including by way of execution of any form of proxy or ballot of such person) that, to the knowledge of such person: all Stock as to which such person has record ownership of or

17

Beneficial Ownership is Owned and Controlled only by Citizens of the United States; or the number and class or series of Stock owned of record or Beneficially Owned by such person that is Owned or Controlled by Non-Citizens is as set forth in such certificate.

(b) With respect to any Stock identified in response to clause (ii) above, the Corporation may require such person to provide such further information as the Corporation may reasonably require in order to implement the provisions of this Article 7.

(c) For purposes of applying the provisions of this Article 7 with respect to any Stock, in the event of the failure of any person to provide the certificate or other information to which the Corporation is entitled pursuant to this Section 7.05, the Corporation shall presume that the Stock in question is Owned or Controlled by Non- Citizens.

## ARTICLE VIII.  MISCELLANEOUS.

### Section 8.01    Place and Inspection of Books.

(a) The books of the Corporation other than such books as are required by law to be kept within the State of Delaware shall be kept in the State of Georgia or at such other place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

(b) At least ten (10) days before each meeting of stockholders, the officer in charge of the stock ledger of the Corporation shall prepare a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either (i) at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting or (ii) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or, if not specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present. Nothing contained herein shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.

(c) The Board of Directors shall determine from time to time whether, when and under what conditions and regulations the accounts and books of the Corporation (except such as may be by law specifically open to inspection or as otherwise provided by these Bylaws) or any of them shall be open to the inspection of the stockholders and the stockholders' rights in respect thereof.

### Section 8.02    Indemnification of Directors, Officers, Employees and Agents.

(a) The Corporation shall indemnify any person who was or is a party to or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the

18

Corporation), by reason of the fact that such person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid or owed in settlement actually and reasonably paid or incurred by him or her or rendered or levied against him or her in connection with such action, suit or proceeding, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent shall not, in itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

(b) The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director or officer of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses, including attorneys' fees, actually and reasonably paid or incurred by him or her in connection with the defense or settlement of such action or suit if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation; provided however, that no indemnification shall be made in respect to any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the court shall deem proper.

(c) The Corporation may, at the discretion of the Board of Directors, indemnify all employees and agents of the Corporation (other than directors and officers) to the extent that directors and officers shall be indemnified pursuant to subsections (a) and (b).

(d) To the extent that a person who may be entitled to indemnification by the Corporation under this section is or has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b), or in defense of any claim, issue or matter herein, he or she shall be indemnified against expenses, including attorney's fees, actually and reasonably paid or incurred by him or her in connection therewith.

(e) Any indemnification under subsections (a), (b) or (c) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the director, officer, employee or agent is proper in the circumstances because he or she has met the applicable standard of conduct set forth in subsection (a) or (b). Such determination shall be made (i) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such action, suit or proceeding, (ii) if such a quorum is not obtainable or, even

19

if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion, (iii) by the stockholders or (iv) in any case in which applicable law makes court approval a prerequisite to indemnification, by the court in which such action, suit or proceeding was brought or another court of competent jurisdiction.

(f) Expenses, including attorneys' fees, incurred by an officer or director in defending a civil, criminal, administrative, or investigative action, suit or proceeding shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Corporation as authorized in this section. Such expenses, including attorneys' fees, incurred by other employees and agents shall be so paid upon terms and conditions, if and as the Board of Directors deems appropriate.

(g) The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of the stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office.

(h) The provisions of this section shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the estate, executors, administrators, spouse, heirs, legatees or devisees of a person entitled to indemnification hereunder and the term "person," there used in the section shall include the estate, executors, administrators, spouse, heirs, legatees or devisees of such person.

(i) For the purposes of this section 8.02, (i) "employee benefit plan" and "fiduciary" shall be deemed to include, but not be limited to, the meanings set forth, respectively, in Sections 3(3) and 21(A) of the Employee Retirement Income Security Act of 1974, as amended, and references to the judgments, fines and amounts paid or owed in settlement or rendered or levied shall be deemed to encompass and include excise taxes required to be paid pursuant to an applicable law in respect of any transaction involving an employee benefit plan, (ii) references to the Corporation shall be deemed to include any predecessor corporation and any constituent corporation absorbed in a merger, consolidation or other reorganization of or by the Corporation which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees, agents or fiduciaries so that any person who was a director, officer, employee, agent or fiduciary of such predecessor or constituent corporation, or served at the request of such predecessor or constituent corporation as a director, officer, employee, agent or fiduciary of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, shall stand in the same position under the provisions of this Section 8.02 with respect to the Corporation as such person would have with respect to such predecessor or constituent corporation if its separate existence had continued, and (iii) all other terms shall be deemed to have the meanings for such terms as set forth in Section 145 of the DGCL.

**Section 8.03    Dividends.**

20

(a) Dividends may be declared at the discretion of the Board of Directors at any meeting thereof.

(b) Dividends may be paid to stockholders in cash or, when the Directors shall so determine, in stock. A Director shall be fully protected in relying in good faith upon the books of account of the Corporation or statements prepared by any of its officers as to the value and amount of the assets, liabilities or net profits of the Corporation, or any other facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared.

(c) Before payment of any dividend or any distribution of profits, there may be set aside out of the said surplus of the Corporation such sum or sums as the Board of Directors from time to time, in its discretion thinks proper as a reserve fund to meet contingencies, or for equalizing dividends, or for such other purpose as the Board of Directors shall think conducive to the interests of the Corporation and the Board of Directors may abolish any such reserve in the manner in which it was created.

**Section 8.04    Execution of Deeds, Contracts and Other Agreements and Instruments**. Subject to the specific directions of the Board of Directors, all deeds, mortgages and bonds entered into by the Corporation and all other written contracts and agreements to which the Corporation shall be a party shall be executed in its name by the Chairman of the Board, the Chief Executive Officer, the President or a Vice President, or such other person or persons as may be authorized by any such officer or by the Board of Directors.

**Section 8.05    Checks**. All checks, drafts, acceptances, notes and other orders, demands or instruments in respect to the payment of money may be signed or endorsed on behalf of the Corporation by such officer or officers or by such agent or agents as the Board of Directors may from time to time designate.

**Section 8.06    Voting Shares in Other Corporations**. The Chairman of the Board or the Chief Executive Officer of the Corporation (or any other director designated by a majority of the Board of Directors) may vote any and all shares held by the Corporation in any other corporation.

**Section 8.07    Fiscal Year**.  The fiscal year of the Corporation shall correspond with the calendar year.

**Section 8.08    Gender/Number**. As used in these Bylaws, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so indicates.

**Section 8.09    Paragraph Titles**. The titles of the paragraphs have been inserted as a matter of reference only and shall not control or affect the meaning or construction of any of the terms and provisions hereof.

**Section 8.10    Amendment**. These Bylaws may be altered, amended or repealed by the affirmative vote of the holders of at least a majority of the voting power of the stock issued and outstanding and entitled to vote at any meeting of stockholders or by resolution

21

adopted by the affirmative vote of not less than a majority of the directors in office at any annual or regular meeting of the Board of Directors or at any special meeting of the Board of Directors if notice of the proposed alteration, amendment or repeal be contained in the notice of such special meeting; provided that no amendment with respect to the time or place for the election of directors shall be made within sixty (60) days before the day on which such election is to be held, and that a notice of any such change of time or place shall be given to each stockholder twenty (20) days before the election is held, in person or by notice or letter mailed to his last known post office address.

**Section 8.11    Amended and Restated Certificate of Incorporation**. Notwithstanding anything to the contrary contained herein, if any provision contained in these Bylaws is inconsistent with or conflicts with a provision of the Certificate of Incorporation of the Corporation, such provision of these Bylaws shall be superseded by the inconsistent provision in the Certificate of Incorporation to the extent necessary to give effect to such provision in the Certificate of Incorporation.

**Adopted by the Board of Directors on [●]**

**Exhibit B**

**New Certificates of Incorporation**

**RESTATED**
**CERTIFICATE OF INCORPORATION**

**OF**

**GLOBAL AVIATION HOLDINGS INC.**[1]

The undersigned, the duly qualified and authorized Secretary of Global Aviation Holdings Inc., a Delaware corporation incorporated on January 26, 2006, does hereby certify that the Amended and Restated Certificate of Incorporation of the Corporation filed on January 26, 2006 was amended pursuant to Sections 241 and 245 of the General Corporation of the State of Delaware by Certificate of Amendments filed with the Secretary of State of the State of Delaware on April 2, 2007, February 19, 2009, March 5, 2009, June 15, 2009 and October 1, 2010 (the "Original Certificate of Incorporation"). The undersigned further certifies that the following is the true and correct. This  Restated Certificate of Incorporation was duly approved by the board of directors of the corporation before receipt of payment for stock in accordance with Sections 241, 245 and 303 of the General Corporation Law of the State of Delaware and in accordance with a first amended plan of reorganization of GLOBAL AVIATION HOLDINGS INC. and certain subsidiaries of it (the "Plan"), as approved by the United States Bankruptcy for the Eastern District of New York in *In re: Global Aviation Holdings Inc. et al,* under Chapter 11 of the United States Bankruptcy Code (U.S.C. § 101-1330), as amended, which Plan is expected to become effective on or about [●], 2012.

The Original Certificate of Incorporation of Global Aviation Holdings Inc. is hereby  restated to read in its entirety as follows:

FIRST:  The name of the corporation (which is hereinafter referred to as the "Corporation") is Global Aviation Holdings Inc.

SECOND:  The address of the Corporation's registered office in the State of Delaware is [The Corporation Trust Center, 1209 Orange Street] in the City of [Wilmington], County of [New Castle].  The name of the Corporation's registered agent at such address is [The Corporation Trust Company].

THIRD:  The purpose of the Corporation is to engage in any lawful act or activity for which corporations maybe organized under the General Corporation Law of Delaware (the "Act").

FOURTH: A.    The total number of shares of all classes of capital stock which the Corporation shall have the authority to issue is [●] consisting of: (i) [●] shares of Class A Common Stock, par value $0.001 per share, of the Company (the "Class A Common Stock"); (ii) [●] shares of Class B Common Stock, par value $0.001 per share, of the Company (the "Class B Common Stock"), (iii) [●] shares of Class C Common Stock, par value $0.001 per share, of the Company (the "Class C Common Stock" together with Class A Common Stock and Class B

---

[1]     The certificates of incorporation of the subsidiary Debtor entities will be substantially in the same form provided herein.

K&E 24437129.1

Common stock, the "Common Stock") and (iv) [●] shares of Preferred Stock, par value $0.001 per share ("Preferred Stock"), issuable in one or more series as hereinafter provided.  The Common Stock has such rights, preferences, powers, privileges and restrictions, qualifications and limitations as stated herein and in the By-laws of the Corporation.

B.    The Corporation is prohibited from issuing non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

C.  Common Stock. (1)  Voting rights.  In the exercise of voting privileges, each holder of shares of the Class A Common Stock of the Corporation shall be entitled to one (1) vote for each share held in his name on the books of the Corporation, each holder of shares of the Class B Common Stock of the Corporation shall be entitled to nine (9) votes for each share held in his name on the books of the Corporation and each holder of shares of the Class C Common Stock of the Corporation shall be entitled to one ninth (1/9) of a vote for each share held in his name on the books of the Corporation.  The holders of shares of Common Stock shall vote together as a single class. In all elections of directors of the Corporation, cumulative voting is expressly prohibited.  (2)  Dividend.  Subject to the provisions of this Certificate of Incorporation, holders of Common Stock shall be entitled to receive equally, on a per share basis, such dividends and other distributions in cash, securities or other property of the Corporation as may be declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefore.  (3)  Redemption.   The Common Stock will be neither convertible nor redeemable.  (4)  Liquidation. Upon liquidation, the holders of the Common Stock will be entitled to receive pro rata assets which are legally available for distribution, after payment of all debts and other liabilities and subject to the prior rights of any holders of preferred stock then outstanding (if applicable). (5) Optional Conversion Rights. At any time or from time to time, subject to the limitations contained herein and in the By-Laws of the Corporation, any holder of shares of Class A Common Stock may convert ten (10) shares of Class A Common Stock held by such holder into one (1) share of Class B Common Stock and nine (9) shares of Class C Common Stock. In addition, at any time or from time to time, subject to the limitations contained herein and in the By-Laws of the Corporation, any holder of shares of Class B Common Stock and shares of Class C Common Stock may convert one (1) share of Class B Common Stock and nine (9) shares of Class C Common Stock into ten (10) shares of Class A Common Stock.

D.  Preferred Stock.  The Board of Directors is hereby expressly granted authority from time to time to issue Preferred Stock in one or more series and with respect to any such series, subject to the terms and conditions of this Certificate of Incorporation, to fix by resolution or resolutions the numbers of shares, designations, powers, preferences and relative, participating, optional or other special rights of such series and any qualifications, limitations or restrictions thereof, including but without limiting the generality of the foregoing, the following: (1) entitling the holders thereof to cumulative, non-cumulative or partially cumulative dividends, or to no dividends; (2) entitling the holders thereof to receive dividends payable on a parity with, junior to, or in preference to, the dividends payable on any other class or series of capital stock of the Corporation; (3) entitling the holders thereof to rights upon the voluntary or involuntary liquidation, dissolution or winding up of, or upon any other distribution of the assets of, the Corporation, on a parity with, junior to or in preference to, the rights of any other class or series of capital stock of the Corporation; (4) providing for the conversion or exchange, at the option of

the holder or of the Corporation or both, or upon the happening of a specified event, of the shares of Preferred Stock into shares of any other class or classes or series of capital stock of the Corporation or of any series of the same or any other class or classes, including provision for adjustment of the conversion or exchange rate in such events as the Board of Directors shall determine, or providing for no conversion; (5) providing for the redemption, in whole or in part, of the shares of Preferred Stock at the option of the Corporation or the holder thereof, or upon the happening of a specified event, in cash, bonds or other property, at such price or prices (which amount may vary under different conditions and at different redemption dates), within such period or periods, and under such conditions as the Board of Directors shall so provide, including provisions for the creation of a sinking fund for the redemption thereof, or providing for no redemption; (6) providing for voting rights or having limited voting rights or enjoying general, special or multiple voting rights; and (7) specifying the number of shares constituting that series and the distinctive designation of that series.

FIFTH:  The name and mailing address of the incorporator are [●].

SIXTH:  In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to alter or repeal the By-laws of the Corporation, or adopt any new By-Laws of the Corporation, subject to any specific limitation on such power contained in any By-laws adopted by the stockholders; provided, however, that, until such time as maybe specified in the By-laws of the Corporation, and subject to such limitations as maybe set forth in the By-laws, in no event shall the stockholders be entitled to alter or repeal the By-laws of the Corporation, or adopt any new By-Laws of the Corporation in a manner that would materially and adversely affect the rights of the holders of the Common Stock of the Corporation, unless any such alteration, repeal or adoption shall have been approved by the Board of Directors of the Corporation pursuant to the By-laws.  Elections of directors need not be by written ballot unless the By-laws of the Corporation so provide.

SEVENTH:  A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of Delaware, or (iv) for any transaction from which the director derived an improper personal benefit.  If the General Corporation Law of Delaware is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of Delaware, as so amended.  Any repeal or modification of this Article Seventh by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

EIGHTH:  Each person who is or was a director or officer of the Corporation, and each person who serves or served at the request of the Corporation as a director or officer of another enterprise, shall be indemnified by the Corporation in accordance with, and to the fullest extent authorized by, the General Corporation Law of Delaware as it may be in effect from time to time.

NINTH:  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this reservation; provided, however, that, until such time as may be specified in the By-laws of the Corporation, and subject to such limitations as may be set forth in the By-laws, the stockholders shall not be entitled to amend, alter, change or repeal any provision contained in Article Sixth of this Certificate of Incorporation in a manner that would materially and adversely affect the rights of the holders of the Common Stock of the Corporation, unless any such amendment, alteration, change or repeal shall have been approved by the Board of Directors of the Corporation pursuant to the By-laws.

TENTH:  The Corporation expressly elects not to be governed by § 203 of the Act (the Delaware Takeover Statute), as now in effect or hereafter amended, or any successor statute thereto.

ELEVENTH:  Limitations on Ownership and Control by Non-U.S. Citizens.

A.  Definitions.  For purposes of this Article Eleventh, the following definitions shall apply:

"Act" shall mean Subtitle VII of Title 49 of the United States Code, as amended, or as the same may be from time to time amended, supplemented, and/or superseded.

"Citizen of the United States" shall have the meaning set forth in Section 40102(a)(15) of the Act (or any successor or replacement of the provision thereto) and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time.

"Foreign Stock Record" shall have the meaning set forth in Article Eleventh (C).

"Non-U.S. Citizen" shall mean any person or entity who is not a "Citizen of the "United States" as defined in Section 40102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time, including any agent, trustee or representative of a Non-Citizen.

"Own or Control" or "Owned" or "Controlled" shall mean (i) ownership of record, (ii) beneficial ownership, or (iii) the power to direct, by agreement, agency or in any other manner, the voting of Stock.  Any determination by the Board of Directors as to whether Stock is Owned or Controlled by a Non-U.S. Citizen shall be final.

''Permitted Percentage" shall mean 25% of the voting power of the Stock, or such other amount as permitted by Section 40102 of the Act (or any successor or replacement thereto) to be Owned or Controlled by Non-U.S. Citizens.

"Stock" shall mean the outstanding capital stock of the Corporation entitled to vote; provided, however, that for the purpose of determining the voting power of Stock that shall at anytime constitute the Permitted Percentage, the voting power of Stock outstanding shall not

- 4 -

be adjusted downward solely because shares of Stock may not be entitled to vote by reason of any provision of this Article Eleventh.

B. <u>Non-U.S. Citizen Ownership</u>.  It is the policy of the Corporation that, consistent with the requirements of the Act, Non-U.S. Citizens shall not Own or Control more than the Permitted Percentage and, if Non-U.S. Citizens nonetheless at any time Own or Control more than the Permitted Percentage, the voting rights of the Stock Owned or Controlled by Non-U. S. Citizens in excess of the Permitted Percentage shall be automatically suspended in accordance with Article Eleventh (C) and (D).

C. <u>Foreign Stock Record</u>.  The Corporation or any transfer agent designated by it shall maintain a separate stock record (the "Foreign Stock Record") in which shall be registered shares of Stock known to the Corporation to be Owned or Controlled by Non-U.S. Citizens. Without limiting the provisions of sub-section E below, each shareholder of the Corporation and any proposed transferee thereof shall certify, if required to do so pursuant to one or more forms which may be established for this purpose from time to time by the Corporation or its transfer agent, whether it is a Citizen of the United States or a Non-U.S. Citizen and the Corporation or its transfer agent shall register in the Corporation's Foreign Stock Record any such shares known to it to be held by a Non-U.S. Citizen.  The Foreign Stock Record shall include (i) the name and nationality of each such Non-U.S. Citizen, (ii) the number of shares of Stock Owned or Controlled by such Non-U.S. Citizen and (iii) the date of registration of such shares in the Foreign Stock Record. In no event shall shares in excess of the Permitted Percentage be entered on the Foreign Stock Record. In the event that the Corporation shall determine that Stock registered on the Foreign Stock Record exceeds the Permitted Percentage, sufficient shares shall be removed from the Foreign Stock Record so that the number of shares entered therein does not exceed the Permitted Percentage. Stock shall be removed from the Foreign Stock Record in reverse chronological order based upon the date or registration therein.  The Corporation may refuse to register the issuance or transfer of shares on its books if such issuance or transfer would result in shares in excess of the Permitted Percentage being entered on the Foreign Stock Record.

D. <u>Voidance of Certain Transfers</u>.  Any purported transfer of beneficial ownership of any shares of any class or series of Stock of the Corporation (excluding, for the avoidance of doubt, the original issuance of such shares by the Corporation), the effect of which would be to cause one or more Non-U.S. Citizens in the aggregate to beneficially own shares of any class or series of Stock of the Corporation in excess of the Permitted Percentage, shall be void and ineffective, and, to the extent that the Corporation knows of such purported transfer, neither the Corporation nor its transfer agent (if any) shall register such purported transfer on the stock transfer records of the Corporation and neither the Corporation nor its transfer agent (if any) shall recognize the purported transferee thereof as a stockholder of the Corporation for any purpose whatsoever. In no event shall any such registration or recognition make such purported transfer effective unless the Board of Directors shall have expressly and specifically authorized the same.

E. <u>Certification</u>.

The Corporation may by notice in writing (which may be included in the form of proxy or ballot distributed to shareholders in connection with the annual meeting or any special

- 5 -

meeting of the shareholders of the Corporation, or otherwise) require a person or entity that Owns or Controls Stock to certify in such manner as the Corporation shall deem appropriate (including by way of execution of any form of proxy or ballot of such person) that, to the knowledge of such person or entity, such person or entity is a Citizen of the United States.

For purposes of applying the provisions of this Article Eleventh with respect to any Stock, in the event of the failure of any person to provide the certificate or other information to which the Corporation is entitled pursuant to this Article Eleventh, the Corporation may, if it so elects, presume that the Stock in question is Owned or Controlled by Non-U.S. Citizens.

F.  Board of Directors and Officers of the Corporation.

The President and Chairman of the Board must at all times be Citizens of the United States.  At least two-thirds of the Board of Directors and other officers must be Citizens of the United States.

TWELFTH:  Stock Trading Restrictions.

A.  Restriction on Dispositions.  Any holder of the Corporation's stock that beneficially owns at any time 4.75% or more of the Corporation's stock, for purposes of Section 382 of the Internal Revenue Code of 1986 (the "Code") and the Treasury regulations thereunder (collectively, "Section 382"), may not transfer, sell or otherwise dispose of more than 55% of the amount of such stock beneficially owned by such holder, unless such transfer, sale or disposition was previously approved in writing by the Corporation's Board of Directors.  In determining whether it shall approve any proposed transfer, sale or other disposition, the Board of Directors shall only be permitted to determine whether such transfer, sale or other disposition would have any adverse effects on the current or future ability of the Corporation to utilize its tax attributes under Section 382 (or any successor provision), and shall not take into account any other factor.

B.  Restriction on Acquisitions.  (A)  Any acquisition of the Corporation's stock by a person or entity (including an existing stockholder) will be null and void *ab initio* as to the purchaser of such stock to the extent such acquisition causes such person or entity to then own 4.75% or more of the Corporation's stock. (or causes an increase in such stockholder's beneficial ownership above 4.75%), unless the acquisition of such stock (i) was previously approved in writing by the Corporation's Board of Directors, or (ii) will not result in an increase in an "owner shift" for purposes of Section 382 in excess of any "owner shift" that would have occurred if the seller had sold the same amount of stock through general public market transactions (a "Permitted Acquisition").  Any acquisition of stock that is neither approved by the Corporation's Board of Directors nor a Permitted Acquisition will be null and void *ab initio* as to the purchaser. In determining whether it shall approve any proposed acquisition of stock, the Board of Directors shall only be permitted to determine whether such transfer, sale or other disposition would have any adverse effects on the current or future ability of the Corporation to utilize its tax attributes under Section 382 (or any successor provision), and shall not take into account any other factor. (B) Any stockholder of the Corporation seeking to use the "Permitted Acquisition" exception in the case of Article Twelfth B(A) above shall, prior to such Permitted Acquisition, notify the Corporation in writing of such transaction and provide relevant factual information sufficient to establish that the acquisition will qualify as a Permitted Acquisition. If the Corporation shall not

agree that such acquisition is a Permitted Acquisition, such stockholder shall be permitted to engage in such acquisition only if either (i) the stockholder obtains a private letter ruling from the IRS that such acquisition is a Permitted Acquisition, or (ii) the stockholder obtains an opinion letter from a nationally recognized law or accounting firm reasonably satisfactory to the Corporation that such acquisition "will" be a Permitted Acquisition.

C.  Reporting Requirements.  All stockholders of the Corporation that have filed or would be required to file a Schedule 13D or 13G with the Securities and Exchange Commission with respect to the Corporation shall be required to provide the following information to the Corporation regarding such stockholder's ownership of the Corporation's stock: (A) the dates of the acquisition and disposition of all such stock and (B) the amounts of such acquisitions and dispositions. Such information shall be provided by the stockholder to the Corporation on a confidential basis within five business days (i) after such stockholder has acquired or disposed an amount of stock of the Corporation that would require such stockholder to later file a Schedule 13D or 13G (assuming it continued to hold such stock through the end of the year) and (ii) from time to time thereafter upon increasing or decreasing its direct or indirect beneficial ownership by more than two percent of the Corporation's stock. In addition, each such stockholder, upon the request of the Corporation shall within five business days provide such other information as may be reasonably necessary for the Corporation to determine the effect of such acquisition or disposition on the Corporation's net operating loss carryforward or as may be required by applicable law or regulation.

D.  Term.  The acquisition and disposition restrictions in Article Twelfth, Section B(A) and Article Twelfth B(B) hereof shall expire on the earliest of (i) the second anniversary of the date on which the Corporation emerges from Chapter 11 bankruptcy protection, (ii) the date that the Corporation makes an election not to apply the provisions of Section 382(l)(5) of the Code to the "ownership change" (as defined in Section 382(g) of the Code) occurring on the date on which the Corporation emerges from Chapter 11 bankruptcy protection, (iii) the date that the Board determines that the Corporation does not qualify for the benefits of the provisions of Section 382(l)(5) of the Code, (iv) the first "change date" (as defined in Section 382(j) of the Code) that occurs after the date on which the Corporation emerges from Chapter 11 bankruptcy protection and (v) the date on which the Board of Directors determines that an "ownership change" (as defined in Section 382(g) of the Code) would not adversely affect the Corporation in any material respect, whether because the Corporation's net operating loss carryforwards have been utilized in all material respects or for any other reason.

E.  Interpretation.  Unless otherwise defined herein, all terms used in herein are intended to have the meanings ascribed to them under Section 382 and shall be construed accordingly.  Any interpretations hereunder shall be made in a manner consistent with the purposes of these provisions, i.e., to protect the Corporation's ability to continue to utilize its tax attributes, including but not limited to its net operating loss carryforwards.

THE UNDERSIGNED, being the duly qualified Secretary of the Corporation, has executed this Restated Certificate of Incorporation on [●], 2012.

_____
[●], Secretary

- 7 -

**Exhibit C**

**Executory Contracts and Unexpired Leases to be Rejected**

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | AAR AIRCRAFT SERVICES | 5300 NW 36TH ST<br>BLDG 850<br>MIAMI, FL 33122 | AIRFRAME MAINTENANCE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AAR PARTS TRADING, INC. | 1100 N. WOOD DALE ROAD<br>WOOD DALE, IL. 60191<br>ATTENTION: VICE PRESIDENT, CONTRACT ADMINISTRATION | ENGINE LEASE GENERAL TERMS AGREEMENT, EFFECTIVE DATE 3/31/2010 |
| NORTH AMERICAN AIRLINES, INC. | ABX AIR, INC. | PO BOX 714983<br>COLUMBUS, OH 43271 | TRAINING AGREEMENT |
| WORLD AIRWAYS, INC. | ACCIONA AIRPORT SERVICES FRANKFURT GMBH | AIRPORT BUILDING 2 E<br>PO BOX 175 071<br>FRANKFURT AM MAIN,  60549<br>GERMANY | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AERCAP PARTNERS LIMITED 1 | 9 QUAI DU PRESIDENT PAUL DOUMER<br>PARIS, FRANCE | GENERAL TERMS AGREEMENT, EFFECTIVE DATE 9/9/2009 |
| NORTH AMERICAN AIRLINES, INC. | AERONAUTICAL TECHNICAL SERVICES | 3957 NW 126TH AVE<br>CORAL SPRINGS, FL 33065 | IATA GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | AEROTEC INTERNATIONAL, INC. | 7301 PKWY DR<br>HANOVER, MD 21076 | MAINTENANCE SERVICE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AEROTEK AVIATION LLC | 30 MONTGOMERY ST<br>STE 210<br>JERSEY CITY, NJ 07302 | SERVICES AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE<br>MIAMI, FL 33122 | ENGINE LEASE - S/N 706156, EFFECTIVE DATE 12/24/2008 |
| WORLD AIRWAYS, INC. | AIR DISPATCH | 6TH FLOOR ASTRAL TOWERS<br>BETTS WAY, CRAWLEY<br>WEST SUSSEX, RH 10 9UY<br>GERMANY | STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | AIR GROUND SERVICES | FRANKFURT AIRPORT CARGO CTR<br>BUILDING 456A<br>FRANKFURT MAIN,  60549<br>GERMANY | IATA STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AIRCONSULT | VIA ADOLFO RAVA, N 106<br>ROME ITALY 00142 | SERVICE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AIRCONSULT | VIA ADOLFO RAVA, N 106<br>ROME ITALY 00142 | AMENDMENT 1 TO SERVICE AGREEMENT |
| WORLD AIRWAYS, INC. | AIRCRAFT SERVICE INTERNATIONAL INC. | 201 S Orange Ave<br>Ste 1100A<br>Orlando, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | AIRLINE CONTAINER LEASING "ACL" | 436 SACO LOWELL RD<br>EASLEY, SC 29640 | LEASES FOR PALLETS |
| NORTH AMERICAN AIRLINES, INC. | AIRLINE REP EUROPE (A.R.E.) | VIA CORONA BOREALE 86<br>FIUMICINOROME,  54<br>ITALY | ANNEX B TO IATA STANDARD GROUND HANDLING AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | ALLIED VAN LINES | 15381 FARM CREEK DR<br>WOODBRIDGE, VA 22191 | NEW AGREEMENT FOR MOTOR CONTRACT CARRIER TRANSPORTATION |
| WORLD AIRWAYS, INC. | ALLIED VAN LINES | 15381 FARM CREEK DR<br>WOODBRIDGE, VA 22191 | PREFERRED CUSTOMER AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | ALOHA AIR CARGO | PO BOX 30900 HONOLULU, HI 96820 | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | ALTITUDE GLOBAL LIMITED | ENTERPRISE HOUSE STANSTEAD AIRPORT STE A300 ESSEX, CM24 1QW UNITED KINGDOM | IATA STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AMECO BEIJING | NO 4 CAPITAL AIRPORT N RD CHAOYANG DISTRICT BEIJING, CHINA | SERVICE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | AT & T | PO BOX 13148 NEWARK, NJ 07101-5648 | AT & T MANAGED INTERNET SERVICES |
| GLOBAL AVIATION HOLDINGS INC. | AT & T | PO BOX 13148 NEWARK, NJ 07101-5648 | TRANSFER OF SERVICES AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | AT & T | PO BOX 13148 NEWARK, NJ 07101-5648 | CUSTOMER PROPRIETARY NETWORK INFORMATION (CPNI) |
| GLOBAL AVIATION HOLDINGS INC. | AT&T GEORGIA (WAS BELLSOUTH) | CORPORATE HEADQUARTERS 208 S AKARD ST ATLANTA, GA 30384-7019 | SPECIAL SERVICES ARRANGEMENT AGREEMENT |
| WORLD AIRWAYS, INC. | ATA E-BUSINESS PROGRAM | 8350 N CENTRAL EXPRESSWAY STE 700 DALLAS, TX 75206 | MEMBERSHIP AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | ATLAS INFLIGHT ENTERTAINMENT | 615 N. Nash St. Ste 201 El Segundo, CA 90245 | IN-FLIGHT PROGRAMMING AGREEMENT |
| WORLD AIRWAYS, INC. | ATLAS INFLIGHT ENTERTAINMENT | 615 N. Nash St. Ste 201 El Segundo, CA 90245 | IN-FLIGHT PROGRAMMING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | Aviation Safeguards | 780 ELKRIDGE LANDING RD. SUITE 220 LINTHICUM HEIGHTS, MD 21090 | Airline Services Agreement |
| NORTH AMERICAN AIRLINES, INC. | AVIATION SUPPORT, S.A. DE C.V. | ACCT NO 01 54 609 638 MEXICO CITY, DF 03339 MEXICO | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | AVIATION SUPPORT, S.A. DE C.V. | ACCT NO 01 54 609 638 MEXICO CITY, DF 03339 MEXICO | AMENDMENT 1 TO GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | Ayres Inn & Suites | SANDRA VAN BOGGET 4395 E ONTARIO MILLS PKWY ONTARIO, CA 91764 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Ayres Inn & Suites | SANDRA VAN BOGGET 4395 E ONTARIO MILLS PKWY ONTARIO, CA 91764 | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | BANGOR INTERNATIONAL AIRPORT | 287 GODFREY BLVD BANGOR, ME 04401 | IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | BANGOR INTERNATIONAL AIRPORT | 287 GODFREY BLVD BANGOR, ME 04401 | IATA STANDARD GROUND HANDLING AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | BANK & BUSINESS SECURITY SYSTEMS | PO BOX 386 TYRONE, GA 30290 | SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | BANK & BUSINESS SECURITY SYSTEMS | PO BOX 386 TYRONE, GA 30290 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | BANK & BUSINESS SECURITY SYSTEMS | 1137A SENOIA RD TYRONE, GA 30290 | AMENDMENT 2 TO SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | BEAGLE AIRCRAFT LTD | STONY LN CHRIST CHURCH DORSET,  BH23 1EX UNITED KINGDOM | FRAMEWORK AGREEMENT FOR THE PROVISION OF REPAIR SERVICES |
| WORLD AIRWAYS, INC. | BELL SOUTH | 2180 LAKE BLVD NE MAIL CODE 08C01 ATLANTA, GA 30319 | LETTER OF ELECTION |
| WORLD AIRWAYS, INC. | BHARAT AVIATION | 1 SITA DHAM NP THAKKAR CROSS RD VILE PARLE E MUMBAI,  400 057 INDIA | STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | BHARAT AVIATION | 1 SITA DHAM NP THAKKAR CROSS RD VILE PARLE E MUMBAI,  400 057 INDIA | AMENDMENT 1 TO STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | BHARAT AVIATION | 1 SITA DHAM NP THAKKAR CROSS RD VILE PARLE E MUMBAI,  400 057 INDIA | AMENDMENT 2 TO STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | BHARAT AVIATION | 1 SITA DHAM NP THAKKAR CROSS RD VILE PARLE E MUMBAI,  400 057 INDIA | AMENDMENT 3 TO STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | BOEING SHANGHAI AVIATION SERVICES CO., LTD | 118 FEI AO RD PUDONG INTERNATIONAL AIRPORT SHANGHAI,  201207 CHINA | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | BOEING TRAINING AND FLIGHT SERVICES LLC (FORMERLY ALTEON) | 6601 NW 36TH ST VIRGINIA GARDENS, FL 33166 | INITIAL TRAINING ORDER |
| NORTH AMERICAN AIRLINES, INC. | BOEING TRAINING AND FLIGHT SERVICES LLC (FORMERLY ALTEON) | 6601 NW 36TH ST VIRGINIA GARDENS, FL 33166 | AMENDMENT TO TRAINING ORDER FT-09-501-JC |
| WORLD AIRWAYS, INC. | CARGOLUX AIRLINES INTERNATIONAL S.A. | ATTN ROXANNE CLEMENTS LUXEMBOURG AIRPORT LUXEMBOURG,  L-2990 LUXEMBOURG | MAINTENANCE SUPPORT AGREEMENT |
| WORLD AIRWAYS, INC. | CBSBUTLER LIMITED | KINGS MILL LN S NUTFIELD REDHILL,  RH15NB UNITED KINGDOM | AGREEMENT TO PROVIDE FAA CERTIFIED A & P ENGINEERS |
| WORLD AIRWAYS, INC. | CBSBUTLER LIMITED | KINGS MILL LN S NUTFIELD REDHILL,  RH15NB UNITED KINGDOM | AMENDMENT 1 TO AGREEMENT TO PROVIDE FAA CERTIFIED A & P ENGINEERS |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | CHINA CARGO AIRLINES LTD (FORMERLY SHANGHAI AIRLINES CARGO INTL CO.) | 399 HUQINGPING RD PUDONG INTERNATIONAL AIRPORT SHANGHAI,  201300 CHINA | AGREEMENT FOR GROUND HANDLING SERVICE |
| WORLD AIRWAYS, INC. | CHINA CARGO AIRLINES LTD (FORMERLY SHANGHAI AIRLINES CARGO INTL CO.) | 399 HUQINGPING RD PUDONG INTERNATIONAL AIRPORT SHANGHAI,  201300 CHINA | AMENDMENT 1 TO AGREEMENT FOR GROUND HANDLING SERVICE |
| WORLD AIRWAYS, INC. | CHINA CARGO AIRLINES LTD (FORMERLY SHANGHAI AIRLINES CARGO INTL CO.) | 399 HUQINGPING RD PUDONG INTERNATIONAL AIRPORT SHANGHAI,  201300 CHINA | AMENDMENT 2 TO AGREEMENT FOR GROUND HANDLING SERVICE |
| WORLD AIRWAYS, INC. | CHINA CARGO AIRLINES LTD (FORMERLY SHANGHAI AIRLINES CARGO INTL CO.) | 399 HUQINGPING RD PUDONG INTERNATIONAL AIRPORT SHANGHAI,  201300 CHINA | AMENDMENT 4 TO AGREEMENT FOR GROUND HANDLING SERVICE |
| WORLD AIRWAYS, INC. | CHINA EASTERN AIRLINES EXECUTIVE AIR | SHANGHAI HONGQIAO INTERNATIONAL AIRPORT SHANGHAI,  200335 CHINA | STANDARD GROUND HANDLING AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | CIBER, INC. | 6363 S FIDDLERS GREEN CIR STE 1400 GREENWOOD VILLAGE, CO 80111 | MASTER SERVICE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | CIBER, INC. | 6363 S FIDDLERS GREEN CIR STE 1400 GREENWOOD VILLAGE, CO 80111 | STATEMENT OF WORK |
| NORTH AMERICAN AIRLINES, INC. | C.I.T. LEASING CORPORATION | ONE CIT DR LIVINGSTON, NJ 07039 | GENERAL TERMS AGREEMENT, EFFECTIVE 12/9/2011 |
| GLOBAL AVIATION HOLDINGS INC. | CONCUR TECHNOLOGIES, INC. | 18400 NE UNION HILL RD REDMOND, WA 98052 | INITIAL SALES ORDER FORM AND BUSINESS SERVICES AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | CONCUR TECHNOLOGIES, INC. | 18400 NE UNION HILL RD REDMOND, WA 98052 | ADDITIONAL SALES ORDER FORM |
| GLOBAL AVIATION HOLDINGS INC. | COPESAN SERVICES | W175N5711 TECHNOLOGY DR MENOMONEE FALLS, WI 53051 | SERVICE CONTRACTOR AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | COPESAN SERVICES | W175N5711 TECHNOLOGY DR MENOMONEE FALLS, WI 53051 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | COPESAN SERVICES | W175N5711 TECHNOLOGY DR MENOMONEE FALLS, WI 53051 | AMENDMENT 2 TO SERVICE CONTRACTOR AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | COPESAN SERVICES | W175N5711 TECHNOLOGY DR MENOMONEE FALLS, WI 53051 | AMENDMENT 3 TO THE SERVICE CONTRACTOR AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Amendment 1 to Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Crowne Plaza Atlanta | LINDA MONTGOMERY 1325 VIRGINIA AVE ATLANTA, GA 30344 | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Kuwait | RAFIK KAMEL MOHAMED AIRPORT ROADT FARWANIYA, 81006 KUWAIT | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Kuwait | RAFIK KAMEL MOHAMED AIRPORT ROADT FARWANIYA, 81006 KUWAIT | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Crowne Plaza Kuwait | RAFIK KAMEL MOHAMED AIRPORT ROADT FARWANIYA, 81006 KUWAIT | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | DATA SYSTEMS & SOLUTIONS | SIN D 11 SINFIN LN PO BOX 31 DERBY,  DE24 8B ENGLAND | PROPOSAL FOR ENGINE HEALTH MONITORING |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES, INC. | ATTN CPC 1775 AVIATION BLVD ATLANTA, GA 30320 | GENERAL TERMS AGREEMENT, EFFECTIVE 12/3/2003 |
| GLOBAL AVIATION HOLDINGS INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | CORPORATE INCENTIVE AGREEMENT DATED JULY 1, 2009 |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | APU REPAIR AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | SIDE LETTER AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 1 TO SIDE LETTER AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | MAINTENANCE SERVICES AGREEMENT DATED JANUARY 1, 2006 |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 1 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 2 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 3 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 5 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 7 TO MAINTENANCE SERVICES AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 8 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 6 TO MAINTENANCE SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | FACILITIES USE AND TRAINING AGREEMENT |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | FACILITIES USE AND TRAINING AGREEMENT EXTENSION |
| WORLD AIRWAYS, INC. | DIRECT MAINTENANCE BV | THERMIEKSTRAAT 17 6361 HB NUTH THE NETHERLANDS | IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | DR. MOHAMED HAMED EID | Albadr Hotel Rm 1157 PO Box 6719 Old Airport Rd Jeddah, Saudia Arabia | CONSULTING AND NON-DISCLOSURE AGREEMENT |
| WORLD AIRWAYS, INC. | EAGLE SERVICES ASIA PRIVATE LIMITED | 51 CALSHOT RD SINGAPORE, 509927 CHINA | PW4460 & PW4056 MAINTENANCE SERVICES AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | ELITE OPERATIONS | 150 BRENDAN MEWS MOUNT WOLF, PA 17347 | LETTER TO CONFIRM SERVICE |
| WORLD AIRWAYS, INC. | EMIRATES | Airport Rd Al Garhoud PO Box 686 Dubai, UAE | IATA STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | ENGINE LEASE FINANCE CORPORATION  (ELFC) | Holland & Knight LLP James H. Rollins 1201 West Peachtree Street Suite 200 Atlanta, GA 30309 | ENGINE LEASE - S/N 31380 - RB211, DATED 3/18/2004, AMENDED 11/12/2008, EXTENDED 2/23/2011 AND AMENDED 5/18/2011 |
| GLOBAL AVIATION HOLDINGS INC. | ERNST & YOUNG | 55 IVAN ALLEN JR BLVD ATLANTA, GA 30308 | SOW - ROUTINE ON CALL ADVICE |
| GLOBAL AVIATION HOLDINGS INC. | ERNST & YOUNG | 55 IVAN ALLEN JR BLVD ATLANTA, GA 30308 | SOW - 2010 FEDERAL AND CONSOLIDATED STATE RETURN |
| GLOBAL SHARED SERVICES, INC. | EVERGREEN AVIATION GROUND LOGISTICS | 4700 YORKMONT RD CHARLOTTE, NC 28219 | ANNEX B1.0 - LOCATION, AGREED SERVICES, FACILITIES AND CHARGES |
| WORLD AIRWAYS, INC. | EVERGREEN MAINTENANCE CENTER | PINAL AIR PARK MARANA, AZ 85653 | AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT NUMBER 08-07-124 |
| WORLD AIRWAYS, INC. | EVERGREEN MAINTENANCE CENTER | PINAL AIR PARK MARANA, AZ 85653 | AMENDMENT 4 TO AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT NUMBER 08-07-124 |
| WORLD AIRWAYS, INC. | EVERGREEN MAINTENANCE CENTER | PINAL AIR PARK MARANA, AZ 85653 | AMENDMENT 9 TO AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT NUMBER 08-07-124 |
| WORLD AIRWAYS, INC. | EVERGREEN MAINTENANCE CENTER | PINAL AIR PARK MARANA, AZ 85653 | AMENDMENT 10 TO AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT NUMBER 08-07-124 |
| WORLD AIRWAYS, INC. | EVERGREEN MAINTENANCE CENTER | PINAL AIR PARK MARANA, AZ 85653 | AMENDMENT 11 TO AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT NUMBER 08-07-124 |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | EXPEDIA.COM | 3150 139TH AVE SE BELLEVUE, WA 98005 | SERVICES AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | F&E AIRCRAFT MAINTENANCE | 531 MAIN STREET NO 672 EL SEGUNDO, CA 90245-3060<br><br>5415 NW 36TH ST. MIAMI, FLORIDA 33166 | IATA GROUND HANDLING AGREEMENT IN JFK |
| NORTH AMERICAN AIRLINES, INC. | F&E AIRCRAFT MAINTENANCE | 531 MAIN STREET NO 672 EL SEGUNDO, CA 90245-3060<br><br>5415 NW 36TH ST. MIAMI, FLORIDA 33166 | AMENDMENT 1 TO THE IATA GROUND HANDLING AGREEMENT IN JFK |
| WORLD AIRWAYS, INC. | FAL COMPONND | FAL BEACH AND RESORT ABHUR ST N ABHUR JEDDAH, SAUDIA ARABIA | APARTMENT LEASE ANNUAL CONTRACT |
| WORLD AIRWAYS, INC. | FAL COMPONND | FAL BEACH AND RESORT ABHUR ST N ABHUR JEDDAH, SAUDIA ARABIA | ANNUAL CONTRACT |
| WORLD AIRWAYS, INC. | FAL COMPONND | FAL BEACH AND RESORT ABHUR ST N ABHUR JEDDAH, SAUDIA ARABIA | ANNUAL CONTRACT |
| WORLD AIRWAYS, INC. | FAL COMPONND | FAL BEACH AND RESORT ABHUR ST N ABHUR JEDDAH, SAUDIA ARABIA | ANNUAL CONTRACT |
| NORTH AMERICAN AIRLINES, INC. | FEDERAL EXPRESS CORPORATION | C/O FEDEX TECHCONNECT 3965 AIRWAYS BLVD MODULE G 3RD FLOOR MEMPHIS, TN 38116 | LOAN AND BORROW AGREEMENT |
| WORLD AIRWAYS, INC. | FERNAND KREMER (MX APT IN LUXEMBOURG) | 15 RUE DE LEGLISE ERSANGE,  L-5423 LUXEMBOURG | RESIDENTIAL LEASE |
| WORLD AIRWAYS, INC. | FINNAIR | JT 25 HELSINKI, FINLAND | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | FINNAIR TECHNICAL SERVICES LTD | MG 31 FINNAIR,  01053 FINLAND | STANDARD GROUND HANDLING AGREEMENT - ANNEX B |
| NORTH AMERICAN AIRLINES, INC. | FLIGHT EXPLORER ASDI MINIMAL AUDIT CHECKLIST | 4835 CORDELL AVE STE 150 STE 150 BETHESDA, MD 20814 | MEMORANDUM OF AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SIDE LETTER FOR PAYOFF OF PAST DUE AMOUNTS |
| NORTH AMERICAN AIRLINES, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SIDE LETTER I FOR PAYOFF OF PAST DUE AMOUNTS |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SIDE LETTER FOR OUTSTANDING BALANCE |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | G.E. CAPITAL AVIATION SERVICES | 201 HIGH RIDGE RD MAIL STOP MS2953 2158 STAMFORD, CT 06927 | S/N 31811 - ENGINE RB211 , EXECUTED 7/11/2003 |
| GLOBAL SHARED SERVICES, INC. | GENERAL  BUILDING MAINTENANCE, INC. | 3835 Presidential Pkwy Ste 200 Atlanta, GA 30340 | SERVICE CONTRACTOR AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | GENERAL  BUILDING MAINTENANCE, INC. | 3835 Presidential Pkwy Ste 200 Atlanta, GA 30340 | AMENDMENT 1 TO THE SERVICE CONTRACTOR AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | GENERAL  BUILDING MAINTENANCE, INC. | 3835 Presidential Pkwy Ste 200 Atlanta, GA 30340 | AMENDMENT 2 TO THE SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | GENERAL  BUILDING MAINTENANCE, INC. | 3835 Presidential Pkwy Ste 200 Atlanta, GA 30340 | SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | GENERAL  BUILDING MAINTENANCE, INC. | 3835 Presidential Pkwy Ste 200 Atlanta, GA 30340 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | GHASSAN O. ATTAR EST. | MEDINA RD 18600 SKAB CTR 18600 JEDDAH,  21425 SAUDI ARABIA | LEASE CONTRACT BETWEEN GHASSAN O. ATTAR EST. AND WORLD AIRWAYS, INC. |
| WORLD AIRWAYS, INC. | GLOBAL AVIATION CONSULTING, LLC | 1374 MICHELLE CIR SCHAUMBURG, IL 60173 | CONSULTING SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | GROUNDCARE LIMITED | KINGS MILL KINGS MILL LN S NUTFIELD REDHILL SURREY,  RH1 5NB ENGLAND | MAINTENANCE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | HAMILTON SUNDSTRAND CORPORATION | ONE HAMILTON RD WINDSOR LOCKS, CT 06096 | GENERAL TERMS AGREEMENT |
| WORLD AIRWAYS, INC. | Hampton Inn Southwind | ALYSSA RUGGIERO 3579 HACKS CROSS RD MEMPHIS, TN 38125 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hampton Inn Southwind | ALYSSA RUGGIERO 3579 HACKS CROSS RD MEMPHIS, TN 38125 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | HAWKER PACIFIC AEROSPACE | PO BOX 894524 LOS ANGELES, CA 90189 | AGREEMENT ON TECHNICAL SERVICES |
| GLOBAL SHARED SERVICES, INC. | HENRY GONZALEZ PLUMBING CO. INC. | 2119 W COLUMBUS DR TAMPA, FL 33607 | SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | HERPA MINIATURNMODELLE | LEONRODSTRASSE 46 47 DIETENHOFEN,  90599 GERMANY | TRADEMARK LICENSE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | HILLTOP AVIATION SERVICES,INC. | 5777 W Century Blvd Ste 1095 Los Angeles, CA 90045 | ANNEX B1.2 TO STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | Hilton Garden Inn Atlanta Airport North | DEBBIE WELLS 3437 BOBBY BROWN PKWY EAST POINT, GA 30344 | Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Garden Inn JFK | NICK WILSON 148 18 134TH ST JAMAICA, NY 11430 | Amendment 3 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Hilton Los Angeles Airport | 5711 W CENTURY BLVD LOS ANGELES, CA 90045 | Agreement to Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Los Angeles Airport | 5711 W CENTURY BLVD LOS ANGELES, CA 90045 | Amendment 1 to Agreement to Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Los Angeles Airport | 5711 W CENTURY BLVD LOS ANGELES, CA 90045 | Amendment 2 to Agreement to Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Hilton Tampa | CINDY COLLEY 2225 N LOIS AVE TAMPA, FL 33607 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hilton Tampa | CINDY COLLEY 2225 N LOIS AVE TAMPA, FL 33607 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | HOGAN WINGS, LTD | 1408 Lippo Sun Plz 28 Canton Rd TST Kowtoon, Hong Kong | TRADEMARK LICENSE AGREEMENT |
| WORLD AIRWAYS, INC. | HOGAN WINGS, LTD | 1408 Lippo Sun Plz 28 Canton Rd TST Kowtoon, Hong Kong | TRADEMARK LICENSE AGREEMENT |
| WORLD AIRWAYS, INC. | Holiday Inn & Suites Chicago OHare Rosemont | KATHY MCALLISTER 10233 W HIGGINS RD ROSEMONT, IL 60018 | Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Holiday Inn & Suites Chicago OHare Rosemont | KATHY MCALLISTER 10233 W HIGGINS RD ROSEMONT, IL 60018 | Amendment 1 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Holiday Inn & Suites Chicago OHare Rosemont | KATHY MCALLISTER 10233 W HIGGINS RD ROSEMONT, IL 60018 | Amendment 2 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Holiday Inn & Suites Chicago OHare Rosemont | KATHY MCALLISTER 10233 W HIGGINS RD ROSEMONT, IL 60018 | Amendment 3 to the Hotel Accommodations Agreement |
| GLOBAL AVIATION HOLDINGS INC. | Holiday Inn & Suites Peachtree City | BRENDA FORD 203 NEWGATE RD PEACHTREE CITY, GA 30269 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Agreement for Hotel Accommodations effective 12/15/08 |
| WORLD AIRWAYS, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Holiday Inn Bangor | BRETT STACEY 404 ODLIN RD BANGOR, ME 04401 | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Holiday Inn DFW Airport West | HANNAH TERRY 3005 AIRPORT FWY BEDFORD, TX 75021 | Hotel Accommodations Agreement EFFECTIVE 11/1/11 |
| WORLD AIRWAYS, INC. | Holiday Inn DFW Airport West | HANNAH TERRY 3005 AIRPORT FWY BEDFORD, TX 75021 | Hotel Accommodations Agreement EFFECTIVE 11/1/11 |
| WORLD AIRWAYS, INC. | Holiday Inn Golden Mile HKG | DAISY JEUNG 50 NATHAN RD TSIM SHA TSUI KOWLOON, HONG KONG | Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Holiday Inn Golden Mile HKG | DAISY JEUNG 50 NATHAN RD TSIM SHA TSUI KOWLOON, HONG KONG | Amendment to Hotel Accommodations Agreement |
| NORTH AMERICAN AIRLINES, INC. | Homewood Suites Miami | ANGELA SATURNO 3590 NW 74TH AVE MIAMI, FL 33122 | Amendment1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Homewood Suites Miami | ANGELA SATURNO 3590 NW 74TH AVE MIAMI, FL 33122 | Amendment 2 to Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Homewood Suites Southwind | ALYSSA RUGGIERO 3583 HACKS CROSS RD MEMPHIS, TN 38125 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hong Kong Sky City Marriott Hotel | SANDY NG 1 SKY CITY RD E HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Hong Kong Sky City Marriott Hotel | SANDY NG 1 SKY CITY RD E HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | Amendment 1 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Hong Kong Sky City Marriott Hotel | SANDY NG 1 SKY CITY RD E HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | Amendment 2 to the Hotel Accommodations Agreement |
| GLOBAL AVIATION HOLDINGS INC. | HOTEL CONNECTIONS | 3100 ABBEY DR SW ATLANTA, GA 30331 | RECIPROCAL NON-DISCLOSURE & CONFIDENTIALITY AGREEMENT |
| WORLD AIRWAYS, INC. | Hyatt Place Atlanta Airport North | TAMESHIA WEAVER 3415 NORMAN BERRY DR ATLANTA, GA 30320 | Travel Services |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Hyatt Regency Bishkek | 191 ABDRAHMANOV ST 720011 BISHKOK BISHKEK, KYRGYSTAN | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | IBERIA MAINTENANCE | CALLE VELAZQUEZ 130 MADRID, SPAIN | ENGINE MAINTENANCE SERVICE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | IBERIA MAINTENANCE | CALLE VELAZQUEZ 130 MADRID, SPAIN | ENGINE LEASE AGREEMENT |
| WORLD AIRWAYS, INC. | ISRAEL AEROSPACE INDUSTRIES | BEDEK AVIATION GROUP BEN GURION INTERNATIONAL AIRPORT , 70100 ISRAEL | PROPOSAL FOR GENERAL TERMS AGREEMENT |
| WORLD AIRWAYS, INC. | JET AIRCRAFT MAINTENANCE, INC | 7505 NW 52 ST MIAMI, FL 33166 | ECOPOWER ENGINE WASH AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | JET SERVICES | 407 DRAPER DR NORFOLK, VA 23505 | LETTER TO CONFIRM SERVICES |
| NORTH AMERICAN AIRLINES, INC. | JET WAY SECURITY & INVESTIGATIONS, LLC | JFK INTERNATIONAL AIRPORT BUILDING 151 STE 337 JAMAICA, NY 11430 | COMPLETE SECURITY SOLUTIONS LETTER AND TERMS |
| GLOBAL AVIATION HOLDINGS INC. | JLT AEROSPACE | 2300 DULLES STATION BLVD SUITE 230 HERNDON, VA 20171 | FEE FOR SERVICES AGREEMENT BETWEEN JLT AEROSPACE (NORTH AMERICA) INC. AND GLOBAL AVIATION HOLDINGS, INC., WOA, NAA |
| WORLD AIRWAYS, INC. | JSC "AIRPORT SARY-ARKA" (KARAGANDY) | REPUBLIC OF KAZAKHSTAN KARAHANDA REGION BUKHAR ZHIRAU DISTRICT KARAGANDA, KAZAKHSTAN | IATA STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | JULIANA AIRPORT HANDLERS | PRINCESS JULIANA INTERNATIONAL AIRPORT SIMPSON BAY ST MAARTEN, NETHERLANDS ANTILLES | GROUND HANDLING AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | KEDRON OFFICE PARK, LLC | 100 WORLD DR STE 240 PEACHTREE CITY, GA 30269 | PARKING LOT LEASE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | KEDRON OFFICE PARK, LLC | 100 WORLD DR STE 240 PEACHTREE CITY, GA 30269 | PARKING LOT LEASE AGREEMENT |
| WORLD AIRWAYS, INC. | KLM | INVOICEING DEPARTMENT PO BOX 7700 LUCHTHAVEN SCHIPHOL,  1117 ZL NETHERLANDS | LOAN & EXCHANGE AGREEMENT |
| WORLD AIRWAYS, INC. | KLM ROYAL DUTCH AIRLINES | ROB NUEGERBUAER ACCOUNTS MGR ENG AND MX M S SPL TQ , NETHERLANDS | AIRCRAFT MAINTENANCE SERVICES GTA |
| WORLD AIRWAYS, INC. | KLM ROYAL DUTCH AIRLINES | ROB NUEGERBUAER ACCOUNTS MGR ENG AND MX M S SPL TQ , NETHERLANDS | MAINTENANCE AGREEMENT FOR GE CF6-80C2 ENGINE SERVICES |
| WORLD AIRWAYS, INC. | KOREAN AIR | 1370 GONGHANG DONG GANGSEO GU SEOUL,  157-240 KOREA | AIRCRAFT MODIFICATION AND MAINTENANCE AGREEMENT |
| WORLD AIRWAYS, INC. | KOREAN AIR | 1370 GONGHANG DONG GANGSEO GU SEOUL,  157-240 KOREA | AMENDMENT 1 TO THE AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | KOREAN AIR | 1370 GONGHANG DONG GANGSEO GU SEOUL,  157-240 KOREA | AMENDMENT 2 TO THE AIRCRAFT MAINTENANCE & MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | KOREAN AIR | 1370 GONGHANG DONG GANGSEO GU SEOUL,  157-240 KOREA | ENGINE LEASE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | KTL SOLUTIONS, INC. | 4640 WEDGEWOOD BLVD STE 104 FREDERICK, MD 21703 | CONSULTING AND NON-DISCLOSURE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | KTL SOLUTIONS, INC. | 4640 WEDGEWOOD BLVD STE 104 FREDERICK, MD 21703 | AMENDMENT 2 TO THE CONSULTING AND NON-DISCLOSURE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | KTL SOLUTIONS, INC. | 4640 WEDGEWOOD BLVD STE 104 FREDERICK, MD 21703 | AMENDMENT 3 TO THE CONSULTING AND NON-DISCLOSURE AGREEMENT |
| WORLD AIRWAYS, INC. | LANIER (ACQUIRED BY RICOH) | 2450 COMMERCE AVE STE 100 DULUTH, GA 30096 | COPIER AGREEMENT |
| WORLD AIRWAYS, INC. | LEXISNEXIS SCREENING SOLUTIONS INC. | 1100 ALDERMAN DR ALPHARETTA, GA 30306 | SCREENING SOLUTIONS APPLICATION & AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | LEXISNEXIS SCREENING SOLUTIONS INC. | 1100 ALDERMAN DR ALPHARETTA, GA 30306 | AMENDMENT 1 TO SCREENING SOLUTIONS APPLICATION & AGREEMENT |
| WORLD AIRWAYS, INC. | LGS HANDLING | 20 AMPHIPOLEOS ST 2025 STROVOLOS NICOSIA, 01506 CYPRUS | IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | LGS HANDLING | 20 AMPHIPOLEOS ST 2025 STROVOLOS NICOSIA, 01506 CYPRUS | AMENDMENT 1 TO IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | LGS HANDLING | 20 AMPHIPOLEOS ST 2025 STROVOLOS NICOSIA, 01506 CYPRUS | ADDENDUM 2 TO THE STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | M & H UNIFORMS | PO BOX 1442 SAN MATEO, CA 94401-0860 | UNIFORM APPARREL AGREEMENT |
| WORLD AIRWAYS, INC. | M & H UNIFORMS | PO BOX 1442 SAN MATEO, CA 94401-0860 | AMENDMENT 1 TO UNIFORM APPAREL AGREEMENT |
| WORLD AIRWAYS, INC. | M & H UNIFORMS | PO BOX 1442 SAN MATEO, CA 94401-0860 | AMENDMENT 2 TO UNIFORM APPAREL AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | MACH II MAINTENANCE CORP | TERMINAL ONE JFK INTERNATIONAL AIRPORT JAMAICA, NY 11430 | IATA STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | MACH II MAINTENANCE CORP | TERMINAL ONE JFK INTERNATIONAL AIRPORT JAMAICA, NY 11430 | AMENDMENT1 TO IATA STANDARD GROUND HANDLING AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | MAINSAIL SUITES HOTEL & CONFERENCE CENTER | 5108 Eisenhower Blvd Tampa, FL 33634 | AGREEMENT FOR HOTEL ACCOMMODATIONS |
| GLOBAL AVIATION HOLDINGS INC. | Mainsail Suites Hotel & Conference Center | 5108 Eisenhower Blvd Tampa, FL 33634 | Agreement for Hotel Accommodations at TPA |
| NORTH AMERICAN AIRLINES, INC. | Mainsail Suites Hotel & Conference Center | 5108 Eisenhower Blvd Tampa, FL 33634 | Agreement for Hotel Accommodations at TPA |
| WORLD AIRWAYS, INC. | MAINSAIL SUITES HOTEL & CONFERENCE CENTER | 5108 Eisenhower Blvd Tampa, FL 33634 | AGREEMENT FOR HOTEL ACCOMMODATIONS |
| WORLD AIRWAYS, INC. | Mainsail Suites Hotel & Conference Center | 5108 Eisenhower Blvd Tampa, FL 33634 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | MARIAH FUELS | BRIAN L NABORS 26411 OAKRIDGE DR THE WOODLANDS, TX 77380 | FUEL SUPPLY AGREEMENT |
| WORLD AIRWAYS, INC. | MARIAH FUELS | BRIAN L NABORS 26411 OAKRIDGE DR THE WOODLANDS, TX 77380 | FUEL SUPPLY AGREEMENT |
| WORLD AIRWAYS, INC. | Marriott Inner Harbor - Baltimore | LEIGH KENNEDY 110 S EUTAW ST BALTIMORE, MD 21201 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Marriott Inner Harbor - Baltimore | LEIGH KENNEDY 110 S EUTAW ST BALTIMORE, MD 21201 | Amendment 1 to Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | Marriott Inner Harbor - Baltimore | LEIGH KENNEDY 110 S EUTAW ST BALTIMORE, MD 21201 | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Marriott Town Place Suites Tampa West Shore | ANGELA MAURER 5302 AVALON PARK DR TAMPA, FL 33607 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Marriott Town Place Suites Tampa West Shore | ANGELA MAURER 5302 AVALON PARK DR TAMPA, FL 33607 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | MIAMI TECH MAINTENANCE | 5200 NW 36TH ST MIAMI, FL 33166 | GENERAL TERMS AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | MILLER ELECTRIC COMPANY | 2251 ROSELLE ST JACKSONVILLE, FL 32204 | SERVICE CONTRACTOR AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | MILLER ELECTRIC COMPANY | 2251 ROSELLE ST JACKSONVILLE, FL 32204 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | MOOG INC. | SENECA ST JAMISON RD EAST AURORA, NY 14052 | COMPONENT MAINTENANCE MANUAL PROPRIETARY INFORMATION AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | MOORECROFT SYSTEMS (MCI) | 850 ASBURY DR BUFFALO GROVE, IL 60089-4557 | VOLUME LICENSING AGREEMENT |
| WORLD AIRWAYS, INC. | NATIONAL AVIATION SERVICES | PO BOX 301 FARWANLY 81014 , KUWAIT | STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | NATIONAL AVIATION SERVICES | PO BOX 301 FARWANLY 81014 , KUWAIT | AMENDMENT 1 TO STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | NATIONWIDE HOSPITALITY, INC. | 85 W ALGONQUIN RD STE 160 ARLINGTON HEIGHTS, IL 60005 | MASTER SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | NATIONWIDE HOSPITALITY, INC. | 85 W ALGONQUIN RD STE 160 ARLINGTON HEIGHTS, IL 60005 | MASTER SERVICES AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | NESTLE WATERS | 460 KINGSLAND AVE BROOKLYN, NY 11222 | SALES AND SERVICE AGREEMENT |
| WORLD AIRWAYS, INC. | NH Brugge | BOEVERIESTRAAT 2, 8000 BRUGGE, BELGIUM | Agreement for Hotel Accommodations in BRU |
| WORLD AIRWAYS, INC. | NORTH AMERICAN AIRCRAFT SERVICES | 11502 JONES MALTSBERGER SAN ANTONIO, TX 78216 | AIRCRAFT REPAIR SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | OVERNIGHT EXPRESS | 9 EL FALAKY ST ALEXANDRIA, 21599 EGYPT | SERVICE AGREEMENT BETWEEN OVERNIGHT EXPRESS AND WORLD AIRWAYS |
| WORLD AIRWAYS, INC. | OVERNIGHT EXPRESS | 9 EL FALAKY ST ALEXANDRIA, 21599 EGYPT | AMENDMENT NO. 1 TO THE SERVICE AGREEMENT DATED JUNE 3, 2011 |
| WORLD AIRWAYS, INC. | PACIFIC AEROSPACE RESOURCES TECHNOLOGIES, LLC | 18200 PHANTOM W VICTORVILLE, CA 92394 | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | PAYSCALE | 39200 6 MILES ROAD LIVONIA, MI 48152 | CUS5669 GLOBAL AVIATION HOLDINGS |
| GLOBAL AVIATION HOLDINGS INC. | PEMCO | DOTHAN HOUSTON COUNTY AIRPORT 100 PEMCO DR DOTHAN, AL 36303 | AIRCRAFT MAINTENANCE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | PEMCO | DOTHAN HOUSTON COUNTY AIRPORT 100 PEMCO DR DOTHAN, AL 36303 | AMENDMENT 1 TO AIRCRAFT MAINTENANCE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | PEMCO | DOTHAN HOUSTON COUNTY AIRPORT 100 PEMCO DR DOTHAN, AL 36303 | AMENDMENT 2 TO AIRCRAFT MAINTENANCE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | PEMCO | DOTHAN HOUSTON COUNTY AIRPORT 100 PEMCO DR DOTHAN, AL 36303 | AMENDMENT 3 AIRCRAFT SERVICES AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | PEMCO | DOTHAN HOUSTON COUNTY AIRPORT 100 PEMCO DR DOTHAN, AL 36303 | AMENDMENT 4 AIRCRAFT MAINTENANCE AGREEMENT |
| WORLD AIRWAYS, INC. | PENTAHOTEL LEIPZIG | GROSSER BROCKHAUS 3 LEIPZIG,  04103 GERMANY | AGREEMENT FOR HOTEL ACCOMMODATIONS |
| NORTH AMERICAN AIRLINES, INC. | PRATT & WHITNEY LINE MAINTENANCE SERVICES, INC. | 400 MAIN ST MAIL STOP132 21 MAIL STOP 132 21 EAST HARTFORD, CT 06108 | ENGINE WASH SERVICES AGREEMENT |
| WORLD AIRWAYS, INC. | PROFORMA BUSINESS CONCEPTS | 50 Millstone Rd., Bldg 100, Ste 360 East Windsor, NJ 08520 | UNIFORM APPAREL AGREEMENT |
| GLOBAL SHARED SERVICES, INC. | PRO-FUEL MANAGEMENT SERVICES, INC. | 5495 N EVANSTON AVE PORT SAINT LUCIE, FL 34893 | CONSULTING AND NON-DISCLOSURE AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | PROSYS INFORMATION SYSTEMS | 4900 AVALON RIDGE PKWY NORCROSS, GA 30071 | MASTER SERVICES AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | Ramada Hotel LEJ | DOREEN FREISMUTH SCHONGAUERSTRASSE 39 LEIPZIG, 04329 GERMANY | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Ramada Hotel LEJ | DOREEN FREISMUTH SCHONGAUERSTRASSE 39 LEIPZIG, 04329 GERMANY | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Ramada Hotel LEJ | DOREEN FREISMUTH SCHONGAUERSTRASSE 39 LEIPZIG, 04329 GERMANY | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Ramada Hotel LEJ | DOREEN FREISMUTH SCHONGAUERSTRASSE 39 LEIPZIG, 04329 GERMANY | Amendment 3 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | READY JET, INC. | 2663 ROUTE 9L CLEVERDALE, NY 12820 | PRIMARY CORE AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | RECALL TOTAL INFORMATION MANAGEMENT | 180 TECHNOLOGY PKWY NORCROSS, GA 30092 | MASTER SERVICE AGREEMENT |
| WORLD AIRWAYS, INC. | RECALL TOTAL INFORMATION MANAGEMENT | 180 TECHNOLOGY PKWY NORCROSS, GA 30092 | AMENDMENT 1 TO MASTER SERVICE AGREEMENT |
| WORLD AIRWAYS, INC. | REVIMA APU SAS | 1 AVE DU LATHAM 47 BP 12 CAUDEBEC EN CAUX,  76490 FRANCE | APU LEASE |
| GLOBAL AVIATION HOLDINGS INC. | RICOH | 2450 COMMERCE AVE STE 100 DULUTH, GA 30096 | ORDER AGREEMENT DATED 10/24/08 |
| GLOBAL SHARED SERVICES, INC. | ROBIN AVIATION INC. | 43 44 SOBO AROBIDU ST LAGOS, NIGERIA | LETTER TO CONFIRM SERVICES |
| NORTH AMERICAN AIRLINES, INC. | ROLLS-ROYCE PLC | PO BOX 31 DERBY,  DE24 8BJ ENGLAND | GENERAL CONDITIONS OF SALE |
| NORTH AMERICAN AIRLINES, INC. | ROLLS-ROYCE PLC | PO BOX 31 DERBY,  DE24 8BJ ENGLAND | ENGINE OVERHAUL AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | ROYAL AERO TECHNICAL GMBH | 11 QUEEN ST HORSHAM WEST SUSSEX,  RH13 5AA ENGLAND | AGREEMENT ON TECHNICAL SERVICES |
| NORTH AMERICAN AIRLINES, INC. | SABRE INC. | 7285 COLLECTION CTR DR CHICAGO, IL 60693 | AMENDMENT 1 TO WORK ORDER 12 |
| NORTH AMERICAN AIRLINES, INC. | SABRE INC. | 7285 COLLECTION CTR DR CHICAGO, IL 60693 | WORK ORDER #12 TO MASTER AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | SABRE INC. | 7285 COLLECTION CTR DR CHICAGO, IL 60693 | AMENDMENT # 1 TO WORK ORDER #12 TO MASTER AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | SABRE INC. | 7285 COLLECTION CTR DR CHICAGO, IL 60693 | MASTER AGREEMENT |
| WORLD AIRWAYS, INC. | Saudi Ground Services Company | Khalidiya District P.O. Box 48154 Jeddah 21572 Kingdom of Saudi Arabia | Agreement for Ground Support Equipments/Services |
| NORTH AMERICAN AIRLINES, INC. | SERVISAIR IRELAND LIMITED | Hampton Ct Manor Park Runcorn Cheshire,  WA71TT Great Brittain | STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | SERVITEC S.A. AIRCRAFT MAINTENANCE | C COMERCIO 1 NAVE 1 PALLEJA,  08780 ES | STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | SHAMROCK STORAGE | 430 SENOIA RD TYRONE, GA 30290 | RENTAL AGREEMENT |
| WORLD AIRWAYS, INC. | Sheraton  Gateway Atlanta Airport | JARED TRAVIS 1900 SULLIVAN RD ATLANTA, GA 30337 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton  Gateway Atlanta Airport | JARED TRAVIS 1900 SULLIVAN RD ATLANTA, GA 30337 | Amendment 1 to Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | Sheraton  Gateway Atlanta Airport | JARED TRAVIS<br>1900 SULLIVAN RD<br>ATLANTA, GA 30337 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton  Gateway Atlanta Airport | JARED TRAVIS<br>1900 SULLIVAN RD<br>ATLANTA, GA 30337 | Amendment 3 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Frankfurt Hotel and Towers | JOCHEN KUEMMEL<br>LE BE HOTELGESELLSCHAFT AM FLUGHAFEN<br>HUGO ECKENER RING 15<br>TERMINAL 1<br>FRANKFURT MAIN, 60549<br>GERMANY | Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Sheraton Frankfurt Hotel and Towers | JOCHEN KUEMMEL<br>LE BE HOTELGESELLSCHAFT AM FLUGHAFEN<br>HUGO ECKENER RING 15<br>TERMINAL 1<br>FRANKFURT MAIN, 60549<br>GERMANY | Amendment 1 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Sheraton Frankfurt Hotel and Towers | JOCHEN KUEMMEL<br>LE BE HOTELGESELLSCHAFT AM FLUGHAFEN<br>HUGO ECKENER RING 15<br>TERMINAL 1<br>FRANKFURT MAIN, 60549<br>GERMANY | Amendment 2 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Sheraton Hotel Brussels Airport | JUAN DORES<br>BRUSSELS NATIONAL AIRPORT<br>ZAVENTEM, 01930 BELGIUM | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Hotel Brussels Airport | JUAN DORES<br>BRUSSELS NATIONAL AIRPORT<br>ZAVENTEM, 01930 BELGIUM | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Hotel Brussels Airport | JUAN DORES<br>BRUSSELS NATIONAL AIRPORT<br>ZAVENTEM, 01930 BELGIUM | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Incheon Hotel | SANDY PARK<br>6 9 SONGDO DONG<br>YEONSU GU<br>INCHEON, 406-840 SOUTH KOREA | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Incheon Hotel | SANDY PARK<br>6 9 SONGDO DONG<br>YEONSU GU<br>INCHEON, 406-840 SOUTH KOREA | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Incheon Hotel | SANDY PARK<br>6 9 SONGDO DONG<br>YEONSU GU<br>INCHEON, 406-840 SOUTH KOREA | Amendment 2 to Hotel Accommodations Agreement |
| NORTH AMERICAN AIRLINES, INC. | Sheraton Norfolk Waterside | BARRY AKERS<br>777 WATERSIDE DR<br>NORFOLK, VA 23510 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Sheraton Norfolk Waterside | BARRY AKERS<br>777 WATERSIDE DR<br>NORFOLK, VA 23510 | Amendment 1 to Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | Sheraton Norfolk Waterside | BARRY AKERS<br>777 WATERSIDE DR<br>NORFOLK, VA 23510 | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Norfolk Waterside | BARRY AKERS<br>777 WATERSIDE DR<br>NORFOLK, VA 23510 | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Sheraton Princess Kaiulani Hotel | Vickie Omura<br>120 Kaiuliani Ave<br>Honolulu, HI 96815 | Agreement for Hotel ACCOMMODATIONS |
| WORLD AIRWAYS, INC. | Sheraton Princess Kaiulani Hotel | Vickie Omura<br>120 Kaiuliani Ave<br>Honolulu, HI 96815 | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Sheraton Skyline Hotel LHR | ANTONIO SIMOES<br>BATH RD<br>HAYES<br>LONDON, UB3 5BP ENGLAND | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Sheraton Skyline Hotel LHR | ANTONIO SIMOES<br>BATH RD<br>HAYES<br>LONDON, UB3 5BP ENGLAND | Amendment 1 to Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Sheraton Skyline Hotel LHR | ANTONIO SIMOES<br>BATH RD<br>HAYES<br>LONDON, UB3 5BP ENGLAND | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Sheraton Skyline Hotel LHR | ANTONIO SIMOES<br>BATH RD<br>HAYES<br>LONDON, UB3 5BP ENGLAND | Amendment 1 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Sherry Frontenac Hotel | IRA SUSSMAN<br>6565 COLLINS AVE<br>MIAMI BEACH, FL 33141 | Agreement for Hotel Accommodations |
| GLOBAL AVIATION HOLDINGS INC. | SIGNIUS COMMUNICATIONS, INC. | 8915 KNIGHT RD<br>HOUSTON, TX 77054 | TERMS AND CONDITIONS |
| WORLD AIRWAYS, INC. | SOUTHERN CALIFORNIA AVIATION, LLC (SCA) | 18438 Readiness St<br>Bldg 691B<br>Victorville, CA 92392 | AIRCRAFT STORAGE AND MAINTENANCE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | Springhill Suites Atlanta Buckhead | LINDSAY BUTLER<br>3459 BUCKHEAD LOOP NE<br>ATLANTA, GA 30326 | Accommodations for flights at ATL |
| WORLD AIR HOLDINGS INC. | SPRINT | 3065 CUMBERLAND BLVD<br>ATLANTA, GA 30339 | MASTER QUOTE SERVICE AGREEMENT |
| WORLD AIR HOLDINGS INC. | SPRINT | 3065 CUMBERLAND BLVD<br>ATLANTA, GA 30339 | AMENDMENT TO ADD 3RD LINE TO BLDG 141 - REPLACES LINES EXECUTED IN MASTER AGREEMENT |
| WORLD AIR HOLDINGS INC. | SPRINT | 3065 CUMBERLAND BLVD<br>ATLANTA, GA 30339 | AMENDMENT TO UPGRADE T-1 LINES IN JFK (BLDG 141) |
| NORTH AMERICAN AIRLINES, INC. | SR TECHNICS | ZURICH AIRPORT<br>ZURICH,  CH-8058<br>GERMANY | GENERAL TERMS AGREEMENT FOR COMPONENT MAINTENANCE & REPAIR |
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT<br>ZURICH,  CH-8058<br>GERMANY | GENERAL TERMS AGREEMENT |
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT<br>ZURICH,  CH-8058<br>GERMANY | GENERAL TERMS AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT ZURICH,  CH-8058 GERMANY | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT ZURICH,  CH-8058 GERMANY | AMENDMENT 1 TO AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT ZURICH,  CH-8058 GERMANY | AMENDMENT 3 TO AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | SR TECHNICS | ZURICH AIRPORT ZURICH,  CH-8058 GERMANY | AMENDMENT 5 TO AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | STATE SPRINKLER COMPANY, INC. | 1075 NINE N DR STE 100 ALPHARETTA, GA 30004 | SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | STATE SPRINKLER COMPANY, INC. | 1075 NINE N DR STE 100 ALPHARETTA, GA 30004 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | STS SERVICES INC. | 2000 NE JENSEN BEACH BLVD JENSEN BEACH, FL 34957 | SERVICE AGREEMENT |
| WORLD AIRWAYS, INC. | STS SERVICES INC. | 2000 NE JENSEN BEACH BLVD JENSEN BEACH, FL 34957 | AMENDMENT 1 TO SERVICE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | SWISSPORT USA, INC. | 45025 AVIATION DRIVE SUITE 350 DULLES, VA 20166 | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | SWISSPORT USA, INC. | 45025 AVIATION DRIVE SUITE 350 DULLES, VA 20166 | AMENDMENT 1 TO GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | SWISSPORT USA, INC. | 45025 AVIATION DRIVE SUITE 350 DULLES, VA 20166 | IATA STANDARD GROUND HANDLING AGREEMENT |
| WORLD AIRWAYS, INC. | TIMCO | 623 RADAR RD GREENSBORO, NC 27410 | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT |
| WORLD AIRWAYS, INC. | TIMCO LINE CARE, LLC | 623 RADAR RD GREENSBORO, NC 27410 | IATA STANDARD GROUND HANDLING AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRANSFORM AVIATION LLC (FROMERLY TRANSFORM LLC) | 321 LORING LN PEACHTREE CITY, GA 30269 | MASTER SERVICES AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRANSFORM AVIATION LLC (FROMERLY TRANSFORM LLC) | 321 LORING LN PEACHTREE CITY, GA 30269 | AMENDMENT 4 TO THE MASTER SERVICES AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELEX | 1152 15TH ST NW 7TH FL WASHINGTON, DC 20005 | TERMS AND CONDITIONS |
| NORTH AMERICAN AIRLINES, INC. | TRAVELEX | 1152 15TH ST NW 7TH FL WASHINGTON, DC 20005 | GLOBAL FOREIGN PAYMENTS |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | TRAVELEX | 1152 15TH ST NW 7TH FL WASHINGTON, DC 20005 | GLOBAL FOREIGN PAYMENTS |
| WORLD AIRWAYS, INC. | TRAVELEX | 1152 15TH ST NW 7TH FL WASHINGTON, DC 20005 | GLOBAL FOREIGN PAYMENTS |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 1 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 2 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 3 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 4 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 5 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 6 TO THE CORPORATE TRAVEL AGREEMENT |
| GLOBAL AVIATION HOLDINGS INC. | TRAVELFOCUS LLC | 8111 LBJ FRWY SUITE 900 DALLAS, TX 75251 | ADDENDUM 7 TO THE CORPORATE TRAVEL AGREEMENT |
| WORLD AIRWAYS, INC. | TUG TECHNOLOGIES CORPORATION | PO BOX 538114 ATLANTA, GA 30353-8114 | MAINTENANCE AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | UNITED AIRLINES, INC. | 1200 E ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | IATA STANDARD GROUND HANDLING AGREEMENT |

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| GLOBAL SHARED SERVICES, INC. | UNITED FIRE PROTECTION, INC. | 12001 31st COURT N ST PETERSBURG, FL 33716 | UNITED FIRE AGREEMENT |
| WORLD AIRWAYS, INC. | UNITED TECHNOLOGIES CORP. PRATT & WHITNEY DIVISION | 2701 REGENT BLVD 300 DALLAS, TX 75261 | PW4000 MATERIAL AGREEMENT |
| WORLD AIRWAYS, INC. | UNITPOOL | STEINACKERSTRASSE 2 KLOTEN, CH-8058 SWITZERLAND | ULD CONTROL SERVICES AGREEMENT |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | WALLACE ELECTRIC COMPANY | 117 PARK W DR MCDONOUGH, GA 30253 | SERVICE CONTRACTOR AGREEMENT |
| WORLD AIRWAYS, INC. | Westin Buckhead Atlanta | 3391 PEACHTREE RD NE ATLANTA, GA 30326 | Agreement for Hotel Accomodations |
| WORLD AIRWAYS, INC. | Westin Buckhead Atlanta | 3391 PEACHTREE RD NE ATLANTA, GA 30326 | Amendment 1 to Agreement for Hotel Accomodations |
| NORTH AMERICAN AIRLINES, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Amendment 1 to the Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Amendment 2 to the Hotel Accommodations Agreement |
| WORLD AIRWAYS, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Amendment 1 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Westin Grand Frankfurt | KONRAD ADENAUER STASSE 7 60313 FRANKFURT, GERMANY | Amendment 2 to the Hotel Accommodations Agreement |
| NORTH AMERICAN AIRLINES, INC. | WFS PTS UNLIMITED LIABILITY | 1925 W JOHN CARPENTER FWY STE 450 IRVING, TX 75063 | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | WFS PTS UNLIMITED LIABILITY | 1925 W JOHN CARPENTER FWY STE 450 IRVING, TX 75063 | STANDARD GROUND HANDLING AGREEMENT |
| NORTH AMERICAN AIRLINES, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Agreement for Hotel Accommodations EFFECTIVE 12/1/08 |
| NORTH AMERICAN AIRLINES, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Amendment 1 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Amendment 2 to Agreement for Hotel Accommodations |
| NORTH AMERICAN AIRLINES, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Amendment 3 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Agreement for Hotel Accommodations effective 12/1/08 |
| WORLD AIRWAYS, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA BWI AIRPORT 1510 AERO DR LINTHICUM, MD 21090 | Amendment 1 to Agreement for Hotel Accommodations |

**EXHIBIT C**
Schedule of Executory Contracts and Unexpired Leases to be Rejected Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION |
|---|---|---|---|
| WORLD AIRWAYS, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA<br>BWI AIRPORT<br>1510 AERO DR<br>LINTHICUM, MD 21090 | Amendment 2 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA<br>BWI AIRPORT<br>1510 AERO DR<br>LINTHICUM, MD 21090 | Amendment 3 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | Wingate by Wyndham BWI | ROXANNE RIVERA<br>BWI AIRPORT<br>1510 AERO DR<br>LINTHICUM, MD 21090 | Amendment 4 to Agreement for Hotel Accommodations |
| WORLD AIRWAYS, INC. | WINGS MAINTENANCE TRAINING | PO BOX 919<br>JAMESTOWN, CA 95327 | WINGS MAINTENANCE TRAINING |
| WORLD AIRWAYS, INC. | WORKCARE, INC. | 300 S HARBOR BLVD<br>STE 600<br>ANAHEIM, CA 92805 | SERVICES AGREEMENT |

## Exhibit D

**Executory Contracts and Unexpired Leases to be Assumed**

**EXHIBIT D**

Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | GENERAL TERMS AGREEMENT FOR SERVICE SUPPORT | $0.00 |
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | GENERAL TERMS AGREEMENT FOR SERVICE SUPPORT | $0.00 |
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | AMENDMENT 1 TO IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ABU DHABI AIRCRAFT TECHNOLOGIES (FORMERLY GAMCO) | ADJACENT TO ABU DHABI INTL AIRPORT PO BOX 46450 ABU DHABI, UNITED ARAB EMIRATES | AMENDMENT 2 TO IATA STANDARD GOUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ACCUFLEET INTERNATIONAL | 777 Benmar 450 Houston, TX 77060 | AGREEMENT FOR AIRCRAFT CLEANING AND LAUNDRY SERVICE | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | ACE LIFE | 436 Walnut St. Philadelphia, PA 19106 | GROUP ACCIDENT POLICIES (ACCIDENTAL DEATH & DISMEMBERMENT) # ADD N04834884 ; | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ACE LIFE | 436 Walnut St. Philadelphia, PA 19106 | BUSINESS TRAVEL ACCIDENT AND WAR RISK POLICY ADD-N04834811 | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | HOSTED SERVICES ADDENDUM TO ADP SALES ORDER | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | ADDENDUM TO MAJOR ACCOUNTS AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | MAJOR ACCOUNTS GUARANTEED TWO YEAR PRICE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | LETTER OF INTENT | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | MAJOR ACCOUNTS GUARANTEED 2 YEAR PRICE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | ADP, INC. | 5680 NEW NORTHSIDE DR NW ADP SE SERVICE CTR ATLANTA, GA 30328 | COBRA/HIPPA, FSA , COMMUTER BENEFITS AND DIRECT BILL SERVICE AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | AECOM NATIONAL SECURITY PROGRAMS, INC. (F/K/A MCNEIL TECHNOLOGIES, INC.) | 6564 LOISDALE COURT, SUITE 900 SPRINGFIELD, VA 22051 ATTENTION: SONYA FORD, DIRECTOR OF CONTRACTS & PRICING | SUBCONTRACT AGREEMENT - SENTINEL | $0.00 |
| WORLD AIRWAYS, INC. | AERO COMPONENTS SUPPLIES CORP | 6730 NW 99TH ST MEDLEY, FL 33178 | CONSIGNMENT AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | AERO COMPONENTS SUPPLIES CORP | 6730 NW 99TH ST MEDLEY, FL 33178 | CONSIGNMENT AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERO COMPONENTS SUPPLIES CORP | 6730 NW 99TH ST MEDLEY, FL 33178 | AMENDMENT 1 TO CONSIGNMENT AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERO MECHANICAL SVS LTD | 200W 1144 29 Ave NE Calgary,  T2E 7P1 Canada | SERVICES AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | AERO MECHANICAL SVS LTD | 200W 1144 29 Ave NE Calgary,  T2E 7P1 Canada | DATA SERVICE AGREEMENT AMENDMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERO MECHANICAL SVS LTD | 200W 1144 29 Ave NE Calgary,  T2E 7P1 Canada | DATA SERVICE AGREEMENT AMENDMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERODOX | 6170 CRESTVIEW DR COVINGTON, GA 30014 | CONSULTING AND NON-DISCLOSURE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | AERODOX | 6170 CRESTVIEW DR COVINGTON, GA 30014 | AMENDMENT 1 TO CONSULTING AND NON-DISCLOSURE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERODOX | 6170 CRESTVIEW DR COVINGTON, GA 30014 | AMENDMENT 2 TO CONSULTING AND NON-DISCLOSURE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | AERODOX | 6170 CRESTVIEW DR COVINGTON, GA 30014 | CONSULTING AND NON DISCLOSURE AGREEMENT AMENDMENT 3 | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE MIAMI, FL 33122 | ENGINE LEASE GENERAL TERMS AGREEMENT, EFFECTIVE DATE 8/20/2009 | $0.00 |
| WORLD AIRWAYS, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE MIAMI, FL 33122 | ENGINE LEASE , SHORT TERM S/N 702381, CF6-80 A/C 382-1 dated 3/4/2011 | $0.00 |
| WORLD AIRWAYS, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE MIAMI, FL 33122 | ENGINE LEASE, SHORT TERM , S/N 702469 CF6-80 A/C 382-3 dated 9/3/2010 | $0.00 |
| WORLD AIRWAYS, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE MIAMI, FL 33122 | ENGINE LEASE, SHORT TERM , S/N 724478 CF6-80 A/C 740-1 dated 12/17/2010 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | AEROTURBINE, INC. | 2323 NW 82 AVE MIAMI, FL 33122 | GENERAL TERMS AGREEMENT FOR ENGINE LEASES, EFFECTIVE DATE 8/27/2009, AMENDMENT 1 EFFECTIVE  11/14/2011 | $0.00 |
| WORLD AIRWAYS, INC. | AERSALE | 121 ALHAMDRA PLZ STE 1110 CORAL GABLES, FL 33134 | GENERAL TERMS AGREEMENT, dated 8/3/2010, AMENDED ON 10/1/2010 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | AIMS INTL LTD | 367 SYNGROU AVE 4TH FL ATHENS,  17564 GREECE | SOFTWARE SUPPORT AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | AIRCRAFT SERVICE INTERNATIONAL INC. | 201 S Orange Ave Ste 1100A Orlando, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | AIRCRAFT SERVICE INTERNATIONAL INC. | 201 S Orange Ave Ste 1100A Orlando, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | AIRCRAFT SERVICE INTERNATIONAL INC. | 201 S Orange Ave Ste 1100A Orlando, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ALLIED AIR LIMITED | NAHCO Building M.M. AIRPORT TKOJN, LAGOS NIGERIA ATTENTION: CAPT. VAL TONGO, CHIEF EXECUTIVE | AMENDED & RESTATED CARGO AIRCRAFT SERVICES AGREEMENT, DATED AS OF JANUARY 1, 2012 | $0.00 |
| WORLD AIRWAYS, INC. | ALLIED AIR LIMITED | NAHCO Building M.M. AIRPORT TKOJN, LAGOS NIGERIA ATTENTION: CAPT. VAL TONGO, CHIEF EXECUTIVE | AMENDMENT NO. 1 TO AMENDED & RESTATED CARGO AIRCRAFT SERVICES AGREEMENT, DATED AS OF JANUARY 1, 2012 | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | AMERICAN AIRLINES | JFK INTERNATIONAL AIRPORT JAMAICA, NY 11430 | CORPORATE TRAVEL AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | AMERICAN AIRLINES, INC. | 4255 AMON CARTER BOULEVARD MD 4412 FT. WORTH, TX 76155 ATTENTION: GEORGE E. COYLE | LETTER AGREEMENT - FY2013 USTRANSCOM CRAF CHARTER AIRLIFT SERVICES PROGRAM, DATED AS OF OCTOBER 17, 2011 | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | AMERICAN AIRLINES, INC. | 4255 AMON CARTER BOULEVARD MD 4412 FT. WORTH, TX 76155 ATTENTION: GEORGE E. COYLE | LETTER AGREEMENT - FY2013 USTRANSCOM CRAF CHARTER AIRLIFT SERVICES PROGRAM, DATED AS OF OCTOBER 17, 2011 | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | MAINTENANCE AGREEMENT NUMBER M1032 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NO. 1 TO MAINTENANCE AGREEMENT NUMBER M1032 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SERVICE AGREEMENT NUMBER 7658 | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NUMBER 1 TO SERVICE AGREEMENT NUMBER 7658 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NUMBER 2 TO SERVICE AGREEMENT NUMBER 7658 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NUMBER 9 TO SERVICE AGREEMENT NUMBER 7658 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NUMBER 10 TO SERVICE AGREEMENT NUMBER 7658 - COCKPIT ACCESS SECURITY SYSTEM | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SUPPLEMENT NUMBER 11 TO SERVICE AGREEMENT NUMBER 7658 - AVINET SERVICE SUPPLEMENT | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | ADDENDUM NO 10-01 TO AVINET SERVICES SUPPLEMENT # 11 - PART OF SERVICE AGREEMENT NO. 7658 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | ADDENDUM NO 10-02 TO AVINET SERVICES SUPPLEMENT # 11 - PART OF SERVICE AGREEMENT NO. 7658 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SERVICE AGREEMENT NUMBER 0545 DATED 26 JANUARY 1959 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | SERVICE SUPPLEMENT NO 114 - COCKPIT ACCESS SECURITY SYSTEM (CASS) | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | AVINET SERVICE SUPPLEMENT 115, PART OF AGREEMENT 0545 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | ADDENDUM NO. 10-01 TO AVNET SERVICE SUPPLEMENT NO. 115 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ARINC | 2551 RIVA RD MAIL STOP 6 3063 ANNAPOLIS, MD 21401 | GLOBALLINK AERONAUTICAL DATA COMMUNICATIONS SERVICE SUPPLEMENT NO. 116 | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | ASAP (AUTOMATED SYSTEMS IN AIRCRAFT PERFORMANCE) | PO BOX 2427 CRANBERRY TWP, PA 16066 | AGREEMENT FOR SOFTWARE LICENSE & SERVICES | $0.00 |
| WORLD AIRWAYS, INC. | ASAP (AUTOMATED SYSTEMS IN AIRCRAFT PERFORMANCE) | PO BOX 2427 CRANBERRY TWP, PA 16066 | AMENDMENT 1 TO AGREEMENT FOR SOFTWARE LICENSE AND SERVICES | $0.00 |
| WORLD AIR HOLDINGS INC. | AT & T | PO BOX 13148 NEWARK, NJ 07101-5648 | AMENDMENT # 2 TO CORPORATE DIGITAL ADVANTAGE AGREEMENT | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIR HOLDINGS INC. | AT & T | PO BOX 13148 NEWARK, NJ 07101-5648 | AMENDMENT # 3 TO CORPORATE DIGITAL ADVANTAGE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIR HOLDINGS INC. | AT & T (CONTRACT EXECUTED WITH CINGULAR, NAME CHANGE TO AT & T) | James Grudus, Esq. One AT&T Way, Room 3A218 Bedminster, NJ 07921 | CORPORATE DIGITAL ADVANTAGE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | AT&T | PO BOX 13148 NEWARK, NJ 07101-5648 | IN BUILDING SERVICE ENHANCEMENT AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | AVERETT WARMUS DURKEE | OSBURN HENNING PA 1417 E CONDORD ST ORLANDO, FL 32803 | ENGAGEMENT LETTER | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | AVIATION TECHNICAL SERVICES | 15207 COLLECTIONS CTR DR CHICAGO, IL 60693 | MAINTENANCE AND SERVICE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | AVIEM INTERNATIONAL, INC. | 1201 PEACHTREE ST NE 400 COLONY SQ ATLANTA, GA 30361 | SERVICE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | B-A-D GESUNDHEITSVORSORGE | HERBERT RABIUS STR 1 BONN,  53225 GERMANY | SERVICE CONTRACT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | BLUESTAR AV SERVICES LLC | 9013 CRESTVIEW DENTON, TX 76207 | GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | BLUESTAR AV SERVICES LLC | 9013 CRESTVIEW DENTON, TX 76207 | STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | BOEING | 4900 E CONANT STREET LONG BEACH, CA 90846 | LEASED A/C OPERATING WEIGHT AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | BOEING | 4900 E CONANT STREET LONG BEACH, CA 90846 | GENERAL TERMS AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | BOEING - PMA | PO BOX 3707 SEATTLE, WA. 98124-2207 | PMA OFFER | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | BOEING - PMA | PO BOX 3707 SEATTLE, WA. 98124-2207 | PMA OFFER | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | BOEING COMPANY | FSB TRAINING CTR 4900 E CONANT ST LONG BEACH, CA 90846 | CUSTOMER SERVICES GTA NO 73-1 INCLUDING SUPPLEMENTAL AGREEMENT SA-EA (CSGTA) | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | BOEING PARTS PURCHASE GTA | 4900 E CONANT STREET LONG BEACH, CA 90846 | GENERAL TERMS AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | BOEING TRAINING AND FLIGHT SERVICES LLC (FORMERLY ALTEON) | 6601 NW 36TH ST VIRGINIA GARDENS, FL 33166 | USAGE LICENSE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | BUPA | RUSSELL HOUSE RUSSELL MEWS BRIGHTIN BN1 2NR UNITED KINGDOM | RENEWAL LETTER GLOBAL CHOICE EX PATRIATE PLAN - POLICY 69985 | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | CHARTIS | 175 WATER STREET NEW YORK, NY 10038 | WORKERS COMP AND EMPLOYERS LIABILITY INSURANCE POLICY # 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 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | CHEMTREC | 2900 FAIRVIEW PARK DR FALLS CHURCH, VA 22042-4513 | AGREEMENT TO PROVIDE A 24-HOUR CALL CENTER FOR WORLDWIDE HAZMAT EMERGENCY ASSISTANCE | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | CISCO CAPITAL | BIALSON, BERGEN & SCHWAB, A PROFESSIONAL CORPORATION 2600 EL CAMINO REAL, SUITE 300 PALO ALTO, CA 94306 | UNIFIED COMMUNICATIONS SYSTEM / LEASE PURCHASE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | CISCO CAPITAL | BIALSON, BERGEN & SCHWAB, A PROFESSIONAL CORPORATION 2600 EL CAMINO REAL, SUITE 300 PALO ALTO, CA 94306 | AMENDMENT 1 TO SCHEDULE 001-000 | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | CISCO CAPITAL | BIALSON, BERGEN & SCHWAB, A PROFESSIONAL CORPORATION 2600 EL CAMINO REAL, SUITE 300 PALO ALTO, CA 94306 | AMENDMENT 1 TO MASTER LEASE EQUIPMENT TO 7600 | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | CISCO CAPITAL | BIALSON, BERGEN & SCHWAB, A PROFESSIONAL CORPORATION 2600 EL CAMINO REAL, SUITE 300 PALO ALTO, CA 94306 | SCHEDULE NO. 002-000. MASTER AGREEMENT TO LEASE EQUIPMENT # 7600 | SEE ABOVE |
| WORLD AIRWAYS, INC. | C.I.T. LEASING CORPORATION | ONE CIT DR LIVINGSTON, NJ 07039 | GENERAL TERMS AGREEMENT, EFFECTIVE 12/11/2009 | $0.00 |
| WORLD AIRWAYS, INC. | CITY OF ATLANTA | SCHNADER HARRISON SEGAL & LEWIS LLP 120 FIFTH AVENUE, SUITE 2700 PITTSBURGH, PA 15222 | AIRPORT USE AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | CITY OF LOS ANGELES | PO BOX 92216 LOS ANGELES, CA 90009-2216 | NON-EXCLUSIVE AIR CARRIER OPERATING PERMIT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | CITY OF LOS ANGELES | PO BOX 92216 LOS ANGELES, CA 90009-2216 | AMENDMENT 1 TO NON-EXCLUSIVE AIR CARRIER OPERATING PERMIT | SEE ABOVE |
| WORLD AIRWAYS, INC. | CITY OF LOS ANGELES | PO BOX 92216 LOS ANGELES, CA 90009-2216 | OPERATING PERMIT | $0.00 |
| WORLD AIRWAYS, INC. | CITY OF LOS ANGELES | PO BOX 92216 LOS ANGELES, CA 90009-2216 | AMENDMENT 1 TO OPERATING PERMIT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC | 2925 COURTYARDS DR ATLANTA, GA 30071 | MASTER SERVICES AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | COMPLY 365 (FORMERLY BALANCED IT SOLUTIONS / BITS) | 15050 ROCKDALE RD SOUTH BELOIT, IL 61080 | GENERAL TERMS AGREEMENT | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | COMPLY 365 (FORMERLY BALANCED IT SOLUTIONS / BITS) | 15050 ROCKDALE RD SOUTH BELOIT, IL 61080 | AMENDMENT 1 REVISED SERVICE AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | COMPLY 365 (FORMERLY BALANCED IT SOLUTIONS / BITS) | 15050 ROCKDALE RD SOUTH BELOIT, IL 61080 | AMENDMENT 2 TO GENERAL TERMS AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | COMPLY 365 (FORMERLY BALANCED IT SOLUTIONS / BITS) | 15050 ROCKDALE RD SOUTH BELOIT, IL 61080 | STATEMENT OF WORK | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | COMPLY 365 (FORMERLY BALANCED IT SOLUTIONS / BITS) | 15050 ROCKDALE RD SOUTH BELOIT, IL 61080 | SOFTWARE LICENSE AND HOSTING AGREEMENT AMENDMENT 4 | SEE ABOVE |
| WORLD AIRWAYS, INC. | COMPUTER PRESENTATIONS AND TRAINING (CPAT) | 2203 TIMBERLOCH PL STE 110 THE WOODLANDS, TX 77380 | TRAINING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | COMPUTER PRESENTATIONS AND TRAINING (CPAT) | 2203 TIMBERLOCH PL STE 110 THE WOODLANDS, TX 77380 | AMENDMENT 2 TO TRAINING AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | CONCENTRA HEALTH SERVICES, INC. | 5080 SPECTRUM DR STE 400 ADDISON, TX 75001 | SERVICES AGREEMENT | $145.00 |
| GLOBAL AVIATION HOLDINGS INC. | CRITICAL TECHNOLOGIES / IMAGIO AIR VAULT | 3601 S BROADWAY ST EDMOND, OK 73013 | IMAGIO AIRVAULT HOSTED SERVICES AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | CRITICAL TECHNOLOGIES / IMAGIO AIR VAULT | 3601 S BROADWAY ST EDMOND, OK 73013 | FIRST AMENDMENT TO IMAGIO AIRVAULT HOSTED SERVICE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | DAL GLOBAL SERVICES, LLC | OPERATIONS CTR III 980 ATLANTA, GA 30354-1312 | TRAINING AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | DELL FINANCIAL SERVICES LLC | ONE DELL WAY ROUND ROCK, TX 78682 | INSTALLMENT PAYMENT AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | RECIPROCAL NON-DISCLOSURE & CONFIDENTIALITY AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | FACILITIES USE AND TRAINING AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | FACILITIES USE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | EQUIPMENT LEASE FOR MD-11 THRUST REVERSERS | $9,523.81 |
| WORLD AIRWAYS, INC. | DELTA AIR LINES | 1030 DELTA BLVD ATLANTA, GA 30354 | AMENDMENT 1 TO EQUIPMENT LEASE FOR MD-11 THRUST REVERSERS | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | DELTA DENTAL | 101 FIRST ST SAN FRANCISCO, CA 94105 | DENTAL ADMINISTRATIVE SERVICES CENTER PPO; ALSO DHMO - DELTA CARE USA GROUP DENTAL SERVICE CONTRACT | $0.00 |
| WORLD AIRWAYS, INC. | EAGLE CONSTRUCTION & ENVIRONMENTAL SERVICES | 9204 US HWY 287 NW FT WORTH, TX 76131 | GENERAL SERVICES AND EMERGENCY SERVICES AGREEMENT | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | EAN SERVICES LLC (ENTERPRISE RENTALS) | 600 CORPORATE PARK DR ST LOUIS, MO 63105 | CORPORATE SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ENVIRONMENTAL LABS & SERVICES | 103 CARROLL CIR CARROLLTON, GA 30117 | LAB SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ENVIRONMENTAL LABS & SERVICES | 103 CARROLL CIR CARROLLTON, GA 30117 | AMENDMENT 1 TO LAB SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | ENVIRONMENTAL LABS & SERVICES | 103 CARROLL CIR CARROLLTON, GA 30117 | AMENDMENT 2 TO LAB SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | $0.00 |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | ADDENDUM DATED JULY 14,2009 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | ADDENDUM DATED OCTOBER 1, 2009 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | ADDENDUM DATED JANUARY 1, 2010 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | FIRST AMENDMENT DATED JULY 31, 2010 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | SECOND AMENDMENT DATED JUNE 1, 2011 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETIHAD AIRWAYS PJSC | POB 35566 NEW AIRPORT ROAD ABU DHABI, UNITED ARAB EMIRATES ATTENTION: DESMOND STEPHEN VERTANNES | THIRD AMENDMENT DATED APRIL 2, 2012 TO ACMI WET LEASE CARGO AIRCRAFT SERVICES AGREEMENT (AGREEMENT NUMBER WO-CGO-EY-25, AUGUST 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | ETS VERIFICATION GMBH | IM GRUND 5 TECKLENBURG,  49545 GERMANY | VERIFICATION OF SERVICES AGREEMENT | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | EUROCONTROL | RUE DE LA LOI 72 BRUXELLES, 01040 BELGIUM | EXTRANET FOR AIRSPACE USERS AGREEMENT | $0.00 |
| GLOBAL SHARED SERVICES, INC. | EVERGREEN AVIATION GROUND LOGISTICS | 4700 YORKMONT RD CHARLOTTE, NC 28219 | ANNEX B1.0 - LOCATION, AGREED SERVICES, FACILITIES AND CHARGES FOR TAMPA FL, | TBD (NEGOTIATIONS PENDING) |
| GLOBAL SHARED SERVICES, INC. | EVERGREEN AVIATION GROUND LOGISTICS | 4700 YORKMONT RD CHARLOTTE, NC 28219 | ADDENDUM TO GROUND HANDLING AGREEMENT | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | EVERGREEN AVIATION GROUND LOGISTICS | 4700 YORKMONT RD CHARLOTTE, NC 28219 | ANNEX B1.0 TO GROUND HANDLING AGREEMENT FOR JFK | SEE ABOVE |
| WORLD AIRWAYS, INC. | EVERGREEN AVIATION GROUND LOGISTICS | 4700 YORKMONT RD CHARLOTTE, NC 28219 | LOCATION, AGREED SERVICES, FACILITIES AND CHARGES | SEE ABOVE |
| WORLD AIRWAYS, INC. | EVERGREEN AVIATION TECHNOLOGY | Taiwann Taoyuan Intl Airport RM C427 6 HARNG Jann S Rd Taoyuan Hsien, 00337 Taiwan | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT FOR CHICAGO | $900,000.00 |
| WORLD AIRWAYS, INC. | EVERGREEN AVIATION TECHNOLOGY | Taiwann Taoyuan Intl Airport RM C427 6 HARNG Jann S Rd Taoyuan Hsien, 00337 Taiwan | AMENDMENT 1 TO AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | EVERGREEN AVIATION TECHNOLOGY | Taiwann Taoyuan Intl Airport RM C427 6 HARNG Jann S Rd Taoyuan Hsien, 00337 Taiwan | AMENDMENT 2 TO AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | EVERGREEN INTERNATIONAL AIRLINES, INC. AVIATION MANAGEMENT AND CONSULTING SERVICES, L.L.C. NORTH AMERICAN AIRLINES, INC. | John Palo 3850 Three Mile Ln McMinnville, OR 97128 Dennis Kemery 213 Loundon St SW Leesburg, VA 20175 BUILDING 141 BAY 2 JFK INTERNATIONAL AIRPORT JAMAICA, NY 11430 | THE ALLIANCE CONTRACTOR TEAM FY2013 ORGANIZING AGREEMENT, DATED AS OF SEPTEMBER 20, 2011 | $0.00 |
| WORLD AIRWAYS, INC. | EVERGREEN INTERNATIONAL AIRLINES, INC. AVIATION MANAGEMENT AND CONSULTING SERVICES, L.L.C. NORTH AMERICAN AIRLINES, INC. | John Palo 3850 Three Mile Ln McMinnville, OR 97128 Dennis Kemery 213 Loundon St SW Leesburg, VA 20175 BUILDING 141 BAY 2 JFK INTERNATIONAL AIRPORT JAMAICA, NY 11430 | ADDENDUM 1 TO THE ALLIANCE CONTRACTOR TEAM FY2013 ORGANIZING AGREEMENT, DATED AS OF APRIL 24, 2012 | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | EVERGREEN INTERNATIONAL AIRLINES, INC. AVIATION MANAGEMENT AND CONSULTING SERVICES, L.L.C. WORLD AIRWAYS, INC. | John Palo 3850 Three Mile Ln McMinnville, OR 97128 Dennis Kemery 213 Loundon St SW Leesburg, VA 20175 BRIAN GILLMAN 101 WORLD DR PEACHTREE CITY, GA 30269 | THE ALLIANCE CONTRACTOR TEAM FY2013 ORGANIZING AGREEMENT, DATED AS OF SEPTEMBER 20, 2011 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | EVERGREEN INTERNATIONAL AIRLINES, INC.<br><br>AVIATION MANAGEMENT AND CONSULTING SERVICES, L.L.C.<br><br>WORLD AIRWAYS, INC. | John Palo<br>3850 Three Mile Ln<br>McMinnville, OR 97128<br><br>Dennis Kemery<br>213 Loundon St SW<br>Leesburg, VA 20175<br><br>BRIAN GILLMAN<br>101 WORLD DR<br>PEACHTREE CITY, GA 30269 | ADDENDUM 1 TO THE ALLIANCE CONTRACTOR TEAM FY2013 ORGANIZING AGREEMENT, DATED AS OF APRIL 24, 2012 | SEE ABOVE |
| WORLD AIRWAYS, INC. | EXXONMOBIL OIL CORP. | 6622 ROCKLAND DR CLIFTON, VA 20124 | DUTY DRAWBACK AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | EXXONMOBILE OIL CORP. | 6622 ROCKLAND DR CLIFTON, VA 20124 | DUTY DRAWBACK AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | F&E AIRCRAFT MAINTENANCE | 531 MAIN STREET NO 672 EL SEGUNDO, CA 90245-3060 | IATA GROUND HANDLIN AGREEMENT FOR LINE MAINTENANCE ASSISTANCE IN JFK, IAH, ATL, BWI | $0.00 |
| WORLD AIRWAYS, INC. | F&E AIRCRAFT MAINTENANCE | 531 MAIN STREET NO 672 EL SEGUNDO, CA 90245-3060 | AMENDMENT 1 TO THE IATA GROUND HANDLING AGREEMENT FOR LINE MAINTENANCE ASSISTANCE IN JFK, IAH, ATL, BWI | SEE ABOVE |
| WORLD AIRWAYS, INC. | F&E AIRCRAFT MAINTENANCE | 531 MAIN STREET NO 672 EL SEGUNDO, CA 90245-3060 | AMENDMENT 2 TO THE IATA GROUND HANDLING AGREEMENT FOR LINE MAINTENANCE ASSISTANCE IN JFK, IAH, ATL, BWI | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | FEDERAL EXPRESS CORPORATION | C/O FEDEX TECHCONNECT 3965 AIRWAYS BLVD MODULE G 3RD FLOOR MEMPHIS, TN 38116 | FEDEX PRICING AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | FEDERAL INSURANCE COMPANY (CHUBB)/JLT AEROSPACE | 5 JUDITH CT WANAMASSA, NJ 07712-4136 | EMPLOYERS LIABILITY POLICIES -9915-1698 AND 9915-1699 (WOA/NAA) | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | FEDERAL INSURANCE COMPANY (CHUBB)/JLT AEROSPACE | 1615 BRETT ROAD 1ST FLOOR NEW CASTLE, DE 19720 | EMPLOYERS LIABILITY POLICIES -9915-1698 AND 9915-1699 (WOA/NAA) | $0.00 |
| WORLD AIRWAYS, INC. | FIDELITY | 100 MAGELLAN WAY COVINGTON, KY 41015 | FIDELITY INVESTMENTS RETIREMENT PLAN SERVICE AGREEMENT; FIDELITY AUTOMATIC ROLLOVER FOR IRA; 38830 | $0.00 |
| WORLD AIRWAYS, INC. | FLIGHT EXPLORER | FLIGHT DIMENSIONS INTERNATIONAL PO BOX 630650 BALTIMORE, MD 21263-0650 | SALES ORDER FOR WORLD AIRWAYS | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SIDE LETTER TO THE SGHA 2004, ANNEX B OF 1 JANUARY, 2008 | SEE ABOVE |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | AMENDMENT 2 TO THE LEASING CONTRACT | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | AMENDMENT 3 TO THE OFICE LEASE | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SERVICE CONTRACTOR AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | AMENDMENT 1 TO THE SERVICE CONTRACTOR AGREEMENT DATED 10 JUNE 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | AMENDMENT 2 TO THE SERVICE CONTRACTOR AGREEMENT DATED 10 JUNE 2008 | SEE ABOVE |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | AMENDMENT 3 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SERVICE CONTRACTOR AGREEMENT AMENDMENT 4 | SEE ABOVE |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | LEASE CONTRACT | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | OFFICE AND STORAGE SPACE LEASE | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | SIDE LETTER TO THE SGHA 2004, ANNEX B OF 1 JANUARY, 2008 | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | PARKING SPACE LEASE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | 1ST AMENDMENT TO PARKING SPACE LEASE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | FLUGHAFEN LEIPZIG/HALLE GMBH | TERMINAIRING 11 LEIPZIG,  04029 GERMANY | 2ND AMENDMENT TO PARKING SPACE LEASE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | FREMOUW ENVIRONMENTAL SERVICES, INC. | PO BOX 2875 VACAVILLE, CA 95696 | ENVIRONMENTAL SERVICES AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | GE AVIATION | ONE NUEMAN WAY M D F108 BANK PNC BANK PITTSBURGH PA 15264 1791 CINCINNATI, OH 45215 | GENERAL TERMS AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | GE AVIATION | ONE NUEMAN WAY M D F108 BANK PNC BANK PITTSBURGH PA 15264 1791 CINCINNATI, OH 45215 | GENERAL TERMS AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | G.E. CAPITAL AVIATION SERVICES | 201 HIGH RIDGE RD MAIL STOP MS2953 2158 STAMFORD, CT 06927 | ENGINE LEASE, LONG TERM S/N 733792; A/C 380-3 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | GLOBAL BENEFITS GROUP (GBG) | 2600 TOWNE CENTRE DR STE 100 FOOTHILL RANCH, CA 92601 | BOUND RISK CONFIRMATION AGREEMENT REFERENCE W3514STD | $0.00 |
| WORLD AIRWAYS, INC. | GLOBAL SHARED SERVICES, INC. | 101 WORLD DR PEACHTREE CITY, GA 30269 | MANAGEMENT SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | HAECO | 80 S PERIMETER RD HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | HAECO | 80 S PERIMETER RD HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | AMENDMENT 1 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | HAECO | 80 S PERIMETER RD HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | AMENDMENT 3 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | HAECO | 80 S PERIMETER RD HONG KONG INTERNATIONAL AIRPORT LANTAU, HONG KONG | AMENDMENT 4 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | HAMILTON SUNDSTRAND CORP. | ONE HAMILTON RD WINDSOR LOCKS, CT 06096 | HAMILTON SUNDSRAND TECHNICAL PUBLICATIONS AND DATA GTA | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | HANCOCK, ASKEW AND CO LLP | 1870 THE EXCHANGE SE STE 235 ATLANTA, GA 30339 | LETTER RE SCOPE OF WORK | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | HILLSBOROUGH COUNTY AVIATION AUTHORITY (TPA) | 4100 GEORGE J BEAN PKWY TAMPA INTERNATIONAL AIRPORT STE 3311 TAMPA, FL 33607 | OPERATING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | HONEYWELL INTERNATIONAL, INC. | 179 COVERED BRIDGE DR SMYRNA, GA 30082 | SERVICE AGREEMENT FOR NAV DATA BASE AGREEMENT # 20001031D | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | HONEYWELL INTERNATIONAL, INC. | 179 COVERED BRIDGE DR SMYRNA, GA 30082 | WHEEL AND BRAKE SERVICE AGREEMENT | $512,984.29 |
| WORLD AIRWAYS, INC. | HYDRO PALACE (DERMUL OST) | AGENCE DERMUL NV KANTOOR MARIAKERKE ZEEDIJK 138 BUS 28 OOSTENDE, 08400 BE | APARTMENT LEASE | $0.00 |
| WORLD AIRWAYS, INC. | HYDRO PALACE (DERMUL OST) | AGENCE DERMUL NV KANTOOR MARIAKERKE ZEEDIJK 138 BUS 28 OOSTENDE, 08400 BE | APARTMENT LEASE | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | HYDRO PALACE (DERMUL OST) | AGENCE DERMUL NV KANTOOR MARIAKERKE ZEEDIJK 138 BUS 28 OOSTENDE, 08400 BE | APARTMENT LEASE | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | IAR INTERTAX AIRLINE REPRESENTATION GMBH | AN DER DAMMHEIDE 10 60486 FRANKFURT AM MAIN DEUTSCHLAND, 60486 GERMANY | REPRESENTATION AGREEMENT FOR AIR TRAVEL TAX | $0.00 |
| WORLD AIRWAYS, INC. | IAR INTERTAX AIRLINE REPRESENTATION GMBH | AN DER DAMMHEIDE 10 60486 FRANKFURT AM MAIN DEUTSCHLAND, 60486 GERMANY | REPRESENTATION AGREEMENT FOR AIR TRAVEL TAX | $0.00 |
| WORLD AIRWAYS, INC. | INTERNATIONAL AIRCRAFT ASSOC., INC. | 10875 MARKS WAY MIRAMAR, FL 33025 | MATERIAL CONSIGNMENT AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ISRAEL AEROSPACE INDUSTRIES | BEDEK AVIATION GROUP BEN GURION INTERNATIONAL AIRPORT , 70100 ISRAEL | AIRCRAFT MAINTENANCE AND MODIFICATION AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | MASTER SERVICES AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | AMENDMENT1 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | SERVICES SUPPLEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | MASTER SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | AMENDMENT 1 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | JEPPESON SANDERSON, INC | 55 INVERNESS DR E ENGLEWOOD, CO 80112 | AMENDMENT 2 TO MASTER SERVICES AGREEMENT | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | KUWAIT AVIATION FUELING COMPANY | OLD AIRPORT ST PO BOX 1654 SAFAT, 13017 KUWAIT | AGREEMENT FOR SALE OF AVIATION PRODUCTS | $0.00 |
| WORLD AIRWAYS, INC. | KUWAIT AVIATION FUELING COMPANY | OLD AIRPORT ST PO BOX 1654 SAFAT, 13017 KUWAIT | AGREEMENT FOR SALE OF AVIATION PRODUCTS | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | LASALLE SOLUTIONS | 6111 N RIVER RD ROSEMONT, IL 60018 | SETTLEMENT & GENERAL RELEASE AGREEMENT | $1,158.00 |
| GLOBAL AVIATION HOLDINGS INC. | LIBERTY MUTUAL INSURANCE COMPANY | 175 BERKLEY ST BOSTON, MA 02116 | GROUP SAVINGS PLUS | $0.00 |
| WORLD AIRWAYS, INC. | LUFTHANSA SHJ | LUFTHANSA TECHNIK LOGISTIK GMBH FRANKFURT BRANCH FRANKFURT, 60546 GERMANY | IATA STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG, 22335 GERMANY | AGREEMENT ON TECHNICAL SERVICES | $217,074.07 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 4 TO AGREEMENT ON TECHNICAL SERVICES | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 5 TO AGREEMENT ON TECHNICAL SERVICES | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AGREEMENT ON TECHNICAL SERVICES - COMPONENT SUPPORT AMENDMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AGREEMENT ON TECHNICAL SERVICES | $575,524.21 |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 1 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 3 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 4 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 5 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 6 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 7 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| WORLD AIRWAYS, INC. | LUFTHANSA TECHNIK AG | DEPT HAM UH B 22335 HAMBURG HAMBURG,  22335 GERMANY | AMENDMENT 8 TO THE IMPLEMENTATION CONTRACT ON TECHNICAL SERVICES TO THE "FRAMEWORK AGREEMENT" | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | MARYLAND AVIATION ADMINISTRATION / MARYLAND DOT | PO BOX 8766 BWI AIRPORT, MD 21240-0766 | CONTRACT FOR CONDUCT OF COMMERCIAL FLIGHTS OPERATIONS AT BWI AIRPORT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | MARYLAND AVIATION ADMINISTRATION / MARYLAND DOT | PO BOX 8766 BWI AIRPORT, MD 21240-0766 | CONTRACT FOR CONDUCT OF COMMERCIAL FLIGHTS OPERATIONS AT BWI AIRPORT | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| NORTH AMERICAN AIRLINES, INC. | MCNEIL TECHNOLOGIES, INC. D/B/A AECOM FEDERAL SERVICES GROUP NATIONAL SECURITY PROGRAMS | 6564 LOISDALE COURT, SUITE 900 SPRINGFIELD, VA 22051 ATTENTION: SONYA FORD, DIRECTOR OF CONTRACTS & PRICING | TEAMING AGREEMENT EFFECTIVE DECEMBER 15, 2010 | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | MEDAIRE, INC. | 1250 W WASHINGTON ST STE 442 TEMPE, AZ 85281 | MEDLINK IN-FLIGHT AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | MEDAIRE, INC. | 1250 W WASHINGTON ST STE 442 TEMPE, AZ 85281 | COMMERCIAL AVIATION COMPREHENSIVE CREW SUPPORT AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | MERRILL LYNCH TRUST CO | 701 B ST FL NO 24 SAN DIEGO, CA 92101 | SERVICE AGREEMENTS ACCOUNT NUMBERS 20404L0401 AND 20405508 | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | MESSIER-BUGATTI | SWIFT CODE SOGE US33 VILLACOUBLAY,  78140 FRANCE | AIRCRAFT WHEEL & BRAKE REPAIR AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | MESSIER-BUGATTI-TRACER | 1600 W CORNELL ST MILWAUKEE, WI 53209 | AIRCRAFT WHEEL & BRAKE REPAIR AND OVERHAUL AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | METLIFE HYATT LEGAL PLAN - GLAH | PO BOX 360229 PITTSBURG, PA 15251-6229 | HYATT LEGAL PLANS AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | METROPOLITAN PROPERTY AND CASUALTY INS. CO. | 10 S LASALLE ST STE 3350 CHICAGO, IL 60603 | GROUP INSURANCE PROGRAM AGREEMENY | $0.00 |
| WORLD AIRWAYS, INC. | METROPOWER | 1703 WEBB DR NORCROSS, GA 30071 | SERVICE CONTRACTOR AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | METROPOWER | 1703 WEBB DR NORCROSS, GA 30071 | AMENDMENT 1 TO SERVICE CONTRACTOR AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | MICROSOFT (SHI) | ONE MICROSOFT WAY REDMOND, WA 98052 | VOLUME LICENSE | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | MILLIMAN | 10000 NORTH CENTRAL EXPRESSWAY SUITE 1500 NORTH CENTRAL EXPRESSWAY DALLAS, TX 75231 | RETIREMENT PLAN SERVICE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | MILLIMAN | 10000 NORTH CENTRAL EXPRESSWAY SUITE 1500 NORTH CENTRAL EXPRESSWAY DALLAS, TX 75231 | TARGET BENEFIT PLAN SERVICE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | NADE | 2301 N PARHAM RD STE 5 RICHMOND, VA 23229 | CONTRACT FOR SERVICES | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | NADE | 2301 N PARHAM RD STE 5 RICHMOND, VA 23229 | ADDENDUM | SEE ABOVE |
| WORLD AIRWAYS, INC. | NAV CANADA | 90 SPARKS ST OTTAWA ONT, ON K1P 5L6 CANADA | PORTAL LICENSE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | NAV TECH | 295 HAGEY BLVD STE 200 WATERLOO, ON N2L 6R5 CANADA | MASTER AGREEMENT FLIGHT OPERATIONS SERVICES | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | NUMERA SOFTWARE SERVICES | 2202 N WESTSHORE BLVD STE 650 TAMPA, FL 33607 | NUMERA SOFTWARE PROFESSIONAL SERVICES MASTER AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | ORLANDO AVIATION AUTHORITY | GREATER ORLANDO AVIATION AUTHORITY ONE AIRPORT BLVD ORLANDO, FL 32827 | NON-SIGNATORY AIRLINE OPERATING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ORLANDO AVIATION AUTHORITY | GREATER ORLANDO AVIATION AUTHORITY ONE AIRPORT BLVD ORLANDO, FL 32827 | NON SIGNATORY AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | SERVICE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | PAETEC COMMUNICATIONS | THREE MICROSOFT CTR 6801 MORROSON BLVD CHARLOTTE, NC 28211 | AMENDMENT TO AGREEMENT | SEE ABOVE |
| NORTH AMERICAN AIRLINES, INC. | PAN AM INTL FLIGHT ACADEMY | 5000 NW 36th St Miami, FL 33166 | FLIGHT TRAINING SERVICES AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | PAN AM INTL FLIGHT ACADEMY | 5000 NW 36th St Miami, FL 33166 | AMENDMENT 1 TO THE FLIGHT TRAINING SERVICE AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | PAN AM INTL FLIGHT ACADEMY | 5000 NW 36th St Miami, FL 33166 | SIMULATOR PROCUREMENT AND UTILIZATION AGREEMENT | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | PEAK 10 DATA CENTER SOLUTIONS | 2775 NORTHWOODS PKWY NW NORCROSS, GA 30071 | MASTER SERVICE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | PENNIMAN & BROWNE, INC. | 6252 FALLS RD BALTIMORE, MD 21209 | SAMPLING & ANALYSIS OF DRINKING WATER ON WOA PLANES @ BWI AIRPORT | $0.00 |
| WORLD AIRWAYS, INC. | PHUKET AIRLINES | 1166 71 25th A Fl Lumpini tower BLDG Rama 4 Rd Thungmahamek Sathorn, 10120 Bangkok | ANNEX B.1.0. TO THE STANDARD GROUND HANDLING AGREEMENT | $25,000.00 |
| NORTH AMERICAN AIRLINES, INC. | PORT AUTHORITY OF NY AND NJ | JFK INTERNATIONAL AIRPORTPROPERTIES AND COMM DEVEL BUILDING 14 JAMAICA, NY 11430 | FLIGHT FEES AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | PORT AUTHORITY OF NY AND NJ | JFK INTERNATIONAL AIRPORTPROPERTIES AND COMM DEVEL BUILDING 14 JAMAICA, NY 11430 | FLIGHT FEES AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | PORT OF SEATTLE | P.O. Box 1209 Seattle, WA 98111 | SEATAC INTERNATIONAL AIRPORT OPERATING PERMIT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | PORTFOLIO EVALUATIONS, INC. (PEI) | SOMERSET HILLS CORPORATE CTR 15 INDEPENDENCE BLVD 4TH FL WARREN, NJ 07059 | INVESTMENT CONSULTING SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | PORTFOLIO EVALUATIONS, INC. (PEI) | SOMERSET HILLS CORPORATE CTR 15 INDEPENDENCE BLVD 4TH FL WARREN, NJ 07059 | INVESTMENT CONSULTING SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | PRATT & WHITNEY | 400 MAIN STREET M S 124 18 EAST HARTFORD, CT 06108 | MASTER GTA | $0.00 |
| WORLD AIRWAYS, INC. | PRATT & WHITNEY TECH PUBLICATIONS | 400 MAIN ST MAIL STOP132 21 MAIL STOP 132 21 EAST HARTFORD, CT 06108 | P & W TECHNICAL PUBLICATIONS GTA | TBD (NEGOTIATIONS PENDING) |
| NORTH AMERICAN AIRLINES, INC. | PRIMARY OBJECT, INC. | 3011 COMMUNITY AVE LACRESENTA, CA 91214 | CASS 2.0 SOFTWARE END USER LICENSE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | PUREWORKS, INC. DBA PURESAFETY | 1321 MURFREESBORO RD STE 200 NASHVILLE, TN 37217 | SERVICE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | RACKSPACE | PO Box 730759 Dallas, TX 75373-0759 | ASSIGNMENT AND ASSUMPTION AGREEMENT DATED 1/08/09 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | REVIMA APU SAS | 1 AVE DU LATHAM 47 BP 12 CAUDEBEC EN CAUX, 76490 FRANCE | MAINTENANCE, REPAIR AND OVERHAUL AGREEMENT | $75,000.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | RICOH | 2450 COMMERCE AVE STE 100 DULUTH, GA 30096 | ORDER AGREEMENT FOR QUOTE 821798 | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | ROYAL ASCOT (DERMUL OST) | ZEEDIJK 138 BUS 28 OOSTENDE,  B-8400 BELGIUM | LEASE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ROYAL PALACE (DERMUL OST) | ZEEDIJK 138 BUS 28 OOSTENDE,  B-8400 BELGIUM | LEASE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | SAFEGUARD WORLD INTERNATIONAL | TRUST CTR 1209 ORANGE ST WILLMINGTON, DE 19801 | AGREEMENT FOR INTERNATIONAL PROFESSIONAL EMPLOYMENT OUTSOURCING SERVICES | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | SAFETY OPERATING SYSTEMS | 212 STATE RT 94 STE 2-E VERNON, NJ 07462-3324 | CONSULTING AGREEMENT | $11,794.09 |
| GLOBAL AVIATION HOLDINGS INC. | SAFETY OPERATING SYSTEMS | 212 STATE RT 94 STE 2-E VERNON, NJ 07462-3324 | AMENDMENT 1 TO THE CONSULTING AGREEMENT | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | SAFETY OPERATING SYSTEMS | 212 STATE RT 94 STE 2-E VERNON, NJ 07462-3324 | AMENDMENT 2 TO THE CONSULTING AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | SAN FRANCISCO INTERNATIONAL AIRPORT | PO BOX 8097 SAN FRANCISCO, CA 94128 | PERMIT SAN FRANCISCO INTERNATIONAL AIRPORT | $0.00 |
| WORLD AIRWAYS, INC. | SANDRA HARDING | 21 LOWER EIGHT MILE RD MELBORNE, KY 41054 | CONSULTANT AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | SANDRA HARDING | 21 LOWER EIGHT MILE RD MELBORNE, KY 41054 | AMENDMENT 1 TO CONSULTANT AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | SATCOM DIRECT | 1901 HWY A1A SATELLITE BEACH, FL 32937 | CUSTOMER SERVICE AGREEMENT DATED 8/21/09 | $0.00 |
| WORLD AIRWAYS, INC. | SHANGHAI FOREIGN AVIATION SERVICE CORP. (FASCO) | 6F 99 HAI TIAN SAN RD PUDONG INTL AIRPORT SHANGHAI, CHINA | STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | SHANGHAI FOREIGN AVIATION SERVICE CORP. (FASCO) | 6F 99 HAI TIAN SAN RD PUDONG INTL AIRPORT SHANGHAI, CHINA | AMENDMENT 1 TO THE STANDARD GROUND HANDLING AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | SHANGHAI FOREIGN AVIATION SERVICE CORP. (FASCO) | 6F 99 HAI TIAN SAN RD PUDONG INTL AIRPORT SHANGHAI, CHINA | AMENDMENT 2 TO THE STANDARD GROUND HANDLING AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | SHANGHAI FOREIGN AVIATION SERVICE CORP. (FASCO) | 6F 99 HAI TIAN SAN RD PUDONG INTL AIRPORT SHANGHAI, CHINA | AMENDMENT 3 TO THE STANDARD GROUND HANDLING AGREEMENT | SEE ABOVE |
| WORLD AIRWAYS, INC. | SHANGHAI PUDONG INTERNATIONAL AIRPORT PUBLIC CARGO TERMINAL CO. (PACTL) | PACTL W 501 W He Bin Rd Shanghai Pudong Intl Airport Shanghai,  201207 China | STANDARD GROUND HANDLING AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | SIGNATURE FLIGHT SUPPORT CORP. (ASIG) | 201 S ORANGE AVE STE 1100A ORLANDO, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | SIGNATURE FLIGHT SUPPORT CORP. (ASIG) | 201 S ORANGE AVE STE 1100A ORLANDO, FL 32801 | IATA STANDARD GROUND HANDLING AGREEMENT | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | SKILLSOFT DIRECT | 107 NORTHEASTERN BLVD NASHUA, NH 03062 | MASTER LICENSE AGREEMENT | $0.00 |
| GLOBAL SHARED SERVICES, INC. | SKY CHEFS, INC. | 6191 N STATE HWY IRVING, TX 75038 | CONSENT TO SUBLEASE | $0.00 |
| GLOBAL SHARED SERVICES, INC. | SKY CHEFS, INC. | 6191 N STATE HWY IRVING, TX 75038 | CATERING AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | SKYTANKING USA, INC. | 910 SE 17 ST STE 201 FT LAUDERDALE, FL 33316 | INTO-PLANE FUELING SERVICE AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | SOUTHERN REFRESHMENT SERVICES | 2527 COMMERCE PL TUCKER, GA 30084 | SERVICE CONTRACTOR AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | STATE OF FLORIDA | 1940 N MONROE ST 1940 NORTH MONROE STREET TALLAHASSEE, FL 32398-0783 | QUALIFIED TARGET INDUSTRY TAX REFUND AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | STATE OF FLORIDA | 1940 N MONROE ST 1940 NORTH MONROE STREET TALLAHASSEE, FL 32398-0783 | STATE OF FLORIDA LIQUOR LICENSE | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | STATE OF HAWAII | DEPT OF COMMERCE AND CONSUMER AFFAIRS BUSINESS REGISTRATION DIVISION HONOLULU, HI 96810 | LEASE EXTENSION AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | STATE OF HAWAII | DEPT OF COMMERCE AND CONSUMER AFFAIRS BUSINESS REGISTRATION DIVISION HONOLULU, HI 96810 | LEASE EXTENSION AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL SHARED SERVICES, INC. | STERLING INFOSYSTEMS | 249 W 17TH ST NEW YORK, NY 10011 | SERVICE AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | STS ENGINEERING SOLUTIONS | 2000 NE JENSEN BEACH BLVD JENSEN BEACH, FL 34957 | AGREEMENT FOR ENGINEERING SERVICES | TBD (NEGOTIATIONS PENDING) |
| GLOBAL AVIATION HOLDINGS INC. | TEAM SAI | 1003 VIRGINIA AVE STE 300 ATLANTA, GA 30354 | MASTER SERVICES AGREEMENT | $127,001.98 |
| GLOBAL AVIATION HOLDINGS INC. | TEAM SAI | 1003 VIRGINIA AVE STE 300 ATLANTA, GA 30354 | EXHIBIT A STATEMENT OF WORK | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | TEAM SAI | 1003 VIRGINIA AVE STE 300 ATLANTA, GA 30354 | STATEMENT OF WORK | SEE ABOVE |
| WORLD AIRWAYS, INC. | TED STEVENS ANCHORAGE INTERNATIONAL AIRPORT | 1031 West 4th Ave, Suite 200 Anchorage, AK 99501 | OPERATING AND TERMINAL SPACE PERMIT | TBD (NEGOTIATIONS PENDING) |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | TEKSYSTEMS, INC. | 100 E KIRK AVE 2ND FL ROANOKE, VA 24011 | STAFFING SERVICES AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | TES PARTS LIMITED | AVIATION HOUSE BROCASTLE AVE BRIDGEND,  CF313XR WALES | ENGINE LEASE GENERAL TERMS AGREEMENT, DATED 9/9/2009 | $0.00 |
| WORLD AIRWAYS, INC. | THE MITRE CORPORATION | 7515 COLSHIRE DR MCLEAN, VA. 22102 | NON-REIMBURSABLE COOPERATIVE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | THOMSON REUTERS (FORMERLY TAXSTREAM) | 121 RIVER ST HOBOKEN NJ 07030 HOBOKEN, NJ 07030 | END USER LICENSE AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | THOMSON REUTERS (FORMERLY TAXSTREAM) | 121 RIVER ST HOBOKEN NJ 07030 HOBOKEN, NJ 07030 | ADDENDUM | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | THOMSON REUTERS (FORMERLY TAXSTREAM) | 121 RIVER ST HOBOKEN NJ 07030 HOBOKEN, NJ 07030 | ONESOURCE SOFTWARE AND SERVICES AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | TLX, INC. | 7944 E BECK LN STE 220 BANK WELLS FARGO BANK AZ SCOTTSDALE, AZ 85260 | BUSINESS SERVICES AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | TRANSIT CENTER, INC. | 1065 AVE OF THE AMERICAS NEW YORK, NY 10018 | PREMIUM TRANSITCHEK PROGRAM | $0.00 |
| WORLD AIRWAYS, INC. | TRINOM BUSINESS APARTMENTS | MARKGRAFENSTRASSE 10 LEIPZIG,  04109 GERMANY | TENANCY AGREEMENT | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | ULTRAMAIN | 7500 JEFFERSON ST NE COURTYARD II STE 212 ALBUQUERQUE, NM 87109 | PROFESSIONAL SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | ULTRAMAIN | 7500 JEFFERSON ST NE COURTYARD II STE 212 ALBUQUERQUE, NM 87109 | PROFESSIONAL SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | UNITED AIRLINES, INC. | 1200 E ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | UNITED SERVICES FLIGHT SIMULATOR DRY LEASE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| WORLD AIRWAYS, INC. | UNITED AIRLINES, INC. | 1200 E ALGONQUIN RD ELK GROVE TOWNSHIP, IL 60007 | AMENDMENT 1TO CONTRACT  145272 - 4 | TBD (NEGOTIATIONS PENDING) |
| GLOBAL SHARED SERVICES, INC. | UNITED AVIATION SERVICES | PLOT W 30 BOX 54482 DUBAI AIRPORT ZONE, DUBAI, UAE | CONSULTING AND NON DISCLOSURE AGREEMENT | TBD (NEGOTIATIONS PENDING) |
| GLOBAL SHARED SERVICES, INC. | UNITED AVIATION SERVICES | PLOT W 30 BOX 54482 DUBAI AIRPORT ZONE, DUBAI, UAE | AMENDMENT 1 TO THE CONSULTING AND NON DISCLOSURE AGREEMENT | SEE ABOVE |
| GLOBAL SHARED SERVICES, INC. | UNITED AVIATION SERVICES | PLOT W 30 BOX 54482 DUBAI AIRPORT ZONE DUBAI, UAE | AMENDMENT 2 TO THE CONSULTING AND NON DISCLOSURE AGREEMENT FOR JED ONLY | SEE ABOVE |
| GLOBAL AVIATION HOLDINGS INC. | UNITED HEALTH CARE | 22703 NETWORK PL CHICAGO, IL 60673-1227 | FINANCIAL RENEWAL NOTICE CONTRACT # 708825; GROUP VISION CARE PPO INSURANCE POLICY 70885 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| GLOBAL AVIATION HOLDINGS INC. | UNITED HEALTHCARE OPTUM | 22703 NETWORK PL CHICAGO, IL 60673-1227 | OPTUM SERVICES AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | UNITED TECHNOLOGIES CORP. PRATT & WHITNEY DIVISION | 400 MAIN ST MAIL STOP 132 21 OBG 2 EAST HARTFORD, CT 06108 | PW4460/62 THRUST UPGRADE FLEXIBILITY | $0.00 |
| WORLD AIRWAYS, INC. | UNIVERSAL RECYCLING TECHNOLOGIES LLC | 2535 BELOIT AVE JANESVILLE, WI 53546 | RECYCLING AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | UNIVERSAL TECHNICAL RESOURCE SERVICE, INC. WBAT | 950 KINGS HWY N STE 208 CHERRY HILL, NJ 08034 | CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT FOR WEB-BASED APPLICATION DEVELOPMENT TOOL | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | UNUM LIFE | PO BOX 740592 ATLANTA, GA 30374-0592 | LIFE AND DISABILITY POLICY # 593503; INCLUDES "NEW YORK DISABILITY BENEFITS LAW " POLICY 152350 AND NAA COCKPIT LONG TERM DISABILITY POLICY # 152349; SUPP INDIVIDUAL DISABILITY 146021 | $0.00 |
| WORLD AIRWAYS, INC. | US AIRWAYS, INC. | 4000 EAST SKY HARBOR BLVD. MAIL CODE: FTC-FCT PHOENIX, AZ 85034 ATTENTION: DEE RUSH | LETTER AGREEMENT - FY2013 USTRANSCOM CRAF CHARTER AIRLIFT SERVICES PROGRAM, DATED AS OF SEPTEMBER 23, 2011 | $0.00 |
| NORTH AMERICAN AIRLINES, INC. | US AIRWAYS, INC. | 4000 EAST SKY HARBOR BLVD. MAIL CODE: FTC-FCT PHOENIX, AZ 85034 ATTENTION: DEE RUSH | LETTER AGREEMENT - FY2013 USTRANSCOM CRAF CHARTER AIRLIFT SERVICES PROGRAM, DATED AS OF SEPTEMBER 23, 2011 | $0.00 |
| WORLD AIRWAYS, INC. | VERIZON WIRELESS LLC | ONE VERIZON PL ALPHARETTA, GA 30004 | MAJOR ACCOUNT AGREEMENT | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | Vista - COMPANION LIFE | 7909 Parkland Road, Suite 200, Columbia, SC 29223 | AGREEMENT FOR MEDICAL STOP LOSS PLAN | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | WELLS FARGO VISA | 7000 CENTRAL PKWY NE STE 600 ATLANTA, GA 30328 | WELLSONE COMMERCIAL CARD AGREEMENT | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION

DVB BANK SE | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111

AVIATION ASSET MANAGEMENT 80 CHEAPSIDE LONDON EC2V 6EE ENGLAND | AIRCRAFT OPERATING LEASE AGREEMENT DATED JULY 24, 2010 FOR B747-412, N742WA, S/N 27071 | $0.00 |

**EXHIBIT D**
Schedule of Executory Contracts and Unexpired Leases to be Assumed Under the Plan

| DEBTOR | COUNTERPARTY NAME | ADDRESS | AGREEMENT DESCRIPTION | ASSUMPTION OBLIGATION |
|---|---|---|---|---|
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION<br><br>DVB BANK SE | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111<br><br>AVIATION ASSET MANAGEMENT 80 CHEAPSIDE LONDON EC2V 6EE ENGLAND | AIRCRAFT OPERATING LEASE AMENDMENT 1 FOR B747-412, N742WA, S/N 27071 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AGREEMENT DATED DECEMBER 14, 2007 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 1 FOR FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 2 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 3 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 4 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 5 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| WORLD AIRWAYS, INC. | WELLS FARGO BANK NW NATIONAL ASSOCIATION | 299 SOUTH MAIN STREET MAC U1228-120 SALT LAKE CITY, UTAH 84111 | AIRCRAFT OPERATING LEASE AMENDMENT 6 FOR B747-400SF, N740WA, S/N 25700 | $0.00 |
| GLOBAL AVIATION HOLDINGS INC. | WORLD AIRWAYS, INC | 101 WORLD DR PEACHTREE CITY, GA 30269 | MANAGEMENT SERVICES AGREEMENT | $0.00 |

## Exhibit E

**Material Terms of the New First Lien Loan Credit Agreement**

**Global Aviation Holdings Inc., *et al.***
**Case No. 12-40783 (CEC) (Jointly Administered)**

**Summary of Terms and Conditions of the New First Lien Loan Credit Agreement** [1]

Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") have engaged in negotiations with the Lenders (as defined below) with respect to the terms of the New First Lien Loan Credit Agreement.  The following form term sheet provides an outline of terms for the New First Lien Loan Credit Agreement. The Debtors intend to finalize the terms of the New First Lien Loan Credit Agreement with the Lenders (as defined below), which will incorporate terms materially consistent with the terms set forth below.

| | |
|---|---|
| **Borrower:** | Global Aviation Holdings Inc. (the "***Borrower***"). |
| **Guarantors:** | All obligations under the New First Lien Loan Credit Agreement will be unconditionally guaranteed by the other Debtors (each a "***Guarantor***" and, together with the Borrower, the "***Loan Parties***"). |
| **Administrative Agent:** | To come. |
| **Lenders:** | Each of the lenders currently party to the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement dated as of March 27, 2012 (each a "***Lender***" and, collectively the "***Lenders***"). |
| **Principal Amount:** | The New First Lien Loan shall be in the principal amount of $95,000,000. |
| **Interest Rate:** | All amounts outstanding under the New First Lien Loan will bear interest of 10% per annum on a cash basis. |
| **Maturity Date:** | The maturity date of the New First Lien Loan will be (and all loans and obligations under the New First Lien Loan shall be repaid in full on) the date that is four and a half years from the Effective Date. |

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 7, 2012 [Docket No. 717] (as modified from time to time, the "***Plan***").

1

| | |
|---|---|
| **Security:** | All obligations of the Loan Parties to the Administrative Agent and the Lenders shall at all times be secured by a perfected lien on substantially all of the Loan Parties' assets. |
| **Representations and Warranties:** | The New First Lien Loan Credit Agreement will contain customary and appropriate representations and warranties by the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |
| **Covenants:** | The New First Lien Loan Credit Agreement will contain customary and appropriate affirmative and negative covenants by each of the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |
| **Events of Default:** | The New First Lien Loan Credit Agreement will contain customary and appropriate events of default by each of the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |

2

**Exhibit F**

**Material Terms of the New Second Lien Loan Credit Agreement**

**Global Aviation Holdings Inc.,** *et al.*
**Case No. 12-40783 (CEC) (Jointly Administered)**

**Summary of Terms and Conditions of the New Second Lien Loan Credit Agreement**[1]

Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") have engaged in negotiations with the Lenders (as defined below) with respect to the terms of the New Second Lien Loan Credit Agreement.  The following form term sheet provides an outline of terms for the New Second Lien Loan Credit Agreement. The Debtors intend to finalize the terms of the New Second Lien Loan Credit Agreement with the Lenders (as defined below), which will incorporate terms materially consistent with the terms set forth below.

| | |
|---|---|
| **Borrower:** | Global Aviation Holdings Inc. (the "***Borrower***"). |
| **Guarantors:** | All obligations under the New Second Lien Loan Credit Agreement will be unconditionally guaranteed by the other Debtors (each a "***Guarantor***" and, together with the Borrower, the "***Loan Parties***"). |
| **Administrative Agent:** | To come. |
| **Lenders:** | Each of the lenders currently party to the Senior Secured Indenture with respect to the 14% Senior Secured First Lien Notes Due 2013, dated as of August 13, 2009 (each a "***Lender***" and, collectively the "***Lenders***"). |
| **Principal Amount:** | The New Second Lien Loan shall be in the principal amount of $40,000,000. |
| **Interest Rate:** | All amounts outstanding under the New Second Lien Loan will bear interest of 3% per annum, with an option of a cash or pay-in-kind basis. |
| **Maturity Date:** | The maturity date of the New Second Lien Loan will be (and all loans and obligations under the New Second Lien Loan shall be repaid in full on) the date that is five years from the Effective Date. |

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 7, 2012 [Docket No. 717] (as modified from time to time, the "***Plan***").

1

2

| | |
|---|---|
| **Security:** | All obligations of the Loan Parties to the Administrative Agent and the Lenders shall at all times be secured by a perfected lien on all substantially all of the Loan Parties' assets, junior in priority to the New Revolver and the New First Lien Loan. |
| **Representations and Warranties:** | The New Second Lien Loan Credit Agreement will contain customary and appropriate representations and warranties by the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |
| **Covenants:** | The New Second Lien Loan Credit Agreement will contain customary and appropriate affirmative and negative covenants by each of the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |
| **Events of Default**: | The New Second Lien Loan Credit Agreement will contain customary and appropriate events of default by each of the Loan Parties (with appropriate thresholds and exceptions appropriate for a loan of this type). |

K&E 24435087.1

## Exhibit G

## Material Terms of the New Revolving Credit Agreement

**Global Aviation Holdings Inc.,** *et al.*
**Case No. 12-40783 (CEC) (Jointly Administered)**

**Summary of the New Revolving Credit Agreement**[1]

As discussed in the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Pay Certain Due Diligence Costs Incurred by Prospective Exit Lenders* [Docket No. 730], Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*") are currently in the process of marketing the New Revolver, and as a result have yet to finalize many of the specific terms.  The Debtors have identified at least three potential lenders and received Bankruptcy Court approval to pay up to $350,000 to the potential lenders, allowing them to complete legal and business due diligence.  Once the New Revolver is secured, the Debtors intend to finalize the terms of the New Revolving Credit Agreement, the material terms of which will be filed with the Bankruptcy Court pursuant to the terms of the Plan.

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 7, 2012 [Docket No. 717] (as modified from time to time, the "*Plan*").

1

**Exhibit H**

**Material Terms of the New Intercreditor Agreement**

**Global Aviation Holdings Inc.,** *et al.*
**Case No. 12-40783 (CEC) (Jointly Administered)**

**Summary of the New Intercreditor Agreement**[1]

Global Aviation Holdings Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***") are currently engaged in negotiations with the proposed lenders under the New First Lien Loan Credit Agreement and the New Second Lien Loan Credit Agreement with respect to the terms of the New Intercreditor Agreement. The Debtors are still in the process of marketing the New Revolver and, as a result, have yet to finalize many of the specific terms. Once the New Revolver is secured, the Debtors intend to finalize the terms of the New Intercreditor Agreement, which will govern the priority and rights among the New Revolving Credit Agreement, the New First Lien Loan Credit Agreement and the New Second Lien Loan Credit Agreement.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the *First Amended Joint Plan of Reorganization of Global Aviation Holdings Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 7, 2012 [Docket No. 717] (as modified from time to time, the "***Plan***").

K&E 24435100.1

**<u>Exhibit I</u>**

**New Employment Agreements**

[To come.]

**<u>Exhibit J</u>**

**Management Equity Incentive Plan**

[To come.]

## Exhibit K

**Employee Equity Plan**

[To come.]

**<u>Exhibit L</u>**

**New Shareholders Agreement**

**STOCKHOLDERS AGREEMENT**

DATED AS OF _____, 2012

among

All Equity Holders of

GLOBAL AVIATION HOLDINGS INC.

and

GLOBAL AVIATION HOLDINGS INC.

---

Solely for the purpose of Sections 1.4, 3.2 and 4

[THE SECOND LIEN LENDERS]

---

NY\5607392.6

**Table of Contents**

Page

STOCKHOLDERS AGREEMENT ....................................................................................................1

RECITALS ........................................................................................................................................1

ARTICLE 1. Restrictions on Transfer.............................................................................................1

    1.1    General Restrictions on Transfer ...................................................................................1
    1.2    Compliance with Securities Laws.................................................................................2
    1.3    Tag-Along Rights.........................................................................................................3
    1.4    Preemptive Rights........................................................................................................7
    1.5    [Reserved] ....................................................................................................................9
    1.6    Cooperation by the Company .......................................................................................9
    1.7    Improper Transfer ......................................................................................................10
    1.8    Involuntary Transfer ..................................................................................................10

ARTICLE 2. Drag-Along Sales.....................................................................................................10

    2.1    Right of Stockholders to Require Sale........................................................................10
    2.2    Drag-Along Notice.....................................................................................................11
    2.3    Delivery of Certificates; Custody Agreement and Power of Attorney .................11
    2.4    Consideration .............................................................................................................11
    2.5    Cooperation................................................................................................................12
    2.6    Conditions of Sale......................................................................................................12

ARTICLE 3. Registration Rights...................................................................................................12

    3.1    Definitions.................................................................................................................12
    3.2    Piggyback Registration ..............................................................................................13
    3.3    Registration Statement................................................................................................14
    3.4    Registration Procedures .............................................................................................14
    3.5    Holdback Agreements.................................................................................................18
    3.6    Registration Expenses ................................................................................................18
    3.7    Restrictions on Use of Registration Statement ...........................................................19
    3.8    Conditions to Holder's Rights ...................................................................................19
    3.9    Indemnification..........................................................................................................20
    3.10    Reports Under Securities Exchange Act of 1934 .................................................24
    3.11    Termination of Registration Rights ..........................................................................24
    3.12    Certification ..............................................................................................................24

ARTICLE 4. Reports.....................................................................................................................25

    4.1    Quarterly Financial Statements...................................................................................25
    4.2    Annual Financial Statements ......................................................................................25

i

4.3     Other Information .................................................................................................25

ARTICLE 5. Representations and Warranties..................................................................................26

     5.1     Representations and Warranties of the Company...................................................26

ARTICLE 6. Termination of Agreement..........................................................................................26

ARTICLE 7. General .......................................................................................................................27

     7.1     Recapitalization, Exchanges, etc. Affecting the Shares........................................27
     7.2     Injunctive Relief....................................................................................................27
     7.3     Notices ..................................................................................................................27
     7.4     Legend...................................................................................................................27
     7.5     Transferees Bound ................................................................................................28
     7.6     Amendment; Waiver.............................................................................................28
     7.7     Additional Documents ..........................................................................................29
     7.8     No Third-Party Benefits........................................................................................29
     7.9     Successors and Assigns.........................................................................................29
     7.10    Severability ...........................................................................................................29
     7.11    Integration.............................................................................................................29
     7.12    Governing Law .....................................................................................................30
     7.13    Headings ...............................................................................................................30
     7.14    Information for Notices.........................................................................................30
     7.15    Counterparts .........................................................................................................30
     7.16    Consent to Jurisdiction.........................................................................................30
     7.17    No Inconsistent Agreements .................................................................................30
     7.18    Certain Distributions Exempt ...............................................................................31
     7.19    Certain Limitations ...............................................................................................31
     7.20    Information Regarding Beneficial Ownership.......................................................31
     7.21    Waiver of Jury Trial..............................................................................................31
     7.22    Computation of Time.............................................................................................31
     7.23    Confidentiality ......................................................................................................31

ARTICLE 8. Union Trust Shares......................................................................................................32

     8.1     Issuance of Additional Shares to the Union Trust ................................................32
     8.2     No Fractional Shares.............................................................................................33
     8.3     Definitions.............................................................................................................33

ARTICLE 9. AFFILIATE TRANSACTIONS ..................................................................................34

     9.1     Affiliate Transactions............................................................................................34
     9.2     Exceptions.............................................................................................................34
     9.3     Definitions...........................................................**Error! Bookmark not defined.**

ARTICLE 10. SHARE REPURCHASES ..........................................................................................35

ii

        10.1    Affilate Share Repurchases ..................................................................................35

ARTICLE  11.  LIMITATIONS  ON  THE  MANAGEMENT  EQUITY  INCENTIVE
        PLAN ...............................................................................................................................35

        11.1    Management Equity Incentive Plan ......................................................................35
        11.2    Definitions ............................................................................................................36

ARTICLE 12. BOARD OF DIRECTORS ...................................................................................36

        12.1    Board Appointments .............................................................................................36
        12.2    Union Non-Voting Members ................................................................................37
        12.3    Expenses ...............................................................................................................37
        12.4    Union Right to Board Appointments ....................................................................37
        12.5    General ..................................................................................................................38
        12.6    Definitions .............................................................................................................38

NY\5607392.6

**STOCKHOLDERS AGREEMENT**

THIS STOCKHOLDERS AGREEMENT (this "Agreement") is entered into as of _____, 2012, by and among all equity holders of Global Aviation Holdings Inc., GLOBAL AVIATION HOLDINGS INC., a Delaware corporation (the "Company") and, solely for the purposes of Sections 1.4, 3.2 and 4, the [holders of the Second Lien Warrants and the Second Lien Lender SAR and their permitted assigns and transferees] (the "Second Lien Lenders") and the [holders of the New Warrants] (the "New Warrant Holders").  Each of the parties to this Agreement (other than the Company) and any other Person (as defined in Section 1.2.4) who shall become a party to or become bound by the terms of this Agreement after the date hereof is sometimes hereinafter referred to as a "Stockholder."

**RECITALS**

1.    Following the consummation of [the Transactions], (i) [_____] will collectively own [__] shares of Class A Common Stock, par value $.01 per share, of the Company (the "Class A Common Stock"), [__] shares of Class B Common Stock, par value $.01 per share, of the Company (the "Class B Common Stock") and [__] shares of Class C Common Stock, par value $.01 per share, of the Company (the "Class C Common Stock"), and (ii) [_____] will own [__] shares of Class [__] Common Stock.  Shares of Class A Common Stock, Class B Common Stock and Class C Common Stock are collectively referred to as the "Common Shares" and Common Shares and any other Securities (as defined below) acquired hereafter pursuant to the provisions of Section 1.4 are collectively referred to as the "Shares".

2.    The Company and each of the Stockholders desire, for their mutual benefit and protection, to enter into this Agreement to set forth their respective rights and obligations with respect to their Shares (whether issued or acquired hereafter, including all Common Shares issuable upon the exercise of warrants, options or other rights to acquire Common Shares, or upon the conversion or exchange of any security).

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

ARTICLE 1.
RESTRICTIONS ON TRANSFER

1.1    General Restrictions on Transfer.

1.1.1    Each Stockholder agrees that it will not, directly or indirectly, sell, give, bequeath, transfer, assign or in any other way whatsoever dispose of (any such event, a "Transfer") or pledge or otherwise encumber (any such event, a "Pledge") any Shares now or hereafter at any time owned by such Stockholder (or any interest therein) to another Person, except for Permitted Transfers (as defined below) and Permitted Pledges (as defined below).

1.1.2    "Permitted Transfers" means any of the following:

1

(i)        Transfers of Shares by any Stockholder to an Affiliate of such Stockholder, irrespective of whether any monetary consideration is received in respect thereof,

(ii)        Transfers of Shares by any Stockholder not in violation of Section 1.3 or pursuant to Article 2 or Article 3,

(iii)        Transfers of Shares by any Stockholder as a result of a foreclosure under a Permitted Pledge,

provided that, prior to or contemporaneously with any Transfer by any Stockholder, the transferee shall deliver to the Company and [_____] an executed counterpart of this Agreement, upon which delivery such transferee thereby agrees to be bound by the terms of this Agreement (including, without limitation, the provisions of Section 1.7 and Article 2) to the extent that the transferring Stockholder is bound hereby and accepts the rights and obligations of such Stockholder set forth in this Agreement, all of which rights and obligations shall become those of such transferee upon the consummation of the applicable Transfer without any further act of any party hereto or of such transferee; provided, however, that the restrictions set forth in this Section 1.1 shall not apply to any sale or other Transfer of Shares pursuant to an effective registration statement under the Securities Act (as defined below).  Any transferee of Shares pursuant to a Permitted Transfer is called a "Transferee".

1.1.3    "Permitted Pledges" means any *bona fide* Pledge of Shares to a commercial bank, savings and loan institution, or any other regulated financial institution (each a "Lender") as security for any bona fide indebtedness of any Stockholder or of any Affiliate of any Stockholder to such Person (or to an Affiliate of such Person); provided that, prior to or contemporaneously with any such Pledge, each such Lender shall deliver to the Company a written agreement in form and substance reasonably satisfactory to the Company, that (i) upon any exercise of a foreclosure or similar right on Shares subject to a Pledge to such Lender, such Lender agrees to be bound by the terms of this Agreement (including, without limitation, the provisions of Section 1.7 and Article 2) to the extent that such Stockholder is bound hereby and accepts the rights and obligations of such Stockholder set forth in this Agreement, all of which rights and obligations shall become those of such Lender upon the exercise of a foreclosure or similar right by such Lender on the Shares subject to such Pledge without any further act of any party hereto or of such Lender and (ii) such Lender shall release the Shares subject to such Pledge in the event of a Drag-Along Sale prior to the exercise of foreclosure or similar right by such Lender with respect to such Shares.

1.2    Compliance with Securities Laws.

1.2.1    No Stockholder shall Transfer any Shares, and the Company shall not transfer on its books any Shares, unless:

(i)        such Transfer is pursuant to an effective registration statement under the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the Commission (as defined below) thereunder, all as the same shall be

2

in effect at the time (the "Securities Act"), and is in compliance with any applicable state securities or blue sky laws, or

(ii)      such Transfer is exempt from the registration and prospectus delivery requirements of the Securities Act and has been registered or qualified under (or is exempt from the registration and qualification requirements of) any applicable state securities or blue sky laws and such Stockholder shall have furnished the Company with an opinion of counsel, to the extent reasonably required by the Company, which opinion of counsel shall be in form and substance reasonably satisfactory to the Company, to the effect that no such registration is required because of the availability of an exemption from registration under the Securities Act and applicable state securities laws.

1.2.2    No Person or group of Persons acting together pursuant to a common plan or arrangement shall take any action or make any Transfer in each case, whether voluntary or involuntary, of record, by operation of law or otherwise of Shares to any Person (regardless of the manner in which such Person initially acquired such Shares), nor shall the Company issue, sell or otherwise transfer any Shares to any Person, if the Company reasonably determines that such Transfer would, if effected, result in the Company having 300 or more holders of record (as such concept is understood for purposes of Section 12(g) of the Exchange Act and any relevant rules promulgated thereunder), unless the Company is already subject to the reporting obligations under Sections 13 or 15(d) of the Exchange Act and any relevant rules promulgated thereunder. Any such prohibited action or Transfer shall be void, unless such Transfer is approved by the Board of Directors of the Company.

1.2.3    As used in this Agreement (other than in Section 2.4 and Article 9), the term "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.

1.2.4    For purposes of this Agreement, the term "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

1.2.5    As used in this Agreement, the term "Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or other agency or political subdivision thereof.

1.3      Tag-Along Rights.

1.3.1    Right to Participate in Sale.

If at any time any Stockholder or group of Stockholders proposes to enter into an agreement (or substantially contemporaneous agreements, whether or not with the same or affiliated Persons) that, if the actions contemplated by such agreement (or substantially contemporaneous agreements) were consummated, would result in the Transfer of a number of Shares that exceeds thirty percent (30%) of the Common Shares held in the aggregate by all Stockholders at such

3

NY\5607392.6

time (with any such attempted or purported Transfer being referred to as a "Tag-Along Sale"), then such Stockholder or group of Stockholders shall afford all other Stockholders (each individually a "Tag-Along Stockholder" and, collectively, the "Tag-Along Stockholders") the opportunity to participate proportionately in such Tag-Along Sale in accordance with this Section 1.3.

The number of Common Shares that each Tag-Along Stockholder will be entitled to include in such Tag-Along Sale (the "Tag-Along Allotment") shall be determined by multiplying:

> (A)     the number of Common Shares held by such Tag-Along Stockholder as of the close of business on the Tag-Along Notice Date (as hereinafter defined) by

> (B)     a fraction, the numerator of which shall equal the number of Common Shares proposed by the selling Stockholder(s) to be sold or otherwise disposed of pursuant to the Tag-Along Sale and the denominator of which shall equal the total number of Common Shares that are held by such selling Stockholder(s) as of the Tag-Along Notice Date (the "Seller Fraction"); provided, however, that if any party fails to elect to participate in a Tag-Along Sale, the applicable selling Stockholders(s) shall give notice of such failure to the other Tag-Along Stockholders.  Such notice shall be made by telephone and confirmed in writing within two (2) business days.  The other Tag-Along Stockholders shall have three (3) business days from the date such notice was given to agree to sell their *pro rata* share of any unsold portion.  For purposes of this Section 1.3.1, a Tag-Along Stockholder's *pro rata* share of any unsold portion shall be equal to the number of shares obtained by dividing (A) the Seller Fraction times the total number of Common Shares that are held by the parties that are not participating in the Tag-Along Sale by (B) the number of Tag-Along Stockholders that are participating in the Tag-Along Sale.

1.3.2     Sale Notice.

The relevant selling Stockholder(s) shall provide each Tag-Along Stockholder and the Company with written notice (the "Tag-Along Sale Notice") not less than thirty (30) days prior to the proposed date of the Tag-Along Sale (the "Tag-Along Sale Date", and the date on which the Tag-Along Sale Notice is sent is the "Tag-Along Notice Date").  Each Tag-Along Sale Notice shall be accompanied by a copy of any written agreement relating to the Tag-Along Sale and shall set forth:

> (i)     the name and address of each proposed Transferee of Common Shares in the Tag-Along Sale;

> (ii)     the number of Common Shares proposed to be Transferred by such Purchaser Parties;

4

(iii)    the proposed amount and form of consideration to be paid for such Common Shares and the terms and conditions of payment offered by each proposed Transferee;

(iv)    the Tag-Along Stockholder's Tag-Along Allotment assuming the Tag-Along Stockholder elected to sell the maximum number of Common Shares possible;

(v)    confirmation that the proposed transferee has been informed of the tag-along rights provided for herein and has agreed to purchase Common Shares from any Tag-Along Stockholder in accordance with the terms hereof; and

(vi)    the Tag-Along Sale Date.

1.3.3    Tag-Along Notice.

(i)    Any Tag-Along Stockholder wishing to participate in the Tag-Along Sale shall provide written notice (the "Tag-Along Notice") to the relevant selling Stockholder(s) no less than fifteen (15) days prior to the Tag-Along Sale Date.  The Tag-Along Notice shall set forth the number of Common Shares that such Tag-Along Stockholder elects to include in the Tag-Along Sale, which shall not exceed such Tag-Along Stockholder's Tag-Along Allotment.

(ii)    The Tag-Along Notice given by any Tag-Along Stockholder shall constitute such Tag-Along Stockholder's binding agreement to sell the Common Shares specified in the Tag-Along Notice on the terms and conditions applicable to the Tag-Along Sale; provided, however, that in the event that there is any material change in the terms and conditions of such Tag-Along Sale applicable to the Tag-Along Stockholder (including, but not limited to, any decrease in the purchase price that occurs other than pursuant to an adjustment mechanism set forth in the agreement relating to the Tag-Along Sale) after such Tag-Along Stockholder gives its Tag-Along Notice, then, notwithstanding anything herein to the contrary, (x) the applicable selling Stockholder(s) shall not complete such Tag-Along Sale until the third Business Day following the receipt of written notice by the Tag-Along Stockholders of such material change and (y) the Tag-Along Stockholder shall have the right to withdraw from participation in the Tag-Along Sale with respect to all of its Common Shares affected thereby.

(iii)    If the proposed transferee does not consummate the purchase of all of the Common Shares requested to be included in the Tag-Along Sale by any Tag-Along Stockholder on the same terms and conditions applicable to the selling Stockholder(s), then such selling Stockholder(s) shall not consummate the Tag-Along Sale of any of its Common Shares to such transferee, unless the Common Shares of such selling Stockholder(s) and the Tag-Along Stockholders to be sold are reduced or limited *pro rata* in proportion to the respective number of Common Shares actually sold in any such Tag-Along Sale and all other terms and conditions of the Tag-Along Sale are the same for such selling Stockholder(s) and the Tag-Along Stockholders.

5

(iv)     If a Tag-Along Notice from any Tag-Along Stockholder is not received by such selling Stockholder(s) prior to the end of the fifteen (15) day period specified above, such selling Stockholer(s) shall have the right to consummate the Tag-Along Sale without the participation of such Tag-Along Stockholder, but only on terms and conditions which are no more favorable in any material respect to such selling Stockholder(s) (and, in any event, at no greater a purchase price, except as the purchase price may be adjusted pursuant to the agreement relating to the relevant Tag-Along Sale) than as stated in the Tag-Along Sale Notice and only if such Tag-Along Sale occurs on a date within one-hundred-twenty (120) days of the Tag-Along Sale Date.  If such Tag-Along Sale does not occur within such one-hundred-twenty (120) day period, the Common Shares that were to be subject to such Tag-Along Sale thereafter shall continue to be subject to all of the restrictions contained in this Section 1.3.

1.3.4    Delivery of Certificates; Custody Agreement and Power of Attorney.

(i)     On the Tag-Along Sale Date, each Tag-Along Stockholder shall deliver a certificate or certificates for the Common Shares to be sold by such Tag-Along Stockholder in connection with the Tag-Along Sale, duly endorsed for transfer with signatures guaranteed, to the Transferee in the manner and at the address indicated in the Tag-Along Notice against delivery of the purchase price for such Common Shares.

(ii)     Notwithstanding the foregoing, in addition, each Tag-Along Stockholder participating in the Tag-Along Sale will, if requested by the relevant selling Stockholder(s), execute and deliver a custody agreement and power of attorney in form and substance reasonably satisfactory to such selling Stockholder(s) (a "Custody Agreement and Power of Attorney") with respect to the Common Shares which are to be included in the Tag-Along Sale pursuant hereto.  The Custody Agreement and Power of Attorney will provide that the Tag-Along Stockholder will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates representing such Common Shares (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank) and irrevocably appoint said custodian and attorney-in-fact as such Tag-Along Stockholder's agent and attorney-in-fact with full power and authority to act under a custody agreement and power of attorney on behalf of the such Tag-Along Stockholder with respect to the matters specified herein.

(iii)     Notwithstanding the provisions of this Section 1.3.4, a Tag-Along Stockholder may, at its option and in lieu of delivering a Custody Agreement and Power of Attorney, deliver to the relevant selling Stockholder(s) such other assurance as may be reasonably acceptable to such selling Stockholder(s) of such Tag-Along Stockholder's ability to complete the Tag-Along Sale on the Tag-Along Sale Date.

1.3.5    Exempt Transfers and Pledges.

The provisions of this Section 1.3 shall not apply to:

6

(i)        any sale or other disposition of Shares by one Stockholder to another Stockholder; or

(ii)       any sale or other disposition of Shares to the public pursuant to an effective registration statement under the Securities Act or pursuant to Rule 144 under the Securities Act, as such Rule may be amended from time to time, or any other similar regulation hereafter adopted by the Commission ("Rule 144"); or

(iii)      any Permitted Pledge.

1.4        Preemptive Rights.

Subject to the terms and conditions specified in this Section 1.4, the Company hereby grants to each Stockholder, each holder of New Warrants, each holder of New Warrant Shares, each holder of Second Lien Warrants, and each holder of Second Lien Warrant Shares (collectively, the "Preemptive Right Stockholders"), a right to participate in future issuances by the Company of its Securities (as hereinafter defined).  Each time the Company proposes in the future to issue any shares of, or securities convertible into or exercisable for any shares of, any of its common stock ("Common Stock Securities") or preferred stock ("Preferred Stock Securities", and together with the Common Stock Securities, the "Securities"), the Company shall give each Preemptive Right Stockholder an opportunity to purchase or subscribe for its *pro rata* share of the newly issued Securities in accordance with this Section 1.4.

1.4.1     Notice.

At least fifteen (15) business days prior to the proposed date of issuance of the Securities, the Company shall deliver a notice by certified mail ("Notice") to each Preemptive Right Stockholder stating (i) its *bona fide* intention to issue Securities, (ii) the number and type of Securities to be issued, and (iii) the price and terms (including, without limitation, any requirement to purchase additional securities of the Company or participate in a financing transaction in order to purchase or subscribe for the Securities to be issued), if any, upon which it proposes to issue such Securities.

1.4.2     Offer Periods; Terms of Sale.

At any time prior to the close of business on the seventh day after its receipt of delivery of the Notice, each Preemptive Right Stockholder may elect to purchase or obtain, at the price and on the terms specified in the Notice, up to that portion of (i) such Common Stock Securities specified in the Notice (if any) which equals the proportion that the number of Common Shares, issued and held, or issuable upon conversion and exercise of all convertible or exercisable securities then held, by such Preemptive Right Stockholder bears to the total number of Commons Shares then outstanding (assuming full conversion and exercise of all convertible or exercisable securities) and (ii) such Preferred Stock Securities specified in the Notice (if any) which equals the proportion that the number of Common Shares, issued and held, or issuable upon conversion and exercise of all convertible or exercisable securities then held, by such Preemptive Right Stockholder bears to the total number of Commons Shares then outstanding (assuming full conversion and exercise of all convertible or exercisable securities);

7

provided that, subject to [Section [__]], the [Trust] shall be entitled to transfer the preemptive rights described in this Section 1.4 and such transferee may exercise such preemptive rights on the terms described in this Section 1.4. The purchase or subscription by the Preemptive Right Stockholders, pursuant to this Section 1.4 shall be on the same price and other terms and conditions, including the date of sale or issuance, as are applicable to the purchasers or subscribers of the additional Securities whose purchases or subscriptions give rise to the preemptive rights described in this Section 1.4, which price and other terms and conditions shall be as stated in the relevant Notice.

### 1.4.3   Expiration of Offer Periods.

The Company may, during the 180-day period following the receipt of the Notice by each of the Preemptive Right Stockholders, issue the remaining unsubscribed portion of the Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than those specified in the Notice. If the Company does not enter into an agreement for the sale of the Securities within such period, or if such sale is not consummated by the earlier to occur of (x) the 90th day after the execution of an agreement for the sale of the Securities and (y) the 180th day following the receipt of the Notice by each of the Preemptive Right Stockholders, the right provided under this Section 1.4 shall be deemed to be revived and such Securities shall not be issued unless first reoffered to the Preemptive Right Stockholders in accordance with this Section 1.4.

### 1.4.4   Exceptions.

The preemptive rights set forth in this Section 1.4 shall not be applicable to:

(i)    the issuance or sale of Securities to employees (and their affiliated entities), consultants or directors pursuant to a stock option plan, restricted stock plan, stock purchase plan or any other equity incentive plan, arrangement or agreement;

(ii)    the issuance of Securities to the public pursuant to an effective registration statement under the Securities Act (including, without limitation, a Public Offering Event);

(iii)    the issuance of Securities in connection with a *bona fide* business acquisition (whether by merger, consolidation, sale of assets, sale or exchange of stock or otherwise) of, with, or by the Company (each an "Acquisition"), other than an Acquisition, by, with, or of a Person who is an Affiliate of the Company or any of the Preemptive Right Stockholders, unless such Acquisition is on terms no less favorable to the Company than those which could be obtained on an arm's-length basis from a non-Affiliate and the Company discloses to each of the Preemptive Right Stockholders in advance the material terms of such Acquisition and the nature of the Affiliate relationship and potential conflicts involved; provided, however, that in no event shall the names and identities of the investors in the relevant Affiliates or the applicable Preemptive Right Stockholders be required to be disclosed to the other Preemptive Right Stockholders;

8

(iv)    the issuance of Securities to financial institutions, bond purchasers or lessors in connection with any *bona fide* financing transaction, commercial credit arrangement, equipment financing or similar transaction (each, a "Financing Transaction"), other than any issuance of Securities to Affiliates of the Company or any of the Preemptive Right Stockholders in connection with a Financing Transaction pursuant to which (A) the aggregate number of Securities to be issued (together with the aggregate number of Securities previously issued pursuant to Financing Transactions involving Affiliates where the preemptive rights set forth in this Section 1.4 were not applicable due to the provisions of this Section 1.4.4(iv)) is equal to or greater than 3% of the issued and outstanding equity securities of the Company (assuming full conversion and exercise of all convertible or exercisable securities) and (B) such Affiliates: (x) are in the aggregate participating in at least a majority of such Financing Transaction or (y) hold an "Administrative Agent" position or similar position in such Financing Transaction; provided, that in the event that any of the Preemptive Right Stockholders elect to exercise their preemptive rights under this Section 1.4.4(iv) and participate in such a Financing Transaction, such Preemptive Right Stockholders shall execute an agreement in form and substance reasonably satisfactory to the Company that such Preemptive Right Stockholders will agree in the future to vote the portion of the Financing Transaction that they hold in same manner as the majority of non-Affiliates to the Financing Transaction vote their respective portions of the Financing Transaction;

(v)    the issuance of Securities pursuant to a stock split, stock dividend, combination, reorganization, recapitalization or similar event;

(vi)    the issuance of Securities in connection with a strategic partnership or alliance entered into by the Company relating to the operation of the Company's business and not for the primary purpose of raising capital; other than a strategic partnership or alliance that is with a Person that is an Affiliate of the Company or any of the Preemptive Rights Stockholders, unless such strategic partnership or alliance involving an Affiliate is on terms no less favorable to the Company than those which could be obtained on an arm's-length basis from a non-Affiliate and is not for the primary purpose of raising capital; and

(vii)    the issuance of Securities pursuant to any agreement in effect on the date of this Agreement;

so long as the Board of Directors of the Company has approved any such issuance of Securities.

1.5    [Reserved].

1.6    Cooperation by the Company.

The Company will provide reasonable assistance to any Stockholder seeking to sell its Shares; provided that the Company shall not be required to provide any confidential information to any prospective purchaser who has not executed a confidentiality agreement in form and substance reasonably satisfactory to the Company. Any reasonable out-of-pocket costs

9

to the Company of providing such assistance shall be paid pro rata by each Stockholder seeking to sell its Shares.  The Company will also cooperate with any Stockholder in having all stop transfer instructions or notations and restrictive legends lifted in connection with the sale (other than to an Affiliate of the Company) of Shares pursuant to Rule 144 promulgated under the Securities Act; provided that in such a case the selling Stockholder shall be required to provide the Company with the opinion provided for in Section 1.2.1.

1.7     Improper Transfer.

Any attempt to Transfer or Pledge any Shares in violation of this Agreement shall be null and void and neither the Company nor any transfer agent of such Shares shall give any effect to such attempted Transfer or Pledge in its stock records.

1.8     Involuntary Transfer.

In the case of any Transfer of title or, beneficial ownership of Shares upon default, foreclosure, forfeit, court order, or otherwise than by a voluntary decision on the part of a Stockholder (an "Involuntary Transfer"), such Stockholder (or his legal representatives) (i) shall not be liable for a breach of this Agreement resulting from a failure to comply with this Article 1 prior to the consummation of such Involuntary Transfer, and (ii) shall promptly (but in no event later than two (2) business days after such Involuntary Transfer) furnish written notice to the Company indicating that the Involuntary Transfer has occurred, specifying the name of the Person to whom such Shares have been transferred, giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer.

ARTICLE 2.
DRAG-ALONG SALES

2.1     Right of Stockholders to Require Sale.

Notwithstanding any other provision of this Agreement, if some or all Stockholders (the "Drag-Along Sellers") agree to sell or otherwise dispose of (or cause to be sold or otherwise disposed of) for value in excess of fifty percent (50%) of the Common Shares of the Company outstanding, on fully diluted basis, at such time (such percentage, the "Drag-Along Percentage"), in one in one or more related transactions (a "Drag-Along Sale"), to a third Person or third Persons (a "Third Party") in a bona fide arm's-length transaction or series of transactions (including by way of a purchase agreement, tender offer, merger or other business combination transaction or otherwise), then, upon the demand of a majority of the Drag-Along Sellers, each other Stockholder (collectively, the "Required Sellers") shall be required to sell to such Third Party such number of Common Shares equal to the product of (i) a fraction, the numerator of which is the number of Common Shares proposed to be sold by the Drag-Along Sellers and the denominator of which is the aggregate number of Common Shares owned as of the Drag-Along Notice Date (as defined below) by the Drag-Along Sellers and (ii) the number of Common Shares owned by such other Stockholder as of the Drag-Along Notice Date, at the same amount and in the same form of consideration to be paid per Common Share and on the same terms and conditions as the Drag-Along Sellers have agreed to with such Third Party.  No Required Seller

10

shall exercise any dissenter's rights with respect to the consummation of any such Drag-Along Sale.

2.2     Drag-Along Notice.

Prior to making any Drag-Along Sale, the Drag-Along Sellers shall promptly provide each Required Seller with written notice (the "Drag-Along Notice") not more than thirty (30) nor less than fifteen (15) days prior to the proposed date of the Drag-Along Sale (the "Drag-Along Sale Date"). The Drag-Along Notice shall set forth: (i) the name and address of the Third Party; (ii) the name and address of each member of the Drag-Along Sellers; (iii) the proposed amount and form of consideration to be paid per Common Share and the terms and conditions of payment offered by the Third Party; (iv) the number of Common Shares held of record as of the close of business on the date of the Drag-Along Sale Notice (the "Drag-Along Notice Date") by the Required Seller to whom the notice is sent; (v) the aggregate number of Common Shares held of record as of the Drag-Along Notice Date by the Drag-Along Sellers; (vi) confirmation that the Drag-Along Sellers are selling such number of Common Shares equal to at least the Drag-Along Percentage; (vii) the Drag-Along Sale Date; and (viii) confirmation that the proposed Third Party has agreed to purchase the Required Sellers' shares of Common Stock in accordance with the terms hereof.

2.3     Delivery of Certificates; Custody Agreement and Power of Attorney.

On the Drag-Along Sale Date, each Required Seller shall deliver a certificate or certificates for all of its Common Shares, duly endorsed for transfer with signatures guaranteed, to such Third Party in the manner and at the address indicated in the Drag-Along Notice against delivery of the purchase price for such Required Seller's Common Shares. Notwithstanding the foregoing, in addition each of the Required Sellers participating in the Drag-Along Sale will, if requested by the Drag-Along Sellers, execute and deliver a Custody Agreement and Power of Attorney in form and substance reasonably satisfactory to the Drag-Along Sellers with respect to the Common Shares which are to be included in the Drag-Along Sale pursuant hereto. The Custody Agreement and Power of Attorney will provide that the Required Sellers will deliver to and deposit in custody with the custodian and attorney-in-fact named therein a certificate or certificates representing such Common Shares (duly endorsed in blank by the registered owner or owners thereof or accompanied by duly executed stock powers in blank) and irrevocably appoint said custodian and attorney-in-fact as such Required Seller's agent and attorney-in-fact with full power and authority to act under a custody agreement and power of attorney on behalf of such Required Seller with respect to the matters specified herein. Notwithstanding the provisions of this Section 2.3, a Required Seller may, at its option and in lieu of delivering a Custody Agreement and Power of Attorney, deliver to the relevant Drag-Along Sellers such other assurance as may be reasonably acceptable to such Drag-Along Sellers of such Required Seller's ability to complete the Drag-Along Sale on the Drag-Along Sale Date.

2.4     Consideration.

The provisions of this Article 2 shall apply regardless of the form of consideration received in the Drag-Along Sale.

11

2.5     Cooperation.

All other Stockholders shall cooperate in good faith with the Drag-Along Sellers in connection with the consummation of the Drag-Along Sale.  Each Required Seller agrees that it will execute such other agreements as the Drag-Along Sellers or the Third Party may reasonably request in connection with the consummation of a Drag-Along Sale and the transactions contemplated thereby.

2.6     Conditions of Sale.  The obligations of the Required Sellers in respect of a Drag-Along Sale under this Article 2 are subject to the satisfaction of the following conditions

(i)     the consideration to be received by each Required Seller shall be the same form and amount of consideration to be received by the Drag-Along Sellers per Common Share and the terms and conditions of such sale shall be the same as those upon which the Drag-Along Seller sells its Common Shares; and

(ii)     if any Drag-Along Seller is given an option as to the form and amount of consideration to be received, the same option shall be given to all Required Sellers.

ARTICLE 3.
REGISTRATION RIGHTS

3.1     Definitions.

"Commission" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder.

"Holder" means a Holder of Registrable Shares (including holders of the Union Warrants, the Second Lien Warrants and the Second Lien Lender SAR), including a Transferee of Registrable Shares (other than a Lender) if (i) the Transfer to such Transferee is not prohibited by this Agreement, and (ii) the Shares Transferred to such Transferee continue to be Registrable Shares.

"Registrable Shares" means the Common Shares (and any securities issued or issuable with respect to such Common Shares by way of stock dividends or stock splits or in connection with a combination of shares, recapitalization, merger, consolidation, or other reorganization or otherwise); provided, however, that any such shares will cease to be Registrable Shares when (i) a registration statement covering such Registrable Shares has been declared effective and such Registrable Shares have been disposed of pursuant to such effective registration statement or (ii) such Registrable Shares may be distributed to the public pursuant to Rule 144 without volume restrictions.

12

"Selling Holder" means, with respect to any registration statement, any Holder whose Registrable Shares are included therein.

### 3.2    Piggyback Registration.

#### 3.2.1    Right to Include Registrable Shares.

If the Company at any time after the effective date of the first registration statement for a public offering of securities of the Company proposes to register any of its equity securities under the Securities Act, whether or not for sale for its own account, on a form and in a manner which would permit registration of Registrable Shares for a public offering under the Securities Act (other than on a registration statement (i) on Form S-4 or Form S-8 or any successor or similar forms thereto, (ii) filed in connection with an exchange offer or (iii) filed in connection with a direct or indirect acquisition by the Company of another company), the Company shall give written notice of the proposed registration to each Holder at least twenty days prior to the filing thereof, and each Holder shall have the right to request that all or any part of its Registrable Shares be included in such registration by giving written notice to the Company within ten (10) days after the giving of such notice by the Company.  If the registration statement is to cover an underwritten offering, such Registrable Shares shall be included in the underwriting on the same terms and conditions as the securities otherwise being sold through the underwriters.

#### 3.2.2    Priority on Piggyback Registrations.

(i)    Company Registrations.  If the registration is an underwritten primary registration on behalf of the Company and the managing underwriter(s) of such offering determine in their good faith judgment that the aggregate number of securities, including Registrable Shares, of the Company which all Holders and all other security holders of the Company, pursuant to contractual rights to participate in such registration (the "Other Holders"), propose to include in such registration statement exceeds the maximum number of securities, including Registrable Shares, that can reasonably be expected to be sold in such offering without materially and adversely affecting the marketability of the offering or the selling price to be obtained, the Company will include in such registration, first, the shares of common stock or other securities which the Company proposes to sell and, second, the Registrable Shares of such Selling Holders and other securities to be sold for the account of Other Holders, pro rata among all such Selling Holders and Other Holders, taken together, on the basis of the number of Registrable Shares or other securities of the Company requested to be included by all Selling Holders and Other Holders who have requested that securities owned by them be so included (it being agreed and understood, however, that if necessary such managing underwriter(s) shall have the right to eliminate entirely the participation in such registration of all Selling Holders and Other Holders on a pro rata basis).

(ii)    Underwriters.  Registrable Shares proposed to be registered and sold for the account of any Selling Holder pursuant to a piggyback registration shall be sold to prospective underwriters selected or approved by the Company.  The Selling Holders shall be permitted to withdraw all or a part of the Registrable Shares held by

13

such Selling Holders which were to be included in such piggyback registration at any time prior to the effective date of such registration.  The Company may withdraw any registration statement for such registration at any time before it becomes effective, or postpone the offering of securities, without obligation or liability to any Selling Holder participating on a piggyback basis.

   3.3  <u>Registration Statement</u>.

   In connection with any registration of Registrable Shares under the Securities Act pursuant to this Agreement, the Company will furnish each Selling Holder with a copy of the registration statement and all amendments thereto and will supply each such Selling Holder with copies of any prospectus included therein (including a preliminary prospectus and all amendments and supplements thereto), in each case including all exhibits, and such other documents as may be reasonably requested, in such quantities as may be reasonably necessary for the purposes of the proposed sale or distribution covered by such registration (and the Company hereby consents to the use in accordance with all applicable laws of each such registration statement (or amendment or post-effective amendment thereto) and each such prospectus (or preliminary prospectus or supplement thereto) by each such Selling Holder in connection with the offering and sale of the Registrable Shares covered by such registration statement or prospectus).

   In connection with any offering of Registrable Shares registered pursuant to this Agreement, the Company shall instruct the transfer agent and registrar of the Common Stock to release any stop transfer orders with respect to the Registrable Shares so sold.

   3.4  <u>Registration Procedures</u>.

   In connection with the Company's obligations to effect a registration pursuant to <u>Section 3.2</u>, the Company will use its reasonable efforts to:

   (i)  prepare and file with the Commission a registration statement with respect to such Registrable Shares, on a form available for the sale of the Registrable Shares by the Holders thereof in accordance with the intended method or methods of distribution thereof and use all reasonable efforts to cause such registration statement to become effective; <u>provided</u>, <u>however</u>, that before filing a registration statement or prospectus or any amendments or supplements thereto (including documents that would be incorporated or deemed to be incorporated therein by reference), the Company will furnish to the Holders of the Registrable Shares covered by such registration statement and the underwriters, if any, and any attorney, accountant or other agent retained by the Holders of Registrable Shares covered by such registration statement, copies of all such documents proposed to be filed, which documents will be subject to the reasonable review and comment of such Holders, such counsel and underwriters, if any;

   (ii)  prepare and file with the Commission such amendments and post-effective amendments to such registration statement and such supplements to the prospectus used in connection therewith as may be necessary to keep such registration statement effective for a period of at least 120 days from the effective date of the

14

registration statement (the "<u>Minimum Registration Period</u>") and to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement until such time as all of such securities have been disposed of in accordance with the intended methods of disposition by the seller or sellers thereof set forth in such registration statement;

(iii)     cooperate and assist in any filings required to be made with the Financial Industry Regulatory Authority ("<u>FINRA</u>");

(iv)     notify each Selling Holder promptly (and in any event within three (3) business days):  (A) when the prospectus or any prospectus supplement or post-effective amendment has been filed, and with respect to the registration statement or any post-effective amendment, when the same has become effective; (B) of any request by the Commission or any other federal or state governmental authority for any amendments or supplements to the registration statement or the prospectus or for additional information; (C) of the issuance by the Commission of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose; (D) if, at any time prior to the closing contemplated by an underwriting agreement entered into in connection with such registration statement, that the representations and warranties of the Company contained in such agreement cease to be true and correct; (E) of the receipt by the Company of any notification with respect to the suspension of the qualification of the Registrable Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; (F) of the happening of any event which makes any statement made in the registration statement, the prospectus or any document incorporated or deemed to be incorporated therein by reference untrue or which requires the making of any changes in the registration statement, the prospectus or any document incorporated therein by reference in order to make the statements therein not misleading; and (G) of the Company's reasonable determination that a post-effective amendment to a registration statement would be required;

(v)     make commercially reasonable efforts prior to the expiration of the Minimum Registration Period to prevent the issuance of any order suspending the effectiveness of the registration statement or of any order preventing or suspending the use of a prospectus or suspending the qualification of any of the Registrable Shares included therein for sale in any jurisdiction, and, in the event of the issuance of any stop order suspending the effectiveness of the registration statement, or of any order suspending or preventing the use of any related prospectus or suspending the qualification of any Common Shares included in such registration statement for sale in any jurisdiction, prior to the expiration of the Minimum Registration Period, the Company will use its commercially reasonable efforts to promptly obtain the withdrawal of any such order;

(vi)     furnish to each Selling Holder, if any, without any additional charge, one signed copy of the registration statement and any post-effective amendment thereto, including financial statements and schedules, all documents incorporated therein by reference and all exhibits (including those incorporated by reference);

15

(vii)    as promptly as reasonably practicable, if required, based on the advice of the Company's counsel, or upon the occurrence of any event contemplated by Section 3.4(iv)(F), prepare and file a supplement or post-effective amendment to the registration statement, the related prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Shares, the prospectus will not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein not misleading;

(viii)    provide and cause to be maintained a transfer agent and registrar for all Registrable Shares covered by such registration statement from and after a date not later than the effective date of such registration statement;

(ix)    provide a CUSIP number for the Registrable Shares, not later than the effective date of the registration statement;

(x)    use its commercially reasonable efforts to (A) obtain opinions of counsel to the Company, and updates thereof addressed to the Underwriters, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by the underwriters, if any; and (B) obtain "cold comfort" letters and updates thereof  from the Company's independent certified public accountants addressed to such Underwriters (and, if necessary, any other independent certified public accountants of any subsidiary of the Company or of any business acquired by the Company for which financial statements and financial data are, or are required to be, included in the registration statement), such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters by accountants in connection with underwritten offerings.  The above shall be done at each closing under an underwriting or similar agreement;

(xi)    make available for inspection by a representative of the Selling Holders and any attorneys or accountants retained by such Holders (and, to the extent reasonably requested, furnish copies), in connection with the preparation of a registration statement pursuant to this Agreement, all financial and other records and pertinent corporate documents and properties of the Company and its subsidiaries, and cause the Company's and its subsidiaries' officers, directors and employees to supply all information reasonably requested by any such representative(s), attorney(s) or accountant(s) in connection with such registration; provided, however, that any records, information or documents that are designated by the Company in writing as confidential shall be kept confidential by such persons unless disclosure of such records, information or documents is required by court or administrative order or under applicable law; and provided, further, that appropriate arrangements are made, to the extent required by applicable antitrust law, to limit access to such information of the Company to representatives of the Holders who are not officers or employees of the Selling Holders; and provided, further that, without limiting the foregoing, no such information shall be used by any such Person in connection with any market transactions in securities of the Company or its subsidiaries in violation of law;

16

(xii)   enter into such agreements reasonably requested and take all such other customary and reasonable actions in connection therewith in order to expedite or facilitate the disposition of the Registrable Shares, and in such connection, whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration:

(A)   make such representations and warranties to the Holders of such Registrable Shares included in the registration statement with respect to the business of the Company and the registration statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings and confirm the same, if and when reasonably requested; and

(B)   deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Shares being included in the registration statement to evidence compliance with clause (a) above and with any provisions contained in the underwriting agreement or other similar agreement entered into by the Company;

The above shall be done at each closing under such underwriting or similar agreement or as and, if not an underwritten offering, to the extent otherwise reasonably requested by the Holders of a majority of the Registrable Shares being sold pursuant to the registration statement;

(xiii)   if so required by the managing underwriter(s) in an underwritten offering of Registrable Shares covered by a registration statement filed pursuant to Section 3.2 hereof, not publicly or privately sell, make any short sale of, loan, grant any option, effect any public sale or distribution of or otherwise dispose of its equity securities or securities convertible into or exchangeable or exercisable for any of such securities during the ten (10) days prior to and the ninety (90) days after any underwritten registration pursuant hereto has become effective, except as part of such underwritten registration and except pursuant to any exchange offer or registrations on Form S-4 or S-8 or any successor or similar forms thereto, except that the Company may make grants of options under its stock option plans and may issue securities issuable upon the exercise or conversion of outstanding convertible securities, stock options and other options, warrants and rights of the Company;

(xiv)   if requested, furnish each Selling Holder with a copy (or a reasonable number of copies, as requested) of the registration statement (together with the Exhibits thereto) and each amendment thereto prior to the filing thereof with the Commission;

(xv)   if requested by a Holder of Registrable Shares being sold, promptly incorporate in a prospectus, supplement or post-effective amendment such information as the Holders of the Registrable Shares being sold reasonably request to be included therein relating to the sale of the Registrable Shares, including, without limitation, information with respect to the number of Registrable Shares being sold to

17

underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the underwritten offering of the Registrable Shares to be sold in such offering; and make all required filings of such prospectus, supplement or post-effective amendment promptly following notification of the matters to be incorporated in such supplement or post-effective amendment;

(xvi)    upon the occurrence of any event that would cause a shelf registration statement to contain a material misstatement or omission, the Company shall promptly file an amendment to such shelf registration statement correcting any such misstatement or omission and use its commercially reasonable efforts to cause such amendment to be declared effective;

(xvii)    otherwise use its commercially reasonable efforts to (x) comply with all applicable rules and regulations of the Commission, and (y) make available to its securityholders an earnings statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder (or any similar rule promulgated under the Securities Act) no later than forty-five (45) days after the end of any twelve-month (12) period (or ninety (90) days after the end of any twelve-month (12) period if such period is a fiscal year) (or in each case within such extended period of time as may be permitted by the Commission for filing the applicable report with the Commission) (i) commencing at the end of any fiscal quarter in which Registrable Shares are sold to underwriters in a firm commitment or best efforts underwritten offering and (ii) if not sold to underwriters in such an offering, commencing on the first day of the first fiscal quarter of the Company after the effective date of a Registration Statement, which statements shall cover said twelve-month (12) periods; and

(xviii)    in connection with any underwritten offering, cooperate with marketing efforts reasonably requested by the managing underwriter or managing underwriters in connection with the sale of the Registrable Shares.

3.5    Holdback Agreements.

3.5.1    Restrictions on Sales by Holders of Registrable Shares.    Each Holder of Registrable Shares agrees, if requested (pursuant to a timely written notice) by the managing underwriter or underwriters in an underwritten offering, not to effect any public or private sale or distribution or otherwise dispose of any of the Company's securities, including a sale pursuant to Rule 144 (except as part of such underwritten offering), during the period beginning ten (10) days prior to the effective date of such registration statement and ending (i) 180 days after the closing of the Company's initial public offering made pursuant to such registration statement or (ii) at the expiration of such time period (as requested by the managing underwriter or underwriters) after the closing of the Company's underwritten offering (other than the initial public offering), that shall not exceed ninety (90) days.

3.6    Registration Expenses.

Except as otherwise required by state securities laws or the rules and regulations promulgated thereunder, all expenses, disbursements and fees incurred by the Company in

18

connection with carrying out its obligations under this Article 3, including but not limited to, (i) all registration, filing fees and expenses (including fees with respect to filings made with FINRA, (ii) printing expenses (including printing certificates for the Registrable Shares to be sold and the registration statements and prospectuses), messenger and delivery expenses, duplication, word processing, and telephone, (iii) fees and disbursements of counsel for the Company, and (iv) fees and disbursements of all independent certified public accountants of the Company incurred in connection with such registration (including the expenses of any special audit and "cold comfort" letters incident to such registration) and fees and disbursements of underwriters and other Persons retained by the Company (all such expenses being herein called "Registration Expenses"), will be borne by the Company regardless of whether a registration statement becomes effective; provided, however, that the Company will, in any event, pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expenses of any annual audit or quarterly review, the fees and expenses of any Person, including special experts, retained by the Company, the expense of any liability insurance and the expenses and fees for listing the securities to be registered on each securities exchange on which similar securities issued by the Company are then listed or quoted on the NASDAQ National Market; and provided further, that each Selling Holder shall pay (x) all costs and expenses of counsel , accounting or financing professionals retained by such Selling Holder, (y) all underwriting discounts, commissions, fees and expenses and all transfer taxes with respect to the Shares sold by such Selling Holder, and (z) all other expenses incurred by such Selling Holder that are incidental to the sale and delivery of the Shares to be sold by such Selling Holder.

3.7     Restrictions on Use of Registration Statement.

Upon written notice to the Holders of Registrable Securities, the Company shall be entitled to suspend, for a period of time (each, a "Suspension Period"), the use of any Registration Statement or Prospectus and shall not be required to amend or supplement the Registration Statement, any related Prospectus or any document incorporated therein by reference if the Company determines in its reasonable good faith judgment, after consultation with counsel, that the Registration Statement or any Prospectus may contain an untrue statement of a material fact or omits any fact necessary to make the statements in the Registration Statement or Prospectus not misleading; provided that (A) there are no more than five (5) Suspension Periods in any 12-month period, (B) the duration of all Suspension Periods may not exceed 120 days in the aggregate in any 12-month period, and (C) the Company shall use its good faith efforts to amend the Registration Statement and/or Prospectus to correct such untrue statement or omission as soon as reasonably practicable unless such amendment would reasonably be expected to have a material adverse effect on any proposal or plan of the Company to effect a merger, acquisition, disposition, financing, reorganization, recapitalization or similar transaction, in each case that is material to the Company.

3.8     Conditions to Holder's Rights.

It shall be a condition of each Selling Holder's rights hereunder that:

3.8.1     Cooperation.

19

Such Selling Holder shall cooperate with the Company by supplying information and executing documents relating to such Selling Holder or the securities of the Company owned by such Selling Holder in connection with such registration which are customary for offerings of this type (including agreeing to sell such Selling Holder's Registrable Shares on the basis provided in any underwriting arrangements containing customary terms reasonably satisfactory to such Selling Holder);

3.8.2    Undertakings.

Such Selling Holder shall enter into any undertakings and take such other action relating to the conduct of the proposed offering which the Company or the underwriters may reasonably request as being necessary to insure compliance with federal and state securities laws and the rules or other requirements of FINRA or which the Company or the underwriters may reasonably request to otherwise effectuate the offering; and

3.8.3    Indemnification.

Such Selling Holder shall execute and deliver an agreement to indemnify to the fullest extent permitted by law and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, any underwriter (as defined in the Securities Act), and each person, if any, who controls the Company or such underwriter within the meaning of the Securities Act, against such losses, claims, damages or liabilities (including reimbursement for legal and other expenses) to which the Company or any such director, officer, underwriter or controlling person may become subject under the Securities Act or otherwise, in such manner as is customary for registrations of the type then proposed, but only with respect to written information about or pertaining to such Selling Holder furnished by such Selling Holder for inclusion in the Registration Statement.

3.9    Indemnification.

3.9.1    Indemnification by the Company.

In the case of any offering registered pursuant to this Agreement, the Company agrees to indemnify to the fullest extent permitted by law and hold each Selling Holder, each affiliate of such Selling Holder and each director, officer, agent, representative and employee of such Selling Holder and its affiliates, each Person who controls each Selling Holder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act and the directors, officers, agents or employees of each such controlling person harmless against any and all losses, claims, damages, liabilities, actions (including reasonable and documented costs (including, without limitation, costs of preparation and reasonable attorneys' fees and disbursements) and expenses, including reasonable expenses of investigation) (collectively "Losses") to which they or any of them may become subject under the Securities Act or any other statute or common law or otherwise, insofar as any such Losses shall arise out of, be caused by or shall be based upon (i) any untrue statement or alleged untrue statement of a material fact contained in the registration statement relating to the sale of the Registrable Shares covered thereby, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) any untrue

20

statement or alleged untrue statement of a material fact contained in any preliminary prospectus (as amended or supplemented if the Company shall have filed with the Commission any amendment thereof or supplement thereof), if used prior to the effective date of such registration statement, or contained in the prospectus (as amended or supplemented if the Company shall have filed with the Commission any amendment, thereof or supplement thereof, including the information deemed part of such registration statement pursuant to Rule 430A promulgated under the Securities Act), if used within the period during which the Company shall be required to keep the registration statement to which such prospectus relates current pursuant to the terms of this Agreement, or the omission or alleged omission to state therein (if so used) a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, that the indemnification agreement contained in this Section 3.8.1 shall not apply to such Losses which shall arise from the sale of Registrable Shares to any Person if such Losses shall arise out of sales of Registrable Securities made during a Suspension Period after notice is given pursuant to Section 3.7 hereof, or shall be caused by or shall be based upon any such untrue statement or alleged untrue statement, or any such omission or alleged omission, (i) if such statement or omission shall have been made in reliance upon and in conformity with information furnished in writing to the Company by such Selling Holder specifically for use in connection with the preparation of the registration statement or any preliminary prospectus or prospectus contained in the registration statement or any such amendment thereof or supplement thereto; (ii) if such untrue statement or omission was made in any preliminary prospectus to the extent that (a) the prospectus corrected such untrue statement or such omission and (b) the Selling Holder was legally required to and failed to send or deliver a copy of the prospectus with or prior to the delivery of written confirmation of the sale by such Selling Holder of Registrable Shares to the Person asserting the claim from which such Losses arise; or (iii) if any such Losses arise out of, are caused by or are based upon an untrue statement or omission in the prospectus, to the extent that (a) such untrue statement or omission is corrected in an amendment or supplement to the prospectus and (b) having previously been furnished by or on behalf of the Company with copies of the prospectus as so amended or supplemented, such Selling Holder was legally required to and thereafter fails to deliver such prospectus as so amended or supplemented, prior to or concurrently with the sale of Registrable Shares to the Person asserting the claim from which such Losses arise.  This indemnity shall be in addition to any other indemnification arrangements to which the Company may otherwise be a party.

3.9.2    Indemnification by Holders of Registrable Shares.

Each Selling Holder agrees to indemnify to the fullest extent permitted by law and hold the Company, its directors, officers, agents and employees, each Person who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act and the directors, officers, agents or employees of such controlling persons harmless against any and all Losses arising out of, caused by or based upon any untrue statement of a material fact contained in any registration statement, prospectus or form of prospectus, or arising out of, caused by or based upon any omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of the preliminary prospectus and the prospectus, in each case, including amendments or supplements, in light of the circumstances in which they were made) not misleading, to the extent, but only to the extent, that such untrue

21

statement or omission is contained in any information furnished in writing by such Selling Holder to the Company, expressly for use in such registration statement or prospectus.  The Company and the Selling Holders shall be entitled to receive indemnities from underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution to the same extent as provided above with respect to information so furnished in writing by such Persons expressly for use in any prospectus or registration statement.

### 3.9.3    Conduct of Indemnification Proceedings.

Any Person entitled to indemnity under this Agreement (an "Indemnified Party") shall give prompt written notice to the party from which such indemnity is sought (the "Indemnifying Party") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; provided, however, that the failure so to notify the Indemnifying Party shall not relieve the indemnifying party from any obligation or liability except to the extent that the Indemnifying Party has been prejudiced materially by such failure.  The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding to assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; provided, however, that under such circumstances an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless:  (1) the Indemnifying Party agrees to pay such fees and expenses; or (2) the Indemnifying Party fails promptly to assume the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; or (3) the Indemnified Party shall have been advised by counsel that (i) there may be one or more material defenses available to such Indemnified Party that are different from or additional to those available to the Indemnifying Party or its affiliates, or (ii) a conflict of interest likely exists if such counsel represents such Indemnified Party and such Indemnifying Party or its affiliate, in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof, it being understood, however, that the Indemnifying Party shall not, in connection with any one such claim or proceeding, or separate but substantially similar or related claims or proceedings arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one separate firm of attorneys (together with appropriate local counsel which such counsel shall be designated by the Indemnified Party and be reasonably acceptable to the Indemnifying Party) at any time for such Indemnified Party, or for fees and expenses that are not reasonable.  Whether or not such defense is assumed by the Indemnifying Party, such Indemnifying Party will not be subject to any liability for any settlement made without its consent (which consent shall not be unreasonably withheld).  The Indemnifying Party shall not consent to entry of any judgment or settle or compromise any pending or threatened claim, action or proceeding, unless it contains as an unconditional term thereof the giving by the claimant or plaintiff to the Indemnified Party of a release, in form and substance satisfactory to such Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder.

22

The Indemnifying Party's liability to any such Indemnified Party hereunder shall not be extinguished solely because any other Indemnified Party is not entitled to indemnity hereunder.

### 3.9.4    Contribution.

If the indemnification provided for in this Section 3.8 is unavailable to an Indemnified Party in respect of any Losses or is insufficient to hold such Indemnified Party harmless, then each applicable Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations appropriate under the circumstances.  The relative fault of such Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue statement of a material fact or omission to state a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information concerning the matter with respect to which the claim was asserted and opportunity to correct or prevent such action, statement or omission.  The amount paid or payable by a party as a result of any Losses shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with any investigation or proceeding.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 3.8.4 were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph.  Notwithstanding the provisions of this Section 3.8.4, no Indemnifying Party that is a Selling Holder shall be required to contribute any amount in excess of the amount by which the net proceeds received by such Selling Holder from the sale of Registrable Shares exceeds the amount of any damages that such Selling Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

The indemnity and contribution agreements contained in this Section 3.8 are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

### 3.9.5    Underwriting Agreement to Govern.

At such time as an underwriting agreement with respect to a particular underwriting is entered into, the terms of any such underwriting agreement shall govern with respect to the matters set forth therein to the extent inconsistent with this Section 3.8; provided, however, that the indemnification provisions of such underwriting agreement as they relate to Selling Holders are customary for registrations of the type then proposed and provide for indemnification by such Selling Holders only with respect to written information furnished by such Selling Holders.

23

NY\5607392.6

3.10 <u>Reports Under Securities Exchange Act of 1934</u>.

3.10.1  With a view to making available to the Stockholders the benefits of Rule 144 promulgated under the Securities Act and any other rule or regulation of the Commission that may at any time permit a Stockholder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(i)      make and keep public information available, as those terms are understood and defined in Rule 144, at all times after ninety (90) days after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public so long as the Company remains subject to the periodic reporting requirements under Section 13 or 15(d) of the Exchange Act; and

(ii)     furnish to any Stockholder, so long as the Stockholder owns any Shares, forthwith upon request (A) a written statement by the Company that it has complied with the reporting requirements of Rule 144 (at any time after ninety (90) days after the effective date of the first registration statement filed by the Company), and the Exchange Act (at any time after it has become subject to such reporting requirements), and (B) a copy of the most recent annual or quarterly report of the Company and such other reports or documents so filed by the Company.

3.11 <u>Termination of Registration Rights</u>.

No Holder shall be entitled to exercise any right provided in this <u>Article 3</u> after the earlier of (i) three (3) years following the date of a Public Offering Event, unless such Holder constitutes an Affiliate (as reasonably determined by the Company pursuant to Rule 144) of the Company, or (ii) such time as Rule 144 or another similar exemption under the Securities Act is available for the sale of all of such Holder's Registrable Shares during a three (3) month period without registration and such Holder beneficially owns less than 1% of the Company's outstanding shares of Common Stock.

3.12 <u>Certification</u>.

Within fifteen (15) business days following receipt of written request from the Company by any Holder (which request shall not be made more than twice in any calendar year), such Stockholder shall certify to the Company that such Holder continues to hold Registrable Shares eligible for registration (the "Certification").  If a Holder fails to provide the Certification within the fifteen (15) business day period referred to in the immediately preceding sentence, the Company reserves the right, in its sole discretion, to remove such Holder's Registrable Shares from a Registration Statement within fifteen (15) Business Days after receipt by such Holder of a second written notice specifying that the Stockholder may be removed from such Registration Statement unless such Stockholder provides the Certification within such subsequent fifteen (15) business day period.

24

ARTICLE 4.
REPORTS

4.1    Quarterly Financial Statements.  The Company will deliver to each Stockholder, each holder of New Warrants, each holder of Second Lien Warrants and each holder of Second Lien Lender SAR as soon as available, and in any event within 45 days after the end of each fiscal quarter of each fiscal year, commencing with the first fiscal quarter ending after the date hereof, the consolidated balance sheets of the Company and its subsidiaries as at the end of such fiscal quarter and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and including a "Management's Discussion and Analysis of Financial Condition and Results of Operations."

4.2    Annual Financial Statements.  The Company will deliver to each Stockholder, each holder of New Warrants, each holder of Second Lien Warrants and each holder of Second Lien Lender SAR as soon as available, and in any event within [120] days after the end of each fiscal year, commencing with the fiscal year ending after the date hereof, (i) the consolidated balance sheets of the Company and its subsidiaries as at the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows of the Company and its subsidiaries for such fiscal year, setting forth in each case in comparative form the corresponding figures for the previous fiscal year and including a "Management's Discussion and Analysis of Financial Condition and Results of Operations" and (ii) with respect to such consolidated financial statements a report thereon of [_____] or other independent certified public accountants of recognized national standing selected by the Company (which public accountants shall include any firm that is within the top fifteen (15) of such firms in the United States as measured by revenues generated in 2011, and which report and/or the accompanying financial statements shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Company and its subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards) ; provided, however, that the annual financial statements for the fiscal year ended December 31, 2012, and the financial statements for any previous periods (that are prepared for comparative purposes or otherwise), shall be unaudited and no report thereon of an independent certified public accountant shall be required.

4.3    Other Information.  The Company will deliver to each Stockholder, each holder of New Warrants, each holder of Second Lien Warrants and each holder of Second Lien Lender SAR promptly upon their becoming available, copies of all financial statements, reports and notices sent or made available generally by the Company to its lenders, bondholders or other Stockholders acting in such capacity.

25

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES

5.1     Representations and Warranties of the Company.

The Company represents and warrants to the Stockholders as follows:

5.1.1   Organization.

It is a corporation duly organized and validly existing under the laws of the State of Delaware;

5.1.2   Authority.

It has full corporate power and authority to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby;

5.1.3   Binding Obligation.

The execution, delivery and performance of this Agreement by it and the consummation by it of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on its part, and this Agreement constitutes its binding obligation, enforceable against it in accordance with its terms, except insofar as enforceability may be limited by bankruptcy, insolvency, moratorium or other laws which may affect creditors' rights and remedies generally and by principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law); and

5.1.4   No Conflict.

The execution, delivery and performance of this Agreement by it and the consummation by it of the transactions contemplated hereby will not, with or without the giving of notice or due to the lapse of time, or both, (i) violate any provision of law, statute, rule or regulation to which it is subject, (ii) violate any order, judgment or decree applicable to it, or (iii) conflict with, or result in a breach or default under, any term or condition of its certificate or articles of incorporation or its by-laws or any material agreement or other material instrument to which it is a party or by which it or its property is bound.

## ARTICLE 6.
## TERMINATION OF AGREEMENT

This Agreement, except for the provisions of Article 3 of this Agreement, shall terminate on the date of a Public Offering Event.  For the purposes of this Agreement, a "Public Offering Event" shall mean the sale or disposition of Common Shares to the public pursuant to one or more effective registration statements under the Securities Act resulting in aggregate gross proceeds to the Company of at least $[_____] and after which at least [__]% of the Company's outstanding shares of common stock is publicly held and such Common Stock is listed or admitted to trading on a national securities exchange or quoted on the NASDAQ National Market.

ARTICLE 7.
GENERAL

7.1     Recapitalization, Exchanges, etc. Affecting the Shares.

The provisions of this Agreement shall apply to the full extent set forth herein with respect to (a) the Common Shares and any option, right or warrant to acquire Common Shares, and (b) any and all shares of capital stock of the Company or any successor or assign of the Company (whether by merger, consolidation, sale of assets or otherwise) which may be issued in respect of, in exchange for, or in substitution for any Common Shares, by combination, recapitalization, reclassification, merger, consolidation or otherwise.  In the event of any change in the capitalization of the Company, as a result of any stock split, stock dividend or stock combination, the provisions of this Agreement shall be appropriately adjusted.

7.2     Injunctive Relief.

It is hereby agreed and acknowledged that it will be impossible to measure in money the damages that would be suffered if the parties fail to comply with any of the obligations herein imposed on them and that, in the event of any such failure, an aggrieved person will be irreparably damaged and will not have an adequate remedy of law.  Any such person shall, therefore, be entitled to injunctive relief, including specific performance, to enforce such obligations, without the posting of any bond and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

7.3     Notices.

Any and all notices, demands or other communications required or permitted hereunder shall be in writing and shall be made by hand delivery (deemed given upon receipt), or by certified mail return receipt requested (deemed given upon execution of such return receipt), addressed to a Stockholder and the Company at the address set forth below such person's or entity's signature.  Any party may change its address for notice by notice given to each Stockholder and the Company in accordance with the foregoing.  No objection may be made to the method of delivery of any notice actually and timely received.

7.4     Legend.

In addition to any other legend which may be required by applicable law, each share certificate representing Common Shares which are subject to this Agreement shall have endorsed, to the extent appropriate, upon its face the following words:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY JURISDICTION.  SUCH SECURITIES MAY NOT BE OFFERED, SOLD, TRANSFERRED, PLEDGED, ASSIGNED, ENCUMBERED,

27

NY\5607392.6

HYPOTHECATED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO (I) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER SUCH ACT OR APPLICABLE STATE SECURITIES LAW, OR (II) ANY EXEMPTION FROM REGISTRATION UNDER SUCH ACT, OR APPLICABLE STATE SECURITIES LAW, RELATING TO THE DISPOSITION OF SECURITIES, INCLUDING RULE 144, PROVIDED AN OPINION OF COUNSEL IS FURNISHED TO THE COMPANY, IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO THE COMPANY, TO THE EFFECT THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND/OR APPLICABLE STATE SECURITIES LAW IS AVAILABLE.

IN ADDITION, THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED OF UNLESS SUCH TRANSFER COMPLIES WITH THE PROVISIONS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 2012 (THE "STOCKHOLDERS AGREEMENT"), A COPY OF WHICH IS ON FILE AND MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER OF THE SECURITIES WILL BE MADE ON THE BOOKS OF THE COMPANY UNLESS ACCOMPANIED BY EVIDENCE OF COMPLIANCE WITH THE TERMS OF THE STOCKHOLDERS AGREEMENT. THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO OTHER RIGHTS AND OBLIGATIONS AS SET FORTH IN THE STOCKHOLDERS AGREEMENT.

7.5     Transferees Bound.

All Shares owned by a Transferee shall, subject to the terms of Section 1.1 of this Agreement, for all purposes be subject to the terms of this Agreement, whether or not such Transferee has executed a consent to be bound by this Agreement. The foregoing shall not apply in the case of any Shares acquired by a Transferee pursuant to a sale of Shares pursuant to an effective registration statement under the Securities Act.

7.6     Amendment; Waiver.

This Agreement may be amended, modified, supplemented or terminated only by a written instrument signed by each of (i) the Company, (ii) Stockholders holding a majority of the Common Shares then held by all Stockholders and (iii) the Union Trust, so long as the Union Trust owns 20% or more of the equity securities (by total voting power) of the Company that were initially held by the Union Trust on the date hereof; provided, however, that (x) Section 1.4, Section 3.2, Article 4 and Article 12 of this Agreement may not be amended or modified without

28

the written consent of each Stockholder who was a Stockholder as of the date of this Agreement and (y) an amendment or modification modifying the rights or obligations of any Stockholder in a manner that materially and adversely affects the rights of such Stockholder relative to the rights of other Stockholders, shall in each case be effective only with that Stockholder's consent. No provision of this Agreement may be waived orally, but only by a written instrument signed by the party against whom enforcement of such waiver is sought. Stockholders shall be bound from and after the date of the receipt of a written notice from the Company setting forth such amendment or waiver by any consent authorized by this Section 7.6, whether or not the Common Shares shall have been marked to indicate such consent; no alteration, modification or impairment shall be implied by reason of any previous waiver, extension of time, delay or omission in exercise, or other indulgence.

7.7    Additional Documents.

Each party hereto agrees to execute any and all further documents and writings within its powers and to perform such other actions which may be or become necessary or expedient to effectuate and carry out this Agreement.

7.8    No Third-Party Benefits.

None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any third-party beneficiary.

7.9    Successors and Assigns.

Subject to the terms hereof, this Agreement shall be binding upon and shall inure to the benefit of the Stockholders, and their respective successors and permitted assigns; provided, however, (i) neither this Agreement nor any rights or obligations hereunder may be transferred by the Company and (ii) no rights or obligations of any Stockholder under this Agreement may be assigned except that any Stockholder may transfer its rights and obligations hereunder, in whole or in part, in connection with a Transfer of Shares (or a foreclosure of Pledged Shares) made in compliance with all of the provisions of this Agreement.

7.10    Severability.

In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein; provided, however, that the parties hereto shall use their best efforts to find and employ an alternative means to achieve the same or substantially the same result as that contemplated by such invalid, illegal or unenforceable term, provision, covenant or restriction.

7.11    Integration.

This Agreement contains the entire understanding of the parties with respect to the subject matter hereof. There are no restrictions, agreements, promises, representations,

warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth or referred to herein. This Agreement supersedes all prior agreements and understandings between the parties with respect to its subject matter.

7.12 Governing Law.

THE RIGHTS AND LIABILITIES OF THE PARTIES SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK, REGARDLESS OF THE CHOICE OF LAWS PROVISIONS OF SUCH STATE OR ANY OTHER JURISDICTION.

7.13 Headings.

The headings in this Agreement are inserted only as a matter of convenience, and in no way define, limit, or extend or interpret the scope of this Agreement or of any particular Section.

7.14 Information for Notices.

No Stockholder (other than a Stockholder as of the date of this Agreement with respect to the Shares held as of such date) shall hold any of its Shares in nominee name unless it otherwise provides the Company and the other Stockholders with its name and address and other information reasonably requested by the Company.

7.15 Counterparts.

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.16 Consent to Jurisdiction.

Notwithstanding the choice of law in Section 7.12 above, each Stockholder agrees that any proceeding arising out of or relating to this Agreement or the breach or threatened breach of this Agreement shall be commenced and prosecuted in a court in the State of Delaware, and in no other venue. Each Stockholder hereby irrevocably and unconditionally consents and submits to the non-exclusive personal jurisdiction of any court in the State of Delaware in respect of any such proceeding. Each Stockholder consents to service of process upon it with respect to any such proceeding by registered mail, return receipt requested, and by any other means permitted by applicable laws and rules. Each Stockholder waives any objection that it may now or hereafter have to the laying of venue of any such proceeding in any court in the State of Delaware and any claim that it may now or hereafter have that any such proceeding in any court in the State of Delaware has been brought in an inconvenient forum.

7.17 No Inconsistent Agreements.

The Company will not hereafter enter into any agreements with respect to its securities which are inconsistent with or violate in any material respects the rights granted to the holders of Common Shares (and any securities issued or issuable with respect to such Common

30

Shares by way of stock dividends or stock splits or in connection with a combination of shares, recapitalization, merger, consolidation, or other reorganization or otherwise) in this Agreement.

7.18    Certain Distributions Exempt.

Notwithstanding anything to the contrary contained in this Agreement, any distribution of Shares by a Stockholder to its equity participants in accordance with the terms of its limited partnership agreement, operating agreement or other governing agreement or instrument, or any distribution of Shares by a Stockholder which is a state-sponsored employee benefit plan to a successor trust or fiduciary or pursuant to a statutory reconstitution, shall be shall be exempt from the terms and conditions of this Agreement, other than that the Persons receiving the Shares in connection with any such distribution shall be bound on a going-forward basis by the terms and conditions of this Agreement.  For example, and not by way of limitation, any such distribution shall not – taken alone – trigger any of the "tag-along" rights set forth in Section 1.3, although the recipient of such distribution shall be deemed a Stockholder.

7.19    Certain Limitations.

Notwithstanding anything to the contrary contained in this Agreement, prior to the issuance or sale of any shares of the Company's capital stock pursuant to an effective registration statement under the Securities Act, the Company shall not be required to register any transfer of Shares on the Company's books if in the reasonable, good faith judgment of the Company, registering such transfer would cause the Company to become subject to registration pursuant to the Exchange Act.

7.20    Information Regarding Beneficial Ownership.

Each Stockholder agrees to promptly provide to the Company any information that the Company may reasonably request regarding such holder's beneficial ownership of shares of any class of the Company's capital stock.

7.21    Waiver of Jury Trial.

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.22    Computation of Time.

Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday, or any date banks in the State of New York are closed, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day which is a regular business day.

7.23    Confidentiality.

31

Any information that is delivered or furnished by or to the Company pursuant to this Agreement (including, without limitation, accounting, financial and operational information, and notices pursuant to this Agreement), whether orally or in writing, shall be maintained in confidence, unless permitted by the terms hereof or as required by applicable law, rule, regulation or legal process (such information, "Confidential Information"); provided, however, that such Confidential Information may be provided to potential investors if (a) such potential investor agrees to execute a joinder to this Agreement to be bound by the terms of this Section 7.23 and (b) such potential investor is (i) not a competitor of the Company and (ii) (x) primarily in the business of investing in securities or (y) a registered broker-dealer.

Notwithstanding the foregoing, the term "Confidential Information" does not include information that: (a) is or becomes generally available to the public other than as a result of a disclosure by the recipient or its representatives in violation of this Agreement; (b) was within the recipient's possession prior to it being furnished to the recipient or its representatives by or on behalf of the Company; provided, however, that the recipient reasonably believes that the source of such information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company; (c) is independently developed by the recipient or its representatives without the use of the information disclosed hereunder; or (d) becomes available to the recipient from a source other than the Company or its advisors; provided, however, that the recipient reasonably believes that the source of such information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Company.

ARTICLE 8.
UNION TRUST SHARES

8.1    Issuance of Additional Shares to the Union Trust.

8.1.1    If, after the date of this Agreement, and subject to the provisions of Section 8.2, the Company shall (i) issue Shares upon exercise of Series A Warrants; (ii) issue Shares upon exercise of Series B Warrants; or (iii) issue Shares pursuant to the Second Lien Lender SAR (any such event being herein called a "Shares Issuance"), the Company shall then issue additional Shares to the Union Trust, if necessary, such that the Union Trust holds the same percentage of the total Shares outstanding, on a fully diluted basis, immediately following such Share Issuance as the Union Trust held immediately prior to such Share Issuance, without giving any effect to Shares acquired by the Union Trust on the open market, through the exercise of New Warrants or otherwise (except Shares received pursuant to the Plan). Any Share issuance required by this Section 8.1.1 shall be made successively immediately after the date of such Shares Issuance at a purchase price of $0.01 per Share.

8.1.2    If, after the date of this Agreement, and subject to the provisions of Section 8.2, the Company shall make a cash payment pursuant to the Second Lien Lender SAR (such event being herein called a "SAR Cash Payment"), the Company shall then issue additional Shares to the Union Trust, if necessary, such that the Union Trust holds the same percentage of the total Shares outstanding, on a fully diluted basis, immediately following such SAR Cash Payment as the Union Trust held immediately prior to such SAR Cash Payment, without giving any effect to any Shares acquired by the Union Trust on the open market, through

32

the exercise of New Warrants or otherwise (except Shares received pursuant to the Plan). For the purposes of this Section 8.1.2, the total Shares outstanding, on a fully diluted basis, immediately following such SAR Cash Payment shall be the sum of (a) the total Shares outstanding, on a fully diluted basis, immediate prior to such SAR Cash Payment and (b) the Shares that would have been issued in lieu of the SAR Cash Payment if such an election to receive Shares would have been made pursuant to the Second Lien Lender SAR. Any Share issuance required by this Section 8.1.2 shall be made successively immediately after the date of such SAR Cash Payment at a purchase price of $0.01 per Share.

8.2     No Fractional Shares.

Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional Shares to the Union Trust pursuant to this Article 8. If the Union Trust would be entitled to receive a fractional interest in a Share, the Company shall round up to the nearest whole number the number of Shares to be issued to the Union Trust or issue cash for the value of such fractional shares, as reasonably determined by the Board.

8.3     Trust Assets.

The repurchase or substitution of any portion of the assets of Trust established under the "Trust for the Global Aviation Holdings Inc. Incentive Compensation Plan Established for the Benefit of Global Aviation Non-Management Employees" (under Section 5(b) of said agreement or any other provision), shall require the affirmative vote of a majority of the Board of Directors of the Company, including the vote of all voting Directors appointed to the board pursuant to Section 12 of this Agreement.

8.4     Definitions.

For the purposes of this Agreement, including this Article 8:

"New Second Lien Lender Warrant Agreement" means that certain warrant agreement dated [●], 2012 by and among the Company and [●], as warrant agent, relating to the issuance of Series A Warrants, Series B Warrants and Series C Warrants to purchase Shares;

"New Warrants" means an outstanding warrant issued in accordance with Section 2.1 of that certain warrant agreement, dated [●], 2012 by and among the Company and [●], as warrant agent, relating to the issuance of warrants to the Union Trust, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor;

"Second Lien Lender SAR" has the meaning assigned to such term in the Plan;

"Second Lien Warrants" means the Series A Warrants, the Series B Warrants and the Series C Warrants.

"Series A Warrants" means an outstanding Series A Warrant issued in accordance with Section 2.1 of the New Second Lien Lender Warrant Agreement, whether issued as Book-

33

Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any Series A Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor;

"Series B Warrants" means an outstanding Series B Warrant issued in accordance with Section 2.1 of the New Second Lien Lender Warrant Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any Series B Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor;

"Series C Warrants" means an outstanding Series C Warrant issued in accordance with Section 2.1 of the New Second Lien Lender Warrant Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any Series C Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor; and

"Union Trust" means the Trust established under the "Trust for the Global Aviation Holdings Inc. Incentive Compensation Plan Established for the Benefit of Global Aviation Non-Management Employees".

ARTICLE 9.
AFFILIATE TRANSACTIONS

9.1    Affiliate Transactions.  The Company will not, and will not permit any of its subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with any Affiliate (which, for the purposes of this of this Article 9, means any entity that holders more than 25% of the outstanding Common Shares of the Company) (each of the foregoing, an "Affiliate Transaction") involving aggregate payments or consideration in excess of $250,000, unless:

9.1.1    such Affiliate Transaction is on terms that are no less favorable, taken as a whole, to the Company or the relevant subsidiary than those that could have been obtained in a comparable transaction by the Company or the relevant subsidiary with an unrelated Person; and

9.1.2    the Company delivers to the Stockholders with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $2.5 million, a resolution of the Board of Directors set forth in an officers' certificate certifying that such Affiliate Transaction complies with Section 9.1.1 above and that such Affiliate Transaction has been approved by a majority of the disinterested members of Company's Board of Directors.

9.2    Exceptions.  Notwithstanding the foregoing, the following items shall not be deemed to be Affiliate Transactions:

9.2.1 any employment agreement or arrangements, incentive compensation plan, benefit arrangements or plan, severance or expense reimbursement arrangement or officer or director indemnification agreement or any similar arrangement entered

34

into by the Company or the relevant subsidiary with any officer or director, including repurchases, cancellations and issuances of equity interests issued pursuant to such agreements, arrangements or plans;

9.2.2    transactions and/or agreements between, among or solely for the benefit of (i) the Company and any entity that the Company controls or own equity in (a "controlled entity") or (ii) any of the Company's controlled entities, provided that in each case no Affiliate of the Company (other than a controlled entity or through a controlled entity of the Company) is an Affiliate of such controlled entity.;

9.2.3    payment of reasonable directors' fees to and reimbursement of expenses of directors of the Company or any of its relevant subsidiaries and other reasonable fees, compensation, benefits and indemnities paid or entered into with directors, officers and employees of the Company or any of its relevant subsidiaries;

9.2.4    any agreement in effect on the date of this Agreement or any amendment thereto or transaction contemplated thereby (and any replacement or amendment of any such agreement so long as any such amendment or replacement thereof is not materially less favorable, taken as a whole, the Company or any of its relevant subsidiaries than the original agreement in effect on the date of this Agreement), and the performance thereof;

9.2.5    any sale of equity or debt securities, so long as no more than 50% of the particular issuance is issued to Affiliates; and

9.2.6    any dividends on a pro rata basis on any class of equity securities; and

9.2.7    any repurchase of Shares in compliance with Section 10.1.

ARTICLE 10.
SHARE REPURCHASES

10.1    Affilate Share Repurchases.  If the Company repurchases any Shares from any Stockholder that is an Affiliate (other than transactions described in Section 9.2.1) (an "Affiliate Share Repurchase"), the Company shall also offer to repurchase Shares from all Stockholders holding more than 5% of the outstanding Common Shares of the Company on a pro rata basis, based on the aggregate number Shares held by each such Stockholder as of the time of such Affiliate Share Repurchase.

ARTICLE 11.
LIMITATIONS ON THE MANAGEMENT EQUITY INCENTIVE PLAN

11.1    Management Equity Incentive Plan.  During the period commencing on the date hereof, and expiring five (5) years after the date hereof, the Company and the Board of Directors shall not issue any additional equity pursuant to the Management Equity Incentive Plan or any other plan to any Person that received equity pursuant to the Management Equity Incentive Plan on or before the date hereof; provided, however, that during the period

35

commencing on the first one-year anniversary of this Agreement, and expiring five (5) years after the date hereof, the Company and the Board of Directors may make any such issuance of equity pursuant to the Management Equity Incentive Plan or any other plan to any Person with the unanimous approval of the Board of Directors.

11.2    Definitions.    For the purposes of this Article 11, "Management Equity Incentive Plan" means that certain incentive plan providing for 6% of the fully-diluted Shares, which shall be issued on the date hereof to certain of the Company's executives and employees in the form of restricted stock units.

ARTICLE 12.
BOARD OF DIRECTORS

12.1    Board Appointments.    From and after the date hereof and until the provisions of this Article 12 cease to be effective, each Stockholder shall vote all of the voting securities of the Company over which such party has voting control, and the Company shall take all necessary and desirable actions within its control and shall cause each of its subsidiaries to take all necessary and desirable actions within its control, so that:

12.1.1  the authorized number of directors on the Board of the Company shall be established at nine (9) directors;

12.1.2  the following individuals shall be elected to the Board of the Company:

(i)     two (2) representatives designated by the [Unions];

(ii)    six (6) representatives designated by [Stockholders other than the Unions]; and

(iii)   the Company's Chief Executive Officer.

12.1.3  in the event that any representative designated by the [Unions] pursuant to Section 12.1.2(i) above ceases to serve as a member of the Board during his term of office, the resulting vacancy on the Board shall be filled by a representative designated by the [Unions] as provided hereunder. The removal from the Board without cause of any representative designated by the Unions pursuant to Section 12.1.2(i) above shall be at the Union's written request, but only upon such written request and under no other circumstances.

12.1.4  in the event that any representative designated by Stockholders other than the [Unions] pursuant to Section 12.1.2(i) above ceases to serve as a member of the Board during his term of office, the resulting vacancy on the Board shall be filled by a representative designated by Stockholders other than the [Unions] as provided hereunder.

12.2    Committee Membership.    Subject to any applicable law, including applicable rules and regulations made pursuant to any such law, any committee that the Board designates pursuant to the Company's by-laws (other than a committee that is delegated the

36

authority to negotiate and/or execute collective bargaining agreements or any other agreements with unions) shall have at least one (1) Union Director designated to such committee.

12.3    Union Non-Voting Members.  The Board shall also include one (1) non-voting board member designated by IBT and one (1) non-voting board member identified by ALPA. The non-voting board member or members shall be qualified and shall not be employees or members of any labor organization. One year after the appointment of the Board, the Board shall consider in good faith whether to add the non-voting board members to the Board as voting board members, provided that doing so (and if the Board decides to do so):

12.3.1  the size of the Board will not increase;

12.3.2  the appointment of the non-voting board members to the Board as voting board members will not effect the [Unions]'s ability to designate two (2) representatives as provided hereunder; and

12.3.3  if the Board adds one of the non-voting board members, it shall also appoint the other.

12.4    Expenses.  The Company shall pay the reasonable out-of-pocket expenses incurred by each director in connection with attending the meetings of the Board and any committee thereof. In addition, the Company shall pay to each Director a nominal fee for his or her service on the audit and compensation committees of the Board. The Company's certificate of incorporation and bylaws shall provide for indemnification and exculpation of directors to the fullest extent permitted under applicable law, and the Company shall enter into indemnification agreements with each director and officer, as approved by the Board.

12.5    Union Right to Board Appointments.

12.5.1 During the period commencing on the date hereof, and expiring five (5) years after the date hereof (the "First Union Board Appointment Period"), the rights of the [Unions] under this Article 12 shall terminate at such time the Union Trust holds, in the aggregate, 20% or less of the equity securities (by total voting power) of the Company that were initially held by the Union Trust on the date hereof; provided that if the Union Trust holds in the aggregate 20% or less of the equity securities (by total voting power) of the Company that were initially held by the Union Trust on the date hereof during the First Union Board Appointment Period, the [Unions] shall only be entitled to designate one (1) non-voting representative to the Board of Directors.

12.5.2  After the expiration of the First Union Board Appointment Period, the rights of the [Unions] under this Article 12 shall terminate at such time the Union Trust holds, in the aggregate, 20% or less of the equity securities (by total voting power) of the Company that were initially held by the Union Trust on the date hereof; provided that (i) if the Union Trust holds in the aggregate  less than 40% (but greater than 20%) of the Company that were initially held by the Union Trust on the date hereof, the [Unions] shall only be entitled to designate one (1) representative to the Board of Directors, and (ii) if the Union Trust holds in the aggregate 20% or less of the equity securities (by total voting power) of the Company held by

37

the Union Trust on the date hereof, the [Unions] shall only be entitled to designate one (1) non-voting representative to the Board of Directors.

12.6    General.    If any party fails to designate a representative to fill a directorship pursuant to the terms of this Article 12, the election of an individual to such directorship shall be accomplished in accordance with the Company's bylaws and applicable law.

12.7    Definitions.

For the purposes of this Article 12:

"ALPA" means the Air Line Pilots Association, in its capacity as union representative for the North American Pilots.

"IBT" means the International Brotherhood of Teamsters, Airline Division, in its capacity as union representative for the World Pilots, the World Flight Attendants and the North American Flight Attendants.

"Unions" means, collectively, [(i) ALPA, (ii) IBT, and (iii) the World Dispatchers represented by the Transport Workers Union AFL-CIO, in its capacity as union representative for the World Dispatchers].

38

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first set forth above.

GLOBAL AVIATION HOLDINGS INC.

By: _____
     Name:
     Title:

Solely for the purpose of Sections 1.4, 3.2 and 4
[THE SECOND LIEN HOLDERS]

By: _____
     Name:
     Title:

Solely for the purpose of Sections 1.4, 3.2 and 4
[NEW WARRANT HOLDER]

By: _____
     Name:
     Title:

NY\5607392.6

## Exhibit M

**New Warrant Agreement**

**GLOBAL AVIATION HOLDINGS INC.**

**WARRANT AGREEMENT**

**Dated as of [●], 2012**

**Warrants to Purchase [Shares of Common Stock] in Global Aviation Holdings Inc.**

## TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS..................................................................................................2
      Section 1.1     Definitions...............................................................................2

ARTICLE 2 ISSUANCE OF WARRANTS; WARRANT CERTIFICATES; BOOK-
      ENTRY WARRANTS ............................................................................................5
      Section 2.1     Issuance of the Warrants....................................................5
      Section 2.2     Form of Warrant; Execution of Warrant Certificates and Warrant
                  Statements ..........................................................................6
      Section 2.3     Issuance of Warrant Certificates and Book-Entry Warrants.......................7

ARTICLE 3 EXERCISE OF WARRANTS .......................................................................8
      Section 3.1     Duration of Warrants .........................................................8
      Section 3.2     Exercise of Warrants..........................................................8
      Section 3.3     Representations and Covenants of the Company.......................12
      Section 3.4     U.S. Citizenship Restrictions. ..................................................13

ARTICLE 4 OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF
      WARRANTS ..........................................................................................................14
      Section 4.1     No Rights as Stockholder Conferred by Warrants, Book-Entry
                  Warrants or Warrant Certificates ..................................................14
      Section 4.2     Lost, Mutilated, Stolen or Destroyed Warrant Certificates .......................14
      Section 4.3     Cancellation of Warrants ...................................................14

ARTICLE 5 EXCHANGE AND TRANSFER.................................................................15
      Section 5.1     Exchange and Transfer .....................................................15
      Section 5.2     Obligations with Respect to Transfers and Exchanges of Warrants..........17
      Section 5.3     Restrictions on Transfers ..................................................18
      Section 5.4     Treatment of Holders of Warrant Certificates .........................................18
      Section 5.5     Fractional Warrants...........................................................18

ARTICLE 6 ADJUSTMENT OF WARRANT SHARE NUMBER; ADJUSTMENT
      OF EXERCISE PRICE..........................................................................................18
      Section 6.1     Adjustments Generally.......................................................18
      Section 6.2     Certain Mechanical Adjustments......................................18
      Section 6.3     Adjustments in the Warrant Share Number.............................19
      Section 6.4     Adjustments for Common Stock Issuances .............................19
      Section 6.5     Adjustments for SAR Cash Payments .................................19
      Section 6.6     Reclassification or Reorganization Event....................................20
      Section 6.7     Adjustments for Certain Issuances or Repricings. ....................................20
      Section 6.8     Notices of Changes in Warrant and Other Events ....................................21
      Section 6.9     No Fractional Shares.........................................................22
      Section 6.10    Form of Warrant ...............................................................22
      Section 6.11    De Minimis Adjustments ..................................................22

i

Section 6.12   No Impairment ..........................................................................................22

**ARTICLE 7 CONCERNING THE WARRANT AGENT ......................................................23**
Section 7.1   Warrant Agent ............................................................................................23
Section 7.2   Conditions of Warrant Agent's Obligations .............................................23
Section 7.3   Resignation and Appointment of Successor .............................................25

**ARTICLE 8 MISCELLANEOUS ........................................................................................27**
Section 8.1   Amendment ................................................................................................27
Section 8.2   Notices and Demands to the Company and Warrant Agent ......................27
Section 8.3   Applicable Law; Waiver of Jury Trial .......................................................28
Section 8.4   Headings ....................................................................................................28
Section 8.5   Counterparts ...............................................................................................28
Section 8.6   Inspection of Agreement ...........................................................................28
Section 8.7   Benefits of This Agreement .......................................................................28
Section 8.8   Termination .................................................................................................28
Section 8.9   Confidentiality ...........................................................................................28
Section 8.10  Prohibited Actions .....................................................................................28

**WARRANT AGREEMENT**

THIS WARRANT AGREEMENT (this "Agreement"), dated as of [●], 2012, is entered into by and among GLOBAL AVIATION HOLDINGS INC., a Delaware corporation (the "Company") and [●], as warrant agent (the "Warrant Agent"). Capitalized terms not otherwise defined herein have the meanings set forth in Section 1.

W I T N E S S E T H :

WHEREAS, on February 5, 2012, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") initiating cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code §§ 101-1330 (as amended, the "Bankruptcy Code") and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Second Amended Joint Plan of Reorganization, as approved by the Bankruptcy Court (the "Plan"), provides that, upon consummation of the Plan, the Company shall issue to Qualifying Represented Employees and Non-Executive, Non-Represented Employees (collectively, the "Initial Holders") Warrants of the Company, entitling the registered holders thereof to purchase shares of the Common Stock;

WHEREAS, the Bankruptcy Court confirmed the Plan and the Effective Date under the Plan occurred on the date first written above;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the Warrants and the Warrant Certificates, and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrants and the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced; and

WHEREAS, all acts and things have been done and performed which are necessary to make the Warrants, when executed on behalf of the Company and countersigned by or on behalf of the Warrant Agent, as provided herein, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the promises and of the mutual agreements herein contained, the parties hereto agree as follows:

**ARTICLE 1**
**DEFINITIONS**

**Section 1.1**    **Definitions**. As used herein:

"Act" has the meaning assigned to such term in Section 3.4.

"Affiliate" means with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.

"Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Bankruptcy Code" has the meaning assigned to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning assigned to such term in the recitals of this Agreement.

"Beneficial Holder" shall mean any person or entity that holds beneficial interests in a Warrant.

"Board of Directors" means the board of directors of the Company or any committee thereof duly authorized to act on behalf of such board.

"Book-Entry Warrants" has the meaning assigned to such term in Section 2.1.

"Business Day" means any day other than a Saturday, Sunday or any other day on which the New York Stock Exchange is authorized or obligated by law or executive order to close.

"By-laws" means, with respect to any Person, its by-laws, or similar organizational document

"Cashless Exercise" has the meaning ascribed to such term in Section 3.2(d).

"Common Stock" means [the Company's Class A Common Stock, [par value $0.01 per share], Class B Common Stock, [par value $0.01 per share] and Class C Common Stock, [par value $0.01 per share], as the case may be under the terms of this Agreement].[1]

"Common Stock Issuance" has the meaning assigned to such term in Section 6.4.

---

[1] NTD: to be confirmed; will follow the new charter and by-laws.

2

"Company" has the meaning assigned to such term in the preamble of this Agreement.

"Depositary" has the meaning assigned to such term in Section 2.2(b).

"Effective Date" means [●], 2012.

"Equity Value" means the total equity value of the Company on a per Share basis, which shall be determined in good faith by a majority of the Board, other than the members of the Board employed by or otherwise affiliated with any person or entity that, together with its Affiliates, own or controls more than 10.0% of the aggregate Shares outstanding as at the date of determination (the "Independent Board Members"), upon the advice of a nationally recognized investment banking firm chosen by the Board with the consent of a majority of the Independent Board Members.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, including any rules or regulations promulgated thereunder.

"Exercise Amount" has the meaning assigned to such term in Section 3.2(c).

"Exercise Date" means any date on which a Warrant is exercised in accordance with the terms of this Agreement and the Warrant.

"Exercise Form" has the meaning assigned to such term in Section 3.2(b).

"Exercise Period" means the period commencing on the date hereof, and expiring at 11:59 p.m., New York City time, on the Expiration Date.

"Exercise Price" means a price per Warrant Share of $[●].

"Expiration Date" means [●], 2017.

"Holder" has the meaning assigned to such term in Section 3.2(a).

"Initial Holders" has the meaning assigned to such term in the recitals of this Agreement.

"Management Equity Incentive Plan" has the meaning assigned to such term in the Plan.

"New Second Lien Lender Warrant Agreement" has the meaning assigned to such term in the Plan.

"Non-Citizen" shall mean any person or entity who is not a "citizen of the United States" as defined in Section 41102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time, including any agent, trustee or representative of a Non-Citizen.

"Non-Executive, Non-Represented Employees" has the meaning assigned to such term in the Plan.

"Person" means an individual, a corporation, a limited liability company, a company, a voluntary association, a general partnership, a limited partnership, a joint venture, an association, a joint-stock company, a trust, an unincorporated organization or a government or any agency, instrumentality or political subdivision thereof.

"Plan" has the meaning assigned to such term in the recitals of this Agreement.

"Qualifying Represented Employees" has the meaning assigned to such term in the Plan.

"Reorganization Event" has the meaning assigned to such term in Section 6.5.

"Registered Holder" has the meaning assigned to such term in Section 2.3(d).

"Second Lien Lender SAR" [has the meaning assigned to such term in the Plan].

"Securities Act" means the Securities Act of 1933, as amended, including any rules or regulations promulgated thereunder.

"Second Lien Lender Warrants" means the warrants issued in accordance with Section 2.1 of that certain warrant agreement, dated [●], 2012 by and among the Company and [●], as warrant agent, relating to the issuance of warrants to the Second Lien Lenders (as defined therein), whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Second Lien Lender Exercise Price" means the exercise price of the Second Lien Lender Warrants as in effect on the date hereof.

"Series A Warrant" means an outstanding Series A Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Series A Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Series B Warrant" means an outstanding Series B Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Series B Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Stockholders Agreement" means the Stockholders Agreement, dated [●], by and among the Company and its stockholders, as amended, restated or otherwise modified from time to time.

"Successor Person" means the successor to the Company or the Person acquiring the Company in connection with a Reorganization Event where the Company is not the surviving Person.

"Transfer Agent" means [●], in its capacity as transfer agent for the Company.

4

"U.S. Citizen" means any person or entity who is a "citizen of the United States" as defined in Section 41102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time.

"Warrants" means an outstanding Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Warrant Agent" means [●], in its capacity as the initial Warrant Agent hereunder, but only for so long as it serves in such capacity, and any successor Warrant Agent appointed pursuant to this Agreement.

"Warrant Agent Office" has the meaning assigned to such term in Section 3.1.

"Warrant Certificates" has the meaning assigned to such term in Section 2.2(a).

"Warrant Register" has the meaning assigned to such term in Section 2.3(c).

"Warrant Share" means the [Common Stock] underlying the Warrants which is deliverable to the holders of Warrants pursuant to the terms of this Agreement, including Section 3.4 hereof.

"Warrant Share Number" means one share of Common Stock, as subsequently adjusted pursuant to the terms of the Warrant and this Warrant Agreement.

"Warrant Statements" has the meaning assigned to such term in Section 2.1.

## ARTICLE 2
## ISSUANCE OF WARRANTS; WARRANT CERTIFICATES; BOOK-ENTRY WARRANTS

**Section 2.1    Issuance of the Warrants**.

The Company shall issue, on the terms and subject to the conditions of this Agreement and pursuant to the Plan, on and as of the Effective Date, Warrants to purchase the Warrant Shares to each Initial Holder, rounded up to the nearest whole number of underlying Warrant Shares such that no Initial Holder shall receive a Warrant that includes a fraction of a Warrant Share, and such that the Company shall issue to the Initial Holders Warrants entitling the Holders to collectively purchase, in the aggregate, up to [●] Warrant Shares, as such amounts may be adjusted from time to time pursuant to this Agreement.

Each Warrant entitles the Holder to purchase from the Company, upon the terms and subject to the conditions hereinafter set forth, a number of fully paid and nonassessable Warrant Shares equal to the Warrant Share Number at a purchase price per share equal to the Exercise Price. The Warrant Share Number is subject to adjustment as provided herein, and all references to "Warrant Share Number" herein shall be deemed to include any such adjustment or series of adjustments.

On the Effective Date, the Company will deliver, or cause to be delivered to the Depositary, one or more Warrant Certificates evidencing a portion of the Warrants. The remainder of the Warrants, if any, shall be issued by book-entry registration on the books of the Warrant Agent ("Book-Entry Warrants") and shall be evidenced by statements issued by the Warrant Agent from time to time to the Registered Holders of Book-Entry Warrants reflecting such book-entry position (the "Warrant Statements").

**Section 2.2** **Form of Warrant; Execution of Warrant Certificates and Warrant Statements**.

(a)    Subject to Sections 5.1 and 5.2 of this Agreement, the Warrants, Warrants shall be evidenced (i) by book-entry registration on the books and records of the Warrant Agent and evidenced by the Warrant Statements, in substantially the form set forth in Exhibit A-1 hereto, and/or (ii) by one or more certificates (the "Warrant Certificates"), with the forms of election to exercise and of assignment printed on the reverse thereof, in substantially the form set forth in Exhibit A-2 hereto. The Warrant Statements and the Warrant Certificates shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any applicable law, including applicable rules and regulations made pursuant to any such law. The Warrant Certificates and the Warrant Statements shall be signed on behalf of the Company by the chairman of the Board of Directors, the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, and each Warrant Certificate and Warrant Statement may but need not be attested by the Company's secretary or one of its assistant secretaries. Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates and Warrant Statements.

(b)    The Warrant Certificates shall be deposited with the Warrant Agent and registered in the name of Cede & Co., as the nominee of The Depositary Trust Company (the "Depositary"). Each Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)    No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder, and such signatures may be manual or facsimile signatures of an authorized representative of the Warrant Agent and may be imprinted or otherwise reproduced on the Warrant Certificates.

(d)    In case any officer of the Company who shall have signed any of the Warrant Certificates or Warrant Statements (either manually or by facsimile signature) shall

cease to hold such officer position before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, or before the Warrant Statements so signed shall have been delivered to the Registered Holders thereof, as the case may be, such Warrant Certificates or Warrant Statements may be countersigned (either manually or by facsimile signature, in the case of the Warrant Certificates) and delivered by the Warrant Agent notwithstanding that the person who signed such Warrant Certificates or Warrant Statements has ceased to hold such officer position with the Company, and any Warrant Certificate or Warrant Statement may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate or Warrant Statement, hold such officer positions with the Company, although at the date of the execution of this Agreement any such person did not hold such officer position.

**Section 2.3**    **Issuance of Warrant Certificates and Book-Entry Warrants**.

(a)    Warrant Certificates evidencing Warrants shall be executed by the Company in the manner set forth in Section 2.2 and delivered to the Warrant Agent.  Upon written order of the Company, the Warrant Agent shall (i) register in the Warrant Register the Book-Entry Warrants and (ii) upon receipt of Warrant Certificates duly executed on behalf of the Company, countersign (either manually or by facsimile signature) each such Warrant Certificate. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Book-Entry Warrants and the number of Warrants that are to be issued as Warrant Certificates. A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

(b)    Subsequent to the original issuance of Warrant Certificates to the Initial Holders, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(c)    The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants as well as any Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Sections 5.1 and 5.2 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Warrant Register shall also include such additional information as is required to be included in it by applicable law.  No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Registered Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to affect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.

(d)    Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, subject to applicable law, the Company and the Warrant Agent may deem and treat the person in whose name any Warrant is registered upon the Warrant Register (the "Registered Holder" of such Warrant) as the

absolute owner of such Warrant (notwithstanding any notation of ownership or other writing on a Warrant Certificate made by anyone other than the Company or the Warrant Agent), for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

(e)    The Company shall provide customary opinions of counsel on or prior to the Effective Date that states that states that all Warrants or Warrant Shares, as applicable, are:

(1)    registered under the Securities Act of 1933, as amended, or are exempt from such registration; and

(2)    any Warrant Shares issuable upon exercise of a Warrant will be upon issuance, validly issued, fully paid and non-assessable.

## ARTICLE 3
## EXERCISE OF WARRANTS

**Section 3.1    Duration of Warrants**. Subject to the provisions of this Agreement, Warrants may be exercised, in whole or in part, on any Business Day during the Exercise Period, at the offices of the Warrant Agent at [*address of Warrant Agent*], via e-mail or facsimile or such other place as the Company or Warrant Agent may notify the Holders from time to time, (the "Warrant Agent Office"). Each Warrant not exercised at or before the Expiration Date shall thereupon become void, and at such time all rights, under this Agreement and the applicable Warrant Certificate, of the Holder of any such Warrant shall automatically cease, with respect to any such Warrant.

**Section 3.2    Exercise of Warrants**.

(a)    Each Warrant shall entitle (i) in the case of the Book-Entry Warrants, the Registered Holder thereof and (ii) in the case of Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, the Beneficial Holder thereof (the Registered Holders and the Beneficial Holders referenced in clauses (i) and (ii) above, collectively, the "Holders"), subject to the provisions of such Warrant and of this Agreement, to purchase the Warrant Shares specified in such Warrant, at the Exercise Price.

(b)    Subject to the provisions of the Warrants and this Agreement, the Holder of a Warrant may exercise such Holder's right to purchase the Warrant Shares, in whole or in part, at any time or from time to time (i) in the case of persons who hold Book-Entry Warrants, by providing an exercise form for the election to exercise such Warrant (each, an "Exercise Form") substantially in the form of Exhibit B hereto, and (ii) in the case of Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, by providing an exercise form (as provided by such Holder's broker) to its broker, in each case properly completed and executed by the Registered Holder or the Beneficial Holder thereof, as the case may be, together with payment to the Warrant Agent (for the account of the Company) of the Exercise Price in accordance with Section 3.2(c).

(c)    The payment of the Exercise Price shall be made, at the option of the Holder, (i) in United States dollars by certified or official bank check payable to the Company, or by wire transfer to an account specified in writing by the Company or the Warrant Agent to such Holder, in either case in immediately available funds in an amount equal to the aggregate Exercise Price for such Warrant Shares as specified in the Exercise Form (the "Exercise Amount"), (ii) by Cashless Exercise in accordance with Section 3.2(d) or (iii) by any combination of clauses (i) and (ii).

(d)    In lieu of paying the Exercise Amount by certified or official bank check or by wire transfer, any Holder may elect to exercise Warrants by authorizing the Company to withhold from issuance such number of Warrant Shares which, when multiplied by the Equity Value on the business day immediately prior to the exercise date is equal to the aggregate Exercise Price of all Warrants being exercised. The number of the Warrant Shares withheld pursuant to the preceding sentence shall thereupon no longer be issuable under the Warrant. Such exercise (a "Cashless Exercise") shall be honored by the Company and the Warrant Agent without payment by the Holder of any Exercise Amount or any cash or other consideration; provided, however, that the Holder shall pay such amounts, if any, as may be required pursuant to Sections 3.2(k) and 5.2(c), or such taxes as may be payable upon issuance of Warrant Shares to a Person other than the Holder. The formula for determining the Warrant Shares to be issued in a Cashless Exercise is as follows:

$$X= \frac{(A-B) \times C}{A}$$

where:

$X$ = the number of Warrant Shares issuable upon exercise of the Warrant pursuant to this subsection (d).

$A$ = the Equity Value immediately preceding the exercise date.

$B$ = the Exercise Price.

$C$ = the number of Warrant Shares as to which a Warrant is then being exercised including the withheld Warrant Shares.

If, with respect to any purported or attempted Cashless Exercise of Warrants, the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via such purported or attempted Cashless Exercise and such Warrants shall be deemed to have not been exercised.

(e)    The date on which payment in full of the Exercise Amount is received by the Warrant Agent (or deemed to be received in the case of a Cashless Exercise) shall, subject to receipt of the Exercise Form, be deemed to be the date on which the Warrant is exercised. The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of Warrants in an account of the Company maintained with it (or in such other account as may be designated by the Company) and shall advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties, at the end of

each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Company in writing.

(f)     Subject to Article 6, upon surrender of the Exercise Form and payment of the Exercise Amount (or the deemed payment of the Exercise Amount in connection with a Cashless Exercise) in connection with the exercise of Warrants by any Holder:

(i)     the Warrant Agent shall requisition from the Transfer Agent for issuance and delivery to or upon the written order of the applicable Holder and in such name or names as the Holder may designate (provided, that the Holder shall pay any and all taxes payable as a result of such designation), a certificate or certificates for the Warrant Shares issuable upon the exercise of the Warrants evidenced by the underlying Warrant Certificate or Book-Entry Warrant, as the case may be, less any Warrant Shares withheld in connection with a Cashless Exercise, if applicable; and

(ii)     the Company shall, as promptly as practicable and at its expense, and in any event within three (3) Business Days thereafter, cause to be issued to the Holder the aggregate number of whole Warrant Shares (rounded up to the nearest whole share, subject to Section 6.9 hereof) issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided.

The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the order delivered by the Holder. The certificate or certificates for such Warrant Shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares, as applicable, as of the date of surrender of the applicable Exercise Form at the Warrant Agent Office duly executed by the Holder thereof and upon payment of the Exercise Amount or the deemed payment of the Exercise Amount in connection with a Cashless Exercise.

(g)     In the event that any Holder makes a partial exercise of the Warrants evidenced by any Warrant Certificate, the Warrant Agent shall within a reasonable time, and in any event not exceeding three (3) Business Days, issue and deliver a new Warrant Certificate to the applicable Holder evidencing a number of Warrants equal to the number of Warrants represented by the Warrant Certificate immediately prior to such partial exercise minus the number of Warrants exercised in such partial exercise. The Warrant Agent is hereby authorized and directed to countersign such new certificate.

(h)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(i)     The Warrant Agent shall:

(i)     examine the Exercise Forms and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face,

10

such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    where an Exercise Form or any other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between Exercise Forms received and delivery of Warrants to the Warrant Agent's account;

(iv)    advise the Company no later than three (3) Business Days after receipt of any Exercise Form, of (a) the receipt of such Exercise Form and the number of Warrants evidenced thereby that have been exercised in accordance with the terms and conditions of this Agreement, (b) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise, subject to timely receipt from the Depositary of the necessary information, and (c) such other information as the Company shall reasonably require; and

(v)    subject to Warrant Shares being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depositary, liaise with the Depositary and endeavor to effect such delivery to the relevant accounts at the Depositary in accordance with its customary requirements.

(j)    All questions as to the validity, form and sufficiency (including time of receipt) of any exercised Warrant, Exercise Form or the Warrant Certificate evidencing any exercised Warrant will be determined by the Company in its reasonable discretion, which determination shall be final and binding (but for the avoidance of doubt subject to review by a court of competent jurisdiction). The Company reserves the right to reject any and all Exercise Forms not in proper form or for which any corresponding agreement by the Company to exchange would be unlawful. Such determination by the Company shall be final and binding on the Holders (but for the avoidance of doubt subject to review by a court of competent jurisdiction). Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. The Warrant Agent shall not be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(k)    Prior to the delivery of any Warrant Shares upon the exercise of a Warrant, the Holder shall pay, or make adequate provision acceptable to the Company for the satisfaction of, the statutory minimum prescribed amount of federal and state income tax and other withholding obligations of the Company, including with respect to any Cashless Exercise permitted hereunder, by having the Company withhold from the Warrant Shares otherwise deliverable in connection with such exercise such number of Warrant Shares which, when multiplied by the Equity Value equal to the amount of such federal and state tax and other withholding obligations not satisfied by the cash first withheld.

11

(l)    The Company acknowledges that the bank accounts maintained by [the Warrant Agent] in connection with the services provided under this Agreement will be in its name and that [the Warrant Agent] may receive investment earnings therefrom. Neither the Company nor the Holders will be entitled to receive interest on any deposits of the Exercise Price.

**Section 3.3**    <u>**Representations and Covenants of the Company**</u>.

(a)    For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued [Class A Shares, Class B Shares and Class C Shares], a number of shares equal to the number of [Class A Shares, Class B Shares and Class C Shares] deliverable upon the exercise of all outstanding Warrants, as applicable, and the Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued [Class A Shares, Class B Shares and Class C Shares] as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent. The Warrant Agent is hereby irrevocably authorized to requisition from time to time from the Transfer Agent share certificates evidencing [Class A Shares, Class B Shares and Class C Shares] issuable upon exercise of outstanding Warrants, and the Company will supply the Transfer Agent with duly executed stock certificates for such purpose.

(b)    Before taking any action which would cause an adjustment pursuant to Article 6 to reduce the Exercise Price below the then par value (if any) of the Warrant Shares, the Company shall take any and all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock at the Exercise Price as so adjusted.

(c)    The Company covenants that all [Class A Shares, Class B Shares and Class C Shares] issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid, nonassessable free of preemptive rights and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof and that all Class A Shares, Class B Shares and Class C Shares shall be identical as to economics and differ only as to voting rights. If at any time prior to the Expiration Date the number and kind of authorized but unissued shares of the Company's shall not be sufficient to permit exercise in full of the Warrants, the Company will promptly take such corporate action as may be necessary to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes. The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Shares to issue Warrant Shares upon the exercise of Warrants. Without limiting the generality of the foregoing, the Company will not increase the stated or par value per share, if any, of the [Class A Shares, Class B Shares or Class C Shares] above the Exercise Price per share in effect immediately prior to such increase in stated or par value.

(d)    The Company represents that as of the date hereof, the Warrant Shares represent, in aggregate, [●]% of the outstanding shares of Common Stock of the Company.

(e)     The Company shall promptly secure the listing of all of the Warrant Shares (after the issuance thereof) upon each national securities exchange and automated quotation system, if any, upon which the Common Stock is then listed (subject to official notice of issuance).  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 3.3(e).

(f)     If any shares of Common Stock required to be reserved for purposes of the exercise of Warrants require, under any Federal or state law or applicable governing rule or regulation of any national securities exchange, registration with or approval of any governmental authority, or listing on any such national securities exchange before such shares may be issued upon exercise, the Company will use its reasonable best efforts to cause such shares to be duly registered or approved by such governmental authority or listed on the relevant national securities exchange, as the case may be.

**Section 3.4     U.S. Citizenship Restrictions.**

Notwithstanding the other provisions of this Warrant Agreement, in order to facilitate the Company's compliance with the provisions of Subtitle VII of Title 49 of the United States Code, as amended, or as the same may be from time to time amended, and the administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time (the "Act"), concerning the ownership of its Common Stock by Non-Citizens:

(a)     in connection with any exercise of a Warrant, a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) shall advise the Company whether or not it satisfies the requirements to be a U.S. Citizen. Under its By-laws, the Company may require a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) to provide it with such documents and other information as it may request as reasonable proof that the Holder (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of the Warrants) satisfies the requirements to be a U.S. Citizen.

(b)     if a Holder can establish to the Company's reasonable satisfaction that it (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) is a U.S. Citizen for purposes of the Act, then such Holder may, pursuant to the terms of this Agreement and the Warrant, exercise Warrants into shares of Class A Common Stock to the extent the receipt of [shares of Class A Common Stock] deliverable upon exercise of the Warrants would comply in all respects with the Company's By-Laws.

(c)     if a Holder cannot establish to the Company's reasonable satisfaction that it (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) is a U.S. Citizen for purposes of the Act, then such Holder may, pursuant to the terms of this Agreement and the Warrant, only exercise Warrants [into shares of Class C Common Stock] to the extent the receipt of [shares of Class C Common Stock] deliverable upon exercise of the Warrants would comply in all respects with the Company's By-Laws.

13

(d)      any sale, transfer or other disposition of a Warrant by any Holder that is a Non-Citizen to a Person who is a U.S. Citizen must be a complete transfer of such Holder's interests to such Person in the Warrant and the Warrant Shares issuable upon exercise or conversion thereof with no ability to direct or control such Person. The foregoing restriction shall also apply to any Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants.

## ARTICLE 4
## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

**Section 4.1    No Rights as Stockholder Conferred by Warrants, Book-Entry Warrants or Warrant Certificates**.  No Book-Entry Warrant, Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement shall be construed to, entitle the Holder or any beneficial owner thereof (in each case solely in its capacity as a holder of a Warrant) to any of the rights of a registered holder or beneficial owner of Warrant Shares, including, without limitation, the right to receive (as a shareholder) any dividends or distributions paid with respect to Warrant Shares, the right to vote or to consent or to receive notice as a shareholder of the Company with respect to the election of directors of the Company or any other matter with respect to which shareholders of the Company are entitled to vote or consent or receive notice, or any other rights whatsoever as shareholders of the Company; provided, that the Initial Holders shall be deemed a party to the Stockholders Agreement, and have all the rights and privileges attendant thereto as if a Stockholder (as defined under the Stockholders Agreement) thereunder, solely with respect to Sections 1.4, 3.2, 4.1, 4.2 and 4.3 thereof.

**Section 4.2    Lost, Mutilated, Stolen or Destroyed Warrant Certificates**.  If any of the Warrant Certificates shall be mutilated, lost, stolen or destroyed, the Company shall issue, and the Warrant Agent shall countersign and deliver, in exchange and substitution for, and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence reasonably satisfactory to the Warrant Agent and the Company of the loss, theft or destruction of such Warrant Certificate and an affidavit and the posting of an indemnity or bond satisfactory to the Warrant Agent and the Company. Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Warrant Agent may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

**Section 4.3    Cancellation of Warrants**.  If the Company shall purchase or otherwise acquire Warrants, the Warrant Certificates representing such Warrants shall thereupon be delivered to the Warrant Agent, if applicable, and shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof. The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

**ARTICLE 5**
**EXCHANGE AND TRANSFER**

**Section 5.1**     **Exchange and Transfer**.

(a)     *Transfer and Exchange of Warrant Certificates or Beneficial Interests Therein.* The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register, upon delivery to the Warrant Agent, at its office designated for such purpose, of a properly completed form of assignment substantially in the form of Exhibit C hereto, duly signed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program and, in the case of a transfer of a Global Warrant Certificate, upon surrender to the Warrant Agent of such Global Warrant Certificate, duly endorsed. Upon any such registration of transfer, a new Global Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee.

(b)     *Exchange of a Beneficial Interest in a Warrant Certificate for a Book-Entry Warrant.*

(i)     Any Holder of a beneficial interest in a Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant. Upon receipt by the Warrant Agent from the Depositary or its nominee of written instructions or such other form of instructions as is customary for the Depositary on behalf of any person having a beneficial interest in a Warrant Certificate, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depositary and Warrant Agent, the number of Warrants represented by the Warrant Certificate to be reduced by the number of Warrants to be represented by the Book-Entry Warrants to be issued in exchange for the beneficial interest of such person in the Warrant Certificate and, following such reduction, the Warrant Agent shall register in the name of the Holder a Book-Entry Warrant and deliver to said Holder a Warrant Statement.

(ii)     Book-Entry Warrants issued in exchange for a beneficial interest in a Warrant Certificate pursuant to this Section 5.1(a) shall be registered in such names as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver the applicable Warrant Statements to the persons in whose names such Warrants are so registered.

(c)     *Transfer and Exchange of Book-Entry Warrants.* When Book-Entry Warrants are presented to the Warrant Agent with a written request (i) to register the transfer of the Book-Entry Warrants; or (ii) to exchange such Book-Entry Warrants for an equal number of Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing.

15

(d)    *Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Warrant Certificate.* A Book-Entry Warrant may not be exchanged for a beneficial interest in a Warrant Certificate except upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Warrant Certificate to reflect an increase in the number of Warrants represented by the Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Warrant Certificate to be increased accordingly. If no Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall countersign a new Warrant Certificate representing the appropriate number of Warrants.

(e)    *Restrictions on Transfer and Exchange of Warrant Certificates.* Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 5.1(f)), unless and until it is exchanged in whole for a Book-Entry Warrant, a Warrant Certificate may not be transferred except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f)    *Book-Entry Warrants.* If at any time:

(i)    the Depositary for the Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Warrant Certificates and a successor Depositary for the Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice; or

(ii)    the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Book-Entry Warrants under this Agreement,

then the Warrant Agent, upon written instructions signed by an officer of the Company, shall register Book-Entry Warrants, in an aggregate number equal to the number of Warrants represented by the Warrant Certificates, in exchange for such Warrant Certificates.

(g)    *Restrictions on Transfer.* No Warrants or Warrant Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

(h)    *Cancellation of Warrant Certificate.* At such time as all beneficial interests in Warrant Certificates have either been exchanged for Book-Entry Warrants, or been redeemed, repurchased, cancelled or exercised, all Warrant Certificates shall be returned to, or retained and cancelled by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent, subject to applicable law.

### Section 5.2    <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(a)    To permit registrations of transfers and exchanges, the Company shall execute Warrant Certificates, if applicable, and the Warrant Agent is hereby authorized, in accordance with the provisions of Section 2.3 and this Article 5, to countersign such Warrant Certificates, either manually or by facsimile signature, if applicable, or register Book-Entry Warrants, if applicable, as required pursuant to the provisions of this Article 5 and for the purpose of any distribution of new Warrant Certificates contemplated by Section 4.2 or additional Warrant Certificates contemplated by Article 6.

(b)    All Book-Entry Warrants and Warrant Certificates issued upon any registration of transfer or exchange of Book-Entry Warrants or Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Book-Entry Warrants or Warrant Certificates surrendered upon such registration of transfer or exchange.

(c)    No service charge shall be imposed upon a Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

(d)    So long as the Depositary, or its nominee, is the registered owner of a Warrant Certificate, the Depositary or such nominee, as the case may be, will be considered the sole owner or holder of the Warrants represented by such Warrant Certificate for all purposes under this Agreement. Except as provided in Section 5.1(a) and Section 5.1(f) upon the exchange of a beneficial interest in a Warrant Certificate for Book-Entry Warrants, Beneficial Holders will not be entitled to have any Warrants registered in their names, and will under no circumstances be entitled to receive physical delivery of any such Warrants and will not be considered the Registered Holder thereof under the Warrants or this Agreement. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(e)    Subject to Section 5.1(a), Section 5.1(c) and Section 5.1(d) and this Section 5.2, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register, upon surrender of Warrant Certificates, if applicable, representing such Warrants at the Warrant Agent Office as set forth in Section 8.3, duly endorsed, and accompanied by a completed form of assignment substantially in the form of Exhibit C attached hereto (or with respect to a Book-Entry Warrant, only such completed form of assignment substantially in the form of Exhibit C attached hereto), duly signed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program. Upon any such registration of transfer, a new Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee for the Warrants so transferred

17

(and, if any Warrants are not transferred to the transferee, to the transferor for the Warrants remaining registered in the transferor's name)..

**Section 5.3** **Restrictions on Transfers**.  The Warrants were issued in reliance upon an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code. The Warrants were not and the Warrants will not be registered under the Securities Act or any state securities law, and to the extent a holder of the Warrants is an "underwriter" under the Securities Act, the Warrants may not be sold or transferred in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder. Without obtaining the consent of the Company to assign or transfer this Warrant, Warrants and all rights thereunder shall be freely transferable, in whole or in part, by the registered holder thereof. For the avoidance of doubt, the Holders shall not be responsible for expenses or other charges incurred by the Company or the Warrant Agent in connection with the preparation, execution and delivery of the new warrants or related documentation issuable to transferees.

**Section 5.4** **Treatment of Holders of Warrant Certificates**.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of the Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

**Section 5.5** **Fractional Warrants**.  The Warrant Agent shall not be required to effect any registration of transfer or exchange which will result in the issuance of a Warrant Certificate for a fraction of a Warrant.

## ARTICLE 6
## ADJUSTMENT OF WARRANT SHARE NUMBER; ADJUSTMENT OF EXERCISE PRICE

**Section 6.1** **Adjustments Generally**.  The Warrant Share Number and the Exercise Price are subject to adjustment from time to time upon the occurrence of any of the events enumerated in this Article 6. If the Company takes any action affecting the Warrant Shares, other than actions described in Article 6, which in the opinion of the Board would adversely affect the exercise rights of the Holder, the Warrant Share Number or the Exercise Price shall be adjusted for the Holder's benefit, to the extent permitted by law, in such manner, and at such time, as such Board shall reasonably determine to be equitable in the circumstances. Failure of the Board to provide for any such adjustment will be evidence that the Board has determined that it is equitable to make no such adjustments in the circumstances.

**Section 6.2** **Certain Mechanical Adjustments**.  If after the Effective Date, and subject to the provisions of Section 6.9, the Company shall (i) declare a dividend or make a distribution on the Common Stock payable in Common Stock, (ii) subdivide, reclassify or recapitalize a class of outstanding Common Stock into a greater number of shares, (iii) combine, reclassify or recapitalize a class of outstanding Common Stock into a smaller number of shares,

or (iv) issue any shares of its capital stock by reclassification of its Common Stock, the Warrant Shares issuable upon exercise of Warrants at the time of the record date of such dividend, distribution, subdivision, combination, reclassification, recapitalization or issuance shall be adjusted so that the Holders shall be entitled to receive the aggregate number and kind of shares which, if their Warrants had been exercised in full immediately prior to such event, the Holders would have owned upon such exercise and been entitled to receive by virtue of such dividend, distribution, subdivision, combination, reclassification, recapitalization or issuance. Any adjustment required by this Section shall be made successively immediately after the distribution date, in the case of a dividend or distribution, or the effective date, in the case of such subdivision, combination, reclassification, recapitalization or issuance, to allow the purchase of such aggregate number and kind of shares.

Section 6.3    **Adjustments in the Warrant Share Number**. Whenever the Warrant Shares issuable upon the exercise of Warrants is adjusted pursuant to Section 6.2, the Warrant Share Number shall be adjusted (to the nearest one hundredth of a Warrant) by multiplying the Warrant Share Number applicable immediately prior to such adjustment by a fraction (x) the numerator of which shall be the number of Warrant Shares issuable upon exercise of each Warrant immediately after such adjustment, and (y) the denominator of which shall be the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to such adjustment.

Section 6.4    **Adjustments for Common Stock Issuances**. If on or after the Effective Date, and subject to the provisions of Section 6.9, the Company shall (i) issue Common Stock upon exercise of Series A Warrants; (ii) issues Common Stock upon exercise of Series B Warrants; (iii) issue Common Stock pursuant to the Second Lien Lender SAR or (iv) issue Common Stock pursuant to the Management Equity Incentive Plan (any such event being herein called a "Common Stock Issuance"), the Warrant Share Number shall be increased to a number determined by multiplying the Warrant Share Number then in effect by a fraction, the numerator of which shall be the total outstanding Common Stock of Company immediately following such Common Stock Issuance, and the denominator of which shall be the total outstanding Common Stock of Company immediately preceding such Common Stock Issuance.  Any adjustment required by this Section shall be made successively immediately after the date of such Common Stock Issuance.

Section 6.5    **Adjustments for SAR Cash Payments**. If, on or after the Effective Date, and subject to the provisions of Section 6.9, the Company shall make a cash payment pursuant to the Second Lien Lender SAR (such event being herein called a "SAR Cash Payment"), the Warrant Share Number shall be increased to a number determined by multiplying the Warrant Share Number then in effect by a fraction, the denominator of which shall be the total outstanding Common Stock of Company immediately following such SAR Cash Payment, and the numerator of which shall be the sum of (a) the total outstanding Common Stock immediately prior to such SAR Cash Payment and (b) the Common Stock that would have been issued in lieu of the SAR Cash Payment if such an election to receive Common Stock would have been made pursuant to the Second Lien Lender SAR. Any adjustment required by this Section 6.5 shall be made successively immediately after the date of such SAR Cash Payment.

19

**Section 6.6** **Reclassification or Reorganization Event**. In the case of any reclassification or reorganization of the outstanding Warrant Shares (other than a change covered by Section 6.2 or that solely affects the par value of such Warrant Shares), each Holder shall thereafter have the right to exercise its Warrants and in lieu of the Warrant Shares that would otherwise be issuable upon such exercise, receive the kind and amount of shares of stock or other securities or property (including cash) that such Holder would have received pursuant to such reclassification or reorganization if such Holder had exercised such Warrants immediately prior to such event and shall have the same rights of election, if any, as holders of the Warrant Shares. The immediately preceding sentence shall similarly apply to successive reclassifications and reorganizations. If a Reorganization Event shall occur, the certificate or articles of incorporation of the continuing or surviving or acquiring or resulting entity, or any contract or agreement providing for such Reorganization Event, shall provide (and the Company shall not consummate any Reorganization Event unless such documents so provide) that, so long as any Warrant remains outstanding, each Warrant, upon the exercise thereof at any time after the consummation of such Reorganization Event, shall be exercisable into (at an initial Exercise Price equal to the Exercise Price in effect immediately prior to such Reorganization Event, and at an initial Warrant Share Number equal to the Warrant Share Number immediately prior to such Reorganization Event, but each subject to any adjustment pursuant to the terms hereof), in lieu of the Warrant Shares issuable upon such exercise prior to such consummation, the amount of cash, securities or other property receivable pursuant to such Reorganization Event by a holder of the number of Warrant Shares for which a Warrant is exercisable immediately prior to the effective time of such Reorganization Event. The provisions set forth herein providing for adjustments and otherwise for the protection of the holders of Warrants shall thereafter continue to be applicable on an as nearly equivalent basis as may be practicable and any such continuing, surviving, acquiring or resulting entity shall expressly assume all of the obligations of the Company set forth herein to the extent applicable. It is acknowledged and agreed that if, in connection with any Reorganization Event other than a Reorganization Event with any Person affiliated with the Company, the Warrants become exercisable solely for cash, and at the time of consummation of such Reorganization Event the Exercise Price is higher than the amount of cash for which such Warrant is exercisable, then, upon consummation of such Reorganization Event, all Warrants then outstanding with such higher Exercise Price shall automatically be terminated and cancelled without payment, and the Company may unilaterally terminate this Warrant Agreement by giving written notice thereof to the Warrant Agent and to the Holders. For purposes hereof, a "Reorganization Event" shall mean (i) a consolidation, merger, amalgamation, share exchange, sale of all or substantially all assets or similar transaction of the Company with or into another Person pursuant to which the Warrant Shares are changed into, converted into or exchanged for cash, securities or other property (whether of the Company or another Person) other than in circumstances covered by Section 6.2; (ii) a reorganization, recapitalization or reclassification or similar transaction in which the Warrant Shares are exchanged for securities other than Warrant Shares (other than in circumstances covered by Section 6.2); or (iii) a statutory exchange of the outstanding Warrant Shares for securities of another Person. The provisions of this Section 6.6 shall apply similarly to all successive reclassifications, reorganizations and events constituting Reorganization Events.

**Section 6.7** **Adjustments for Certain Issuances or Repricings.**

20

(a)    Other than in the event of an adjustment to the Second Lien Lender Exercise Price as a result of an event giving rise to an independent adjustment to the Exercise Price or the Warrant Share Number, in the event of a reduction of the Second Lien Lender Exercise Price, the Exercise Price shall be reduced proportionately.

(b)    If on or after the Effective Date, the Company shall issue Common Stock (other than Common Stock issued pursuant to the Management Equity Incentive Plan, this Agreement, the Second Lien Warrants or the Second Lien Lender SAR) (or rights, warrants or other securities exercisable or convertible into or exchangeable into such Common Stock, or stock appreciation rights or other rights to receive payments based upon the value of Common Stock ("Common Stock Equivalents")) (collectively, the "Additional Common Stock") at a price per share of Common Stock less than the Equity Value as of the date of such issuance (a "Below Market Issuance"), then the Exercise Price shall be reduced to the price (the "Adjusted Exercise Price") determined by multiplying the Exercise Price then in effect by a fraction, the numerator of which is the sum of (a) the total outstanding Common Stock on a fully diluted basis immediately preceding such Below Market Issuance plus (b) the number of shares of Additional Common Stock (treating Common Stock Equivalents as having been fully exercised or converted) which the aggregate consideration received by the Company in the Below Market Issuance would purchase at a price per share equal to the Equity Value as of the date immediately prior to such Below Market Issuance and the denominator of which is the total outstanding Common Stock of Company on a fully diluted basis immediately after such Below Market Issuance. In the event of a Below Market Issuance, the Warrant Share Number shall also be increased to the number obtained by dividing (x) the product of the Warrant Share Number before such adjustment and the Exercise Price in effect immediately prior to the Below Market Issuance by (y) the Adjusted Exercise Price.  For purposes of this Section 6.7(b), (i) the consideration received by the Company shall not be deemed reduced by any underwriting or placement agency fees, discounts, commissions and expense, (ii) the value of any non-cash portion of the consideration shall be deemed to be  the fair market value of such consideration as determined in good faith by the majority of the Independent Board Members, upon the advice of a nationally recognized investment banking firm chosen by the Board with the consent of a majority of the Independent Board Members and (iii) to the extent the Below Market Issuance consists of the issuance of Common Stock Equivalents, the consideration received by the Company shall be deemed to include the additional consideration that would payable to the Company upon the eventual exercise, conversion or exchange of such Common Stock Equivalent. For purposes of this Section 6.7, any issuance of Common Stock to an independent third party who prior to such issuance was not a beneficial or record holder of any securities of the Company or a creditor of the Company shall be conclusively presumed not to be a Below Market Issuance. For the avoidance of doubt, no increase in the Exercise Price or reduction in the Warrant Share Number shall be made pursuant to this Section 6.7 (or Sections 6.1, 6.4 or 6.5).

**Section 6.8    Notices of Changes in Warrant and Other Events**. Upon every adjustment of the Warrant Share Number or of the Exercise Price, the Company shall give written notice thereof to the Warrant Agent and to each Holder, which notice shall state the Warrant Share Number and Exercise Price (as the case may be) resulting from such adjustment and shall set forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

21

Such giving of notice shall be initiated at least ten (10) Business Days prior to the date fixed as an effective date or the date of closing of the Company's register of members for the determination of the shareholders entitled to such issuance. Such notice shall specify such record date or the date of closing of the register of members, as the case may be. Failure to provide such notice shall not affect the validity of any action taken in connection with such issuance or other proposed transaction. For the avoidance of doubt, no such notice shall supersede or limit any adjustment otherwise called for hereby by reason of any event as to which notice is required by this Section 6.8.

Upon each determination of Equity Value hereunder, the Company shall promptly give notice thereof to the Holder, setting forth in reasonable detail the calculation of such Equity Value, and the method and basis of determination thereof.

At least five (5) Business Days prior to taking any action that would give rise to an adjustment of the Warrant Share Number or of the Exercise Price, the Company shall give written notice thereof to each Holder, which notice shall state the anticipated Warrant Share Number and Exercise Price (as the case may be) that would result from such adjustment and shall set forth in reasonable detail the relevant action, method of calculation and the facts upon which such calculation is based.

**Section 6.9    No Fractional Shares**. Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants. If, by reason of any adjustment made pursuant to this Article 6, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a Warrant Share, the Company shall, upon such exercise, round up to the nearest whole number the number of Warrant Shares to be issued to the Holder or issue cash for the value of such fractional Warrant Shares, as reasonably determined by the Board.

**Section 6.10    Form of Warrant**. The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article 6, and Warrant Certificates issued after such adjustment may state the same Exercise Price and the same Warrant Share Number as is stated in the Warrant Certificates initially issued pursuant to this Agreement. However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

**Section 6.11    De Minimis Adjustments**. No adjustment in the Warrant Share Number shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares purchasable upon the exercise of each Warrant; provided, however, that any adjustments which by reason of this Section 6.11 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations shall be made to the nearest to the nearest one-hundredth of a Warrant Share.

**Section 6.12    No Impairment**. The Company will not, by amendment of its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger,

dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder.

## ARTICLE 7
## CONCERNING THE WARRANT AGENT

**Section 7.1** <u>**Warrant Agent**</u>. The Warrant Agent shall serve as the agent of the Company in respect of the Warrants and the Warrant Certificates, upon the terms of, and subject to the conditions set forth in, this Agreement and the Warrant Certificates. The Warrant Agent shall have the powers and authority granted to and conferred upon it hereunder and in the Warrant Certificates, and such further powers and authority as the Company may hereafter grant to or confer upon it. All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions of this Agreement.

**Section 7.2** <u>**Conditions of Warrant Agent's Obligations**</u>.   The Warrant Agent accepts its obligations herein set forth upon the terms and conditions hereof, including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(a) *Compensation and Indemnification*. The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon between the Company and the Warrant Agent for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses incurred by the Warrant Agent without negligence, bad faith or willful misconduct or breach of this Agreement on its part in connection with the services rendered hereunder by the Warrant Agent. The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Warrant Agent, arising out of or in connection with its acting as the Warrant Agent hereunder, as well as the reasonable costs and expenses of defending against any claim of such liability. In addition, from time to time, Company may provide the Warrant Agent with instructions concerning the services performed by the Warrant Agent hereunder. In addition, at any time Warrant Agent may apply to any officer of Company for instruction, and may consult with legal counsel for Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement. The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by Company for any action taken or omitted by the Warrant Agent in reliance upon any Company instructions or upon the advice or opinion of such counsel. The Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from Company.

(b) *Agent for the Company*. In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(c)     *Counsel*. The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the advice of such counsel.

(d)     *Documents*. Subject to Section 3.2(j), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it in reliance upon any Warrant Certificate, Exercise Form, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties. The Company shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and/or delivered all such further acts, instruments and documents as may reasonably be required by the Warrant Agent for the carrying out of the provisions of this Agreement.

(e)     *Certain Transactions*. The Warrant Agent, and its officers, directors and employees, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(f)     *No Liability for Interest*. The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(g)     *No Liability for Invalidity*. The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or, subject to Section 3.2(j), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(h)     *No Liability for Recitals*. The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(i)     *No Implied Obligations*. The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent. The Warrant Agent shall not be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant

24

Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default.

(j)    *Aggregate Liability*. Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, other than in the case of the Warrant Agent's bad faith or willful misconduct, the amounts paid hereunder by the Company to Warrant Agent as fees and charges, but not including reimbursable expenses,

(k)    Damages. Neither party to this agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this agreement or for any consequential, indirect, penal, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

**Section 7.3    Resignation and Appointment of Successor**.

(a)    The Company agrees, for the benefit of the Holders from time to time, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable. The initial Warrant Agent and any successor Warrant Agent hereunder shall be the Company or a bank or trust company in good standing, and shall be authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers and subject to examination by federal or state authority.

(b)    The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than ninety (90) days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be the Company or a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers and subject to examination by federal or state authority) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent. The Company may, at any time and for any reason at no cost to the Holders, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent. Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b). In the event a successor Warrant Agent has not been appointed and accepted its duties within ninety (90) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent. Upon its resignation or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to

the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 7.2(a).

(c)    The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due. Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)    Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)    Any corporation into which the Warrant Agent hereunder may be merged or converted or any corporation with which the Warrant Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto. No costs and expenses associated with any replacement or appointment of a successor Warrant Agent shall be paid by the Holders.

(f)    In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Warrant Shares not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such holder's address appearing on the Warrant Register. Failure to give any notice provided for in this Section or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

## ARTICLE 8
## MISCELLANEOUS

**Section 8.1** __Amendment__.  The terms of the Warrants may be amended by the Company for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained herein or adding or changing any other provisions with respect to matters or questions arising under this Agreement as the Company and the Warrant Agent may reasonably deem necessary or desirable (including without limitation any addition or modification to provide for compliance with the transfer restrictions set forth herein or to conform the provisions of this Agreement to any provisions of the Plan), provided, that the affirmative vote or consent of the Holders of Warrants exercisable for a majority of the Warrant Shares then issuable upon exercise of the Warrants then outstanding shall be required if the rights of the Holders are adversely affected by such amendment; provided, however, that the consent of each Holder of a Warrant affected shall be required for any amendment of this Agreement that would (i) increase the Exercise Price or decrease the number of Warrant Shares purchasable upon exercise of the Warrants, or alter the Company's obligation to issue Warrant Shares upon exercise of the underlying Warrant (other than adjustments made pursuant to Section 6 hereof), (ii) change the Expiration Date to an earlier date, or (iii) treat such Holder differently in an adverse way from any other Holder of Warrants. Any amendment effected pursuant to and in accordance with this Section will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, the Company will give prompt notice thereof to all Registered Holders and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange.

**Section 8.2** __Notices and Demands to the Company and Warrant Agent__.  If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

(a)     Any notice or communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to [●], Attention: [President], and any notice or communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to such address as shall be specified in writing by the Warrant Agent to the Company from time to time (or such other address as shall be specified in writing by the Warrant Agent or by the Company). Any notice or communication that is given to any Holder pursuant to this Agreement or with respect to any Warrant, Book-Entry Warrant or Warrant Certificate shall be addressed to such Holder's address as it appears on the books of the Warrant Agent.

(b)     All notices and communications made to the Company, the Warrant Agent or any Holder pursuant to this Agreement or any Warrant Certificate shall be in writing and shall be conclusively deemed to have been duly given (i) when hand delivered to the receiving party; (ii) three (3) Business Days after deposit in the U.S. mail with first class or certified mail receipt requested postage prepaid; or (iii) the next Business Day after deposit with a national overnight delivery service, postage prepaid, with next Business Day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery service provider.

**Section 8.3    Applicable Law; Waiver of Jury Trial**.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction. Nothing herein is intended to circumvent any duties owed by the parties to one another (including without limitation any duties owed to the Holders as express third-party beneficiaries), or to limit any implied covenant of good faith and fair dealing as applicable hereto, under the governing law of this Warrant Agreement. THE COMPANY, THE WARRANT AGENT, AND EACH HOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY WARRANT CERTIFICATE OR WARRANT ISSUED HEREUNDER.

**Section 8.4    Headings**.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

**Section 8.5    Counterparts**.  This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile, PDF, or other forms of electronic delivery, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

**Section 8.6    Inspection of Agreement**.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Book-Entry Warrant or Warrant Certificate. The Warrant Agent may require such Holder of a Warrant Certificate to submit such Warrant Certificate for inspection by it.

**Section 8.7    Benefits of This Agreement**.  This Agreement is otherwise intended solely for the benefit of the Company, the Warrant Agent, the Holders and each of their respective successors and permitted assigns, and this Agreement shall not confer any rights upon any other Person.

**Section 8.8    Termination**.  This Agreement shall terminate at the earliest to occur of (a) the exercise of all Warrants and (b) the expiration of the Exercise Period; provided, however, that Section 7.2 and this Article 8 shall survive any termination or expiration hereof.

**Section 8.9    Confidentiality**.  The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law.

**Section 8.10    Prohibited Actions**.

28

(a)       Prior to the exercise in full of the Warrants, the Company agrees that it will not take any action which would entitle the Holder to an adjustment of the Warrant Share Number or an adjustment of the Exercise Price if the total number of Warrant Shares issuable after such action upon exercise of the Warrants, together with all Warrant Shares then outstanding and all Warrant Shares then issuable upon the exercise of all outstanding options, warrants, conversion and other rights, would exceed the total number of Warrant Shares then authorized by its certificate of incorporation.

(b)       Prior to the exercise in full of the Warrants, the Company shall not declare, pay or make any dividends or distributions (whether in assets, cash or other property of the Company) to holders of Common Stock, nor purchase or redeem any Common Stock, other than (i) dividends or distributions described in Section 6.2 and (ii) purchases or redemptions of Common Stock held by present or former directors, consultants, officers or employees of the Company or any of its Subsidiaries (other than shares of Common Stock directly or indirectly transferred to such persons by shareholders of the Company) upon such person's death, disability, retirement or termination of employment.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**GLOBAL AVIATION HOLDINGS INC.**

By:_____

Name: _____

Title: _____

**[WARRANT AGENT]**

By:_____

Name: _____

Title: _____

**Exhibit A-1**

**FORM OF WARRANT STATEMENT**

**[As provided by the Warrant Agent]**

**EXHIBIT A-2**

**FORM OF FACE OF**

**GLOBAL WARRANT CERTIFICATE**

**VOID AFTER 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]**

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 5.2(a) of the Warrant Agreement dated as of •, 2012 (the "Warrant Agreement"), (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 5.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of • or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to • or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, •, has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 5 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books of the Company until such provisions have been complied with.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT, DATED AS OF •, 2012, BY AND BETWEEN GLOBAL AVIATION HOLDINGS INC. AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]

**WARRANT TO PURCHASE, AT THE ELECTION OF THE HOLDER, EITHER
_____ WARRANT SHARES IN GLOBAL AVIATION HOLDINGS, INC.**

CUSIP # •
ISSUE DATE: •, 2012

No. 1

        This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Global Aviation Holdings, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 11:59 p.m., New York time, on •, 20[●], at the election of the Registered Holder the number of Warrant Shares of the Company at the Exercise Price (as defined in the Warrant Agreement) applicable to the Warrants. The Exercise Price and the Warrant Share Number hereunder are subject to adjustment from time to time as provided in Article 6 of the Warrant Agreement. The initial Exercise Price shall be $[●] and the initial Warrant Share Number shall be one Warrant Share.

        This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

        IN WITNESS WHEREOF, this Warrant has been duly executed by the Company under its corporate seal as of the _____ day of _____, 2012.

                                          **GLOBAL AVIATION HOLDINGS, INC.**

                                          By:_____
                                              Name:
                                              Title:

Attest: _____
            Secretary

•,
as Warrant Agent

By:    _____
            Name:
            Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

**FORM OF REVERSE OF WARRANT**

The Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Warrants to purchase an aggregate of [●] Warrant Shares issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used on the face of this Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Warrant at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a shareholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

4

**EXHIBIT B**

**EXERCISE FORM FOR REGISTERED HOLDERS**
**HOLDING BOOK-ENTRY WARRANTS**

**(To be executed upon exercise of Series Warrant)**

In this election form, "Warrant Agreement" means the Warrant Agreement dated [●], 2012 between Global Aviation Holdings, Inc. and [●], and capitalized terms defined therein have the same meaning in this election form.

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrants, to purchase Warrant Shares and (check one and fill in the appropriate information under ):

☐    herewith tenders payment for exercise of _____ Warrants in accordance with the elections specified below to the order of Global Aviation Holdings, Inc. in the amount of $_____ in accordance with the terms of the Warrant Agreement and this Warrant;

or

☐    herewith tenders this Warrant pursuant to the net issuance exercise provisions of Section 3.2(d) of the Warrant Agreement in accordance with the elections specified below. This exercise and election shall be immediately effective or shall be effective as of 5:00 p.m., New York time, on [insert date].

• _____ Warrants are exercised for Warrant Shares; and

The undersigned agrees to become a shareholder of Global Aviation Holdings, Inc. and to be bound by its certificate of incorporation and bylaws, as amended.

The undersigned requests that [a statement representing] the Warrant Shares be delivered as follows:

Name    _____

Address _____

Delivery Address (if different)

_____

_____

If said number of shares shall not be all the shares purchasable under the within Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the balance of such Warrants shall be registered, with the appropriate Warrant Statement delivered as follows:

Name  _____

Address _____

Delivery Address (if different)

      _____

      _____

_____

Signature: _____

Social Security or Other Taxpayer
Identification Number of Holder

Note: If the statement representing the Warrant Shares or any Book-Entry Warrants representing Warrants not exercised is to be registered in a name other than that in which the Book-Entry Warrants are registered, the signature of the holder hereof must be guaranteed.

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

Countersigned:
Dated: _____ , 20 _____

•,
as Warrant Agent

By:_____
   Name:
   Title:

**EXHIBIT C**

### FORM OF ASSIGNMENT

**(To be executed only upon assignment of Warrant)**

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such  Warrants listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Registered Holder under the Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Warrants on the books of the within-named Company with respect to the number of Warrants set forth below, with full power of substitution in the premises:

Name(s) of Assignee(s)_____

Address _____

No. of Warrants_____

And if said number of Warrants shall not be all the Warrants represented by the Warrants owned by the Assignor, new Warrants are to be issued in the name of said undersigned for the balance remaining of the Warrants registered by said Warrants.

Dated: _____ , 20_____

Signature _____

Note:  The above signature should correspond exactly with the name on the face of this Warrant

**<u>Exhibit N</u>**

**New Second Lien Lender Warrant Agreement**

**GLOBAL AVIATION HOLDINGS INC.**

**WARRANT AGREEMENT**

**Dated as of [●], 2012**

**Warrants to Purchase [Shares of Common Stock] in Global Aviation Holdings Inc.**

**TABLE OF CONTENTS**

**Page**

**ARTICLE 1 DEFINITIONS**......................................................................................................2
    Section 1.1    Definitions.................................................................................................2

**ARTICLE 2 ISSUANCE OF WARRANTS; WARRANT CERTIFICATES; BOOK-
ENTRY WARRANTS** ....................................................................................................5
    Section 2.1    Issuance of the Warrants...........................................................................5
    Section 2.2    Form of Warrant; Execution of Warrant Certificates and Warrant
Statements................................................................................................6
    Section 2.3    Issuance of Warrant Certificates and Book-Entry Warrants......................7

**ARTICLE 3 EXERCISE OF WARRANTS**.................................................................................8
    Section 3.1    Duration of Warrants ................................................................................8
    Section 3.2    Exercise of Warrants.................................................................................8
    Section 3.3    Representations and Covenants of the Company......................................12
    Section 3.4    U.S. Citizenship Restrictions. ..................................................................13

**ARTICLE 4 OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF
WARRANTS**..................................................................................................................14
    Section 4.1    No Rights as Stockholder Conferred by Warrants, Book-Entry
Warrants or Warrant Certificates.............................................................14
    Section 4.2    Lost, Mutilated, Stolen or Destroyed Warrant Certificates ......................14
    Section 4.3    Cancellation of Warrants ..........................................................................15

**ARTICLE 5 EXCHANGE AND TRANSFER**.............................................................................15
    Section 5.1    Exchange and Transfer .............................................................................15
    Section 5.2    Obligations with Respect to Transfers and Exchanges of Warrants..........17
    Section 5.3    Restrictions on Transfers .........................................................................18
    Section 5.4    Treatment of Holders of Warrant Certificates .........................................18
    Section 5.5    Fractional Warrants..................................................................................18

**ARTICLE 6 ADJUSTMENT OF WARRANT SHARE NUMBER; ADJUSTMENT
OF EXERCISE PRICE**..................................................................................................18
    Section 6.1    Adjustments Generally..............................................................................18
    Section 6.2    Certain Mechanical Adjustments..............................................................19
    Section 6.3    Adjustments in the Warrant Share Number ..............................................19
    Section 6.4    Adjustments for Common Stock Issuances ..............................................19
    Section 6.5    Adjustments for SAR Cash Payments ......................................................19
    Section 6.6    Reclassification or Reorganization Event..................................................20
    Section 6.7    Adjustments for Certain Issuances or Repricings......................................21
    Section 6.8    Notices of Changes in Warrant and Other Events .....................................22
    Section 6.9    No Fractional Shares.................................................................................22
    Section 6.10   Form of Warrant ......................................................................................22
    Section 6.11   De Minimis Adjustments ..........................................................................23

Section 6.12   No Impairment ..................................................................................................23

**ARTICLE 7 CONCERNING THE WARRANT AGENT**........................................................**23**
Section 7.1   Warrant Agent..................................................................................................23
Section 7.2   Conditions of Warrant Agent's Obligations ...............................................23
Section 7.3   Resignation and Appointment of Successor .............................................25

**ARTICLE 8 MISCELLANEOUS** .............................................................................................**27**
Section 8.1   Amendment......................................................................................................27
Section 8.2   Notices and Demands to the Company and Warrant Agent ....................27
Section 8.3   Applicable Law; Waiver of Jury Trial........................................................28
Section 8.4   Headings ...........................................................................................................28
Section 8.5   Counterparts.....................................................................................................28
Section 8.6   Inspection of Agreement.................................................................................28
Section 8.7   Benefits of This Agreement.............................................................................28
Section 8.8   Termination.......................................................................................................28
Section 8.9   Confidentiality .................................................................................................28
Section 8.10  Prohibited Actions ...........................................................................................29

**WARRANT AGREEMENT**

THIS WARRANT AGREEMENT (this "Agreement"), dated as of [●], 2012, is entered into by and among GLOBAL AVIATION HOLDINGS INC., a Delaware corporation (the "Company") and [●], as warrant agent (the "Warrant Agent"). Capitalized terms not otherwise defined herein have the meanings set forth in Section 1.

W I T N E S S E T H :

WHEREAS, on February 5, 2012, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") initiating cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code §§ 101-1330 (as amended, the "Bankruptcy Code") and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Second Amended Joint Plan of Reorganization, as approved by the Bankruptcy Court (the "Plan"), provides that, upon consummation of the Plan, the Company shall issue to the holders of Second Lien Claims (collectively, the "Initial Holders") Series A Warrants of the Company, Series B Warrants of the Company and Series C Warrants of the Company, entitling the registered holders thereof to purchase shares of the Common Stock;

WHEREAS, the Bankruptcy Court confirmed the Plan and the Effective Date under the Plan occurred on the date first written above;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company in connection with the issuance, transfer, exchange, exercise and replacement of the Warrants and the Warrant Certificates, and in this Agreement wishes to set forth, among other things, the form and provisions of the Warrants and the Warrant Certificates and the terms and conditions on which they may be issued, transferred, exchanged, exercised and replaced; and

WHEREAS, all acts and things have been done and performed which are necessary to make the Warrants, when executed on behalf of the Company and countersigned by or on behalf of the Warrant Agent, as provided herein, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the promises and of the mutual agreements herein contained, the parties hereto agree as follows:

**ARTICLE 1**
**DEFINITIONS**

**Section 1.1**    **Definitions**. As used herein:

"Act" has the meaning assigned to such term in Section 3.4.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such Person.

"Agreement" has the meaning assigned to such term in the preamble of this Agreement.

"Bankruptcy Code" has the meaning assigned to such term in the recitals of this Agreement.

"Bankruptcy Court" has the meaning assigned to such term in the recitals of this Agreement.

"Beneficial Holder" shall mean any person or entity that holds beneficial interests in a Warrant.

"Board of Directors" means the board of directors of the Company or any committee thereof duly authorized to act on behalf of such board.

"Book-Entry Warrants" has the meaning assigned to such term in Section 2.1.

"Business Day" means any day other than a Saturday, Sunday or any other day on which the New York Stock Exchange is authorized or obligated by law or executive order to close.

"By-laws" means, with respect to any Person, its by-laws, or similar organizational document

"Cashless Exercise" has the meaning ascribed to such term in Section 3.2(d).

"Common Stock" means [the Company's Class A Common Stock, [par value $0.01 per share], Class B Common Stock, [par value $0.01 per share] and Class C Common Stock, [par value $0.01 per share], as the case may be under the terms of this Agreement].[1]

"Common Stock Issuance" has the meaning assigned to such term in Section 6.4.

---

[1] NTD: to be confirmed; will follow the new charter and by-laws.

2

"Company" has the meaning assigned to such term in the preamble of this Agreement.

"Depositary" has the meaning assigned to such term in Section 2.2(b).

"Effective Date" means [●], 2012.

"Equity Value" means the total equity value of the Company on a per Share basis, which shall be determined in good faith by a majority of the Board, other than the members of the Board employed by or otherwise affiliated with any person or entity that, together with its Affiliates, own or controls more than 10.0% of the aggregate Shares outstanding as at the date of determination (the "Independent Board Members"), upon the advice of a nationally recognized investment banking firm chosen by the Board with the consent of a majority of the Independent Board Members..

"Exchange Act" means the Securities Exchange Act of 1934, as amended, including any rules or regulations promulgated thereunder.

"Exercise Amount" has the meaning assigned to such term in Section 3.2(c).

"Exercise Date" means any date on which a Warrant is exercised in accordance with the terms of this Agreement and the Warrant.

"Exercise Form" has the meaning assigned to such term in Section 3.2(b).

"Exercise Period" means the period commencing on the date hereof, and expiring at 11:59 p.m., New York City time, on the Expiration Date.

"Exercise Price" means, in the case of the Series A Warrants, a price per Warrant Share of $[●], in the case of the Series B Warrants, a price per Warrant Share of $[●] and, in the case of the Series C Warrants, a price per Warrant Share of $[●].

"Expiration Date" means [●], 2017.

"Holder" has the meaning assigned to such term in Section 3.2(a).

"Initial Holders" has the meaning assigned to such term in the recitals of this Agreement.

"Management Equity Incentive Plan" [has the meaning assigned to such term in the Plan].

"Non-Citizen" shall mean any person or entity who is not a "citizen of the United States" as defined in Section 41102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time, including any agent, trustee or representative of a Non-Citizen.

"Person" means an individual, a corporation, a limited liability company, a company, a voluntary association, a general partnership, a limited partnership, a joint venture, an association,

3

a joint-stock company, a trust, an unincorporated organization or a government or any agency, instrumentality or political subdivision thereof.

"Plan" has the meaning assigned to such term in the recitals of this Agreement.

"Reorganization Event" has the meaning assigned to such term in Section 6.5.

"Registered Holder" has the meaning assigned to such term in Section 2.3(d).

"Second Lien Claims" has the meaning assigned to such term in the Plan.

"Second Lien Lender SAR" [has the meaning assigned to such term in the Plan].

"Securities Act" means the Securities Act of 1933, as amended, including any rules or regulations promulgated thereunder.

"Series A Warrant" means an outstanding Series A Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Series A Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Series B Warrant" means an outstanding Series B Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Series B Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Series C Warrant" means an outstanding Series B Warrant issued in accordance with Section 2.1 of this Agreement, whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate, and any Series B Warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Stockholders Agreement" means the Stockholders Agreement, dated [●], by and among the Company and its stockholders, as amended, restated or otherwise modified from time to time.

"Successor Person" means the successor to the Company or the Person acquiring the Company in connection with a Reorganization Event where the Company is not the surviving Person.

"Transfer Agent" means [●], in its capacity as transfer agent for the Company.

"Union Warrants" means the warrants issued in accordance with Section 2.1 of that certain warrant agreement, dated [●], 2012 by and among the Company and [●], as warrant agent, relating to the issuance of warrants to the Union Trust (as defined therein), whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

"Union Warrant Exercise Price" means the exercise price of the Union Warrants as in effect on the date hereof.

"U.S. Citizen" means any person or entity who is a "citizen of the United States" as defined in Section 41102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time.

"Warrants" means either a Series A Warrant, Series B Warrant or Series C Warrant, either individually or collectively as the context requires.

"Warrant Agent" means [●], in its capacity as the initial Warrant Agent hereunder, but only for so long as it serves in such capacity, and any successor Warrant Agent appointed pursuant to this Agreement.

"Warrant Agent Office" has the meaning assigned to such term in Section 3.1.

"Warrant Certificates" has the meaning assigned to such term in Section 2.2(a).

"Warrant Register" has the meaning assigned to such term in Section 2.3(c).

"Warrant Share" means the [Common Stock] underlying the Warrants which is deliverable to the holders of Warrants pursuant to the terms of this Agreement, including Section 3.4 hereof.

"Warrant Share Number" means one share of Common Stock, as subsequently adjusted pursuant to the terms of the Warrant and this Warrant Agreement.

"Warrant Statements" has the meaning assigned to such term in Section 2.1.

## ARTICLE 2
## ISSUANCE OF WARRANTS; WARRANT CERTIFICATES; BOOK-ENTRY WARRANTS

**Section 2.1    Issuance of the Warrants**.

The Company shall issue, on the terms and subject to the conditions of this Agreement and pursuant to the Plan, on and as of the Effective Date, Warrants to purchase the Warrant Shares to each Initial Holder, on a pro rata basis, based upon the amount of their respective ownership of Second Lien Claims, rounded up to the nearest whole number of underlying Warrant Shares such that no Initial Holder shall receive a Warrant that includes a fraction of a Warrant Share, and such that the Company shall issue to the Initial Holders Series A Warrants entitling the Holders to collectively purchase, in the aggregate, up to [●] Warrant Shares, Series B Warrants entitling the Holders to collectively purchase, in the aggregate, up to [●] Warrant Shares and Series C Warrants entitling the Holders to collectively purchase, in aggregate, up to [●] Warrant Shares, in each case, as such amounts may be adjusted from time to time pursuant to this Agreement.

Each Warrant entitles the Holder to purchase from the Company, upon the terms and subject to the conditions hereinafter set forth, a number of fully paid and nonassessable Warrant Shares equal to the Warrant Share Number at a purchase price per share equal to the Exercise Price. The Warrant Share Number is subject to adjustment as provided herein, and all references

5

to "Warrant Share Number" herein shall be deemed to include any such adjustment or series of adjustments.

On the Effective Date, the Company will deliver, or cause to be delivered to the Depositary, one or more Warrant Certificates evidencing a portion of the Warrants. The remainder of the Warrants, if any, shall be issued by book-entry registration on the books of the Warrant Agent ("Book-Entry Warrants") and shall be evidenced by statements issued by the Warrant Agent from time to time to the Registered Holders of Book-Entry Warrants reflecting such book-entry position (the "Warrant Statements").

**Section 2.2** **Form of Warrant; Execution of Warrant Certificates and Warrant Statements**.

(a)      Subject to Sections 5.1 and 5.2 of this Agreement, the Series A Warrants, the Series B Warrants and Series C Warrants shall be evidenced (i) by book-entry registration on the books and records of the Warrant Agent and evidenced by the Warrant Statements, in substantially the form set forth in Exhibits A-1, A-2 and A-3, respectively, hereto, and/or (ii) by one or more certificates (the "Warrant Certificates"), with the forms of election to exercise and of assignment printed on the reverse thereof, in substantially the form set forth in Exhibits A-4, A-5 and A-6, respectively, hereto. The Warrant Statements and the Warrant Certificates shall be dated and may have such letters, numbers or other marks of identification or designation and such legends or endorsements printed, lithographed or engraved thereon as the officers of the Company executing the same may approve (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Agreement, or as may be required to comply with any applicable law, including applicable rules and regulations made pursuant to any such law. The Warrant Certificates and the Warrant Statements shall be signed on behalf of the Company by the chairman of the Board of Directors, the chief financial officer, the president, any vice president, any assistant vice president, the treasurer or any assistant treasurer of the Company, and each Warrant Certificate and Warrant Statement may but need not be attested by the Company's secretary or one of its assistant secretaries. Such signatures may be manual or facsimile signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates and Warrant Statements.

(b)      The Warrant Certificates shall be deposited with the Warrant Agent and registered in the name of Cede & Co., as the nominee of The Depositary Trust Company (the "Depositary"). Each Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(c)      No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence, and the only evidence, that the Warrant Certificate so countersigned has been duly issued hereunder, and such signatures may be manual or

6

facsimile signatures of an authorized representative of the Warrant Agent and may be imprinted or otherwise reproduced on the Warrant Certificates.

(d)    In case any officer of the Company who shall have signed any of the Warrant Certificates or Warrant Statements (either manually or by facsimile signature) shall cease to hold such officer position before the Warrant Certificates so signed shall have been countersigned and delivered by the Warrant Agent as provided herein, or before the Warrant Statements so signed shall have been delivered to the Registered Holders thereof, as the case may be, such Warrant Certificates or Warrant Statements may be countersigned (either manually or by facsimile signature, in the case of the Warrant Certificates) and delivered by the Warrant Agent notwithstanding that the person who signed such Warrant Certificates or Warrant Statements has ceased to hold such officer position with the Company, and any Warrant Certificate or Warrant Statement may be signed on behalf of the Company by such persons as, at the actual date of the execution of such Warrant Certificate or Warrant Statement, hold such officer positions with the Company, although at the date of the execution of this Agreement any such person did not hold such officer position.

### Section 2.3    <u>Issuance of Warrant Certificates and Book-Entry Warrants</u>.

(a)    Warrant Certificates evidencing Warrants shall be executed by the Company in the manner set forth in Section 2.2 and delivered to the Warrant Agent.  Upon written order of the Company, the Warrant Agent shall (i) register in the Warrant Register the Book-Entry Warrants and (ii) upon receipt of Warrant Certificates duly executed on behalf of the Company, countersign (either manually or by facsimile signature) each such Warrant Certificate. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Book-Entry Warrants and the number of Warrants that are to be issued as Warrant Certificates. A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof.

(b)    Subsequent to the original issuance of Warrant Certificates to the Initial Holders, the Warrant Agent shall countersign a Warrant Certificate only if the Warrant Certificate is issued in exchange or substitution for one or more previously countersigned Warrant Certificates or in connection with their transfer as hereinafter provided.

(c)    The Warrant Agent shall keep, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants as well as any Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in Sections 5.1 and 5.2 of this Agreement, all in form satisfactory to the Company and the Warrant Agent. The Warrant Register shall also include such additional information as is required to be included in it by applicable law.  No service charge shall be made for any exchange or registration of transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Registered Holder in connection with any such exchange or registration of transfer. The Warrant Agent shall have no obligation to affect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.

(d)    Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Agreement, subject to applicable law, the Company and the Warrant Agent may deem and treat the person in whose name any Warrant is registered upon the Warrant Register (the "Registered Holder" of such Warrant) as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing on a Warrant Certificate made by anyone other than the Company or the Warrant Agent), for the purpose of any exercise thereof, any distribution to the holder thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

(e)    The Company shall provide customary opinions of counsel on or prior to the Effective Date that states that states that all Warrants or Warrant Shares, as applicable, are:

(1)    registered under the Securities Act of 1933, as amended, or are exempt from such registration; and

(2)    any Warrant Shares issuable upon exercise of a Warrant will be upon issuance, validly issued, fully paid and non-assessable.

## ARTICLE 3
## EXERCISE OF WARRANTS

**Section 3.1    Duration of Warrants**. Subject to the provisions of this Agreement, Warrants may be exercised, in whole or in part, on any Business Day during the Exercise Period, at the offices of the Warrant Agent at [*address of Warrant Agent*], via e-mail or facsimile or such other place as the Company or Warrant Agent may notify the Holders from time to time, (the "Warrant Agent Office"). Each Warrant not exercised at or before the Expiration Date shall thereupon become void, and at such time all rights, under this Agreement and the applicable Warrant Certificate, of the Holder of any such Warrant shall automatically cease, with respect to any such Warrant.

**Section 3.2    Exercise of Warrants**.

(a)    Each Warrant shall entitle (i) in the case of the Book-Entry Warrants, the Registered Holder thereof and (ii) in the case of Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, the Beneficial Holder thereof (the Registered Holders and the Beneficial Holders referenced in clauses (i) and (ii) above, collectively, the "Holders"), subject to the provisions of such Warrant and of this Agreement, to purchase the Warrant Shares specified in such Warrant, at the Exercise Price.

(b)    Subject to the provisions of the Warrants and this Agreement, the Holder of a Warrant may exercise such Holder's right to purchase the Warrant Shares, in whole or in part, at any time or from time to time (i) in the case of persons who hold Book-Entry Warrants, by providing an exercise form for the election to exercise such Warrant (each, an "Exercise Form") substantially in the form of Exhibit B hereto, and (ii) in the case of Warrants held through the book-entry facilities of the Depositary or by or through persons that are direct participants in the Depositary, by providing an exercise form (as provided by such Holder's broker) to its broker, in each case properly completed and executed by the Registered Holder or

8

the Beneficial Holder thereof, as the case may be, together with payment to the Warrant Agent (for the account of the Company) of the Exercise Price in accordance with Section 3.2(c).

(c)    The payment of the Exercise Price shall be made, at the option of the Holder, (i) in United States dollars by certified or official bank check payable to the Company, or by wire transfer to an account specified in writing by the Company or the Warrant Agent to such Holder, in either case in immediately available funds in an amount equal to the aggregate Exercise Price for such Warrant Shares as specified in the Exercise Form (the "Exercise Amount") (ii) by Cashless Exercise in accordance with Section 3.2(d) or (iii) by any combination of clauses (i) and (ii).

(d)    In lieu of paying the Exercise Amount by certified or official bank check or by wire transfer, any Holder may elect to exercise Warrants by authorizing the Company to withhold from issuance such number of Warrant Shares which, when multiplied by the Equity Value on the business day immediately prior to the exercise date is equal to the aggregate Exercise Price of all Warrants being exercised. The number of the Warrant Shares withheld pursuant to the preceding sentence shall thereupon no longer be issuable under the Warrant. Such exercise (a "Cashless Exercise") shall be honored by the Company and the Warrant Agent without payment by the Holder of any Exercise Amount or any cash or other consideration; provided, however, that the Holder shall pay such amounts, if any, as may be required pursuant to Sections 3.2(k) and 5.2(c), or such taxes as may be payable upon issuance of Warrant Shares to a Person other than the Holder. The formula for determining the Warrant Shares to be issued in a Cashless Exercise is as follows:

$$X = \frac{(A-B) \times C}{A}$$

where:

X = the number of Warrant Shares issuable upon exercise of the Warrant pursuant to this subsection (d).

A = the Equity Value immediately preceding the exercise date.

B = the Exercise Price.

C = the number of Warrant Shares as to which a Warrant is then being exercised including the withheld Warrant Shares.

If, with respect to any purported or attempted Cashless Exercise of Warrants, the foregoing calculation results in a negative number, then no Warrant Shares shall be issuable via such purported or attempted Cashless Exercise and such Warrants shall be deemed to have not been exercised.

(e)    The date on which payment in full of the Exercise Amount is received by the Warrant Agent (or deemed to be received in the case of a Cashless Exercise) shall, subject to receipt of the Exercise Form, be deemed to be the date on which the Warrant is exercised. The Warrant Agent shall promptly deposit all funds received by it in payment for the exercise of

9

Warrants in an account of the Company maintained with it (or in such other account as may be designated by the Company) and shall advise the Company, by telephone or by facsimile transmission or other form of electronic communication available to both parties, at the end of each day on which a payment for the exercise of Warrants is received of the amount so deposited to its account. The Warrant Agent shall promptly confirm such advice to the Company in writing.

(f)     Subject to Article 6, upon surrender of the Exercise Form and payment of the Exercise Amount (or the deemed payment of the Exercise Amount in connection with a Cashless Exercise) in connection with the exercise of Warrants by any Holder:

(i)     the Warrant Agent shall requisition from the Transfer Agent for issuance and delivery to or upon the written order of the applicable Holder and in such name or names as the Holder may designate (provided, that the Holder shall pay any and all taxes payable as a result of such designation), a certificate or certificates for the Warrant Shares issuable upon the exercise of the Warrants evidenced by the underlying Warrant Certificate or Book-Entry Warrant, as the case may be, less any Warrant Shares withheld in connection with a Cashless Exercise, if applicable; and

(ii)     the Company shall, as promptly as practicable and at its expense, and in any event within three (3) Business Days thereafter, cause to be issued to the Holder the aggregate number of whole Warrant Shares (rounded up to the nearest whole share, subject to Section 6.9 hereof) issuable upon such exercise and deliver to the Holder written confirmation that such Warrant Shares have been duly issued and recorded on the books of the Company as hereinafter provided.

The Warrant Shares so issued shall be registered in the name of the Holder or such other name as shall be designated in the order delivered by the Holder. The certificate or certificates for such Warrant Shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become the holder of record of such Warrant Shares, as applicable, as of the date of surrender of the applicable Exercise Form at the Warrant Agent Office duly executed by the Holder thereof and upon payment of the Exercise Amount or the deemed payment of the Exercise Amount in connection with a Cashless Exercise.

(g)     In the event that any Holder makes a partial exercise of the Warrants evidenced by any Warrant Certificate, the Warrant Agent shall within a reasonable time, and in any event not exceeding three (3) Business Days, issue and deliver a new Warrant Certificate to the applicable Holder evidencing a number of Warrants equal to the number of Warrants represented by the Warrant Certificate immediately prior to such partial exercise minus the number of Warrants exercised in such partial exercise. The Warrant Agent is hereby authorized and directed to countersign such new certificate.

(h)     Any exercise of a Warrant pursuant to the terms of this Agreement shall be irrevocable and shall constitute a binding agreement between the Holder and the Company, enforceable in accordance with its terms.

(i)     The Warrant Agent shall:

10

(i)        examine the Exercise Forms and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Forms and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)        where an Exercise Form or any other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)        inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between Exercise Forms received and delivery of Warrants to the Warrant Agent's account;

(iv)        advise the Company no later than three (3) Business Days after receipt of any Exercise Form, of (a) the receipt of such Exercise Form and the number of Warrants evidenced thereby that have been exercised in accordance with the terms and conditions of this Agreement, (b) the instructions with respect to delivery of the Warrant Shares deliverable upon such exercise, subject to timely receipt from the Depositary of the necessary information, and (c) such other information as the Company shall reasonably require; and

(v)        subject to Warrant Shares being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depositary, liaise with the Depositary and endeavor to effect such delivery to the relevant accounts at the Depositary in accordance with its customary requirements.

(j)        All questions as to the validity, form and sufficiency (including time of receipt) of any exercised Warrant, Exercise Form or the Warrant Certificate evidencing any exercised Warrant will be determined by the Company in its reasonable discretion, which determination shall be final and binding (but for the avoidance of doubt subject to review by a court of competent jurisdiction). The Company reserves the right to reject any and all Exercise Forms not in proper form or for which any corresponding agreement by the Company to exchange would be unlawful. Such determination by the Company shall be final and binding on the Holders (but for the avoidance of doubt subject to review by a court of competent jurisdiction). Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in the exercise thereof with regard to any particular exercise of Warrants. The Warrant Agent shall not be under any duty to give notice to the Holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(k)        Prior to the delivery of any Warrant Shares upon the exercise of a Warrant, the Holder shall pay, or make adequate provision acceptable to the Company for the satisfaction of, the statutory minimum prescribed amount of federal and state income tax and other withholding obligations of the Company, including with respect to any Cashless Exercise permitted hereunder, by having the Company withhold from the Warrant Shares otherwise deliverable in connection with such exercise such number of Warrant Shares which, when

11

multiplied by the Equity Value equal to the amount of such federal and state tax and other withholding obligations not satisfied by the cash first withheld.

(l)     The Company acknowledges that the bank accounts maintained by [the Warrant Agent] in connection with the services provided under this Agreement will be in its name and that [the Warrant Agent] may receive investment earnings therefrom. Neither the Company nor the Holders will be entitled to receive interest on any deposits of the Exercise Price.

**Section 3.3     <u>Representations and Covenants of the Company</u>**.

(a)     For the purpose of enabling it to satisfy any obligation to issue Warrant Shares upon exercise of Warrants, the Company will at all times through the Expiration Date, reserve and keep available out of its aggregate authorized but unissued [Class A Shares, Class B Shares and Class C Shares], a number of shares equal to the number of [Class A Shares, Class B Shares and Class C Shares] deliverable upon the exercise of all outstanding Warrants, as applicable, and the Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued [Class A Shares, Class B Shares and Class C Shares] as shall be required for such purpose.  The Company will keep a copy of this Agreement on file with the Transfer Agent. The Warrant Agent is hereby irrevocably authorized to requisition from time to time from the Transfer Agent share certificates evidencing [Class A Shares, Class B Shares and Class C Shares] issuable upon exercise of outstanding Warrants, and the Company will supply the Transfer Agent with duly executed stock certificates for such purpose.

(b)     Before taking any action which would cause an adjustment pursuant to Article 6 to reduce the Exercise Price below the then par value (if any) of the Warrant Shares, the Company shall take any and all corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and nonassessable shares of Common Stock at the Exercise Price as so adjusted.

(c)     The Company covenants that all [Class A Shares, Class B Shares and Class C Shares] issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be fully paid, nonassessable free of preemptive rights and free from all taxes, liens, charges and security interests created by or imposed upon the Company with respect to the issuance and holding thereof and that all Class A Shares, Class B Shares and Class C Shares shall be identical as to economics and differ only as to voting rights. If at any time prior to the Expiration Date the number and kind of authorized but unissued shares of the Company's shall not be sufficient to permit exercise in full of the Warrants, the Company will promptly take such corporate action as may be necessary to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes. The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Shares to issue Warrant Shares upon the exercise of Warrants. Without limiting the generality of the foregoing, the Company will not increase the stated or par value per share, if any, of the [Class A Shares, Class B Shares or Class C Shares] above the Exercise Price per share in effect immediately prior to such increase in stated or par value.

(d)      The Company represents that as of the date hereof, (i) the Warrant Shares underlying the Series A Warrants represent, in aggregate, [●]% of the fully-diluted shares of Common Stock of the Company, (ii) the Warrant Shares underlying the Series B Warrants represent, in aggregate, [●]% of the fully-diluted shares of Common Stock of the Company, and (iii) the Warrant Shares underlying the Series C Warrants represent, in aggregate, [●]% of the fully-diluted shares of Common Stock of the Company.

(e)      The Company shall promptly secure the listing of all of the Warrant Shares (after the issuance thereof) upon each national securities exchange and automated quotation system, if any, upon which the Common Stock is then listed (subject to official notice of issuance).  The Company shall pay all fees and expenses in connection with satisfying its obligations under this Section 3.3(e).

(f)      If any shares of Common Stock required to be reserved for purposes of the exercise of Warrants require, under any Federal or state law or applicable governing rule or regulation of any national securities exchange, registration with or approval of any governmental authority, or listing on any such national securities exchange before such shares may be issued upon exercise, the Company will use its reasonable best efforts to cause such shares to be duly registered or approved by such governmental authority or listed on the relevant national securities exchange, as the case may be.

**Section 3.4      U.S. Citizenship Restrictions.**

Notwithstanding the other provisions of this Warrant Agreement, in order to facilitate the Company's compliance with the provisions of Subtitle VII of Title 49 of the United States Code, as amended, or as the same may be from time to time amended, and the administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time (the "Act"), concerning the ownership of its Common Stock by Non-Citizens:

(a)      in connection with any exercise of a Warrant, a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) shall advise the Company whether or not it satisfies the requirements to be a U.S. Citizen. Under its By-laws, the Company may require a Holder (or, if not the Holder, the Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) to provide it with such documents and other information as it may request as reasonable proof that the Holder (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise or conversion of the Warrants) satisfies the requirements to be a U.S. Citizen.

(b)      if a Holder can establish to the Company's reasonable satisfaction that it (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) is a U.S. Citizen for purposes of the Act, then such Holder may, pursuant to the terms of this Agreement and the Warrant, exercise Warrants into shares of Class A Common Stock to the extent the receipt of [shares of Class A Common Stock] deliverable upon exercise of the Warrants would comply in all respects with the Company's By-Laws.

(c)      if a Holder cannot establish to the Company's reasonable satisfaction that it (or, if not the Holder, such other Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants) is a U.S. Citizen for purposes of the Act, then such Holder may, pursuant to the terms of this Agreement and the Warrant, only exercise Warrants [into shares of Class C Common Stock] to the extent the receipt of [shares of Class C Common Stock] deliverable upon exercise of the Warrants would comply in all respects with the Company's By-Laws.

(d)      any sale, transfer or other disposition of a Warrant by any Holder that is a Non-Citizen to a Person who is a U.S. Citizen must be a complete transfer of such Holder's interests to such Person in the Warrant and the Warrant Shares issuable upon exercise or conversion thereof with no ability to direct or control such Person. The foregoing restriction shall also apply to any Person that the Holder has designated to receive the Warrant Shares issuable upon exercise of the Warrants.

### ARTICLE 4
### OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

**Section 4.1      No Rights as Stockholder Conferred by Warrants, Book-Entry Warrants or Warrant Certificates**.  No Book-Entry Warrant, Warrant Certificate or Warrant evidenced thereby shall, and nothing contained in this Agreement shall be construed to, entitle the Holder or any beneficial owner thereof (in each case solely in its capacity as a holder of a Warrant) to any of the rights of a registered holder or beneficial owner of Warrant Shares, including, without limitation, the right to receive (as a shareholder) any dividends or distributions paid with respect to Warrant Shares, the right to vote or to consent or to receive notice as a shareholder of the Company with respect to the election of directors of the Company or any other matter with respect to which shareholders of the Company are entitled to vote or consent or receive notice, or any other rights whatsoever as shareholders of the Company; provided, that the Initial Holders shall be deemed a party to the Stockholders Agreement, and have all the rights and privileges attendant thereto as if a Stockholder (as defined under the Stockholders Agreement) thereunder, solely with respect to Sections 1.4, 3.2, 4.1, 4.2 and 4.3 thereof.

**Section 4.2      Lost, Mutilated, Stolen or Destroyed Warrant Certificates**.  If any of the Warrant Certificates shall be mutilated, lost, stolen or destroyed, the Company shall issue, and the Warrant Agent shall countersign and deliver, in exchange and substitution for, and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor and representing an equivalent number of Warrants, but only upon receipt of evidence reasonably satisfactory to the Warrant Agent and the Company of the loss, theft or destruction of such Warrant Certificate and an affidavit and the posting of an indemnity or bond satisfactory to the Warrant Agent and the Company. Applicants for such substitute Warrant Certificates shall also comply with such other reasonable regulations and pay such other reasonable charges as the Warrant Agent may prescribe and as required by Section 8-405 of the Uniform Commercial Code as in effect in the State of New York.

14

**Section 4.3** **Cancellation of Warrants**. If the Company shall purchase or otherwise acquire Warrants, the Warrant Certificates representing such Warrants shall thereupon be delivered to the Warrant Agent, if applicable, and shall be promptly cancelled by the Warrant Agent and shall not be reissued and, except as expressly permitted by this Agreement, no Warrant Certificate shall be issued hereunder in exchange therefor or in lieu thereof. The Warrant Agent shall cause all cancelled Warrant Certificates to be destroyed and shall deliver a certificate of such destruction to the Company.

**ARTICLE 5**
**EXCHANGE AND TRANSFER**

**Section 5.1** **Exchange and Transfer**.

(a) *Transfer and Exchange of Warrant Certificates or Beneficial Interests Therein.* The Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register, upon delivery to the Warrant Agent, at its office designated for such purpose, of a properly completed form of assignment substantially in the form of Exhibit C hereto, duly signed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program and, in the case of a transfer of a Global Warrant Certificate, upon surrender to the Warrant Agent of such Global Warrant Certificate, duly endorsed. Upon any such registration of transfer, a new Global Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee.

*(b)* *Exchange of a Beneficial Interest in a Warrant Certificate for a Book-Entry Warrant.*

(i) Any Holder of a beneficial interest in a Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant. Upon receipt by the Warrant Agent from the Depositary or its nominee of written instructions or such other form of instructions as is customary for the Depositary on behalf of any person having a beneficial interest in a Warrant Certificate, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depositary and Warrant Agent, the number of Warrants represented by the Warrant Certificate to be reduced by the number of Warrants to be represented by the Book-Entry Warrants to be issued in exchange for the beneficial interest of such person in the Warrant Certificate and, following such reduction, the Warrant Agent shall register in the name of the Holder a Book-Entry Warrant and deliver to said Holder a Warrant Statement.

(ii) Book-Entry Warrants issued in exchange for a beneficial interest in a Warrant Certificate pursuant to this Section 5.1(a) shall be registered in such names as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent. The Warrant Agent shall deliver the applicable Warrant Statements to the persons in whose names such Warrants are so registered.

15

(c)    *Transfer and Exchange of Book-Entry Warrants.* When Book-Entry Warrants are presented to the Warrant Agent with a written request (i) to register the transfer of the Book-Entry Warrants; or (ii) to exchange such Book-Entry Warrants for an equal number of Book-Entry Warrants of other authorized denominations, then the Warrant Agent shall register the transfer or make the exchange as requested if its customary requirements for such transactions are met; provided, however, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing.

(d)    *Restrictions on Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Warrant Certificate.* A Book-Entry Warrant may not be exchanged for a beneficial interest in a Warrant Certificate except upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Warrant Certificate to reflect an increase in the number of Warrants represented by the Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant, then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Warrants represented by the Warrant Certificate to be increased accordingly. If no Warrant Certificates are then outstanding, the Company shall issue and the Warrant Agent shall countersign a new Warrant Certificate representing the appropriate number of Warrants.

(e)    *Restrictions on Transfer and Exchange of Warrant Certificates.* Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 5.1(f)), unless and until it is exchanged in whole for a Book-Entry Warrant, a Warrant Certificate may not be transferred except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

(f)    *Book-Entry Warrants.* If at any time:

(i)    the Depositary for the Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Warrant Certificates and a successor Depositary for the Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice; or

(ii)    the Company, in its sole discretion, notifies the Warrant Agent in writing that it elects to exclusively cause the issuance of Book-Entry Warrants under this Agreement,

then the Warrant Agent, upon written instructions signed by an officer of the Company, shall register Book-Entry Warrants, in an aggregate number equal to the number of Warrants represented by the Warrant Certificates, in exchange for such Warrant Certificates.

(g)     *Restrictions on Transfer.* No Warrants or Warrant Shares shall be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

(h)     *Cancellation of Warrant Certificate.* At such time as all beneficial interests in Warrant Certificates have either been exchanged for Book-Entry Warrants, or been redeemed, repurchased, cancelled or exercised, all Warrant Certificates shall be returned to, or retained and cancelled by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent, subject to applicable law.

### Section 5.2     Obligations with Respect to Transfers and Exchanges of Warrants.

(a)     To permit registrations of transfers and exchanges, the Company shall execute Warrant Certificates, if applicable, and the Warrant Agent is hereby authorized, in accordance with the provisions of Section 2.3 and this Article 5, to countersign such Warrant Certificates, either manually or by facsimile signature, if applicable, or register Book-Entry Warrants, if applicable, as required pursuant to the provisions of this Article 5 and for the purpose of any distribution of new Warrant Certificates contemplated by Section 4.2 or additional Warrant Certificates contemplated by Article 6.

(b)     All Book-Entry Warrants and Warrant Certificates issued upon any registration of transfer or exchange of Book-Entry Warrants or Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Book-Entry Warrants or Warrant Certificates surrendered upon such registration of transfer or exchange.

(c)     No service charge shall be imposed upon a Holder for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other governmental charge that may be imposed on the Holder in connection with any such exchange or registration of transfer.

(d)     So long as the Depositary, or its nominee, is the registered owner of a Warrant Certificate, the Depositary or such nominee, as the case may be, will be considered the sole owner or holder of the Warrants represented by such Warrant Certificate for all purposes under this Agreement. Except as provided in Section 5.1(a) and Section 5.1(f) upon the exchange of a beneficial interest in a Warrant Certificate for Book-Entry Warrants, Beneficial Holders will not be entitled to have any Warrants registered in their names, and will under no circumstances be entitled to receive physical delivery of any such Warrants and will not be considered the Registered Holder thereof under the Warrants or this Agreement. Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.

(e)     Subject to Section 5.1(a), Section 5.1(c) and Section 5.1(d) and this Section 5.2, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any outstanding Warrants in the Warrant Register, upon surrender of Warrant Certificates, if applicable, representing such Warrants at the Warrant Agent Office as set forth in Section 8.3, duly endorsed, and accompanied by a

17

completed form of assignment substantially in the form of Exhibit C attached hereto (or with respect to a Book-Entry Warrant, only such completed form of assignment substantially in the form of Exhibit C attached hereto), duly signed by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program. Upon any such registration of transfer, a new Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee for the Warrants so transferred (and, if any Warrants are not transferred to the transferee, to the transferor for the Warrants remaining registered in the transferor's name)..

Section 5.3    **Restrictions on Transfers**.  The Warrants were issued in reliance upon an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code. The Warrants were not and the Warrants will not be registered under the Securities Act or any state securities law, and to the extent a holder of the Warrants is an "underwriter" under the Securities Act, the Warrants may not be sold or transferred in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder. Without obtaining the consent of the Company to assign or transfer this Warrant, Warrants and all rights thereunder shall be freely transferable, in whole or in part, by the registered holder thereof.  For the avoidance of doubt, the Holders shall not be responsible for expenses or other charges incurred by the Company or the Warrant Agent in connection with the preparation, execution and delivery of the new warrants or related documentation issuable to transferees.

Section 5.4    **Treatment of Holders of Warrant Certificates**.  Each Holder of a Warrant Certificate, by accepting the same, consents and agrees with the Company, the Warrant Agent and every subsequent Holder of such Warrant Certificate that until the transfer of such Warrant Certificate is registered on the books of the Warrant Agent, the Company and the Warrant Agent may treat the registered Holder of such Warrant Certificate as the absolute owner thereof for any purpose and as the person entitled to exercise the rights represented by the Warrants evidenced thereby, any notice to the contrary notwithstanding.

Section 5.5    **Fractional Warrants**.  The Warrant Agent shall not be required to effect any registration of transfer or exchange which will result in the issuance of a Warrant Certificate for a fraction of a Warrant.

**ARTICLE 6**
**ADJUSTMENT OF WARRANT SHARE NUMBER; ADJUSTMENT OF EXERCISE PRICE**

Section 6.1    **Adjustments Generally**.  The Warrant Share Number and the Exercise Price are subject to adjustment from time to time upon the occurrence of any of the events enumerated in this Article 6. If the Company takes any action affecting the Warrant Shares, other than actions described in Article 6, which in the opinion of the Board would adversely affect the exercise rights of the Holder, the Warrant Share Number or the Exercise Price shall be adjusted for the Holder's benefit, to the extent permitted by law, in such manner, and at such time, as such Board shall reasonably determine to be equitable in the circumstances.  Failure of the Board to

18

provide for any such adjustment will be evidence that the Board has determined that it is equitable to make no such adjustments in the circumstances.

Section 6.2    **Certain Mechanical Adjustments**.    If after the Effective Date, and subject to the provisions of Section 6.9, the Company shall (i) declare a dividend or make a distribution on the Common Stock payable in Common Stock, (ii) subdivide, reclassify or recapitalize a class of outstanding Common Stock into a greater number of shares, (iii) combine, reclassify or recapitalize a class of outstanding Common Stock into a smaller number of shares, or (iv) issue any shares of its capital stock by reclassification of its Common Stock, the Warrant Shares issuable upon exercise of Warrants at the time of the record date of such dividend, distribution, subdivision, combination, reclassification, recapitalization or issuance shall be adjusted so that the Holders shall be entitled to receive the aggregate number and kind of shares which, if their Warrants had been exercised in full immediately prior to such event, the Holders would have owned upon such exercise and been entitled to receive by virtue of such dividend, distribution, subdivision, combination, reclassification, recapitalization or issuance. Any adjustment required by this Section shall be made successively immediately after the distribution date, in the case of a dividend or distribution, or the effective date, in the case of such subdivision, combination, reclassification, recapitalization or issuance, to allow the purchase of such aggregate number and kind of shares.

Section 6.3    **Adjustments in the Warrant Share Number**. Whenever the Warrant Shares issuable upon the exercise of Warrants is adjusted pursuant to Section 6.2, the Warrant Share Number shall be adjusted (to the nearest one hundredth of a Warrant) by multiplying the Warrant Share Number applicable immediately prior to such adjustment by a fraction (x) the numerator of which shall be the number of Warrant Shares issuable upon exercise of each Warrant immediately after such adjustment, and (y) the denominator of which shall be the number of Warrant Shares issuable upon exercise of each Warrant immediately prior to such adjustment.

Section 6.4    **Adjustments for Common Stock Issuances**. If on or after the Effective Date, and subject to the provisions of Section 6.9, the Company shall (i) issue Common Stock pursuant to the Management Equity Incentive Plan; (ii) issue Common Stock pursuant to the Second Lien Lender SAR or (iii) issue Common Stock upon exercise of Union Warrants (any such event being herein called a "Common Stock Issuance"), the Warrant Share Number shall be increased to a number determined by multiplying the Warrant Share Number then in effect by a fraction, the numerator of which shall be the total outstanding Common Stock of Company immediately following such Common Stock Issuance, and the denominator of which shall be the total outstanding Common Stock of Company immediately preceding such Common Stock Issuance.  Any adjustment required by this Section shall be made successively immediately after the date of such Common Stock Issuance.

Section 6.5    **Adjustments for SAR Cash Payments**. If, on or after the Effective Date, and subject to the provisions of Section 6.9, the Company shall make a cash payment pursuant to the Second Lien Lender SAR (such event being herein called a "SAR Cash Payment"), the Warrant Share Number shall be increased to a number determined by multiplying the Warrant Share Number then in effect by a fraction, the denominator of which shall be the total outstanding Common Stock of Company immediately following such SAR Cash Payment, and

19

the numerator of which shall be the sum of (a) the total outstanding Common Stock immediately prior to such SAR Cash Payment and (b) the Common Stock that would have been issued in lieu of the SAR Cash Payment if such an election to receive Common Stock would have been made pursuant to the Second Lien Lender SAR. Any adjustment required by this Section 6.5 shall be made successively immediately after the date of such SAR Cash Payment.

**Section 6.6    Reclassification or Reorganization Event**. In the case of any reclassification or reorganization of the outstanding Warrant Shares (other than a change covered by Section 6.2 or that solely affects the par value of such Warrant Shares), each Holder shall thereafter have the right to exercise its Warrants and in lieu of the Warrant Shares that would otherwise be issuable upon such exercise, receive the kind and amount of shares of stock or other securities or property (including cash) that such Holder would have received pursuant to such reclassification or reorganization if such Holder had exercised such Warrants immediately prior to such event and shall have the same rights of election, if any, as holders of the Warrant Shares. The immediately preceding sentence shall similarly apply to successive reclassifications and reorganizations. If a Reorganization Event shall occur, the certificate or articles of incorporation of the continuing or surviving or acquiring or resulting entity, or any contract or agreement providing for such Reorganization Event, shall provide (and the Company shall not consummate any Reorganization Event unless such documents so provide) that, so long as any Warrant remains outstanding, each Warrant, upon the exercise thereof at any time after the consummation of such Reorganization Event, shall be exercisable into (at an initial Exercise Price equal to the Exercise Price in effect immediately prior to such Reorganization Event, and at an initial Warrant Share Number equal to the Warrant Share Number immediately prior to such Reorganization Event, but each subject to any adjustment pursuant to the terms hereof), in lieu of the Warrant Shares issuable upon such exercise prior to such consummation, the amount of cash, securities or other property receivable pursuant to such Reorganization Event by a holder of the number of Warrant Shares for which a Warrant is exercisable immediately prior to the effective time of such Reorganization Event. The provisions set forth herein providing for adjustments and otherwise for the protection of the holders of Warrants shall thereafter continue to be applicable on an as nearly equivalent basis as may be practicable and any such continuing, surviving, acquiring or resulting entity shall expressly assume all of the obligations of the Company set forth herein to the extent applicable. It is acknowledged and agreed that if, in connection with any Reorganization Event other than a Reorganization Event with any Person affiliated with the Company, the Warrants become exercisable solely for cash, and at the time of consummation of such Reorganization Event the Exercise Price is higher than the amount of cash for which such Warrant is exercisable, then, upon consummation of such Reorganization Event, all Warrants then outstanding with such higher Exercise Price shall automatically be terminated and cancelled without payment, and the Company may unilaterally terminate this Warrant Agreement by giving written notice thereof to the Warrant Agent and to the Holders. For purposes hereof, a "Reorganization Event" shall mean (i) a consolidation, merger, amalgamation, share exchange, sale of all or substantially all assets or similar transaction of the Company with or into another Person pursuant to which the Warrant Shares are changed into, converted into or exchanged for cash, securities or other property (whether of the Company or another Person) other than in circumstances covered by Section 6.2; (ii) a reorganization, recapitalization or reclassification or similar transaction in which the Warrant Shares are exchanged for securities other than Warrant Shares (other than in circumstances covered by Section 6.2); or (iii) a statutory exchange of the outstanding Warrant Shares for securities of another Person. The provisions of this Section 6.6

shall apply similarly to all successive reclassifications, reorganizations and events constituting Reorganization Events.

###### Section 6.7    <u>Adjustments for Certain Issuances or Repricings</u>.

(a)    Other than in the event of an adjustment to the Union Warrant Exercise Price as a result of an event giving rise to an independent adjustment to the Exercise Price or the Warrant Share Number, in the event of a reduction of the Union Warrant Exercise Price, the Exercise Price shall be reduced proportionately.

(b)    If on or after the Effective Date, the Company shall issue Common Stock (other than Common Stock issued pursuant to the Management Equity Incentive Plan, this Agreement, the Union Warrants or the Second Lien Lender SAR) (or rights, warrants or other securities exercisable or convertible into or exchangeable into such Common Stock, or stock appreciation rights or other rights to receive payments based upon the value of Common Stock ("Common Stock Equivalents")) (collectively, the "Additional Common Stock") at a price per share of Common Stock less than the Equity Value as of the date of such issuance (a "Below Market Issuance"), then the Exercise Price shall be reduced to the price (the "Adjusted Exercise Price") determined by multiplying the Exercise Price then in effect by a fraction, the numerator of which is the sum of (a) the total outstanding Common Stock on a fully diluted basis immediately preceding such Below Market Issuance plus (b) the number of shares of Additional Common Stock (treating Common Stock Equivalents as having been fully exercised or converted) which the aggregate consideration received by the Company in the Below Market Issuance would purchase at a price per share equal to the Equity Value as of the date immediately prior to such Below Market Issuance and the denominator of which is the total outstanding Common Stock of Company on a fully diluted basis immediately after such Below Market Issuance.  In the event of a Below Market Issuance, the Warrant Share Number shall also be increased to the number obtained by dividing (x) the product of the Warrant Share Number before such adjustment and the Exercise Price in effect immediately prior to the Below Market Issuance by (y) the Adjusted Exercise Price.  For purposes of this Section 6.7(b), (i) the consideration received by the Company shall not be deemed reduced by any underwriting or placement agency fees, discounts, commissions and expense, (ii) the value of any non-cash portion of the consideration shall be deemed to be the fair market value of such consideration as determined in good faith by the majority of the Independent Board Members, upon the advice of a nationally recognized investment banking firm chosen by the Board with the consent of a majority of the Independent Board Members and (iii) to the extent the Below Market Issuance consists of the issuance of Common Stock Equivalents, the consideration received by the Company shall be deemed to include the additional consideration that would payable to the Company upon the eventual exercise, conversion or exchange of such Common Stock Equivalent.  For purposes of this Section 6.7, any issuance of Common Stock to an independent third party who prior to such issuance was not a beneficial or record holder of any securities of the Company or a creditor of the Company shall be conclusively presumed not to be a Below Market Issuance.   For the avoidance of doubt, no increase in the Exercise Price or reduction in the Warrant Share Number shall be made pursuant to this Section 6.7 (or Sections 6.1, 6.4 or 6.5).

**Section 6.8     Notices of Changes in Warrant and Other Events**. Upon every adjustment of the Warrant Share Number or of the Exercise Price, the Company shall give written notice thereof to the Warrant Agent and to each Holder, which notice shall state the Warrant Share Number and Exercise Price (as the case may be) resulting from such adjustment and shall set forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event.

Such giving of notice shall be initiated at least ten (10) Business Days prior to the date fixed as an effective date or the date of closing of the Company's register of members for the determination of the shareholders entitled to such issuance. Such notice shall specify such record date or the date of closing of the register of members, as the case may be. Failure to provide such notice shall not affect the validity of any action taken in connection with such issuance or other proposed transaction. For the avoidance of doubt, no such notice shall supersede or limit any adjustment otherwise called for hereby by reason of any event as to which notice is required by this Section 6.8.

Upon each determination of Equity Value hereunder, the Company shall promptly give notice thereof to the Holder, setting forth in reasonable detail the calculation of such Equity Value, and the method and basis of determination thereof.

At least five (5) Business Days prior to taking any action that would give rise to an adjustment of the Warrant Share Number or of the Exercise Price, the Company shall give written notice thereof to each Holder, which notice shall state the anticipated Warrant Share Number and Exercise Price (as the case may be) that would result from such adjustment and shall set forth in reasonable detail the relevant action, method of calculation and the facts upon which such calculation is based.

**Section 6.9     No Fractional Shares**. Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of Warrants. If, by reason of any adjustment made pursuant to this Article 6, any Holder would be entitled, upon the exercise of such Warrant, to receive a fractional interest in a Warrant Share, the Company shall, upon such exercise, round up to the nearest whole number the number of Warrant Shares to be issued to the Holder or issue cash for the value of such fractional Warrant Shares, as reasonably determined by the Board.

**Section 6.10     Form of Warrant**. The form of Warrant or Warrant Certificate need not be changed because of any adjustment pursuant to this Article 6, and Warrant Certificates issued after such adjustment may state the same Exercise Price and the same Warrant Share Number as is stated in the Warrant Certificates initially issued pursuant to this Agreement. However, the Company may at any time in its sole discretion make any change in the form of Warrant or Warrant Certificate that the Company may deem appropriate and that does not affect the substance thereof, and any Warrant Certificates thereafter issued or countersigned, whether in exchange or substitution for an outstanding Warrant Certificate or otherwise, may be in the form as so changed.

22

**Section 6.11    De Minimis Adjustments**. No adjustment in the Warrant Share Number shall be required unless such adjustment would require an increase or decrease of at least one percent (1%) in the number of Warrant Shares purchasable upon the exercise of each Warrant; provided, however, that any adjustments which by reason of this Section 6.11 are not required to be made shall be carried forward and taken into account in any subsequent adjustment. All calculations shall be made to the nearest to the nearest one-hundredth of a Warrant Share.

**Section 6.12    No Impairment**. The Company will not, by amendment of its certificate of incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in taking of all such action as may be necessary or appropriate in order to protect the rights of the Holder.

## ARTICLE 7
## CONCERNING THE WARRANT AGENT

**Section 7.1    Warrant Agent**. The Warrant Agent shall serve as the agent of the Company in respect of the Warrants and the Warrant Certificates, upon the terms of, and subject to the conditions set forth in, this Agreement and the Warrant Certificates. The Warrant Agent shall have the powers and authority granted to and conferred upon it hereunder and in the Warrant Certificates, and such further powers and authority as the Company may hereafter grant to or confer upon it. All of the terms and provisions with respect to such powers and authority contained in the Warrant Certificates are subject to and governed by the terms and provisions of this Agreement.

**Section 7.2    Conditions of Warrant Agent's Obligations**.    The Warrant Agent accepts its obligations herein set forth upon the terms and conditions hereof, including the following, to all of which the Company agrees and to all of which the rights hereunder of the Holders from time to time of the Warrant Certificates shall be subject:

(a)    *Compensation and Indemnification*. The Company agrees promptly to pay the Warrant Agent the compensation to be agreed upon between the Company and the Warrant Agent for all services rendered by the Warrant Agent and to reimburse the Warrant Agent for reasonable out-of-pocket expenses incurred by the Warrant Agent without negligence, bad faith or willful misconduct or breach of this Agreement on its part in connection with the services rendered hereunder by the Warrant Agent. The Company also agrees to indemnify the Warrant Agent for, and to hold it harmless against, any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of the Warrant Agent, arising out of or in connection with its acting as the Warrant Agent hereunder, as well as the reasonable costs and expenses of defending against any claim of such liability. In addition, from time to time, Company may provide the Warrant Agent with instructions concerning the services performed by the Warrant Agent hereunder. In addition, at any time Warrant Agent may apply to any officer of Company for instruction, and may consult with legal counsel for Company with respect to any matter arising in connection with the services to be performed by the Warrant Agent under this Agreement. The Warrant Agent and its agents and subcontractors shall not be

liable and shall be indemnified by Company for any action taken or omitted by the Warrant Agent in reliance upon any Company instructions or upon the advice or opinion of such counsel. The Warrant Agent shall not be held to have notice of any change of authority of any person, until receipt of written notice thereof from Company.

(b)     *Agent for the Company*. In acting under this Agreement and in connection with the Warrants and the Warrant Certificates, the Warrant Agent is acting solely as agent of the Company and does not assume any obligation or relationship of agency or trust for or with any of the Holders of Warrant Certificates or beneficial owners of Warrants.

(c)     *Counsel*. The Warrant Agent may consult with counsel satisfactory to it in its reasonable judgment (who may be counsel for the Company), and the advice of such counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in accordance with the advice of such counsel.

(d)     *Documents*. Subject to Section 3.2(j), the Warrant Agent shall be protected and shall incur no liability for or in respect of any action taken or thing suffered by it in reliance upon any Warrant Certificate, Exercise Form, notice, direction, consent, certificate, affidavit, statement or other paper or document reasonably believed by it to be genuine and to have been presented or signed by the proper parties. The Company shall perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and/or delivered all such further acts, instruments and documents as may reasonably be required by the Warrant Agent for the carrying out of the provisions of this Agreement.

(e)     *Certain Transactions*. The Warrant Agent, and its officers, directors and employees, may become the owner of, or acquire any interest in, Warrants, with the same rights that it or they would have if it were not the Warrant Agent hereunder, and, to the extent permitted by applicable law, it or they may engage or be interested in any financial or other transaction with the Company and may act on, or as depositary, trustee or agent for, any committee or body of holders of Warrant Shares or other obligations of the Company as freely as if it were not the Warrant Agent hereunder.

(f)     *No Liability for Interest*. The Warrant Agent shall have no liability for interest on any monies at any time received by it pursuant to any of the provisions of this Agreement or of the Warrant Certificates.

(g)     *No Liability for Invalidity*. The Warrant Agent shall not be under any responsibility with respect to the validity or sufficiency of this Agreement or the execution and delivery hereof (except the due authorization to execute this Agreement and the due execution and delivery hereof by the Warrant Agent) or, subject to Section 3.2(j), with respect to the validity or execution of any Warrant Certificates (except its countersignature thereof).

(h)     *No Liability for Recitals*. The recitals contained herein shall be taken as the statements of the Company and the Warrant Agent assumes no liability for the correctness of the same.

(i)     *No Implied Obligations*. The Warrant Agent shall be obligated to perform only such duties as are herein and in the Warrant Certificates specifically set forth and no

implied duties or obligations shall be read into this Agreement or the Warrant Certificates against the Warrant Agent. The Warrant Agent shall not be under any obligation to take any action hereunder which may tend to involve it in any expense or liability, the payment of which within a reasonable time is not, in its reasonable opinion, assured to it. The Warrant Agent shall not be accountable or under any duty or responsibility for the use by the Company of any of the Warrant Certificates countersigned by the Warrant Agent and delivered by it to the Company pursuant to this Agreement or for the application by the Company of the proceeds of the Warrant Certificates. The Warrant Agent shall have no duty or responsibility in case of any default by the Company in the performance of its covenants or agreements contained herein or in the Warrant Certificates or in the case of the receipt of any written demand from a Holder of a Warrant Certificate with respect to such default.

(j)    *Aggregate Liability*. Notwithstanding anything contained herein to the contrary, the Warrant Agent's aggregate liability during any term of this Agreement with respect to, arising from, or arising in connection with this Agreement, or from all services provided or omitted to be provided under this Agreement, whether in contract, or in tort, or otherwise, is limited to, and shall not exceed, other than in the case of the Warrant Agent's bad faith or willful misconduct, the amounts paid hereunder by the Company to Warrant Agent as fees and charges, but not including reimbursable expenses,

(k)    Damages. Neither party to this agreement shall be liable to the other party for any consequential, indirect, special or incidental damages under any provisions of this agreement or for any consequential, indirect, penal, special or incidental damages arising out of any act or failure to act hereunder even if that party has been advised of or has foreseen the possibility of such damages.

**Section 7.3    <u>Resignation and Appointment of Successor</u>**.

(a)    The Company agrees, for the benefit of the Holders from time to time, that there shall at all times be a Warrant Agent hereunder until all the Warrants have been exercised or are no longer exercisable. The initial Warrant Agent and any successor Warrant Agent hereunder shall be the Company or a bank or trust company in good standing, and shall be authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers and subject to examination by federal or state authority.

(b)    The Warrant Agent may at any time resign as such by giving written notice of its resignation to the Company, specifying the desired date on which its resignation shall become effective; provided, however, that such date shall be not less than ninety (90) days after the date on which such notice is given unless the Company agrees to accept shorter notice. Upon receiving such notice of resignation, the Company shall promptly appoint a successor Warrant Agent (which shall be the Company or a bank or trust company in good standing, authorized under the laws of the jurisdiction of its organization to exercise corporate trust powers and subject to examination by federal or state authority) by written instrument in duplicate signed on behalf of the Company, one copy of which shall be delivered to the resigning Warrant Agent and one copy to the successor Warrant Agent. The Company may, at any time and for any reason at no cost to the Holders, remove the Warrant Agent and appoint a successor Warrant Agent (qualified as aforesaid) by written instrument in duplicate signed on behalf of the

25

Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent. Any resignation or removal of the Warrant Agent and any appointment of a successor Warrant Agent shall become effective upon acceptance of appointment by the successor Warrant Agent as provided in this subsection (b). In the event a successor Warrant Agent has not been appointed and accepted its duties within ninety (90) days of the Warrant Agent's notice of resignation, the Warrant Agent may apply to any court of competent jurisdiction for the designation of a successor Warrant Agent. Upon its resignation or removal, the Warrant Agent shall be entitled to the payment by the Company of the compensation and to the reimbursement of all reasonable out-of-pocket expenses incurred by it hereunder as agreed to in Section 7.2(a).

(c)     The Company shall remove the Warrant Agent and appoint a successor Warrant Agent if the Warrant Agent (i) shall become incapable of acting, (ii) shall be adjudged bankrupt or insolvent, (iii) shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, (iv) shall consent to, or shall have had entered against it a court order for, any such relief or to the appointment of or taking possession by any such official in any involuntary case or other proceedings commenced against it, (v) shall make a general assignment for the benefit of creditors or (vi) shall fail generally to pay its debts as they become due. Upon the appointment as aforesaid of a successor Warrant Agent and acceptance by it of such appointment, the predecessor Warrant Agent shall, if not previously disqualified by operation of law, cease to be Warrant Agent hereunder.

(d)     Any successor Warrant Agent appointed hereunder shall execute, acknowledge and deliver to its predecessor and the Company an instrument accepting such appointment hereunder, and thereupon such successor Warrant Agent, without any further act, deed or conveyance, shall become vested with all the authority, rights, powers, immunities, duties and obligations of such predecessor with like effect as if originally named as Warrant Agent hereunder, and such predecessor shall thereupon become obligated to transfer, deliver and pay over, and such successor Warrant Agent shall be entitled to receive, all monies, securities and other property on deposit with or held by such predecessor as Warrant Agent hereunder.

(e)     Any corporation into which the Warrant Agent hereunder may be merged or converted or any corporation with which the Warrant Agent may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any corporation to which the Warrant Agent shall sell or otherwise transfer all or substantially all the assets and business of the Warrant Agent, provided that it shall be qualified as aforesaid, shall be the successor Warrant Agent under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto. No costs and expenses associated with any replacement or appointment of a successor Warrant Agent shall be paid by the Holders.

(f)     In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the

26

Warrant Shares not later than the effective date of any such appointment, and (ii) cause written notice thereof to be delivered to each Registered Holder at such holder's address appearing on the Warrant Register. Failure to give any notice provided for in this Section or any defect therein shall not affect the legality or validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

## ARTICLE 8
## MISCELLANEOUS

**Section 8.1    <u>Amendment</u>**.    The terms of the Warrants may be amended by the Company for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained herein or adding or changing any other provisions with respect to matters or questions arising under this Agreement as the Company and the Warrant Agent may reasonably deem necessary or desirable (including without limitation any addition or modification to provide for compliance with the transfer restrictions set forth herein or conform the provisions of this Agreement to any provisions of the Plan), provided, that the affirmative vote or consent of the Holders of Warrants exercisable for a majority of the Warrant Shares then issuable upon exercise of the Warrants then outstanding shall be required if the rights of the Holders are adversely affected by such amendment; provided, however, that the consent of each Holder of a Warrant affected shall be required for any amendment of this Agreement that would (i) increase the Exercise Price or decrease the number of Warrant Shares purchasable upon exercise of the Warrants, or alter the Company's obligation to issue Warrant Shares upon exercise of the underlying Warrant (other than adjustments made pursuant to Section 6 hereof), (ii) change the Expiration Date to an earlier date, or (iii) treat such Holder differently in an adverse way from any other Holder of Warrants.  Any amendment effected pursuant to and in accordance with this Section will be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent. In the event of any amendment, the Company will give prompt notice thereof to all Registered Holders and, if appropriate, notation thereof will be made on all Warrant Certificates thereafter surrendered for registration of transfer or exchange.

**Section 8.2    <u>Notices and Demands to the Company and Warrant Agent</u>**.    If the Warrant Agent shall receive any notice or demand addressed to the Company by the Holder of a Warrant Certificate pursuant to the provisions of the Warrant Certificates, the Warrant Agent shall promptly forward such notice or demand to the Company.

(a)    Any notice or communication from the Warrant Agent to the Company with respect to this Agreement shall be addressed to [●], Attention: [President], and any notice or communication from the Company to the Warrant Agent with respect to this Agreement shall be addressed to such address as shall be specified in writing by the Warrant Agent to the Company from time to time (or such other address as shall be specified in writing by the Warrant Agent or by the Company). Any notice or communication that is given to any Holder pursuant to this Agreement or with respect to any Warrant, Book-Entry Warrant or Warrant Certificate shall be addressed to such Holder's address as it appears on the books of the Warrant Agent.

(b)    All notices and communications made to the Company, the Warrant Agent or any Holder pursuant to this Agreement or any Warrant Certificate shall be in writing and shall be conclusively deemed to have been duly given (i) when hand delivered to the receiving party;

(ii) three (3) Business Days after deposit in the U.S. mail with first class or certified mail receipt requested postage prepaid; or (iii) the next Business Day after deposit with a national overnight delivery service, postage prepaid, with next Business Day delivery guaranteed, provided that the sending party receives a confirmation of delivery from the delivery service provider.

Section 8.3    **Applicable Law; Waiver of Jury Trial**.  The validity, interpretation and performance of this Agreement and each Warrant Certificate issued hereunder and of the respective terms and provisions hereof and thereof shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any conflicts of law provision that would require the application of the law of any other jurisdiction. Nothing herein is intended to circumvent any duties owed by the parties to one another (including without limitation any duties owed to the Holders as express third-party beneficiaries), or to limit any implied covenant of good faith and fair dealing as applicable hereto, under the governing law of this Warrant Agreement. THE COMPANY, THE WARRANT AGENT, AND EACH HOLDER HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY WARRANT CERTIFICATE OR WARRANT ISSUED HEREUNDER.

Section 8.4    **Headings**.  The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

Section 8.5    **Counterparts**.  This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile, PDF, or other forms of electronic delivery, each of which as so executed shall be deemed to be an original, but such counterparts shall together constitute but one and the same instrument.

Section 8.6    **Inspection of Agreement**.  A copy of this Agreement shall be available at all reasonable times at the principal corporate trust office of the Warrant Agent for inspection by the Holder of any Book-Entry Warrant or Warrant Certificate. The Warrant Agent may require such Holder of a Warrant Certificate to submit such Warrant Certificate for inspection by it.

Section 8.7    **Benefits of This Agreement**.  This Agreement is otherwise intended solely for the benefit of the Company, the Warrant Agent, the Holders and each of their respective successors and permitted assigns, and this Agreement shall not confer any rights upon any other Person.

Section 8.8    **Termination**.  This Agreement shall terminate at the earliest to occur of (a) the exercise of all Warrants and (b) the expiration of the Exercise Period; provided, however, that Section 7.2 and this Article 8 shall survive any termination or expiration hereof.

Section 8.9    **Confidentiality**.  The Warrant Agent and the Company agree that all books, records, information and data pertaining to the business of the other party, including inter alia, personal, non-public warrant holder information, which are exchanged or received pursuant to the negotiation or the carrying out of this Agreement including the fees for services set forth in

28

the attached schedule shall remain confidential, and shall not be voluntarily disclosed to any other person, except as may be required by law.

### Section 8.10    **Prohibited Actions**.

(a)    Prior to the exercise in full of the Warrants, the Company agrees that it will not take any action which would entitle the Holder to an adjustment of the Warrant Share Number or an adjustment of the Exercise Price if the total number of Warrant Shares issuable after such action upon exercise of the Warrants, together with all Warrant Shares then outstanding and all Warrant Shares then issuable upon the exercise of all outstanding options, warrants, conversion and other rights, would exceed the total number of Warrant Shares then authorized by its certificate of incorporation.

(b)    Prior to the exercise in full of the Warrants, the Company shall not declare, pay or make any dividends or distributions (whether in assets, cash or other property of the Company) to holders of Common Stock, nor purchase or redeem any Common Stock, other than (i) dividends or distributions described in Section 6.2  and (ii) purchases or redemptions of Common Stock held by present or former directors, consultants, officers or employees of the Company or any of its Subsidiaries (other than shares of Common Stock directly or indirectly transferred to such persons by shareholders of the Company) upon such person's death, disability, retirement or termination of employment.

*[Signature Page Follows]*

29

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**GLOBAL AVIATION HOLDINGS INC.**

By:_____

Name: _____

Title: _____

**[WARRANT AGENT]**

By:_____

Name: _____

Title: _____

**Exhibit A-1**

**FORM OF WARRANT STATEMENT**

**FOR SERIES A WARRANTS**

**[As provided by the Warrant Agent]**

**Exhibit A-2**

**FORM OF WARRANT STATEMENT**

**FOR SERIES B WARRANTS**

**[As provided by the Warrant Agent]**

**Exhibit A-3**

**FORM OF WARRANT STATEMENT**

**FOR SERIES C WARRANTS**

**[As provided by the Warrant Agent]**

**EXHIBIT A-4**

**FORM OF FACE OF**

**GLOBAL WARRANT CERTIFICATE**

**FOR SERIES A WARRANTS**

**VOID AFTER 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]**

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 5.2(a) of the Warrant Agreement dated as of •, 2012 (the "Warrant Agreement"), (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 5.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of • or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to • or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, •, has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 5 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Series A Warrant will be recorded on the books of the Company until such provisions have been complied with.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE SERIES A WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT, DATED AS OF •, 2012, BY AND BETWEEN GLOBAL AVIATION HOLDINGS INC. AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS SERIES A WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]

**SERIES A WARRANT TO PURCHASE, AT THE ELECTION OF THE HOLDER, EITHER _____ WARRANT SHARES IN GLOBAL AVIATION HOLDINGS, INC.**

CUSIP # •
ISSUE DATE: •, 2012

No. A-1

This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Global Aviation Holdings, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 11:59 p.m., New York time, on •, 20[●], at the election of the Registered Holder the number of Warrant Shares of the Company at the Exercise Price (as defined in the Warrant Agreement) applicable to Series A Warrants. The Exercise Price and the Warrant Share Number hereunder are subject to adjustment from time to time as provided in Article 6 of the Warrant Agreement. The initial Exercise Price shall be $[●] and the initial Warrant Share Number shall be one Warrant Share.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Series A Warrant has been duly executed by the Company under its corporate seal as of the _____ day of _____, 2012.

**GLOBAL AVIATION HOLDINGS, INC.**

By:_____
    Name:
    Title:

Attest: _____
    Secretary

•,
as Warrant Agent

By: _____
    Name:
    Title:

Address of Registered Holder for Notices (until changed in accordance with this Series A Warrant):

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

**FORM OF REVERSE OF SERIES A WARRANT**

The Series A Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Series A Warrants to purchase an aggregate of [●] Warrant Shares issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Series A Warrants. All capitalized terms used on the face of this Series A Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Series A Warrant at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Series A Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Series A Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Series A Warrant does not entitle the Registered Holder to any of the rights of a shareholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-5**

**FORM OF FACE OF**

**GLOBAL WARRANT CERTIFICATE**

**FOR SERIES B WARRANTS**

**VOID AFTER 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]**

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 5.2(a) of the Warrant Agreement dated as of •, 2012 (the "Warrant Agreement"), (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 5.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of • or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to • or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, •, has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 5 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Series B Warrant will be recorded on the books of the Company until such provisions have been complied with.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE SERIES B WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT, DATED AS OF •, 2012, BY AND BETWEEN GLOBAL AVIATION HOLDINGS INC. AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS SERIES B WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]

**SERIES B WARRANT TO PURCHASE, AT THE ELECTION OF THE HOLDER, EITHER _____ WARRANT SHARES IN GLOBAL AVIATION HOLDINGS, INC.**

CUSIP # •
ISSUE DATE: •, 2012

No. A-1

This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Global Aviation Holdings, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 11:59 p.m., New York time, on •, 20[●], at the election of the Registered Holder the number of Warrant Shares of the Company at the Exercise Price (as defined in the Warrant Agreement) applicable to Series B Warrants. The Exercise Price and the Warrant Share Number hereunder are subject to adjustment from time to time as provided in Article 6 of the Warrant Agreement. The initial Exercise Price shall be $[●] and the initial Warrant Share Number shall be one Warrant Share.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Series B Warrant has been duly executed by the Company under its corporate seal as of the _____ day of _____, 2012.

**GLOBAL AVIATION HOLDINGS, INC.**

By:_____
        Name:
        Title:

Attest: _____
                Secretary

•,
as Warrant Agent

By:        _____
                Name:
                Title:

Address of Registered Holder for Notices (until changed in accordance with this Series B Warrant):

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

**FORM OF REVERSE OF SERIES B WARRANT**

The Series B Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Series B Warrants to purchase an aggregate of [●] Warrant Shares issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Series B Warrants. All capitalized terms used on the face of this Series B Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Series B Warrant at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Series B Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Series B Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Series B Warrant does not entitle the Registered Holder to any of the rights of a shareholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-6**

## FORM OF FACE OF

## GLOBAL WARRANT CERTIFICATE

## FOR SERIES C WARRANTS

## VOID AFTER 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 5.2(a) of the Warrant Agreement dated as of •, 2012 (the "Warrant Agreement"), (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 5.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred to a successor Depositary with the prior written consent of the Company.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of • or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to • or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, •, has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee, and transfers of portions of this Global Warrant Certificate shall be limited to transfers made in accordance with the restrictions set forth in Section 5 of the Warrant Agreement.

No registration or transfer of the securities issuable pursuant to the Series C Warrant will be recorded on the books of the Company until such provisions have been complied with.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE SERIES C WARRANT) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT, DATED AS OF •, 2012, BY AND BETWEEN GLOBAL AVIATION HOLDINGS INC. AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS SERIES C WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO 11:59 P.M., NEW YORK CITY TIME, ON [●], 20[●]

**SERIES C WARRANT TO PURCHASE, AT THE ELECTION OF THE HOLDER, EITHER _____ WARRANT SHARES IN GLOBAL AVIATION HOLDINGS, INC.**

CUSIP # •
ISSUE DATE: •, 2012

No. A-1

This certifies that, for value received, _____, and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Global Aviation Holdings, Inc., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time before 11:59 p.m., New York time, on •, 20[●], at the election of the Registered Holder the number of Warrant Shares of the Company at the Exercise Price (as defined in the Warrant Agreement) applicable to Series C Warrants. The Exercise Price and the Warrant Share Number hereunder are subject to adjustment from time to time as provided in Article 6 of the Warrant Agreement. The initial Exercise Price shall be $[●] and the initial Warrant Share Number shall be one Warrant Share.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

IN WITNESS WHEREOF, this Series C Warrant has been duly executed by the Company under its corporate seal as of the \_\_\_\_ day of _____, 2012.

**GLOBAL AVIATION HOLDINGS, INC.**

By:_____
      Name:
      Title:

Attest: _____
      Secretary

•,
as Warrant Agent

By: _____
      Name:
      Title:

Address of Registered Holder for Notices (until changed in accordance with this Series C Warrant):

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

**FORM OF REVERSE OF SERIES C WARRANT**

The Series C Warrant evidenced by this Warrant Certificate is a part of a duly authorized issue of Series C Warrants to purchase an aggregate of [●] Warrant Shares issued pursuant to the Warrant Agreement, a copy of which may be inspected at the Warrant Agent's office. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Series C Warrants. All capitalized terms used on the face of this Series C Warrant herein but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

Upon due presentment for registration of transfer of the Series C Warrant at the office of the Warrant Agent, a new Warrant Certificate or Warrant Certificates of like tenor and evidencing in the aggregate a like number of Series C Warrants shall be issued to the transferee in exchange for this Warrant Certificate, subject to the limitations provided in the Warrant Agreement, without charge except for any applicable tax or other governmental charge.

The Company shall not be required to issue fractions of Warrant Shares or any certificates that evidence fractional Warrant Shares.

No Series C Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Series C Warrant does not entitle the Registered Holder to any of the rights of a shareholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT B**

### EXERCISE FORM FOR REGISTERED HOLDERS
### HOLDING BOOK-ENTRY SERIES [A][/][B][/][C] WARRANTS

**(To be executed upon exercise of Series [A][/][B] [/][C] Warrant)**

In this election form, "Warrant Agreement" means the Warrant Agreement dated [●], 2012 between Global Aviation Holdings, Inc. and [●], and capitalized terms defined therein have the same meaning in this election form.

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrants, to purchase Warrant Shares and (check one and fill in the appropriate information under ):

☐ herewith tenders payment for exercise of _____ Warrants in accordance with the elections specified below to the order of Global Aviation Holdings, Inc. in the amount of $_____ in accordance with the terms of the Warrant Agreement and this Series [A][/][B][/][C] Warrant;

or

☐ herewith tenders this Series [A][/][B][/][C] Warrant pursuant to the net issuance exercise provisions of Section 3.2(d) of the Warrant Agreement in accordance with the elections specified below. This exercise and election shall be immediately effective or shall be effective as of 5:00 p.m., New York time, on [insert date].

• _____ Warrants are exercised for Warrant Shares; and

The undersigned agrees to become a shareholder of Global Aviation Holdings, Inc. and to be bound by its certificate of incorporation and bylaws, as amended.

The undersigned requests that [a statement representing] the Warrant Shares be delivered as follows:

Name _____

Address _____

Delivery Address (if different)

_____

_____

If said number of shares shall not be all the shares purchasable under the within Book-Entry Warrants, the undersigned requests that a new Book-Entry Warrant representing the balance of such Series [A][/][B][/][C] Warrants shall be registered, with the appropriate Warrant Statement delivered as follows:

Name _____

Address _____

Delivery Address (if different)

      _____

      _____

_____     Signature: _____

Social Security or Other Taxpayer
Identification Number of Holder

Note: If the statement representing the Warrant Shares or any Book-Entry Warrants representing Warrants not exercised is to be registered in a name other than that in which the Book-Entry Warrants are registered, the signature of the holder hereof must be guaranteed.

SIGNATURE GUARANTEED BY:

_____

Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

Countersigned:
Dated: _____ , 20 _____

•,
as Warrant Agent

By:_____
    Name:
    Title:

**EXHIBIT C**

## FORM OF ASSIGNMENT

**(To be executed only upon assignment of Warrant)**

For value received, _____ hereby sells, assigns and transfers unto the Assignee(s) named below the rights represented by such Series [A][/][B][/][C] Warrants listed opposite the respective name(s) of the Assignee(s) named below and all other rights of the Registered Holder under the Series [A][/][B [/][C]Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said Series [A][/][B][/][C] Warrants on the books of the within-named Company with respect to the number of Warrants set forth below, with full power of substitution in the premises:

Name(s) of Assignee(s)_____

Address _____

No. of Warrants_____

And if said number of Warrants shall not be all the Warrants represented by the Series [A][/][B][/][C] Warrants owned by the Assignor, new Series [A][/][B][/][C] Warrants are to be issued in the name of said undersigned for the balance remaining of the Warrants registered by said Series [A][/][B][/][C] Warrants.

Dated: _____ , 20_____

Signature _____

Note:  The above signature should correspond
         exactly with the name on the face of this
         Series [A][/][B][/][C] Warrant

**Exhibit O**

**Second Lien Lender SAR Agreement**

# GLOBAL AVIATION HOLDINGS INC.

## STOCK APPRECIATION RIGHTS AGREEMENT

\* \* \* \* \*

Grantees: [As listed on Exhibit A attached hereto]

Number of Shares subject to this SAR:  [3% of the fully-diluted Common Stock outstanding at the Effective Date, as distributed to each Grantee as set forth opposite each such Grantee's name on Schedule A attached hereto]

\* \* \* \* \*

THIS STOCK APPRECIATION RIGHTS AGREEMENT (this "Agreement"), dated as of the [●], 2012, is entered into by and between Global Aviation Holdings Inc., a corporation organized in the State of Delaware (the "Company"), and each of the Grantees specified on Schedule A attached hereto.

W I T N E S S E T H :

WHEREAS, on February 5, 2012, the Company and certain of the Company's direct and indirect subsidiaries each filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") initiating cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code §§ 101-1330 (as amended, the "Bankruptcy Code") and continued in the possession of their assets and in the management of their businesses pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Second Amended Joint Plan of Reorganization, as approved by the Bankruptcy Court (the "Plan"), provides that, upon consummation of the Plan, the Company shall grant to the Second Lien Lenders a stock appreciation right in respect of 3% of the fully-diluted Common Stock outstanding at the Effective Date entitling the Second Lien Lenders, upon a Liquidity Event within five years of the Effective Date to certain cash payments or Shares as provided herein;

WHEREAS, the Bankruptcy Court confirmed the Plan and the Effective Date under the Plan occurred on the date first written above; and

WHEREAS, all acts and things have been done and performed which are necessary to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1.     **Definitions**.  Capitalized terms used herein but not otherwise defined shall have the meaning set forth below:

(a)     "Affiliate" means, with respect to any individual or entity, any other individual or entity, which, directly or indirectly, controls, is controlled by or is under common control with such individual or entity.

(b)     "Board" means the Company's Board of Directors, as constituted from time to time.

(c)     "By-Laws" means the by-laws of the Company in effect as of the Effective Date, as may be amended from time to time.

(d)     "Citizen of the United States" means any person or entity who is a "citizen of the United States" as defined in Section 40102(a)(15) of the Act (or any successor or replacement of the provision thereto) and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time.

(e)     "Common Stock" means [the Company's Class A Common Stock, [par value $0.001 per share], Class B Common Stock, [par value $0.001 per share] and Class C Common Stock, [par value $0.001 per share], as the case may be under the terms of this Agreement].

(f)     "Effective Date" means the date hereof.

(g)     "Equity Value" means the total equity value of the Company, which shall be determined in good faith by a majority of the Board, other than the members of the Board employed by or otherwise affiliated with any person or entity that, together with its Affiliates, own or controls more than 10.0% of the aggregate Shares outstanding as at the date of determination (the "Independent Board Members"), upon the advice of a nationally recognized investment banking firm chosen by the Board with the consent of a majority of the Independent Board Members.

(h)     "Equity Value Threshold" means each Equity Value set forth on Schedule A hereto.

(i)     "Exchange Act" means the Securities Exchange Act of 1934, as amended and all rules and regulations promulgated thereunder.  Any reference to any section of the Exchange Act shall also be a reference to any successor provision.

(j)     "Expiration Date" means [●], 2017, the fifth (5th) anniversary of the Grant Date.

(k)     "Independent Third Party" means any person or group other than a person or entity that as of the Effective Date holds more than five percent (5%) of the outstanding Shares of the Company.

2

(l)      "<u>Liquidity Event</u>" means any (i) sale, disposition, in-kind distribution or other transfer of all or substantially all of the assets of the Company and its Subsidiaries on a consolidated basis to an Independent Third Party, (ii) any underwritten offering by the Company (or a successor to the Company) of Shares to the public pursuant to an effective registration statement under the Securities Act (or the closing of another transaction that results in any Shares being publicly traded and widely held by the public) (a "Public Offering"), (iii) (a) consolidation or merger of (x) the Company with or into an Independent Third Party or (y) a Subsidiary with or into an Independent Third Party if such transaction involves an exchange or conversion of the Shares or (b) any sale, transfer or issuance or integrated series of sales, transfers and/or issuances of the Company's voting securities to an Independent Third Party which, in the case of clauses (a) or (b), results in the holders of such outstanding voting securities immediately prior to such transaction ceasing to own at least fifty percent (50%) of such outstanding voting interests immediately following such transaction.

(m)      "<u>Management Equity Incentive Plan</u>" has the meaning assigned to such term in the Plan.

(n)      "<u>Non-Citizen</u>" mean any person or entity who is not a "Citizen of the "United States" as defined in Section 40102(a)(15) of the Act and administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time, including any agent, trustee or representative of a Non-Citizen.

(o)      "<u>Plan</u>" has the meaning assigned to such term in the recitals.

(p)      "<u>Second Lien Lenders</u>" has the meaning assigned to such term in the Plan.

(q)      "<u>Securities Act</u>" means the Securities Act of 1933, as amended and all rules and regulations promulgated thereunder.  Any reference to any section of the Securities Act shall also be a reference to any successor provision.

(r)      "<u>Shares</u>" means shares of any class of the Company's Common Stock.

(s)      "<u>Stockholders Agreement</u>" means the Stockholders Agreement, dated [●], by and among the Company and its stockholders, as amended, restated or otherwise modified from time to time.

(t)      "<u>Subsequent Liquidity Event</u>" means, following a Public Offering and prior to the Expiration Date, each time the Equity Value, as determined by the simple arithmetic average of each Trading Day's VWAP for the preceding 15 Trading Days, exceeds an Equity Value Threshold.

(u)      "<u>Subsidiary</u>" means any corporation, partnership, limited liability company or other entity in which the Company owns, directly or indirectly, stock or other equity securities or interests possessing fifty percent (50%) or more of the total combined voting power of such entity.

(v)      "<u>Trading Day</u>" shall mean a full trading day (beginning at 9:30 a.m., New York City time, and ending at 4:00 p.m., New York City time) on the relevant stock exchange.

(w)    "Union Warrants" means the warrants issued in accordance with Section 2.1 of that certain warrant agreement, dated [●], 2012 by and among the Company and [●], as warrant agent, relating to the issuance of warrants to the Union Trust (as defined therein), whether issued as Book-Entry Warrant or evidenced by a Warrant Certificate (as defined therein), and any warrant issued upon transfer thereof, upon partial exercise thereof or in substitution therefor.

(x)    "Union Warrant Exercise Price" means the exercise price of the Union Warrants as in effect on the date hereof.

(y)    "VWAP" shall mean the per share daily volume weighted average price (based on a Trading Day from 9:30 a.m. to 4:00 p.m. (New York time)) of the Shares as reported by Bloomberg Financial L.P. The "VWAP" will be determined without regard to after hours trading or any other trading outside of the regular trading session trading hours.

2.    **Grant of SAR**.

(a)    The Company hereby grants to each of the Grantees, as of the Effective Date, a stock appreciation right ("SAR") in respect of a number of Shares in the amounts set forth opposite each such Grantee's name on Schedule A attached hereto with respect to each Equity Value Threshold (the "SAR Underlying Shares").  The SAR represents the right for a Grantee to receive, (i) upon the occurrence of a Liquidity Event, a cash payment equal to the Equity Value implied from the Liquidity Event, divided by the aggregate number of Shares issued and outstanding at the time of such Liquidity Event, and multiplied by the number of SAR Underlying Shares set forth opposite each such Grantee's name on Schedule A attached hereto with respect to each Equity Value Threshold, as adjusted pursuant to Section 4 below, and (ii) upon the occurrence of each Subsequent Liquidity Event, if any, a cash payment equal to (a) the Equity Value implied from the Subsequent Liquidity Event, divided by the aggregate number of Shares issued and outstanding at the time of such Liquidity Event (exclusive of any Shares delivered pursuant to this Agreement), and multiplied by the number of SAR Underlying Shares set forth opposite each such Grantee's name on Schedule A attached hereto with respect to each applicable Equity Value, minus (b) any amount previously paid (including the then-current value of any Shares previously distributed) to such Grantee pursuant to this Agreement.

(b)    In lieu of a cash payment pursuant to Section 2(a), at the election of the Company or the applicable Grantee, each in its sole discretion, the obligations under this Agreement shall be settled, in whole or in part, by delivering the applicable number of shares of Common Stock, at a purchase price of $0.001 per share of Common Stock, or the consideration which the Grantee of the applicable number of shares of Common Stock would receive in exchange for such Common Stock pursuant to the Liquidity Event.

(c)    Each Grantee agrees and understands that, except as otherwise specifically provided for in this Agreement, nothing contained in this Agreement provides, or is intended to provide, the Grantee with any protection against potential future dilution of the Grantee's interest in the Company for any reason.    No adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of any such Shares, except as otherwise specifically provided for in this Agreement.

4

3.       **Equity Purchase Option**.

(a)       If (i) a Liquidity Event has not occurred on or before the Expiration Date, or  (ii) a Public Offering has occurred but the Equity Value as of the Expiration Date is less than any Equity Value Threshold, with respect to any Underlying SAR Shares as to which a Subsequent Liquidity Event has not yet been achieved pursuant to Section 2(a)(ii) as of the Expiration Date, then each Grantee shall have the option (the "Equity Purchase Option"), at any time within ten business days following the Expiration Date, to purchase for cash the number of SAR Underlying Shares set forth opposite each such Grantee's name on Schedule A attached hereto (as adjusted pursuant to Section 4) with respect to each applicable Equity Value Threshold (the "Equity Purchase Shares") at a price per Share equal to (x) the applicable Equity Value Threshold divided by the aggregate Shares outstanding as of the Expiration Date, minus (y) if a Public Offering has occurred prior to the Expiration Date, the simple arithmetic average of each Trading Day's VWAP for the preceding 15 Trading Days, prior to and including the Expiration Date (and otherwise, zero).

If a Public Offering has occurred prior to the Expiration Date, in lieu of paying all or any portion of the applicable price per Share in cash pursuant to this Section 3(a), such Grantee may instead elect to authorize the Company to withhold a number of Equity Purchase Shares which, when multiplied by the public price per Share as of the close of business on the Expiration Date, is equal to the portion of the purchase price which the Grantee elects not to pay in cash.

(b)       The cash payment, if any, for any Shares delivered pursuant to this Section shall be made in United States dollars by certified or official bank check payable to the Company, or by wire transfer to an account specified in writing by the Company to such Grantee in immediately available funds in an amount equal to the aggregate cash amount payable for such Shares.

4.       **Adjustments to Number of Shares and/or Equity Value Threshold**

(a)       If after the Effective Date, the Company shall (i) declare a dividend or make a distribution on the Common Stock payable in Common Stock, (ii) subdivide, reclassify or recapitalize a class of outstanding Common Stock into a greater number of shares, (iii) combine, reclassify or recapitalize a class of outstanding Common Stock into a smaller number of shares, or (iv) issue any shares of its capital stock by reclassification of its Common Stock, the SAR Underlying Shares and the Equity Purchase Shares at the time of the record date of such subdivision, combination, reclassification or issuance shall be adjusted so that each Grantee shall be entitled to receive the aggregate number and kind of shares which, if the SAR or Equity Purchase Option had been exercised in full immediately prior to such event, the Grantee would have owned upon such exercise and been entitled to receive by virtue of such subdivision, combination, reclassification or issuance. Any adjustment required by this Section shall be made successively immediately after the effective date of such subdivision, combination, reclassification or issuance to allow the purchase of such aggregate number and kind of shares.

(b)       Other than in the event of an adjustment to the Union Warrant Exercise Price as a result of an event giving rise to an independent adjustment to the Equity Value

Threshold or the SAR Underlying Shares, in the event of a reduction of the Union Warrant Exercise Price, each Equity Value Threshold shall be reduced proportionately.

(c)    If on or after the Effective Date, the Company shall issue Common Stock (other than Common Stock issued pursuant to the Management Equity Incentive Plan, this Agreement or the Union Warrants) (or rights, warrants or other securities exercisable or convertible into or exchangeable into such Common Stock, or stock appreciation rights or other rights to receive payments based upon the value of Common Stock ("Common Stock Equivalents") (collectively, the "Additional Common Stock") at a price per Share less than the Equity Value per Share as of the date of such issuance (a "<u>Below Market Issuance</u>"), then each Equity Value Threshold shall be reduced to the number (the "Adjusted Equity Value Threshold") determined by multiplying the applicable Equity Value Threshold then in effect by a fraction, the numerator of which is the sum of (a) the total outstanding Common Stock on a fully diluted basis immediately preceding such Below Market Issuance plus (b) the number of shares of Additional Common Stock (treating Common Stock Equivalents as having been fully exercised or converted) which the aggregate consideration received by the Company in the Below Market Issuance would purchase at a price per share equal to the Equity Value as of the date immediately prior to such Below Market Issuance and the denominator of which is the total outstanding Common Stock on a fully diluted basis immediately after such Below Market Issuance.  In the event of a Below Market Issuance, the SAR Underlying Shares and the Equity Purchase Shares shall each also be increased to the number obtained by dividing (x) the product of the number of SAR Underlying Shares or Equity Purchase Shares, as applicable, before such adjustment and the Equity Value Threshold in effect immediately prior to the Below Market Issuance by (y) the Adjusted Equity Value Threshold. For purposes of this Section 4(c), (i) the consideration received by the Company shall not be deemed reduced by any underwriting or placement agency fees, discounts, commissions and expense, (ii) the value of any non-cash portion of the consideration shall be deemed to be the fair market value of such consideration as determined in good faith by the majority of the Independent Board Members and (iii) to the extent the Below Market Issuance consists of the issuance of Common Stock Equivalents, the consideration received by the Company shall be deemed to include the additional consideration that would payable to the Company upon the eventual exercise, conversion or exchange of such Common Stock Equivalent.  For purposes of this Section 4(b), any issuance of Common Stock to an independent third party who prior to such issuance was not a beneficial or record holder of any securities of the Company or a creditor of the Company shall be conclusively presumed not to be a Below Market Issuance For the avoidance of doubt, no increase in any Equity Value Threshold or reduction in the number of Shares issuable upon exercise of the SAR or the Equity Purchase Option shall be made pursuant to this Section 4(c) (or Sections 4(b)-(e)).

(d)    If after the Effective Date , the Company shall issue Common Stock pursuant to the Management Equity Incentive Plan (any such event being herein called a "<u>Common Stock Issuance</u>"), the SAR Underlying Shares and the Equity Purchase Shares shall be increased to a number determined by multiplying the SAR Underlying Shares and the Equity Purchase Shares then in effect by a fraction, the numerator of which shall be the total outstanding Common Stock of Company immediately following such Common Stock Issuance, and the denominator of which shall be the total outstanding Common Stock of Company immediately preceding such Common Stock Issuance.  Any adjustment required by this Section shall be made successively immediately after the date of such Common Stock Issuance.

(e)     If the Company takes any action affecting the SARs or the Equity Purchase Option, other than actions described in Sections 4(a)-(d), which in the opinion of the Board would adversely affect the exercise rights of a Grantee, the Equity Value Threshold, the SAR Underlying Shares or the Equity Purchase Shares shall be adjusted for the Grantee's benefit, to the extent permitted by law, in such manner, and at such time, as such Board shall reasonably determine to be equitable in the circumstances.  Failure of the Board to provide for any such adjustment will be evidence that the Board has determined that it is equitable to make no such adjustments in the circumstances.

(f)     Upon every adjustment of the Equity Value Threshold, the SAR Underlying Shares or the Equity Purchase Shares, the Company shall give written notice thereof to each Grantee, which notice shall state the Equity Value Threshold and number of SAR Underlying Shares and Equity Purchase Shares (as the case may be) resulting from such adjustment and shall set forth in reasonable detail the method of calculation and the facts upon which such calculation is based. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. Such giving of notice shall be initiated at least ten (10) Business Days prior to the date fixed as an effective date or the date of closing of the Company's register of members for the determination of the shareholders entitled to such issuance.   Such notice shall specify such record date or the date of closing of the register of members, as the case may be. Failure to provide such notice shall not affect the validity of any action taken in connection with such issuance or other proposed transaction. For the avoidance of doubt, no such notice shall supersede or limit any adjustment otherwise called for hereby by reason of any event as to which notice is required by this Section 4.  Upon each determination of Equity Value hereunder, the Company shall promptly give notice thereof to each Grantee, setting forth in reasonable detail the calculation of such Equity Value, and the method and basis of determination thereof.  At least five (5) Business Days prior to taking any action that would give rise to an adjustment of the Equity Value Threshold, the SAR Underlying Shares or the Equity Purchase Shares, the Company shall give written notice thereof to each Grantee, which notice shall state the anticipated Equity Value Threshold, SAR Underlying Shares and the Equity Purchase Shares (as the case may be) that would result from such adjustment and shall set forth in reasonable detail the relevant action, method of calculation and the facts upon which such calculation is based.

(g)     Notwithstanding any provision contained in this Agreement to the contrary, the Company shall not issue fractional shares upon exercise of the SAR or the Equity Purchase Option. If, by reason of any adjustment made pursuant to this Section 3, any Grantee would be entitled, upon the exercise of the SAR or the Equity Purchase Option, to receive a fractional interest in a Share, the Company shall, upon such exercise, round up to the nearest whole number the number of Shares to be issued to such Grantee or issue cash for the value of such fractional shares, as reasonably determined by the Board.

5.     **Exercise**.

(a)     Exercise.   This SAR shall be triggered automatically upon, or in connection with, the occurrence of a Liquidity Event or, as applicable, Subsequent Liquidity Event.  The Company shall give each Grantee prompt written notice of any Liquidity Event or Subsequent Liquidity Event, and any payment required by Section 2(a) shall become

immediately payable thereupon, and due within five (5) Business Days of the occurrence of the Liquidity Event or Subsequent Liquidity Event; provided, the Company or the applicable Grantee may exercise the election described in Section 2(b) at any time during such five (5) Business Day Period by delivery of written notice to the other.

(b)    Expiration.  Unless earlier terminated in accordance with the terms and provisions of this Agreement, all portions of the SAR shall expire and shall no longer be exercisable upon the Expiration Date (but subject to the rights in Section 3(a)).

6.    [Reserved].

7.    **Non-Transferability**.  The SAR, and any rights and interests with respect thereto, issued under this Agreement shall not be sold, exchanged, transferred, assigned or otherwise disposed of in any way by any Grantee, unless such Grantee shall transfer all of its rights hereunder to not more than three individual persons (or groups of affiliated persons who agree to be represented, in dealing with the Company, by a single person).  Any attempt to sell, exchange, transfer, assign or otherwise dispose of in any way the SAR, or the levy of any execution, attachment or similar legal process upon the SAR, contrary to the terms and provisions of this Agreement shall be null and void and without legal force or effect.

8.    **Administration.** It shall be the duty of the Company to administer this Agreement in accordance with this Agreement's provisions.  The Company shall adopt such procedures as it deems necessary to effectuate the grant of the SAR and related rights to the Grantees in accordance with this Agreement, including the provision of issuance of additional Shares to the extent required pursuant to Section 2(b).

9.    **No Rights as Stockholder Conferred by this Agreement or Granted SARs.**  No SAR granted hereunder and nothing contained in this Agreement shall be construed to, entitle the Grantee or any beneficial owner of a SAR (in each case solely in its capacity as a Grantee) to any of the rights of a registered holder or beneficial owner of Shares, including, without limitation, the right to receive (as a shareholder) any dividends or distributions paid with respect to Shares, the right to vote or to consent or to receive notice as a shareholder of the Company with respect to the election of directors of the Company or any other matter with respect to which shareholders of the Company are entitled to vote or consent or receive notice, or any other rights whatsoever as shareholders of the Company; provided, that the Second Lien Lenders shall be deemed a party to the Stockholders Agreement, and have all the rights and privileges attendant thereto as if a Stockholder (as defined under the Stockholders Agreement) thereunder, solely with respect to Sections 1.4, 3.2, 4.1, 4.2 and 4.3 thereof.

10.    **Securities Law Restrictions.**    The SAR rights contained herein were granted in reliance upon an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code.  Such rights were not and the SAR will not be registered under the Securities Act or any state securities law, and to the extent a holder of the SARs is an "underwriter" under the Securities Act, the SARs may not be sold or transferred in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.  Each Grantee understands and acknowledges that federal and state securities laws govern and restrict such Grantee's right to offer, sell or

otherwise dispose of any of Shares issued hereunder unless such Grantee's offer, sale or other disposition thereof is registered under the Securities Act, and state securities laws or such offer, sale or other disposition is exempt from registration thereunder.    Each Grantee further understands that any Shares issued hereunder shall bear a legend as set forth in the Stockholders Agreement or such other legends as the Company reasonably deems necessary or desirable in connection with the Securities Act or other applicable rules, regulations or laws.

11.    **Limitations of Share Ownership by Non-Citizens.** Notwithstanding the other provisions of this Agreement, in order to facilitate the Company's compliance with the provisions of Subtitle VII of Title 49 of the United States Code, as amended, or as the same may be from time to time amended, and the administrative interpretations issued by the Department of Transportation, its predecessors and successors, from time to time (the "Act"), concerning the ownership of its Common Stock by Non-Citizens:

(a)    in connection with any exercise of the SAR, a Grantee (or, if not the Grantee, the Person that the Grantee has designated to receive the Shares issuable upon any exercise of the SAR) shall advise the Company whether or not it satisfies the requirements to be a Citizen of the United States. Under its By-laws, the Company may require a Grantee (or, if not the Grantee, the Person that the Grantee has designated to receive the Shares issuable upon any exercise of the SAR) to provide it with such documents and other information as it may request as reasonable proof of that the Grantee (or, if not the Grantee, such other Person that the Grantee has designated to receive the Shares issuable upon any exercise of the SAR) satisfies the requirements to be a Citizen of the United States.

(b)    if a Grantee can establish to the Company's reasonable satisfaction that it (or, if not the Grantee, such other Person that the Grantee has designated to receive the Shares issuable upon any exercise of the SAR) is a U.S. Citizen for purposes of Act compliance, then such Grantee may, pursuant to the terms of this Agreement, receive [Class A Common Stock] upon any exercise of the SAR, to the extent the receipt of [shares of Class A Common Stock] deliverable upon any exercise of the SAR would comply in all respects with the Company's By-Laws.

(c)    if a Grantee cannot establish to the Company's reasonable satisfaction that it (or, if not the Grantee, such other Person that the Grantee has designated to receive the Shares issuable upon any exercise of the SAR) is a U.S. Citizen for purposes of Act compliance, then such Grantee may, pursuant to the terms of this Agreement, only receive [shares of Class C Common Stock] upon any exercise of the SAR to the extent the receipt of [shares of Class C Common Stock] deliverable upon any exercise of the SAR would comply in all respects with the Company's By-Laws.

12.    **Restricted Payments.**    For so long as the SAR shall be in effect, the Company shall not declare, pay or make any dividends or distributions (whether in assets, cash or other property of the Company) to holders of Common Stock, nor purchase or redeem any Common Stock, other than (i) dividends or distributions described in Section 4(a) and (ii) purchases or redemptions of Common Stock held by present or former directors, consultants, officers or employees of the Company or any of its Subsidiaries (other than shares of Common

9

Stock directly or indirectly transferred to such persons by shareholders of the Company) upon such person's death, disability, retirement or termination of employment.

13.    **Governing Law**.  All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the choice of law principles thereof.

14.    **Jurisdiction; Waiver of a Jury Trial.**  Each of the parties agrees that any dispute between the parties shall be resolved only in the Bankruptcy Court or the other federal courts of the United States of America located in the City and County of New York or the courts of the State of New York in each case located in the City and County of New York and the appellate courts having jurisdiction of appeals in such courts.  In that context, and without limiting the generality of the foregoing, each of the parties hereto irrevocably and unconditionally (a) submits in any proceeding relating to this Agreement (a "Proceeding"), to the exclusive jurisdiction of the Bankruptcy Court and the other federal courts of the United States of America located in the City and County of New York or the courts of the State of New York in each case located in the City and County of New York, and appellate courts having jurisdiction of appeals from any of the foregoing, and agrees that all claims in respect of any such Proceeding shall be heard and determined in any such court or, (b) consents that any such Proceeding may and shall be brought in such courts and waives any objection that such Grantee(s) or the Company may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court and agrees not to plead or claim the same, (c) waives all right to trial by jury in any Proceeding (whether based on contract, tort or otherwise) arising out of or relating to this Agreement or the Grantees' or the Company's performance under, or the enforcement of, this Agreement, (d) agrees that service of process in any such Proceeding may be effected by mailing a copy of such process by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at the Grantees' or the Company's address as provided in Section 16 hereof, and (e) agrees that nothing in this Agreement shall affect the right to effect service of process in any other manner permitted by the laws of the State of New York.

15.    **Entire Agreement; Amendment**.  This Agreement contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  This Agreement may only be modified or amended by a writing signed by both the Company and the Grantees; provided, however, that this Agreement may be amended, modified, supplemented by the Company to correct any technical defect(s) or technical omission(s), reconcile any technical inconsistency(ies) in this Agreement or make any changes necessary to conform this Agreement to the provisions of the Plan.

16.    **Notices**.  Any notice hereunder by a Grantee shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to a Grantee in writing and such notice shall be deemed duly given only upon receipt thereof at such address as such Grantee may have on file with the Company.

17.     **Binding Agreement; Assignment**.   This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns. No Grantee shall assign any part of this Agreement without the prior express written consent of the Company.

18.     **Headings**.    The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

19.     **Counterparts**.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

20.     **Further Assurances**.   Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated thereunder.

21.     **Severability**.   The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**GLOBAL AVIATION HOLDINGS INC.**

By:_____

Name:_____

Title:_____


**GRANTEES**


_____


*SAR AGREEMENT SIGNATURE PAGE*

**SCHEDULE A**

NUMBER OF SHARES TO BE ISSUED IF THE EQUITY VALUE IS (in $ million):

| GRANTEE | 103.5 | 113.5 | 123.5 | 133.5 | 143.5 | 153.5 | 163.5 | 173.5 | 183.5 | 183.5 | 203.5 | 213.5 | 223.5 | 233.5 | 243.5 | 253.5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Exhibit P**

**Identity of the Members of the New Boards**

## List of Members of the New Boards

Pursuant to the terms of the Plan, the New Global Aviation Board will include a slate of nine directors, including the Chief Executive Officer of Global Aviation, Robert R. Binns.  The remaining members of the New Boards will be chosen through a process led by the Board Selection Committee, which will consist of the Chief Executive Officer of Global Aviation, a representative of the Ad Hoc Group of Senior Secured Noteholders and a representative of the Qualifying Represented Employees or Non-Executive, Non-Represented Employees.  The Board Selection Committee may, at its election, retain a qualified search firm, paid for by the Debtors, to identify director candidates.    To the extent that the members of the New Boards are selected before the Effective Date, the Debtors will file a revised list of members of the New Boards with the Bankruptcy Court.

K&E 24434829.1